UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

SEVERN PEANUT CO, INC.,
MEHERRIN AGRICULTURE &
CHEMICAL CO., and TRAVELERS
PROPERTY CASUALTY COMPANY
OF AMERICA as Subrogee of Severn
Peanut Co., Inc. and Meherrin Agriculture
& Chemical Co.,

           Plaintiffs,

vs.

INDUSTRIAL FUMIGANT CO. and
ROLLINS INC.,

           Defendants.

DOCKET NO. 2:11-cv-00014-BO

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE PLAINTIFFS' POST-DISCLOSURE EXPERT TESTING AND SUPPLEMENTAL REPORTS AND OPINIONS

Defendants Industrial Fumigant Co. ("IFC") and Rollins, Inc. ("Rollins"), by and through counsel, and pursuant to Rule 37(c)(1) of the Federal Rules of Civil Procedure, hereby supply their memorandum of law in support of their motion to exclude Plaintiffs' post-disclosure expert testing and supplemental reports and opinions.

## NATURE OF THE CASE AND SUMMARY OF RELEVANT FACTS

This case arises out of a fire that destroyed Plaintiff Severn Peanut Company's ("SPC's") dome-shaped peanut storage warehouse and the approximately 21 million pounds of peanuts it stored at the time of the fire. Plaintiffs contend that IFC's pesticide applicators improperly fumigated the warehouse by "piling" Fumitoxin tablets[1] on the surface of the peanut pile rather than distributing the tablets across the surface; they contend that such piling caused an intense

---

[1] Fumitoxin is the brand name of the aluminum phosphide tablets the IFC applicators applied to the Severn peanut dome on August 4, 2009. The tablets are intended to interact with the humidity in the air to produce phosphine gas, which then eradicates the targeted pests.

chemical reaction and, ultimately, the fire. Defendants contend that SPC improperly stored and monitored the peanuts and that such improper storage and monitoring resulted in excess moisture, mold growth, heat, and ultimately, the fire.

On February 21, 2013, this Court entered an order extending the scheduling deadlines, such that Plaintiffs' expert disclosures and reports were due May 1, 2013 and Defendants' expert disclosures and reports were due June 26, 2013; depositions could occur only after Defendants' disclosures. (DE #53). Discovery is set to close on October 28, 2013 and dispositive motions are due on November 27, 2013. (*Id.*)

In accordance with the scheduling order, and pursuant to Rule 26(a)(2), on May 1, 2013, Plaintiffs disclosed four retained, testifying expert witnesses:

- **Lester V. Rich**, who will testify as the origin and cause of the fire at issue;
- **John L. Schumacher**, who will testify as to the origin and cause of the fire at issue;
- **Dr. Steve L. Brown**, who will testify in the fields of fumigation in stored agricultural commodities, as well as agricultural and environmental sciences, entomology and pesticide education; and
- **John B. Mueller**, who will testify in the field of fumigation of stored agricultural commodities, as well as commodity storage.

Pls.' Discl. Expt. Witnesses (attached hereto as Ex. A). The expert reports of these retained experts were attached to Plaintiffs' disclosures as Exhibits 1-4 respectively. (*See* Ex. A., Exs. 1-4).

Notably, all four of Plaintiffs' retained experts have opined that IFC's applicators improperly piled the Fumitoxin tablets on the surface of the peanut pile. *See* Rich Expt. Rpt. pp. 15, 18; Schumacher Expt. Rpt. pp. 12-14; Brown Expt. Rpt. pp. 6-8; Mueller Expt. Rpt. pp. 7-9.

2

These opinions are not, however, supported by any testing or demonstrations of how Fumitoxin tablets dropped from 20-25 feet[2] would actually distribute across a massive commodity pile and that such distribution would result in piling of the tablets.

