```
              IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF NORTH CAROLINA
                      NORTHERN DIVISION
   _____
                                      |
   SEVERN PEANUT CO., INC.,           |
   MEHERRIN AGRICULTURE &             |
   CHEMICAL CO., and TRAVELERS        |
   PROPERTY CASUALTY COMPANY          |
   OF AMERICA as Subrogee of          |
   Severn Peanut Co., Inc., and       |
   Meherrin Agriculture &             |         DOCKET NO.:
   Chemical Co.,                      |
                                      |      2:11-cv-00014-BO
             Plaintiffs,              |
                                      |
   v.                                 |
                                      |
   INDUSTRIAL FUMIGANT CO. and        |
   ROLLINS INC.,                      |
                                      |
             Defendants.              |
   _____|
```

                      DEPOSITION OF

               R A N D A L L   T U R N E R

   _____

                   POYNER SPRUILL, LLP
             301 FAYETTEVILLE STREET, SUITE 1900
                   RALEIGH, NORTH CAROLINA

   _____

                      June 26, 2012
                       9:01 A.M.


                  PAGES 1 THROUGH 234

**5813 Shawood Drive**        **VIVIAN TILLEY & ASSOCIATES**        **tel:919.847.5787**
**Raleigh, NC 27609**              **ctrptr4u@aol.com**              **fax: 919.847.2265**
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 1 of 243   EXHIBIT F

Page 2

ATTORNEYS OF RECORD PRESENT

HOWARD M. WIDIS, ESQ.

- and -

HUNTER C. QUICK, ESQ.

ATTORNEYS FOR THE PLAINTIFFS

QUICK, WIDIS & NALIBOTSKY, PLLC

2115 REXFORD ROAD, SUITE 100

CHARLOTTE, NC  28211

(704) 364-2500

Fax: (704) 365-8734

hwidis@qwnlaw.com

- and -

hquick@qwnlaw.com


STEVEN B. EPSTEIN, ESQ.

ATTORNEYS FOR THE DEFENDANTS

POYNER SPRUILL, LLP

301 FAYETTEVILLE STREET, SUITE 1900

RALEIGH, NC 27601

(919) 783-2846

Fax: (919) 783-1075

sepstein@poynerspruill.com


ALSO PRESENT:

BRAD HENRY, IFC, LLC

KEITH SCOTT, ROLLINS INC.

ROBIN ALEXANDER, ROLLINS INC.

5813 Shawood Drive                **VIVIAN TILLEY & ASSOCIATES**              tel:919.847.5787
Raleigh, NC 27609                         ctrptr4u@aol.com                        fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 2 of 243

I N D E X

REPORTER'S NOTE:  This transcript may contain quoted
material.  If so, such material is reproduced as read
or spoken.

EXAMINATION                                         PAGE
        DIRECT EXAMINATION - by MR. WIDIS             6

_____

ADJOURNMENT                                         231
REPORTER CERTIFICATE                                234

_____

E X H I B I T S

| EXHIBIT | DESCRIPTION | IDENTIFIED |
|---|---|---|
| Plaintiffs' 1 | SOP Manual | 31 |
| Plaintiffs' 2 | Certificate of Training IFC-ROL004019 - 4020 | 44 |
| Plaintiffs' 3 | Product Label | 47 |
| Plaintiffs' 4 | Applicator's Manual Fumitoxin | 58 |
| Plaintiffs' 5 | Application Agreement | 69 |
| Plaintiffs' 6 | Service Report | 72 |
| Plaintiffs' 7 | Photograph | 81 |
| Plaintiffs' 8 | Photograph | 83 |
| Plaintiffs' 9 | Fumigation Management Plan IFC-ROL000171 - 0179 | 92 |
| Plaintiffs' 10 | Fumigation Management Plan IFC-ROL004281 - 4288 | 104 |
| Plaintiffs' 11 | Photograph | 106 |
| Plaintiffs' 12 | Fumigation Service Report | 107 |

**5813 Shawood Drive**        **VIVIAN TILLEY & ASSOCIATES**        **tel:919.847.5787**
**Raleigh, NC 27609**              **ctrptr4u@aol.com**              **fax: 919.847.2265**
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 3 of 243

E X H I B I T S

| EXHIBIT | DESCRIPTION | IDENTIFIED |
|---|---|---|
| Plaintiffs' 13 | Emergency Information Sheet | 114 |
| Plaintiffs' 14 | Fumigation Service Report IFC-ROL000140 | 118 |
| Plaintiffs' 15 | Emergency Information Sheet | 118 |
| Plaintiffs' 16 | Fumigation Service Report | 125 |
| Plaintiffs' 17 | Emergency Information Sheet | 125 |
| Plaintiffs' 18 | Photograph | 133 |
| Plaintiffs' 19 | Photograph | 136 |
| Plaintiffs' 20 | Photograph | 140 |
| Plaintiffs' 21 | Drawing | 140 |
| Plaintiffs' 22 | Photograph | 141 |
| Plaintiffs' 23 | Fumigation Service Report IFC-ROL000166 - 0168 | 149 |
| Plaintiffs' 24 | Emergency Information Sheet | 149 |
| Plaintiffs' 25 | Letter dated 4/20/09 | 149 |
| Plaintiffs' 26 | Drawing | 169 |
| Plaintiffs' 27 | Drawing | 183 |
| Plaintiffs' 28 | Photograph | 204 |
| Plaintiffs' 29 | Defendants' Response to First Set of Interrogatories | 209 |

(Exhibits attached.)

***** *

**5813 Shawood Drive**            **VIVIAN TILLEY & ASSOCIATES**            **tel:919.847.5787**
**Raleigh, NC 27609**                     **ctrptr4u@aol.com**                       **fax: 919.847.2265**
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 4 of 243

STIPULATIONS

Pursuant to notice and/or consent of the parties, the deposition hereon captioned was conducted at the time and location indicated and was conducted before Maren M. Fawcett, Notary Public in and for the County of Wake, State of North Carolina at large.

Notice and/or defect in notice of time, place, purpose and method of taking the deposition was waived. Formalities with regard to sealing and filing the deposition were waived and it is stipulated that the original transcript, upon being certified by the undersigned court reporter, shall be made available for use in accordance with the applicable rules as amended.

It was stipulated that objections to questions and motions to strike answers are reserved until the testimony, or any part thereof, is offered for evidence, except that objection to the form of any question shall be noted herein at the time of the taking of the testimony, and that objections based on questions calling for privileged information or work product may be made and the witness may defer answer until he or she may be instructed to answer by the Court after motion to compel by the questioning party.

Reading and signing of the deposition was requested by the witness.

5813 Shawood Drive          **VIVIAN TILLEY & ASSOCIATES**          tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                     fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 5 of 243

Page 6

1                 P R O C E E D I N G S

2              Whereupon, RANDALL TURNER, was

3              called as a witness, duly sworn,

4              and testified as follows:

5    Direct Examination                    9:01 A.M.

6    BY MR. WIDIS:

7         Q.   Would you state your name, please.

8         A.   Randall Scott Turner.

9         Q.   Mr. Turner, my name is Howard Widis.  I'm

10   representing Severn Peanut and Meherrin and Travelers in

11   the lawsuit filed against Industrial Fumigant and

12   Rollins in this case.  I'm going to be taking your

13   deposition today.  I take it you've had an opportunity

14   to speak with your counsel about the deposition?

15        A.   I have.

16        Q.   Have you ever been deposed before?

17        A.   One time.

18        Q.   And when was that?

19        A.   Five or six years ago.

20        Q.   What were the circumstances of that

21   deposition?

22        A.   It's a fumigation where an employee claimed to

23   have been exposed to the fumigant.

24        Q.   And were you a fact witness in that case or

25   were you representing the company?

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com               fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 6 of 243

1              MR. EPSTEIN:  Objection to the form.  I'm not

2       sure I understand.

3       Q.   What was your role when you were deposed?

4       A.   I was the fumigator in charge.

5       Q.   Okay.  All right.  Let's just have some ground

6    rules.  I'm sure you've been advised of this.  I'm going

7    to be asking you questions.  If you will wait until I'm

8    finished with my question, that will make a much better

9    transcript.

10              This is not supposed to be a torture contest.

11   So if you do need to stand for any reason, please feel

12   free to.  If you need to take a break, let me know that.

13   I'll ask that you answer the question on the table, but

14   we'll be glad to stop then and take a break.

15              If you don't understand my question or if I've

16   confused you, please let me know that and I'll try to

17   rephrase it in another way.  All right?

18       A.   Yes, sir.

19       Q.   By whom are you employed?

20       A.   Industrial Fumigant Company.

21       Q.   And how long have you been employed by them?

22       A.   Twelve years.

23       Q.   What's your current position with them?

24       A.   Territory manager.

25       Q.   What territory do you cover?

5813 Shawood Drive        VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com              fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 7 of 243

1      A.    North Carolina, South Carolina, Virginia and

2  east Tennessee.

3      Q.    What was your position when you were first

4  hired 12 years ago?

5      A.    Area manager.

6      Q.    What area do you --

7      A.    North Carolina.

8      Q.    Can you tell me your educational background

9  starting with high school?

10     A.    Starting with high school?

11     Q.    Yes.

12     A.    From high school I went to North Carolina

13 State University and I graduated with two associate's

14 degrees.

15     Q.    When was that?

16     A.    1983 -- '84, excuse me.

17     Q.    What were those degrees?

18     A.    Agricultural pest control and field crop

19 technology.

20     Q.    And those are two separate degrees or --

21     A.    Yes.

22     Q.    -- a joint degree?

23     A.    I went to the ag institute and, like I say, I

24 obtained two degrees in the ag institute.

25     Q.    And you got both of those in '84?

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 8 of 243

Page 9

1      A.    Eighty-four.

2      Q.    **Give me, if you would, your work experience,**

3 **say after graduating from State in '84.**

4      A.    From NC State I went to work for Fertilizer

5 Farm Chemical Company that actually my father was a part

6 of, and then went to work with Cargill in the grain

7 division.

8      Q.    **And when did you work at Fertilizer Farm, what**

9 **years?**

10     A.    I actually worked there while going to school.

11 And I left there in approximately 1989.

12     Q.    **So about five years?**

13     A.    Yes, sir.

14     Q.    **And what did you do there?**

15     A.    I was in sales and also helped in the

16 applications of fertilizer and chemicals.

17     Q.    **What type of fertilizers did you apply?**

18     A.    On farm crops.

19     Q.    **Right.**

20     A.    Uh-huh.

21     Q.    **Is there a brand name?**

22     A.    We manufactured our own liquid fertilizers.

23     Q.    **Any of those involve aluminum phosphide?**

24     A.    No, sir.

25     Q.    **And while you were at Fertilizer Farm, did you**

5813 Shawood Drive            **VIVIAN TILLEY & ASSOCIATES**            tel:919.847.5787
Raleigh, NC 27609                    ctrptr4u@aol.com                   fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 9 of 243

1    apply any metal phosphide fumigants?

2         A.   No, sir.

3         Q.   All right.  You worked there, what, about four

4    years you said?

5         A.   Full time?

6         Q.   Yeah, full time.

7         A.   About five years.

8         Q.   And then you went to Cargill?

9         A.   That's correct.

10        Q.   And what did you do at Cargill?

11        A.   I was an area manager at three of their grain

12   elevators.

13        Q.   What were your responsibilities?

14        A.   Merchandise, buy grain from the local farmers.

15        Q.   Did you apply fumigant during that time with

16   Cargill?

17        A.   No, sir.

18        Q.   All right.  How long did you stay at Cargill?

19        A.   I was there from 1989 to year 2000.

20        Q.   And where did you go in 2000?

21        A.   IFC.

22        Q.   And you were hired by IFC as an area manager?

23        A.   Correct.

24        Q.   And that was North Carolina?

25        A.   Yes, sir.

5813 Shawood Drive        **VIVIAN TILLEY & ASSOCIATES**      tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com           fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 10 of 243

1      Q.    All right.  And what were your

2   responsibilities as area manager when you joined IFC?

3      A.    Sales as well as just routine services that we

4   provided to our customers and I had technicians under me

5   that I managed their work.

6      Q.    When were you promoted to territory manager?

7      A.    2002.

8      Q.    All right.  When was the first time you

9   applied or you were trained to apply metal phosphide

10  fumigants?

11     A.    Upon my training with IFC.

12     Q.    Well, let's talk about your training then with

13  IFC.  Tell me, what type of training were you provided

14  at IFC?

15     A.    Initially upon hire, we go to our corporate

16  office for the book training and then I was provided

17  hands-on training in the field from my boss.

18     Q.    And how long a training program is that?

19     A.    The initial --

20     Q.    The book training, how long is that?

21     A.    Three days.

22     Q.    And what type of areas did they cover?

23     A.    Block out, tag out, respirator, how to

24  properly wear respirators, confined space entry.  That's

25  a few of them, but it's a long list.

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                   ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 11 of 243

Page 12

1      Q.    And that was over a three-day period?

2      A.    Yes, sir.

3      Q.    Did you take a test at the end of that --

4      A.    Yes, sir.

5      Q.    -- or test periodically?

6      A.    Periodically.

7      Q.    All right.  Tell me about the hands-on

8    training you received.

9      A.    It was working with a certified person that

10   had been in the field and actually went on the job and

11   witnessed, you know, what it takes to perform a

12   fumigation.

13     Q.    All right.  And, actually, did you become a

14   certified applicator?

15     A.    Yes, sir.

16     Q.    When did you first become a certified

17   applicator?

18     A.    Year 2000.

19     Q.    2000.  What kind of program did you have to

20   take to become a certified applicator?

21     A.    You have to pass a test, review manuals and

22   pass a test by the state.

23     Q.    This is North Carolina?

24     A.    North Carolina was the first one that I

25   obtained.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 12 of 243

1      Q.    All right.   And how many have you taken -- how

2   many states have you taken the course on?

3      A.    North Carolina, South Carolina, Virginia,

4   Tennessee and Kentucky.

5      Q.    And you're a certified applicator in those

6   five states?

7      A.    That's correct.

8      Q.    What type of commodity did you first -- I

9   mean, what type of fumigant did you first train on when

10   you trained under this certified applicator when you

11   first joined IFC?

12      A.    Aluminum phosphide.

13      Q.    Any other fumigant besides aluminum phosphide?

14      A.    Yes.

15      Q.    What other kinds?

16      A.    Methyl bromide.

17      Q.    Any other kind?

18      A.    Later in my career there were others.

19      Q.    What were those?

20      A.    ECO2FUME.

21      Q.    And what is that?

22      A.    Liquid cylinderized phosphene and sulfuryl

23   fluoride.

24      Q.    And what is that?

25      A.    It's used in fumigating flour mills,

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                    ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 13 of 243

1   structures.  It's a fumigant.

2       Q.   Okay.  Now, what type of commodities have you

3   fumigated?

4       A.   Grain, peanuts, flour.  I'm sure there's

5   others, but they're the main.

6       Q.   What type of commodity would you say you

7   fumigated the most?

8       A.   Tobacco.

9       Q.   And what percentage of your fumigation

10  experience would you say would be tobacco?

11      A.   I don't know.

12      Q.   Would you say over 50 percent?

13      A.   No, sir.

14      Q.   Twenty-five percent?

15      A.   I'm just not sure.

16      Q.   Okay.  What percentage would you say would be

17  peanuts?  And I'm talking about your career here from

18  2000 on through today.

19      A.   I'm just not sure.

20      Q.   Would you say it's more than 50 percent of

21  your experience is with peanuts?

22      A.   No.

23      Q.   Would you say less than 25 percent?

24      A.   I'm not sure.

25      Q.   So you do grain, peanuts, flour and tobacco?

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 14 of 243

1      A.    Uh-huh.

2      Q.    **Do you do any other commodities?**

3            MR. QUICK:  That was a yes?  The "uh-huh" was

4      a "yes" for the record?

5            MR. WIDIS:  I'm sorry, I didn't hear it.

6            MR. QUICK:  He just said "uh-huh" instead of a

7      "yes."  You need to give a verbal response, like a

8      "yes" or "no" instead of an "uh-huh."

9            MR. EPSTEIN:  And by no means --

10           MR. QUICK:  That's just a housekeeping thing.

11           MR. EPSTEIN:  I know, but I would like the

12     housekeeping and all speaking matters to be left to

13     Mr. Widis so there is only one talking.

14           MR. QUICK:  Sure.

15           MR. EPSTEIN:  Thank you.

16   BY MR. WIDIS:

17     Q.    **I'm sorry, I didn't hear what you said, so**

18   **let's go back -- that's all right.**

19           **We're talking about grain, peanuts, flour and**

20   **tobacco, all right.  Let me ask you a different question**

21   **then at this point.  What is the difference in**

22   **fumigating say tobacco as opposed to peanuts?**

23           MR. EPSTEIN:  Objection to form.

24     Q.    **You can answer.**

25     A.    Well, the structure type for one, how we seal

5813 Shawood Drive              **VIVIAN TILLEY & ASSOCIATES**              tel:919.847.5787
Raleigh, NC 27609                    ctrptr4u@aol.com                          fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 15 of 243

Page 16

1    it, prepare for the fumigation.

2        Q.   Does it make a difference as far as the

3    commodity or is it more the structure that makes the

4    difference?

5        A.   More the structure.

6        Q.   So you use the same fumigant with tobacco as

7    peanuts, it wouldn't be a problem?

8        A.   Yes.

9        Q.   All right.  How long have you been fumigating

10   peanuts?

11       A.   I'm not sure exactly, but I started in about

12   2002.

13       Q.   Okay.  And do you recall any of the companies

14   that you -- any of the clients that you fumigated

15   peanuts for?

16            MR. EPSTEIN:  And just to make sure the record

17       is really clear, you have used the pronoun "you" a

18       lot.  Are you intending that to mean him --

19            MR. WIDIS:  I'm just talking about Turner.

20            MR. EPSTEIN:  -- or IFC?

21            MR. WIDIS:  I'm talking about Mr. Turner

22       because we will probably be taking a 30(b)(6) of --

23            MR. EPSTEIN:  That's fine.

24            MR. WIDIS:  -- IFC.  Right now I'm asking

25       Mr. Turner.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 16 of 243

1          THE WITNESS:  Severn Peanut Company.

2      Q.    They were one of your first clients?

3      A.    No, sir.

4      Q.    Were they one of the first peanut -- clients

5  for peanuts?

6      A.    I can't remember.

7      Q.    Well, you believe you started fumigating

8  peanuts about 2002; is that right?

9      A.    That's not when I started with Severn.

10     Q.    All right.  Who did you start with first?

11     A.    I don't remember.

12     Q.    When do you think you started with Severn?

13     A.    2006, 2007.

14     Q.    The first -- if we can go back to when --

15  before Severn, do you recall what kind of structures

16  those peanuts were in?

17     A.    What was done then was in what we call flat

18  storages, the barn-style warehouses.

19     Q.    And when they were flat storages, what type of

20  application did you do; were you doing say probing or

21  surface?

22     A.    Surface.

23     Q.    And those were in barns I take it; is that

24  what you said?

25     A.    It's what it looks like.

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                    ctrptr4u@aol.com                        fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 17 of 243

1        Q.    All right.  When you were doing -- let's say

2   starting in '02 when you're doing peanuts, what type of

3   different structures were these peanuts in besides

4   barns?

5        A.    I really can't remember.

6        Q.    Do you remember anything other than barns?

7        A.    That's all that I can recall.

8        Q.    And in each of those instances those would be

9   surface application of the fumigant?

10        A.    Yes.

11        Q.    How about tobacco, what type of structure for

12   the tobacco?

13        A.    Warehouses.

14        Q.    That's different from barns?

15        A.    Different from the peanut warehouses.

16        Q.    Okay.  In which way were they different?

17        A.    Just the style of the structure.

18        Q.    Can you explain what you mean by that?  I

19   mean --

20        A.    I'm not sure I can explain it.

21        Q.    Well, I'm just trying to get an understanding

22   of what would be the difference between, you know, a

23   style for a peanut as opposed to for tobacco?

24        A.    One difference is your peanut warehouses have

25   catwalks across the top where you can walk across the

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                    ctrptr4u@aol.com                   fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 18 of 243

1    top.  Tobacco warehouses are not that way.

2        Q.   Any other differences that you can think of?

3        A.   No, sir.

4        Q.   All right.  Besides the training that you

5    received from IFC, did you receive any other training --

6    and you've also mentioned the training you received at

7    State.  Did you receive any training say from the actual

8    manufacturers or distributors of the fumigant?

9        A.   Of which fumigant?

10        Q.   Well, let's just say Fumitoxin.

11        A.   No, sir, not Fumitoxin.

12        Q.   Did you receive it from any other manufacturer

13    of any other fumigant?

14        A.   Yes, sir.

15        Q.   What, which ones?

16        A.   ProFume, which is sulfuryl fluoride, ECO2FUME,

17    and methyl bromide.

18        Q.   Who provided the training for methyl bromide?

19        A.   Originally I actually had the manufacturer,

20    Great Lakes, and we have training now every other year,

21    but it's provided in house.

22        Q.   Do you have a training on aluminum phosphide

23    periodically?

24        A.   No, sir.

25        Q.   So the only training you received on the

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                   ctrptr4u@aol.com                   fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 19 of 243

Page 20

1        aluminum phosphide was your training with the state, is

2        that right, and with IFC when you first joined in 2002

3        or 2000?

4            A.   And on-the-job training.

5            Q.   And on-the-job training, but I'm talking about

6        the training -- I'm sorry, I'm confusing you.  We've got

7        you joined IFC, you received in-house training and

8        on-the-job training through IFC, right?

9            A.   Yes, sir.

10           Q.   Has IFC provided you any additional training

11       on aluminum phosphide other than that initial period?

12           A.   Not that I can recall.

13           Q.   And you've received training through the

14       various states where you're certified; is that right?

15           A.   Yes.

16           Q.   Once you're certified, do you receive any

17       additional training in applying or using the aluminum

18       phosphide?

19           A.   Yes.

20           Q.   What kind of training is that?

21           A.   We have to keep up our credit hours each year

22       with the state to maintain our license.

23           Q.   What do you have to do to keep up your credit

24       hours?

25           A.   Attend classes.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 20 of 243

Page 21

1     Q.   And what do those classes entail?

2     A.   They talk about changes in the industry.

3     Q.   Do they go into the actual application of

4  fumigant?

5     A.   I don't recall.

6     Q.   Have you been trained to use safety equipment?

7     A.   Yes, sir.

8     Q.   Okay.  How often do you -- let me ask this:

9  When do you use safety equipment when you're involved

10  with aluminum phosphide?

11     A.   We have detection equipment and once it

12  reaches its limits, then we have to wear our PPE.

13     Q.   Okay.  And what is PPE?

14     A.   SCBA.

15     Q.   That's self-contained breathing apparatus?

16     A.   Yes, sir.

17     Q.   Can you describe that for me just so I can

18  visualize in my mind what it is you're talking about?

19     A.   It's a full face mask and you have like an air

20  tank that you put on your back.

21     Q.   Is it like a tank I see scuba divers in the

22  water wear?

23     A.   Very similar, yeah.

24     Q.   Smaller, larger?

25     A.   Same.

5813 Shawood Drive        VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787
Raleigh, NC 27609        ctrptr4u@aol.com        fax: 919.847.2265
Case 2:11-cv-00014-BO  Document 75-7  Filed 11/07/13  Page 21 of 243

1      Q.    And would each of the people who are applying

2    the fumigant have one of those with them?

3      A.    We have them on site.

4      Q.    Do you take it with you each time you do a job

5    when you're applying aluminum phosphide?

6      A.    Yes.

7      Q.    Is that a requirement of IFC?

8      A.    It's the law.

9      Q.    And when would you use the SCBA?

10     A.    When we are in environments that's over .3

11   parts per million.

12     Q.    And until it reaches that, you don't need to

13   put it on; is that right?

14     A.    That's correct.

15     Q.    All right.  You are the territory manager.

16   Could you explain to me what your responsibilities are

17   when you are applying aluminum phosphide?

18     A.    Just see that the job runs properly and in a

19   safe manner.

20     Q.    Do you take an actual role in the application

21   of the fumigant?

22     A.    Yes, sir.

23     Q.    And what is your role?  I understand you're

24   supervising and making sure it runs properly and safely.

25   What are you doing generally when you're applying

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com               fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 22 of 243

Page 23

1    fumigant?

2            MR. EPSTEIN:  Are you talking about a

3       particular type of fumigant?

4            MR. WIDIS:  Aluminum phosphide.

5            MR. EPSTEIN:  Okay.

6            MR. WIDIS:  Thank you.

7       A.   I'm involved hands on.

8       Q.   Hands on?

9       A.   Applying the fumigant myself.

10       Q.   And you're taking the lead role; is that

11   right?

12       A.   Yes.

13       Q.   Do you have a crew that works with you

14   generally when you're applying the aluminum phosphide?

15       A.   Yes, sir.

16       Q.   Is it the same crew?

17       A.   Usually.

18       Q.   Who -- who would that be then?  We'll talk

19   over the last few years we'll say.

20       A.   Brian Lilley, James Ward, Johnny Meeks, Mack

21   Kelemen, Ronnie Southern.

22       Q.   These people rotate through depending on what

23   the job is?

24       A.   And how many jobs we have, you know, if

25   there's other jobs going on.

5813 Shawood Drive        VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com              fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 23 of 243

Page 24

1       Q.    How many people are employed by IFC in your

2   office?  I'm sorry, where are you located?

3       A.    I'm based out of Rocky Mount, North Carolina.

4       Q.    And how many IFC employees are there in Rocky

5   Mount?

6       A.    In my territory, it's a total of 12.

7       Q.    And your territory is North Carolina, South

8   Carolina, would you say Virginia and east Tennessee?

9       A.    Yes, sir.

10       Q.    All right.  How many are located specifically

11   in Rocky Mount or work out of the Rocky Mount office?

12       A.    Four plus the secretary.

13       Q.    Which four are those?

14       A.    Johnny Meeks, James Ward, Brian Lilley and

15   myself.

16       Q.    This may be a tough question:  How many times

17   would you say you applied aluminum phosphide?  I told

18   you it was going to be tough.

19       A.    I don't know.

20       Q.    Would you say over a hundred?

21       A.    I don't know.

22       Q.    How often -- is it normal for you to apply

23   aluminum phosphide say once a week?

24       A.    No, sir.

25       Q.    How would often would you say you apply?

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                 fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 24 of 243

Page 25

1       A.   I don't know.

2       Q.   **Would you say once a month would be normal?**

3       A.   No, sir.

4       Q.   **Too much or too little?  Is that too high a**

5   **number or too low?**

6       A.   Depends upon the time of the year.

7       Q.   **Okay.  And when is the active period for**

8   **applying aluminum phosphide?**

9       A.   During the warmer weather months.

10      Q.   **And during those warmer weather months, how**

11  **often would you say you apply it on average?**

12      A.   I'm just not certain.

13      Q.   **Would you say once a week is normal for you?**

14      A.   No, sir.

15      Q.   **All right.  Is it once every two weeks is**

16  **normal?**

17      A.   I'm just not certain.

18      Q.   **You don't have any idea how often you apply**

19  **aluminum phosphide?**

20      A.   No, sir.

21      Q.   **All right.  Would you say you apply it more**

22  **than once a month during the summer, during the hotter**

23  **season?**

24           MR. EPSTEIN:  Howard, you've asked the same

25           question about five times.

5813 Shawood Drive              **VIVIAN TILLEY & ASSOCIATES**              tel:919.847.5787
Raleigh, NC 27609                     ctrptr4u@aol.com                      fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 25 of 243

Page 26

1           MR. WIDIS:  I'm sorry, Steve.  I think -- I

2       think, you know, a little refreshing of the memory,

3       I think Mr. Turner can figure out how often he

4       applies aluminum phosphide.

5           MR. EPSTEIN:  He's given you his best answer.

6       I'm not going to stop you.

7       Q.   We won't go on forever, but I'm just looking

8   for you to have an idea.

9       A.   Yes, sir.

10      Q.   Is it once a week, twice a week, once every

11  two weeks?  That's what I'm looking for.

12      A.   I'm just not certain on an exact answer.

13      Q.   All right.  Could you describe to me the

14  various ways that you have applied aluminum phosphide?

15  And by that I mean surface and probing?  That's what I'm

16  looking for, the ways that you have applied it.

17      A.   Scattering surface.

18      Q.   Any other ways besides scattering surface?

19      A.   One incident with cotton seed we probed.

20      Q.   All right.  So you remember one incident where

21  you've probed?

22      A.   Yes.

23      Q.   Do you remember any other incidents other than

24  that one?

25      A.   No, sir.

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES         tel:919.847.5787
Raleigh, NC 27609                  ctrrptr4u@aol.com              fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 26 of 243

Page 27

1      Q.    All right.  So is it accurate to say then all

2  of your experience other than that one with aluminum

3  phosphide is surface application?

4      A.    Yes.

5      Q.    And do you ever put tarps over it, over the

6  fumigants?

7      A.    I have done that in grain.

8      Q.    And that's with aluminum phosphide?

9      A.    Yes.

10      Q.    Okay.  So surface you're talking about you

11  would put it on the top, sometimes you would put a tarp

12  over it, sometimes you don't put a tarp over it; is that

13  correct?

14      A.    Correct.

15      Q.    What type of commodities do you put aluminum

16  phosphide -- do you use aluminum phosphide with?

17      A.    Peanuts, grain.  We used to use it in tobacco,

18  but no longer do.

19      Q.    Why not?

20      A.    That industry prefers to use it in sashays so

21  you can clean it up easier.

22      Q.    All right.  Besides peanuts and grain then,

23  are those the only two at this point that use aluminum

24  phosphide?

25      A.    Yes, sir.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609          ctrptr4u@aol.com          fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 27 of 243

 1      Q.   When was the last job you had that used

 2   aluminum phosphide?

 3      A.   I'm not sure.

 4      Q.   Have you used it say in June?

 5      A.   No, sir.

 6      Q.   Have you used it in May?

 7      A.   No, sir.

 8      Q.   Have you applied aluminum phosphide this year,

 9   2012?

10      A.   No, sir.

11      Q.   Did you apply aluminum phosphide in 2011?

12      A.   I don't remember.

13      Q.   Is it fair to say that you don't -- that it's

14   not common for you to apply aluminum phosphide?

15           MR. EPSTEIN:   Objection, form.

16      A.   A few years back we used -- we used a lot of

17   it.

18      Q.   Okay.  But you haven't used it recently?

19      A.   Not recently.

20      Q.   Okay.  When do you think the last time you

21   all -- you applied aluminum phosphide?

22      A.   I'm not sure.

23      Q.   How are -- how are the applicators paid when

24   you apply aluminum phosphide; what's the basis of your

25   pay?

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                    ctrptr4u@aol.com                  fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 28 of 243

1      A.   Most of the employees are on a base plus

2   commission and I have some hourly.

3      Q.   And could you describe to me or explain to me

4   the way the commission works; how is the commission

5   calculated?

6      A.   It's based on -- the commission is determined

7   on whether you're on the job from beginning to end and

8   it's based on the price of the job.

9      Q.   And who calculates the commission?  I mean,

10  who determines what the commission is going to be?

11     A.   I do.

12     Q.   When you say when you're on the job from the

13  beginning to the end, what do you mean by that?

14     A.   With fumigations you have to get it under gas,

15  and then at the end of the fumigation you have to go

16  back and aerate it, if you're there for both parts of

17  the job.

18     Q.   You get a higher commission if you're there --

19     A.   For the full job.

20     Q.   -- for the full job?

21          And what does the commission run; is it

22  2 percent, 3 percent, 5 percent, what?

23     A.   It depends upon the type of fumigation.

24     Q.   Which ones are higher?  Which type of

25  fumigation results in a higher commission?

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                ctrprtr4u@aol.com               fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 29 of 243

Page 30

1      A.    Typically it's two and a half percent.

2      Q.    **What type of fumigation is that, that which**

3  **would be two and a half percent?**

4      A.    A structure, a building.

5      Q.    **And are you talking about fumigating with**

6  **aluminum phosphide at that time or just any type of**

7  **fumigation?**

8      A.    Any type of fumigant.

9      Q.    **How about does the fact that you're using**

10  **aluminum phosphide increase the commission?**

11     A.    No, sir.

12     Q.    **And what type of structures would increase the**

13  **commission?**

14     A.    Our corporate office has a scale for that.  We

15  just follow that scale.

16     Q.    **Does Industrial Fumigant have a standing**

17  **operational plan that they produced?**

18     A.    Yes, sir.

19     Q.    **Have you reviewed that?**

20     A.    Yes, sir.

21     Q.    **Are you familiar with the standard operational**

22  **plan?**

23     A.    Yes, sir.

24          MR. EPSTEIN:  Just to clarify, you mean

25     standard operating procedures?

5813 Shawood Drive              **VIVIAN TILLEY & ASSOCIATES**              tel:919.847.5787
Raleigh, NC 27609                   ctrptr4u@aol.com                      fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 30 of 243

1          MR. WIDIS:  Well, that's a good point.  I'll

2      pull it out.  We'll take a look.

3          MR. EPSTEIN:  Okay.

4          MR. WIDIS:  Make sure I'm saying it right.

5          THE WITNESS:  And that's what I was assuming

6      when I agreed.

7          MR. WIDIS:  That's fine.  That's fine.  I'm

8      not trying to trick you here.  I stand corrected,

9      standard operating procedure.  Let's mark that as

10     Plaintiffs' Exhibit Number 1.

11          (Exhibit No. 1 marked for identification.)

12      Q.   Mr. Turner, I'm handing you a document.  It's

13  the packet of documents we've identified as Plaintiffs'

14  Exhibit 1.  First of all, I want to look at the first

15  page of that.  Is that your signature --

16      A.   Yes sir.

17      Q.   -- on each of those lines?

18          And the purpose of that signature was just to

19  state that you had read the various sections; is that

20  right?

21      A.   Yes, sir.

22      Q.   Okay.  All right.  I'm going to go through

23  these.  I did not produce the entire plan, just isolated

24  copies.  I will state this was provided by Industrial

25  Fumigant to me in their responses, their discovery

5813 Shawood Drive              **VIVIAN TILLEY & ASSOCIATES**              tel:919.847.5787
Raleigh, NC 27609                    ctrprtr4u@aol.com                      fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 31 of 243

1    responses, and the Bates numbers are on the bottom of

2    each of the documents.  So if you would turn to the

3    third page, which is IFC-Rollins 4306 Bates number.