In accordance with the scheduling order, and pursuant to Rule 26(a)(2), on June 26, 2013, Defendants disclosed eight retained, testifying expert witnesses:

- **Dr. Carol L. Jones**, who will testify in the fields of fumigation of stored agricultural commodities, commodity storage, biosystems engineering, and agricultural engineering;

- **Dale C. Mann**, who will testify in the field of forensic and analytical chemistry;

- **Dr. Michael D. Montross**, who will testify in the fields of commodity storage, biosystems engineering, and agricultural engineering;

- **Rodney M. Nohr**, who will testify in the fields of commodity storage, biosystems engineering, and agricultural engineering;

- **Dr. Sean Francis O'Keefe**, who will testify in the fields of food science technology and the chemistry and quality of peanuts;

- **Dennis Ryman**, who will testify in the fields of fumigation of stored agricultural commodities and the chemical properties and characteristics of Fumitoxin;

- **David B. South**, who will testify regarding the properties and attributes of monolithic dome structures; and

- **John D. Walker**, who will testify as to the origin and cause of the fire at issue.

Defs.' Discl. Expt. Witnesses (attached hereto as Ex. B). The reports of these experts were attached to Defendants' disclosures as Exhibits 1-8 respectively. (*See* Ex. B., Exs. 1-8). Several of Defendants' expert reports are critical of Plaintiffs' experts' opinions that the IFC applicators'

---

[2] There is general agreement between the parties that IFC's applicators applied the Fumitoxin tablets from a 15-inch by 41-inch opening in the dome roof, some 20-25 feet above the peak of the peanut pile.

method of application necessarily resulted in piling. *See* Jones Expt. Rpt. pp. 17-18; Mann Expt. Rpt. pp. 8, 11; Ryman Expt. Rpt. pp. 2-3; Walker Expt. Rpt. p. 21. For example, Mr. Ryman stated:

> To the extent SPC's experts opine that the method of application employed by the IFC applicators necessarily resulted in the piling or stacking of tablets, their opinion constitutes nothing more than speculation. There is nothing in their reports indicating that they performed any testing or located any previously conducted tests or literature which supports their opinion and, in my opinion, their opinion is inconsistent with what would have happened to the tablets [IFC's applicators] broadcast into the peanut dome on August 4, 2009.

Ryman Expt. Rpt. pp. 2-3.

Defendants took the deposition of Mr. Rich on July 30, 2013. He conceded that he had not undertaken any physical testing to support his conclusion that the method of application utilized by the IFC applicators would have resulted in piling of the tablets. Rich Dep. p. 262 (attached hereto as Ex. C). He further testified that he did not have any plans to perform any additional work on this case prior to trial. *Id.* p. 316. On August 2, 2013, Defendants took the deposition of Dr. Brown. He testified that he had not done any testing to support his opinion that the IFC applicators piled Fumitoxin tablets and was instead relying solely on his "experience" to support that opinion. *See* Brown Dep. pp. 55-58 (attached hereto as Ex. D). Defendants took the deposition of Mr. Mueller on August 13, 2013. When asked whether he had done any testing to support his opinion that the IFC applicators must have piled the tablets, he testified that he was relying on "[j]ust my experience." Mueller Dep. p. 98 (attached hereto as Ex. E). He did not identify any further work he intended to undertake on this case prior to trial. *Id.* p. 140.

Defendants served their notice to take the deposition of Mr. Schumacher on July 29, 2013 (attached hereto as Ex. F); his deposition was noticed for September 12, 2013. On September 6, 2013, Plaintiffs served on Defendants a second supplemental expert report of Mr. Schumacher (attached hereto as Ex. G). In that report, Mr. Schumacher stated that on September 4, 2013 –

4

*over four months after his expert report was due* – he took part in and witnessed demonstrations in Memphis, Tennessee of Fumitoxin tablets being dispensed from flasks onto the surface of a peanut pile. His second supplemental report states that "[t]hese demonstrations provide additional support for my previously expressed opinion that the manner in which Industrial Fumigant Company applied the Fumitoxin tablets to the Severn dome resulted in one or more piles on the surface of the peanuts." (Ex. G, Ex. 1). Plaintiffs also disclosed four pages of Mr. Schumacher's field notes taken during the September 4, 2013 testing and over 100 photographs (attached hereto as Exs. H & I).