4              All right.  And I'm looking down at number

5    four that says:  "A detailed background check" -- the

6    last sentence -- "A detailed background check is also

7    performed to determine if there's any criminal record,

8    serious motor violations and to evaluate the past three

9    years employment."  Do you see that?

10        A.   Uh-huh.

11        Q.   And it's your understanding that IFC does a

12   background check; is that right?

13        A.   Yes, sir.

14        Q.   Okay.  As long as I've got that out, I do want

15   to ask one question.  In the interrogatory responses we

16   were told that one of the people that fumigated the

17   Severn dome on August 4th was in jail now, Mr. Bratton.

18   Do you know Mr. Bratton?

19        A.   I do.

20        Q.   Okay.  Do you know -- was a background check

21   performed on Mr. Bratton?

22        A.   Yes.

23        Q.   Okay.  What did that -- did that background

24   check reveal any criminal activity?

25        A.   I actually don't view the results.  That's

5813 Shawood Drive          **VIVIAN TILLEY & ASSOCIATES**          tel:919.847.5787
Raleigh, NC 27609                    ctrptr4u@aol.com                     fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 32 of 243

Page 33

1    done at our corporate office.

2         Q.   Do you know why Mr. Bratton is incarcerated?

3         A.   I do.

4         Q.   What is that?

5         A.   Indecent liberties with a minor, a child.

6         Q.   Thank you.  Do you know when he was

7    incarcerated?

8         A.   August 2009.

9         Q.   So at the time that you were doing the Severn

10   fumigation in August of '09, he had been arrested

11   already at that point?

12        A.   I know he had charges pending.

13        Q.   Do you know when the charges were -- when the

14   charges were presented against Mr. Bratton?

15        A.   I'm not sure.

16        Q.   Sometime before August 2009 though, right?

17        A.   Yes, sir.

18        Q.   Did you have any concerns on keeping

19   Mr. Bratton on staff then in August of 2009 with the

20   criminal charges pending?

21        A.   He was a good employee.

22        Q.   You weren't concerned about perhaps he didn't

23   meet the qualifications for IFC at that time?

24        A.   No, sir.

25        Q.   All right.  Turn if you would to page 3, which

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                 ctrptr4u@aol.com                      fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 33 of 243

1    is Bates 4318 at the bottom, and I'm looking at number

2    11.  It says:  "An IFC Pest Management Service notebook

3    is to be maintained at all customer accounts where

4    regular service work is performed."

5         Do you know if an IFC management service

6    notebook was maintained at Severn?

7    A.   There was not a service notebook maintained at

8    Severn.  I interpret this as mainly for our -- what we

9    call our routine service accounts.

10   Q.   All right.  You didn't consider Severn to be a

11   routine service account?

12   A.   No, sir.

13   Q.   And why is that?

14   A.   Our routine service accounts are accounts that

15   we're in like on a weekly basis.

16   Q.   So you considered this provision wouldn't

17   apply to Severn; is that right?

18   A.   Yes, sir.

19   Q.   All right.  Number 14 says:  "Service reports

20   are legal documents and must be filled out completely

21   and accurately."  You understood that?

22   A.   Yes, sir.

23   Q.   All right.  And is all the information you put

24   on the service reports accurate?

25   A.   To the best of my knowledge.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 34 of 243

Page 35

1      Q.   It says when applying -- the last sentence:

2  "When applying pesticides, the method and exact

3  locations of placement and method of placement must be

4  specified on the report."  Did you understand that to

5  mean that your service report when you did aluminum

6  phosphide should show where you're putting the fumigant?

7      A.   No, sir.

8      Q.   Why not?

9      A.   I'm not sure.  I've never been instructed to

10  do it.

11      Q.   The way that I'm reading this it seems to say

12  that you're supposed to put the method and the location

13  of the placement on the report, but I never saw that on

14  a report.  You never put the placement and the location

15  on the service report, right?

16      A.   No, sir.

17      Q.   On the next page, page 4, which is Bates 4319,

18  it says:  "Have appropriate customer representative sign

19  the bottom of the pest management report and verbally

20  review with the customer what work was done and any

21  significant findings."

22           Is it your understanding that you were to

23  review the service report with a representative from the

24  company after you -- of the client after you did a

25  fumigation there?

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com                 fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 35 of 243

Page 36

1      A.    I'm not sure.

2      Q.    Okay.  Do you believe that you should have a

3   representative from the company sign a service report

4   after you do a fumigation?

5      A.    Yes, sir, but often they're not on site to get

6   a signature.

7      Q.    But this procedure seems to say that they want

8   you to get that, that IFC wants you to have them sign a

9   service report, doesn't it?

10     A.    Yes, sir.

11     Q.    But you don't do that all the time?

12     A.    Not every time.

13     Q.    And why is that?

14     A.    When the customer is not on site to get a

15  signature.

16     Q.    All right.  You don't go look for them?

17     A.    No, sir.

18     Q.    Let's turn to page -- the next sheet is Bates

19  number 4408 at the bottom.  Pre-fumigation, number one

20  there says:  "Read and follow all label instructions.

21  The label is the law."  Is that your understanding?

22     A.    Yes, sir.

23     Q.    And label, are we also talking about the

24  application manual?

25     A.    Yes, sir.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                 fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 36 of 243

1      Q.   Okay.  All right.  Number two, it says:

2    "Arrange for a meeting with key facility personnel to

3    coordinate the fumigation and to clarify party

4    responsibilities."  Is that something you should do

5    before every fumigation?

6      A.   Yes, sir.

7      Q.   If you turn to the next page, page 2, Bates

8    4409, I'm looking at number 10:  "Arrange for someone

9    from facility management who is knowledgeable about the

10   treatment site and equipment to be available the day of

11   the fumigation for a final walk through and to assist if

12   there's any difficulty shutting down processing or

13   aeration equipment."  Do you see that?

14     A.   Uh-huh.

15     Q.   All right.

16     A.   Yes, sir.

17     Q.   Is it your understanding that you're supposed

18   to -- you said yes?

19     A.   Yes, sir.

20     Q.   Okay.  Is it your understanding that you

21   should arrange to meet someone from the facility on the

22   day of the fumigation for a final walk through when you

23   do a fumigation at a site?

24     A.   Yes, sir.

25     Q.   All right.  Let's look at the next page, 4410

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 37 of 243

1    is the Bates number.  Number 21 says:  "The official

2    notification of fumigation must be submitted to the fire

3    chief 24 hours prior to fumigation unless otherwise

4    instructed by fire department."

5            Now, when would you give -- when would you

6    normally give a notification to the fire department of

7    an area when you were doing fumigation with aluminum

8    phosphide?

9        A.   Fumigating the peanuts, we did it the day of.

10       Q.   Had you coordinated that with the Severn Fire

11   Department in Severn, North Carolina that you would do

12   it the day of the fumigation?

13       A.   We would leave a packet at the fire department

14   and then also give a packet to Pat Rowe, which is

15   involved with the firefighters.

16       Q.   All right.  Let's talk about just the fire

17   department.  Would you talk to anyone at the fire

18   department normally in Severn, North Carolina when you

19   did an application of aluminum phosphide there at Severn

20   or would you just leave a packet with them?

21       A.   It was a volunteer fire department, so no one

22   was on site, so we would leave a packet with them.  But,

23   again, I would leave one with Pat Rowe.

24       Q.   No, I understand.  I'm just asking you right

25   now about the fire department.  So is it a building, a

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 38 of 243

1    room, where is the -- what did you consider the location

2    of the volunteer fire department in Severn?

3         A.   I don't understand the question.

4         Q.   Where was the fire department, the

5    headquarters of the volunteer fire department in Severn,

6    North Carolina located?

7         A.   I can't remember the road number.

8         Q.   That's okay.

9         A.   But it was on the left-hand side just going

10   out of Severn.  It's like a metal building.

11        Q.   All right.  Is it locked?

12        A.   Yes.

13        Q.   All right.  But no one would be there, so you

14   would just leave the notification -- where would you

15   leave the notification?

16        A.   Tape it to the door.

17        Q.   Just so I understand, you would tape it to the

18   door, but you didn't personally notify anyone, you just

19   taped this notification on the door of the fire

20   department -- of the fire department building there; is

21   that right?

22        A.   At the fire department, but, again, I would

23   put a packet in Pat Rowe's hand, which is part of the

24   fire department.

25        Q.   Now, turn to the next page, 4413, Bates number

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com               fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 39 of 243

Page 40

1   4413.  It says:  "Prior to gas release --

2           MR. EPSTEIN:  Where are you?

3           MR. WIDIS:  Number one under "prior to gas

4   release."

5       Q.  It says:  "Complete a final walk through with

6   management or key personnel."  Do you see that?

7       A.  (Witness nods.)

8       Q.  Is it your understanding that before you did a

9   fumigation with aluminum phosphide you should do a final

10  walk through with management or key personnel of the

11  client?

12      A.  Yes, sir.

13      Q.  And you should do that each time you do a

14  fumigation with aluminum phosphide at a client's

15  facility; is that right?

16      A.  Yes, sir.

17      Q.  It says:  "Check off all items on the

18  fumigation check" -- on the -- "Check off all items on

19  the, quote, Fumigation Check Prior to Gas Release, end

20  quote, form.  This form is to be completed for each

21  fumigation and sent to the corporate IFC office with the

22  Fumigation Service Report and Gas Monitoring Report."

23  Would you fill out a Fumigation Check Prior to Gas

24  Release form each time you did a fumigation?

25      A.  When fumigating with methyl bromide or

5813 Shawood Drive        VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787
Raleigh, NC 27609             ctrptr4u@aol.com              fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 40 of 243

Page 41

1    sulfuryl fluoride.

2         Q.   Not with aluminum phosphide; is that right?

3         A.   Correct.

4         Q.   Okay.  Does it say that somewhere -- are you

5    aware of it saying that somewhere in the operating

6    procedures that you don't do it with aluminum phosphide?

7         A.   No, sir.

8         Q.   It's just your understanding that you don't do

9    it with aluminum phosphide?

10        A.   Yes.

11        Q.   Do you know a reason why you wouldn't fill out

12   a Fumigation Check Prior to Gas Release form for

13   aluminum phosphide?

14        A.   No, sir.

15        Q.   You just -- it's your understanding you just

16   wouldn't do it with it; is that right?

17        A.   In this particular situation.

18        Q.   I'm sorry, "In this particular situation,"

19   what do you mean by that?

20        A.   With peanuts and on farm-type stuff.

21        Q.   So peanuts and farm-type stuff you don't feel

22   you need to fill out the Fumigation Check Prior to Gas

23   Release form; is that right?

24        A.   Yes, sir.

25        Q.   All right.  If you would, turn to the next

5813 Shawood Drive        VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com              fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 41 of 243

Page 42

1    page and that's Bates 4435; is that right?

2         A.   Yes, sir.

3         Q.   The last sentence of that first page, this one

4    is entitled dispose -- "Field Operations, Disposal of

5    Metal Phosphide Products."  It says metal -- the last

6    sentence in this paragraph under "introduction," it

7    says:  "Metal phosphide fumigants should not be stacked

8    or piled up or contacted with liquid water."  Do you see

9    that?

10        A.   You're in the last paragraph?

11        Q.   I'm sorry, right here.  Starting right there

12   (Indicating).

13        A.   Oh, okay.

14        Q.   It says:  "Metal phosphide fumigants should

15   not be stacked or piled up or contacted with liquid

16   water."

17        A.   Yes, sir.

18        Q.   Okay.  Metal phosphide -- aluminum phosphide

19   is a metal phosphide fumigant, correct?

20        A.   Yes, sir.

21        Q.   Is it your understanding that metal phosphide

22   fumigants should not be stacked during the application

23   process?

24        A.   I'm not sure.  From what I read here, yes.

25        Q.   Do you know -- let me ask you this:  Do you

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 42 of 243

Page 43

1  believe aluminum phosphide fumigants should not be piled

2  up when you're doing an application?

3      A.   I don't know.

4      Q.   Do you feel that there is a fire hazard if you

5  pile up aluminum phosphide tablets?

6      A.   I'm just not sure.

7      Q.   You don't know that?

8      A.   No, sir.

9      Q.   Have you had any training in hazards created

10 by aluminum phosphide tablets?

11     A.   Yes.

12     Q.   Did that training tell you that fire was one

13 of the hazards that could result in aluminum phosphide

14 tablets being piled up?

15     A.   Yes.

16     Q.   All right.  So isn't it true that aluminum

17 phosphide tablets should not be piled up when you're

18 doing application of fumigant -- of aluminum phosphide

19 fumigant?

20     A.   I'm not sure.  I don't know.

21     Q.   When you apply aluminum phosphide tablets, do

22 you try to make sure that they don't pile up?

23     A.   Correct.

24     Q.   Okay.  Why not?

25     A.   I'm not sure.

5813 Shawood Drive        VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787
Raleigh, NC 27609            ctrptr4u@aol.com              fax: 919.847.2265
Case 2:11-cv-00014-BO  Document 75-7  Filed 11/07/13  Page 43 of 243

1      Q.   It's true though that when you apply aluminum

2   phosphide tablets, you don't want them to pile up,

3   correct?

4      A.   That's correct.

5      Q.   All right.  Do you know why you don't want

6   them to pile up?

7      A.   I'm not sure.  I don't know.

8      Q.   Have you ever heard that piling up tablets can

9   result in ignition or result in a fire?

10     A.   In our training it could result -- I was told

11  it could result in fire.

12     Q.   And that's the reason -- that's the reason

13  that you don't want them to pile up, correct?  They

14  could start a fire; is that right?

15     A.   I'm not certain on that.

16          MR. WIDIS:  Bear with me one minute.  I'd like

17      to get this marked as Plaintiffs' Exhibit 2.

18          THE WITNESS:  Are you done with Exhibit 1 or

19      are you still going to use it?

20          MR. WIDIS:  No, we're still going to use it.

21          (Exhibit No. 2 marked for identification.)

22     Q.   All right.  I'm going to show you a document

23  we've marked as Plaintiffs' Exhibit 2.  This is a

24  Certificate of Training Process Safety Management.  Is

25  that your signature at the top?

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                 fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 44 of 243

Page 45

1      A.   Yes, sir.

2      Q.   Okay.  Dated March 8th, 2008; is that right?

3      A.   Yes, sir.

4      Q.   All right.  Bates stamped IFC 4019 at the

5    bottom.  If you would turn to the next page, IFC 4020

6    Bates stamp.  Number five says:  "What are some hazards

7    associated with phosphene gas?"  Are these handwritten

8    items, are those ones that you wrote in?

9      A.   Yes, sir.

10      Q.   Okay.  You see number two, you said "fire,"

11    right?

12      A.   Yes, sir.

13      Q.   All right.  You agree that one of the hazards

14    associated with phosphene gas is fire, right?

15      A.   Yes, sir.

16      Q.   All right.  Do you know how that fire could

17    occur with using aluminum phosphide fumigant?

18      A.   I've been trained that it's flammable when

19    wet.

20      Q.   How about piling up, is that a problem?

21           MR. EPSTEIN:  Objection to form.

22      A.   I'm not sure.

23      Q.   Do you know anywhere where there are

24    instructions instructing you not to pile up aluminum

25    phosphide tablets?

5813 Shawood Drive            VIVIAN TILLEY & ASSOCIATES            tel:919.847.5787
Raleigh, NC 27609                 ctrptr4u@aol.com                  fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 45 of 243

Page 46

1      A.   No, sir.

2      Q.   All right.  Now, your operations manual says:

3  "Metal phosphide should not be stacked," right?  Look

4  again at 4435.  That sentence right there.  This

5  operations manual, field operations procedure says:

6  "Metal phosphide fumigants should not be stacked or

7  piled up or in contact with liquid water."  Do you see

8  that?

9      A.   Yes, sir.

10     Q.   Okay.  Doesn't that tell you that metal

11 phosphide fumigants should not be stacked?

12     A.   That's how I interpret it.

13     Q.   And it says metal phosphide fumigants should

14 not be piled up?

15     A.   Yes, sir.

16     Q.   Is it your understanding you shouldn't pile up

17 metal phosphide fumigants?

18     A.   That's how it reads here.

19     Q.   Okay.  Do you believe this is incorrect?

20     A.   I don't know.

21     Q.   You don't know if you should pile things --

22 pile metal phosphide tablets or not, is that what you're

23 saying?

24     A.   I've been trained not to do it.

25     Q.   And why not?  Why do you think you've been

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                  ctrptr4u@aol.com                 fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 46 of 243

Page 47

1    trained not to pile up phosphide tablets?

2         A.   I'm not sure why.

3              MR. WIDIS:  Let's mark this as number three.

4         I'm going to make it easier on everybody.  I've got

5         a blowup of that.  I'm just going to put all of

6         these under three, all right.

7              MR. EPSTEIN:  All right.

8              MR. WIDIS:  And, in fact, we're going to do

9         this last one, too.  This is the actual label on

10        the can.

11             (Exhibit No. 3 marked for identification.)

12        Q.   All right.  I'm going to hand you a document

13   we've marked as Plaintiffs' Exhibit Number 3.  Do you

14   see that?

15        A.   Yes, sir.

16        Q.   Do you know what that is?

17        A.   That's the label.

18        Q.   All right.  And the label is the law; is that

19   correct?

20        A.   Yes, sir.

21        Q.   That's the label to the Fumitoxin.  The next

22   page is a blowup of that to make it a little easier for

23   you to read.  Could you please read the second sentence

24   in the second paragraph, which would be right --

25   starting with the word "piling."

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                    ctrptr4u@aol.com                   fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 47 of 243

1      A.    "Piling of pellets or dust from the

2  fragmentation may cause a temperature increase and

3  confine the release of the gas so ignition could occur."

4      Q.    All right.  Does that -- is it your

5  understanding that this label is telling you that

6  don't -- that piling it could be a -- could result in

7  ignition?

8      A.    That it may result.

9      Q.    All right.  It's your understanding that you

10 don't want to pile the pellets, is that right, pile the

11 tablets?

12     A.    Yes.

13     Q.    And that's because an ignition could occur?

14     A.    Yes, sir.

15     Q.    And the last page, let's just look at this,

16 this is -- can you tell me what that's a photo of?

17     A.    A flask.

18     Q.    All right.  And that's the label on the flask?

19     A.    Yes, sir.

20     Q.    All right.  Do you see the same language on

21 that label that's attached to the flask?

22     A.    Yes, sir.

23     Q.    Again.  That's saying don't pile the fumigant,

24 correct?

25     A.    Yes, sir.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 48 of 243

Page 49

1      Q.  And that's the law, right?

2      A.  Yes, sir.

3      Q.  Do you fill out any audit forms at all after

4 you do a fumigation using aluminum phosphide?

5      A.  Could you reask that question?

6      Q.  Yes.  When you do a job using aluminum

7 phosphide as the fumigant, do you subsequently fill out

8 an audit form?

9      A.  Not that I recall.

10      Q.  All right.  Have you ever filled out an audit

11 form -- an audit form when you do fumigant -- fumigation

12 with aluminum phosphide?

13      A.  Not that I can recall.

14      Q.  And why is that?

15      A.  I'm not sure.

16      Q.  Do you think that IFC requires you to do an

17 audit form when you fumigate with aluminum phosphide?

18      A.  Not that I'm aware of.

19      Q.  Did your procedural -- operational procedural

20 manual tell you to fill out an audit form after you do a

21 fumigation?

22      A.  I don't remember.

23      Q.  Okay.  You can put those away if you'd like.

24      MR. EPSTEIN:  And when you get to a good

25      stopping point, we've been going for about an hour.

5813 Shawood Drive      **VIVIAN TILLEY & ASSOCIATES**      tel:919.847.5787
Raleigh, NC 27609      ctrptr4u@aol.com      fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 49 of 243

Page 50

1          MR. WIDIS:  Okay.  Well, this is a good

2      stopping point.

3          MR. EPSTEIN:  Okay.  That's why I'm asking.

4      Five-minute break?

5          MR. WIDIS:  That will be fine.

6          (Brief recess 10:01 - 10:08 a.m.)

7   BY MR. WIDIS:

8      Q.   Mr. Turner, I'd like to go back and make sure

9   I understand the training that you received with IFC

10  when you joined, and in particular I want to talk about

11  the training that you received in applying aluminum

12  phosphide.  Did you receive any training from Industrial

13  Fumigant Company regarding the application of aluminum

14  phosphide fumigant?

15     A.   Again, hands-on training where I was taken out

16  to job sites working with someone else.

17     Q.   Did you receive any training manuals from

18  Industrial Fumigant regarding the application of

19  aluminum phosphide?

20     A.   The labels, labels and MSDS.

21     Q.   Any -- any written publications, any manual,

22  any pamphlets provided by Industrial Fumigant to you

23  regarding applying aluminum phosphide?

24     A.   I'm not sure.

25     Q.   You may have, you may not have, you just don't

5813 Shawood Drive                VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                     ctrprtr4u@aol.com                   fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 50 of 243

Page 51

1    remember?

2         A.    I just don't remember.

3         Q.    All right.  Do you know if you've got any

4    documents from Industrial Fumigant regarding fire

5    hazards that could be caused by aluminum phosphide?

6         A.    I don't know.

7         Q.    When you were trained -- you said you received

8    on-site training by someone when you first joined the

9    company, right?

10        A.    Yes, sir.

11        Q.    And who was that?

12        A.    Mike Monk.

13        Q.    Is he still with the company?

14        A.    No, sir.

15        Q.    What happened to Mr. Monk, did he resign?

16        A.    I'm not sure.

17        Q.    Do you know where Mr. Monk is now?

18        A.    I do not.

19        Q.    Do you know how to spell his last name?

20        A.    M-o-n-k.

21        Q.    Where did he live?

22        A.    The last I know he was living in

23   Winston-Salem.

24        Q.    Did Mr. Monk explain to you any hazards that

25   could be created by -- when you apply aluminum

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 51 of 243

Page 52

1   phosphide?

2        A.   Yes.

3        Q.   And what did Mr. Monk tell you?

4        A.   Well, we discussed things like the inhalation

5   hazard and when you should have on your breathing

6   apparatus.

7        Q.   Did Mr. Monk ever tell you to be careful not

8   to let the fumigant pile up?

9        A.   I know he instructed me that we wanted to

10  scatter it.

11       Q.   All right.  And why did he want you to scatter

12  it?  Did he tell you why he wanted you to scatter it?

13       A.   I'm not sure if he explained.

14       Q.   Why did you think he wanted you to scatter it?

15       A.   It's how it instructs you in the label.

16       Q.   And the label says do not allow it to pile up;

17  is that right?

18       A.   Yes.

19       Q.   All right.  So is it your understanding then

20  that you shouldn't allow aluminum phosphide tablets to

21  pile up when you're fumigating?

22       A.   Yes.

23       Q.   Okay.  And that's because it could cause a

24  fire?

25       A.   I don't know.

5813 Shawood Drive            VIVIAN TILLEY & ASSOCIATES            tel:919.847.5787
Raleigh, NC 27609                  ctrptr4u@aol.com                  fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 52 of 243

Page 53

1    Q.   You don't know if it would cause a fire or

2  not?

3    A.   I don't know.

4    Q.   Did you receive any training that would

5  discuss what could cause a fire using aluminum

6  phosphide?

7    A.   I know that I've been trained that if it comes

8  in contact with water, it could cause fire.

9    Q.   All right.  Is there any other way it could

10 cause a fire besides contact with water?

11   A.   I'm not sure.  I don't know.

12   Q.   Why is it you think that you're not supposed

13 to pile it up?

14   A.   I'm not sure.

15   Q.   Have you ever looked into that, ever tried to

16 find out why you shouldn't pile it up?

17   A.   No.

18   Q.   And no one has told you why you shouldn't pile

19 it up?

20   A.   I can't say that anyone has told me.  I know

21 what I read in the label.

22   Q.   And you know the label says don't pile it up,

23 right?

24   A.   Yes, sir.

25   Q.   But you don't know why you shouldn't pile it

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com                 fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 53 of 243

Page 54

1   up; is that right?

2        A.   Well, it tells you in the label that it could

3   cause -- may cause -- can I look at it?

4        Q.   Yes.  Of course.

5        A.   And I'll read it off.

6        Q.   Yeah.  Yeah.

7        A.   Here we go.  It says here piling -- this

8   sentence I read earlier:  The piling of the pellets or

9   dust from their fragment may cause a temperature

10  increase and confine the gas -- release of gas so that

11  ignition may occur.

12       Q.   All right.  So you don't pile it because it

13  could cause ignition; is that right?

14       A.   It could cause ignition.

15       Q.   So that's right?  So the reason you don't pile

16  it is it could cause ignition; is that right?

17       A.   Yes.

18       Q.   Okay.  All right.  During your training, were

19  you ever told by anyone at IFC that piling or stacking

20  the peanuts could cause a fire -- I'm sorry, let me

21  change that.

22            During your training -- during your training,

23  were you ever told by IFC that piling or stacking the

24  fumigant could cause a fire?

25       A.   I don't recall.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                fax:919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 54 of 243

1      Q.    Do you recall -- did you ever receive any

2  information from IFC during your training that told you

3  that piling or stacking fumigant could cause a fire?

4      A.    I can't be certain.  I'm not sure.

5      Q.    You may have, you may not, you just don't

6  know?

7      A.    Correct.

8      Q.    What is a fumigation plan?

9      A.    A Fumigation Management Plan is we put those

10  together prior to fumigation with phosphene.  It

11  describes the process, what we're going to do and it's

12  put in place for safety reasons, which has first

13  responders, such as fire department, police, as well as

14  contact names, my name as fumigator and the customer

15  name and contact numbers.

16      Q.    And what is your role in formulating or

17  developing a fumigation plan as territory manager?

18      A.    I talk with the customer and get information

19  needed to put this plan together, and it's a plan that's

20  jointly put together with the customer.

21      Q.    How often do you work on the plan?  Do you

22  revise the plan?

23      A.    We only revise it if there's been changes.

24      Q.    And how often do you update a plan?

25      A.    On Fumigation Management Plans only if there's

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                    ctrptr4u@aol.com                    fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 55 of 243

Page 56

1    changes via contact person or changes to the structure.

2         Q.    Where's the plan kept?

3         A.    There's one at our corporate office.  I keep

4    one with me in my truck when I'm on site and the

5    customer is provided a copy.

6         Q.    Is it important to follow the plan when you're

7    doing fumigation?

8         A.    Yes, sir.

9         Q.    All right.  Do you always follow the plan when

10   you do fumigation?

11        A.    It's my intent to.

12        Q.    Okay.  All right.  Let's -- what is the

13   difference between Fumitoxin and PhosToxin?

14        A.    I'm not sure.

15        Q.    Have you ever used PhosToxin when you're

16   fumigating?

17        A.    Yes.

18        Q.    Do you know if PhosToxin is an aluminum

19   phosphide fumigant?

20        A.    Yes.

21        Q.    Do you know what difference there is, if any,

22   between Fumitoxin and PhosToxin?

23        A.    The active ingredient is the same in the same

24   percentage.

25        Q.    All right.  Do you know any differences other

5813 Shawood Drive            VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                  ctrptr4u@aol.com              fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 56 of 243

Page 57

1    than the name?

2         A.   No, sir.

3         Q.   Okay.  You have used PhosToxin in the past?

4         A.   Yes, sir.

5         Q.   Do you know why in one instance you would use

6    PhosToxin and in another instance you would use

7    Fumitoxin?

8         A.   Fumitoxin is cheaper.

9         Q.   How much cheaper?

10        A.   I'm not sure.

11        Q.   Do you buy the product yourself?  Do you buy

12   the Fumitoxin?

13        A.   No, sir.

14        Q.   Who is in charge of buying that Fumitoxin?

15        A.   Our corporate office.

16        Q.   All right.  Other than cost, do you know any

17   other reason you would use -- choose one over the other?

18        A.   No, sir.

19        Q.   All right.  When you fumigate with Fumitoxin,

20   there is an applicator's manual, correct?

21        A.   Yes.

22        Q.   And the applicator's manual is also the law;

23   is that correct?

24        A.   Yes.

25             MR. WIDIS:  Four.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com               fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 57 of 243

Page 58

1            (Exhibit No. 4 marked for identification.)

2       Q.   All right.  I'm handing you what we have

3  marked as Plaintiffs' Exhibit 4 and I will tell you it's

4  an abbreviated version of the applicator's manual.  Have

5  you seen a Fumitoxin Applicator's Manual before?

6       A.   Yes, sir.

7       Q.   Have you read it?

8       A.   Yes, sir.

9       Q.   All right.  If you would, turn to the second

10  page, and that's page number 4.  Make it easy, starting

11  with where it says "aluminum phosphide," do you see it?

12  Yeah, right there.  Would you read that sentence,

13  please.

14       A.   "Aluminum phosphide tablets and pellets

15  outside of their container should not be stacked or

16  piled up or contacted with liquid water."

17       Q.   All right.  And does that mean to you that you

18  should not pile up the aluminum phosphide tablets?

19       A.   Yes, sir.

20       Q.   And the law would require you not to pile them

21  up?

22       A.   Yes.

23       Q.   Read the next sentence.

24       A.   "This may cause a temperature increase,

25  accelerate the rate of gas production and confined gas

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                     ctrptr4u@aol.com                     fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 58 of 243

Page 59

1    so that ignition may occur."

2         Q.   And, again, that -- does that mean to you that

3    if you pile up aluminum phosphide tablets, it could

4    cause ignition, could cause a fire?

5         A.   Yes, sir.

6         Q.   All right.   On page 8 -- I'm sorry, the next

7    page, just turn to the next page, which is page 8.

8         A.   Yes, sir.

9         Q.   The very last paragraph it says:  "It is

10   permissible and often desirable to use a low-flow

11   recirculation system for phosphene gas in certain bulk

12   storages."  Do you know what a low-flow recirculation

13   system is?

14        A.   I think I do.

15        Q.   What is that?

16        A.   As I understand it, it's where you would have

17   a pipe like running from the bottom to the top in a bin

18   and recirculate the gas.

19        Q.   Is that like a closed-loop system?

20        A.   Yes, sir.

21        Q.   Have you ever used a closed-loop system?

22        A.   Yes, sir.

23        Q.   All right.   Were you able to create it, to

24   manufacture it, a closed-loop system?

25        A.   I don't know if I understand the question.

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                  ctrptr4u@aol.com                   fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 59 of 243

Page 60

1      Q.   Were you able to build it, the closed loop,

2   put the piping up yourself?

3      A.   Yes, sir.

4      Q.   All right.  In what circumstances would you

5   want to use a closed-loop system?

6      A.   I've used it in grain.  Yeah, I've just used

7   it in grain.

8      Q.   All right.  And what circumstances or -- what

9   are the circumstances that would dictate to you that you

10   want to use a closed-loop system?

11      A.   Again, in grain, I've used it in larger grain

12   bins.  Grain is very compacted and it just helps move

13   the fumigant.

14      Q.   Are you concerned about gas distribution

15   within the structure when you decide to use a

16   closed-loop system?

17      A.   I'm not sure on that.

18      Q.   You don't know?

19      A.   I don't know.

20      Q.   Do you know about how far down in a commodity,

21   if you put fumigant on the surface, about how far down

22   into the product the gas will distribute?  And I'm

23   talking about aluminum phosphide.

24      A.   It's supposed to fill the entire space.

25      Q.   All right.  If you have the commodity stacked,

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 60 of 243

Page 61

1    is there any limit to how far the gas will go down to

2    where a closed-loop system makes sense?

3         A.    Not that I'm aware of.

4         Q.    All right.  Turn to page 9, if you would.

5    Start right here.  Poor gas -- do you see that right

6    there?

7         A.    Yes, sir.

8         Q.    Read that sentence right here where it says

9    "poor gas."

10        A.    "Poor gas distribution frequently results when

11   the fumigant is added on top of the grain."

12        Q.    Now, what does that mean to you?

13        A.    That the gas may not equally distribute.

14        Q.    All right.  Is that when perhaps a closed-loop

15   system might be beneficial?

16        A.    Yes.

17        Q.    All right.  So is surface application -- just

18   putting a fumigant on top of a surface of the commodity,

19   it might not penetrate to the bottom; is that basically

20   what this statement is saying?

21        A.    I'm not sure on that.

22        Q.    And you don't know how far down gas would

23   generally distribute if placed on top of a commodity, do

24   you?

25        A.    We go back and monitor, take readings at top

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 61 of 243

Page 62

1    and bottom, so I know it distributes.

2         Q.    Do you do that in each instance?

3         A.    Usually.

4         Q.    Were you able to do it in the Severn dome?

5         A.    Yes.

6         Q.    Monitor the distribution of the gas at the top

7    and the bottom?

8         A.    Yes.

9         Q.    How did you do that?

10        A.    With electronic equipment and we had read line

11   that came from the top so we could monitor top; and we

12   took our readings at the bottom from the aeration

13   ductwork that goes under the dome.

14        Q.    All right.  And that's outside the dome?

15        A.    That is correct.

16        Q.    Okay.  All right.  Turn, if you would, to page

17   16.  Number 17, if you would read that first sentence

18   there.

19        A.    "The structure to be fumigated must first be

20   inspected to determine if it can be made sufficiently

21   gas tight."

22        Q.    And is that something you should do in each

23   instance when you do a fumigation?

24        A.    Yes.

25        Q.    All right.  Turn to page 18.  Underneath where

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com               fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 62 of 243

1    it says, "Fumigation Management Plan number 21," look at

2    number three down there.  Do you see that?

3        A.   Yes, sir.

4        Q.   All right.  Would you read that?

5        A.   "Prior to each fumigation, review any existing

6    FMP, MSDS, applicator manual and other relevant safety

7    procedures with company officials and appropriate

8    employees."

9        Q.   Now, this is the applicator's manual and is it

10   telling you that prior to each fumigation you need to

11   review the Fumigation Management Plan, the MSDS, the

12   applicator's manual and any other relevant safety

13   features with officials of the client?

14       A.   That's how I understand this.

15       Q.   All right.  And is that something you do each

16   time you do a fumigation?

17       A.   No.

18       Q.   Why not?

19       A.   In situations where we've fumigated the same

20   structure more than one time and there's been no

21   changes, then often I do not.

22       Q.   And if you've done it before, you don't feel

23   there's been any changes, then you don't feel there's a

24   need to contact the official -- the client before you do

25   the fumigation?