On September 12, 2013, Defendants took Mr. Schumacher's deposition. He was asked whether he did any testing subsequent to issuing his expert report on April 30, 2013. He replied: "[m]ore like demonstrations, yeah." Schumacher Dep. p. 64 (attached hereto as Ex. J). He testified that:

> I wanted to actually play with the Fumitoxin tablets and flasks and peanuts and see how they would be distributed in a situation that [the IFC applicators] were under when they were trying to distribute these tablets inside the dome or into the dome.
>
> . . .
>
> I believe I created a condition that **bolsters my opinion** that when you distribute these things, you get a very large concentration of tablets directly below where they're applying them . . . .

*Id.* pp. 64-65 (emphasis added). When asked why he felt it necessary to engage in such post-report testing, Mr. Schumacher stated "[b]ecause I wanted to see it. That's what I thought would happen, and that was my opinion. And I wanted to see it and confirm that even more." *Id.* p. 65. The testing was authorized by and paid for by Plaintiffs' counsel. *Id.* p. 67.

Mr. Schumacher testified that during the testing, the Fumitoxin tablets were applied through a simulated 15" x 40" opening by turning the flasks upside down. *Id.* pp. 81-86. This

5

was done both onto a flat surface of peanuts and a mounded pile of peanuts. *Id.* pp. 87-91. Three of Plaintiffs' four testifying experts participated in this testing: Mr. Schumacher, Mr. Rich, and Mr. Mueller. *Id.* p. 91:

> Q. All right. So three of the four experts for the plaintiffs in this case, over four months after the expert report deadline, were out doing testing on what happens when you drop Fumitoxin tablets from above a pile of peanuts; am I accurate?
>
> A. Three of the four experts were doing demonstrations, yes, of this phenomenon. Exactly.
>
> Q. Four-plus months after you were required to issue your expert reports in this case, correct.
>
> A. Right.
>
> Q. Okay. ***Any reason that didn't happen prior to the time you were required to issue your expert report in this case?***
>
> A. ***No reason.***
>
> Q. Any reason that you felt it was a good idea to do it after you issued your expert report in this case?
>
> A. I just wanted to see the peanuts and how the tablets landed on them, how the tablets came out of the flasks, and it was consistent with what I thought was going to happen.

*Id.* pp. 91-92 (emphasis added). Mr. Schumacher testified that in addition to the photographs he took, and provided to Defendants' counsel, Mr. Rich also took photographs and video of the September 4 testing, *id.* pp. 94, 98, which Plaintiffs' counsel first agreed to make available to Defendants' counsel following Mr. Schumacher's deposition. *Id.* pp. 98-99. Once learning that there were additional materials associated with Plaintiffs' experts' September 4 testing which had not been produced prior to Mr. Schumacher's deposition, Defendants' counsel ceased questioning Mr. Schumacher regarding the September 4 testing. *Id.* p. 99.

On September 23, 2013, Plaintiffs disclosed a second supplemental expert report of Mr. Rich, (attached hereto as Ex. K), in which Mr. Rich stated:

6

> Since issuing my initial report dated April 30, 2013, I have conducted a visit with Mr. Mueller at his facility in Memphis, TN and participated in a demonstration of the application and use of Fumitoxin® and Weevilcide®, both Aluminum Phosphide fumigants.
>
> This additional information provides further support for my original opinions, as outlined in my April 30, 2013 report.

(*Id.*, Ex. 1). On September 20, 2013 – eight days after Mr. Schumacher's deposition – Plaintiffs produced to Defendants 184 photographs and videos Mr. Rich filmed regarding the September 4, 2013 testing (attached hereto as Ex. L[3]).

## ARGUMENT

### I. PLAINTIFFS' EXPERTS' POST-REPORT TESTING IS NOT PERMISSIBLE SUPPLEMENTATION OF THEIR EXPERT REPORTS AND SHOULD THEREFORE BE EXCLUDED FROM EVIDENCE.

#### A. Expert Witnesses May Not Perform Post-Report Testing to Bolster Their Opinions Under the Guise of Rule 26(e) Supplementation.