5813 Shawood Drive      **VIVIAN TILLEY & ASSOCIATES**      tel:919.847.5787
Raleigh, NC 27609      ctrptr4u@aol.com      fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 63 of 243

Page 64

1      A.    Well, now we do talk.

2      Q.    Well, that's what I'm asking.

3      A.    Yes.

4      Q.    What this says is prior to each fumigation you

5   review these documents and safety features with the

6   officials?

7      A.    We talk and discuss the job.  I don't review

8   this manual and all the documents every time.

9      Q.    I see.  So your practice is to talk each time

10  you do a fumigation with someone from the -- from that

11  particular facility?

12     A.    Yes, sir.

13     Q.    And what if they're not available or you can't

14  find them, has that ever happened?

15     A.    I don't remember.

16     Q.    May have, may not, you just -- there may be

17  times --

18     A.    I really don't remember.

19     Q.    All right.  Turn if you would to page 26.

20  That's the last page.  And read number 8, if you would.

21     A.    "Spread Fumitoxin on the sheets at a density

22  no greater than 30 tablets per square feet or 150

23  pellets per square feet."

24     Q.    Now, let me stop you there.  Why do you think

25  it should be no greater than 30 tablets per square foot?

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                   ctrptr4u@aol.com                     fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 64 of 243

Page 65

1      A.   I'm not sure.

2      Q.   Do you think that would have to do with piling

3  if you had more than 30 in a square foot, that would be

4  piling?

5           MR. EPSTEIN:   Objection to form.

6      Q.   You can answer.

7      A.   I'm not sure if that would be considered

8  piling.

9      Q.   What do you think piling would be?  What do

10 you consider piling to be?

11     A.   I'm not certain.

12     Q.   You don't know what piling would be?

13     A.   (Witness shakes head.)

14     Q.   Would you consider 30 tablets in -- within a

15 square foot to be piling?

16     A.   Yes.

17     Q.   All right.  The last sentence of this one

18 says:  "Check to see that Fumitoxin has not been piled

19 up and it is spread out evenly to minimize contact

20 between the individual tablets or pellets."  Do you see

21 that?

22     A.   Uh-huh.

23     Q.   Why do you think the application manual is

24 saying check to see that it's not piled up and spread

25 out evenly?

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES         tel:919.847.5787
Raleigh, NC 27609                   ctrptr4u@aol.com              fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 65 of 243

Page 66

1     A.   Well, we'll go back to the label.

2     Q.   And what --

3     A.   It says it may cause ignition.

4     Q.   All right.  So it's accurate that you don't

5  pile it up because it could cause a fire; is that right?

6  It could cause a fire?

7     A.   It could.

8     Q.   Okay.  Do you do a pre-inspection visit before

9  each fumigation?

10    A.   No, sir.

11    Q.   Why not?

12    A.   I do in situations where it's first time

13  fumigating it, but if we've fumigated it before, I

14  typically do not do a pre-inspection.

15    Q.   Let me go back and ask you one other question

16  on this and then we'll go on.

17    A.   Yes, sir.

18    Q.   Let me go back to page 18, it says under 21

19  under three, where it was prior to each fumigation

20  review any of these documents and other safety features

21  with the company officials.  You said you don't do that

22  unless there has been a change; is that right?

23    A.   Yes, sir.

24    Q.   All right.  Is there anything in the manual

25  that you're aware of that would give you -- that says

5813 Shawood Drive                VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                    ctrptr4u@aol.com                      fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 66 of 243

Page 67

1    you don't have to check it just because there hasn't

2    been a change?

3            MR. EPSTEIN:  Objection to form.

4        A.   I'm not aware.  I don't know.

5        Q.   Your policy is just not to do it if there

6    hasn't been a change; is that right?  In other words,

7    your policy is not to go back and go over the documents

8    with the official if there hasn't been a change in them?

9        A.   I have a conversation with the official.

10       Q.   Okay.  We were talking about pre-inspection

11   visits.  You don't do a pre-inspection of the site if

12   you've already been there before; is that right?

13       A.   I just have a conversation with the customer.

14       Q.   Do you do a pre-inspection of the facility if

15   you've already fumigated that structure before?

16       A.   Can you ask me that question again.

17       Q.   Do you do a pre-inspection again of this site

18   if it's a situation where you've already fumigated this

19   structure one time previously or any time previously?

20       A.   There are occasions we do, but not every time.

21       Q.   Why don't you do it every time?

22       A.   Again, we have a conversation with the

23   customer, or I have a conversation with the customer and

24   if he tells me there's been no changes, and I've already

25   been to the site before, then I don't do a

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 67 of 243

Page 68

1    pre-inspection visit.

2        Q.    Do you feel that you should see it yourself

3    and not rely on what the customer has told you?

4        A.    When we're on site to do the fumigation prior

5    to starting it, it is inspected; and if it wasn't suited

6    for fumigation, then I would stop.

7        Q.    Are you able to refuse to do fumigation when

8    you come to a site?

9        A.    Yes, sir.

10       Q.    In fact, would you say you have a duty not to

11   fumigate something if you feel it could not be done

12   safely?

13       A.    Yes, sir.

14       Q.    Or have there been times when you have refused

15   to fumigate a site?

16       A.    Yes, sir.

17       Q.    All right.  Can you recall any of those times?

18       A.    Yes, sir.

19       Q.    Tell me -- at Severn, do you recall any

20   circumstances at Severn where you came to the site to do

21   a fumigation, you felt it could not be done safely or

22   properly and you refused to do it?

23       A.    Yes, sir.

24       Q.    All right.  Tell me about that.

25       A.    It was a warehouse in I believe it's

5813 Shawood Drive           VIVIAN TILLEY & ASSOCIATES           tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                  fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 68 of 243

1    Pendleton, not far from Severn and it was a warehouse

2    that was -- I didn't feel that I could seal properly and

3    there were houses nearby, so I refused to fumigate it.

4         Q.   All right.  Any others?

5         A.   That's all that I can recall.

6              MR. WIDIS:  Let's get this marked as Exhibit

7    5.  You've seen this before.

8              MR. EPSTEIN:  Thank you.

9              (Exhibit No. 5 marked for identification.)

10        Q.   I'm showing you a document we've marked as

11   Exhibit 5.  Can you identify it?

12        A.   Yes, sir.

13        Q.   What is it?

14        A.   It's the agreement between our company and the

15   customer.

16        Q.   It says, number six:  "IFC is to assume

17   responsibility for sealing and preparing the building

18   area for treatment."

19             MR. EPSTEIN:  Okay.  Where?

20             MR. WIDIS:  Number six.

21             MR. EPSTEIN:  Okay.

22             MR. WIDIS:  I'm sorry.

23             THE WITNESS:  Okay.

24        Q.   It's IFC's responsibility to seal and prepare

25   the building and area for treatment, correct?

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                  fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 69 of 243

Page 70

1    A.    Yes.

2         Q.    Look, if you would, at number nine on the

3    second page that says:  "If after inspection of the

4    facility, commodity or space to be treated by IFC

5    employees, it is determined that the treatment should

6    not be completed for any reason whatsoever, IFC shall

7    promptly notify client and this agreement shall become

8    null and void and no further effect."  Do you see that?

9    A.    Yes, sir.

10        Q.    It says, "If treatment should not be completed

11   for any reason whatsoever," and I want to make sure I

12   understand what you would feel would fall within that

13   category of any reason whatsoever.  Give me examples of

14   what would make it so that you would not fumigate a site

15   after you've done your inspection of the facility,

16   commodity or space.

17        A.    If the building wouldn't hold gas, if I

18   couldn't seal it.

19        Q.    All right.  What else?

20        A.    Just determining if I could do it safely and

21   protect my employees.

22        Q.    And what do you mean by "doing it safely"?

23        A.    Keeping my employees safe and the people

24   around it safe.

25        Q.    If you felt you couldn't do this without

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 70 of 243

1    piling up the pellets or the tablets, would that be

2    something that you would then refuse to fumigate?

3           MR. EPSTEIN:  Objection to form.

4       A.   Could you ask me that question again.

5       Q.   If you felt that you couldn't apply this

6    fumigant without creating a potential fire hazard, would

7    that be something that would cause you to refuse to

8    fumigate it?

9       A.   Yes, sir.

10      Q.   If you saw water entry or moisture, which you

11   felt was excessive, would that be sufficient to cause

12   you not to fumigate?

13          MR. EPSTEIN:  Aluminum phosphide?

14          MR. WIDIS:  Aluminum phosphide, yes.

15      A.   Yes, sir.

16      Q.   If you felt you couldn't distribute the

17   tablets properly on the commodity, would that be some

18   reason that you felt you would -- couldn't -- that you

19   would refuse to fumigate?

20      A.   Yes, sir.

21      Q.   If you observed some type of fungus on the

22   commodity, would that be a reason that you refused to

23   fumigate?  Again, talking about aluminum phosphide.

24      A.   I'm not sure on that one.

25          MR. WIDIS:  I'd like to mark this as six.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 71 of 243

1            (Exhibit No. 6 marked for identification.)

2        Q.   I'm handing you a document we've marked as

3    Exhibit 6.  And I want you to look at -- first of all,

4    look at IFC Bates number 0087.  I think that will

5    probably be the second or third one.  I'm sorry.  This

6    one right here.  See it says:  "Severn tank fumigations

7    cancelled due to peanuts bridged or unsafe conditions."

8    What does that mean, "due to peanuts bridged or unsafe

9    conditions"?

10       A.   I don't think I was with the guys this time,

11   so I'm not sure what they observed, but bridging is when

12   the peanuts or grain is actually bridged and there's a

13   risk of it caving in and it creating an engulfment of

14   the employee, which is a safety hazard.

15       Q.   And what do you mean by "bridged"?

16       A.   This typically occurs when peanuts or grain

17   has been pulled out of a bin and there's like a crust or

18   a bridge across -- it forms a crust or a bridge.

19       Q.   I'm just trying to -- I'm not understanding

20   exactly what that is, so you'll just have to tell me.

21   You say you pull the peanuts out of the structure?

22       A.   Which is something the customer would have

23   done.

24       Q.   Okay.  And then go ahead.

25       A.   It creates a void, a pocket area in the grain

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                 fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 72 of 243

1    or peanuts, and the bridge is actually formed from the

2    grain or peanuts.

3        Q.   Is this a situation where the IFC employees

4    are actually going to go out and walk on the commodity

5    itself?

6        A.   Yes.

7        Q.   And you're concerned that it might collapse on

8    them or they might get stuck inside the commodity

9    itself?

10       A.   Yes.

11       Q.   Look at the third page on this one, which is

12   Bates IFC-Rollins 788.  And that has your name down

13   under "commissions," see that?

14       A.   Yes, sir.

15       Q.   And it says, "Technical report must be

16   attached," that has your signature, correct?

17       A.   Yes, sir.

18       Q.   It says:  "Cancellation due to peanuts bridged

19   or unsafe condition," and that's Seaboard, North

20   Carolina.  Do you see that?

21       A.   Uh-huh.  Yes, sir.

22       Q.   Do you recall that job?

23       A.   I wasn't on that particular job.

24       Q.   So even though you're getting a commission,

25   you're not on that job?

5813 Shawood Drive        VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787
Raleigh, NC 27609            ctrptr4u@aol.com               fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 73 of 243

Page 74

1      A.    That's a 3 percent standard I get as territory

2   manager.   It's an admin.

3      Q.    Do you know what happened to cause a

4   cancellation here at Seaboard?

5      A.    I don't remember.

6      Q.    Would Brian Lilley -- let's see, Brian Lilley

7   was at that job; is that right?

8      A.    According to the report, yes, sir.

9      Q.    Okay.  Brian would be the person supervising

10   that particular job; is that right?

11      A.    Yes, sir.

12      Q.    Did Brian discuss with you this cancellation?

13      A.    I don't remember.

14      Q.    Did Brian generally discuss with you jobs that

15   resulted in a cancellation?

16      A.    Yes.

17      Q.    But you don't remember this one?

18      A.    I don't remember this particular one.

19      Q.    Look at this first page then.  This is Bates

20   IFC 258.  This one again is Brian Lilley.  I don't see

21   your name on here.  On this particular -- this was a job

22   in Severn, June 7th, '06.  Do you see that?

23      A.    Yes, sir.

24      Q.    It says:  "Travel to Severn, NC to fumigate

25   peanut tank.  Peanuts were not leveled out.  Too

5813 Shawood Drive            VIVIAN TILLEY & ASSOCIATES            tel:919.847.5787
Raleigh, NC 27609                  ctrptr4u@aol.com                   fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 74 of 243

1      dangerous to be in tank.  Customer had not looked in

2      tank."  Do you recall that job?  Do you recall Brian

3      Lilley talking to you about that job?

4           A.   I can't recall in particular.

5           Q.   It's accurate to say though if you look into

6      a -- if you're supposed to do fumigation at a site and

7      you feel it cannot be done properly or safely, you

8      should refuse to fumigate it, correct?

9           A.   Yes.

10          Q.   And as fumigator, let me just go over this,

11     your obligation as a certified fumigator and the

12     applicator at a site is to make sure that the site can

13     be fumigated safely, correct?

14          A.   Yes.

15          Q.   And you have a duty to make sure that the site

16     is able to be fumigated safely before you fumigate,

17     correct?

18          A.   Yes.

19          Q.   And you are responsible to make sure that the

20     commodity is ready to be fumigated before you fumigate,

21     correct?

22          A.   I'm not sure on that.

23          Q.   Well, let me ask you this:  Is it correct that

24     you are responsible for making sure the commodity is

25     ready to be fumigated safely before you fumigate it?

5813 Shawood Drive           **VIVIAN TILLEY & ASSOCIATES**        tel:919.847.5787
Raleigh, NC 27609                  ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 75 of 243

Page 76

1      A.    Ask me that one more time.

2      Q.    Yeah.  You, as the certified applicator, have

3   responsibility to make sure that the commodity is ready

4   to be fumigated safely before you do your fumigation?

5      A.    Yes.

6      Q.    And you, as a certified applicator, are

7   responsible to make sure that you're using the right

8   amount of fumigant, correct?

9      A.    Yes.

10      Q.    And you are responsible, as a certified

11   fumigator, for making sure that the application is done

12   properly, correct?

13      A.    Yes.

14      Q.    And you, as a fumigator, are responsible for

15   making sure the application is done safely, correct?

16      A.    Yes.

17      Q.    Okay.  And you have a duty not to fumigate if

18   it cannot be done safely, correct?

19      A.    Yes.

20      Q.    And you have an obligation not to fumigate if

21   it cannot be done properly, correct?

22      A.    Yes.

23      Q.    Other than the Severn dome, do you have any

24   experience in fumigating a dome?

25      A.    No.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 76 of 243

Page 77

1      Q.   Had you ever fumigated a dome before you did

2   the Severn dome?

3      A.   No.

4      Q.   Had you done any -- let me ask you this:  Do

5   you -- what are the advantages that you were told of

6   using a dome to store peanuts?

7      A.   Could you reask me that again, please.

8      Q.   Yeah.  Were you aware of any advantages for

9   having a dome as a structure to store peanuts as opposed

10  to another structure?

11     A.   I wasn't aware of any.

12     Q.   Can you tell me what the differences would be

13  in your mind regarding fumigating a dome as opposed to

14  another structure?

15     A.   I'm not certain there would be any

16  differences.

17     Q.   So sealing this dome is basically the same as

18  just a square warehouse to you?

19     A.   I'm not sure.

20     Q.   You don't know?

21     A.   Yeah.

22     Q.   Do you feel that the dome -- you could make

23  the dome gastight in a better manner than you could

24  other types of structures?

25     A.   It held gas well.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com               fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 77 of 243

Page 78

1      Q.    So did that -- was that an advantage to you

2    when you were doing your fumigation -- or did you feel

3    that was an advantage when you were doing your

4    fumigation with aluminum phosphide?

5      A.    Yes.

6      Q.    Were there any disadvantages that you saw to

7    the dome when you planned to fumigate a dome?

8      A.    No.

9      Q.    How many times have you fumigated the Severn

10   dome, or did you fumigate the Severn dome?

11     A.    I'm not sure exactly.

12     Q.    Do you recall doing it more than once?

13     A.    Yes.

14     Q.    More than twice?

15     A.    Yes.

16     Q.    Do you recall three times?

17     A.    Yes.

18     Q.    I've got that IFC did a total of five times.

19   Does that sound right?

20     A.    I'm not sure exactly.

21     Q.    I want to go back to May of -- well, let's go

22   back to 2006 and talk about the first time that the dome

23   was fumigated.  Do you recall being told that you were

24   going to fumigate a dome at Severn?

25              MR. EPSTEIN:  Objection to form if your

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com                 fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 78 of 243

Page 79

1          predicate is fumigation in 2006.

2                  MR. WIDIS:  It's 2000 -- I'm sorry, '7.

3                  MR. EPSTEIN:  Okay.  So if you would rephrase

4          the question.

5                  MR. WIDIS:  I'd be glad to.

6          Q.   Let me -- do you recall -- hang on.  Let me

7     get this straight.

8               Do you recall the first time you did the dome,

9     you fumigated the dome?

10         A.   Yes, sir.

11         Q.   And when was that?

12         A.   I'm not certain.  I think it was 2007.

13         Q.   All right.  What were you told when you first

14    were advised that you were going to be fumigating a dome

15    the first time?

16         A.   I don't clearly understand the question.

17         Q.   All right.  I'm trying to go back to that

18    first time you fumigated the dome -- you fumigated the

19    dome.  Did someone tell you from IFC we want you to come

20    fumigate a dome, our new structure?

21         A.   Did someone from IFC tell me?

22         Q.   I'm sorry, someone from Severn tell you we

23    want you to come fumigate our new structure, which is a

24    dome?

25         A.   Yes, sir.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com                 fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 79 of 243

1      Q.   Did you go and look at the dome?

2      A.   I don't remember.  I had seen the dome before,

3  but I don't remember if I went and looked at it prior to

4  that fumigation.

5      Q.   Did you do a Fumigation Management Plan for

6  that first time you fumigated the dome?

7      A.   I'm not sure, but I think I did.

8      Q.   We didn't -- I don't think we've received

9  that, but --

10          MR. EPSTEIN:  For the record, you did.

11          MR. WIDIS:  Okay.  All right.

12     Q.   At that first visit, when you first saw the

13  dome, who did you design the plan with?

14     A.   I'm not positive, but I think it was Pat Rowe.

15     Q.   And were there peanuts in the dome?  And,

16  again, I'm talking about that first visit.

17     A.   Half full.

18     Q.   Half full.  Could you enter the dome through

19  the doors on the side?

20     A.   Yes.

21     Q.   Was some of the peanuts gone at that point?

22     A.   Yes.

23     Q.   Did you do a pre-inspection visit of the dome

24  at that time?

25          MR. EPSTEIN:  Objection to form.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 80 of 243

Page 81

1      A.    I don't remember, but I had seen the dome

2  before.

3      Q.    All right.  What did you do to determine how

4  you were going to seal it to keep the gas from escaping?

5      A.    An inspection.

6      Q.    And what did that inspection entail?

7      A.    Walking around the dome, going on top of the

8  dome to determine what all -- what needs to be sealed.

9      Q.    And what did you -- where did you feel you

10 were going to put the tablets?

11     A.    Ask me the question again, please, sir.

12     Q.    Where were you going to apply the tablets in

13 that first fumigation?

14     A.    From the ground level.

15     Q.    And that's because you could get in on the

16 door, right?

17     A.    The door was open and we could get in.

18           (Exhibit No. 7 marked for identification.)

19     Q.    I'm going to show you some photos.  I'd just

20 like to make sure I understand what these are.  First of

21 all, let me show you Exhibit 7, can you identify what's

22 in that photograph?

23     A.    Yes, sir.

24     Q.    What is that?

25     A.    It's the interior of the dome.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 81 of 243

Page 82

1      Q.   And what is this big structure in the center

2   here?

3      A.   Piled peanuts mixed with dirt in them.

4      Q.   This was basically a stack of peanuts right in

5   the center that was still standing in the center; is

6   that right?

7      A.   Yes, but, as I recall, it wasn't perfect

8   center.

9      Q.   That's fine.

10      A.   Yeah.

11      Q.   All right.  And at the top of this photograph,

12   what is this that I'm pointing to?

13      A.   That's the hatch, the opening where the

14   peanuts enter the bin.

15      Q.   Okay.  Could you circle that and just write

16   "hatch" on it so we know what we're ...

17      A.   (Witness complies.)

18      Q.   Just write "hatch" off to the side.

19      A.   (Witness complies.)

20      Q.   What is that dark spot in the middle?

21      A.   This spot (Indicating)?

22      Q.   Yes.

23      A.   I'm not certain, but I assume it's where the

24   peanuts enter from the conveyor.

25      Q.   Is this -- is that dark spot the opening that

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 82 of 243

Page 83

1    was at the top of the dome?

2         A.   I'm just not certain.

3         Q.   As I understand, there's a hole in the top of

4    the dome with a headhouse on top of it, correct?

5         A.   There is a headhouse on top.

6         Q.   All right.  Is there an opening?  Did you see

7    an opening in the dome where there was no concrete, but

8    a round opening?

9         A.   I'm not sure.

10        Q.   About how tall was that structure of peanuts,

11   that pile of peanuts?

12        A.   It was tall, but I'm not sure.

13        Q.   Do you know how tall the dome is, the height

14   of the dome?

15        A.   I have that in a file somewhere, but I'm not

16   sure off the top of my head.

17        Q.   Okay.  Do you know how far it was from the top

18   of the dome to the top of that pile?

19        A.   I don't recall.

20             (Exhibit No. 8 marked for identification.)

21        Q.   Okay.  All right.  Look at the next photograph

22   which we have, Exhibit 8.

23        A.   Yes, sir.

24        Q.   Now, what am I looking at here?

25        A.   I'm thinking you can see the peanuts, the pile

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                 fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 83 of 243

Page 84

1    of peanuts in the back.  And what you have in the front

2    is poly that we've placed down on the concrete.  And on

3    the poly are the flasks of the Fumitoxin or PhosToxin,

4    I'm not sure which, they look the same, the containers.

5         Q.    Were you -- who spread them out like that?

6         A.    Me and the employees that were with me.

7         Q.    Do you know who took these photographs?

8         A.    Yes, sir.

9         Q.    Who is that?

10        A.    Me.

11        Q.    All right.  Why did you take photographs of

12   them?

13        A.    I had never seen the inside of a dome before.

14        Q.    All right.  Tell me how you fumigated, the

15   application process with the -- on this first visit.

16   Tell me exactly what you did.

17        A.    Once we had it laid out, as you see in this

18   picture, we then went in and opened the flasks and

19   scattered it, as in scattered it up on the peanut pile

20   as well as on this poly.

21        Q.    And how would you scatter them; what did you

22   use to scatter them?

23        A.    Our hands.

24        Q.    Meaning your hands held the flask and did it,

25   or did you put the tablets in your hands and then

5813 Shawood Drive            VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                  ctrptr4u@aol.com                 fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 84 of 243

Page 85

1   scatter them?

2       A.   Some of both.

3       Q.   So in each instance you would -- you emptied

4   all the flasks; is that right?

5       A.   Correct.

6       Q.   And put some on the poly and some up on the

7   piles --

8       A.   Correct.

9       Q.   -- on the pile of peanuts?

10          All right.  Did you make sure that the tablets

11  were not piled up during that time?

12      A.   Yes.

13      Q.   All right.  And if you would have seen say 30

14  tablets piled in one pile, would you have tried to

15  disperse that?

16      A.   Probably so.

17      Q.   And why is that?

18      A.   Because we were trained to scatter them.

19      Q.   'Cause it could cause a fire if they were

20  piled up, is that -- could cause a fire if they were

21  piled up?

22      A.   I don't know what amount it takes to cause a

23  fire.

24      Q.   All right.  But the reason that you were

25  scattering them is you were trained not to allow them to

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 85 of 243

1  pile up, right?

2       A.   Yes.

3       Q.   And the label says that piling can cause --

4       A.   May cause.

5       Q.   May cause ignition or a fire, correct?

6       A.   Yes, the label does say that.

7       Q.   So isn't it accurate that the reason that

8  you're making sure that they're not piling up is you

9  want to make sure that this does not cause a fire?

10      A.   I'm not sure on that one.

11      Q.   All right.  So you're trained not -- you're

12 trained not to allow the tablets to pile up; you

13 probably would have dispersed scattered piles if you had

14 seen more than 30 piled up, but you don't know why; is

15 that right?

16      A.   Again, we were just trained to scatter because

17 the label tells us to scatter the tablets.

18      Q.   Okay.  But you don't know why at this point?

19      A.   Well, according to the label, it says it could

20 possibly cause an ignition.

21      Q.   Okay.  All right.  How did you calculate how

22 many -- how much fumigant to use in the dome?

23           MR. EPSTEIN:  Are you talking about for this

24      application?

25           MR. WIDIS:  Yes, this application.  I'm

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com              fax:919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 86 of 243

                                                      Page 87

1       talking about the first application.

2       A.    I obtained the cubic footage from the

3   customer.

4       Q.    Cubic footage of what?

5       A.    The space of the dome.

6       Q.    Did it matter to you how many peanuts were in

7   the dome?

8       A.    No, sir.

9       Q.    Okay.  Go ahead, what did you do at that

10  point?  You obtained the cubic footage from the

11  customer?

12      A.    And then I referred to the label to see the

13  minimums and maximum amount of tablets that you could

14  use.

15      Q.    Do you know the maximum amount of tablets that

16  you could use for peanuts?

17      A.    It's in the label.

18      Q.    Label meaning the application manual, but all

19  together, right?

20      A.    Yes.

21      Q.    But you don't know it as you sit here, right?

22      A.    No.

23      Q.    And do you know what number you came up with?

24      A.    I would need to look at the reports.

25            MR. WIDIS:  Now, that we didn't get was that

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com                  fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 87 of 243

Page 88

1      first report.

2           MR. EPSTEIN:  I don't think that's accurate

3      either.

4           MR. WIDIS:  Well, your paralegal said she

5      couldn't find one.  It's all right.

6      Q.   You decided to fumigate by scattering across

7  the surface and the poly.  Did you have any other

8  options available to you?  Did you think of any other

9  ways that you might broadcast the fumigant or apply

10 it -- apply the fumigant?

11     A.   No, sir.  This was -- seemed to be the

12 practical thing to do for the space.

13     Q.   When you did that first one, did you give any

14 particular instructions to Severn as to what they needed

15 to do?

16     A.   I feel certain I did, but I can't in

17 particular tell you particularly what I said.

18     Q.   Were there any concerns that you had about

19 electricity inside the dome?

20     A.   Yes.

21     Q.   What was that?

22     A.   There was a conveyor inside the dome.

23     Q.   Inside the dome or inside the headhouse?

24     A.   Inside the dome.

25     Q.   All right.  And what was the conveyor doing?

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                   ctrptr4u@aol.com                   fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 88 of 243

Page 89

1        A.    They were using it to move the peanuts out.

2        Q.    Did you give them any instructions regarding

3   that conveyor?

4        A.    Yes, sir.

5        Q.    What did you tell them?

6        A.    They needed to remove it.

7        Q.    And did they?

8        A.    Yes, sir.

9        Q.    Any evidence of water intrusion when you were

10  there?

11       A.    Not as I can remember.

12       Q.    And if you had seen anything, you would have

13  told Severn about it?

14       A.    Yes, sir.

15       Q.    And if you had seen any water intrusion, you

16  would not have fumigated; is that correct?

17       A.    Yes, sir.

18       Q.    Okay.  Was there any information that you felt

19  you needed from Severn that they didn't give you?

20       A.    At that time, no.

21       Q.    Did you ask for any information that you were

22  not given?

23       A.    No.

24       Q.    Did you have any concerns about fumigating the

25  dome with the aluminum phosphide when you did this

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 89 of 243

Page 90

1    fumigation?

2        A.   No, sir.

3        Q.   Do you know what the temperature was at

4    this -- at this initial fumigation?

5             MR. EPSTEIN:   Temperature of?

6        Q.   Temperature of let's say the interior of the

7    dome.

8        A.   I did take a temperature reading interior.  I

9    can't remember -- I'd have to look at the report.

10       Q.   Did anyone from Severn go in the dome with

11   you?

12       A.   Pat Rowe and, as I recall, there was another

13   Severn employee, but I did not know their name.

14       Q.   Was anyone from Severn with you when you

15   fumigated the dome?

16       A.   Do you mean when we released the fumigant?

17       Q.   Yes, when you released the fumigant.

18       A.   No.

19       Q.   Do you recall how long the actual process took

20   from let's say laying out all the flasks on the poly

21   there and then opening them and distributing them and

22   then sealing the dome?

23       A.   I don't remember exactly how long it took.

24       Q.   Do you have an estimate?

25       A.   I'd estimate three hours on site.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                 fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 90 of 243

Page 91

1      Q.   Do you recall who was with you from IFC?

2      A.   On this first fumigation?  I remember Charles

3   Watson was with me.  I'd need to look at the service

4   report, the names are listed.  I'm just not -- I

5   remember Charles being with me.

6      Q.   Do you think Brian Lilley was with you?

7      A.   No.

8      Q.   You seem sure about that.

9      A.   Yeah.  I remember Brian wasn't with me.

10     Q.   How is it you know Brian wasn't with you?

11     A.   I just remember he wasn't on that particular

12   job.

13     Q.   Did you tell him about it?

14     A.   Yes.

15     Q.   Describe this is an unusual structure?

16     A.   Yes, sir.

17     Q.   How long did you leave it sealed?

18     A.   I don't remember.

19     Q.   Did you leave the Fumitoxin empty flasks in

20   the dome after you broadcast it and then sealed it?

21   Were the flasks still in the dome?

22     A.   Yes.

23     Q.   Is that standard practice?

24     A.   Yes.

25     Q.   When do you get the empty flasks?

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 91 of 243

Page 92

1      A.    When we come back to aerate.

2      Q.    Do you know how much Fumitoxin you used?

3      A.    I'd have to look at the report.

4      Q.    Were you satisfied with the amount you used?

5      A.    Yes, sir.

6      Q.    Did you feel there were any problems with that

7    fumigation?

8      A.    No, sir.

9            MR. EPSTEIN:  Can we go off the record for

10   just a second.

11           MR. WIDIS:  Sure.

12           (Discussion off the record.)

13           MR. WIDIS:  All right.  I'm going to mark this

14   as ...

15           MR. EPSTEIN:  Nine.

16           (Exhibit No. 9 marked for identification.)

17      Q.    Mr. Turner, we've handed you what we've marked

18   Exhibit Number 9.  Can you tell me what that is?

19      A.    It's a Fumigation Management Plan.

20      Q.    Is this the Fumigation Management Plan that

21   you created prior to your first fumigation of the dome?

22   Take your time and look at it.

23      A.    I think this is the first one that was

24   prepared.

25      Q.    Did you -- have you prepared a fumigation plan

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com               fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 92 of 243

1   since then?

2          A.    I can't remember.  I don't think I did.

3          Q.    So you think there's been a revision to this

4   management plan?

5          A.    No, I don't think there has been revision.

6          Q.    So then is it accurate that this is the one

7   and only fumigation plan for the dome?

8          A.    I'm not certain on that.

9          Q.    If there was another Fumigation Management

10  Plan subsequent to this, that would be in IFC records as

11  far as you know?

12         A.    As far as I know.

13         Q.    Look, if you would, at the second page, which

14  is IFC 172.  Number 2, it's referring to the concrete

15  dome building, correct?

16         A.    Yes.

17         Q.    So this to you means this is the plan for the

18  dome, that's how you're identifying that?

19         A.    Yes, sir.

20         Q.    All right.  Under number 4, it says "fire or

21  combustible hazards."  And, again, you participated in

22  creating this plan, correct?

23         A.    I participate, yes.

24         Q.    It says:  "Fire or combustibility hazards,

25  grain or flour dust."  You didn't put anything about

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                   ctrptr4u@aol.com                    fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 93 of 243

Page 94

1    peanuts.  Is there a reason why you didn't put anything

2    about peanuts there?

3        A.    That's a standard line that our corporate

4    office keys in -- or enters in.

5        Q.    All right.  And there is no fire hazard

6    regarding peanut dust that you're aware of, is there?

7        A.    I'm not sure.

8        Q.    You don't know?

9        A.    I don't know.

10       Q.    All right.  Go down to number 4, if you would,

11   at the bottom.  The third checklist, I want to make sure

12   I know what we're talking about in this plan.

13   "Personnel performing the fumigation and aeration have

14   read the applicator's manual and are aware of hazards

15   that may be encountered, proper selection and use of

16   personal protective equipment and monitoring devices."

17   Do you see that?

18       A.    Yes.

19       Q.    So this plan would say the person performing

20   the fumigation has read the applicator's manual and

21   aware of the hazards, right?

22       A.    Yes.

23       Q.    And one of those hazards would be piling up

24   the fumigant, correct?

25       A.    That is a potential hazard according to the

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com               fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 94 of 243

Page 95

1   label.

2        Q.   And so -- all right.  And the plan says that

3   anyone who is doing this, the person performing the

4   fumigation should be aware of that hazard, correct?

5        A.   Yes.

6        Q.   Now, if you turn to page 5, the plan calls for

7   notification, it's checked:  "Local authorities are

8   contacted prior to each fumigation."  That's contacting

9   the fire department; is that right?

10       A.   Yes.

11       Q.   And if you turn to page 6, it says, "Structure

12  sealing capability," you've checked:  "Structure or area

13  to be fumigated has been investigated and deemed

14  suitable for fumigation," right?

15       A.   Yes.

16       Q.   That would mean that every time you fumigate,

17  according to the plan, the applicator will have

18  checked -- will have inspected the structure or area to

19  be fumigated and deemed it to be suitable for

20  fumigation, right?

21       A.   Yes.

22       Q.   Under 3:  "Number of personnel required to

23  complete sealing, four IFC-certified applicators."  Now

24  when you say "IFC-certified applicators," does that mean

25  IFC has certified them or the North Carolina Department

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 95 of 243

Page 96

1   of Agriculture has certified them?

2          A.    One certified applicator has to be on site.

3          Q.    This says four IFC certified applicators,

4   doesn't it?

5          A.    The FMP does read that way.

6          Q.    Okay.  So if you were going to follow this

7   Fumigation Management Plan, you should have four

8   certified applicators on site, correct?