The disclosure of expert testimony is governed by Rule 26(a)(2), which provides that an expert report must contain, in pertinent part:

(i) a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii) the facts or data considered by the witness informing them;

(iii) any exhibits that will be used to summarize or support them;

Fed. R. Civ. P. 26(a)(2)(B). An expert report may be supplemented pursuant to Rule 26(e) only when the original report was "defective in some way so that the disclosure was incorrect or incomplete and, therefore, misleading." *Akeva L.L.C. v. Mizuno Corp.*, 212 F.R.D. 306, 310 (M.D.N.C. 2002).

---

[3] Pursuant to the Court's practices and procedures, Defendants are filing simultaneously herewith their Motion for Leave to File Videos.

In this case, as Mr. Schumacher testified, the testing in which he, Mr. Rich, and Mr. Mueller participated on September 4, 2013 – *over four months after Plaintiffs' expert disclosure deadline* – was for the purpose of "bolster[ing my] opinion," Schumacher Dep. pp. 64-65, not to correct an incomplete or misleading disclosure.[4] The permissible time for such testing, however, expired on May 1, 2013, the date Plaintiffs' expert reports were due.

Counsel for Defendants could not locate a single case in any district court in which such post-report testing was permitted as "supplementation" of an expert's initial report. Every district court that has addressed this situation in a published decision has found such supplementation improper. The case most frequently cited on this point is the *Akeva* case from the Middle District of North Carolina. In *Akeva*, several expert reports were produced to support the plaintiff's contention that the defendant's athletic shoe infringed its patents. One of the plaintiff's experts, Mr. Fredericksen, performed testing which was discussed in his September 3, 2002 expert report. 212 F.R.D. at 308. The defendant identified a Dr. Pourdeyhimi, who performed a different type of test. His report was produced on or about October 7, 2002. *Id.* On November 18, 2002 – over two months after the plaintiff's expert disclosure deadline – the plaintiff notified the defendant of its intent to "supplement" Fredericksen's report with the results of an additional test to be conducted at Michigan State University three days thereafter. *Id.*

Defendant contended that Fredericksen's post-report testing and supplementation was untimely and violated Rule 37(c)(1). *Id.* Rule 37(c)(1) provides:

> (1) *Failure to Disclose or Supplement*. If a party fails to provide information or identify a witness as required by Rule 23(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is

---

[4] Similarly, in his second supplemental report, Mr. Rich stated that the September 4 testing "provides further support for my opinions, as outlined in my April 30, 2013 report." (Ex. K, Ex. 1).

8

harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

(A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

(B) may inform the jury of the party's failure; and

(C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Fed. R. Civ. P. 37(c)(1).

The plaintiff in *Akeva* contended that Fredericksen's new testing was permitted as supplementation of his original expert report pursuant to Rule 26(e)(1), which, as the plaintiff pointed out, "only requires disclosures at least thirty days prior to trial and, thus, the new Fredericksen test was timely disclosed." 212 F.R.D. at 309. Rule 26(e) provides:

**(1)** *In General*. A party who has made a disclosure under Rule 26(a) – or who has responded to an interrogatory, request for production, or request for admission – must supplement or correct its disclosure or response:

(A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or

(B) as ordered by the court.

**(2)** *Expert Witness.* For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pre-trial disclosures under Rule 26(a)(3) are due.[5]

The defendant contended that the Fredericksen supplemental report was not supplemental at all, and should have been disclosed at the time of his initial report; his failure to do so, the defendant

---

[5] "Unless the court orders otherwise, these disclosures must be made at least 30 days before trial." Fed. R. Civ. P. 26(a)(3)(B).

argued, caused it prejudice in necessitating additional depositions and possibly the retention of an additional expert witness. 212 F.R.D. at 309.