9          A.    According to what is typed here.

10         Q.    And this is the plan, isn't it?

11         A.    Yes.

12         Q.    All right.  And just to be clear, I just want

13  to make sure, to follow the federal -- the management --

14  Fumigation Management Plan, you would need to have four

15  IFC-certified applicators on site each time you do a

16  fumigation, correct?

17         A.    That's how it reads in this plan.

18         Q.    I know that's how it reads, but I'm asking

19  you, it is accurate, isn't it, that to follow the plan

20  you would need to have four IFC-certified applicators,

21  right?

22         A.    I'm not sure.

23         Q.    Well --

24         A.    That's how it's typed in this plan.

25         Q.    This is the plan.  It's a simple question

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                    ctrptr4u@aol.com                   fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 96 of 243

Page 97

1    here.  If you follow the plan and this is how it's

2    typed, you would need four IFC-certified applicators

3    each time you do a fumigation at the dome, right?

4        A.   That's how it reads in this plan.

5             MR. WIDIS:  Mr. Turner, it's a simple

6        question.  Steve, I'm looking for a yes or no here.

7        I'm not asking how it reads.  I'm asking --

8             MR. EPSTEIN:  He's going to answer to the best

9        of his ability, that's all he can do.

10            MR. WIDIS:  That's why I'm going to ask it

11       again.

12       Q.   The question is:  If you're following the

13   Fumigant Management Plan, you would need to have four

14   IFC-certified applicators each time you do a fumigation

15   at the dome; isn't that right?

16       A.   That's how it's typed in this plan.

17       Q.   Are you refusing to answer my question,

18   Mr. Turner?

19            MR. EPSTEIN:  Objection to form.  That's not a

20       question.  You may ask him a question.

21            MR. WIDIS:  I am asking him a question.

22       Q.   It's very simple what I'm trying to get you to

23   say here.  Isn't it true that if you follow the

24   Fumigation Management Plan for the dome, you would need

25   four IFC-certified applicators at the site every time

5813 Shawood Drive      **VIVIAN TILLEY & ASSOCIATES**      tel:919.847.5787
Raleigh, NC 27609      ctrptr4u@aol.com      fax:919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 97 of 243

1  you did a fumigation at the dome?

2          MR. EPSTEIN:  Objection to form.  It's been

3      asked and answered.  Go ahead and answer again.

4      A.   That's how it's typed.  That's how I read it

5  in this plan.

6      Q.   At the time you did this application,

7  according to the plan, was it your understanding that

8  you needed four IFC-certified applicators present with

9  you -- I mean present?

10     A.   It wasn't my understanding that I needed four

11 certified applicators.

12     Q.   All right.  But, as you read it now, as you

13 read the plan now, it's clear that you did need four

14 certified applicators if you were going to follow the

15 management plan, right?

16     A.   That's how I interpret what I'm reading.

17     Q.   All right.  Now, we're talking about list

18 general sealing.  It says:  "Top of the dome where the

19 conveyor enters the warehouse will be sealed."  We're

20 talking about up in the headhouse; is that right?

21     A.   Yes.

22     Q.   "Aeration fans inside draws will be sealed,"

23 right?

24     A.   Yes.

25     Q.   "The drive-through door will also be sealed"?

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrprtr4u@aol.com               fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 98 of 243

Page 99

1    A.   Yes.

2    Q.   "The entrance will be secured and building

3  placards will be posted around the building."  When you

4  say, "The entrance will be secured," what do you mean?

5  What do you consider the entrance?

6    A.   The one roll-up door to the dome.

7    Q.   All right.  That's the entrance?

8    A.   That's the entrance.

9    Q.   Any other entrance?

10   A.   No, sir.

11   Q.   All right.  Next page, number 8, and this is

12  Bates IFC 178, it says:  "Empty fumigant packaging

13  materials, sealing material and other paper trash is

14  properly discarded."  But, as you've said, your

15  procedure is to leave the packing material and the other

16  contents, say the flasks and the application manuals, at

17  the site until the fumigation is completed and you

18  unseal it and then you take the fumigant packaging

19  material away; is that right?

20   A.   In that situation, certain situation, that's

21  how we done it.

22   Q.   Did you do it differently other times?  In

23  non-Severn situations, did you do it differently?

24   A.   Yes.

25   Q.   All right.  How would you do it then?

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                   ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 99 of 243

1      A.   There are times that we've carried the empty

2  flasks and the trash with us upon releasing the gas.

3      Q.  All right.  Why would you leave it at Severn

4  instead of taking it with you as soon as you release the

5  gas?

6      A.   In which fumigation are you referring to?

7      Q.  Well, let's say this first one that you've

8  told me about.  You said you left the packaging material

9  inside the dome and you retrieved it after you had

10  unsealed it; is that right?

11     A.   I've done that for safety reasons.

12     Q.  What safety reasons are those?

13     A.   Because once you've released the gas, you only

14  have a certain amount of time to get out before it

15  reaches unsafe levels.  And so it was safer to wait

16  until it's aerated to go back inside to remove the

17  flasks.

18     Q.  Where do you put the flasks after you release

19  the tablets in that first instance?

20     A.   Just set them over to the side.

21     Q.  Are you putting them back in the boxes, in the

22  cases?

23     A.   I don't remember.

24     Q.  How long would it have taken to gather the

25  flasks and the cases and take them out with you?

5813 Shawood Drive          **VIVIAN TILLEY & ASSOCIATES**         tel:919.847.5787
Raleigh, NC 27609             ctrptr4u@aol.com           fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 100 of 243

1      A.   I'm not sure.

2      Q.   More than five minutes?

3      A.   Yes.

4      Q.   And how long do you think would have been a

5  safe amount of time for you to gather the flasks and the

6  packaging material?

7      A.   That could vary due to weather conditions.

8      Q.   All right.  What I'm going to talk about now

9  is this first time you did the fumigation in the dome.

10 You're on the floor, you put the fumigant on the poly

11 and on the pile, how long do you think you had to get

12 out of the dome?

13     A.   I'd estimate less than 30 minutes.

14     Q.   And you didn't feel there was time to take the

15 packaging with you?

16     A.   No.

17     Q.   Were you wearing safety equipment when you

18 were releasing the gas inside the dome?  By "safety

19 equipment," I mean the breathing apparatus.

20     A.   No.

21     Q.   Should you have been?

22     A.   No.

23     Q.   If you were concerned about their exposure to

24 gas, could you have worn breathing equipment?

25     A.   We had our monitoring devices on us.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 101 of 243

Page 102

1     Q.   All right.  And did the monitoring devices

2   show you what the exposure level was?

3     A.   Yes.

4     Q.   What was it?

5     A.   Less than .3.

6     Q.   But you still didn't feel there was time to

7   gather the packaging and take it?

8     A.   I felt it was safer to wait until we aerated

9   the building.

10    Q.   Did you feel there was any risk or down side

11  let's say to leaving this packaging material inside the

12  dome?

13    A.   No.

14    Q.   When you did this management plan, were you

15  planning on leaving the packaging material inside the

16  dome until you took it out?

17    A.   Yes.

18    Q.   And when you first devised this management

19  plan, had you been inside the dome already?

20    A.   I don't remember.

21    Q.   Did you know if you were going to be able to

22  go inside and put it on the floor when you devised this

23  FMP?

24    A.   Yes.

25    Q.   Turn, if you would, to number 7, page 7.  It

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com                 fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 102 of 243

1    says:  "Application procedure:  One, All fumigant will

2    be applied in accordance with the product labeling

3    requirements."  Do you see that?

4        A.   Yes.

5        Q.   All right.  So at the time you understood that

6    you weren't supposed to pile the tablets, correct?

7        A.   Yes.

8        Q.   All right.  The third box is not checked.  It

9    says:  "Fumigant is applied from outside the area being

10   treated."  That's because you were going to go inside

11   the dome?

12       A.   Yes.

13       Q.   And then it says -- the next box is also not

14   checked:  "Electrical lights as well as all nonessential

15   electrical motors in the fumigated structure will be

16   turned off."  That's not checked.  Is there a reason why

17   that's not checked?

18       A.   I'm not sure.

19       Q.   Should -- did you feel there were electrical

20   lights that needed to be turned off inside the dome?

21       A.   I wasn't aware there was any lights in the

22   dome.

23       Q.   The last sentence on that page 7 that's

24   checked, it says:  "Phosphene pellets will be dispersed

25   throughout the peanut hulls."  What does that mean

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 103 of 243

Page 104

1    "throughout the peanut hulls"?

2        A.   To scatter them across the peanuts.

3        Q.   All right.  But that says disperse throughout

4    it.  It doesn't say on the surface.

5             MR. EPSTEIN:  Objection to form.

6        Q.   When you say "dispersed throughout," doesn't

7    that mean inside the pile?

8        A.   I'm not sure.

9        Q.   Have you ever done a management plan that said

10   you were going to put the fumigant on the surface?

11       A.   I'd have to go back and look at them, I'm not

12   sure.

13           MR. EPSTEIN:  Howard, when you get to a good

14       stopping point, I think we should stop.  We've been

15       going for an hour and a half and probably need to

16       think about what we're going to do for lunch.

17           MR. WIDIS:  Okay.  We're not quite there yet,

18       but okay.  Let's mark this.

19           (Exhibit No. 10 marked for identification.)

20       Q.   I'm going to hand you a document we've marked

21   Plaintiffs' Exhibit Number 10, starts Bates number 4281

22   at the bottom.  If you would turn to page 7 of that

23   fumigation -- first of all, let's look at the first

24   page.  This is a fumigation plan dated April 12th, 2010.

25   Do you see that?

5813 Shawood Drive        VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com              fax:919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 104 of 243

Page 105

1        A.    Yes, sir.

2        Q.    Okay.  Severn Peanut, Oak City, North

3   Carolina, correct?

4        A.    Yes, sir.

5        Q.    Thank you.  If you would turn to page 7.  That

6   one where it says notes on fumigants, it says:  "Tablets

7   or pellets are walked into the peanuts or distributed on

8   the peanut surface where possible."  Do you see that?

9        A.    Yes, sir.

10       Q.    Okay.  So you do at times put -- distribute on

11  the surface, right?

12       A.    Yes, sir.

13       Q.    Isn't that different than what you've said in

14  this fumigation plan?

15            MR. EPSTEIN:  Objection to form.  "This" being

16       what?

17       Q.    You said disperse throughout the pile on this

18  one.  Your fumigation plan of July 18th regarding the

19  dome is Exhibit 9, it says:  "Phosphene pellets will be

20  dispersed throughout the peanut hulls," right?  That's

21  not the same as putting it on the surface, is it?

22       A.    I'm not sure.  It's how I interpreted it is

23  putting it on the surface.

24       Q.    So according to you, your interpretation, if

25  you put "disperse throughout the peanut hulls," that's

5813 Shawood Drive            VIVIAN TILLEY & ASSOCIATES           tel:919.847.5787
Raleigh, NC 27609                 ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 105 of 243

1    the same thing as putting it on the surface; is that

2    right?

3         A.    Yes.

4         Q.    And the plans that say put it on the surface,

5    what is that, just additional language with no meaning,

6    is that what those plans say?

7              MR. EPSTEIN:   Objection to form.

8         A.    I'm not sure.

9         Q.    Are you aware of any plans that say put it on

10   the surface besides the one I've shown you?

11        A.    I'd have to look at them to know.

12        Q.    All right.  Do you believe there are other

13   fumigation plans out there that say the fumigant should

14   be distributed on the peanut surface?

15        A.    I'm not sure.

16             MR. WIDIS:  All right.  Let's take a break.

17             MR. EPSTEIN:   Okay.

18             (Brief recess 11:40 - 11:57 a.m.)

19             (Exhibit No. 11 marked for identification.)

20   BY MR. WIDIS:

21        Q.    All right.  Mr. Turner, we've handed you a

22   photo, Plaintiffs' Exhibit 11.  Can you tell me what

23   that's a picture of?

24        A.    That's the dome.

25        Q.    Okay.  And that's the dome at the Severn

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com                 fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 106 of 243

1   facility?

2        A.   Yes, sir.

3        Q.   All right.  And is the door that you see in

4   the bottom, is that the entrance door that you were

5   talking about?

6        A.   Yes, sir.

7        Q.   Okay.  Could you circle that and just put

8   "entrance"?

9        A.   (Witness complies.)

10       Q.   And is that the only entrance to the dome is

11  this door that you've marked, is that the only entrance

12  to the dome other than through the headhouse on the top?

13       A.   Correct.

14            (Exhibit No. 12 marked for identification.)

15       Q.   I've handed you a document we've marked

16  Plaintiffs' Exhibit 12.  And I think this probably is

17  the service report for the fumigation that you have just

18  discussed; is that right?  This being the first time

19  that you applied --

20       A.   The first.

21       Q.   -- fumigant in the dome?

22       A.   Yes, sir.

23       Q.   And is that your signature on the bottom?

24       A.   Yes, sir.

25       Q.   Now, this was done July 23rd, '07.  That's

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                 ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 107 of 243

1    what this report says.  Does that seem like the first

2    date that you've applied fumigant in the dome at Severn?

3         A.   I think that is correct.

4         Q.   As we go down on the sheet, we've got

5    Fumitoxin being used, correct?

6         A.   Yes.

7         Q.   And we've got quantity used 59,000 grams.  Do

8    you see that?

9         A.   Yes.

10        Q.   All right.  Now, each of the tablets weigh how

11   much?

12        A.   One gram each.

13        Q.   Tablets weigh -- is that tablets, is that the

14   weight of the tablet itself?

15        A.   I think that's correct.

16        Q.   Okay.  Don't the tablets weigh three grams

17   each?

18        A.   I'm not sure.

19        Q.   Okay.  Do you know how many grams of phosphene

20   gas is released when the tablet is activated?

21        A.   I have to look in the handbook.  I don't know.

22        Q.   Under weather conditions, "Temperature

23   exterior 82 degrees," do you see that?

24        A.   Yes.

25        Q.   Now, how did you calculate that?

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                 ctrptr4u@aol.com              fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 108 of 243

1      A.   I don't remember.  Normally I use a

2  thermometer, it has a thermometer and humidity gauge,

3  digital gauge.

4      Q.   And you carry that with you?

5      A.   I'm not sure if I used that on this particular

6  job.

7      Q.   This says interior 66 degrees.  Now, what are

8  you referring to when you put "interior 66 degrees"?

9      A.   Inside the dome.

10     Q.   And do you know how you calculated that?

11     A.   I don't remember.

12     Q.   The humidity exterior 62, 62 percent.  Do you

13 see that?

14     A.   Yes, sir.

15     Q.   All right.  And how did you calculate that?

16     A.   I can guess, but I really don't remember

17 exactly.

18     Q.   Okay.  Well, I don't want you to guess, so --

19     A.   Uh-huh.

20     Q.   -- under "humidity," we've got "interior

21 41 percent."  Now, when you're saying "humidity

22 interior," you're talking about inside the dome?

23     A.   Yes.

24     Q.   All right.  Did you have any concerns about

25 41 percent?

5813 Shawood Drive                **VIVIAN TILLEY & ASSOCIATES**          tel:919.847.5787
Raleigh, NC 27609                     ctrptr4u@aol.com                   fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 109 of 243

1        A.    No, sir.

2        Q.    All right.  Did you -- do you know how you

3    calculated that 41 percent?

4        A.    I don't remember.

5        Q.    We've got "commodity 71 degrees."  Do you know

6    how you calculated -- how you determined the temperature

7    of the commodity?

8        A.    It would have been a discussion with Severn

9    and myself.

10       Q.    And you think that they told you the

11   temperature?

12       A.    Yes, sir.

13       Q.    Did you do any calculations yourself or were

14   you relying on what Severn told you?

15       A.    I was relying on what they told me.

16       Q.    Now, "moisture of commodity," we have a dash,

17   what does that mean?

18       A.    That I didn't know.

19       Q.    Were you concerned about the moisture of the

20   commodity?

21       A.    No, sir.

22       Q.    Why not?

23       A.    It didn't appear wet, so it's never been a

24   concern.

25       Q.    We've got the fire department notified 7/23

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 110 of 243

Page 111

1    10:00 a.m.  Now, what happened at 10:00 a.m. that you

2    marked that?

3         A.    That's when I went to the fire department and

4    ...

5         Q.    And did what?

6         A.    To deliver the packet.

7         Q.    All right.  And this is when you taped it to

8    the door?

9         A.    Yes, sir.

10        Q.    All right.  When do you fill out this form,

11   actually physically fill it out?

12        A.    It's physically filled out near the end of the

13   fumigation.

14        Q.    All right.  So the 10 o'clock would have been

15   filled out -- the 10:00 a.m. is filled out on July --

16   let's see here.  You were there 7/23.  That's the date

17   of service.  The bottom line shows your name and Pat

18   Rowe's name 7/31.  So that's about a week later, but my

19   question is when are you actually writing all this

20   information?

21        A.    I wrote this report up when I went back and

22   cleared the dome, which would have been 7/31, and was on

23   site and had Pat to sign it.

24        Q.    All right.  So on July 31 is when you filled

25   in these actual times and figures, correct?

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                   ctrprtr4u@aol.com                  fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 111 of 243

Page 112

1        A.    (Witness nods.)

2        Q.    Now, do you keep any field notes at the time

3   when you're out there?

4        A.    Yes, sir.

5        Q.    And what do you do with those field notes?

6        A.    Throw them away.

7        Q.    Do you have -- do you keep any of these in a

8   personal file?

9              MR. EPSTEIN:  I'm sorry, objection to form.

10   "Any of these" being what?

11       Q.    Any of these field notes in a personal file?

12       A.    No, sir.

13       Q.    All right.  You mentioned before when we were

14   talking about fumigation plans, you said, "I'd have to

15   check my file."  Do you have a personal file that you

16   maintain of your fumigation plans, service reports?

17       A.    Yes, sir.

18       Q.    All right.  And what is in your personal file?

19       A.    The contract, the service reports, dimensions

20   of each structure.

21       Q.    Do you have a personal file regarding Severn,

22   the dome at Severn?

23       A.    Yes, sir.

24       Q.    All right.  Did you produce that to your

25   attorney?

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com                  fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 112 of 243

1       A.    Yes, sir.

2       **Q.    All right.  And what was in the personal file**

3  **regarding Severn?**

4       A.    As I recall, the contract, the service

5  reports, Fumigation Management Plan, e-mails that R.P.

6  or Pat had sent with measurements or cubic footage of

7  the structures and that's all that I can remember right

8  now.

9            MR. WIDIS:  Okay.  And, for the record, you

10           may have sent those to me.  There's a lot of

11           material, so I may not --

12           MR. EPSTEIN:  Whatever materials he had were

13           included in the entire grab bag that was sent to

14           you.

15           MR. WIDIS:  All right.  I'll look again for

16           individual e-mails regarding specifications of the

17           dome.

18           MR. EPSTEIN:  I don't know that we had any of

19           those.

20           MR. WIDIS:  I don't recall.

21           MR. EPSTEIN:  Whatever he had was given -- was

22           given to the company, was given to the paralegal

23           for Rollins in house and was ultimately given to

24           me.

25      **Q.    Okay.  And you provided your entire personnel**

5813 Shawood Drive          **VIVIAN TILLEY & ASSOCIATES**          tel:919.847.5787
Raleigh, NC 27609                 ctrptr4u@aol.com                      fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 113 of 243

1    file -- not personnel, your personal file on Severn to

2    IFC, right?

3        A.   Yes, sir.

4            MR. WIDIS:  I'll go back and check.  If it

5        looks like something's not right, you and I will

6        discuss it.

7            MR. EPSTEIN:  Sure.

8        Q.   All right.  Back on this July 23rd, then you

9    came back on September 31st.  I'm sorry, let's go back

10   to the fire -- fire department.  Ten a.m. you put the

11   notice on the door of the volunteer fire department; is

12   that right?

13       A.   Yes, sir.

14           (Exhibit No. 13 Marked for identification.)

15       Q.   Handing you a document marked as 13, is this

16   the -- is Exhibit 13 the notification that you gave to

17   the fire department regarding your fumigation of the

18   dome on July 23rd, '07?

19       A.   I'm not sure if that's the one that I gave to

20   the fire department or gave to Pat Rowe.

21       Q.   Do they look different?  Does the one you gave

22   to the fire department look different than what you gave

23   to Pat Rowe?

24       A.   Time could have been different.  All the other

25   information would have been the same.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com               fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 114 of 243

Page 115

1      Q.   Okay.  And when you say, "Treatment start time

2   12:00 p.m.," you're saying at 10:00 a.m. you dropped it

3   off; is that right?

4      A.   Yes, sir.

5      Q.   And you're estimating at 12:00 p.m. you'll

6   start releasing the gas; is that what the 12:00 p.m.

7   means?

8      A.   Yes, sir.

9      Q.   And is that figure just an estimate on the

10  sheet?

11     A.   That's correct.

12     Q.   Is that generally -- two hours, is that

13  generally what you use?

14     A.   It depends upon the circumstances, yes, sir.

15     Q.   Okay.  But you felt in this situation, this is

16  your first time in the dome, two hours is probably about

17  right from when you drop this off at the fire department

18  or Pat Rowe to actually when you start releasing the

19  gas?

20     A.   Yes, sir.

21     Q.   Okay.  This says PhosToxin at the top.  Did

22  you have any placards -- I mean any notices that didn't

23  say PhosToxin?

24     A.   Could you?

25     Q.   Did you have any sheets that say -- let me ask

5813 Shawood Drive            VIVIAN TILLEY & ASSOCIATES            tel:919.847.5787
Raleigh, NC 27609                 ctrptr4u@aol.com                  fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 115 of 243

Page 116

1    you this:  Any reason you left a sheet that said

2    PhosToxin if you're actually using Fumitoxin?

3         A.   The emergency packets we have was for

4    PhosToxin and so that's what I delivered.

5         Q.   Did you feel that was important whether it

6    said PhosToxin or Fumitoxin?

7         A.   I'm not sure.

8         Q.   It could have made a difference if that's all

9    you had; is that right?

10        A.   But the fumigants work the same and the same

11   hazards.

12        Q.   So were you concerned about dropping off a

13   sheet that said PhosToxin when actually you were using

14   Fumitoxin?

15        A.   No, sir, I wasn't concerned.

16        Q.   All right.  On the service report, how many

17   people did you have on site from IFC?

18        A.   For the July 23rd, 2007 job, three people on

19   site.

20        Q.   Now, your Fumigation Management Plan was in

21   effect at that time, right?

22        A.   Yes, sir.

23        Q.   And it called for four certified applicators,

24   didn't it?

25        A.   Yes, sir.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                 fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 116 of 243

Page 117

1      Q.   You're a certified applicator, right?  Randy,

2  that's you?

3      A.   Yes, sir.

4      Q.   Charles, what's Charles' name?

5      A.   Watson.

6      Q.   Watson.  Is he a certified applicator?

7      A.   No, sir.

8      Q.   Johnny, what's his name?

9      A.   Meeks.

10     Q.   Meeks.  Is he a certified applicator?

11     A.   Yes.

12     Q.   Is it fair to say that although the plan

13  called for four certified applicators, you only had two

14  certified applicators present?

15     A.   That's correct.

16     Q.   And while it called for four individuals, you

17  only had three individuals, right?

18     A.   Correct.

19     Q.   So in that sense you weren't following the

20  management plan, were you?

21     A.   Correct.

22     Q.   Now, your management plan said you were going

23  to disperse the fumigant throughout the hulls, correct,

24  disperse the fumigant throughout the hulls?

25     A.   Yes.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES         tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 117 of 243

Page 118

1      Q.    But you didn't disperse throughout the hulls,

2   you just put it on the surface; is that right?

3      A.    Yes.

4            MR. EPSTEIN:  Objection to form.

5            (Exhibit Nos. 14 and 15 marked for

6       identification.)

7      Q.    I've handed you Exhibit 14.  This looks like a

8   service report dated April 22nd, 2008; is that right?

9      A.    Yes, sir.

10     Q.    And were you at that fumigation?

11     A.    No, sir.

12     Q.    Okay.  Who conducted that fumigation?

13     A.    Brian Lilley.

14     Q.    Is this fumigation done on April 22nd, 2008

15   the next one after the September -- the July 23rd, '07

16   one?

17     A.    I think so, but, without looking at the file,

18   I'm not positive.

19     Q.    All right.  And what file do you have to look

20   at to tell you that?

21     A.    All their service reports.  I need to see all

22   their service reports.

23     Q.    Okay.  And who would have that file?

24     A.    Steven.  We have that at our corporate office.

25     Q.    Are you aware if there were any -- as you sit

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                 fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 118 of 243

Page 119

1    here, are you aware of any fumigations that were

2    conducted at the dome between September 23rd, '07 and

3    this April 22nd, '08 service?

4         A.   I'm not aware of any.

5         Q.   All right.  Did Brian Lilley conduct the next

6    fumigation after the initial one where the dome -- that

7    was done on July 23rd, 2007 when the dome was partially

8    empty?

9         A.   He was the certified applicator in charge at

10   the job site.

11        Q.   Now, Brian had not been at the initial one in

12   July of -- July 23, '07, had he?

13        A.   He was not at the July fumigation.

14        Q.   Did you discuss with Brian the manner in which

15   you applied the fumigant in that July 23rd,

16   '07 fumigation?

17        A.   Yes.

18        Q.   Was this fumigation on April 22nd, '08, were

19   the peanuts in the same condition inside the dome as

20   they were in July of '07?

21        A.   And when you -- could you reask that question.

22        Q.   Sure.  The dome was partially empty on -- in

23   July of '07 when you did that first application of

24   aluminum phosphide fumigant, right?

25        A.   Yes, sir.

5813 Shawood Drive            VIVIAN TILLEY & ASSOCIATES            tel:919.847.5787
Raleigh, NC 27609                  ctrptr4u@aol.com                 fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 119 of 243

1    Q.   Was the dome partially empty when Brian did

2  the April 22nd, '08 fumigation?

3    A.   You couldn't enter from the roll-up door.

4    Q.   And why is that?

5    A.   'Cause it was covered with peanuts.

6    Q.   So there were more peanuts in the dome when

7  Brian went to do it on April 22nd than there was when

8  you were there in May -- in July of '07, right?

9    A.   Yes.

10   Q.   Did you discuss with Brian the method in which

11 he should fumigate -- should apply the fumigant when he

12 came to the dome in this April '08 visit?

13   A.   I don't remember.

14   Q.   Did Brian do a pre-inspection visit of the

15 site before he did a fumigation in April of '08?

16   A.   I don't know.

17   Q.   I mean, Brian was going to be facing very

18 different conditions than you were, right?

19        MR. EPSTEIN:  Objection to form.

20   Q.   You can answer that.

21   A.   Could you reask the question.

22   Q.   Brian was not going to be able to apply the

23 fumigant in the same manner that you applied it; is that

24 right?

25   A.   Correct.

5813 Shawood Drive        VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com              fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 120 of 243

Page 121

1    Q.   So how is it -- did you discuss with Brian how

2  he should do it?

3    A.   I'm sure we did, but I can't recall the

4  specific conversation.

5    Q.   Do you recall telling Brian that you're going

6  to have to apply the peanuts through the headhouse?

7    A.   I don't remember.

8    Q.   Did you recall any concern being expressed how

9  you're going to apply the peanuts -- I mean apply the

10 fumigant now that the dome is almost full of peanuts?

11   A.   I don't recall any concerns.

12   Q.   How did you think Brian was going to apply the

13 fumigant in that April 22nd, '08 visit?

14   A.   From the headhouse.

15   Q.   Did you discuss with him how he should do it?

16   A.   I don't remember.

17   Q.   Had you been up to the headhouse to see where

18 it could be inserted into the dome?

19   A.   Yes.

20   Q.   All right.  Do you recall telling Brian how he

21 should do it?

22   A.   I feel sure I did, but I can't recall the

23 exact conversation.

24   Q.   All right.  How do you think he should have

25 applied it?

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 121 of 243

Page 122

1          A.    By carrying it to the headhouse and removing

2    the top hatch and scattering the tablets across the top

3    of the peanuts.

4          Q.    And did you tell him to do that?

5               MR. EPSTEIN:  Objection to form; asked and

6          answered.  Go ahead and answer again.

7          A.    I don't -- I don't remember if I told him.

8          Q.    All right.  Do you know how many people went

9    with Brian when he did the April 22nd fumigation?

10         A.    According to this report, there was three on

11   the job.

12         Q.    Now, the plan required four certified

13   applicators, didn't it?

14         A.    Yes.

15         Q.    And how many of the three that were there were

16   certified applicators?

17         A.    Two.

18         Q.    So that was not in compliance with the plan,

19   right?

20              MR. EPSTEIN:  Objection to form.

21         A.    Yes.

22         Q.    And is it your understanding that Brian

23   dropped the tablets from the headhouse down onto the

24   pile, onto the surface of the pile?

25         A.    Yes.

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                   ctrptr4u@aol.com                    fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 122 of 243

1      Q.   And is that the same as dispersing it

2  throughout the hulls?

3           MR. EPSTEIN:  Objection to form.

4      A.   That's how I interpret it.

5      Q.   So if you drop the tablets onto the surface of

6  the pile, in your mind, that's the same as dispersing it

7  throughout the hulls; is that what you're saying?

8      A.   Yes.

9      Q.   After that fumigation, did Brian tell you

10 anything about the procedure?

11     A.   I'm certain we discussed it, but I don't

12 recall the conversation.

13     Q.   Do you know exactly where Brian -- what

14 opening Brian used to deposit the tablets into the dome?

15     A.   There was only one option.

16     Q.   How many openings were there in that dome up

17 in the headhouse?

18     A.   Without removing the conveyor, there was just

19 one, the hatch.

20     Q.   Did you talk to Pat Rowe about other openings

21 that may be in the headhouse?

22     A.   I don't remember.

23     Q.   As you sit here today, how many openings do

24 you believe are on the floor of that headhouse that

25 would open up and let you see down to the dome?

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com               fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 123 of 243

Page 124

1       A.    As I remember, it's the opening where the

2   conveyor dumps the peanuts in and beside it is the

3   hatch.

4       Q.    **All right.  And other than those two openings,**

5   **are there any other openings within the headhouse that**

6   **would go to the dome?**

7       A.    That's all that I remember.

8             MR. WIDIS:  We can take a break.

9             MR. EPSTEIN:  Okay.  Let's do it.

10            (Lunch recess 12:24 - 12:54 p.m.)

11  BY MR. WIDIS:

12      Q.    **Mr. Turner, I think it's Exhibit 12, this is**

13  **the service report for that July 23rd, '07.  One before**

14  **that.  This one, the one that you participated in**

15  **(Indicating).**

16      A.    Yes, sir.

17      Q.    **All right.  We've got 59,000 grams Fumitoxin**

18  **used, and I believe you said you felt that was a proper**

19  **amount; is that right?**

20      A.    That was our first time fumigating the dome

21  and we -- it held gas really well.  We got high gas

22  readings.

23      Q.    **All right.  Look at Exhibit I guess 14 now.**

24  **Now, Mr. Lilley used 39,000 grams.  How was that**

25  **calculated?**

**5813 Shawood Drive**              **VIVIAN TILLEY & ASSOCIATES**              **tel:919.847.5787**
**Raleigh, NC 27609**                    **ctrptr4u@aol.com**                          **fax: 919.847.2265**
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 124 of 243

**Randall Turner**                                                          **June 26, 2012**
**Severn Peanut Co., Inc., et al. v. Industrial Fumigant Co., et al.   2:11-cv-00014-BO**

Page 125

 1        A.    We went with a lower dosage, which was 20

 2   grams per thousand cubic feet, and the reason for that

 3   is because when we fumigated it the first time in July,

 4   it held gas extremely well and we felt that 20 grams

 5   would be sufficient to get the job done.

 6        **Q.    And did you feel the 39,000 grams were**

 7   **sufficient, the 39,000 grams were sufficient?**

 8        A.    Yes, sir.

 9        **Q.    All right.  The next fumigation I have is**

10   **December 18th, '08.**

11             **(Exhibit Nos. 16 and 17 marked for**

12        **identification.)**

13        **Q.    All right.  If you would look at Exhibit 16**

14   **and tell me what that is.**

15        A.    That's our Fumigation and Fogging Service

16   Report.

17        **Q.    And this was done -- this was at the dome; is**

18   **that right?**

19        A.    Yes.

20        **Q.    And is that the next one that was at the**

21   **fumigation that followed the one that was conducted by**

22   **Brian Lilley on April 22nd, '08?**

23        A.    I'm not certain, but I think so.

24        **Q.    You used Fumitoxin in this one, correct?**

25        A.    Yes.

**5813 Shawood Drive**              **VIVIAN TILLEY & ASSOCIATES**              **tel:919.847.5787**
**Raleigh, NC 27609**                      **ctrptr4u@aol.com**                      **fax: 919.847.2265**
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 125 of 243

Page 126

1    Q.   And this was -- this report says the

2  individuals who worked this job Randy and Brian.  That's

3  you and Brian Lilley, correct?

4    A.   Yes, sir.

5    Q.   Were you the only two individuals that worked

6  that job?

7    A.   I don't remember.

8    Q.   If other individuals had been on this job,

9  would you have put them on this service report?

10    A.   I should have, but there's been occasions

11  where there's part-timers, part-time labor and they may

12  not get on the report.

13    Q.   All right.  Does your procedures say that you

14  don't list an individual on the service report if he's

15  only a part-timer?

16    A.   No, sir.

17    Q.   And so wouldn't you think that the fact that

18  you have only two individuals here mean that only you

19  and Mr. Lilley were at that December 18th,

20  '08 fumigation?

21    A.   Yes.

22    Q.   Now, the conditions that you encountered in

23  this December '08 fumigation were very different from

24  the fumigation that you first did in April of '07,

25  weren't they -- July of '07?

5813 Shawood Drive        **VIVIAN TILLEY & ASSOCIATES**        tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com                 fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 126 of 243

Page 127

1            MR. EPSTEIN:  Objection to form.

2       A.   Which was the first fumigation.

3       **Q.   That's right.**

4       A.   Could you reask your question.

5       **Q.   Let's say this:  You had said that you change**

6  **your fumigation plan if conditions change; is that**

7  **right?  Didn't you testify to that, you'll revise the**

8  **fumigation plan if conditions change?**

9       A.   That's something with the structure or like

10  personnel -- contact person changes.