Magistrate Judge Eliason agreed with the defendant's position, finding that "Mr. Fredericksen's additional opinion does not constitute supplementation. . . . The Court cannot accept a definition of supplementation which would essentially allow for unlimited bolstering of expert opinions." *Id.* at 310. Rather, Rule 26(e) envisions supplementation only "when a party's discovery disclosures happen to be defective in some way so that the disclosure was incorrect or incomplete and, therefore, misleading. It does not cover failures of omission because the expert did an inadequate or incomplete preparation." *Id.* Magistrate Judge Eliason noted further that permitting supplementation to bolster an expert opinion would wreak "havoc in docket control and amount to unlimited expert opinion preparation." *Id.* He found Fredericksen's second test to be a mere "out-of-time disclosure" rather than proper supplementation. *Id.* He concluded that the "disruption caused by the proliferation of untimely expert testimony is real and attorneys must know such will not be permitted." *Id.* at 312; *see also Gallagher v. Southern Source Packaging, LLC*, 568 F. Supp. 2d 624, 630-31 (E.D.N.C. 2008) ("[s]upplementation of an expert report permits a party to correct inadvertent errors or omissions" and does not afford a right 'to produce information in a belated fashion'" (quoting *Reid v. Lockheed Martin Aeronautics Co.*, 205 F.R.D. 655, 662 (N.D. Ga. 2001)).

The Honorable Martin Reidinger addressed a similar situation in *Snoznik v. Jeld-Wen, Inc.*, 2010 U.S. Dist. LEXIS 46814 (W.D.N.C. May 12, 2010) (unpublished and attached). Mr. Snoznik was injured when he fell out of a casement window manufactured by the defendant. He designated Dr. Bryan Durig as an expert in window design. In his June 1, 2009 report, Dr. Durig opined that the window was defective due to a lack of a safety screw or spring-loaded ball and

that there was an economically feasible alternative design that would have prevented Mr. Snoznik's accident. *Id.* at *14-15. One such design would have been to use a safety screw in the safety screw hole of the hinge track. *Id.* at *15. The defendant window manufacturer filed a *Daubert* motion to preclude Dr. Durig's testimony, contending in part that Dr. Durig had failed to test any of his proposed alternative designs. *Id.* at *20. In response to the motion, Dr. Durig submitted an affidavit averring that following his July 2009 deposition, he tested the alternative safety screw design and "that the results of this testing confirm the opinions that he expressed in his original report." *Id.*

The defendant moved to strike Dr. Durig's affidavit, contending it was merely an attempt to bolster his opinions; the plaintiffs countered that his affidavit constituted proper supplementation. *Id.* at *21. Relying on the *Gallagher* case from the Eastern District, and *Akeva* case from the Middle District, Judge Reidinger noted that supplementation of expert reports is permitted solely "to correct inadvertent mistakes or omissions" and that allowing supplementation of the sort sought by the plaintiffs "'would create a system where preliminary reports could be followed by supplementary reports and there would be no finality to expert reports[.]'" *Id.* at *22 (quoting *Beller ex rel. Beller v. United States*, 221 F.R.D. 696, 701 (D.N.M. 2003)). Turning to the facts before him, Judge Reidinger observed:

> In the present case, Dr. Durig's affidavit offers new opinions and testing to support his previously disclosed opinions. It is evident from the nature of Dr. Durig's supplemental testimony that the Plaintiffs submitted this affidavit not in an effort to correct an inadvertent mistake or omission in Dr. Durig's report but in an attempt to bolster Dr. Durig's opinions so that he may withstand the Defendant's *Daubert* challenge. Dr. Durig's affidavit is not a timely supplementation as permitted under Rule 26(e); it is a new, but untimely, expert disclosure.

*Id.* at *23.

Judge Reidinger concluded that the opinions and testing disclosed in Dr. Durig's affidavit should be excluded. *Id.* at *25. Though the plaintiffs insisted that Dr. Durig's affidavit merely confirmed the validity of his prior opinions, "the Plaintiffs offer no explanation as to why such testing could not have been performed much earlier so that the test results could have been disclosed and fully discovered by the Defendant." *Id.* Judge Reidinger observed that the defendant had already produced experts to respond to and rebut Dr. Durig's opinions. *Id.* Thus, if his "additional opinions and testing were allowed, the Defendant would be required to seek supplemental reports from its rebuttal experts, and the parties would be required to undergo additional rounds of depositions[.]" *Id.* "'The factors of docket control planning are sufficiently important to alone justify the exclusion of an untimely disclosed expert report or opinion even in [the] absence of prejudice to the opposing party.'" *Id.* at *26 (quoting *Akeva*, 212 F.R.D. at 311).