11      **Q.   All right.  When you were there in July of**

12  **'07, the dome was partially empty, you were able to go**

13  **in through the side door.  When you came in, in July --**

14  **I mean, when you came here in December of '08, when you**

15  **were going to fumigate that time, the dome was full,**

16  **correct?  You couldn't -- you couldn't go through the**

17  **side doors, correct?**

18      A.   That's correct.

19      **Q.   And you weren't going to be able to apply it**

20  **the same way, putting it out on the floor and partially**

21  **on the pile from within the dome, correct?**

22      A.   Yes.

23      **Q.   Would you consider that a sufficient change to**

24  **have made a revised fumigation plan?**

25      A.   I'm not sure if I would.

5813 Shawood Drive          **VIVIAN TILLEY & ASSOCIATES**          tel:919.847.5787
Raleigh, NC 27609                 ctrptr4u@aol.com                   fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 127 of 243

1       Q.   But you didn't make a revised fumigation plan

2   on this one?

3       A.   I did not.

4       Q.   The fumigation plan for this

5   December '08 fumigation was the fumigation plan that was

6   done in July of '07, correct?

7       A.   I don't recall that I revised the plan.

8       Q.   So the only plan that you're aware of is the

9   fumigation plan dated July 18th, 2007 pertaining to the

10  dome?

11      A.   Yes.

12      Q.   Now, that fumigation plan required four

13  IFC-certified applicators, didn't it?

14      A.   Yes.

15      Q.   But in this case you only had two certified

16  applicators, correct?

17      A.   Yes.

18      Q.   All right.  This time you've used 49,000

19  grams.  Now -- so you used 59,000 the first time, 39,000

20  the next time and this time 49,000 grams.  Why did you

21  make the change?

22      A.   Cooler temperatures.

23      Q.   Did you feel the 39,000 worked in July of '07?

24      A.   Yes.

25      Q.   All right.  And did you feel the -- I'm sorry,

5813 Shawood Drive            VIVIAN TILLEY & ASSOCIATES            tel:919.847.5787
Raleigh, NC 27609                 ctrptr4u@aol.com                    fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 128 of 243

Page 129

1    did you feel the 39,000 grams of Fumitoxin worked in

2    April of '08?  That's what I meant to say, I'm sorry.

3        A.   Yes.

4        Q.   That was in April of '08.  Now, you have

5    December of -- December of '08, but you've gone up to

6    49,000 because the temperatures are cooler in December;

7    is that right?

8        A.   Yes, sir.

9        Q.   And you felt maybe it wouldn't -- the gas

10   would not react as quickly, is that why?

11       A.   Yes.

12       Q.   But you had no trouble with the 39,000, right,

13   when you used that in April of '08?

14       A.   Yes.

15       Q.   Okay.  The fire department, the notes say

16   December 18th, '08, and you gave your sheet at

17   9:00 a.m.; is that right?

18       A.   Yes.

19       Q.   And on the sheet, which we've marked

20   Exhibit 17, is this the sheet that you gave to the fire

21   department?

22       A.   I think Brian delivered this one because

23   that's his handwriting.

24       Q.   The estimated starting time is 10:00 a.m.; is

25   that right?

5813 Shawood Drive            VIVIAN TILLEY & ASSOCIATES            tel:919.847.5787
Raleigh, NC 27609                ctrprtr4u@aol.com                 fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 129 of 243

Page 130

1        A.    Yes.

2        Q.    And is that because you would calculate it if

3    you dropped it off at 9:00, about an hour later you'd be

4    ready to start fumigating?

5        A.    That was estimated 'cause we didn't actually

6    release guess at 10:00.  It was later in the day.

7        Q.    When did you -- when did you release the gas

8    in December of '08, December 18th, '08?

9        A.    Let me see.  I don't remember on this

10   particular job.

11       Q.    The sheet says, "Secure entrances 12/18/08."

12   Now, is that after you released the gas or before you

13   released the gas?

14       A.    That was before.

15       Q.    So would you be releasing the gas around

16   11:00?

17       A.    After we secured the entrances, that would

18   have been the next step.

19       Q.    All right.  Did you do a pre-inspection visit

20   for the dome on December 18th, '08?

21            MR. EPSTEIN:  Objection, form.

22       A.    I don't remember.

23       Q.    Would you have made any notes that would show

24   that you made a pre-inspection visit?

25       A.    Not that I recall.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com               fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 130 of 243

Page 131

1      Q.   So you don't know if you would have -- if you

2   came or not?

3      A.   I really don't remember.

4      Q.   Did you feel there was a need to do a pre --

5   do a previsit inspection?

6      A.   No.

7      Q.   Why not?

8      A.   I was familiar with the dome and R.P. Watson

9   and I had discussed it.

10      Q.   And when had you talked to R.P. Watson about

11   this?

12      A.   I'm not sure exactly.  A week or two prior to

13   the fumigation.

14      Q.   And what had R.P. told you?

15      A.   We discussed, you know, the pest problem,

16   timing of the fumigation, temperatures.

17      Q.   And you say you discussed temperatures, what

18   do you mean?

19      A.   Temperatures in the peanuts.

20      Q.   What did R.P. tell you?

21      A.   Well, our concern in December was whether it

22   was warm enough to fumigate the peanuts.

23      Q.   And what did he tell you?

24      A.   That it was above 40 degrees.

25      Q.   Now, you've got temperatures and humidity

5813 Shawood Drive        VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787
Raleigh, NC 27609             ctrptr4u@aol.com             fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 131 of 243

Page 132

1    listed here.  So you've got temperature exterior

2    58 degrees.  Where did you get that?

3         A.   I really don't remember.  Here, again, in my

4    truck I have a thermometer, so, but I'm not positive.

5         Q.   Now, 58 degrees, is that outside of the

6    headhouse or inside of the headhouse?

7         A.   That would be outside.

8         Q.   And temperature interior, what are you talking

9    about there when you say 46 degrees?

10        A.   Inside the dome.

11        Q.   And where did you get that information,

12   46 degrees?

13        A.   I don't remember.

14        Q.   Did you take any measurements yourself?

15        A.   I don't remember.

16        Q.   The exterior humidity 37 percent or might

17   be -- is that 32 or 37?

18        A.   I think that's a 32.

19        Q.   Okay.  And where did you get that?

20        A.   I don't remember.

21        Q.   Do you know where you were able to get the

22   27 percent humidity for the interior humidity?

23        A.   I don't remember.

24        Q.   And that's the interior, that's within the

25   dome?

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                   ctrptr4u@aol.com                    fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 132 of 243

Page 133

1        A.    Within the dome.

2        Q.    **The commodity you've got 46 percent.  That's**

3   **the temperature inside the dome and that's the**

4   **temperature of the commodity?**

5              MR. EPSTEIN:  You said 46 percent, Howard.

6              MR. WIDIS:  I'm sorry, 46 degrees.  Thank you.

7        A.    Yes.

8        Q.    **And moisture, again, we have a dash, meaning**

9   **the moisture was not of concern to you?**

10       A.    I had no way of checking it myself.

11       Q.    **Now, had you been to the headhouse before this**

12  **visit on December of '08?**

13       A.    Yes, sir.

14             (Exhibit No. 18 marked for identification.)

15       Q.    **Show you number 18.  Can you identify that**

16  **photo?**

17       A.    Yes, sir.

18       Q.    **What is that?**

19       A.    That's the top of the dome and the headhouse.

20       Q.    **Now, did you climb this ladder to get into the**

21  **dome?**

22       A.    Yes, sir.

23       Q.    **Okay.  So you and Brian climbed the dome; is**

24  **that right?  Climbed this ladder to get up to that?**

25       A.    To the top of the dome, yes, sir.

5813 Shawood Drive        **VIVIAN TILLEY & ASSOCIATES**        tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com                  fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 133 of 243

Page 134

1        Q.   And how many boxes of Fumitoxin, how many

2   cases of Fumitoxin did you take with you?

3            MR. EPSTEIN:  Are you talking for

4        December 18th, '08?

5            MR. WIDIS:  December '08.  December '08.

6            MR. EPSTEIN:  December '08.

7        A.   Can I refer back?

8        Q.   Absolutely.  Absolutely.  We're talking about

9   49,000 grams.

10       A.   That would be seven boxes.

11       Q.   And who -- how many -- how heavy is a case of

12   Fumitoxin?

13       A.   I'm not certain exactly.  I want to say

14   47 pounds, but I'm not positive.

15       Q.   So did you have to take more than one trip up

16   and down to take all the Fumitoxin up there?

17       A.   Yes, sir.

18       Q.   And how about the safety equipment, did you

19   take any safety equipment with you?

20       A.   I don't remember.

21       Q.   Do you believe you would have taken any

22   breathing apparatus with you just for safety sake?

23       A.   I took my detection equipment, but did not

24   carry the SCBA.

25       Q.   Describe the detection equipment, what is

5813 Shawood Drive            VIVIAN TILLEY & ASSOCIATES            tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                  fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 134 of 243

1  that?

2       A.   It's an electronic device used for detecting

3  phosphene.

4       Q.   How big is it?

5       A.   We actually have two.  The one that I carry in

6  this situation I would compare it to a pack of

7  cigarettes in size.

8       Q.   Does it hook onto your belt?

9       A.   That's correct.

10      Q.   So what other equipment did you take up there

11  besides your detection device?

12      A.   Flashlight.

13      Q.   What kind of flashlight?

14      A.   Streamlight.

15      Q.   Streamlight, is that a brand?

16      A.   Yes, sir.

17      Q.   Is it a bigger one, more powerful or normal?

18  I mean, I know that's a bad question, but give me a

19  little more information about the flashlight.

20      A.   It's approximately eight to ten inches in

21  length.

22      Q.   Do you know how many lumens it is?

23      A.   I don't, but it's a high-powered light.

24      Q.   Do you still have that?

25      A.   Yes, sir.

5813 Shawood Drive            VIVIAN TILLEY & ASSOCIATES            tel:919.847.5787
Raleigh, NC 27609                    ctrptr4u@aol.com                    fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 135 of 243

1      Q.    Same one?

2      A.    Yes, sir.

3            MR. WIDIS:  Steve, we'd ask that you preserve

4      that flashlight 'cause we probably want to see,

5      make sure -- take a look at that at some point.

6            MR. EPSTEIN:  Okay.

7      Q.    All right.  Now, how many doors are there into

8  the headhouse?

9      A.    One.

10     Q.    And is it visible in that photo?

11     A.    Yes, sir.

12     Q.    Did you do -- did you talk to anyone that

13  morning or that day, April -- I mean December --

14           MR. EPSTEIN:  Eighteenth.

15     Q.    -- 18th of '08?  Did you talk to anyone at

16  Severn prior to going up in the headhouse?

17     A.    I don't remember.

18     Q.    You may have, you may not, you just don't

19  remember?

20     A.    Right.  I just don't remember.

21           (Exhibit No. 19 marked for identification.)

22     Q.    Tell me what you did when you got inside the

23  headhouse.

24     A.    And we're still talking about the December --

25     Q.    We're still talking about December.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com               fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 136 of 243

Page 137

1      A.   -- the December fumigation?

2      Q.   **That's right.**

3      A.   I don't remember that one as clear, as good.

4      Q.   **Did Brian tell you where he had inserted the**

5   **tablets into the dome?**

6      A.   I don't remember.  I think we just knew.

7      Q.   **All right.  This is your first time applying**

8   **fumigant from the headhouse; is that right?**

9      A.   I need to go back and look at the reports.

10     Q.   **I believe they're all there.**

11     A.   I believe that would be correct.

12     Q.   **So you had never actually taken any of the**

13  **plates off in the headhouse, correct?**

14     A.   I had looked at it before, but never actually

15  taken it off.

16     Q.   **But Brian had taken one of the plates off; is**

17  **that right?**

18     A.   Correct.

19     Q.   **Did Brian, when you were there in December of**

20  **'08, talk about how he did it the time before?**

21     A.   I don't remember.

22     Q.   **Let me show you what we've marked Plaintiffs'**

23  **Exhibit 19.  That I'll represent to you is the conveyor**

24  **once it was taken off.  Do you see the plate that you**

25  **took off in that photograph or the area it would be?**

5813 Shawood Drive          **VIVIAN TILLEY & ASSOCIATES**          tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                  fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 137 of 243

Page 138

1       A.    I can't tell from this photograph.

2       Q.    Okay.  I'm going to ask you if you could draw

3   the configuration of the headhouse and where -- and the

4   plate that you took off, show me where that is.  We're

5   talking about December of '08.

6       A.    Okay.  This is the headhouse (Indicating).  Am

7   I drawing this poor?

8       Q.    No.  What I'm looking for though -- I

9   understand.  That's the headhouse?

10      A.    That's the headhouse.

11      Q.    All right.  Go ahead.

12      A.    The conveyor coming in and then at the end of

13  the conveyor was the hatch, the metal plate

14  (Indicating).

15      Q.    Okay.  Let's mark that Exhibit -- well, I'll

16  tell you what, let's do it on the same one.  If you

17  would right here, can you draw it say from a bird's eye

18  view looking straight down.  In other words, you've got

19  the conveyor coming this way, and here's the hatch, and

20  the peanuts are going to come drop in the hatch, and

21  here's the house, and you've walked in right here,

22  here's the door.  Where is the hatch?

23      A.    The hatch would be right here (Indicating).

24      Q.    All right.  Can you put -- go ahead.  I'm

25  sorry.

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES           tel:919.847.5787
Raleigh, NC 27609                    ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 138 of 243

1        A.    It's just like a catwalk that comes around

2    that we could stand on.

3        Q.    And the hatch would be right in front of the

4    chute at the end of the conveyor; is that right?

5        A.    Yes.

6        Q.    All right.  Could you mark and just say

7    "hatch"?

8        A.    (Witness complies.)

9        Q.    And that hatch is the only opening that you

10   inserted the tablets in, in December of '08; is that

11   right?

12       A.    I don't remember.

13       Q.    Did you open more than one hatch in the

14   headhouse when you inserted the tablets of 2008 -- in

15   December 2008?

16       A.    I don't think we did, but I'm not certain.

17       Q.    Where were the other openings?

18       A.    The only other opening I'm aware of is where

19   the grain goes in from the conveyor.

20       Q.    All right.  So if the -- is the question in

21   your mind whether you also put things down the chute,

22   put tablets down the chute?

23       A.    I don't remember that we did that.

24       Q.    All right.  So is it accurate that the only

25   hatch that you opened and put tablets in was that

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                 ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 139 of 243

Page 140

1    opening in front of the chute on the floor of the

2    headhouse?

3        A.    The best that I can remember, yes.

4              MR. WIDIS:  Let's get this marked.

5              (Exhibit No. 20 marked for identification.)

6              MR. WIDIS:  For housekeeping, before I show

7        you 20, let's mark your drawing 21.

8              (Exhibit No. 21 marked for identification.)

9        Q.    I'm going to show you a photograph and Exhibit

10   20, IFC Bates 2331.  This being the chute.  Do you see

11   the plate you removed in December 2008?

12             MR. EPSTEIN:  Do you have one of those for me?

13             MR. WIDIS:  Oh, I'm sorry.

14       A.    I'm not sure from looking at this photo.

15       Q.    Where do you think it is?  What area would it

16   be in?

17       A.    So this is the conveyor that you come in this

18   way (Indicating)?

19       Q.    Yes.  This is the chute going down.

20       A.    Then it would have been this side

21   (Indicating).

22       Q.    Can you draw a circle around --

23       A.    'Cause this --

24       Q.    Can you draw a circle around that where you

25   think it was?

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                   ctrptr4u@aol.com                   fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 140 of 243

Page 141

1       A.   I'm just not certain.  I can draw it where I

2   think it was, but I'm not positive.

3       Q.   All right.  Well, draw it where you think it

4   was and we'll take it from there.

5       A.   Down here (Indicating).

6       Q.   All right.  Was it right up next to the chute?

7       A.   I don't remember.

8       Q.   Okay.  Well, let's look at your photo -- I

9   mean your drawing, number 21, Exhibit 21.  You've drawn

10  it right close to the chute, the hatch right up close to

11  the chute, haven't you?

12      A.   Uh-huh.

13      Q.   All right.

14           MR. QUICK:  Yes?  I'm sorry.

15           MR. WIDIS:  Let's mark this.  We've got some

16      other photos.  We'll keep working at it.

17           (Exhibit No. 22 marked for identification.)

18      Q.   All right.  Showing you Exhibit 22 now, this

19  being the chute coming down (Indicating).  Do you see

20  where you believe would be the hatch that you removed?

21      A.   Yes.

22      Q.   All right.  Where is that?

23      A.   This looks like the hatch (Indicating).

24      Q.   So you've got -- how big is that hatch?

25      A.   I'm not certain.  I want to say approximately

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                   ctrptr4u@aol.com                    fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 141 of 243

Page 142

1    one foot by three foot.

2         Q.   All right.  Why don't you put a circle around

3    that.  Here's a better, thicker pen that you can use.

4         A.   (Witness complies.)

5         Q.   All right.  And just write out here and write

6    "hatch" with an arrow to it.

7         A.   (Witness complies.)

8              MR. EPSTEIN:  He wants you to put an arrow to

9    it.

10             MR. WIDIS:  Yeah.

11        Q.   Okay.  And the hatch that you've drawn a

12   circle to is the same -- that corresponds with what

13   you've marked as hatch on your Exhibit 21 drawing,

14   right?

15        A.   Yes.

16        Q.   Okay.  And the other hole that you mentioned

17   knowing to be present in the headhouse was the chute,

18   right?

19        A.   Yes.

20        Q.   All right.  All right.  Why don't you on this

21   one mark this as chute if you would.  Write it with this

22   if you don't mind.

23        A.   (Witness complies.)

24        Q.   All right.  And is it accurate that the only

25   two openings that you knew in the headhouse were the

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 142 of 243

Page 143

1    chute and that hatch that you removed?

2         A.   Yes.

3         Q.   Okay.  All right.  Tell me what you did then

4    on December 28th after you -- tell me, how do you remove

5    this plate, this hatch?

6         A.   Unscrewed bolts.  It was bolted down.

7         Q.   Was it sealed in any way or just bolted down?

8         A.   Just bolted down.

9         Q.   And who removed it?

10        A.   I don't remember.

11        Q.   Would you and Brian have removed it or just

12   one of you?

13        A.   We probably worked together.  I don't

14   remember.

15        Q.   All right.  Let's just clarify something, too.

16   On Exhibit 22 -- I'm now looking at Exhibit 20 -- is the

17   hatch right here?  Do you see that bar there, the bar

18   there, would this be the hatch right here (Indicating)?

19        A.   It's difficult to tell, but I would say yes.

20        Q.   Okay.  Why don't you draw a circle around that

21   hatch on 20, the hatch that you believe it is, but you

22   feel it's a little difficult to tell.  Just write in

23   right there inside hatch (Indicating).

24        A.   (Witness complies.)

25        Q.   Okay.  Now, tell me after you removed the

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 143 of 243

Page 144

1   hatch, what did you do?

2       A.   Took the flashlight and shined in and looked

3   at the peanuts.

4       Q.   All right.  Now, were you standing when you

5   did this?  Were you sitting?  Were you --

6       A.   Kneeling.

7       Q.   Kneeling.  Did you get on your knees?

8       A.   Yes.

9       Q.   Were you concerned about falling in?

10      A.   No.

11      Q.   So you got on your knees, and where did you

12  put your face, how close to the floor did you put your

13  face?

14      A.   In the hole.

15      Q.   You put it in the hole, all right.  So you

16  were leaning inside with your flashlight down in the

17  dome?

18      A.   Yes.

19      Q.   All right.  Tell me what you saw.

20      A.   The peanuts.

21      Q.   How high was the stack?

22      A.   Approximately 20 foot from the top.

23      Q.   And could you see the pile sloping to the

24  sides?

25      A.   Yes.

5813 Shawood Drive        VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com              fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 144 of 243

1       Q.    Could you tell how high up the sides the

2   peanuts were?

3       A.    No.

4       Q.    Are there any markings inside -- on the walls

5   of the dome on the inside?

6       A.    I don't remember.

7       Q.    What were you looking for when you looked

8   inside?

9       A.    How the peanuts were piled, anything unusual.

10      Q.    And tell me -- describe how they were piled.

11      A.    It was a small flat spot at the top and then

12  it was peaked down -- it was like a peak on the sides.

13      Q.    And how far was it would you say from where

14  you were looking down to the outside wall?

15            MR. EPSTEIN:  Objection to form.

16      A.    I'm not sure.

17      Q.    Do you know the diameter of the dome?

18      A.    I've been given that information, but I don't

19  remember.

20      Q.    Did you see any moisture?

21      A.    No.

22      Q.    If you had seen moisture, would you have

23  fumigated the dome?

24      A.    No.

25      Q.    Did you see anything that would cause you to

5813 Shawood Drive            VIVIAN TILLEY & ASSOCIATES            tel:919.847.5787
Raleigh, NC 27609                 ctrptr4u@aol.com                  fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 145 of 243

Page 146

1    refuse to fumigate?

2         A.    No.

3         Q.    Then what did you do -- well, let me ask, how

4    long did you look down in the dome?

5         A.    I don't remember.

6         Q.    What do you think, five seconds, 30 seconds?

7         A.    I don't remember.

8         Q.    Now, you say you have your flashlight.  Which

9    hand are you using?  Which hand is the flashlight in?

10        A.    I probably used my left.

11        Q.    Are you right-handed or left-handed?

12        A.    Left.

13        Q.    And your face is down inside the dome?

14        A.    Yes.

15        Q.    Are you stretched out or still on your knees?

16        A.    On my knees.

17        Q.    All right.  And you're down looking in the

18   dome?

19        A.    Yes.

20        Q.    All right.  Then what did you do?

21        A.    Could you reask.

22        Q.    After you looked inside the dome and didn't

23   see anything that would cause you to decide not to

24   fumigate, what was your next step in the fumigation

25   process?

5813 Shawood Drive            VIVIAN TILLEY & ASSOCIATES            tel:919.847.5787
Raleigh, NC 27609                  ctrptr4u@aol.com                    fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 146 of 243

Page 147

1    A.   Opening up the boxes of fumigant.

2    Q.   **And who did that?**

3    A.   I really don't remember all the events on the

4  December fumigation.

5    Q.   **Okay.  It's just you and Brian up there in**

6  **that one though, right?**

7    A.   I'm not sure.

8    Q.   **How did you disperse the tablets in December**

9  **of '08?**

10   A.   By shaking them out of the flasks and

11 scattering them across -- slinging them.

12   Q.   **All right.  Describe your posture for me.**

13 **Were you still on your knees?**

14   A.   Squatting or on my knees.

15   Q.   **And what is Brian doing during this time?**

16   A.   I really don't recall all the events on this

17 December fumigation.  Normally we're working together

18 side by side.

19   Q.   **Is there room for him to be sitting --**

20 **squatting right next to you?**

21   A.   Yes, sir.

22   Q.   **And how long did it take you to disperse the**

23 **tablets in that December '08 fumigation?**

24   A.   I don't remember.

25   Q.   **All right.  What did you do when you were**

5813 Shawood Drive          **VIVIAN TILLEY & ASSOCIATES**          tel:919.847.5787
Raleigh, NC 27609                 ctrptr4u@aol.com                     fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 147 of 243

Page 148

1    through --

2         A.   Put the hatch --

3         Q.   -- dispersing?

4         A.   -- put the hatch back on and sealed around it

5    with tape and glue.

6         Q.   Then what did you do?

7         A.   I don't remember.

8         Q.   How long did that whole process take?

9         A.   I'm not sure.

10        Q.   Did you take the fumigant with you when you

11   left, take the boxes and flasks with you when you left

12   the dome in that December '08 fumigation?

13        A.   I don't remember.

14        Q.   Did you have any problem with that, with that

15   fumigation?

16        A.   No.

17        Q.   Now, in that one, would you call that applying

18   the peanuts to the surface of the dome?

19        A.   Yes.

20        Q.   You wouldn't consider dropping the tablets

21   onto the surface dispersing throughout the hull, would

22   you?

23             MR. EPSTEIN:  Objection to form.

24        A.   I'm not sure.  We were scattering it across

25   the top of the peanuts.

5813 Shawood Drive            VIVIAN TILLEY & ASSOCIATES            tel:919.847.5787
Raleigh, NC 27609                    ctrptr4u@aol.com                     fax:919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 148 of 243

1      Q.   Across the top.  Let's move to the August 4th,

2  '09 fumigation.

3           (Exhibit Nos. 23 - 25 marked for

4      identification.)

5      Q.   When were you contacted by Severn regarding

6  doing a fumigation in '09?

7      A.   I don't remember the exact time.

8      Q.   Who would have contacted you?  Who was your

9  contact at Severn?

10     A.   R.P. Watson.

11     Q.   All right.  And would Mr. Watson have said he

12  wanted you to come by and do a fumigation of the dome?

13     A.   Yes, sir.

14     Q.   Was there any particular date that it was

15  determined you would fumigate the dome?

16     A.   Yes.

17     Q.   And what was that date?

18     A.   That would have been on August 4th.

19     Q.   All right.  When did you decide that you were

20  going to do the fumigation on August 4th, '09?

21     A.   I don't remember.

22     Q.   Was there a predetermined date where you said

23  I'm going to be coming on August 4th of '09 to do the

24  dome?

25     A.   Yes.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 149 of 243

Page 150

1    Q.   All right.  Was that put in writing?

2    A.   No, I don't think it was.

3    Q.   How was that conveyed to Severn?

4    A.   Telephone.

5    Q.   Who did you speak to?

6    A.   It would have been R.P. Watson or Pat Rowe,

7  I'm not sure which one.

8    Q.   How much time prior to August 4th, '09 did you

9  tell them you were going to be coming on that day?

10   A.   I don't remember.

11   Q.   You were -- do you remember actually speaking

12 to R.P. Watson or Pat Rowe about coming out there that

13 day, coming out on August 4th, '09?

14   A.   I believe that I planned it with R.P. Watson

15 and scheduled this date.

16   Q.   And that would have been by telephone?

17   A.   Yes.

18   Q.   Did you do a previsit inspection at the dome

19 for that August 4th, '09 fumigation?

20   A.   No.

21   Q.   Why not?

22   A.   We had just fumigated it December before and I

23 was told there were no changes.

24   Q.   And who told you that?

25   A.   R.P. Watson.

5813 Shawood Drive            VIVIAN TILLEY & ASSOCIATES            tel:919.847.5787
Raleigh, NC 27609                  ctrptr4u@aol.com                  fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 150 of 243

1    Q.   And when did -- when did he tell you that?

2    A.   I don't remember.

3    Q.   Do you think that was in a telephone

4    conversation or face-to-face visit?

5    A.   Telephone.

6    Q.   Did you all talk about other fumigation jobs

7    you had that day, when you had that conversation with

8    R.P., or was it just the dome fumigation you were

9    talking about?

10    A.   I don't remember.

11    Q.   Let me show you what we've marked as Exhibit

12    25.  Have you seen that document?

13    A.   Yes, sir.

14    Q.   And what is that?

15    A.   It's the cover letter that went to Mr. Watson.

16    Q.   And this is dated April 20th, 2009, correct?

17    A.   Yes.

18    Q.   And it talks about a number of fumigations

19    that you're going to do for Severn; is that right?

20    A.   Yes.

21    Q.   And the dome is one of those; is that right?

22    A.   Yes.

23    Q.   Did you speak to Mr. Watson about each of

24    these individual projects or fumigations?

25    A.   Again, it was either Mr. Watson or Pat Rowe.

5813 Shawood Drive            VIVIAN TILLEY & ASSOCIATES            tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 151 of 243

Page 152

1        Q.    And did you speak about each of these

2   individually, each of the fumigation projects

3   individually?

4        A.    Several of these, when we went out, we done

5   two or three in a day.

6        Q.    Was there a set day when you were going to do

7   each of these projects, set scheduled day?

8        A.    Not a set day for each one, but we were -- we

9   gave them a time frame that we would have it done.

10       Q.    And what was the time frame?

11       A.    I don't remember.

12       Q.    Was it within a month period or two-month

13   period?

14       A.    More like a week.

15       Q.    Is that for all of them or individual ones?

16   Were you going to do all of these projects within a

17   week?

18       A.    I'm not sure.

19       Q.    The contract is dated April 20 and the letter

20   is dated April 20, but your fumigation wasn't done until

21   August 4th of '09.  So when do you think you told

22   Mr. Watson you were going to come out and do the dome?

23            MR. EPSTEIN:  Objection to form; asked and

24       answered.  Go ahead and answer again.

25       A.    I don't remember.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 152 of 243

Page 153

1    Q.   Is it possible you didn't give him an exact

2  date, but just an approximate time when you were going

3  to come out?

4    A.   I don't remember.

5    Q.   Now, on August 4th of '09, did you contact

6  anyone at Severn before going out to the dome?

7    A.   I don't remember.

8    Q.   Your standard operating procedure says that

9  you're supposed to contact somebody before you go out on

10  each fumigation, doesn't it?

11    A.   Yes.

12    Q.   You don't know if you did on this August 4th,

13  '09?

14    A.   I don't remember.

15    Q.   And on the applicator's manual, it says you're

16  supposed to contact somebody prior to each fumigation to

17  discuss the fumigation plan.  You didn't do that, did

18  you, on August 4th, '09?

19    A.   Not on August 4th.

20    Q.   That's because you felt you were familiar with

21  the dome and with the peanuts inside and there was no

22  reason to do -- to contact anyone?

23    A.   Yes.

24    Q.   So you got there that day on August 4th.

25  Let's look at Exhibit 24.  Is that the sheet that you

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 153 of 243

Page 154

1    gave to the fire department?

2        A.   Yes.

3        Q.   And that sheet, your estimating start time

4    would be about 3 o'clock; is that right?

5        A.   Yes.

6        Q.   What did you do from the time you went to the

7    fire department to the dome?

8        A.   I don't remember.

9        Q.   When you put 3 o'clock, what were you going to

10   estimate, about an hour from the time you contacted them

11   until when you would start fumigation?

12       A.   I would think more time than that.

13       Q.   What did you need to do?

14       A.   Could you reask me that question.

15       Q.   Yes.  What do you feel you needed to do from

16   the time you dropped off this notification to the fire

17   department until you were able to start the fumigation,

18   what was going to take another hour?

19       A.   Prepare, seal everything.

20       Q.   How long did you think that was going to take?

21       A.   Two or three hours.

22       Q.   Was it going to take more this time than it

23   was the other time?

24       A.   It was a very hot day and I remember

25   considering that.

5813 Shawood Drive            VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                       fax:919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 154 of 243

Page 155

1      Q.    Who was with you this time?

2      A.    Brian Lilley, Lucas Bratton and James Ward.

3      Q.    And how many of the four of you were certified

4   applicators?

5      A.    Brian Lilley and myself.

6      Q.    So two of the four were certified applicators;

7   is that correct?

8      A.    Yes.

9      Q.    But your plan required four certified

10  applicators; isn't that right?

11     A.    That's what was wrote in the plan.

12     Q.    You're using Fumitoxin.  Now, quantity used it

13  says 49,000 grams, right?

14     A.    Yes.

15     Q.    All right.  And why did you use 49,000?

16     A.    Well, we know we get good readings at that

17  rate.  We had used it earlier in the December

18  fumigation.  And also we knew that they had a bigger

19  infestation problem.

20     Q.    Did they tell you they had a bigger

21  infestation problem?

22     A.    I don't remember.

23     Q.    Why do you think they had a bigger infestation

24  problem?

25     A.    When I took the hatch off, I could see the

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                   ctrptr4u@aol.com                     fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 155 of 243

Page 156

1    Indian meal moths flying out.

2        Q.   Okay.  But you had already decided to do

3    49,000 grams before you took the hatch off, hadn't you?

4        A.   That was our plan when we went to the job

5    site.

6        Q.   That's my question, how did you come up with

7    49,000 grams?  You used 39,000 grams back in April.  You

8    went up to 49,000 in December because you thought it was

9    cool.  Now it's hot in August, but you're still using

10   49,000 grams.  Why did you stick with 49,000 grams?

11       A.   I'm not sure.  I don't remember why I stuck

12   with 49,000.

13       Q.   Under the temperature you've got exterior

14   90 degrees.  Do you know where you got that temperature?

15       A.   I can't be certain.

16       Q.   And interior is 75.  Do you know where you got

17   the interior 75 degrees?

18       A.   No, sir.

19       Q.   We've got humidity 72 percent outside

20   exterior.  Now, it's not inside the headhouse; that's

21   72 degrees outside, right --

22       A.   Yes, sir.

23       Q.   -- 72 percent?

24       A.   Yes, sir.

25       Q.   Where did you get that?

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                 fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 156 of 243

1      A.    Again, typically I have a thermometer in my

2   truck with the temperature, it reads temperature and

3   humidity, and that's what I normally use.

4      Q.    Did you know the humidity inside the dome?

5      A.    No, sir.

6      Q.    Now, you're using 90 degrees exterior for

7   outside the headhouse I take it, right?

8      A.    Yes.

9      Q.    All right.   Do you know the temperature inside

10   the headhouse?

11      A.    No.

12      Q.    I take it on August 4th it was hot inside that

13   headhouse?

14      A.    Yes.

15      Q.    Was it in excess of a hundred do you think?

16      A.    No.

17      Q.    What's that headhouse made out of?

18      A.    Tin.

19      Q.    And what time of day is this that you're up

20   there?

21      A.    Midday.

22      Q.    All right.   So it's 90 degrees outside, but

23   you don't think it's over a hundred inside the

24   headhouse?

25      A.    I'm not sure.

5813 Shawood Drive      VIVIAN TILLEY & ASSOCIATES      tel:919.847.5787
Raleigh, NC 27609      ctrptr4u@aol.com      fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 157 of 243

Page 158

1      Q.   Could be?

2      A.   I'm not sure.

3      Q.   Okay.  It was hot inside though there, right?

4      A.   It was hot.

5      Q.   All right.  Now, you've got secured entrances

6    at 1:00 p.m., right?

7      A.   Yes.

8      Q.   Now, is that when -- that was before you

9    started doing the fumigation?

10     A.   Yes.

11     Q.   So when do you think you actually started the

12   fumigation?

13     A.   Immediately after.

14     Q.   So around 1 o'clock is when you're starting to

15   release it?

16     A.   Yes.

17     Q.   All right.  The four of you all -- I want to

18   start with you going up the ladder again.  You've got

19   seven boxes again?