The case of *Cochran v. The Brinkmann Corp.*, 2009 U.S. Dist. LEXIS 114895 (N.D. Ga. Dec. 9, 2009) (unpublished and attached) is of similar effect. *Cochran* was also a product liability case involving injuries sustained by the plaintiffs' son resulting from the use of a turkey fryer manufactured by the defendant. The plaintiffs' deadline for disclosure of expert reports was December 5, 2008; the defendants' deadline was January 5, 2009. *Id.* at *4. On December 5, 2009, the plaintiffs disclosed two experts, one of whom was Mr. Edmondson, a design defect expert. *Id.* at *4-5. The defendant took Edmondson's deposition on December 9, 2008. During his deposition, Edmondson disclosed that, two days prior to his deposition, he had conducted physical testing on the turkey fryer at issue; during the deposition, the plaintiffs also produced a video and photographs of such testing. *Id.* at *7.

On January 29, 2009, Edmondson did further testing on the fryer to address questions raised at his deposition. *Id.* at *8. The plaintiffs sent to the defendant's counsel videos and

photographs from that round of testing on February 5, 2009 and offered to make Edmondson available for further deposition. *Id.* On May 14, 2009 – over five months after their expert disclosure deadline – the plaintiffs filed a supplemental report pursuant to Rule 26(e)(2) which indicated that Edmondson was expected to testify regarding his two rounds of post-report testing. *Id.* The defendant moved to strike this supplemental report and any testimony regarding Edmondson's testing which occurred after the December 5, 2008 expert disclosure deadline. *Id.* at *11-12. It contended that Edmondson's post-report testing was improper and untimely and that it had been harmed by its inability to pursue discovery of such untimely disclosures. *Id.* at *13-14.

As was true in *Akeva* and *Snoznik*, the district judge found that such post-report testing improperly interfered with and frustrated the schedule to which the parties had agreed:

> The purpose of expert reports and a deadline for serving them is to put an opposing party on notice of what it must contend with at trial. Plaintiffs' strategy of ongoing testing and report amendment defeats the purpose of the report requirement and the order of this Court, which was to end discovery and fix for the parties the evidence and opinions with which they would have to contend at trial so a trial could be fairly and efficiently conducted. That effort would be hopelessly and unfairly frustrated if the Court allowed Plaintiffs' tactic in this case. Rule 26(e) requires a party to supplement a report it finds was "incomplete or inaccurate." It is not a device to allow a party's expert to engage in additional work, or to annul opinions or offer new ones to perfect a litigating strategy.

*Id.* at *14-15 (citation omitted). The court also found that the post-report disclosures violated Rule 26(a) because Edmondson's initial expert report did not, as Rule 26(a) requires, contain all the data and information he considered in forming his opinions or exhibits related to those opinions. "Plaintiffs undeniably failed to comply with these requirements by adding opinions and exhibits, based on new testing unforecasted to Defendant and which was undertaken weeks and months after the December 5, 2008 deadline for Edmondson's expert report. . . . Plaintiffs'

13

twisted attempt to use Rule 26(e) to justify their untimely disclosures is unprecedented, and unfair." *Id.* at *18-19.[6]

In deciding the appropriate sanction, the court noted that Rule 37(c)(1) provides that "when a 'party fails to provide information or identify a witness as required by Rule 26(a) or 26(e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.'" *Id.* at *13 (quoting Fed. R. Civ. P. 37(c)(1)). It found that the plaintiffs' failure to have Edmondson conduct his testing "before the deadline for expert reports was not substantially justified nor were the late testing and disclosures harmless." *Id.* at *19. The testing Edmondson undertook, the court observed, "is the kind of work a competent and thoughtful expert would have undertaken before offering an opinion in the first instance." *Id.* at *19 n.7. The court therefore limited the plaintiffs to the opinions and bases contained in Edmondson's December 5, 2008 report and excluded all of his post-report testing and supplemental report. *Id.* at *19-20.