20     A.   Yes.

21     Q.   Who is carrying the boxes this time?

22     A.   We all took a turn and the bigger guys had to

23   take two trips.

24     Q.   How many did you have to carry?

25     A.   I just carried one.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com               fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 158 of 243

1     Q.   Did you bring anything else besides the boxes

2  of Fumitoxin?

3     A.   Yes.

4     Q.   What else did you bring?

5     A.   Our read line, flashlight.

6     Q.   Same flashlight that you referred to before?

7     A.   Yes.

8     Q.   Anything else?

9     A.   Tape and glue.

10    Q.   Anything else?

11    A.   Not that I can recall.

12    Q.   Did you bring any safety equipment with you?

13    A.   Our detection equipment, our Draeger.

14    Q.   And that was clipped to your belt?

15    A.   Yes.

16    Q.   But you didn't bring any breathing apparatus

17  with you?

18    A.   No.

19    Q.   All right.  So tell me what you did when

20  you -- when you got up, entered the headhouse.

21    A.   We stacked our fumigant in the corner.  We

22  removed the plate, the hatch.

23    Q.   Who removed the hatch?

24    A.   I don't remember.  Then we positioned

25  ourselves.  We had two people, James and Lucas, opening

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES            tel:919.847.5787
Raleigh, NC 27609                   ctrptr4u@aol.com                   fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 159 of 243

Page 160

1    the flasks and they were handing them to -- and this was

2    after we had looked in and all -- and they were handing

3    it to me and Brian and we were scattering the tablets

4    across the peanuts.

5         Q.    Okay.  Let's stop there.  You opened that one

6    hatch; is that right?

7         A.    Yes.

8         Q.    And that's the hatch that you identified in

9    Exhibit 22, this one right here (Indicating)?

10        A.    Yes.

11        Q.    Did you open any other hatch other than that

12   one hatch you've identified there on Exhibit 22?

13        A.    No.

14        Q.    Were there any other hatches that you felt

15   were able to be opened that you could have inserted the

16   tablets in?

17        A.    No.

18        Q.    Did you look around and see if there were any

19   other plates that were bolted down on the floor of the

20   headhouse?

21        A.    I don't remember.

22        Q.    Is it possible that there were other plates

23   that could be removed in that headhouse that you did not

24   utilize?

25        A.    I don't know.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com               fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 160 of 243

Page 161

1    Q.    If you were aware of other plates, would you

2    have used them?

3    A.    I'm sure I would.

4    Q.    And why is that?

5    A.    It would have allowed easier access.

6    Q.    Easier access in what way?

7    A.    Just being able to reach in.

8    Q.    Do you feel that would have allowed you to

9    scatter the tablets a little more effectively if you had

10   used more than one opening?

11   A.    No.

12   Q.    So you open that one hatch and then what did

13   you -- you said you looked in?

14   A.    Yes.

15   Q.    Describe that for me.  How did you look in?  I

16   believe you feel you remember this August one a little

17   better than you do in '08, I mean, the December of '08

18   one.

19   A.    And likewise getting on our knees and bending

20   over and using our -- using the flashlight.

21   Q.    So you get on your knees and use your

22   flashlight and you put your face where, level with the

23   floor?

24   A.    Reach down in, face and head into the opening.

25   Q.    Okay.  Is anybody holding your feet?

5813 Shawood Drive              **VIVIAN TILLEY & ASSOCIATES**              tel:919.847.5787
Raleigh, NC 27609                   ctrptr4u@aol.com                          fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 161 of 243

Page 162

1    A.   No.

2    Q.   All right.  You're reaching down through this

3  hole and this is a one-by-three-foot opening, correct?

4    A.   Yes.

5    Q.   All right.  Is it just you or is Brian Lilley

6  doing that, too?

7    A.   Brian did look as well.

8    Q.   Does he have his own flashlight?

9    A.   As I recall, I was the only one that carried a

10  flashlight up.  He used mine.

11    Q.   Okay.  And I'm talking about when you first

12  open the hatch, you're on your knees, you look down with

13  the flashlight.  Tell me what you -- what you did.

14  Where did you look?

15    A.   Inside the dome.

16    Q.   All right.  What did you see?

17    A.   The pile of peanuts.

18    Q.   How far was it down to the top of the pile of

19  the peanuts?

20    A.   Same as December, about 20, I'm guessing

21  20 feet.

22    Q.   Did it look similar to how it looked when you

23  looked down in December?

24    A.   Yes.

25    Q.   Did you see any difference?

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 162 of 243

Page 163

```
 1        A.    Not that I recognized.

 2        Q.    And you said you saw insects?

 3        A.    Yes.

 4        Q.    What were they doing?

 5        A.    Flying out.

 6        Q.    How long did you look down in there with your

 7  flashlight?

 8        A.    I don't recall.

 9        Q.    Can you estimate?

10        A.    I'm just not sure.

11        Q.    Did you see -- did you see any moisture in

12  there?

13        A.    No.

14        Q.    Did you see any fungus?

15        A.    Not that I recognized.

16        Q.    Did you see anything that would -- that gave

17  you any concern about doing fumigation at that time?

18        A.    No, sir.

19        Q.    And you've already said you, as the certified

20  applicator, are responsible to make sure that that

21  commodity can be safely fumigated that day, right?

22        A.    Yes, sir.

23        Q.    And if you had seen anything, you wouldn't

24  have fumigated it?  If you had seen anything that caused

25  you concern, you would not have fumigated that day; is
```

5813 Shawood Drive            **VIVIAN TILLEY & ASSOCIATES**            tel:919.847.5787
Raleigh, NC 27609                  ctrptr4u@aol.com                      fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 163 of 243

Page 164

1    that right?

2        A.   That's correct.

3        Q.   All right.  So you've looked in there.  Now

4    tell me the process of broadcasting the tablets.

5        A.   Again, Lucas and James, they were opening the

6    flasks and handing them to Brian and myself.  And we

7    would just shake and sling the flasks and the tablets,

8    and I would take some in my hands and sling them all

9    across the peanuts.

10       Q.   Now, what -- you've got what, seven cases?

11       A.   Yes.

12       Q.   What posture are you in at that time?  Are you

13   still kneeling; are you standing; how are you --

14       A.   I think it was a mixture of kneeling and

15   squatting.

16       Q.   And when you say shaking the flasks, how would

17   you do that?

18       A.   Slinging it from side to side.

19       Q.   Over the opening?

20       A.   Yeah.

21       Q.   Now, Brian was standing next to you; is that

22   right?

23       A.   We were reaching down into the opening.

24       Q.   All right.  Squatting down, squatting down,

25   reaching.  Is the flask actually below the surface of

5813 Shawood Drive       **VIVIAN TILLEY & ASSOCIATES**       tel:919.847.5787
Raleigh, NC 27609          ctrptr4u@aol.com         fax:919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 164 of 243

Page 165

1    the headhouse -- I mean the floor of the headhouse?

2         A.   We were reaching in.

3         Q.   But, I mean, if this was the floor of the

4    headhouse, is the flask down below the --

5         A.   Yes, sir.

6         Q.   -- floor (Indicating)?

7         A.   Yes, sir.

8         Q.   All right.  How far does your arm go down

9    below the floor of the headhouse?

10        A.   I don't remember.

11        Q.   But you've got -- you're squatting.  Are you a

12   little concerned about falling in?

13        A.   No, sir.

14        Q.   You're not worried about that?

15        A.   (Witness shakes head.)

16        Q.   All right.  And you're shaking the flask; is

17   that right?

18        A.   Uh-huh.

19        Q.   All right.  Is Brian right beside you?

20        A.   No.

21        Q.   And where is he?

22        A.   He's on the other end of the opening.

23        Q.   All right.  So we've got a one by three --

24   let's draw this.  You can tell me if you don't like my

25   drawing.  But here's -- that's a one by three and the

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                   ctrptr4u@aol.com                    fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 165 of 243

Page 166

1    chute is like right here, okay.  This would be the chute

2    (Indicating).

3         A.   Okay.

4         Q.   All right.  You've got a space and then here's

5    the opening (Indicating).  All right.  Does that look

6    about right?

7         A.   Yes, sir.

8         Q.   Okay.  Where would you be and where was Brian?

9         A.   Brian was on this side (Indicating).

10        Q.   And the door is right here that you came in;

11   is that right?

12        A.   That's correct.

13        Q.   Okay.  Put door right there (Indicating).

14        A.   And I was right here (Indicating).

15        Q.   All right.  So you all are on opposite ends of

16   it?

17        A.   (Witness nods.)

18        Q.   All right.  So the space in front of you is

19   the one-foot space, right?

20             MR. EPSTEIN:  Objection to form.

21        Q.   This is the one.  This is three feet, that's

22   one (Indicating).  Is that right?

23        A.   Yes.

24        Q.   Could you mark that, just put one foot, three

25   foot, one foot.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 166 of 243

Page 167

1      A.    And this one foot and three foot is

2   approximate.

3      Q.    I understand.  And put one foot over here

4   (Indicating).

5      A.    (Witness complies.)

6      Q.    All right.  And you're leaning over and

7   shaking the flask; is that right?

8      A.    Yes.

9      Q.    Okay.  Now, tell me what you did when you put

10  them in your hand.

11     A.    Well, I reached both hands in together, mostly

12  I was shaking, but occasionally I would take them and

13  sling them.

14     Q.    All right.  So you would dump some tablets in

15  your hand and reach in and throw it; is that right?

16     A.    Yes.

17     Q.    How far do you think you could throw a tablet?

18     A.    I don't know.

19     Q.    Did you see where it landed?

20     A.    Well, we would look in and you could see and

21  you could hear them rolling on the peanuts.

22     Q.    Okay.  But you didn't have your flashlight in

23  your hand at that time, right?  Your flashlight --

24  where's your flashlight when you're -- when you're

25  broadcasting the --

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES            tel:919.847.5787
Raleigh, NC 27609                   ctrptr4u@aol.com                 fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 167 of 243

Page 168

1      A.   In my back pocket.

2      Q.   And when you're dumping them in your hand and

3   throwing them, you're not shining in with a flashlight,

4   right?

5      A.   But there was some daylight that was shining

6   in.

7      Q.   How is the daylight getting in?

8      A.   Through -- through that opening.

9      Q.   All right.  Could you see down into the dome

10   well -- we'll put it that way -- without the flashlight?

11      A.   No.

12      Q.   So you heard them rolling down the side; is

13   that what you said?

14      A.   And you could heard them knocking the peanuts

15   around.

16      Q.   And how long did that take to empty all the --

17   to put in all 49,000 tablets?

18      A.   I'm not sure.

19      Q.   What do you think?

20      A.   I don't remember.

21      Q.   Well, give me just a ballpark figure what you

22   think.

23      A.   I don't remember.

24      Q.   Was it more than an hour?

25           MR. EPSTEIN:  Objection to form; asked and

5813 Shawood Drive           VIVIAN TILLEY & ASSOCIATES           tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                  fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 168 of 243

Page 169

1        answered three times.  Go ahead and answer again.

2        A.   I don't remember how long it took.

3             MR. WIDIS:  Let's get this marked.

4             MR. EPSTEIN:  And if you can get to a good

5        stopping point, I do need a bathroom break.

6             MR. WIDIS:  Let's stop.

7             (Brief recess 2:04 - 2:15 p.m.)

8             (Exhibit No. 26 marked for identification.)

9   BY MR. WIDIS:

10       **Q.   Mr. Turner, I've got you squatting, kneeling,**

11  **distributing the tablets from the flask at this point**

12  **over the opening.  Do you know how far it was to the**

13  **walls?**

14       A.   I'm not sure.

15       **Q.   All right.  Did you ever see the walls when**

16  **you looked in with your flashlight?**

17       A.   I could not see the walls.

18       **Q.   Do you know how far you could actually fling a**

19  **tablet?**

20       A.   No, sir.

21       **Q.   Do you know how far you could have thrown a**

22  **tablet?**

23       A.   No, sir.

24       **Q.   And most of the tablets you were shaking out**

25  **of the can, right?**

5813 Shawood Drive          **VIVIAN TILLEY & ASSOCIATES**          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                    fax:919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 169 of 243

Page 170

1           MR. EPSTEIN:  Objection to form.  You're

2      saying "can."  He's used the term "flask."

3      Q.   You know what I'm talking about?

4      A.   Yes, sir.

5      Q.   Most of them you were shaking out of the

6  flask, right, as opposed to putting them in your hand

7  and throwing them?

8      A.   Yes.

9      Q.   How long does it take to empty a flask, just

10  average, if you're shaking it like that down that

11  opening?

12     A.   I'm not sure.

13     Q.   What would you say, one minute, more than a

14  minute?

15     A.   Approximately one minute.

16     Q.   And how many flasks did you all empty?

17     A.   Fourteen times seven.

18     Q.   Ninety-eight?

19     A.   Ninety-eight.

20     Q.   Would you say you and Brian did half each?

21     A.   Close, yes.

22     Q.   Who did more do you think?

23     A.   Probably Brian.

24     Q.   Why is that?  He was -- why would you say

25  Brian?

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 170 of 243

1      A.    He's younger and tougher.

2      Q.    All right.  Did you stop at any time during

3   the distribution and look down in the dome or did you

4   just from the beginning to the end shake them out and

5   then -- till you were finished?

6      A.    I don't remember.

7      Q.    Was there any reason to stop and look in there

8   once you started applying the fumigant, once you started

9   broadcasting these tablets down into the dome?

10      A.    I mean, I was looking in the entire time, not

11   with the flashlight, but I was.

12      Q.    You were looking down into the dome?

13      A.    (Witness nods.)

14      Q.    But you never stopped and pulled out the

15   flashlight and looked around and then continued on

16   distributing?

17      A.    I don't remember.

18      Q.    And what would have been the reason to stop

19   and look in?

20      A.    To make sure the tablets were being evenly

21   distributed.

22      Q.    Did you -- what did you do then to make sure

23   that the tablets were being distributed evenly?

24      A.    I could hear them scattering and rolling

25   across the peanuts.

5813 Shawood Drive            VIVIAN TILLEY & ASSOCIATES            tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                  fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 171 of 243

1      Q.   And as long as you could hear them scattering

2   and rolling across it, did that mean to you that they

3   were being distributed evenly?

4      A.   Yes.

5      Q.   If you were to look down -- strike that.

6   Strike that.

7           When you were distributing during this

8   process, when you were shaking the can and throwing it

9   by hand, did you ever look in and see how they were

10  being distributed?

11     A.   I don't remember.

12     Q.   Mostly it was based on hearing them roll and

13  that, so you knew at that point that they were being

14  evenly distributed; is that right?

15     A.   Just knowing that we were slinging them.

16     Q.   Just knowing you were slinging them out gave

17  you confidence that they were being evenly distributed;

18  is that right?

19     A.   And I could see in the hole while we were --

20  you know, I was looking as we shook and scattered the

21  tablets.

22     Q.   All right.  But you couldn't see the wall,

23  right?

24     A.   No.

25     Q.   How far could you see down in there when you

5813 Shawood Drive        VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787
Raleigh, NC 27609             ctrptr4u@aol.com              fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 172 of 243

Page 173

1   were just down there distributing, how far down into the

2   dome could you see?

3       A.   I'm not sure exactly.  I mean, I could see the

4   peanuts.

5       Q.   You could see the pile where -- the top of the

6   peanut pile?

7       A.   I'm not positive on that, sir, I'm not sure.

8       Q.   All right.  Let's just make sure I understand

9   something.  All right.  This is that one by three and

10  you're right here and Brian's over here, okay.  You're

11  kneeling, you can't see any of this part behind you, can

12  you (Indicating)?

13      A.   No, sir.

14      Q.   I mean, it's all this -- in fact, from here

15  back, if this is the dome, you can't see any of this to

16  the rear of you, can you (Indicating)?  You can

17  basically see, what, about down -- straight down the

18  hole, but you can't see anything behind you, right?

19           MR. EPSTEIN:  Objection to form.

20      A.   I mean, I could see -- I couldn't see the

21  walls.

22      Q.   Okay.  And you couldn't see the walls to the

23  left, to the right, in front or behind, you couldn't see

24  the walls, right?

25      A.   That is correct.

5813 Shawood Drive        VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787
Raleigh, NC 27609            ctrptr4u@aol.com              fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 173 of 243

Page 174

1     Q.   And the pile as it went down, you couldn't see

2  the pile as it was sloping down behind you, right, like

3  right above you and down behind you?

4     A.   When I looked in with the light I could.

5     Q.   Okay.  But not while you were broadcasting,

6  right?

7     A.   Right.

8     Q.   Now, when you were through throwing them out

9  there or distributing them, what did you do at that

10  point?

11    A.   We took the flasks and put them back in their

12  boxes, cased them back up.

13    Q.   Did you look into the pile at that point?

14    A.   Yes, we did.

15    Q.   Did you use your flashlight?

16    A.   Yes, we did.

17    Q.   What did you see?

18    A.   I could see that the tablets had been

19  scattered.  They were all across the peanuts.

20    Q.   All right.  And how much of the pile could you

21  see?

22    A.   I could see a lot of it, but I couldn't see

23  all the way to the walls.

24    Q.   Okay.  Do you know about how many feet you

25  could see?

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 174 of 243

1      A.   I'm not sure.

2      Q.   And how long did you -- did you stick your

3   head down in the opening?

4      A.   Yes.

5      Q.   All right.  Were you concerned about breathing

6   toxic fumes at that point?

7      A.   No, sir.

8      Q.   Why not?

9      A.   And I had my detection equipment with me.

10      Q.   How long did you keep your head down there?

11      A.   I'm not sure exactly, not long.

12      Q.   Five seconds maybe?

13      A.   I'm just not sure.

14      Q.   Do you have a ballpark for that?

15      A.   Approximately 30 seconds.

16      Q.   If you saw piling down there, what were you

17   going to do?

18           MR. EPSTEIN:  Objection to form.

19      A.   I don't know.

20      Q.   My question is how were you going to address

21   piling down on the peanuts if you did see it?

22           MR. EPSTEIN:  Objection to form.

23      A.   I don't know.

24      Q.   Was there any way for you to rectify the

25   situation if you saw piling?

5813 Shawood Drive            VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                 ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 175 of 243

Page 176

1              MR. EPSTEIN:  Objection to form.

2       A.   I don't know.

3       Q.   As you sit here today, do you know of any way

4  you could have rectified the piling of peanuts if you

5  would have seen it down there?

6              MR. EPSTEIN:  Objection to form.

7       Q.   I'm sorry, any way you could have rectified

8  the piling of fumigant when you looked down in the pile

9  if you would have seen piling of fumigant?

10      A.   I'm not sure.  I don't know.

11      Q.   Did you have any plan in place that would have

12 allowed you to fix the situation if you looked down and

13 saw fumigant, the tablets piled up down in the peanuts?

14      A.   I did not have a plan in place.

15      Q.   So is it accurate to say that you were

16 broadcasting this fumigant down into the dome with no

17 way to rectify the situation if the fumigant was

18 improperly applied?

19             MR. EPSTEIN:  Objection to form.

20      A.   I didn't have a plan in place.

21      Q.   All right.  And you would agree that stacking

22 or piled up peanuts is improperly -- applied improperly,

23 wouldn't you?

24             MR. EPSTEIN:  Objection, form.

25      Q.   I'll say that again.  You would agree that if

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com                 fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 176 of 243

1   the fumigant tablets are stacked or piled up, they would

2   be considered improperly applied?

3       A.   In accordance to the label.

4       Q.   And the label is the law, right?

5       A.   Yes.

6       Q.   Thank you.  All right.  So let me ask it

7   again.  It's accurate then that you are broadcasting

8   peanuts -- I mean broadcasting fumigant down into the

9   dome with no way to rectify this situation if the

10   fumigant is improperly applied by being piled up or

11   stacked?

12       A.   I didn't have a plan in place.

13       Q.   And so you had no way to rectify it if you saw

14   that it was piled up; is that right?

15       A.   I didn't have a plan in place at the time.

16       Q.   But that means you couldn't have rectified it?

17   Do you know of any way you could have rectified the

18   piling so it wasn't piled up?

19           MR. EPSTEIN:  Objection, form.

20       A.   No.

21       Q.   Have you ever been applying fumigant and saw

22   it was piled up and had to rectify the situation?

23       A.   No, sir.

24       Q.   You've never had to -- you've never felt you

25   piled anything up and felt you had to smooth it out or

5813 Shawood Drive           **VIVIAN TILLEY & ASSOCIATES**         tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com             fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 177 of 243

Page 178

1    scatter them a little more?

2        A.    No, sir.

3        Q.    All right.  You've cleaned up.  You've taken

4    the flasks.  Did anything happen when you were taking

5    the flasks and putting them in the box?

6        A.    Yes, sir.

7        Q.    What happened?

8        A.    One of the flasks was dropped inside the dome.

9        Q.    Who dropped it?

10       A.    That I'm not sure of.

11       Q.    And --

12       A.    It was sort of like football fumble.

13       Q.    And did you look for it?

14       A.    Yes.

15       Q.    Who did?

16       A.    I'm not sure.  We all looked at it.

17       Q.    Everybody looked down in the dome to see it?

18       A.    (Witness nods.)

19       Q.    Now, what were you going to do if you found

20   it?

21       A.    We did find it.

22       Q.    Oh, you did see it down there?

23       A.    It was on the top.

24       Q.    Okay.  And then what did you do at that point?

25       A.    We left it 'cause we knew it was empty.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                 ctrptr4u@aol.com              fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 178 of 243

Page 179

1      Q.   All right.   And what were you going to do if

2   it wasn't empty?   I mean, you've dropped it.   Is there

3   any way for you to retrieve it?

4      A.   I would have found a way.

5      Q.   As you sit here, do you know what you would

6   have done to retrieve that can?

7      A.   No, sir.

8      Q.   Do you feel it was a problem having the can

9   down in the dome?

10      A.   No, sir.

11      Q.   Did you feel that that can in the peanuts

12   caused -- could cause some type of problem to Severn?

13      A.   No, sir.

14      Q.   Did you tell Severn that you all dropped a can

15   down in that dome?

16      A.   I don't remember.   I'm certain we didn't on

17   the day of the fumigation.

18      Q.   Why not?

19      A.   My plan was to find a way to retrieve it.

20      Q.   Were you going to come back and try and

21   retrieve it?

22      A.   When we cleared it.

23      Q.   Did you -- did you come up with a plan?

24      A.   I have used like a fishing rod and reel

25   before.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 179 of 243

Page 180

1    Q.    Were you going to try that?

2    A.    Yes, sir.

3    Q.    But you never -- you never tried to get it

4  out, did you?

5    A.    No, sir.

6    Q.    And how far down was the can?

7    A.    It was on top.

8    Q.    So what was it, about 20 feet down from the

9  top --

10   A.    Yes, sir.

11   Q.    -- from the opening?

12   A.    Yes, sir.

13   Q.    And you think maybe you could have gotten it

14 with a rod and reel?

15   A.    It's questionable.

16   Q.    You would have tried though?

17   A.    I would have tried.

18   Q.    All right.  After you looked for that flask

19 and observed it, what did you do then?

20   A.    That's when we sealed the hatch up, put the

21 hatch back up.

22   Q.    How did you do that?

23   A.    Put the metal plate back on, bolted it back

24 down and then with tape and glue sealed around it.

25   Q.    Had it been sealed and glued in December,

5813 Shawood Drive            VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                   ctrptr4u@aol.com               fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 180 of 243

1   December of '08 when you all were there prior?

2       A.   I don't remember.  It's a normal practice.  I

3   would think we would.

4       Q.   But you don't recall one way or the other?

5       A.   But I can't, right, remember.

6       Q.   What did you do after you sealed that one

7   opening?

8       A.   We stuffed the chute, sealed that off.

9       Q.   Then what?

10      A.   We came out and shut the door to the headhouse

11  and came off the top of the dome.

12      Q.   All right.  Was there any placard put up on

13  the headhouse?

14      A.   No, sir.  It was --

15      Q.   By "placard," I mean saying fumigation?

16      A.   No, sir, there wasn't.  There was one placed

17  on the ladder going up to the headhouse.

18      Q.   All right.  Did you leave the fumigant boxes

19  up at the headhouse?

20      A.   Yes.

21      Q.   And why was that?

22      A.   Our plan was to, when we came back and

23  aerated, to clean them up.

24      Q.   Did you contact anyone at Severn and tell them

25  you had completed your fumigation of the dome?

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 181 of 243

1        A.   I don't remember.

2        Q.   **Doesn't your operating procedure say you**

3   **should contact someone from the facility and let them**

4   **know how it went?**

5        A.   That would be at the completion of the

6   fumigation.

7        Q.   **When you finished this actual distributing the**

8   **fumigant, you didn't feel you needed to tell anybody; is**

9   **that right?**

10       A.   I don't remember if I told anybody or not.

11       Q.   **Do you recall actually telling anyone you were**

12  **going to be there August 4th, 2009?**

13       A.   I'm not sure.  I know R.P. and I had agreed

14  upon a time, but I can't confirm that I told him I was

15  going to be there at this exact time.

16       Q.   **This exact time or this exact date?**

17       A.   I'm not sure.  I don't remember.

18       Q.   **At this point you don't remember if you told**

19  **R.P. you were actually going to be there on a certain**

20  **date or not; is that right?**

21       A.   That's correct, I don't know.

22       Q.   **Did you take any field notes when you were at**

23  **this August 4th, '09 fumigation?**

24       A.   No, sir.

25       Q.   **Does IFC require you to make field notes?**

5813 Shawood Drive          **VIVIAN TILLEY & ASSOCIATES**          tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 182 of 243

Page 183

1    A.   Not that I'm aware of.

2    Q.   I'm going to mark this Exhibit as long as

3    we've talked about it.

4         (Exhibit No. 27 marked for identification.)

5    Q.   Twenty-seven is the drawing I made when we

6    talked about you at one end of the plate and whether you

7    can see behind you, just for reference sake.

8         All right.  Let's take a look at Exhibit 20,

9    this photograph.  Looking at the hatch right here, which

10   you've identified that you took off, where you've

11   written the word hatch, right (Indicating)?

12   A.   Yes, sir.

13   Q.   Is this an opening that I'm pointing to that

14   could have been removed?

15   A.   I don't know.

16   Q.   Do you remember seeing an opening just to the

17   side of the chute?

18   A.   I don't remember.

19   Q.   Did you ever look for any other openings in

20   the headhouse other than the -- that one that you've

21   marked "hatch" that was at the end of the chute?

22   A.   I don't remember looking.  I remember sealing

23   around the chute.

24   Q.   All right.  Did you ever ask anyone at Severn

25   if there were any other openings besides that one

1    opening at the end of the chute that you used to

2    broadcast the fumigant?

3         A.   I don't remember.

4         Q.   Do you think knowing that -- whether there

5    were any additional hatches or place -- removable plates

6    would be helpful in distributing the fumigant into the

7    dome?

8              MR. EPSTEIN:  Objection; asked and answered.

9         You can go ahead and answer again.

10        A.   Could you ask me the question again.

11        Q.   Yeah.  Do you think knowing whether there were

12   additional plates that could be removed on the floor of

13   the headhouse would be helpful in your distribution of

14   fumigant into the dome?

15             MR. EPSTEIN:  Same objection.

16        A.   It would have made it easier.

17        Q.   Do you believe it also would have made it

18   safer for you to fumigate the dome by having more

19   openings to put the fumigant into?

20             MR. EPSTEIN:  Objection to form.

21        A.   I can't say that it would make it safer.

22        Q.   Do you think it would have been easier for you

23   to -- it would have been a more effective way to scatter

24   the tablets if you used more than one opening above the

25   dome -- I mean above the pile of peanuts?

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787
Raleigh, NC 27609                 ctrptr4u@aol.com             fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 184 of 243

Page 185

1            MR. EPSTEIN:  Objection to form.

2       A.   Yes.

3       Q.   Did you consider asking anyone at Severn if

4  there were any hatches that could be used besides that

5  one, the one being that you used to broadcast the

6  fumigant?

7       A.   No.

8       Q.   Who told you about this hatch at the end of --

9  that you did use, where did you learn about this hatch?

10      A.   R.P. Watson.

11      Q.   Did you ask him about any other hatches?

12      A.   Not that I can recall.

13      Q.   Were you ever told that you couldn't use any

14  other hatches other than the one that you used?

15      A.   Not that I can recall.

16      Q.   If there were four other hatches up in that

17  headhouse, do you think it would have been a more

18  effective way to fumigate if you used all four hatches,

19  if you used four hatches plus that one you did open?

20           MR. EPSTEIN:  Objection, form.

21      A.   I can't say it would be more effective.

22      Q.   Do you think you would have been able to

23  scatter the tablets more effectively if you used more

24  than one opening?

25           MR. EPSTEIN:  Objection to form.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 185 of 243

Page 186

1       A.   I could have done it easier.  I don't know

2  about more effective.

3       Q.   **Do you think you could scatter them the same**

4  **degree if you used one opening as opposed to four**

5  **different openings, is that your testimony?**

6            MR. EPSTEIN:  Objection to form.

7       A.   Yes, because it was a small area.

8       Q.   **Well, what's the diameter of the dome?**

9       A.   I don't remember.  It's big.

10      Q.   **Did you get anybody to sign a service report**

11 **after you applied the fumigant on August 4th, '09?**

12      A.   No.

13      Q.   **Why is that?**

14      A.   Technically the fumigation wasn't over.

15      Q.   **And the plan was you would turn in that**

16 **service report after the fumigation was over and you --**

17      A.   The building was completely cleared.

18      Q.   **So after August 4th, were you contacted --**

19 **when were you next contacted about the dome?**

20      A.   R.P. Watson called me and it was six or seven

21 days later.

22      Q.   **And what did he tell you?**

23      A.   That they were seeing smoke come from the top

24 of the dome.

25      Q.   **And what did you think at that point?**

5813 Shawood Drive        **VIVIAN TILLEY & ASSOCIATES**      tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com              fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 186 of 243

Page 187

1      A.    Well, I wasn't sure.

2      Q.    **What options were running through your mind at**

3  **that point?**

4      A.    A lot.  And actually it was under fumigation,

5  so I was concerned.

6      Q.    **Concerned about what?**

7      A.    That it possibly could have been because of

8  the fumigation and the fact that there was gas in it and

9  the exposure to surrounding people.

10      Q.    **All right.  And were you concerned that**

11  **somehow the manner in which you applied the fumigant had**

12  **caused the fire in the dome?**

13      A.    That wasn't a first reaction when he first

14  called me.

15      Q.    **Okay.  But did it become a reaction later, or**

16  **did that -- was that a possibility in your mind?**

17      A.    Yes, sir, I did think about it.

18      Q.    **As soon as he told you about the smoke, did**

19  **you come over there?**

20      A.    The first thing I done was call Brian Lilley

21  because he was closer to that job site.  He could get

22  there quicker.

23      Q.    **And what did you tell Brian?**

24      A.    The fact that they were seeing smoke and he

25  needed to go there with the detection equipment and

5813 Shawood Drive          **VIVIAN TILLEY & ASSOCIATES**          tel:919.847.5787
Raleigh, NC 27609                  ctrptr4u@aol.com                     fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 187 of 243

Page 188

1    monitor the area.

2        Q.   Did you express any concern that perhaps

3    something y'all had done might have caused that fire?

4        A.   No.

5        Q.   Did Brian say, "Well, I hope it's nothing we

6    did," something like that?

7        A.   I don't remember.

8        Q.   He may have, you just don't remember?

9        A.   I don't remember.

10       Q.   At that point you knew you were dealing with a

11   dangerous substance that could cause a fire if it was

12   improperly applied, right?

13       A.   Yes.

14            MR. EPSTEIN:  Objection.  Objection to form.

15       Q.   And when you heard there was a fire, you were

16   concerned that maybe perhaps something you did caused

17   that fire, right?

18       A.   That wasn't -- when I first got the phone

19   call, I didn't think that.

20       Q.   When did you think that?  At some point you

21   thought that, didn't you?

22       A.   All kinds of things go through your mind.

23       Q.   Well, all right.  When did you first think

24   that perhaps something I did caused the fire?

25            MR. EPSTEIN:  Objection to form.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                 ctrptr4u@aol.com               fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 188 of 243

Page 189

1      A.   I really don't remember.

2      Q.   **You did think that at some point though,**

3  **right?**

4      A.   Yes, sir.

5      Q.   **All right.  Was that within the first couple**

6  **days after being told that there was smoke coming out?**

7      A.   Probably so.

8      Q.   **All right.  When you -- when did you first go**

9  **there?**

10     A.   I arrived at midnight that night.

11     Q.   **So Brian got there first and you got there**

12  **later?**

13     A.   That's correct.

14     Q.   **And did you talk -- was Brian still there when**

15  **you got there?**

16     A.   Yes, he was still on site.

17     Q.   **Did you talk to Brian?**

18     A.   Yes.

19     Q.   **What did he tell you?**

20     A.   Just that he had been taking gas readings and

21  told me what the gas readings were.

22     Q.   **And what were the gas readings?**

23     A.   He was not -- everything was undetectable

24  outside of the dome and actually he did not have a

25  high-range detection equipment with him, so he couldn't

5813 Shawood Drive          **VIVIAN TILLEY & ASSOCIATES**          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com               fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 189 of 243

Page 190

1    take readings inside.  I did.  So I did upon arrival.

2         Q.   And this is inside the dome or inside the

3    headhouse?

4         A.   Dome.

5         Q.   All right.  How did you get inside the dome?

6         A.   We had a quarter inch read line that ran

7    inside.

8         Q.   And what type of reading were you getting from

9    that read line?

10        A.   I'd need to look at the readings to be exact.

11        Q.   Were you concerned about the readings?

12        A.   No, sir.

13        Q.   Did you see smoke?

14        A.   Not that night.

15        Q.   And were you there the next day?

16        A.   Yes, sir.

17        Q.   All right.  Do you know what day that was?

18        A.   No, sir.

19        Q.   Did you see smoke the next day?

20        A.   Yes.

21        Q.   Did you think there was a fire in the dome at

22    that point?

23        A.   Or smoldering.

24        Q.   And what's the difference in your mind between

25    smoldering and a fire?

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                    ctrptr4u@aol.com                   fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 190 of 243

1       A.   Smoldering is just heat and creating smoke.

2   Fire is flame.

3       Q.   All right.  Did you think there was smoldering

4   going on in the dome?