Of similar effect is *Fritter v. Dafina, Inc.*, 181 F.R.D. 215 (N.D.N.Y. 1998). In that case, the defendant moved for an order allowing its expert, Mr. Gizzi, to testify regarding testing he performed after the defendant's April 16, 1998 expert disclosure deadline. *Id.* at 216. During his deposition on July 1, 1998, the defendant informed the plaintiff of testing Gizzi had performed in June 1998, two months after issuing his expert report. *Id.* Following his deposition, Gizzi conducted further testing; he provided photographs, videotapes, and test data from his two rounds of post-report testing. *Id.* The defendant contended that since the post-report testing merely confirmed Gizzi's opinions as stated in his original expert report, and because there was

---

[6] The plaintiffs attempted to justify their belated disclosure by claiming that Edmondson's additional testing was disclosed to the defendant prior to Edmondson's deposition and was addressed in his deposition. The court flatly rejected this justification, observing that "[i]t is disingenuous to claim that disclosure of an expert's additional opinions and testing the day before a deposition is anything other than an attempt to disadvantage the opposing party." *Id.* at *19 n.6.

14

insufficient time prior to the submission of his original report to perform such testing, an order was appropriate allowing him to testify regarding his post-report testing. *Id.* The court concluded that "[a]ny additional data generated by the June and July testing would be bolstering, not merely confirmatory." *Id.* at 217. It also noted several administrative difficulties which would result from allowing Gizzi to testify regarding his post-report testing, including the plaintiff's need (1) to redepose Gizzi and (2) for its expert to perform additional testing to rebut testimony arising from Gizzi's post-report testing. *Id.* Further, no reason existed why such testing could not have preceded the submission of Gizzi's April 16, 1998 report. *Id.* Consequently, the court held that Gizzi would be precluded from testifying regarding his post-report testing. *Id.* at 218.

The Fourth Circuit recently addressed similar issues in *Campbell v. United States*, 470 Fed. Appx. 153, 2012 U.S. App. LEXIS 391 (4th Cir. Jan. 9, 2012) (unpublished and attached). *Campbell* involved a tort claim against the United States based on alleged medical malpractice at a Veterans Affairs medical center. The plaintiff filed her expert designation identifying a Dr. Moffatt as her proposed expert. *Id.* at 156. She attempted to supplement his report over a month later, some six weeks following her disclosure deadline. *Id.* at 157. The plaintiff contended that her supplementation was proper because Rule 26(e) placed her under a "continuing duty" to supplement Dr. Moffatt's original report. *Id.* The Fourth Circuit rejected her position: "'To construe [Rule 26(e)] supplementation to apply whenever a party wants to bolster or submit additional expert opinions would [wreak] havoc in docket control and amount to unlimited expert opinion preparation.'" *Id.* (quoting *Sharpe v. United States*, 230 F.R.D. 452, 462 (E.D. Va. 2005)).

### B. The Testing Undertaken by Plaintiffs' Experts Over Four Months Following Their Disclosure Deadline Is Not Permissible Supplementation and Should be Excluded as Evidence.

Three general principles emerge from the cases discussed above: (1) Rule 26(e) does not permit experts to conduct post-report testing to bolster their opinions, *Akeva*, 212 F.R.D. at 310; *Cochran*, 2009 U.S. Dist. LEXIS 114895, at \*14-15; *Fritter*, 181 F.R.D. at 217; (2) under Rule 37(c)(1), exclusion of such post-report testing and/or supplemental reports is warranted if the expert could have performed such testing prior to the submission of his original expert report, *Snoznik*, 2010 U.S. Dist. LEXIS 46814, at \*25; *Cochran*, 2009 U.S. Dist. LEXIS 114895, at \*19; *Fritter*, 181 F.R.D. at 217; and (3) under Rule 37(c)(1), exclusion of such post-report testing and/or supplemental reports is also warranted if allowing the admission of such testing/reports would result in the necessity of further expert reports, depositions, and scheduling delays. *Akeva*, 212 F.R.D. at 310; *Snoznik*, 2010 U.S. Dist. LEXIS 46814, at \*25-26; *Fritter*, 181 F.R.D. at 217; *Campbell*, 470 Fed. Appx. At 157. Each of those factors compels the exclusion of Plaintiffs' experts' September 4 testing and supplemental reports.