5       A.   Yes.

6       Q.   Did you at that point consider whether

7   something you had done caused this smoldering inside the

8   dome?

9       A.   I really didn't know.

10      Q.   I know.  Did you think about that though?  Did

11  you think to yourself, "Perhaps I may have done

12  something that caused this smoldering"?

13      A.   Yes, sir.

14      Q.   Who did you contact when you got there at

15  midnight?

16      A.   I don't remember.  I contacted my corporate

17  office on my trip there prior to getting there.

18      Q.   You're coming from Rocky Mount there?

19      A.   Winston-Salem.  I was in Winston working.

20      Q.   Who did you contact at corporate office?

21      A.   I'm not positive who the first person was I

22  talked to.

23      Q.   How many people did you talk to that day at

24  corporate?

25      A.   I remember four.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                  fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 191 of 243

Page 192

1    Q.    Who were they?

2    A.    Dan Ponton, Mike Newland, Robert Blachly.

3    Q.    Blachly?

4    A.    (Witness nods.)  And Dave Cooper.

5    Q.    And who is Dan Ponton?

6    A.    He's like vice president of our company.

7    Q.    What did you tell him?

8    A.    Well, I told him I had received a call from a

9    customer and he was seeing smoke coming from the dome.

10   Q.    Did you tell him that you had fumigated the

11   dome within the last week say?

12   A.    Yes.

13   Q.    All right.  And what did he say to you?

14   A.    I don't remember.

15   Q.    Did they ask you to write a report?  Anyone

16   from corporate ask you to write a report?

17   A.    I can't recall.

18   Q.    Did anybody ask you to write a statement or

19   any memo or anything, ask you to put anything in writing

20   about what you had done and what had happened?

21   A.    I can't recall that I was asked to do that.

22   Q.    All right.  And then you mentioned a Mike

23   somebody?

24   A.    Newland.

25   Q.    Newland, who is he?

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                 fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 192 of 243

Page 193

1       A.   He was at the time CEO of our company or --

2   CEO.

3       Q.   And you talked to him as well?

4       A.   Yeah, we were like, I don't know, conference

5   call.

6       Q.   Who was on the conference call?

7       A.   Those names.

8       Q.   All these people?

9       A.   There may have been additional ones.  They're

10  the ones I remember.

11      Q.   And what was discussed in that conference

12  call?

13      A.   I don't remember all the details 'cause I was

14  nervous and just the fact that I was traveling to the

15  site and -- I don't remember the details of the call.

16      Q.   And what were you nervous about?

17      A.   There was smoke coming from one of my

18  fumigated sites.

19      Q.   And that was a concern because you may have

20  done something that caused it?

21           MR. EPSTEIN:  Objection to form.

22      Q.   Is that what you were concerned about?

23      A.   No, sir.

24      Q.   What was -- what were you nervous about then?

25      A.   I had a hazardous material there that could

5813 Shawood Drive        VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787
Raleigh, NC 27609             ctrptr4u@aol.com               fax:919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 193 of 243

Page 194

1    cause risk to people.

2        Q.   So the next day who did you talk to -- you're

3    at the Severn facility at that time, right?

4        A.   Yes.  There was a lot of people.  I can't --

5    R.P. and --

6        Q.   Did Don Ponton --

7             MR. EPSTEIN:  He's still working on his

8        answer.

9             MR. WIDIS:  Oh, okay.

10            THE WITNESS:  I mean, there was several Severn

11       people.  I don't even know all of their names,

12       R.P., Dallas Barnes, Pat Rowe.  I know that Dan

13       Ponton came in from our corporate office.  I'm not

14       sure if that was the very next day or two days

15       later.  And there were just a lot of people in and

16       out.  And EPA came in and they met with me and

17       asked questions.

18       Q.   The information that you gave to EPA, was

19   that -- did you give them truthful answers?

20       A.   Yes, sir.

21       Q.   Did you speak to any government officials

22   besides the EPA?

23       A.   I don't recall that I did.

24       Q.   Did you speak to Mike Gibney?

25       A.   I believe that was days later.

5813 Shawood Drive        VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787
Raleigh, NC 27609            ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 194 of 243

1    Q.    Do you remember talking to a Richard Hargis,

2    investigator from Engineering Design & Testing?

3    A.    I remember that name.

4    Q.    Was he there when you first got there?

5    A.    When I first arrived that night?

6    Q.    Yeah.

7    A.    I don't know.  I remember the hazmat team

8    being there and they left real soon after I arrived.

9    Q.    Did they come back?

10   A.    I don't think so.

11   Q.    Were you asked by anyone to write any memos or

12   reports or statements about what you did?

13   A.    I can't recall that I was asked and that I

14   did.

15   Q.    Did you put anything in writing about what you

16   did?

17          MR. EPSTEIN:  Okay.  Can you be more specific

18          "about what you did"?

19          MR. WIDIS:  Sure.

20   Q.    Did you put anything in writing about your

21   fumigation of August 4th, '09 other than the service

22   report?

23   A.    No, sir, not that I can remember.

24   Q.    Do you recall being there when Bob Cotham came

25   from Piedmont Risk?

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 195 of 243

Page 196

1      A.   Yes.

2      Q.   When was that?  Do you remember how many days

3  you had been there when you first saw Bob Cotham?

4      A.   I don't remember exactly.  Three or four --

5  three or four days and I'm not certain on that.

6      Q.   When you spoke to EPA, did they ask you for

7  details as to how you fumigated the dome on August 4th,

8  '09?

9      A.   Yes.

10      Q.   And you told them everything -- you were

11  truthful when you told them?

12      A.   Yes, sir.

13      Q.   All right.  When you were there that next day

14  and looked up at the smoke, did you feel any guilt?

15          MR. EPSTEIN:  Objection to form.

16      A.   Concern.

17      Q.   And what kind of concern was that?

18      A.   Well, R.P. and them, they're not just

19  customers, they're friends of mine, and the fact that

20  this was just happening, this situation was happening.

21      Q.   Did you feel any concern about how you had

22  perhaps applied the fumigant?

23          MR. EPSTEIN:  Objection; asked and answer.  Go

24      ahead.

25      A.   Yeah, I searched my memory in that did I do

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com                 fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 196 of 243

1  things right.

2        Q.    And do you think you did things right?

3        A.    Yes, sir.

4        Q.    Did you think -- do you think maybe dumping --

5  or broadcasting all the fumigant down one opening above

6  the pile may not have been the safest way to apply the

7  fumigant?

8              MR. EPSTEIN:  Objection to form.

9        A.    I feel comfortable that I properly scattered

10 those tablets.

11       Q.    Did you ever discuss the way you were doing it

12 with Brian Lilley?  Did you ever discuss that perhaps

13 this method might not be the best way to have fumigated

14 the dome?

15             MR. EPSTEIN:  Objection to form.

16       A.    I can't recall that we discussed it.

17       Q.    You may have, you may not, you just don't

18 remember?

19       A.    Yes, sir.

20       Q.    Do you know Keith Ham?

21       A.    Yes.

22       Q.    Who is he with?

23       A.    Pestcon.

24       Q.    Did you ever talk to Keith Ham about this

25 loss?

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 197 of 243

Page 198

1      A.   Not that I remember, no, sir.

2      Q.   **Do you recall Keith Ham ever telling you that**

3  **he had heard from Dagesh that you were not able to get**

4  **into the bin and distribute the fumigant?**

5           MR. EPSTEIN:  Objection to form.

6      A.   I don't recall that.

7      Q.   **Do you recall Ham ever telling you that he**

8  **heard from Dagesh that IFC opened the top feed and just**

9  **dumped a tremendous amount of chemical in one spot?**

10          MR. EPSTEIN:  Objection to form.

11     A.   No, sir.

12     Q.   **You don't remember that?**

13     A.   I don't remember that.

14     Q.   **All right.  Did you talk to any investigators**

15  **from IFC or Rollins?**

16     A.   I'm sure I did, but I can't recall a name.

17     Q.   **Do you recall talking to Richard Hargis?**

18     A.   Yes.

19     Q.   **Okay.  Any other investigator?**

20     A.   Not that I can recall.

21     Q.   **What do you recall telling Richard Hargis?**

22     A.   I really don't remember.  I'm sure he asked me

23  questions about the fumigation, but I don't know any

24  details.

25     Q.   **Were you at any meetings where the discussion**

5813 Shawood Drive        **VIVIAN TILLEY & ASSOCIATES**        tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com                  fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 198 of 243

Page 199

1    of suppressing the fire took place?

2         A.   I was around, but most of those meetings I

3    might have been on site, but they were happening in

4    R.P.'s office.

5         Q.   And you were not in there?

6         A.   They were -- yes, there was -- I can recall

7    one.

8         Q.   Do you remember what was said at that meeting?

9         A.   I remember the discussion about the dry ice

10   and looking for dry ice to put in on it.

11        Q.   Was there any -- what do you recall as to

12   various options that were presented or possibilities

13   that were presented to suppress the fire?

14        A.   One of the suggestions from our company was to

15   pull the peanuts out, start drawing the peanuts off.

16        Q.   And who suggested that?

17        A.   Brad Henry.

18        Q.   Who is Brad Henry?

19        A.   This guy at the table.

20        Q.   Was he at the meeting?

21        A.   I don't think so.  No, he was not.  He was not

22   on site.

23        Q.   Did you hear any suggestions made at the

24   meeting that you were at, methods of suppressing the

25   fire other than the dry ice?

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                  ctrptr4u@aol.com                     fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 199 of 243

1       A.   I remember the dry ice and the option of

2   starting to draw off the peanuts, pull down the peanuts.

3       **Q.   And was that discussed at the meeting?**

4       A.   There was so many people in and out, I don't

5   remember when you say "at the meeting."

6       **Q.   But you do remember that being discussed at**

7   **some point --**

8       A.   In R.P.'s office, yeah.

9       **Q.   Did you have an opinion personally as to how**

10  **they should suppress the fire?**

11      A.   I felt they should have started by drawing

12  peanuts off and I relate that to my past grain -- when I

13  worked in the grain business.

14      **Q.   Did you make that opinion known to anybody?**

15      A.   I don't remember.

16      **Q.   Were you at the Severn facility when Bob**

17  **Cotham arrived?**

18      A.   Yes.

19      **Q.   Did you hear Mr. Cotham say that he had been**

20  **sent by IFC and Rollins?**

21      A.   No, I don't think I heard that.

22      **Q.   Did you hear Mr. Cotham say that he had the**

23  **expertise to handle the situation?**

24      A.   I don't remember.

25      **Q.   Did you ever talk to Bob Cotham yourself?**

5813 Shawood Drive          **VIVIAN TILLEY & ASSOCIATES**          tel:919.847.5787
Raleigh, NC 27609                  ctrptr4u@aol.com                   fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 200 of 243

Page 201

1      A.   I met him, yes.

2          Q.   **What did he say his role was there?**

3      A.   That he had been sent by Rollins and that he

4  handled situations like this for the company.  I don't

5  remember from there.

6          Q.   **Did you hear Cotham say that Rollins was going**

7  **to pay for the suppression of the fire?**

8      A.   I can't recall that I heard that.

9          Q.   **Was it your understanding that Rollins was**

10  **going to pay to suppress the fire?**

11      A.   No, sir.

12          Q.   **Do you know if Rollins paid for any fire**

13  **suppression activities?**

14      A.   I don't know.

15          Q.   **Did you talk to Bill Cotham?**

16      A.   Yes.

17          Q.   **All right.  What was his role?**

18      A.   Same as Bob.

19          Q.   **Did Bill tell you he had been sent by Rollins?**

20      A.   I don't know that he directly told me.

21          Q.   **But --**

22      A.   'Cause at that time I had Dan Ponton there,

23  too.

24          Q.   **Did Dan Ponton ever tell you that Rollins was**

25  **going to pay for the suppression of the fire?**

5813 Shawood Drive          **VIVIAN TILLEY & ASSOCIATES**          tel:919.847.5787
Raleigh, NC 27609                 ctrptr4u@aol.com                  fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 201 of 243

Page 202

1       A.   No, sir.

2       Q.   How many times did you come back to the scene,

3   to the Severn scene?

4       A.   I stayed several days.

5       Q.   All right.

6       A.   And --

7       Q.   After you left that first time, did you come

8   back?

9       A.   Yes, sir.

10      Q.   All right.  What was your purpose of coming

11  back?

12      A.   I'm not sure.  I don't remember.

13      Q.   Did you do fumigation there at Severn, at the

14  facility there in Severn, North Carolina?

15      A.   Ask me the question again.

16      Q.   You left -- you left the scene after you

17  stayed there a few days once the smoke was discovered?

18      A.   Right.

19      Q.   You came back at some point.  Were you coming

20  back to do fumigation at another facility or were you

21  just coming back to kind of observe and --

22      A.   Observe what was going on.

23      Q.   How many times did you come back to observe

24  what was going on with the dome?

25      A.   I don't remember, but I know I spent a long

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                    ctrptr4u@aol.com                    fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 202 of 243

Page 203

1  time there.

2      Q.   Came back several different times?

3      A.   Yes, sir, which I got a motel room and just

4  stayed there for a long time.

5      Q.   Where is that, Roanoke Rapids?  Where did you

6  stay?

7      A.   Roanoke Rapids.

8      Q.   Were you ever told by anyone at Rollins or IFC

9  not to come to the scene?

10     A.   It reached a point I was told there was no

11  need for me to come back to do my job.

12     Q.   Were you ever told not to speak to anybody

13  about what happened when you were there on August 4th,

14  '09?

15          MR. EPSTEIN:  Well, let me instruct you, I

16      don't know anything about this --

17          MR. WIDIS:  Not by your counsel.

18          MR. EPSTEIN:  -- but if you were told anything

19      by a lawyer of any kind that was working for

20      Rollins, you are not to reveal that in any way,

21      shape or form.

22     A.   I can't recall that I was told.

23     Q.   When you first worked for IFC, was it a part

24  of the Rollins family?

25     A.   No, sir.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrrptr4u@aol.com              fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 203 of 243

Page 204

1      Q.   When did Rollins take over, take over IFC?

2      A.   I think it was 2000 -- I'm giving you an

3  approximate, 2005.

4      Q.   Did your role change in any way when Rollins

5  took over?

6      A.   No, sir.

7      Q.   Did your contacts change in any way once you

8  were taken -- once Rollins took over IFC?

9      A.   No, sir.

10     Q.   Did you report to anyone at Rollins as opposed

11 to someone at IFC --

12     A.   No, sir.

13     Q.   -- once Rollins took over?

14     A.   No, sir.

15     Q.   Do you know what aspects of IFC business would

16 you consider controlled by Rollins?

17          MR. EPSTEIN:  Objection, form.

18     A.   I don't know.

19          MR. WIDIS:  Let's take a break.

20          THE WITNESS:  Thank you.

21          (Brief recess 3:08 - 3:24 p.m.)

22          (Exhibit No. 28 marked for identification.)

23 BY MR. WIDIS:

24     Q.   Mr. Turner, I want to clarify a point or two.

25 Did you put anything in writing after you performed the

5813 Shawood Drive        **VIVIAN TILLEY & ASSOCIATES**        tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com                   fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 204 of 243

1   fumigation on August 4th -- I'm sorry.

2           Did you put anything in writing regarding the

3   fumigation that you performed in Severn on August 4th,

4   2009 after the fire was discovered?

5       A.   I can't recall that I did.  The only document

6   I think I got was where we documented our gas readings.

7       Q.   And what document is that?

8       A.   It's a gas reading sheet and we were taking

9   gas readings regularly; and we would document that we

10  were taking readings; we would document what the reading

11  was, the time, what it was.

12      Q.   No statements, you didn't write any memos,

13  reports, statements, anything about what you did at the

14  site?

15          MR. EPSTEIN:  You mean apart from the

16      fumigation service report?

17          MR. WIDIS:  Well, if that's it, he can tell me

18      the fumigation report, too.

19      A.   Well, I did write the fumigation service

20  report.

21      Q.   All right.  Other than the service report?

22      A.   I can't recall anything else that I wrote.  I

23  can't remember.

24      Q.   Okay.  All right.  Take a look at Exhibit 28,

25  and let me try and orient you so that you can kind of

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com              fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 205 of 243

Randall Turner      June 26, 2012
Severn Peanut Co., Inc., et al. v. Industrial Fumigant Co., et al. 2:11-cv-00014-BO

Page 206

1 get a feel for what we're looking at here.  This is, as

2 I understand, the left side of the headhouse.  In other

3 words, you would come in over here on the right side.

4 Now, this is the other side.  You'd come in on this

5 catwalk from the door, come around, here's the back, and

6 then you would come around so that the hatch that you're

7 saying you removed would be in front this way

8 (Indicating).  Does that make sense to you?

9   A. Okay.  So where's the door again?

10   Q. The door's back here (Indicating).  What we're

11 looking at right here is this side over here.  This is

12 that -- you're looking at it -- you've got two sides,

13 this is a catwalk on the left.  You come in on the

14 catwalk on the right.

15   A. Okay.

16   Q. All right.  What you call this metal around,

17 all right.  I want you to assume this is an opening, a

18 hatch that can be removed on the headhouse floor, this

19 is a hatch, and that there's two similar hatches on the

20 right side as well, meaning four additional hatches,

21 besides the hatch that you removed and, of course, the

22 opening in the chute, all right.  Is it your testimony

23 that distributing it in the one hatch is just as safe as

24 distributing it in all -- in five other hatches

25 together?

5813 Shawood Drive   **VIVIAN TILLEY & ASSOCIATES**   tel:919.847.5787
Raleigh, NC 27609    ctrptr4u@aol.com    fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 206 of 243

Page 207

1          MR. EPSTEIN:  Objection to form.

2     A.   Ask me the question again.  My mind is

3  going -- ask me the question again.

4     Q.   Okay.  If you assume that there's four other

5  hatches that can be opened in that headhouse, besides

6  that hatch that you opened, in other words, you can

7  unbolt four additional hatches.  I want you to assume

8  that that's the case for the question.  Would you agree

9  that you would be able to distribute the fumigant more

10  evenly and perhaps more widespread through the five

11  hatches than you would through just one hatch?

12          MR. EPSTEIN:  Objection to form.

13     A.   I really don't know.  I'd assume.

14     Q.   It would make sense, wouldn't it, that you can

15  distribute the fumigant more evenly and more widespread

16  if you use five hatches as opposed to one hatch?

17          MR. EPSTEIN:  Same objection.

18     A.   Again, I don't know, but I would assume.

19     Q.   Okay.  All right.  Piling the fumigant is --

20  can possibly lead to fire; is that right?

21          MR. EPSTEIN:  Objection to form; asked and

22      answered.  Go ahead and answer again.

23     Q.   It says that in the label, right?

24     A.   Yeah, it says it in the label.

25     Q.   And piling of the fumigant is an unsafe

5813 Shawood Drive         VIVIAN TILLEY & ASSOCIATES       tel:919.847.5787
Raleigh, NC 27609          ctrptr4u@aol.com        fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 207 of 243

Page 208

1    application, would you agree with that?

2        A.   Yes.

3        Q.   All right.  As you sit here today, thinking

4    back on the way that you applied the fumigant on

5    August 4th, 2009, would you agree that applying the

6    fumigant in that method, that is, releasing 49,000

7    tablets all from one opening onto a pile of peanuts that

8    is 20 feet below may not be the safest way to apply the

9    fumigant?

10            MR. EPSTEIN:  Objection to form.

11       A.   I don't know.

12       Q.   You don't -- you don't think that --

13       A.   I felt safe with it.

14       Q.   So you -- and let me understand your

15   testimony.  You feel that applying it by dropping 49,000

16   tablets from one spot down to a peanut pile 20 feet

17   below is a safe method of applying fumigant?

18            MR. EPSTEIN:  Objection to form.

19       A.   The pile was mounded so that the tablets were

20   scattering.

21       Q.   And they were scattering because you were

22   dropping them in the area and they were rolling down the

23   side?

24       A.   Yes.

25       Q.   Okay.  Are there any other structures that you

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 208 of 243

Page 209

1    have fumigated where you apply the fumigant by dropping

2    it on its surface from one opening?

3            MR. EPSTEIN:  Objection to form.

4        A.   I'm not sure.

5        Q.   All right.  Are there any other structures

6    that you have fumigated where you apply aluminum

7    phosphide by dropping all the tablets from one opening

8    down onto the commodity?

9            MR. EPSTEIN:  Objection to form.

10       A.   I can't recall right now that I have.

11       Q.   Do you know of any, does anything come to mind

12   where you're dropping it down only one opening?

13           MR. EPSTEIN:  Objection to form.

14       A.   Possibly some grain bins, but I can't be

15   certain.

16       Q.   Where would those grain bins have been?

17       A.   I don't recall.

18           (Exhibit No.  29 marked for identification.)

19       Q.   Mr. Turner, I'm handing you Exhibit 29, which

20   are the Defendant's Responses to the Interrogatories.

21   Have you ever seen this document before?

22       A.   Yes.

23       Q.   All right.  Did you take part in preparing the

24   answer -- answers to any of these questions?

25       A.   Yes.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com                 fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 209 of 243

Page 210

1    Q.   Have you seen the answers that were provided?

2    A.   Yes.

3    Q.   All right.  What I want to do is go over the

4    first two just so I understand.  The first one we've

5    already discussed and you've already said that, so I

6    have no problem with that.

7         Let's look at number 2.  The question was:

8    "Please identify and describe in complete detail the

9    means and methods you used to fumigate the peanuts in

10   the dome on August 4th, 2009.  The answer should include

11   the identity of each of your employees or agents who

12   conducted the fumigation work and all steps taken to

13   prepare the structure to determine the amount of

14   fumigant needed, apply the fumigant and monitor the

15   process."

16        It says:  "Approximately 11:00 a.m. on

17   August 4th, 2009, Randy Turner, Brian Lilley, James Ward

18   and Lucas Bratton arrived at the Severn facility."

19        Now, where are you getting the 11 o'clock?  Do

20   you remember being there around 11:00?

21   A.   I remember we got there just before lunch.

22   Q.   And did you eat lunch before you released the

23   fumigant?

24   A.   No.

25   Q.   You -- did you eat lunch after you released

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com                 fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 210 of 243

1    the fumigant?

2         A.   Yes.

3         Q.   Do you know about what time you had lunch that

4    day?

5         A.   I don't remember.

6         Q.   It says:  "First sealed off the 14-foot

7    roll-up door with four-inch Aramark tape and aerosol

8    glue and then sealed off the draw-off spouts and

9    aeration fans with poly sheeting, four-inch Aramark tape

10   and aerosol glue."

11             Now, it doesn't say that you talked to anybody

12   at Severn.  Did you notify anybody at Severn that day

13   that you were going to be there?

14        A.   Again, I don't remember.

15        Q.   Did you contact anybody and tell them that you

16   had arrived at Severn on August 4th, '09 and that you

17   were now going to fumigate the dome?

18        A.   I don't remember.

19        Q.   And the last time you had been in the dome was

20   December of 2008, correct?  Last time you had been in

21   the headhouse above the dome?

22        A.   Yes.

23        Q.   "Then placed danger placards on the door,

24   ladder access and approximately every 20 to 25 feet

25   around the circumference of the dome.  The four IFC

5813 Shawood Drive        **VIVIAN TILLEY & ASSOCIATES**       tel:919.847.5787
Raleigh, NC 27609             ctrptr4u@aol.com           fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 211 of 243

1   employees next ascended to the headhouse through the

2   vertical stairway and horizontal catwalk carrying with

3   them the 98 flasks of Fumitoxin tablets, which is 49,000

4   grams, which were in seven cardboard boxes needed for

5   the fumigation."  And that's what you testified to

6   before.  And the 49,000 was because that's the figure

7   you used in December of '08; is that right?

8        A.   Yes, and it was the rate I was comfortable

9   using.

10       Q.   All right.  "That amount had been determined

11  prior to the December 18th, 2008 fumigation," and then

12  it goes on how you determined that.

13       A.   Yes.

14       Q.   All right.  We won't go into that.  "The four

15  IFC employees then removed the metal cover at the end of

16  the conveyor on the headhouse floor and placed it beside

17  them."  That's the one plate that you've identified in

18  your testimony and references the hatch on the exhibits,

19  right?

20       A.   Yes.

21       Q.   "Mr. Turner had a flashlight with him and

22  shined it through the opening at the peanuts.

23  Mr. Turner and Mr. Lilley observed the peanut pile was

24  in a conical shape, peaked at the top, with a small

25  level area in the middle of the peak and that the peak

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                  ctrptr4u@aol.com                    fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 212 of 243

Page 213

1   of the peanut pile was approximately 20 feet below the

2   headhouse floor."  And it looked just like it did in

3   December of '08; is that right?

4       A.   As I recall, yes.

5       Q.   All right.  "At that point the four IFC

6   employees paired off, Mr. Turner with Mr. Bratton, and

7   Mr. Lilley with Mr. Ward.  Mr. Bratton and Mr. Ward

8   began opening the flasks of the Fumitoxin and handing

9   them to Mr. Turner and Mr. Lilley.  Mr. Lilley and

10  Mr. Turner, from opposite ends of the opening, then

11  broadcast the tablets from each flask into the dome

12  through the opening."  And that's you standing on either

13  side shaking the flask and dropping it in, right?

14      A.   Yes.

15      Q.   Dropping -- dropping the tablets in.  "Their

16  method of doing so was as follows:  They shook each

17  flask side to side using their elbows of the same arm

18  holding the flask as a hinge to ensure maximum

19  distribution across the peanut pile."  And now you're

20  squatting and kneeling during this time; is that right?

21      A.   Yes.

22      Q.   Were you ever standing?

23      A.   No, sir.

24      Q.   Just squatting and kneeling?

25      A.   Yes.

5813 Shawood Drive        VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com              fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 213 of 243

Page 214

1      Q.   Okay.  Looking at Exhibit 22, you see the bar

2   right here, were your knees pressed up against that bar,

3   do you remember that (Indicating)?

4      A.   I don't remember.

5      Q.   Okay.  I wonder if that might give you comfort

6   to think you're not going to fall in?  That's what I'm

7   -- you don't remember what your knees were pressed

8   against?

9      A.   I really don't remember.

10      Q.   Do you remember if any of these bars were in

11   the way?

12      A.   I do remember reaching around them.

13      Q.   Okay.  It looks like there is one horizontal

14   one -- or diagonal one, I'm sorry.  Do you remember

15   reaching around it to shake the flask or get your hand

16   down there?

17      A.   I can't remember exactly.  I remember it was

18   just crowded.

19      Q.   A little tight up there?

20      A.   Yes.

21      Q.   And you do remember reaching under or around,

22   how -- what do you recall?

23      A.   I don't remember.

24      Q.   Okay.  "Occasionally Mr. Turner used his free

25   hand to scatter some of the tablets across the peanut

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com                 fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 214 of 243

Page 215

1    pile."  You've told me about that.

2              "When the 98 flasks were emptied, Mr. Turner

3    used his flashlight to confirm that the Fumitoxin

4    tablets were scattered -- were adequately scattered

5    across the area of the peanut pile he could visualize

6    and were not piled or clumped in any location."

7              Now, as I read that, you emptied the 98 flasks

8    and then pulled your flashlight out and looked down; is

9    that right?

10        A.   Yes.

11        Q.   So you didn't pull it out during it and looked

12   down, it was after -- you did it before and then you

13   took your flashlight out afterward, right?

14        A.   The best I can remember, yes.

15        Q.   And you looked down and saw the area of the

16   peanut pile he could visualize.  Now, you couldn't see

17   the whole pile, right?

18        A.   Right.

19        Q.   You could only see a portion as you're looking

20   down through that one-by-three-foot opening, right?

21        A.   Yes.

22        Q.   All right.  "The four IFC employees then

23   gathered the empty flasks into the empty boxes, and

24   while doing so, inadvertently dropped one of the empty

25   flasks into the peanut pile.  They did not attempt to

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                    ctrptr4u@aol.com                   fax:919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 215 of 243

Page 216

1    retrieve the flask at that time, although Mr. Turner did

2    shine the flashlight through the opening to see if it

3    could be located."  And you did locate it, right?

4         A.   Yes.

5         Q.   I mean, as soon as you shined the flashlight

6    down there, there it was on the top of the pile?

7         A.   Yes, sir.

8         Q.   It didn't take long to locate it, right?

9         A.   No, sir.

10        Q.   When you saw it you said, "Okay, I'll come

11   back and try and get it another time."  Is that right?

12        A.   Yes.

13        Q.   So I take it you didn't examine very long down

14   there; you looked down, there it was immediately and no

15   reason to look further, there it was; is that right?

16        A.   Well, using my flashlight, I looked all

17   around.

18        Q.   Well, when you looked down, didn't you see it

19   pretty soon, pretty quickly?

20        A.   The flask -- while looking for the flask, yes.

21        Q.   That's what I'm talking about, the second

22   time.

23        A.   Yes.

24        Q.   First you looked down after you finished, then

25   you dropped the -- someone dropped a flask?

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 216 of 243

Page 217

1       A.   Right.

2       Q.   And now you're looking a second time looking

3  for the flask?

4       A.   Right.

5       Q.   It didn't take long to find the flask, did it?

6       A.   No.

7       Q.   After you found it, did you look any longer or

8  are you through looking now?

9       A.   As I recall, I was through looking.

10       Q.   Yeah.  I mean, once you're looking for

11  something, once you find it --

12       A.   Right.

13       Q.   -- time to stop looking?

14       A.   Right.

15       Q.   Okay.  "While Mr. Turner was shining the

16  flashlight through the opening, Mr. Lilley scanned the

17  peanut pile for the flask.  While doing so, he observed

18  Fumitoxin tablets scattered across the peanut pile and

19  did not see any evidence of tablets piled or clumped

20  together."  And that's what Mr. Lilley is going to do

21  and he'll tell us how long that took tomorrow.

22           "The IFC employees" -- how long do you think

23  you actually signed the flashlight down there, ten

24  seconds maybe, to find the flask if it's right on top?

25       A.   I don't know exactly.  That would be an

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 217 of 243

Page 218

1   estimate.

2       Q.   Is it an accurate estimate do you think?

3       A.   It was quickly seen.

4       Q.   Okay.  Just a couple seconds, there it is,

5   okay, we'll come back and get it; does that sound right?

6       A.   Maybe more than a couple seconds, but it was

7   quick.

8       Q.   "The IFC employees next put a quarter-inch

9   poly tubing read line approximately 15 feet into the

10  dome above the peak of the peanut pile."  Now, describe

11  for me this poly tubing read line.

12      A.   It's a quarter inch.

13      Q.   Flexible tubing?

14      A.   Flexible, uh-huh.  It's --

15      Q.   Clear --

16      A.   -- poly, clear.

17      Q.   -- white?  And you can draw gas through it I

18  guess?

19      A.   That is correct.

20      Q.   "They closed the headhouse floor with the

21  metal plate, taped and sealed it in place with aerosol

22  glue."  So was the read line coming up through the --

23  through the plate and then you sealed it?

24      A.   Yes.

25      Q.   Okay.  Didn't that pinch it off if you sealed

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com              fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 218 of 243

1    the plate?

2         A.    No, we didn't tighten the bolts down that

3    tight because we taped around it and all with our tape

4    and glue.

5         Q.    You sealed it -- you sealed it with tape and

6    glue, it was enough to where it didn't crush the tube?

7         A.    Correct.

8         Q.    "The four IFC employees then walked out of the

9    headhouse through the catwalk and down the

10   ladder/stairway to the ground level with the other end

11   of the read line."  How long is this read line?  How --

12   what's the total length?

13        A.    I'm not sure, but it reached from the top of

14   the dome down to the ground so that we could take the

15   readings from ground level.

16        Q.    Who carried that up?

17        A.    I don't remember.

18        Q.    Was it in a roll?

19        A.    Yes.

20        Q.    Fairly heavy?

21        A.    No.

22        Q.    "They taped that end of the read line to the

23   handrail at the bottom of the stairway, then they

24   gathered their supplies, cleaned up and left the

25   premises."

5813 Shawood Drive                VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                      ctrptr4u@aol.com                      fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 219 of 243

Page 220

1          Did you notify Severn that you had finished

2    the fumigation -- finished applying the fumigant on

3    August 4th, 2009?

4          A.    I'm not sure.  I don't recall.

5          Q.    Do you recall talking to Mr. Watson or

6    Mr. Rowe or anybody at Severn on August 4th, 2009 before

7    or after?

8          A.    I can't be for sure because R.P. and I talk on

9    the phone a lot, so I just -- I don't remember.

10          Q.    Is it standard procedure for IFC to notify

11    someone at the facility that you've finished applying

12    fumigant and you've left?

13          A.    Not that I'm aware of.

14          Q.    So that's not something you would normally do

15    or that's not anything you felt you needed to do; is

16    that right?

17          A.    Right.

18          Q.    "IFC was notified of the fire prior to the

19    time any IFC employees returned to the Severn facility

20    to monitor reading."  So you were going to come back,

21    but didn't have an opportunity because you were notified

22    of the fire in the meantime?

23          A.    Yes, sir.

24          Q.    Okay.  Did you speak to anyone from Dagesh

25    while you were at the Severn facility?

5813 Shawood Drive            VIVIAN TILLEY & ASSOCIATES            tel:919.847.5787
Raleigh, NC 27609                  ctrptr4u@aol.com                    fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 220 of 243

Page 221

1      A.   Yes.

2          Q.   Who did you speak to?

3      A.   I don't remember his name, but if you say it,

4   I could tell you yes or no.

5          Q.   Did it begin with a "V" and it sounds like a

6   foreign name?

7      A.   Yes.

8          Q.   What did you tell him?

9      A.   He was there briefly.  We just discussed the

10   process of how we use the fumigant and that's all I

11   really remember.  I remember he didn't stay very long.

12          Q.   And did you tell him that you applied all

13   49,000 tablets down through one hatch?

14      A.   I'm certain I didn't use those exact words,

15   but I told him the fumigant was applied from the top.

16          Q.   All right.  You told him you broadcast it

17   through one opening?

18      A.   I may have.

19          Q.   You may have, you may not, you just don't

20   remember?

21      A.   That's correct.

22          Q.   What else did you talk about with him?

23      A.   I don't remember anything else in particular

24   pertaining to the job.

25              MR. WIDIS:  All right.  We'll take another

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                 ctrptr4u@aol.com                 fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 221 of 243

Page 222

1        short break and maybe that's it, or it won't be too

2        much longer if it isn't.