First, both Mr. Schumacher and Mr. Rich have made clear that the purpose of the testing undertaken on September 4 was to bolster or confirm their opinion that the application of Fumitoxin tablets by the IFC applicators would have resulted in them piling on the surface of the peanut pile. *See supra* pp. 5-7. The nearly 300 photographs and videotapes taken of their testing make quite clear that they were not simply correcting errors or mistakes in their original reports. Consequently, the September 4 testing cannot be justified as Rule 26(e) supplementation.

Second, as Mr. Schumacher readily agreed, there is "no reason" why the testing he, Mr. Rich, and Mr. Mueller undertook on September 4 had not been performed prior to Plaintiffs' May 1, 2013 expert disclosure deadline such that the results of the testing could have been incorporated into their initial opinions and reports. *See supra* p. 6. It is evident that the testing

was performed to respond to the criticism of Plaintiffs' experts' failure to conduct such testing. *See supra* pp. 3-4. In that regard, this case is no different from *Akeva*, *Snoznik*, and *Cochran*.

Finally, allowing the admission of Plaintiffs' experts' September 4 testing would result in the necessity of further expert reports, depositions, and scheduling delays. Under the current scheduling order, discovery is set to close October 28, 2013. Yet if the September 4 testing information and results are permitted to bolster Plaintiffs' experts' opinions, Defendants, in fairness, will need to be provided:

- Ample time to have their experts conduct their own testing to rebut or counter such testing and then be permitted to issue their own supplemental reports; and

- An opportunity to depose Messrs. Schumacher, Rich, and Mueller regarding their September 4 testing and how they believe such testing bolsters their opinions.

As Judge Eliason explained in *Akeva*, allowing this type of post-report testing and supplementation wreaks havoc on the scheduling of a case and causes unnecessary disruption which the expert disclosure deadline is intended to avoid. 212 F.R.D. at 310, 312. Moreover, permitting such post-report testing would result in the lack of finality the expert disclosure deadline is intended to achieve. *Snoznik*, 2010 U.S. Dist. LEXIS 46814, at *22.

For all of these reasons, and pursuant to Rule 37(c)(1), Plaintiffs and their experts should be precluded from relying on any information developed from their September 4 testing because their failure to include such information in their May 1, 2013 Rule 26(a)(2) expert disclosures and initial expert reports is not "substantially justified" and is not "harmless."

## **CONCLUSION**

For all of the foregoing reasons, Defendants respectfully request that the Court enter an order excluding from evidence in this case any and all testing undertaken by Plaintiffs' expert

17

witnesses subsequent to May 1, 2013 – including but not limited to the testing they undertook in Memphis, Tennessee on or about September 4, 2013 – and any supplemental reports and/or opinions associated with such testing.

This the 8th day of October, 2013.

**POYNER SPRUILL LLP**

By: s/ Steven B. Epstein
Steven B. Epstein
N.C. State Bar No. 17396
Email: sepstein@poynerspruill.com
301 Fayetteville Street, Suite 1900
Raleigh, NC 27601
Telephone: 919.783.2846
Facsimile: 919.783.1075
*Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

  I hereby certify that I have this day electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel and parties of record as follows:

    Howard M. Widis, Esq.
    Quick, Widis & Nalibotsky, PLLC
    2115 Rexford Rd., Suite 100
    Charlotte, NC 28211
    Email: hwidis@qwnlaw.com

This the 8th day of October, 2013.

            s/ Steven B. Epstein
            Steven B. Epstein