3             THE WITNESS:  Yes, sir.

4             (Brief recess 3:47 - 3:53 p.m.)

5    BY MR. WIDIS:

6        Q.    Mr. Turner, we're looking here at the Exhibit

7    29, which is Responses to the Interrogatories.  I want

8    you to look at number 6.  I want to ask you what you

9    know about these.  The question that was asked is:  "Do

10   you contend any other entity or person caused or

11   contributed to the damages which is the subject of this

12   lawsuit?  If so, state each and every fact upon which

13   you base such contention, name of person you contend

14   contributed to or caused the damage."

15           All right.  The answers that were provided

16   says:  "Upon information and belief, Severn Peanut or

17   Meherrin failed to disclose information regarding the

18   contents of the peanut dome which was material to the

19   fumigation conducted by IFC and which may have increased

20   the risk of fire within the dome."

21           What information do you have that Severn

22   failed to provide you with information regarding the

23   contents of the peanut dome?

24       A.    I wasn't involved in preparing that answer, I

25   don't know.

5813 Shawood Drive              VIVIAN TILLEY & ASSOCIATES              tel:919.847.5787
Raleigh, NC 27609                    ctrptr4u@aol.com                   fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 222 of 243

1      Q.   Do you -- and I don't have to be concerned

2  with -- you don't have to be concerned with what this

3  response specifically says.  Right now, what do you

4  think Severn did not tell you about the contents of the

5  peanut dome?

6      A.   I don't know.

7      Q.   Is there anything that you asked of Severn

8  that they did not provide you with regarding the

9  commodity inside the dome?

10     A.   No.

11     Q.   You, as the certified applicator, you are the

12 one who is responsible to make sure that the commodity

13 can be safely fumigated before you can fumigate it,

14 aren't you?

15          MR. EPSTEIN:  Objection to form.

16     A.   According to the label.

17     Q.   And were you satisfied that the commodity

18 could safely be fumigated before you started your

19 fumigation?

20     A.   Yes.

21     Q.   A pre-inspection visit, can you tell us, is

22 checking out the commodity and the structure, isn't it?

23          MR. EPSTEIN:  Objection to form.

24     A.   Not always.

25     Q.   All right.  But when you're doing a

5813 Shawood Drive                **VIVIAN TILLEY & ASSOCIATES**           tel:919.847.5787
Raleigh, NC 27609                      ctrptr4u@aol.com                      fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 223 of 243

Page 224

1   pre-inspection visit before you do a fumigation, aren't

2   you looking to look at the structure and the commodity

3   to make sure it can be fumigated properly?

4          MR. EPSTEIN:  Objection to form.

5      A.   I always look at the structure, not always the

6   commodity.

7      Q.   All right.  If you had gone and done a

8   pre-inspection visit on the -- before this August 4th,

9   '09 fumigation, would you have been looking at the

10  commodity inside the dome?

11         MR. EPSTEIN:  Objection to form.

12     A.   No, sir.

13     Q.   What would you have been looking at?

14     A.   Any changes in the structure from the last

15  time we fumigated it.

16     Q.   You didn't feel that was necessary, right?

17     A.   Right.

18     Q.   Did you ask any questions of Severn regarding

19  the commodity?

20     A.   Yes.

21     Q.   What did you ask them?

22     A.   If any peanuts had been drawn out of it, the

23  temperature, and that's all I can recall right now.

24     Q.   And did they give you the information that you

25  asked for?

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 224 of 243

Page 225

1      A.   Yes.

2      Q.   Okay.  And do you feel Severn cooperated in

3   answering any questions you had?

4      A.   Yes.

5      Q.   All right.  The next one says:  "Severn and

6   Meherrin failed to disclose information regarding the

7   dome which was material to the fumigation."  Do you know

8   of any information that Severn or Meherrin failed to

9   provide you regarding the dome which was material to the

10  fumigation?

11     A.   At the time of the fumigation I wasn't aware

12  of anything.

13     Q.   As the certified applicator, you're

14  responsible to make sure that the dome is properly

15  sealed and ready for fumigation, aren't you?

16     A.   Yes, according to the label.

17     Q.   And the label's the law, right?

18     A.   Yes.

19     Q.   Is there anything Severn didn't tell you that

20  you needed to know before you did this fumigation?

21     A.   I don't know.

22     Q.   Did you ask Severn for any information that

23  they didn't provide you regarding the structure?

24     A.   No.

25     Q.   It says:  "Severn and Meherrin failed to

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 225 of 243

Page 226

1    adequately monitor the moisture content of the commodity

2    stored in the peanut dome prior to the fumigation and

3    failed to detect excessive moisture in the dome."  Are

4    you aware of any excessive moisture in the peanuts in

5    the dome?

6        A.   No.

7        Q.   Did you request information regarding moisture

8    of the peanuts from Severn?

9        A.   No.

10       Q.   Did Severn refuse to give you any information

11   that you asked for regarding moisture of the peanuts in

12   the dome?

13       A.   No.

14       Q.   It says:  "Severn and Meherrin failed to

15   adequately aerate and ventilate the dome prior to the

16   August 4, 2009 fumigation."  You're the expert, you're

17   the certified applicator here, aren't you responsible

18   for making sure the dome can be safely fumigated before

19   you fumigate it?

20            MR. EPSTEIN:  Objection to form.

21       A.   I believe this statement means something else.

22       Q.   What do you think it means?

23       A.   Could you reask your question.

24       Q.   Okay.  Let me ask you first:  What do you

25   think this statement means?

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609               ctrptr4u@aol.com               fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 226 of 243

Page 227

1      A.    That it wasn't properly ventilated and aerated

2   prior to -- not while it was under fumigation.

3      Q.    **You think they failed to aerate it and**

4   **fumigate prior to the fumigation?**

5            MR. QUICK:  Aerated, not fumigated.  Aerated

6            and ventilated.

7      Q.    **Ventilated, I'm sorry.  I didn't understand**

8   **you.**

9      A.    I don't know.

10     Q.    **Did you ask Severn or Meherrin any questions**

11  **about whether they had aerated or ventilated the dome**

12  **prior to the August 4 fumigation?**

13     A.    I don't remember.

14     Q.    **Is that something you would normally ask them,**

15  **"Did you aerate and ventilate the dome prior to me**

16  **coming to fumigate the dome?"**

17     A.    That would have been a question I would have

18  more likely asked during the December one when

19  temperatures were more of an issue.

20     Q.    **Okay.  But you didn't ask it prior to the**

21  **August 4th, '09 fumigation, right?**

22     A.    I don't remember asking.

23     Q.    **And there would be no reason to ask it you**

24  **don't believe?**

25     A.    I don't know.

5813 Shawood Drive              **VIVIAN TILLEY & ASSOCIATES**              tel:919.847.5787
Raleigh, NC 27609                   ctrptr4u@aol.com                      fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 227 of 243

1        Q.    What would you have done with the information

2    if they had told you about aerating or ventilating the

3    dome prior to the August 4th, '09 fumigation?

4        A.    Again, my main concern would have been

5    temperature and that's how you control your temperatures

6    inside the commodity.

7        Q.    And did you know -- did you check the

8    temperature inside the dome prior to doing the

9    August 4th, '09 fumigation?

10       A.    I didn't check it myself.

11       Q.    All right.  Where did you get the number

12   that's on your service report?

13       A.    R.P. Watson provided it for me.

14       Q.    But you didn't check any temperature yourself?

15       A.    No.

16       Q.    Don't you, as an expert, have an obligation to

17   check the condition of the dome and the commodity before

18   you fumigate?

19            MR. EPSTEIN:   Objection to form.

20       A.    Could you ask me the question again.

21       Q.    Yes.  Don't you, as a certified applicator,

22   have a duty to make sure that the commodity and

23   structure is capable of being fumigated before you

24   fumigate?

25       A.    According to the label, it would be my

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 228 of 243

Page 229

1  responsibility.

2      Q.   And if you would have felt there was something

3  wrong with the temperature, it's your duty not to

4  fumigate, isn't it?

5      A.   Yes.

6      Q.   But you didn't feel there was any problem on

7  August 4th, '09, as you went ahead and fumigated,

8  correct?

9      A.   Yes.

10     Q.   Did you ever tell Severn and Meherrin that it

11  was their responsibility to fumigate and aerate --

12          MR. QUICK:  Ventilate.

13          MR. WIDIS:  Okay, got it.

14     Q.   -- aerate and ventilate the dome prior to the

15  August 4th fumigation?

16     A.   No.

17     Q.   How is it that you think Severn should have

18  known then that you wanted them to aerate and ventilate

19  the dome prior to the August 4th, '09 fumigation?

20     A.   I don't know.

21     Q.   And it said:  "Severn and Meherrin failed to

22  adequately monitor the temperature of the peanuts stored

23  within the dome and detect indications of heating within

24  the dome."  Did you ask them about whether they were

25  adequately monitoring the temperature within the dome?

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609                ctrptr4u@aol.com                fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 229 of 243

Page 230

1     A.   No.

2         Q.   Did they fail -- did Severn or Meherrin fail

3    to give you any information that you asked about the

4    temperatures of the peanuts within the dome?

5         A.   No.

6         Q.   Did you ever advise Severn or Meherrin that it

7    was their duty to monitor the temperature of the peanuts

8    inside the dome prior to your fumigating it on

9    August 4th, 2009?

10        A.   No.

11        Q.   And, in fact, it's your responsibility as the

12   certified applicator to make sure that the commodity can

13   be safely fumigated before you do a fumigation, isn't

14   it?

15        A.   According to the label, yes.

16        Q.   And the next one says:  "Severn and Meherrin

17   failed to ensure that the temperature monitoring

18   equipment within the dome was in proper operating

19   condition prior to the fumigation."

20             Did you ever tell Severn or Meherrin, "You

21   better have that monitoring equipment working -- in

22   proper working condition before I do a fumigation"?

23        A.   No.

24             MR. WIDIS:  All right.  Mr. Turner, I think

25        that's all the questions I have at this time.

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com              fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 230 of 243

Page 231

1          MR. EPSTEIN:  I have no questions.  You're

2     done.

3                 [SIGNATURE RESERVED.]

4          [DEPOSITION CONCLUDED AT 4:05 P.M.]

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5813 Shawood Drive          VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787
Raleigh, NC 27609              ctrptr4u@aol.com              fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 231 of 243

1   STATE OF NORTH CAROLINA  )

    SS:                      )

2   COUNTY OF WAKE           )

3

4

5          I, RANDALL TURNER, declare under

6   the penalties of perjury under the State of North

7   Carolina that the foregoing is true and correct.

8          Executed on this _____ day of _____

9   2012, at _____, North Carolina.

10

11

12

13                     _____

14                     RANDALL TURNER

15

16  This deposition was signed in my presence by

17  _____, on the _____ day of

18  _____, 2012.

19

20

21                     _____

22                     Notary Public

23

24  My commission expires:

25

**5813 Shawood Drive**          **VIVIAN TILLEY & ASSOCIATES**          **tel:919.847.5787**
**Raleigh, NC 27609**               **ctrptr4u@aol.com**               **fax: 919.847.2265**
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 232 of 243

```
1                    TRANSCRIPTION CORRECTIONS

2    IN THE MATTER OF:  SEVERN PEANUT VS. IFC

     WITNESS NAME:  RANDALL TURNER

3    CASE NO.: 2:11-cv-00014-BO

4

5    PAGE   LINE         READS              SHOULD READ

6    _____|_____|_____|_____

7    _____|_____|_____|_____

8    _____|_____|_____|_____

9    _____|_____|_____|_____

10   _____|_____|_____|_____

11   _____|_____|_____|_____

12   _____|_____|_____|_____

13   _____|_____|_____|_____

14   _____|_____|_____|_____

15   _____|_____|_____|_____

16   _____|_____|_____|_____

17   _____|_____|_____|_____

18   _____|_____|_____|_____

19   _____|_____|_____|_____

20   _____|_____|_____|_____

21   _____|_____|_____|_____

22   _____|_____|_____|_____

23   _____|_____|_____|_____

24   _____|_____|_____|_____

25   _____|_____|_____|_____
```

**5813 Shawood Drive**          **VIVIAN TILLEY & ASSOCIATES**          **tel:919.847.5787**
**Raleigh, NC 27609**                 **ctrptr4u@aol.com**                   **fax: 919.847.2265**
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 233 of 243

1   STATE OF NORTH CAROLINA

2   COUNTY OF WAKE

3         C E R T I F I C A T E

4       I, MAREN M. FAWCETT, RPR, a Notary Public in

5   and for the State of North Carolina, do hereby certify

6   that there came before me on June 26, 2012, the person

7   hereinbefore named, who had been previously sworn to

8   testify to the truth and nothing but the truth of his

9   knowledge concerning the matters in controversy in this

10   cause; that the witness was thereupon examined under

11   oath, the examination reduced to typewriting under my

12   direction; and the transcript is a true record of the

13   testimony given by the witness.

14       I further certify that I am neither attorney

15   or counsel for nor related to or employed by, any

16   attorney or counsel employed by the parties hereto or

17   financially interested in the action.

18       Signed this the 8th day of July, 2012.

19

20

21          _____

         Maren M. Fawcett, RPR

22        Notary Public - North Carolina

        Certificate No.: 200621500068

23

24

25

5813 Shawood Drive     **VIVIAN TILLEY & ASSOCIATES**     tel:919.847.5787
Raleigh, NC 27609     ctrptr4u@aol.com     fax: 919.847.2265
Case 2:11-cv-00014-BO   Document 75-7   Filed 11/07/13   Page 234 of 243

APPLICATOR'S MANUAL
FOR

## Fumitoxin

## TABLETS AND PELLETS

THESE PRODUCTS MUST BE ACCOMPANIED BY AN APPROVED LABEL AND AP-
PLICATOR'S MANUAL. READ AND UNDERSTAND THE ENTIRE LABELING AND
APPLICATOR'S MANUAL. ALL PARTS OF THE LABELING AND APPLICATOR'S
MANUAL ARE EQUALLY IMPORTANT FOR SAFE AND EFFECTIVE USE OF THESE
PRODUCT. CONSULT WITH YOUR STATE LEAD PESTICIDE REGULATORY
AGENCY TO DETERMINE REGULATORY STATUS, REQUIREMENTS, AND RE-
STRICTIONS FOR FUMIGATION USE IN THAT STATE. CALL 540-234-9281/1-800-
330-2525 IF YOU HAVE ANY QUESTIONS OR DO NOT UNDERSTAND ANY PART
OF THIS LABELING.

RESTRICTED USE PESTICIDE
DUE TO HIGH ACUTE INHALATION TOXICITY OF PHOSPHINE GAS

For retail sale to Dealers and Certified Applicators only.
For use by Certified Applicators or persons under their direct supervision,
and only for those uses covered by the Certified Applicator's certification.
Refer to the directions in this applicator manual for requirements of the phys-
ical presence of a Certified Applicator.

FOR USE AGAINST INSECTS WHICH INFEST STORED
COMMODITIES AND CONTROL OF BURROWING PESTS
Active Ingredient: Aluminum Phosphide.........................(55%)
Inert Ingredients:.............................................................(45%)
Total                                                                                100%

 KEEP OUT OF REACH OF CHILDREN 
DANGER - POISON - PELIGRO

PRECAUCION AL USUARIO: Si usted no puede leer ingles, no use este producto hasta
que el marbete le haya sido completamente explicado.
(TO THE USER: If you cannot read English, do not use this product until the label has been
fully explained to you.)

Manufactured for:

D & D HOLDINGS, INC.
P. O. Box 116
153 Triangle Drive
Weyers Cave, VA 24486 USA
Telephone: (540) 234-9281/1-800-330-2525
Fax: (540) 234-8225
Internet: www.degeschamerica.com
E-mail: degesch@degeschamerica.com
EPA Est. Nos. 073926-CHN-001, 073927-CHN-001, or 5857-NC-001
EPA Reg. Nos. 72959-1 and 72959-2

Form 36868 (R1/2009)


PLAINTIFF'S
EXHIBIT Turner
#4

4. <u>PRECAUTIONARY STATEMENTS</u>

4.1 **Hazards to Humans and Domestic Animals**

**DANGER:** Aluminum phosphide from FUMITOXIN tablets, pellets or dust may be fatal if swallowed. Do not get in eyes, on skin or on clothing. Do not eat, drink or smoke while handling aluminum phosphide fumigants. If a sealed container is opened, or if the material comes into contact with moisture, water or acids, these products will release phosphine, which is an extremely toxic gas. If a garlic odor is detected, refer to the Industrial Hygiene Monitoring instructions found in Section 15.6 of this manual for appropriate monitoring procedures. Pure phosphine gas is odorless; the garlic odor is due to a contaminant. Since the odor of phosphine may not be detected under some circumstances, the absence of a garlic odor does not mean that dangerous levels of phosphine gas are not present. Observe proper re-entry procedures specified under Section 15.4 in this labeling to prevent overexposure.

4.2 **Physical and Chemical Hazards**

Aluminum phosphide in tablets, pellets and partially spent dust will release phosphine if exposed to moisture from the air or if it comes into contact with water, acids and many other liquids. Since phosphine may ignite spontaneously at levels above its lower flammable limit of 1.8-% v/v, it is important not to exceed this concentration. Ignition of high concentrations of phosphine can produce a very energetic reaction. Explosion can occur under these conditions and may cause severe personal injury. <u>Never allow the buildup of phosphine to exceed explosive concentrations.</u> Do not confine spent or partially spent aluminum phosphide fumigants as the slow release of phosphine from this material may result in formation of an explosive atmosphere. Aluminum phosphide tablets and pellets, outside their containers, should not be stacked or piled up or contacted with liquid water. This may cause a temperature increase, accelerate the rate of gas production and confine the gas so that ignition could occur. It is preferable to open containers of aluminum phosphide products in open air as under certain conditions, they may flash upon opening. Containers may also be opened near a fan or other appropriate ventilation that will rapidly exhaust contaminated air. When opening, invert the container several times then point the container away from the face and body and slowly loosen the cap. Although the chances for a flash are very remote, never open these containers in a flammable atmosphere. These precautions will also reduce the fumigator's exposure to phosphine gas. Containers may be opened inside the structure to be fumigated provided worker's exposure to phosphine gas does not exceed allowable limits.

Pure phosphine gas is practically insoluble in water, fats and oils, and is stable at normal fumigation temperatures. However, it may react with certain metals and cause corrosion, especially at higher temperatures and relative humidities. Metals such as copper, brass and other copper alloys, and precious metals such as gold and silver are susceptible to corrosion by phosphine. Thus, small electric motors, smoke detectors, brass sprinkler heads, batteries and battery chargers, fork lifts, temperature monitoring systems, switching gears, communication devices, computers, calculators and other electrical equipment should be protected or removed before fumigation. Phosphine gas will also react with certain metallic salts and, therefore, sensitive items such as photographic film, some inorganic pigments, etc., should not be exposed. Immediately after addition of phosphine to the structure, turn off any lights and unessential electrical equipment.

4

7. <u>EXPOSURE CONDITIONS</u>

The following table may be used as a guide in determining the minimum length of the exposure period at the indicated temperatures:

| Temperature | Minimum Exposure Periods for FUMITOXIN Pellets | Tablets |
|---|---|---|
| 40°F (5°C) | Do not fumigate | Do not fumigate |
| 41°-53°F (5-12°C) | 8 days (192 hours) | 10 days(240 hours) |
| 54°-59°F (12-15°C) | 4 days (96 hours) | 5 days (120 hours) |
| 60°-68°F (16-20°C) | 3 days (72 hours) | 4 days (96 hours) |
| above 68°F (20°C) | 2 days (48 hours) | 3 days (72 hours) |

The fumigation must be long enough so as to provide for adequate control of the insect pests that infest the commodity being treated.

Additionally, the fumigation period should be long enough to allow for more or less complete reaction of **FUMITOXIN** with moisture so that little or no unreacted aluminum phosphide remains. This will minimize worker exposures during further storage and/or processing of the treated bulk commodity as well as reduce hazards during the disposal of partially spent aluminum phosphide products remaining after space fumigations. The proper length of the fumigation period will vary with exposure conditions since, in general, insects are more difficult to control at lower temperatures, and the rate of hydrogen phosphide gas production by **FUMITOXIN** is lower at lower temperatures and humidities.

It should be noted that there is little to be gained by extending the exposure period if the structure to be fumigated has not been carefully sealed or if the distribution of gas is poor and insects are not subjected to lethal concentrations of phosphine. Careful sealing is required to ensure that adequate gas levels are retained and proper application procedures must be followed to provide satisfactory distribution of phosphine gas. Application of additional **FUMITOXIN** is recommended if phosphine concentrations drop below an effective level. If re-entry into the treated structure is required, follow the requirements for manpower and respiratory protection usage found under Section 10 in this manual.

Some structures can only be treated when completely tarped while others cannot be properly sealed by any means and should not be fumigated. Exposure times must be lengthened to allow for penetration of gas throughout the commodity when fumigant is not uniformly added to the commodity mass, for example, by surface application or shallow probing. This is particularly important in the fumigation of bulk commodity contained in large storages.

Remember, exposure periods recommended in the table are minimum periods and may not be adequate to control all stored products pests under all conditions nor will they always provide for total reaction of **FUMITOXIN.**

It is permissible and often desirable to use a low-flow recirculation system for phosphine gas in certain bulk storages. This method may be used in ship's holds, various types of flat storage and vertical storage bins. Recirculation usually involves the ap-

8

plication of fumigant to the surface of the commodity. The phosphine gas is then continuously or intermittently drawn out of the over space and blown into the bottom of the storage using specially designed low volume fans and ductwork. This method facilitates the quick and uniform penetration of phosphine throughout the commodity. In some instances a reduced dosage may be used. Please contact Degesch America, Inc. if assistance is required in designing the recirculation system.

8. DOSAGE RATE GUIDELINES

**Allowable and Recommended Dosages Rates**

Phosphine is a mobile gas and will penetrate to all parts of the storage structure. Therefore, dosage must be based upon the total volume of the space being treated and not on the amount of commodity it contains. The same amount of FUMITOXIN is required to treat a 30,000-bushel silo whether it is empty or full of grain unless, of course, a tarpaulin seals off the surface of the commodity. The following dosage ranges are recommended for bulk (per 1,000 bushels) and space (per 1,000 cu.ft.) fumigations:

8.1 Maximum Allowable Dosages for Fumigation with FUMITOXIN

| Product | per 1000 cu.ft.* | per 1000 bu.* |
|---------|------------------|----------------|
| Pellets | 725 | 900 |
| Tablets | 145 | 180 |

*NOTE: Maximum Dosage for dates, nuts & dried fruits is 200 pellets, 40 tablets/1000 cu. ft.; 250 pellets, 50 tablets/1000 bu.

The above dosages are not to be exceeded. It is important to be aware that a shortened exposure period cannot be fully compensated for with an increased dosage of phosphine.

Somewhat higher dosages, not to exceed the maximum dosage, are usually recommended under cooler, drier conditions or where exposure periods are relatively short. However, the major factor in selection of dosage is the ability of the structure to hold phosphine gas during the fumigation. A good illustration of this point is comparison of the low dosages recommended to treat modern, well-sealed warehouses with the higher ranges used for poorly constructed buildings that cannot be sealed adequately. In certain other fumigations, proper distribution of lethal concentrations of phosphine gas reaching all parts of the structure becomes a very important factor in dose selection. An example where this may occur is in the treatment of grain stored in tall silos. Poor gas distribution frequently results when the fumigant is added on top of the grain. In such cases, use of a low-flow recirculation system is recommended under these circumstances. Please contact Degesch America, Inc. if assistance is required in designing the recirculation system.

8.2 Recommended FUMITOXIN Dosages for Various Types of Fumigation

One (1) FUMITOXIN tablet or five (5) FUMITOXIN pellets will produce a concentration of 25 parts per million (ppm) of phosphine gas ($PH_3$) in a volume of 1000 cubic feet. (1 gram $PH_3$/1000 cu.ft. is equivalent to 25 ppm).

9

10.3  Requirements for availability of respiratory protection.

If FUMITOXIN is to be applied from within the structure to be fumigated, an approved full-face gas mask – phosphine canister combination or SCBA or its equivalent must be available at the site of application in case it is needed. Respiratory protection need not be available for applications from outside the area to be fumigated such as addition of tablets or pellets to automatic dispensing devices, outdoor applications, etc., if exposures above the permitted exposure limits will not be encountered.

If monitoring equipment is not available on a farm and application of FUMI-TOXIN fumigant cannot be made from outside the structure, an approved canister respirator must be worn during application from within the structure being treated. However, if entry into an on-farm structure that is under fumigation is required, SCBA must be worn if the gas concentration is unknown or above the permissible limits.

11.  REQUIREMENTS FOR CERTIFIED APPLICATOR TO BE PRESENT AND RESPONSIBLE FOR ALL WORKERS AS FOLLOWS:

A Certified Applicator must be physically present, responsible for, and maintain visual and/or voice contact with all fumigation workers during the application of the fumigant. Once the application is complete and the structure has been made secure the certified applicator does not need to be physically present at the site.

A Certified Applicator must be physically present, responsible for, and maintain visual and/or voice contact with all fumigation workers during the initial opening of the fumigation structure for aeration. Once the aeration process is secured and monitoring has established that aeration can be completed safely the certified applicator does not need to be physically present and trained person(s) can complete the process and remove the placards.

Persons with documented training in the handling of phosphine products must be responsible for receiving, aerating and removal of placards from vehicles, which have been fumigated in transit. Refer to Section 12 for training requirements.

12.  TRAINING REQUIREMENTS FOR RECEIPT OF INTRANSIT VEHICLES UNDER FUMIGATION.

The trained person(s) must be trained by a Certified Applicator following the EPA accepted product applicator's manual that must precede or be attached to the outside of a transport vehicle; or by other training which is accepted by local and/or state authorities. When training has been completed and the employee demonstrates safety knowledge proficiency, the training date must be logged and maintained in the employee's safety training record for a minimum of three years. Refresher training must be done on an annual basis.

This training must cover the following items, each of which may be found in this manual:

12

Do not remove placards until the treated commodity is aerated down to 0.3- ppm hydrogen phosphide or less. To determine whether aeration is complete, each fumigated structure or vehicle must be monitored and shown to contain 0.3 ppm or less phosphine gas in the air space around and, if feasible, in the mass of the commodity.

17. **SEALING OF STRUCTURES**

The structure to be fumigated must first be inspected to determine if it can be made sufficiently gas tight. Careful sealing is required so that adequate gas levels are retained. Turn off all ventilation, supply air, air conditioning, and any other air moving systems which could negatively affect the fumigation. Thoroughly inspect the structure to be fumigated and seal cracks, holes and openings. These areas could include, but are not limited to: windows, doors, vents, chimneys and structural flaws. Sealing techniques can vary, but most often include polyethylene sheeting, adhesive tapes and adhesive sprays. Expandable foam or caulking material can work well on structural flaws. Proper sealing will insure sufficient gas levels within the fumigated structure and will decrease the chance of unwanted exposures outside of the fumigated area.

As with all fumigations, it is required that sealing be inspected for leaks. If phosphine above 0.3 ppm is found in an area where exposure to workers or bystanders may occur, the fumigator, using proper respiratory protective equipment must attempt to seal the leak from the exterior of the structure. Failing this, the fumigators, following proper procedures to prevent accidental poisoning, may enter the structure and seal the leaks from the interior. If the concentration inside the structure has decreased below the target level as a result of the leakage, additional fumigant may be added following the sealing repairs.

DO NOT FUMIGATE A STRUCTURE THAT CANNOT BE SEALED SUFFICIENTLY GAS TIGHT.

18. **AERATION OF FUMIGATED COMMODITIES**
As an alternative to the aeration time periods listed below, each container of the treated commodity may be analyzed for residues using accepted analytical methods.

18.1 **Foods and feeds**
Tolerances for phosphine residues have been established at ppm for animal feeds and 0.01 ppm for processed foods. To guarantee compliance with these tolerances, it is necessary to aerate these commodities for 48 hours prior to offering them to the end consumer.

18.2 **Non-food commodities**
Aerate all non-food commodities to 0.3 ppm or less of phosphine. Monitor densely packed commodities to ensure that aeration is complete.

18.3 **Tobacco**
Tobacco must be aerated for at least three days (72 hours) when fumigated in hogsheads and for at least two days (48 hours) when fumigated in other containers or until concentration is below 0.3 ppm. When plastic liners are used, longer aeration periods may be required to aerate the commodity down to 0.3 ppm.

16

20.2  Transportation Special Permit:

Degesch America, Inc. – Special Permit: DOT-SP11329
Pestcon Systems, Inc. – Special Permit: DOT-SP10753
Purpose and Limitation: "...The motor vehicles used under the terms of this exemption are not required to be placarded..."

Modes of Transportation Authorized: Motor vehicle (Only private motor vehicles used in pest control operations are authorized to transport the packages covered by the terms of this exemption.)

NOTE: You must have a copy of this exemption with you during transportation. For a copy of this exemption contact:

DEGESCH AMERICA, INC.              PESTCON SYSTEMS, INC.
153 Triangle Drive                 1808 Firestone Parkway
P. O. Box 116                      Wilson, NC 27893-7991
Weyers Cave, VA 24486              Tel.: (252)237-7923
Tel.: (540)234-9281/1-800-330-2525 1-800-548-2778
Internet: www.degeschamerica.com  Internet: www.pestcon.com

## 21.  FUMIGATION MANAGEMENT PLAN

The certified applicator is responsible for working with the owners and/or responsible employees of the structure and/or area to be fumigated to develop and follow a Fumigation Management Plan (FMP). The FMP is intended to ensure a safe and effective fumigation. The FMP must address characterization of the structure and/or area, and include appropriate monitoring and notification requirements, consistent with, but not limited to, the following:

1. Inspect the structure and/or area to determine its suitability for fumigation.
2. When sealing is required, consult previous records for any changes to the structure, seal leaks, and monitor any occupied adjacent buildings to ensure safety.
3. Prior to each fumigation, review any existing FMP, MSDS, Applicators Manual and other relevant safety procedures with company officials and appropriate employees.
4. Consult company officials in the development of procedures and appropriate safety measures for nearby workers that will be in and around the area during application and aeration.
5. Consult with company officials to develop an appropriate monitoring plan that will confirm that nearby workers and bystanders are not exposed to levels above the allowed limits during application, fumigation and aeration. This plan must also demonstrate that nearby residents will not be exposed to concentrations above the allowable limits.
6. Consult with company officials to develop procedures for local authorities to notify nearby residents in the event of an emergency.
7. Confirm the placement of placards to secure entrance into any area under fumigation.

18

the building, contents, air and/or commodity temperature and the general tightness of the structure.

6. Apply tablets or pellets by surface application, shallow probing, deep probing or uniform addition as the flat storage is filled.

Storages requiring more than 24 hours to fill should not be treated by addition of fumigant to the commodity stream as large quantities of phosphine may escape before the bin is completely sealed.

Probes should be inserted vertically at intervals along the length and width of the flat storage. Pellets or tablets may be dropped into the probe at intervals as it is withdrawn.

Surface application may be used if the bin can be made sufficiently gas tight to contain the fumigant gas long enough for it to penetrate the commodity. In this instance, it is advisable to place about 25 percent of the dosage in the floor level aeration ducts. Check the ducts prior to addition of FUMITOXIN to make sure that they contain no liquid water.

7. Placement of plastic tarp over the surface of the commodity is often advisable, particularly if the overhead of the storage cannot be well sealed.

8. Lock all entrances to the storage and post fumigation warning placards.

22.3 **Vertical storages** (concrete upright bins and other silos in which grain can be rapidly transferred)

1. Inspect the site to determine its suitability for fumigation.

2. Determine if the structure is in an area where leakage during fumigation or aeration would expose nearby workers or bystanders to concentrations above the permitted levels.

3. Develop an appropriate Fumigation Management Plan. (Refer to FMP guidelines.)

4. Consult previous records for any changes to the structure. Close openings and seal cracks to make the structure as airtight as possible. Prior to the fumigation, seal the vents near the bin top, and any openings which connect to adjacent bins.

5. Using the applicator manual, determine the length of the fumigation and calculate the dosage of tablets or pellets to be applied based upon volume of the building, air and/or commodity temperature and the general tightness of the structure.

6. Pellets or tablets may be applied continuously by hand or by an automatic dispenser on the headhouse/gallery belt or into the fill opening as the com-

25

modity is loaded into the bin. An automatic dispenser may also be used to add FUMITOXIN into the commodity stream in the up leg of the elevator.

7. Seal the bin deck openings after the fumigation has been completed.

8. Bins requiring more than 24 hours to fill should not be fumigated by continuous addition into the commodity stream. Probing, surface application, or other appropriate means may be employed to fumigate these bins. Exposure periods should be lengthened to allow for diffusion of gas to all parts of the bin if FUMITOXIN has not been applied uniformly throughout the commodity mass.

9. Place warning placards on the discharge gate and on all entrances.

## 22.4 Mills, Food Processing Plants and Warehouses

1. Inspect the site to determine its suitability for fumigation.

2. Determine if the structure is in an area where leakage during fumigation or aeration would expose nearby workers or bystanders if concentrations were above the permitted exposure levels.

3. Develop an appropriate Fumigation Management Plan. (Refer to FMP guidelines.)

4. Using the Applicator's Manual, determine the length of the fumigation and calculate the dosage of tablets or pellets to be applied based upon volume of the building, air and/or commodity temperature and the general tightness of the structure.

5. Read the directions found in 4.2 Physical and Chemical Hazards and remove or cover any of the listed items that can become damaged from exposure to phosphine gas.

6. Consult previous records for any changes in the structure. Carefully seal and placard the space to be fumigated.

7. Place trays or sheets of Kraft paper or foil, up to 12-sq. ft. (1.1 sq. M) in area, on the floor throughout the structure.

8. Spread FUMITOXIN on the sheets at a density no greater than 30 tablets per sq. ft. or 150 pellets per sq. ft. This corresponds to slightly more than one-half flask of tablets or one-half flask of pellets per 3'x4' sheet. Check to see that FUMITOXIN has not piled up and that it is spread out evenly to minimize contact between the individual tablets or pellets.

9. Turn off any lights within the treated area and shut off all electrical motors not essential to operations of the storage. Doors leading to the fumigated space must be closed, sealed, and placarded with warning signs.

26