IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NORTH CAROLINA

NORTHERN DIVISION


SEVERN PEANUT CO., INC.,

MEHERRIN AGRICULTURE &

CHEMICAL CO., and TRAVELERS

PROPERTY CASUALTY COMPANY OF

AMERICA as Subrogee of Severn

Peanut Co., Inc. and Meherrin

Agriculture & Chemical Co.,

        Plaintiffs,

    vs.              DOCKET NO. 2:11-cv-00014-BO

INDUSTRIAL FUMIGANT CO. and

ROLLINS, INC.,

        Defendants.



VIDEOTAPED DEPOSITION

OF

LESTER V. RICH


At Mount Pleasant, South Carolina      Reported by:

July 30, 2013 - 9:13 a.m.        Cherie J. Anderson

```
 1                  A P P E A R A N C E S
 2     FOR THE PLAINTIFFS:
 3          Howard M. Widis
 4          Jay M. Goldstein
 5          QUICK WIDIS & NALIBOTSKY
 6          2115 Rexford Road, Suite 100
 7          Charlotte, North Carolina 28211
 8          (704)364-2500
 9          (704)365-8734 Fax
10          hwidis@qwnlaw.com
11          jgoldstein@qwnlaw.com
12
13     FOR THE DEFENDANTS:
14          Steven B. Epstein
15          POYNER SPRUILL
16          301 Fayetteville Street, Suite 1900
17          Raleigh, North Carolina 27601
18          (919)783-6400
19          (919)783-1075 Fax
20          sepstein@poynerspruill.com
21
22     ALSO PRESENT:
23          Michael Beish, Videographer
24          Keith Scott
25
```

1              T A B L E   O F   C O N T E N T S

2     EXAMINATION - ATTORNEY                              PAGE

3     Direct - Epstein                                       6

4     Cross - Widis                                        318

5

6     EXHIBITS                                            PAGE

7     Exhibit 7     Photograph                            254

8     Exhibit 23    Fumigation/Fogging Service Report     226

9     Exhibit 105   Cable Numbering Diagram               211

10    Exhibit 190   Forensic Fire Case Management Log       7

11    Exhibit 191   Forensic Fire Invoices                 11

12    Exhibit 192   Forensic Fire Report                   13

13    Exhibit 193   Forensic Fire Timeline of Events       43

14    Exhibit 194   Depostion Transcript: Lester Rich     110

15    Exhibit 195   Laboratory Study                      141

16    Exhibit 196   Temperature Chart                     184

17    Exhibit 197   Temperature Chart                     184

18    Exhibit 198   Montross' Report                      200

19    Exhibit 199   Deposition Excerpt: Randall Turner    227

20    Exhibit 200   Deposition Excerpt: R.P. Watson       228

21    Exhibit 201   Deposition Excerpt: Randall Turner    256

22    Exhibit 202   Deposition Excerpt: Brian Lilley      256

23    Exhibit 203   Photographs                           276

24    Exhibit 204   Travelers Claims Report               278

25    Exhibit 205   Chain of Custody Form                 279

Deposition of Lester Rich

1    EXHIBITS, Cont'd                                    PAGE

2    Exhibit 206   Deposition Excerpt: Dennis Ryman   282

3    Exhibit 207   Report                             283

4    Exhibit 208   Email                              299

5    Exhibit 209   Photograph                         301

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            I, Cherie J. Anderson, being a

2    Registered Professional Reporter and Notary Public,

3    was appointed Commissioner by consent to take the

4    deposition of Lester V. Rich, on July 30, 2013, at

5    9:13 a.m., in the offices of Bluestein Law Firm,

6    located at 1040 E Wall Street in Mount Pleasant,

7    South Carolina.

8                   _____

9            THE VIDEOGRAPHER:  This is the videotaped

10   deposition of Lester Rich, taken by Steven Epstein

11   in the matter of Severn Peanut Company,

12   Incorporated, Meherrin Agriculture & Chemical

13   Company, and Travelers Property Casualty Company of

14   America as subrogee of Severn Peanut Company,

15   Incorporated and Meherrin Agriculture & Chemical

16   Company, Plaintiffs, v. the Industrial Fumigant

17   Company and Rollins, Incorporated, Defendants.

18       This deposition is being held in the offices

19   of Bluestein Law Firm located in Mount Pleasant,

20   South Carolina.

21       Today's Tuesday, July 30th, 2013.  The time

22   now is 9:13 a.m.

23       The court reporter is Cherie Anderson with

24   the firm of Clark & Associates, Incorporated,

25   located in North Charleston, South Carolina.  The

1    videographer is Michael Beish with the firm of

2    Clark & Associates located in North Charleston,

3    South Carolina.

4         Would counsel please introduce themselves.

5         MR. WIDIS:  Howard Widis representing the

6    plaintiffs.

7         MR. GOLDSTEIN:  Jay Goldstein representing

8    the plaintiffs.

9         MR. EPSTEIN:  Steve Epstein representing the

10   defendants.

11        THE VIDEOGRAPHER:  Will the court reporter

12   please swear in the witness.

13        THE COURT REPORTER:  Please raise your right

14   hand, sir.  Do you swear or affirm to tell the

15   truth, the whole truth, and nothing the truth?

16        THE WITNESS:  I do.

17                    LESTER V. RICH

18   having been first duly sworn, was examined and

19   testified as follows:

20   DIRECT EXAMINATION

21   BY MR. EPSTEIN:

22        Q    Good morning.

23        A    Good morning.

24        Q    Mr. Rich, as I think you know, my name is

25   Steve Epstein.  I represent the defendants in this

1   case, and I'm here today to take your deposition

2   because you've been designated by the plaintiffs in

3   this case as a testifying expert witness.

4         You understand that, correct?

5   A   Yes.

6   Q   You've taken -- had your deposition taken

7   several times before, correct?

8   A   Yes.

9   Q   You know what the process is?

10  A   Yes.

11  Q   You don't need me to familiarize you with the

12  rules, do you?

13  A   No, I don't think so.

14  Q   All right, sir.  I'm going to start by showing

15  you what I marked as Exhibit 190.

16        (Exhibit No. 190 was marked for

17    identification.)

18  Q   And Mr. Rich, I'm going to ask you if you can

19  identify what Exhibit 190 is.

20  A   Yep.  Looks like a copy of the case log or

21  management log for the file.

22  Q   Okay.  And for whose file?

23  A   For mine.

24  Q   And what is a case management log as you keep

25  one in your business?

1      A    It's just a record of activities, dates,

2    times, that type of information.

3      Q    All right.  Does Exhibit 190 represent all of

4    the work that you have done related to any

5    investigation as to the origin and cause of the fire

6    at the Severn peanut dome that occurred in August of

7    2009?

8      A    it does through 7/15, yes.

9      Q    All right.  And tell me what you've done since

10    July 15th related to your work in this matter.

11      A    Primarily it would be deposition preparation

12    or meetings with Mr. Howard or Mr. Widis.

13      Q    Okay.

14      A    Maybe some tele- -- I'm sorry.  Maybe some

15    telephone calls.

16      Q    Have you reviewed anything between 7/15 and

17    today, 15 days later, that you had not reviewed prior

18    to July 15th?

19      A    Yes -- well, I'm not exactly sure of the

20    dates, but I have had a chance to briefly look at

21    some of the expert -- defense experts' reports.

22      Q    And you've done that --

23      A    I think that's been since the 15th.

24      Q    Okay.  You said you made some telephone calls.

25    To the extent those were not with Mr. Widis or

1    anybody at his law firm, tell me what those telephone

2    calls were.

3        A    Most of them were with him.  I believe I did

4    have one or two telephone calls with John Schumacher,

5    one of the other experts in this case.

6        Q    Okay.  When was that?

7        A    I don't actually -- I don't know the date

8    exactly.  It would have been -- this is -- let's see.

9    Today is Tuesday.  I believe it would have been the

10   first part of last week.

11       Q    All right.  Tell me about that telephone call

12   you had with Mr. Schumacher the first part of last

13   week.

14       A    We just talked about -- what did we talk

15   about?  The -- a little about the case, about my

16   report, about his report a little bit.  I think at

17   that point we -- I had seen Montross's report.  I

18   believe we talked briefly about it.  And then we -- I

19   think we followed that up the next day with a

20   conference call with Howard.  So I think we were

21   talking a little bit about the conference calls.

22       Q    Okay.  You talked with Mr. Schumacher, who's

23   also been designated, as you know, as a testifying

24   witness for the plaintiffs, correct?

25       A    Correct.  Yes.

1      Q    About Dr. Montross's report?

2      A    Yes, sir.

3      Q    What did you talk about regarding that report?

4      A    Just basically review -- just kind of talked

5  about what was in it.  I had a question -- I noticed

6  that he referred to a model that he had used which

7  I'm not familiar with.  I had asked Schumacher about

8  that.  That's -- I think that's probably about it.

9  Just, you know, general conversation about did you

10  read the report, did you see that report, that kind

11  of --

12      Q    All right.  You specifically talked about the

13  model that Dr. Montross used regarding temperatures,

14  correct?

15      A    Yes.

16      Q    All right.  What did Mr. Schumacher tell you

17  about that model?

18      A    I don't think he was familiar with it, either,

19  and that was -- I think that's kind of the substance

20  of the conversation is I haven't heard of this, I'm

21  not familiar with this type of model.  And I believe

22  that he indicated that he was familiar with like

23  maybe a different -- similar model but yet different

24  of some sort.

25           But that's kind of the substance of that.

1     Q   Did you come away from your phone conversation

2   with Mr. Schumacher with any better understanding of

3   the model that Dr. Montross used in his report?

4     A   No.

5     Q   Okay.  Did you come away from your conference

6   call with Mr. Schumacher with a different

7   understanding or a better understanding of anything

8   that relates to your expert opinions in this case?

9     A   No, I don't believe so, because we didn't

10   really talk about, you know, our reports or my

11   report.  It was more a conversation about that and,

12   frankly, mostly about the model, had he heard of that

13   or had I heard of that.

14     Q   All right.  Let me show what we're going to

15   mark as Exhibit 191.

16         (Exhibit No. 191 was marked for

17     identification.)

18     A   Okay.

19     Q   Can you identify what Exhibit 191 is, please.

20     A   It's a copy of the invoices that have been

21   submitted to date, I believe, of the -- let's see.

22   That was through May -- yeah, invoices through

23   May 8th of 2013.

24     Q   Okay.  And would you quarrel with me if I told

25   you that the invoices through that time represent

Deposition of Lester Rich

1    approximately $100,000 that's been paid to you and

2    your business?

3        A    I haven't added it up, so I wouldn't quarrel

4    with you.

5        Q    Okay.  And tell me, if you would, what you

6    have or intend to bill for your services since

7    May 8th until today, based upon the work that's in

8    your case management log, Exhibit 190 --

9        A    Okay.

10        Q    -- and the work done since then until now.

11        A    Let's see.  Last page.  That would be -- what

12    was -- May 18th -- I think this is -- I think this

13    one picks up with May 8th.  Okay.  Yeah, that was

14    the end.  So it would be the items on the last page,

15    which are through July 15th.

16        Q    Last page of Exhibit 190?

17        A    I'm sorry.  Yes.

18        Q    Okay.

19        A    Which starts at the top May 31st.  It would

20    be that time plus yesterday's deposition

21    preposition -- deposition preparation time, a couple

22    of -- like I said, a couple of telephone calls, maybe

23    a couple of conference calls.

24        Q    So how much additional time that's not on the

25    last page of Exhibit 190?

1       A    It would be an estimation, but I would say ten

2    hours, maybe.

3       Q    Okay.  So if we add up the ten hours estimate

4    that you just provided plus all the time on the last

5    page of Exhibit 190 and multiply that by your hourly

6    rate, we would have the additional amount that you

7    intend to invoice, correct?

8       A    Correct.

9       Q    And what is the amount that you're charging

10   per hour?

11      A    140.

12      Q    Okay.

13      A    Of course that doesn't include today's

14   deposition.

15      Q    You actually get to charge me for that.

16           All right.  I'm going to hand you what we're

17   marking as Exhibit 192.

18           (Exhibit No. 192 was marked for

19     identification.)

20      Q    Mr. Rich, can you identify what Exhibit 192

21   is.

22      A    Yep.  This would be a copy of the report that

23   I submitted to Quick Widis with the appendix listing

24   the documents reviewed, references, as well as my CV

25   and my previous testimony and the -- our current 2013

1   rate sheet.

2       Q   All right.  And is, as far as you know,

3   everything in the appendices to Exhibit 192 accurate?

4       A   Yes.

5       Q   That would include the materials that you

6   reviewed, it would include your CV, it would include

7   the prior testimony?

8       A   Yes, sir.  As far as I know, it's accurate.

9   Absolutely.

10      Q   And is your prior testimony list complete?

11      A   Yes.  I believe that I only have to provide it

12  back four years, but that's the complete list.  I

13  just keep adding to the list that I have.

14      Q   Okay.  So if I understand you correct, those

15  are all of the times that you have testified under

16  oath as an expert witness in your career?

17      A   Yes.

18      Q   And that would be 11 times prior to today?

19      A   Right.  And one of those is -- well, yeah,

20  it's 11 times of testimony, but there was some

21  duplicity because a guy got re- -- had a retrial, and

22  then there was a deposition followed by a trial.

23      Q   Okay.  And your CV contains a complete and

24  accurate list of all of your publications, all of

25  your speeches, all of your conferences, all of your

Deposition of Lester Rich

1      training, and so forth?

2          A    Yes.  It's current through whatever the date I

3      have up there of April 13th.  I don't believe

4      there's anything that I've added since then.

5          Q    Okay.  Mr. Rich, you went to Appalachian State

6      University to obtain your college degree, correct?

7          A    I did.

8          Q    You received a BS?

9          A    Yes.

10         Q    And what was that in?

11         A    Criminal justice.

12         Q    Okay.  You did not major in any science?

13         A    No.

14         Q    How long did you attend Appalachian State?

15         A    I was there from '82 to '86, 1986.

16         Q    So four years?

17         A    Yes.

18         Q    What was your GPA when you graduated?

19         A    I don't remember.  Probably a low 3, maybe.

20         Q    On a 4-point scale?

21         A    Yeah.  Yeah.  Probably a low B, high C, I

22     would guess.  I don't really remember.

23         Q    Okay.  Did you have -- were you assigned a

24     class rank at the conclusion of your academic career?

25         A    Not that I know of.

Deposition of Lester Rich

1      Q    Okay.  Did you fail any courses while you were

2   in college?

3      A    Yes, freshman year.

4      Q    Which --

5      A    Physics.

6      Q    Did you have to retake that course?

7      A    I did not retake that course.

8      Q    You just didn't get any credit for it?

9      A    Correct.

10     Q    Is that the only course you failed while you

11  were in college?

12     A    I believe so, yes.

13     Q    Did you make any Ds while you were in college?

14     A    Yes, I believe I did.

15     Q    What did you make a D in?

16     A    I think two, precalculus and chemistry.

17     Q    You made a D in chemistry?

18     A    Uh-huh.

19     Q    Is that a yes?

20     A    Yes.

21     Q    What year did you take chemistry?

22     A    My freshman year.

23     Q    And what year did you take precalculus?

24     A    My freshman year.

25     Q    So am I accurate in saying that in your

1    freshman year while at Appalachian State University,

2    you made two Ds and an F?

3        A    Yes, I believe that's correct.

4        Q    And one of those Ds -- I'm sorry.  One was of

5    the Ds was in chemistry and the F was in physics?

6        A    Yes.

7        Q    Is there chemistry and physics involved in

8    fire science, sir?

9        A    Yes.

10       Q    Okay.  Did you take further courses in

11   chemistry and physics during the course of your

12   career at ASU?

13       A    I did.  I retook the chemistry course.

14       Q    Okay.  Did you retake any physics while you

15   were in college?

16       A    No, I didn't retake any physics.

17       Q    And just took -- the same chemistry course

18   that you made a D in, you took again?

19       A    Yes, because it was -- I believe it was like a

20   split -- it was a semester -- it was like two parts.

21       Q    Mr. Rich, do you have any education, training,

22   or experience in the field of agricultural

23   engineering?

24       A    No.

25       Q    Do you have any education, training, or

Deposition of Lester Rich

1   experience in the field of biosystems engineering?

2       A   No.

3       Q   Do you have any education, training, or

4   experience in the field of crop science?

5       A   No.

6       Q   Do you have any education, training, or

7   experience in the field of forensic chemistry?

8       A   Forensic chemistry?

9       Q   Yes.

10      A   Yes.

11      Q   Tell me about the training you have in the

12  field of forensic chemistry.

13      A   Well, the certified fire investigator program

14  that I participated in with ATF, a segment of that

15  both dealt with chemistry, and it would be, I guess,

16  forensic chemistry in the issues like related to

17  crime scene processing and laboratory analysis of

18  samples, that type of thing, I guess would be the way

19  to kind of characterize that.

20      Q   Okay.  As part of that training, did you

21  receive training in experimentation related to the

22  origin and cause of fire?

23      A   I don't exactly understand what you mean as

24  far as experimentation.  Like --

25      Q   In terms of reproducing a fire through a means

1    or method that might have been the cause of a fire.

2        A    Oh, yes.

3        Q    You did?

4        A    Yes.

5        Q    As part of that training that you just

6    described through ATF?

7        A    Yes.  And maybe specifically part of the

8    forensic chemistry but also throughout other aspects

9    of the ATF training.  I don't know if it necessarily

10   was specific to a chemistry portion, but throughout

11   that training.

12       Q    Okay.  And when was that training that you

13   received that related specifically to forensic

14   chemistry?

15       A    That would have been during the time that I

16   was in the certified fire investigator candidate

17   program, which would have been '90 -- let's see.  I

18   finished that program in '97.  So it's a two-year

19   program, so that would have been basically '95 to

20   '97.

21            And then prior to that, I was accepted into

22   the explosive specialist training program, which is a

23   separate designation.  And there's -- I think some of

24   that training would have overlapped probably the

25   explosives training prior to me getting into the fire

1    investigator training.

2        Q    Okay.  Did any of your training in forensic

3    chemistry include the analysis of the flammable

4    properties of gases in a laboratory setting?

5        A    I don't know about the analysis of flammable

6    gases, but it did include like gas chromatography,

7    analysis of samples that had been collected at a

8    scene, and then some of that training involved like

9    the collection of gases at a scene for later

10   analysis.  So I don't know if that answers your

11   question or not.

12       Q    It does.  I take it you do not have the

13   requisite training/experience to perform laboratory

14   analysis of gases, correct?

15            MR. WIDIS:  Object to the form.  You can

16     answer that.

17       A    Yes.  I do not.  I have done it in a training

18   environment, but no, I would not --

19       Q    In other words, if you collected a sample of

20   gas at a fire scene for the purpose of laboratory

21   testing, it would be your approach to take that to a

22   certified laboratory and have it tested?

23       A    Yes.

24       Q    And I take it you've done that through the

25   course of your career?

Deposition of Lester Rich

1      A    I have.

2      Q    All right.  Page 2 of your CV says that you

3   have over 3900 hours of classroom instruction and

4   practical instruction in fire- and arson-related

5   matters.  Is that correct?  Is that what it says?

6      A    Yes.

7      Q    And is that, in fact, accurate?

8      A    Yes.  That's an estimation, but yes.

9      Q    All right.  Can you tell me, of those 3900

10  hours of classroom instruction and practical

11  instruction, how many related to stored agricultural

12  commodities.

13     A    Well, as far as fires involving that --

14     Q    Correct.

15     A    -- or just stored commodities in general?  I

16  don't understand exactly.

17     Q    As far as --

18     A    I might be reading too much into your

19  question.

20     Q    Fire- and arson-related matters.  That's what

21  your CV says.  You have 3900 hours of classroom

22  instruction and practical instruction.

23     A    Okay.  It would be an estimation, but the

24  training and classes involved various classes.

25  Portions of them would have involved training on

1    stored commodities, spontaneous combustion, bulk

2    storage or fires in warehouses, tobacco warehouses,

3    that type of thing.

4      Q    All right.  So if you package all of those

5    subtopics up into hours, out of the 3900 hours of

6    training that you've received, how many would you say

7    were devoted to those -- that package of subjects?

8      A    I don't know that I can really estimate that.

9    I mean, I could guess, but I really don't know

10   because a lot of times in the training it's, you

11   know, a certain number of hours.  You know, a session

12   or a block of instruction may be about agricultural

13   storage and then the next session might be incendiary

14   fires.

15         I really don't know if I could break that down

16   for you by hours.

17     Q    Well, let me ask this specifically.  Did you

18   receive specific training during those 3900 hours

19   regarding the self-heating of stored agricultural

20   commodities?

21     A    Yes.

22     Q    Do you think that was longer than an hour or

23   two of your training out of 3900 hours?

24     A    Yes.

25     Q    Do you think it was more than ten hours?

Deposition of Lester Rich

1     A    Probably, by the time you add them all

2  together, yes.

3     Q    Do you think it was more than 20 hours?

4     A    I'm just trying to remember some of the

5  classes because normally those blocks are -- I would

6  have to say, if I was guessing, probably more on the

7  order of -- out of the 3900, maybe 100 of the hours

8  or more.

9     Q    Related to self-heating of stored agricultural

10 products?

11    A    Probably, yes, if you split it out, of course,

12 you know, across all the different classes that I've

13 taken.  And like I said, there's not been -- I

14 haven't taken an eight-hour class on spontaneous

15 combustion or something like that.  But by the time

16 you split them out, I would say -- but it's a

17 complete estimation on my part because, like I said,

18 it's a fragmented training regimen, I guess would be

19 the way to say that -- or it's attending different

20 blocks of instruction.

21    Q    All right.  Same question regarding the

22 chemical compound aluminum phosphide.  How much of

23 your 3900 hours would have been devoted specifically

24 to aluminum phosphide?

25    A    Specifically to aluminum phosphide, probably

1    not that much.  The hazardous materials training that

2    I've had talks about combustion metals and flammable

3    metals, and I'm sure aluminum phosphide was

4    mentioned.  But it wasn't, again, like a specific

5    two-hour class on aluminum phosphide.  So the

6    combination of that -- and then, too, there's a --

7    the chemistry pyrotechnics class that I took also

8    dealt with combustible metals and that --

9    formulations, although it wasn't the entire -- the

10   class wasn't specific to aluminum phosphide.

11       Q    All right.  Let me ask specifically whether

12   any of your instruction, 3900 hours, related to the

13   use of aluminum phosphide as a pesticide.

14       A    I would -- no, I don't believe so.

15       Q    Okay.  How much of your 3900 hours, if any,

16   related specifically to phosphene gas?

17       A    I don't know that I can estimate specific.  I

18   mean, like I said, phosphene and the other toxic

19   gases and flammable gases are included -- a lot of

20   the hazardous materials training as well as -- well,

21   mostly -- I would say mostly in the hazardous

22   materials training.  But I don't know a way to

23   specifically estimate the number of hours devoted to

24   just that material.

25       Q    Fair enough.  Did any of your 3900 hours of

1    classroom instruction and practical instruction

2    include the specific topic of the spontaneous

3    ignition of phosphene gas?

4        A    I don't know that it would -- not in like a

5    lecture format, but material that I've researched and

6    read would have included that.

7        Q    Okay.  So the reading component but not the

8    lecture component?

9        A    Right.  I don't recall a lecture on --

10   attending a lecture on the spontaneous ignition of

11   aluminum phosphide.

12       Q    Or phosphene gas?

13       A    Or phosphene gas.  Right.  Sorry.

14       Q    Okay.  I want to shift away from that

15   3900 hours we've been talking about and talk about

16   your fire investigations both during the time you

17   were with ATF and since the time you've been on your

18   own.

19       A    Okay.

20       Q    Approximately -- combining both together,

21   approximately how many fire investigations have you

22   been a participant in to date?

23       A    Go back to this number here because this

24   doesn't -- I'll stick with the 1500 that's listed on

25   my CV.  It's probably a little more than that because

1    that doesn't include fires necessarily that I've

2    worked this year, you know, as part of the company.

3    So that's a fair, accurate representation or

4    estimation, is about 1500.

5        Q    Can you tell me the number of those 1500 that

6    involved a peanut storage warehouse.

7        A    That I investigated?

8        Q    Yes.

9        A    Two.

10       Q    That would be the E.J. Cox warehouse fire and

11   the Severn warehouse fire?

12       A    Yes.  Let's see.  Oh, no, just the two.  I

13   thought of another one, but it wasn't -- it's not

14   peanuts.

15       Q    Okay.  Well, this may get to the next

16   question.  Can you tell me the number that involved a

17   warehouse storing any type of stored agricultural

18   commodity.

19       A    Yes.  Let's see.  Warehouses -- probably --

20   and again, that's -- it's an estimation because I'm

21   trying to remember back through the fires that I've

22   been to.  Overall the warehouses may be 25 to 30,

23   would be my estimation.

24       Q    And that --

25       A    Of various -- I'm sorry.  Just of various

1    commodities or storage.

2        Q    I know that includes two peanuts, two peanut

3    fires.  My guess is the bulk of those are tobacco

4    fires, correct?

5        A    There are, yes, several.

6        Q    What else besides peanuts and tobacco?

7        A    Carpet.

8        Q    I'm focused on stored agricultural

9    commodities.

10       A    Just agricultural stuff.  Right.  Sorry.

11   Well, that's not agricultural.  It was like a meat

12   processing warehouse or food product warehouse.

13       Q    I'm specifically focused on items grown in the

14   ground that's stored in a warehouse.

15       A    Right.  I would say -- what was the question

16   again?  How many of those -- I'm sorry.  I got off

17   track.

18       Q    You said that there were 25 to 30.

19       A    About warehouses, right.

20       Q    Well, I asked you about storing any type of

21   agricultural commodity.

22       A    Okay.  I misunderstood you then.  I would say

23   about 25 to 30 warehouse fires, and of those that

24   contained agricultural commodity -- was that --

25       Q    Yes.

1      A    That was your question.  I'm sorry.

2    Probably -- the tobacco warehouses, maybe eight to

3    ten.

4      Q    Okay.  And besides peanuts and tobacco, are

5    there any other stored agricultural commodities

6    involved in a warehouse fire that you investigated?

7      A    Oh, yes.  Cotton.

8      Q    How many cotton?

9      A    How many fires?

10     Q    Yes.

11     A    I believe two, I believe.

12     Q    So two cotton, two peanut, and four to six

13   tobacco?

14     A    Yeah.  I'm not completely sure on the tobacco

15   number, but that's -- that's a good estimation.

16     Q    Okay.  Did you, for any of those eight to ten

17   fires that you investigated involving stored

18   agricultural commodities, conclude that self-heating

19   or spontaneous combustion played a role in the fire?

20     A    In the warehouse fires?

21     Q    The --

22     A    Just specifically that we just talked about?

23     Q    Yes.

24     A    Yes.  The cotton, cotton bales.

25     Q    Both cotton fires that you investigated, that

1    was your conclusion?

2        A    One was undetermined.  One was spontaneous

3    heating.  I believe.

4        Q    And where was the spontaneous heating fire?

5    Where was that located, that cotton fire?

6        A    I believe it was here at Port Charleston.  I

7    think that's the one I did while I was with ATF.

8        Q    Were you the one who made the determination as

9    to the origin and cause of that fire, or did somebody

10   else at ATF make that determination?

11       A    It would have been me, but there may have been

12   a state or local investigator involved, also, or

13   maybe somebody from the Port's authority, also.

14       Q    What was it about that particular fire that

15   led you to conclude that self-heating or spontaneous

16   combustion was the cause of that fire?

17       A    The -- just the facts surrounding the incident

18   and the investigation.

19       Q    Were there temperature records that predated

20   the fire regarding that stored commodity?

21       A    Not that I'm aware of.

22       Q    Is that the only stored agricultural commodity

23   fire that during the course of your career you

24   concluded was caused by self-heating or spontaneous

25   combustion?

Deposition of Lester Rich

1    A    For stored commodities?

2    Q    Yes.

3    A    I believe so, because I think the other -- the

4    other self-heating fires have not been stored

5    commodity.

6    Q    All right.  And you've used the term

7    self-heating.  I've used the term self-heating.

8    Let's make sure we both know what each other's

9    talking about.

10       When you say self-heating in relation to a

11   stored agricultural commodity, what do you mean?

12   A    I mean the commodity begins to heat up

13   independent of an external heat source.

14   Q    Okay.  And what causes self-heating in a

15   stored agricultural commodity?

16   A    Normally it starts out with a biological

17   decomposition of the material that's organic

18   material, and that then can lead to a chemical

19   oxidation, kind of the next step.

20       But to answer your question, it would start

21   out with usually like a biological -- I would say a

22   biological event or decomposition.

23   Q    And in your experience and training, what

24   leads to that -- what typically leads to that

25   biological decomposition?

1    A    It's normally related to moisture content

2    within the stored commodity.

3    Q    The normal moisture content or excess moisture

4    content?

5    A    I would say excess.

6    Q    Okay.  Are there characteristics of stored

7    agricultural commodities that make them prone to

8    self-heating?

9    A    Yes.

10    Q    And what are those characteristics?

11    A    Primarily that they're agricultural products

12    and they're therefore susceptible, to some extent, to

13    self-heating.  And the storage configuration, the

14    storage -- the management, the warehouse management

15    storage practices, I guess, the way the stuff's

16    stored.  The ambient conditions can affect that.  And

17    then insect activity is -- could possibly affect

18    that, also.

19         That's kind of the -- off the top of my head.

20    Q    Okay.  And can self-heating in a stored

21    agricultural commodity lead to self-combustion or

22    spontaneous ignition?

23    A    Yes, it can.

24    Q    Have you seen that over the course of your

25    career?

1      A    Yes.

2      Q    What causes the process of self-heating to

3  eventually result in self-combustion or spontaneous

4  ignition?

5      A    Well, it goes through a phase.  So the

6  original -- the biological decomposition begins, and

7  that can raise the temperature, and then at that

8  point, the biological activity begins to cease.  And

9  if oxidization then begins to occur, that can

10  continue to drive the reaction through what's called

11  thermal runaway, and then that thermal runaway can

12  advance to ignition or spontaneous combustion.

13      Q    So if I heard you correctly, the process leads

14  from the self-heating to oxidization followed by

15  thermal runaway; is that right?

16      A    It can.  I mean, it doesn't always proceed --

17  in other words, the reaction will sometimes stop, or

18  you can have self-heating without having spontaneous

19  combustion.  But that is the sequence, if it goes all

20  the way through.

21      Q    What does it take for the oxidization to

22  occur?  Oxygen?

23      A    Yes.

24      Q    Is there typically oxygen in a warehouse

25  environment?

1    A    Yes.

2    Q    Is there any extra oxygen beside the oxygen

3  that is typically in a warehouse environment that's

4  required?

5    A    I don't follow you.

6    Q    You said oxidation is the step that happens

7  after you get to a certain temperature and the

8  biological activity is no longer really the issue?

9    A    Right.

10   Q    Is there any additional oxygen that needs to

11  be supplied into the warehouse for that to occur, or

12  can it just -- oxidation occur from the oxygen that's

13  already there?

14   A    Right.  Yes.  From the oxygen that's already

15  there.  You don't need to add oxygen.

16   Q    All right.  All right.  I want to go back to

17  the 1500 estimated fires that you've participated in

18  investigation of.  I want to ask you the number of

19  those that related to the application of a pesticide

20  to a stored agricultural commodity.

21   A    I believe it's just going to be the two, from

22  pesticide to stored agricultural commodity.

23   Q    And that's E.J. Cox and Severn?

24   A    Yes.

25   Q    And in both of those instances, you concluded

1   that the origin and cause of the fire related to the

2   application of pesticide, correct?

3       A    Yes.

4       Q    And I think we're going to narrow this down to

5   one, but I would like to confirm that.  The number of

6   the 1500 or so fires that you've personally

7   participated in investigation of that involved the

8   application of pesticide onto the surface of a stored

9   agricultural commodity?

10      A    Well, it would be -- oh, as far as -- say the

11  question again.  The origin of the fire -- is that

12  what you said?  I'm sorry.

13      Q    I'll repeat it.

14      A    Yeah.

15      Q    The number of the 1500 estimated fires in

16  which you've participated in the investigation that

17  related to the application of a pesticide onto the

18  surface of a stored agricultural commodity.

19      A    Well, that would be two because, in part of

20  the instance at E.J. Cox, the pesticide was applied

21  to the surface.  And then in Severn, it was also

22  applied to the surface.

23      Q    All right.  And remind me, if you would, did

24  you conclude that both the probed pesticide and the

25  surface-applied pesticide in E.J. Cox contributed to

1    the fire there or just the probed?

2       A    Just the probed.

3       Q    Okay.  So is it, in fact, correct to say that

4    out of the 1500 or so fires in which you've

5    participated in investigation, there has been one in

6    which your conclusion was that the surface

7    application of a pesticide to a stored agricultural

8    commodity was the cause of the fire?

9       A    Yes.

10      Q    And that's the case we're here to talk about

11   today?

12      A    Yes.

13      Q    Let me ask you, forgetting about stored

14   agricultural commodities, the number of fire

15   investigations to date that you've been involved in

16   that related in any way to the application or

17   liberation of phosphene gas.

18      A    Just the fires would be -- it would be the

19   two.

20      Q    E.J. Cox and Severn?

21      A    Yes.

22      Q    Same question about aluminum phosphide.  Same

23   answer?

24      A    Yes, I don't recall another fire that involved

25   aluminum phosphide.

1    Q    Okay.  Mr. Rich, how many times have you been

2    qualified as an expert witness relating to the origin

3    and cause of a fire in a court of law?

4    A    Let's see.  I believe three.

5    Q    Can you pick them out of the past expert

6    testimony for Lester V. Rich pages from your -- from

7    Exhibit Number 192.

8    A    Yes.  The U.S. v. Paul Ferrara was a criminal

9    case.  The Runaway Bay Apartments v. Mid-America was

10   a civil case.  State of South Carolina -- these were

11   just court testimonies, right?

12   Q    Yes.

13   A    Yeah.  And the State of South Carolina v.

14   Wesley Max Myers was court testimony.  The U.S. v.

15   Gary Dean Boone was explosives testimony.  It was not

16   a fire origin.  It was explosives related.  And

17   Alasteri -- that was a deposition.

18        Those -- yeah.  Just those that I mentioned --

19   Q    So you've been --

20   A    -- for the trials.

21   Q    So you've been qualified four times by a court

22   to testify as an expert witness related to your

23   training and background in explosives and fire?

24   A    Yes.

25   Q    All right.  The U.S. v. Paul Ferrara case,

1     that was tried in federal court in South Carolina?

2         A    Yes, sir.

3         Q    And you were qualified to testify as an expert

4     witness in June of 1999?

5         A    Yes.  I believe, yeah, that's when the trial

6     was.

7         Q    That's while you were still with ATF, correct?

8         A    Correct.

9         Q    All right.  The Runaway Bay Apartments, you

10    were qualified by a state court judge to testify as

11    an expert witness in that case; is that right?

12        A    Actually, that was a federal civil case.

13        Q    Okay.  So it was federal?

14        A    Yes.  Because that was -- yeah, that was at

15    the federal courthouse in Charleston.

16        Q    In Charleston?

17        A    Uh-huh.

18        Q    Okay.  And that's also while you were still

19    with ATF, correct?

20        A    Yes.

21        Q    And that was in 1999?

22        A    Yes.

23        Q    It's -- okay.  So that's a trial testimony.

24    You did both a deposition and a trial in that case?

25        A    That's correct.  I'm sorry.  You're right.

Deposition of Lester Rich

1    Yeah, the deposition would have been in '99, and then

2    the trial was in 2000.

3        Q    And you testified at trial regarding the

4    origin and cause of that fire?

5        A    Yes.

6        Q    The State of South Carolina v. Wesley Max

7    Myers, you were qualified to testify in that case as

8    to the origin and cause of the fire?

9        A    Yes.

10       Q    Was that in state court or in federal court?

11       A    That was state court.

12       Q    And that's also while you were with AFF,

13   correct?

14       A    2000 -- yes.

15       Q    And that was in February of 2001?

16       A    I have it here, 2000 -- well, that's the

17   retrial.  I'm sorry.  2001.  Yes, you're right.

18   You're right.  I'm sorry.  I was looking at the next

19   one.

20       Q    Okay.  And then U.S. v. Gary Dean Boone, you

21   testified in federal court in South Carolina in that

22   case?

23       A    Yes.

24       Q    And were qualified to testify as to

25   explosions?

1   A   Yes.  I was testifying -- it was about

2   explosion and evidence collection.

3   Q   And you were still with ATF at the time in

4   June of 2002?

5   A   Yes.

6   Q   Am I correct then in saying that you have not

7   in over 11 years been qualified to testify as an

8   expert witness in any court?

9   A   I don't think that's correct.  I haven't

10  testified in court since -- I guess since Boone.

11  Q   That's my question.  There's no judge that's

12  qualified you to testify as an expert witness except

13  when you've actually appeared in court, correct?

14  A   Yes.  Correct.  Correct.

15  Q   And that hasn't happened since June of 2002,

16  correct?

17  A   Yes.

18  Q   Have you ever been challenged as an expert

19  witness by opposing counsel in any case?

20  A   I don't think so, but I have had -- in the

21  E.J. Cox, we did prepare some documents for a

22  Daubert-style hearing that didn't materialize.  So I

23  don't exactly know how to answer that.  I think so,

24  but I'm not sure.

25  Q   Well, you tell me if this is not a correct

1    statement.  The case settled before it got that far;

2    is that correct?

3        A    The case did settle, yes, but the documents,

4    as far as I know, were prepared.  But I don't know

5    the time frame.

6        Q    Outside of the E.J. Cox case, to your

7    recollection, have you ever been challenged as an

8    expert witness in a court?

9        A    No, not that I'm aware of.

10       Q    Has any judge ever not permitted you to

11   testify to an opinion you had intended to express but

12   for what the judge let you do?

13       A    No.

14       Q    And out of the four times that you've been

15   qualified to testify as an expert witness in federal

16   or state court, did any of those involve something

17   other than an allegation that someone had

18   deliberately set a fire?

19       A    Yes.

20       Q    Which one?

21       A    The Runaway Bay Apartments.  What was the

22   fourth one -- are you still counting Boone?

23       Q    Yes.

24       A    Okay.  Yeah.  Just Runaway Bay Apartments.

25   Right.

1     Q    What was your opinion as to the origin and

2     cause of the fire in that case?

3     A    That it was a chimney fire.

4     Q    So correct me if I'm wrong, but the Runaway

5     Bay case is the only case in which you have testified

6     in court as to the origin and cause of what you

7     concluded was a non-incendiary fire?

8     A    Yes.

9     Q    All right.  Mr. Rich, are there books,

10    treatises, monographs, or articles that you consider

11    authoritative regarding the proper method to

12    investigate the origin and cause of a fire?

13    A    Yes.

14    Q    All right.  Would you tell me what they are.

15    A    Well, the primary -- primary one that's in use

16    is the NFPA 921.  There are also additional -- Kirk's

17    Fire Investigation, Forensic Fire Scene

18    Reconstruction.

19         Then as far as like references that you would

20    look at would be like Emission Handbook, Fire

21    Protection Handbook.  There's -- there's an IFSTA

22    manual on fire investigation also.

23    Q    Say that -- spell that.

24    A    IFSTA, I-F-S-T-A.  And I think that's the

25    International Fire Service Training Agency, I believe

1     is what that is.  They're out of Oklahoma.

2          Those would be kind of the ones that I would

3     think of right off the top of my head.

4     Q    That you would consider to be authoritative on

5     the subject of the proper methods to investigate a

6     fire?

7     A    Yes.

8     Q    Okay.  And specifically for the fire

9     investigation that occurred in this case beginning in

10    2009, you considered the 2008 version of NFPA 921 to

11    be applicable, correct?

12    A    Yes, that would be accurate, because the other

13    one was -- is a newer version.

14    Q    Okay.  Are there books, treatises, monographs,

15    or articles that you consider authoritative regarding

16    fire science generally?  Would that be the same set

17    of books?

18    A    I would say predominantly it would be the same

19    set of books, yes.

20    Q    All right, Mr. Rich.  As you know, we're here

21    to talk about the fire that occurred to a peanut dome

22    in Severn, North Carolina in August of 2009.  I will

23    interchangeably refer to that as the dome, the peanut

24    dome, the Severn dome.  If I refer to it as any of

25    those things, will you know what I'm talking about?

1    A    Yes, or I'll ask you.

2    Q    Okay.  I understand that you actually began

3    your involvement in the investigation of that fire on

4    or about August 13th, 2009.  Is that correct?

5    A    Yes.

6    Q    And to the extent you need to, with the use of

7    Exhibit 190, could you please walk us through the

8    beginning stages of your involvement in this matter

9    from the time you got the first phone call about it,

10   at least up until the time the fire -- you left the

11   fire scene, if you can walk us through that process.

12   A    Okay.  The -- I also have some dates written

13   out.  So I don't know that the report necessarily

14   follows chronologically, if I could refer to a

15   calendar of some dates.

16   Q    I'm going to do better than that.

17        (Exhibit No. 193 was marked for

18    identification.)

19   Q    Let me show what we're marking as Exhibit 193.

20   Can you tell me what Exhibit 193 is.

21   A    This looks like a copy of the timeline that I

22   prepared for Mr. Widis.

23   Q    Approximately when did you prepare that

24   timeline?

25   A    Approximately -- I'm going to say a year and a

Deposition of Lester Rich

1  half ago.  It might be -- actually, it might be on

2  the case management log.

3      Q    Okay.  I believe it is.  And so that will

4  accurately reflect when you prepared it and how long

5  it took to prepare it, correct?

6      A    I believe so, yes, sir.

7      Q    All right.  Well, using any parts of

8  Exhibits 190 to 193 that you need to to refresh your

9  recollection --

10     A    Okay.

11     Q    -- I'd like you to walk us through the moment

12  you learned of this fire until the time the fire was

13  out, working in steps as to what you did, what you

14  were trying to do, and what you learned.

15     A    Okay.  Page in here between these.  Okay.  And

16  then can I refer to this, also?

17     Q    Yes.  That's what I said.  Using any --

18     A    I'm sorry.  I'm sorry.

19         MR. WIDIS:  Anything you want.

20     A    I'm sorry.

21         MR. WIDIS:  If you have another note you want

22     to look at, if it will help give the information.

23     A    Okay.  So I was originally notified on August

24  the 11th.

25     Q    By whom?

1      A    I believe that call came from Mr. Widis.

2      Q    Okay.  I don't want to -- we've agreed we're

3   not going to ask our experts about communications

4   with each other, so I'm not going to ask you about

5   that.  But it was Mr. Widis who got you involved in

6   this fire investigation?

7      A    Yes.

8      Q    Okay.  Is it, in fact, true that you were

9   already working for Mr. Widis's firm at that time

10  regarding the E.J. Cox fire investigation?

11     A    Yes.  Yes.  That fire predates this fire.

12     Q    Okay.  So essentially you were working on the

13  two fire investigations pretty much simultaneously?

14     A    There was some overlap, yes.

15     Q    Okay.  You weren't still on the scene at the

16  E.J. Cox fire as of August 11, 2009, were you?

17     A    No.

18     Q    Okay.  So approximately what time of the day

19  on August 11th did you receive that call from

20  Mr. Widis?

21     A    I think it was around the middle of the day.

22     Q    Okay.  And you learned that you were being

23  engaged to investigate the origin and cause of the

24  fire?

25     A    Correct.

1      Q    Were you separately engaged by Travelers

2   Insurance Company to assist in any way with the fire

3   suppression, fire extinguishment, or providing advice

4   to Travelers regarding those subjects?

5      A    No.

6      Q    Your sole engagement was to assist in

7   determining the origin and cause of the peanut dome

8   fire?

9      A    Yes.

10     Q    Okay.  What did you do?

11     A    At that point, I think I -- I believe that he

12  told me that I needed to be up there or they'd like

13  for me to be up there on the 13th, which is when

14  other people were going to be there.  I believe there

15  were some representatives from Travelers there, the

16  representatives from Severn, the corporate -- the

17  employees -- RP Watson and those people.

18          And there was going to be -- basically there

19  was a meeting on the -- oh, it's a calendar.  Okay.

20  There was a meeting on the 13th.

21          MR. WIDIS:  Steve, this is the calendar of

22    August.

23          MR. EPSTEIN:  Okay.

24     A    And that was -- that was basically -- I think

25  I left here early that morning to be in Severn

1    midday.  I think that means it was scheduled for

2    around 10:00 on the 13th.

3        Q    Okay.  So you had a day and a half or so

4    before -- between the time Mr. Widis contacted you

5    and the time that you got to the scene?

6        A    Yes, I believe that's correct.  I think there

7    was a day in between there.

8        Q    Okay.  In your mind, did you plan out how you

9    were going to investigate the origin and cause of

10   this fire during that time?

11       A    Yes, I gave it some thought.

12       Q    And what in your mind did you plan out in

13   terms of how you would go about determining the

14   origin and cause of the fire?

15       A    I don't know that I really planned it out, but

16   I was thinking about the structure, what was going

17   on, who was there, who was going to be there, what

18   conditions were at the time, that sort of

19   information.

20       Q    Did you think about how you could use the

21   contents from the dome or the exterior of the dome or

22   what was above the dome to in some way document

23   conditions that would help determine the origin and

24   cause of the fire?

25       A    I don't know if I thought about it then, but

1  I'm sure I thought about that later, you know, once I

2  got there and saw the configuration and the setup,

3  saw how the building was built.

4      Q    Did you have an understanding before you even

5  got there that there was temperature monitoring

6  equipment embedded in that dome?

7      A    I don't think I knew that until I got there.

8      Q    All right.  I mean, ideally, if you had the

9  luxury of time, the luxury of autonomy, and no

10  expense issues, how would you have gone about trying

11  to figure out what caused this fire?

12          MR. WIDIS:  Object to form.  You can answer.

13      A    I don't know that there was -- I mean, I'm

14  not sure -- I don't -- I don't understand -- I don't

15  think I would -- would I have done something

16  different without any sort of limit or time or -- I

17  don't think so, no.

18      Q    Okay.

19      A    I mean, without being able to go inside the

20  dome -- which -- if that's your limit, I mean, I

21  don't -- superhuman, I can't do, but --

22      Q    So if you could have, getting inside the dome

23  would have given you a greater ability to detect what

24  caused the fire than would be the case without being

25  able to get inside the dome?

1     A    I would say yes.

2     Q    Okay.  And what is it that prevented you from

3  going inside the dome?

4     A    The construction of the dome, the access to

5  the dome, the fire inside the dome.  The conditions,

6  I guess would be the way you'd say that.

7     Q    Short of getting inside of the dome, what

8  would have been the best way to get closest to

9  getting inside the dome?

10     A    Some sort of remote monitoring, perhaps, or

11  some sort of remote sensing.

12     Q    Okay.  And did you, in fact, design anything

13  within the first day or two that you were there to be

14  able to accomplish that?

15     A    I tried to get some video from inside by using

16  a portable battery-operated video camera, and that

17  was unsuccessful.

18     Q    And why was that unsuccessful?

19     A    I think it was a combination of the equipment

20  and the conditions that -- it just -- the heat just

21  affected the -- it's not -- it certainly wasn't a

22  camera designed for that.  It was something that I

23  was just going to try to see if it would work, and I

24  think the conditions were just too bad for the

25  camera.

Deposition of Lester Rich

1    Q    Would it be accurate to say that prior to

2  August 27th, 2009, there is no picture in existence

3  of what was going on inside of that dome?  Correct or

4  incorrect?

5    A    I think that would be correct, yes.

6    Q    So we can't look at a picture and say, well,

7  that's the spot where the fire was burning at any

8  time prior to August 27th, correct?

9    A    Oh, in -- on August 27th, are you referring

10  to the thermal imaging?

11    Q    I am.  And I'm trying to get us to a period of

12  time before then.

13    A    Okay.  Yes, that would be correct.  I don't

14  know of any photographs prior to that time.

15    Q    Okay.

16    A    Or usable -- you know, anything that's there

17  that you can see.

18    Q    And as a fire investigator, it would have been

19  ideal for you to have access to such photographs

20  taken as soon after the fire was discovered as

21  possible, correct?

22    A    That would have been ideal, yes.

23    Q    And you just don't have that to work with in

24  this matter, do you?

25    A    I do not.

1    Q   All right.  Were you asked to do anything

2  specifically other than investigate the origin and

3  cause of the fire?

4    A   No.

5    Q   Were you left to your own devices to figure

6  out the best way to investigate the origin and cause

7  of the fire?

8    A   I guess so.  I mean, I'm not sure what you

9  mean left to my own devices.  I mean, there were

10  other -- there were -- you know, Mr. Widis was there.

11  There were representatives from Travelers there,

12  representatives from the fire suppression company

13  there.

14      But I guess, yes, because there -- I would say

15  yes.

16    Q   You were provided whatever access to the dome,

17  to Severn Peanut Company's people, to materials that

18  you needed, correct?

19    A   Yes.

20    Q   Were you reporting to Mr. Widis?  To

21  Travelers?  To RP Watson?  Who were you reporting to?

22    A   I would say -- well, I'd have to say both, I

23  guess because --

24    Q   Both of --

25    A   Mr. Widis and Travelers, because there were

1    occasional -- I mean, there were calls, conference

2    calls, with Mr. Widis and Travelers.  And so I would

3    say -- I would say both.

4        Q    And who specifically from Travelers were you

5    interfacing with?

6        A    Let's see.  Walter Nader was there, Jonathan

7    Byers was there for -- on and off, and I believe

8    there's another -- you have the list, the sign-in

9    sheet from that first meeting.  There may have been

10   another Travelers employee or designee on there, but

11   I'm not sure.  I don't remember their name.

12       Q    Okay.  Was there another fire investigator

13   that Travelers retained in addition to yourself?

14       A    Yes.  I'm sorry.  You're right.

15       Q    Who was that?

16       A    Mark Beavers.

17       Q    From Rimkus?

18       A    From Rimkus, yes.

19       Q    Did you work side by side with him, or did you

20   work independent of him?

21       A    I would say side by side.

22       Q    Did you know why there were two fire

23   investigators retained for the purpose of determining

24   the origin and cause of the fire?

25       A    Not exactly, but that's not -- I've run into

1    that before with different companies, so -- and

2    frankly, I don't know the answer, but it just seems

3    to be dependent on the company.

4        Q    Did you understand from the time that you got

5    there that there was going to be an issue of whether

6    Travelers would be able to subrogate this loss?

7        A    I don't know what you mean by an issue.  I

8    mean, that's a consideration, you know, as the

9    investigation goes on.  But I don't think it's a --

10   you don't know that until you get further into the

11   investigation.

12       Q    Let me put it a different way.  Did you

13   understand that Travelers was the property insurance

14   company that was going to be paying for all of the

15   damages to Severn Peanut Company?

16       A    Yes, that's my understanding.

17       Q    And based upon your experience, did you have

18   an understanding that, for a large loss, Travelers

19   would be trying at least to recover that money from

20   somebody else?

21       A    Yes.

22       Q    Okay.  And so you understood that there might

23   come a day where you'd be sitting in a room in

24   Mount Pleasant, South Carolina, testifying in

25   response to questions by that somebody else's lawyer,

1    correct?

2        A    Yes.

3        Q    You knew that from the first day you got

4    there, correct?

5        A    I mean, that's kind of standard procedure,

6    yes.  I don't know that I would say that I actually

7    knew that, but that happens.

8        Q    Okay.  What was the condition of the dome and

9    peanuts at the time you arrived -- I think you said

10   about 10 o'clock on the morning of the 13th?

11       A    Yes.

12       Q    What was the condition of the dome and the

13   peanuts at that time?

14       A    I don't know at that time, because I didn't go

15   to the -- I didn't, so to speak, put eyes on the dome

16   until later that day, because it's my recollection I

17   got there about the same time the meeting was to

18   occur, around 10:00, and there was lots of

19   introductions and sign-in and trying to figure out

20   who was there.

21            So I really don't believe that I went out and

22   looked at the dome until that meeting broke up

23   sometime midday.

24       Q    Okay.  So let me ask it this way.  When you

25   first looked at the dome, as you understood it, what

1    was the condition of the dome and the peanuts?

2        A    It was on fire.

3        Q    Was there any doubt in your mind that a fire

4    was in progress within the dome as of that time?

5        A    No.  Not in my mind, no.

6        Q    Did you understand that Travelers did not

7    consider the dome and the peanuts to be on fire as of

8    that time?

9        A    I have since read that, yes, and I think there

10    was -- that was maybe talked about in the meeting

11    that everyone signed into that they may not have

12    fully thought that the dome was on fire.

13        Q    Based upon --

14        A    But I don't -- but that's -- I'm sorry.  That

15    would be their thoughts or my recollections of the

16    conversation.

17        Q    Based upon your education, training, and

18    experience, you had no doubt that it, in fact, was on

19    fire?

20        A    I would say yes, I thought the dome was on

21    fire.

22        Q    And what was your basis for saying that?

23        A    My observations.

24        Q    What in particular?

25        A    Well, at that time, there was smoke visible

1   from the top house.  I believe at that time the

2   previously installed thermocouple system had been

3   read and was generating some temperature data.  And

4   then the -- talking to the Severn employees about

5   what the conditions are, what it looks like, how long

6   has it been smoking, what's going on with the -- what

7   have you been seeing coming out of that house.

8        Those would be kind of the things that I used

9   to make that assessment.

10   Q   When you went out to the dome that afternoon,

11   in addition to your sight, did you observe anything

12   by smell?

13   A   I don't recall any smells that -- then, but I

14   mean, it's -- there's a vertical difference between

15   where -- I didn't go up on the top.  So I don't

16   recall any smell at that time.

17   Q   At ground level?

18   A   Right.

19   Q   Okay.

20   A   I mean, that's an outside -- you know, there's

21   no confinement there, so it would be -- if you got a

22   whiff of something, you might.  But I don't recall

23   smell permeating the area.

24   Q   In your view, who was the ultimate

25   decision-maker at the fire scene regarding how to

1    suppress the fire?

2        A    In my view, it was -- it was a combination --

3    it was Williams Fire Suppression, and then they were

4    working in concert with RP or the Severn -- the

5    company, Severn.  And I guess I'd have to throw Bill

6    Cottam in there, also, because he was -- he was sent

7    there by IFC, is my understanding, to sort of manage

8    the scene.  So I would put him in that group.

9        Q    Did you in any way assist in the direction,

10   the efforts to suppress the fire, too?

11       A    No.

12       Q    Were you supportive of the methods employed to

13   suppress the fire?

14       A    I don't really have an opinion on that.  I

15   mean, they did what they thought they could do.  I

16   know there were other suggestions offered, but I

17   don't really have an opinion one way or the other.

18       Q    You don't have any opinion on whether there

19   were better ways to suppress the fire that were not

20   employed?

21       A    I knew there were other -- right.  There were

22   other ideas offered, but for whatever reason -- they

23   could have been better, but maybe they weren't

24   practical or they couldn't have been implemented.  I

25   don't know.

Deposition of Lester Rich

1    Q   You were in Houston, Texas when I deposed

2  Chauncey Mueller, correct?

3    A   Yes.

4    Q   And you heard his views on that subject,

5  correct?

6    A   Right.

7    Q   His views were that the peanuts should have

8  been moved out of the dome as quickly as possible.

9  You heard him say that, right?

10    A   I recall that.  And I think he also talked

11  about a different approach to the application of the

12  $CO_2$, I believe.

13    Q   You don't have an opinion as to whether the

14  peanuts should have come out of that dome more

15  quickly than they did?

16    A   No, sir.

17    Q   Okay.  Mr. Rich, was there any inconsistency

18  with what you needed for purposes of your

19  investigation as to the origin and cause and what was

20  in the best interest of the fire suppression?

21    A   I would say no because, you know, as a general

22  rule, the fire suppression comes before the

23  investigation, just as a natural course of business.

24  The only concern that I would have had as the

25  investigator was -- and I think Chauncey might have

1  even expressed this in deposition, too -- the dumping

2  of the dry ice onto the top of the pile may have some

3  way altered any preexisting Fumitoxin or evidence or

4  anything else, frankly, that might have been there,

5  because that was quite a bit of weight.

6      Q   How many pounds of dry ice went in starting on

7  August 15th?

8      A   I don't remember the exact number, but I

9  believe it was over 100,000 pounds.

10     Q   And it is, in fact, true that dumping over

11  100,000 pounds of dry ice onto the top of the peanut

12  pile disturbed the evidence on the top of the peanut

13  pile, correct?

14     A   I would agree with that, yes.

15     Q   So it would be hard to draw a scientifically

16  valid conclusion about what was on the top of the

17  peanut pile subsequent to the unloading of over

18  100,000 pounds of dry ice on it, correct?

19         MR. WIDIS:   Object to form.

20     A   I don't know that it would be -- what was the

21  word that you used -- unreasonable or --

22     Q   Scientifically valid.

23     A   Valid.  I think that would have to be

24  determined based on what you got.  I mean, in this

25  particular case, after the application, we were able

1    to pull a sample using the dredge.  But I would say

2    yes, it altered -- for example, there's the testimony

3    that a flask was dropped in there.  Well, if you dump

4    100,000 pounds of dry ice on it, that's probably

5    going to change and move or squish or flatten the

6    flask.

7        But yes, to answer your question, it would

8    have changed it, but I don't know that it changed it

9    in such a fashion that you can -- you couldn't do

10   anything.

11   Q    Okay.  And in fact, the purpose of dumping the

12   dry ice onto the peanut pile was to affect the

13   temperatures within the peanut pile, correct?

14   A    I don't know if it was necessarily to affect

15   the temperatures in the peanut pile.  It was my

16   understanding it was done to extinguish the fire, and

17   it may or may not have affected the temperature.

18   Q    Is there not a relationship between fire and

19   temperature?

20   A    There is, but that's a class A ordinary

21   combustible material, the peanut farmer stock that's

22   burning.  And to extinguish that fire -- you've got a

23   fire triangle, air, heat, and fuel.  You have to

24   remove one side of that.  While the dry ice does

25   displace air inside -- carbon dioxide displaces the

1    oxygen, it may not fully extinguish the fire because

2    you haven't dissipated the heat from the class A

3    material.

4       Q    But it can also cause that heat to move within

5    the mass of 21 million pounds of peanuts, correct?

6       A    The ice on top?

7       Q    Yes.

8       A    Yes, certainly it would affect or certainly it

9    would and could affect the thermal balance, I guess

10   would be the right word, inside the dome.

11      Q    So just to make sure we're clear on this,

12   you -- I think we started this line of answers

13   related to my question about whether there was an

14   inconsistency between what you needed to do to

15   investigate the fire and what needed to be done to

16   suppress the fire, and you mentioned dry ice was to

17   some degree inconsistent with what you were trying to

18   do to investigate the fire, correct?

19      A    I would say -- I don't know if inconsistent is

20   the right word.  I would say it would complicate it

21   or it would affect -- let's say it would affect it.

22      Q    And that means that there are pictures that if

23   you took subsequent to them that possibly were

24   affected by the dry ice, correct?

25      A    Yes.  I don't know the answer to that

1    question.  It could be.  It could not be.

2        Q    And temperatures that were read from various

3    sensors following the dumping of the dry ice could

4    potentially be affected by the fact that dry ice was

5    dumped, correct?

6        A    Yes.

7        Q    Okay.

8            THE VIDEOGRAPHER:  Counsel, I need to go off

9        the record, change tapes.

10           MR. EPSTEIN:  Let's take a break.

11           THE VIDEOGRAPHER:  This is the end of tape

12       number 1.  Time now is 10:25 a.m.  We're off the

13       record.

14           (A recess was taken.)

15           THE VIDEOGRAPHER:  This is going to be the

16       beginning of tape number 2.  The time now is

17       10:34 a.m.  We're back on the record.

18       Q    Mr. Rich, I'd like to walk through Exhibit 193

19   with you, not the entire exhibit, but I'm going to

20   pick out pages.  So if you can kind of put that back

21   together again.

22       A    Okay.

23       Q    And we will get to the beginning of your

24   investigation, but we're going to start before then.

25       A    This one goes this way.  Okay.

1      Q    And so we have numbers in the bottom

2   right-hand corner.  I'm going to start referring you

3   to different page numbers starting with 12.

4          Your timeline on that page begins at

5   February 9th, 2009 and takes --

6      A    Hold on a second.  I put it together upside

7   down.  I'm sorry.  Okay.  Page 12.

8      Q    Yeah.  Your timeline there begins

9   February 9th, 2009 and gets us to August of 2009,

10  correct?

11     A    Yes, sir.

12     Q    And you have commodity temperatures where you

13  say dome temp intra-commodity, and then you've got

14  various temperatures.  52.74 on March 11th, 67.65

15  on June 9th, 79.51 on July 13th, correct?

16     A    Yes.

17     Q    And if I understand those numbers, what you

18  did was you took the average of all temperature

19  sensors as displayed on spreadsheets that were

20  provided to you and came up with one average number,

21  correct?

22     A    Yes, sir, I believe that is correct.

23     Q    In other words, nobody took a singular

24  temperature on March 11th, 2009 and got a

25  temperature of 52.74 somewhere intra-commodity?

1      A    Right.

2      Q    Okay.  When were those temperatures first

3   provided to you, the temperatures from the

4   temperature monitoring system designed by Safe-Grain?

5      A    I don't think it was the first day that I was

6   there, but it was -- it was sometime in that first

7   three or four days, I would say --

8      Q    You had --

9      A    -- that I -- I'm sorry -- that I saw them.

10  But I don't think I actually got copies of them until

11  later.

12     Q    Correct me if I'm wrong.  You had access

13  within the first few days you were on the scene to

14  the prefire temperatures recorded in the dome?

15     A    I don't think I had this history all the way

16  back.  I think there were -- I believe the records

17  that I had access to started like on the 11th.

18     Q    Of August?

19     A    Right, which would have been the day they saw

20  the smoke.  I don't think I had access to these

21  records at that time.

22     Q    That's what I'm specifically asking you about.

23  On page 12 --

24     A    Right.

25     Q    -- the temperatures that you're indicating

1  there, when did you first have access to those

2  records?

3      A    I don't remember exactly, but I would say it

4  was -- these were -- these were provided later, and

5  so probably after the first -- maybe even after the

6  explosion.  I'm not sure.  I don't think I had access

7  to these until later.

8      Q    Were you still at the scene when you were

9  provided access to these, or is it after you had

10  already done all of your work at the scene?

11     A    I believe it was after I had left the scene.

12     Q    And when did you leave the scene?

13     A    September 1st, the second time.  I was there

14  twice.  These -- some of these may have started --

15  because -- my recollection is -- and it could be

16  incorrect, but my recollection was that these

17  temperatures were maintained -- or they were

18  maintained by Severn.  And there was some issue with

19  the computer they were on or they had to be reentered

20  or they couldn't find the spreadsheets or they had

21  switched computers.

22          I'm not -- I know I'm not under oath, and I'm

23  not 100 percent certain of that, but that's my

24  recollection.  There was some issue with just handing

25  them to me.

1    Q    Okay.  Correct me if I'm wrong, but to the

2    extent that you were at the scene in August and early

3    September of 2009, you were forming impressions about

4    the origin and cause of the fire that were in no way

5    informed by the preexisting temperatures monitored by

6    Severn Peanut Company?

7    A    I wouldn't say I was forming impressions.  I

8    would say I was collecting information, and I didn't

9    have -- you're correct, I didn't have this

10   information right then.

11   Q    You knew nothing about the temperature history

12   within that dome prior to August 11th while you

13   were at the scene?

14   A    Wait.  Say that again.  I knew nothing about

15   it prior to August --

16   Q    You knew nothing about the temperature history

17   as it existed prior to August 11th, 2009 while you,

18   Mr. Rich, were at the scene, correct?

19   A    I don't think that's completely accurate,

20   because I think RP Watson had talked to me about

21   there were records, there were -- and that whole

22   issue of we can't get them, we might be able to get

23   them, I think that happened towards the end of the

24   first -- the first time I was at the scene.

25   Q    Let me try it this way.  While you were at the

1    scene --

2        A    Right.

3        Q    -- up until the very beginning of

4    September 2009, you were unaware of the actual

5    temperatures that had been recorded in that dome

6    prior to August 11th, 2009, correct?

7        A    Yes, I believe that's correct.

8        Q    All right.  If you would move forward to

9    page 16 --

10       A    Okay.

11       Q    There's an entry for August the 7th, 2009 that

12   Employee Mike Lassiter may smell odor.  Where did you

13   get that information from?

14       A    That information came from an interview

15   that -- or from talking.  I believe it was either

16   from Jonathan Byers or Mark Beavers, the other two

17   investigators there -- had talked to him, and he

18   reported smelling an odor, but he can't -- he

19   couldn't characterize it.  He couldn't say what it

20   was.

21       Q    Okay.  Mr. Rich, I've asked, through Mr.

22   Widis, for you to supply me with every field note,

23   every note of any kind, that you've made about this

24   matter, and there is nothing whatsoever that I've

25   been provided related to a Mr. Mike Lassiter.  Is

1    there something that you have that hasn't been

2    provided?

3        A    I don't think I have that.  I don't think I

4    made any -- I didn't make notes about that because I

5    didn't talk to him in person.  That was -- that was

6    information that was relayed to me.

7        Q    You don't have first-hand knowledge as to

8    whether that entry is correct or incorrect, do you?

9        A    What -- no, I don't have a convers- -- I

10   didn't have a conversation with Mr. Lassiter.  I'm

11   sorry.

12       Q    Okay.  And did you know that Mr. Beavers is

13   not involved in this case?

14       A    I don't know.  I mean, I haven't talked to him

15   about the case in a while, so I don't know if he's

16   still involved at all or not.

17       Q    Did you know he's not been designated as an

18   expert witness in the case?

19       A    No, I don't think -- no, I did not know that.

20       Q    Okay.  Who else did you mention that

21   Mr. Lassiter supposedly talked to about smelling an

22   odor?

23       A    The -- the Travelers fire investigator,

24   John Byer- -- the employee of Travelers, the fire

25   investigator.

1      Q    All right.  If Mr. Watson said that the first

2    evidence that Severn Peanut Company had of a fire was

3    on August 10th or August 11th, 2009, would you

4    have any reason to dispute that?

5      A    No.

6      Q    All right.  August 11th at 4:00, smoke

7    visible from dome, top house.  You also heard that

8    referred to as the head house, correct?

9      A    Yes.

10     Q    That was the first manifestation of a fire in

11   the dome, as far as you know, correct?

12     A    Well, I don't know if I would agree with that

13   because the smell is -- that smell has been

14   persistent all day according to them, and so --

15     Q    Let me ask it a different way.  That was the

16   first visible manifestation of the existence of a

17   fire, correct?

18     A    Yes.  That's my understanding.  Yes, sir.

19     Q    And the prior day, there was a manifestation

20   related to smell, correct?

21     A    On the 10th.  I'm sorry.  Yes, on the 10th.

22   Yes, sir.

23     Q    Okay.  So we know that in all likelihood,

24   there was a fire on or about the 10th of August,

25   2009, correct?

1     A    Yes.  And possibly as early as the 7th, but

2    again, there's no -- that can't be -- I mean, it's a

3    smoke smell is what he reports, but there's also --

4    they can't -- he couldn't differentiate -- this is

5    what I told -- he couldn't differentiate between

6    somebody burning leaves or a smell of burning peanuts

7    or a smell of anything that was burning.

8         It's a -- it's a fact that's there, but it may

9    not have any relevance because we can't associate it

10   to a particular -- this particular fire, I guess

11   would be the way to say that.

12    Q    And as a fact, it is not one upon which you

13   relied in your determination as to the origin and

14   cause of this fire, correct?

15    A    Yes, sir.

16    Q    Okay.  Go, if you would, to page 72.  Page 72

17   at the bottom left, it says that at 1:00 p.m. on

18   August 15th, 2009, there was an application of

19   1,000 pounds of dry ice to test the conveyor system,

20   correct?

21    A    Yes, sir.

22    Q    And so as of that time, the conditions inside

23   the dome had changed from what they were at the time

24   the fire commenced, correct?

25    A    What do you mean by the conditions?  The --

Deposition of Lester Rich

1    Q   Let me ask a different way.  As of that

2  time -- this goes back to a conversation you and I

3  have already had -- the immediate post fire condition

4  of the peanut pile had been disturbed to some degree,

5  correct?

6         MR. WIDIS:   Object to form.

7    A   I would agree, yes, because the -- I mean, it

8  was run through the conveyor system and put in on the

9  top.

10   Q   And if you go forward to page 74 --

11   A   74.  I'm sorry.  Okay.

12   Q   That, in fact, depicts what you've just

13  described, correct?

14   A   Yes.

15   Q   Okay.  And that was just the first

16  1,000 pounds.  There were then, as you testified

17  earlier, approximately 100,000 more pounds that were

18  put in?

19   A   That's correct.  And there was a concern that

20  the crane -- the system, this system that delivered

21  the peanuts to the top of the dome, might not

22  effectively deliver the dry ice to the top of the

23  dome because of -- it's so cold it would affect the

24  belt or whatever.

25         So that's why there was a test and then the

1    actual application.

2        Q    If you go forward to page 79.

3        A    Okay.

4        Q    On August 16th at 12:00 p.m., 100,000 pounds

5    of dry ice were inserted into the dome, correct?

6        A    That was over -- yeah, over a time period.  I

7    mean, it took a while, but yes.

8        Q    All right.  And on August 17th up at the

9    top, an additional 60,000 pounds of dry ice were

10   added, correct?

11       A    Yes, sir.

12       Q    So that's 161,000 pounds of dry ice that went

13   in between August 15th and August 16th, correct?

14       A    Yes.  And I should probably revise my

15   estimation of 100 to 161.

16       Q    Okay.  And we don't disagree that that had an

17   effect on what was going on inside of the dome that

18   in some way would affect what significance anything

19   discovered after that date had?  Agree or disagree?

20       A    I think I agree that it would affect it, but

21   I -- and this may not be what you said, but I don't

22   agree that it then makes it completely irrelevant.

23   But I agree that, yes, a movement or a change or a

24   disruption would affect what's there.

25       Q    All right.  And then on August 17th, the

1    dome was sealed by Williams, correct?

2       A    Yes.

3       Q    And just to make sure I'm clear on this, was

4    the dome sealed at the time that you got there on

5    August 13th?

6       A    Yes, sir.

7       Q    As far as you know, was the poly sheathing

8    that sealed the dome compromised in any way by the

9    existence of the fire within the dome?

10      A    No.  As far as I know, no.

11      Q    How were those wisps of smoke that were coming

12   out of the head house on August the -- August the

13   11th, how were they getting out through the ceiling

14   of the dome that was done as part of the fumigation?

15      A    They were getting out through the gap that

16   would have remained after the IFC employees

17   reinstalled the hatch that they used, because it's my

18   understanding that previously those hatches would

19   have had like a caulk or a seal when Severn placed

20   them down, but when they removed them for -- to apply

21   the -- to apply the Fumitoxin, they put it back down

22   and just bolted it back down.  That's my

23   understanding.

24      Q    Your understanding -- there was no

25   polyethylene that was placed over those hatches?

Deposition of Lester Rich

1    A    Over that hatch, yes.  Yes.

2    Q    That is your understanding?

3    A    Yes, sir.

4    Q    And that's where you think the smoke was

5  coming from?

6    A    That's correct.

7    Q    Okay.  On August 17th, it says, insert

8  3-point thermocouple array.  Tell me specifically who

9  did that and what was done.

10    A    I did that.  And I put it in to see if I could

11  get any temperature readings from what -- as it --

12  there was a discussion about how far it was from the

13  dome to the peanuts, and there wasn't a real good

14  estimation of that at that time, so I created this

15  array.  I believe this was 45 feet.  So I actually

16  got the array down on the pile of peanuts, and it was

17  simply an effort by me to see if I could characterize

18  what was going on inside the dome through some

19  temperature measurements.

20    Q    First of all, did you determine with that

21  3-point array what the distance was from the ceiling

22  of the dome to the surface of the pile?

23    A    No, not with that.  No, sir.

24    Q    And in fact, the application of 161,000 pounds

25  of dry ice would have affected that number, too,

1   wouldn't it have?

2       A   Oh, it would have affected the distance.

3       Q   Yes.

4       A   Yes, sir.  Probably so.

5       Q   Okay.  Were you successful in getting

6   temperature readings from that 3-point thermocouple

7   array?

8       A   Yes.

9       Q   Were they meaningful temperature readings, as

10  far as you understood them?

11      A   At that point, it's just -- it's data.  I

12  mean, it might -- nothing said this has meaning right

13  this second, but it's being collected, and it may

14  have meaning later on.

15      Q   Did the data collected from that 3-point

16  thermocouple array assist you in any way in

17  determining the origin and cause of the fire?

18      A   I would say that I considered that data.  I

19  don't know that that data is a key factor in the

20  determination.  But it's certainly data, as the other

21  temperature data that came out of there that I would

22  have considered, yes.

23      Q   Let me ask it this way.  Did you learn

24  anything from the data produced by the 3-point

25  thermocouple array installed on August 17th, 2009

Deposition of Lester Rich

1    that was materially different from other information

2    that you had available to you?

3        A    No.

4        Q    Okay.  Go forward, if you would, to page 87.

5    And I will tell you that there are several --

6        A    Eighty --

7        Q    87.

8        A    87.

9        Q    There are several of these charts interspersed

10   throughout Exhibit 193.  First of all, I want to find

11   out what this is a chart of.  Is this from the

12   temperatures being recorded by that array we just

13   discussed?

14       A    These -- let's see.  This is six.  No, this

15   would -- these temperatures are being recorded by a

16   second six-channel array that was -- that I placed in

17   through a PVC pipe port on the side -- off to the

18   side of the dome.

19       Q    So this was not toward the center of the dome.

20   This was off to the side?

21       A    Yes, sir.

22       Q    How did you get the pipe in through the side

23   of the dome?

24       A    No.  The pipe was there.

25       Q    Okay.

1      A    In other words, in the -- in the top of this

2  top house, in each of the corners, almost as far in

3  the corner as you could get with the metal building,

4  confines of the metal building -- and it probably was

5  for originally electrical chase or something.

6          But there were preexisting 4-inch PVC

7  pass-throughs that were capped on top so you could

8  lift the cap off and put the array down.

9      Q    And you did that in one location with six

10 different arrays or in six different locations?

11     A    No, sir.  In one location with six points.

12     Q    Okay.  And let me ask you the same question

13 that I just asked you about the array that you

14 placed -- the 3-point array that you placed in.  Did

15 you learn anything from this six-channel temperature

16 device that was materially different than all of the

17 other information that you obtained in the case?

18     A    I would -- it's not materially different, but

19 I did learn that there were temperatures higher than

20 were being recorded by the Severn system.

21     Q    Okay.  And let's talk about that for a moment.

22 The Severn system, as you know, the one designed

23 Safe-Grain, could not record temperatures any higher

24 than 230 degrees.  You knew that, correct?

25     A    That's my understanding, yes.

Deposition of Lester Rich

1    Q    So you knew that to the extent there were

2   hotter temperatures in there, that system wasn't

3   going to tell you about it, right?

4    A    Right, or it would max out.  I mean, right.

5   There could be hotter temperatures in there.  It's

6   just -- it's maxed out.

7    Q    Correct.  So for instance, looking at page 87,

8   you know that there were temperatures that got as

9   high as about 300 degrees based upon the array that

10  you placed in through the PVC pipe?

11   A    You're looking at like channel number 4?

12   Q    Yes.

13   A    Yes, sir.

14   Q    Okay.  But because there was a fire going on

15  inside of that dome, you already knew that there were

16  temperatures hotter than 230 degrees inside of the

17  dome, correct?

18   A    I expected that, yes.

19   Q    It couldn't be true that there was a fire and

20  there weren't temperatures hotter than 230 degrees,

21  correct?

22   A    That is correct.

23   Q    All right.  Go forward to page 89.  Can you

24  tell me what that is.  It goes on to page 90.

25   A    Yes, sir.  These are -- this is temperature

1    data that was recorded -- excuse me -- by either Mark

2    Beavers -- and P Rowe is Pat Rowe, which is an

3    employee of Severn.  And it's the two arrays -- well,

4    actually, the third -- the first one we talked about,

5    the three --

6        Q    Yes.

7        A    -- was pulled out or discontinued once these

8    two were put in.  And they were put in, I believe --

9    they were put in at two different times, but it may

10   have been like early on the day and late on the day.

11            And so the first one -- the head space, as

12   it's called here, those are simply temperature

13   readings from those -- from that thermocouple array.

14            And the -- down into well pipe, at some

15   point -- and I think it's in here on the timeline,

16   but at some point -- I believe it was around the

17   17th, in the evening of the 17th -- in an effort

18   to better assess what's going on inside the dome,

19   Williams drove a well point, I guess would be the

20   best way to describe that, basically a black iron

21   pipe with a point on it.  And it was something that

22   they used for suppression of their fires and -- it

23   was some piece of equipment that they use for other

24   types of fires.

25            But anyway, they drove it down into the pile,

1   and then we placed an array inside the pipe basically

2   hanging to see if we could get lower in the pile.

3       Q    And how low did these particular thermocouples

4   get in the pile that we're looking at on pages 89 and

5   90?

6       A    The -- we're talking about down the well pipe,

7   that side?

8       Q    Yes.

9       A    Because the others were surface, obviously.

10          These -- I believe -- I'll have to do the math

11  here.  I believe that Williams drove 40 feet of pipe,

12  because they were carrying up in sections, and I

13  think they drove 40 feet.  So if you back out the 20

14  of void space, I'm guessing that you're probably

15  about 20 feet into the pile because that 40 at the

16  top was the total length of the thermocouple.

17      Q    Gotcha.

18      A    And so if it went down the pipe -- and of

19  course there's, you know, a little bit out of the top

20  to hook to the recording data or whatever, but -- I'm

21  not 100 percent sure, but I believe Williams drove

22  four sections of pipe.

23      Q    Okay.  Let me ask you this question.  What do

24  temperatures that were taken from August 18th to

25  August 27th tell us about a fire that began over a

1    week before then?

2         A    Well, in this case, they would suggest to me,

3    looking at the data, that the fire is continuing to

4    burn.

5         Q    Of course you know that by the smoke that

6    continues to come out, correct?

7         A    Right.  Well, yeah.  After it's sealed.  I

8    mean, no smoke came out then, but --

9         Q    I asked that in a bad way.  Let me ask it this

10   way.  What do temperatures of the sort that we see in

11   Exhibit 80 -- we see in Exhibit 193 on pages 89 and

12   90 -- what do those temperatures tell us about the

13   origin and cause of a fire that started over a week

14   before?

15        A    They probably are not that helpful to the

16   origin and cause because at this point, as you said,

17   if the fire's been burning a week, I would expect the

18   conditions to be -- the thermal balance to be

19   occurring within the dome where we're starting to

20   get -- now there's enough time elapsed that it's --

21   the conditions in the dome are starting to -- I want

22   to say homogenize, but I don't think -- that's not

23   exactly the right word, but they're equalized through

24   the dome.  The temperatures would start to spread

25   out.  In other words, the pile has been being heated,

1    the top is being heated, the concrete is being

2    heated.  An equilibrium, I guess is the word actually

3    I was trying to look for.

4        Q    Equilibrate?

5        A    Yes.  We're trying to get there.

6        Q    Okay.  Go, if you would, to page 104, and 104

7    and 105 as a pair.  104 is a -- some photographs.

8    105 is some photographs.

9        A    Yes, sir.

10       Q    Those photographs were taken on August 27th,

11   2009 when peanuts were off-loaded from some of the

12   chutes, correct?

13       A    Is that -- that's an 8.  Yes, sir.  I was

14   trying to read the date on the bag.  Yes, sir, that's

15   correct.  It was August 27th.

16       Q    And did you take these photographs or did

17   somebody else take them?

18       A    I took these photographs.

19       Q    All right.  So you were right there when the

20   peanuts were coming out of the chutes, correct?

21       A    That is correct.

22       Q    What did you detect to be the condition of the

23   peanuts that were coming out of the chutes?

24       A    The only thing I detected was just a -- an

25   odor.  I would say a rancid odor.  I really can't --

1    it doesn't smell like anything.  It just smelled bad.

2    And then just -- as the photo shows, I mean,

3    obviously I saw that some of the nuts were

4    discolored.  Some of them were -- you know, as you

5    can see in the photo, some of them were brown and

6    that sort of discoloration.

7         But really my only observation there would

8    have just been the smell.

9    Q    Were they wet or dry to the touch?  Do you

10   remember?

11   A    Yes, sir, they were dry to the touch.

12   Q    You didn't detect any wet peanuts that came

13   out of the chutes?

14   A    No, not to my -- no, sir.

15   Q    And you know that Williams Fire had actually

16   begun to spray water on the top of the pile the day

17   before, right?

18   A    On the --

19   Q    26th.

20   A    Twenty -- yes, sir.  That's -- yes, that's

21   correct.

22   Q    And as someone who is both a fire investigator

23   and a firefighter, would you be able to conclude from

24   what you saw in these peanuts that that water did

25   not, in fact, penetrate the peanuts that were coming

1    out of the chutes?

2       A    I would agree with that, yes.

3       Q    Okay.  And you would also agree, would you

4    not, that the peanuts that came out of the chutes

5    were peanuts that before coming out of the chutes had

6    been directly above where those chutes were?

7       A    I think so.  I don't -- I mean, the chute goes

8    into the wall, and there's peanuts above.  So yeah,

9    they would -- yeah, they came from up there

10   somewhere, but I don't know exactly where.  In other

11   words, I couldn't -- I can't -- I couldn't estimate a

12   distance in the pile or were they peanuts off the

13   very top or were they down a little bit lower.  If

14   that's what you meant.  I'm sorry.

15      Q    I'm trying to talk laterally.

16      A    Okay.

17      Q    The peanuts that were coming out of the chutes

18   were laterally positioned somewhere next to the walls

19   of the dome, correct?

20      A    They were, but I believe -- it's my

21   understanding that these chutes protruded into the

22   dome by a certain amount.  Maybe not a lot.  Maybe a

23   foot, 14 inches.  So they -- I don't think the

24   peanuts are actually sliding down the wall and out

25   the chute.  I think the chute is into the mass, and

1  then those are coming down, you know, just filtering

2  through.

3      Q    So maybe a foot to a foot and a half into the

4  lateral interior of the dome?

5      A    Yes, sir.

6      Q    Those -- the peanuts that we're looking at on

7  pages 104 and 105 were not coming from anywhere near

8  the center of the dome, correct?

9      A    No, sir, I don't believe they were.  No.

10     Q    Nor were the peanuts that were pulled out on

11  August 27th have been coming from the very top of

12  the peanut pile.  Would you agree with that?

13     A    Yes.

14     Q    Okay.  All right.  Go ahead to page 106.  And

15  there's a reference to flaming combustion visible

16  from inside dome.  I hope you mean from inside of the

17  head house.  Correct?

18     A    Oh, visible from inside of the head house, but

19  the fire is inside the dome.

20     Q    Correct.

21     A    Yes.

22     Q    Nobody was actually inside of the dome taking

23  a picture?

24     A    That's correct, sir.

25     Q    But you were, as I understand it, inside of

1    the head house on August 27th, 2009 at 5:45 p.m.

2    using a thermal imaging camera, correct?

3        A    Yes, sir.

4        Q    All right.  And if you would go to page 108 --

5        A    Okay.

6        Q    -- is that your right hand wearing a gray

7    glove holding a yellow device?

8        A    That is not my right hand.

9        Q    Is that somebody else's right hand --

10       A    Yes.

11       Q    -- holding a yellow device?

12       A    Yes, sir.  I'm making the photograph.  And as

13   I discovered, I could not hold the device and make a

14   photograph at the same time.  So that is Troy Johnson

15   who's holding the device so that I can attempt to

16   make a photograph of the screen.

17       Q    And that's looking through the conveyor hatch;

18   is that correct?

19       A    No, sir.  That's looking through the hatch

20   which would be adjacent to the hatch that IFC removed

21   to place the Fumitoxin through.

22       Q    So what we're looking at is neither the hatch

23   through which the peanuts were loaded into the dome

24   nor the hatch through which the Fumitoxin was placed

25   into the dome?

1    A    That's my recollection, that this is to -- and

2    the reason I think that is because you'll notice how

3    this photograph, the -- the hatch is going long ways,

4    in other words, kind of a north to south orientation.

5    And in photo -- the photo beside it, the two

6    hatches -- you see the expanded mesh metal on the

7    floor.  The two hatches were long ways on either side

8    of that conveyor assembly, and there was a hatch

9    across the front of that.  So it was three that

10   were -- basically their corners were touching kind of

11   in that configuration.  I'm sorry.

12   Q    What is the device that's yellow?

13   A    It's a thermal imaging camera.

14   Q    Is it something you purchased within the days

15   preceding August 27th, 2009?

16   A    It actually was something that I rented in the

17   preceding days.

18   Q    Okay.  It only shows images in black and

19   white; is that correct?

20   A    Yes, sir.

21   Q    Go forward to the next page.  Do you have any

22   idea what we're looking at on page 109?

23   A    Yes, sir, I believe I do.

24   Q    Okay.  Tell me what you think we're looking

25   at.

1      A    The camera is -- the thermal imager is looking

2    through the same hatch that you just previously saw.

3    These are just close-ups of that photo.  There's

4    distortion on the sides.  The white area in the

5    center kind of near where that cross area is is

6    combustion.  It's a hotter area.  The -- I'm not

7    100 percent sure, but the item hanging or the black

8    line --

9      Q    Uh-huh.

10     A    -- with the thing at the bottom, I believe

11   that is what's remaining of the sampling that the --

12   IFC put in, because their tube went down.

13     Q    The Draeger tube?

14     A    The Draeger tube, right.

15          And I don't know for certain -- I think they

16   did weight it, but I don't know how they did that or

17   if there was some -- at any rate, that could be it.

18   It's something hanging there, and the view is sort of

19   back slightly towards the center of the dome, kind of

20   as you can see just the angle of the camera is

21   slightly back towards the center.  That's what I

22   think that is.

23     Q    So do you think that these photographs are of

24   the peak of the peanut pile or somewhere else?

25     A    I would think they're close to the peak.

1    Well, it's not really a peak because we understand --

2    I understand that it's been flattened off because the

3    peanuts will settle after they've been stored.  But

4    yes, it's more towards -- I think this is more

5    towards the center -- more towards the center of the

6    dome.

7        Q    Where 161,000 pounds of dry ice were dumped?

8        A    It's going to be pretty close, yes.

9        Q    Okay.  Tell me, if you could, what the

10   photographs that we see on page 109 and 110 told you

11   about the origin and cause of the Severn peanut dome

12   fire.

13       A    Well, it indicates to me that there's -- you

14   know, that there's active fire -- in other words,

15   first off, when you look at this visually, you

16   couldn't -- there was no indication that there was

17   anything happening under the layer -- in other words,

18   the $CO_2$ layer was still there.  So when you looked

19   through it with a thermal imager, you see this

20   defined circle of heat, and it's -- to me, it's

21   another -- it's a data point in that, well, that's

22   odd.  I have -- and it's a defined ring at this point

23   as you move it around.  I mean, you can see almost

24   three-quarters of it in this photo.  And it's a

25   differentiation.  It's a hotter area.

1        And then the next phase of this was someone

2   down on the ground turned on one of the fans because

3   the idea was to try to move some of the carbon

4   dioxide out to view what this is.  But I'm trying to

5   get an early look with the thermal imager through the

6   cloud.  Literally just seconds after that fan was

7   initiated and we saw the vapor cloud start to move,

8   the vapor cloud turned red underneath.  It lit up,

9   basically.  This still looked like it did through the

10  thermal imager except now there's a red glow under

11  what's left -- you know, the CO2 layer.

12        So at that point, Williams said, shut

13  everything down.  Shut the fan down.  I left the head

14  house at that point.

15        And so that to me says two things.  One, I'm

16  seeing here that there's a hot spot or a ring of fire

17  basically there, and then as soon as the air started

18  moving, what probably is glowing combustion in this

19  photo is now flaming combustion once you start to

20  disturb that air -- fuel/air mixture that's

21  already -- you know, it's established.  It's got the

22  CO2 in there.  That layer is already there.

23   Q   I'm trying to draw you back to the time period

24  of August 4th to August 11th, 2009.  What do

25  these thermal images have to do with what happened in

1    that time period?

2        A    I'm not sure I understand.  I mean, they

3    depict -- it's a visual depiction of at least a

4    portion of the fire that's burning inside the dome.

5        Q    Correct.  But in terms of determining the

6    origin and cause of that fire, you have to understand

7    what was happening between August 4th and

8    August 11th, correct?

9        A    Yes.

10       Q    What do these thermal images communicate to

11   you about what was happening between August 4th and

12   August the 11th?

13       A    Well, they don't communicate anything about

14   what was happening between the 4th and the 11th.

15   To me it's just another piece of information to plug

16   into the whole investigation.  And the information

17   that was happening between the 4th and the 11th is

18   important.  What's happening here -- and it's

19   simply -- and really it's simply showing that there's

20   a defined fire on the surface of the pile at this

21   point, and then -- and it's glowing combustion, not

22   flaming, until the air -- I'm sorry -- until the $CO_2$

23   level is disturbed and some fresh air is drawn in.

24            And then it immediately transfers to flaming

25   combustion, which is then when the water -- and

1    Williams took all those actions to try to quench

2    that.

3        Q    Mr. Rich, is it your testimony in this case

4    that you can make a correlation between what we're

5    looking at on pages 109 and 110 of Exhibit 192 --

6    193 and the application of Fumitoxin on August 4th,

7    2009?

8        A    You might be able to.

9        Q    I'm asking if you have.

10       A    What do you mean by a correlation?  I'm not

11   saying that that's a picture of a pile of Fumitoxin

12   burning.  I'm saying that there was Fumitoxin

13   applied, and in this particular photo, I do have a

14   fire -- a smoldering fire on the surface of the pile

15   that then transitions to flaming combustion.

16           That's all I'm saying, I guess.

17       Q    And that set of facts could have existed

18   independent of there having been a pesticide

19   application, correct?  Knowing that there was a fire

20   in the dome that had been burning for at least

21   16 days, that set of facts could have happened just

22   because there was a fire that had been burning for

23   16 days?

24       A    Oh, you're saying that what I'm seeing could

25   have been the fire burning for 16 days?

1    Q    Correct.  You disagree with that?

2    A    No.  No.  I agree with that.  I think that is

3    the fire that I'm seeing.

4    Q    But it doesn't necessarily have any

5    correlation to the application of Fumitoxin on

6    August 4th, correct?

7    A    It might.

8    Q    And it might not?

9    A    It might not.  But it might.

10   Q    You have no way of telling -- of saying which

11   is more likely, do you?

12   A    Well, if you look at the totality of the

13   circumstances, the investigation, I think it tends to

14   put you one way or the other.  But you're right.  I

15   agree with you.  This is simply a photo of a fire

16   burning on the surface of the pile.

17   Q    Okay.  Apart from the different things you did

18   at the fire scene related to your investigation to

19   determine the origin and cause of the fire, did you

20   do anything away from the fire scene to assist you in

21   determining origin and cause of the fire?

22   A    Yes.

23   Q    What?

24   A    Well, I reviewed other materials.  I looked at

25   the stuff that was collected at the fire scene.

1    There was some evidence collected that was sent to a

2    laboratory.  There was some that IFC sent to a

3    laboratory, the -- and that would be as far as the --

4    there's -- I guess once the scene was -- once I left

5    the scene, the rest of the results would have simply

6    been collecting the data, analyzing it, and

7    researching it and putting together the opinion.  I

8    don't know as far as the --

9        Q    I just want to know if you did any further --

10       A    Right.  Yeah, I would say --

11       Q    -- analysis.

12       A    -- that that would be -- right.  That stuff

13   would have happened after I left the fire.

14       Q    But you just described that stuff in terms of

15   what you did?

16       A    Yes.

17       Q    Okay.  When did you form a conclusion as to

18   what the origin and cause of this fire was?

19       A    I would say the day that I prepared the

20   report.

21       Q    You didn't in your own mind reach that

22   conclusion prior to the day you prepared the report?

23       A    Well, I had an idea, yes, but really until you

24   write it down and you create the report, that's --

25   that's your opinion.

1       Q    Your mind vacillated between the ultimate

2   opinion you expressed in that report and something

3   else until you actually wrote the report; is that

4   what you're saying?

5       A    No.  No.  I'm not saying that my mind

6   vacillated.  I'm saying that it's -- I think it's my

7   opinion once I create the report.

8       Q    Okay.  When in your mind did you conclude that

9   the application of Fumitoxin to the dome on

10  August 4th, 2009 is what caused this fire?  When

11  did you in your mind make that conclusion?

12      A    I don't know.  I mean, it would have been

13  prior to preparing the document, but I don't -- I

14  can't give you a date that I said it's Fumitoxin.

15      Q    Did you make that conclusion while you were at

16  the scene of the fire?

17      A    No.  I took that data in from the Fumitoxin --

18  I mean, that's data.  It was there, it was applied,

19  how much, photographs, the containers.  But I also

20  felt like I needed the other temperature information

21  and the other -- there's still data out there to

22  collect.  So I'm not going to make an opinion until I

23  have at least as much of the facts as I think I can

24  get.

25      Q    When did you acquire at least as much of the

1    facts that you needed to get to form an opinion in

2    your mind that the Fumitoxin is what caused the fire?

3        A   I don't know how to answer that.  I mean, it's

4    a -- it's a process.  And I would say sometime

5    shortly before this report was prepared.

6        Q   And so in 2013 is when you formed that opinion

7    in your mind?

8        A   I would say that's when it solidified in my

9    mind, yes, and then when I went to write it out, yes.

10       Q   So if somebody had asked you before 2013 what

11   caused this fire, you would have said, I don't know?

12       A   I may have said I think it's the Fumitoxin or

13   the Fumitoxin could be a potential fire cause.  But I

14   don't know that I would have said it's just the

15   Fumitoxin.

16       Q   Okay.  When should a fire investigator

17   conclude that the cause of a fire is undetermined?

18       A   Well, that's a classification out of 921, and

19   I'm paraphrasing what it says, but it basically is if

20   you can't determine what caused the fire -- I'm

21   sorry.  If you can't -- because the classification of

22   undetermined is -- that's a classification of a fire.

23   That's not necessarily the cause of a fire.  So you

24   have the classifications listed out in 921 of

25   natural, accidental, incendiary, or undetermined.  So

1   to classify the fire, it should fit in one of those

2   four categories.

3       Q   Okay.  Well, let me ask it this way.  Would

4   you agree with me that a fire investigator should

5   conclude that the cause of a fire is undetermined if

6   there are two completely different possible causes

7   neither of which can be scientifically eliminated as

8   a possibility?

9       A   Neither can be scientifically eliminated as a

10  possibility.

11      Q   In other words, if there are two competing

12  causes, neither of which could be eliminated, is it

13  undetermined?

14      A   Are you reading from 921?

15      Q   No.

16      A   Or -- well, I would prefer, if I can, to look

17  and see what 921 defines as undetermined and stick

18  with that definition.

19      Q   That's fine.  Do you have a copy available to

20  you?

21      A   I do, if we can do that.

22      Q   You can.

23      A   What you quoted sounds very similar, but I'd

24  just like to see what they say and make sure I say

25  the same thing.

1          MR. WIDIS:  Do you have the section?

2          MR. EPSTEIN:  No, I don't.

3          THE WITNESS:  I think it's -- it's a little

4     bit moved in this book.

5          MR. WIDIS:  19.2.1.4.

6     A    18.  That was 19.  That's where the sticky

7     note is.

8          Okay.  Now I think I remember what your

9     question was, and I would say no, I don't agree to

10    that -- to that question and would use this

11    definition of undetermined as opposed to yours.

12    Q    The one in 19.2.1.4?

13    A    Yes.

14    Q    Well, what do you as a fire investigator do if

15    you have two competing causes of a fire neither of

16    which you can eliminate?  How do you get beyond that?

17    A    Well, you might not be able to at that

18    particular point, but that doesn't mean that there

19    won't be additional information or other facts

20    discovered down the road.

21    Q    Well, have you ever --

22    A    So you could leave that fire as under

23    investigation or you could just not classify that

24    fire.

25    Q    Has that ever happened in the 1500-plus fires

1    that you've investigated over the years that you

2    concluded that there were two possible causes, and

3    with all the information available, could not decide

4    which was the one that actually was the cause?

5        A    I don't know if exactly the way you described

6    it has happened, but yes, I've had competing

7    hypotheses, competing fire causes, where I couldn't

8    determine one way or the other.

9        Q    That's my question.

10       A    Right.  Okay.  Then yes.

11       Q    In which case you would not express on

12   affirmative opinion as to the cause of the fire,

13   correct?

14       A    That's correct.  Yes.

15       Q    And if that happened in this case, you would

16   have had to have told Mr. Widis, I can't express an

17   opinion as to the cause of this fire because I've got

18   two competing causes, neither of which I can

19   eliminate?

20       A    That's correct.

21       Q    Okay.  And if a fire investigator expressed an

22   opinion as to cause when he could not eliminate other

23   possible causes, would you agree with me that that

24   opinion expressed would lack a scientific foundation?

25       A    Not necessarily.

1    Q   And why is that?

2    A   Because you said that if he expressed an

3  opinion --

4    Q   Without being able to eliminate other possible

5  causes.

6    A   Without being able to eliminate something

7  else.

8    Q   Let me put it this way.  I'll withdraw the

9  question.

10        If were two competing causes, A and B, neither

11  of which the fire investigate can eliminate and the

12  fire investigator testifies under oath that A is what

13  caused the fire --

14    A   Right.

15    Q   -- would you agree with me that that opinion

16  lacks scientific foundation?

17    A   Well, his opinion might have a scientific

18  foundation.  I mean, he might -- A might -- he might

19  be wrong, A or B, but that doesn't necessarily mean

20  that his opinion or the methodology of which he

21  arrove at that opinion -- arrived at that opinion

22  were necessarily incorrect.  I mean, he might have

23  still followed the methodology.

24    Q   Would you ever testify -- in that scenario

25  where you had A and B as competing causes, neither of

1   which you could eliminate, would you ever testify

2   that one versus the other was the cause of the fire?

3       A    If I didn't think I could eliminate one or the

4   other, no, I would not testify that way.

5       Q    In other words, a fire investigator who has a

6   hypothesis about the cause of a fire cannot reach the

7   opinion that turning the hypothesis -- cannot reach

8   an opinion turning that hypothesis into a cause

9   determination unless all other possible causes of the

10  fire can be eliminated, correct?

11          MR. WIDIS:  Object to form.

12      Q    Did you understand?

13      A    I think I understand.  I don't know that I

14  completely agree with that, because there may be --

15  there may be facts and circumstances surrounding a

16  fire that are possible but not likely or not probable

17  or not even beyond a reasonable doubt.  So to say

18  that an investigator has to -- I think you can still

19  make a fire determination -- a fire cause

20  determination if the evidence that you have and the

21  facts that you have are swayed one way or the other.

22          In other words, there's -- there may still be

23  a possible fire cause, but there's a very probable

24  fire cause or there's a -- let's say there's a

25  witnessed fire cause.

1           So I think that I sort of agree with what

2      you're saying but not completely.

3           Q    Okay.

4           A    If that's an answer.

5           Q    The fire investigator under NFPA 921 must test

6      his hypothesis before he can turn that hypothesis

7      into a cause determination, correct?

8           A    Yes.

9           Q    Failing to do so would cause the cause

10     determination to lack scientific foundation, correct?

11          A    Yes.

12          Q    And Mr. Rich, your cause determination in this

13     case would lack scientific foundation if you did not

14     adequately test your hypothesis that became your

15     cause determination, correct?

16          A    Yes.

17          Q    Would you agree with me -- and I'm

18     specifically now referring to 4.3.8, if you want to

19     read along with me.

20          A    And are you in --

21          Q    2008.

22          A    2-8.  And I'm sorry.  Give me that --

23          Q    4.3.8.

24          A    Okay.

25          Q    Would you agree with me that the fire

1    investigator should approach his task without

2    presumption as to cause until the use of the

3    scientific method has yielded a provable hypothesis?

4          I'm sorry.  That's 4.3.7.

5    A    I was going to say, I didn't see what you just

6    read.  Hold on.  Let me get there.  4.3.7?

7    Q    Yes.

8    A    Okay.  All right.

9    Q    The fire investigator should approach his task

10   without presumption as to cause until the use of the

11   scientific method has yielded a provable hypothesis,

12   correct?

13   A    Presumption -- yes, I would agree with that.

14   Q    In other words -- just put that in lay

15   language -- the fire investigator is supposed to

16   avoid presumptions, correct?

17   A    I would say keep an open mind, but yes.

18   Q    And the fire investigator is supposed to avoid

19   jumping to a conclusion, correct?

20   A    Yes.

21   Q    A fire investigator who jumps to a conclusion

22   is unlikely to gather all of the necessary

23   information to reach a scientifically provable cause

24   determination, correct?

25   A    That could happen.  I don't --

1      Q    It's more likely to happen?

2      A    I don't know.  If -- I mean, yeah, if you have

3   on blinders and ignore information, then maybe, yes.

4      Q    Okay.  And the fire investigator -- 4.3.8

5   now -- is supposed to avoid expectation bias,

6   correct?

7      A    Yes.

8      Q    Expectation bias occurs when an investigator

9   reaches a premature conclusion too early in the study

10  and without having examined or considered all of the

11  relevant data, correct?

12     A    Yes.  That's a paraphrase, but yeah, I think

13  that's generally what this is saying.

14     Q    And if an investigator reaches a premature

15  determination about the cause of the fire, that could

16  result in the investigative process being biased in a

17  direction that leads to a scientifically invalid

18  conclusion as to cause, correct?  That could happen?

19     A    That's too -- there's two questions there.

20  Can you split that up for me or -- I'm not -- or just

21  ask me again.  I'm sorry.

22     Q    If an investigator reaches a premature

23  determination about the cause of a fire, that may

24  result in the investigative process being biased in a

25  direction which leads to a scientifically invalid

1    conclusion.  Would you agree with that?

2        A    I would say yes.  I don't know scientifically

3    invalid conclusion -- it could lead to the wrong

4    conclusion.

5        Q    That's fine.

6        A    But -- which I guess would technically be

7    scientifically invalid.  So yes, I would agree with

8    that.

9        Q    In other words, a fire investigator should not

10   assume the conclusion and then go find the evidence

11   that supports it?

12       A    I would agree with that.

13       Q    And as it says here, the introduction of

14   expectation bias into the investigation results in

15   the use of only data that supports the previously

16   formed conclusion and often results in a

17   misinterpretation and/or the discarding of data that

18   does not support the original opinion.  That's what

19   it says in 4.3.8.

20       A    That's where you were?  4.3.8?

21       Q    Right.

22       A    Oh, right there.  The introduction of

23   expectation bias.

24       Q    I believe I read that word for word.

25       A    That's -- right.  Yeah, I wanted to make sure

1    I was in the right place.  Yes, that's correct.

2        Q    Do you have any disagreement at all with that

3    sentence from 4.3.8?

4        A    No.  I don't have any disagreement with that.

5        Q    And it's important to you as a fire

6    investigator who wants to come to scientifically

7    valid conclusions as to the cause of a fire not to

8    allow expectation bias to creep into your analysis,

9    correct?

10       A    That's correct.

11       Q    You would agree it's never proper to form a

12   conclusion as to cause and then fit your

13   consideration of the evidence around that conclusion,

14   correct?

15       A    Read that to me one more -- ask me one more

16   time.

17       Q    Would you agree it's never proper to form a

18   conclusion as to cause and then fit your

19   consideration of the evidence around that conclusion?

20       A    I would agree with that, yes.

21       Q    And in a case that results in litigation like

22   this one, you wouldn't want to reach a conclusion

23   about the cause of a fire without considering all of

24   the evidence developed through the litigation,

25   correct?

1    A    Well, as -- I would say as it pertains to the

2    fire.  I mean, there may be other factors in the

3    litigation that would have nothing to do with the

4    fire.  But I would say yes as it pertains to the

5    fire.

6    Q    In other words, litigation has the ability to

7    unearth information that potentially you hadn't

8    considered before because you didn't know about it,

9    right?

10   A    That's correct, yes.

11   Q    So you wouldn't want to develop your final

12   conclusion as to what caused the fire until you had

13   that additional information available to you,

14   correct?

15   A    Right.  Or had all the information that was

16   available to me, yes.

17   Q    And that includes deposition of fact witnesses

18   who had something to do with the fire, correct?

19   A    Deposition, yes, or statements from them.  You

20   know, if a witness provides a statement early on or

21   let's say they're interviewed at the time of the

22   fire.  It may not be as important to get their

23   deposition if you have an interview with them, you

24   know, earlier on.  I mean, it may be important.  It

25   may not be important.  You kind of have to see what's

1    there.

2        Q    There is a difference between an interview and

3    a deposition in terms of the witness being under oath

4    at their deposition, correct?

5        A    Yes, sir.

6        Q    And you would tend to pay more attention to a

7    deposition in terms of how a witness describes what

8    he or she did or saw than you would just their

9    statement; would you agree with that?

10       A    I would agree that -- sometimes it's

11   different, so I don't know if I agree with that.  I

12   mean, sometimes things in deposition are different

13   than what they were -- what you may have been told at

14   the time of the fire.

15           So yes, the deposition's under oath.  It has

16   to -- it has to take precedence, I guess would be the

17   way to say that.  So I believe I'm answering your

18   question yes, but both of those are still --

19   there's -- they're both still data points, and they

20   both should be looked at and considered.

21       Q    You would not want to reach a conclusion about

22   the cause of a fire before examining the under-oath

23   testimony of those who had personal involvement in

24   the events leading up to the fire, correct?

25       A    That would be important, yes.

1    Q   So I'm going to ask in a slightly different

2  way than I did before.  When did you reach your

3  conclusion that an improper application of aluminum

4  phosphide tablets was the cause of the fire in the

5  Severn peanut dome?

6    A   I still don't -- I mean, I would still answer

7  it the same way.  About the time that I prepared the

8  report.

9    Q   Mr. Rich, you reached your conclusion as to

10  the cause of this fire before discovery in this case

11  had even commenced; isn't that right?

12    A   I don't understand what you mean before

13  discovery in the case had commenced.

14    Q   Discovery in this case commenced pursuant to a

15  January 5th, 2012 scheduling order.  No discovery

16  was taken before that.  All right.

17    A   Okay.  Right.  Okay.

18    Q   You reached your conclusion as to the origin

19  and cause of the Severn peanut fire before then,

20  hadn't you?

21    A   I don't know that I had fully reached the

22  opinion, but I certainly had data that was suggesting

23  that could be a cause.

24    Q   Mr. Rich, you had reached that conclusion by

25  the time you testified under oath at your deposition

1    in the E.J. Cox v. Pestcon case; isn't that right?

2        A    I think I said that there was Fumitoxin

3    involved with that case, but I don't know if I said

4    that I had reached that conclusion.

5            (Exhibit No. 194 was marked for

6      identification.)

7        Q    I'm showing you what we're marking as

8    Exhibit 194.  If you would please go to page -- first

9    of all, can you confirm to me that this is the

10    transcript of your deposition that was taken in the

11    E.J. Cox versus Pestcon Systems case on July 13th,

12    2011?

13        A    Yes, sir.

14        Q    And you were testifying under oath that day

15    right here, correct?

16        A    Yes, sir.

17        Q    All right.  Go to page 226.  On that day, you

18    were testifying as an expert witness for Mr. Widis's

19    firm, correct?

20        A    Yes, sir.

21        Q    And you were being questioned by the attorneys

22    for the pesticide application company, Pestcon,

23    correct?

24        A    Yes.

25        Q    And you were asked on page 226, line 17, have

1    you ever investigated a fire where Fumitoxin was

2    applied contrary to the label that caused a fire?

3         And you answered what?

4    A    Yes.

5    Q    And then the question was, did not cause a

6    fire?

7         And you answered what?

8    A    Yes, that did cause a fire.

9    Q    And you were asked, when was that?

10        And you said?

11   A    That was at Severn.

12   Q    And you were asked, how was that applied

13   contrary to label?

14        And you said?

15   A    The application was allowed to pile.  The

16   tablets were allowed to come in close proximity to

17   each other.  In that case, a very large pile of

18   tablets reacted, and the heat from the reaction was

19   forced into the peanuts.  It raised into their

20   ignition temperatures.

21   Q    Right.  Mr. Rich, when did you form your

22   opinion that -- we know it was as of July 13th,

23   2011, correct?

24   A    Right.  That's -- that's correct, but that

25   doesn't mean that this wouldn't change if additional

1    information was provided.  Because that's what I'm

2    saying.  This is a -- that is -- that's what I

3    thought then, and if additional information is given

4    to me, then that would come into play here.

5        Q   You had latched onto one hypothesis to the

6    exclusion of all others as to the cause of the Severn

7    peanut fire as of July 13, 2011, correct?

8        A   I wouldn't say that I had latched onto it, but

9    that's -- yes, that's what I said.

10       Q   You, in fact, described exactly how the fire

11   occurred.  The tablets were allowed to come in very

12   close proximity to each other.  A very large pile of

13   tablets reacted, and heat from the reaction was

14   forced into the peanuts and raised into their

15   ignition temperature.  Correct?

16       A   Yes.  That's what I said.

17       Q   And clearly you had formed that opinion even

18   before July 13, 2011, correct?

19       A   I don't know if I would say that.  I mean,

20   this is -- that was a -- that -- this is in answer to

21   those questions.  So yeah, I would have had some

22   idea, but I don't know that I -- yeah.  I would say I

23   do -- I did have -- the opinion that I said here is

24   what I had on this date.

25       Q   It's not an opinion you formed in the months

1    preceding writing your report in April of 2013, is

2    it?

3        A    This is not, no.

4        Q    You didn't need any of the materials or

5    evidence developed through the discovery in this case

6    to scientifically determine the origin and cause of

7    the fire in the Severn peanut dome, did you?

8        A    I don't know if I -- well, I don't know that

9    they would -- I would -- no, I would say no.

10       Q    You didn't need the materials from the

11   evidence coming from discovery in this case to

12   develop an opinion that you had expressed nearly two

13   years before you rendered your expert opinion?

14       A    No.  That's correct.

15       Q    So whatever anybody testified to in their

16   depositions in this case wasn't going to change your

17   opinion as to what caused the fire, correct?

18       A    Not necessarily.  That's my point, is when I

19   was talking about this fire in this deposition, if

20   there's additional information -- if there's

21   additional information presented today, that is going

22   to have some effect on the opinion.

23       Q    You don't think you reached a premature

24   conclusion as of July 2011 as to the cause of the

25   Severn peanut dome fire?

1      A    No, sir.

2      Q    You don't believe you let expectation bias

3   play a role in your determination of the cause of the

4   Severn peanut fire?

5      A    No.

6      Q    You don't believe that you misinterpreted

7   and/or discarded data that did not support your

8   conclusion; is that correct?

9      A    Absolutely.

10     Q    As of July 13th, 2011, you had also come to

11  the conclusion regarding the size of the piles of

12  tablets IFC applicators created during their

13  application at the Severn peanut dome; isn't that

14  right?

15     A    What page was that again?  Are we talking

16  about the same place?

17     Q    Well, let me ask --

18     A    I don't -- I don't think so.

19     Q    You don't think so.  Go to page 247.

20     A    Okay.

21     Q    Page 247, line 9, you say, if you look in your

22  manual, it talks about when you place tablets -- I

23  think that's supposed to say tablets and not

24  tables -- on a piece of paper in a commodity

25  warehouse, don't clump those tablets together.  Don't

1    put more than 50 tablets in any one piece of paper,

2    one pile, one hole, one probe insertion because of

3    what we're talking about.

4           You were asked, have you seen any documents

5    discussing the -- establishing that there has been a

6    fire as a result of putting too many tablets in one

7    spot?

8           You answer, have I seen any documents to that

9    effect?

10          And then you were asked, anything discussing

11   that that is a possibility of a theoretical or a

12   study in case where that had occurred.

13          What did you say in response to that,

14   Mr. Rich?

15      A    The -- my Severn case is more than 250 peanuts

16   in a pile.

17      Q    And by that, you meant more than 250 tablets

18   in a pile, correct?

19      A    Well, possibly, but it also is more than

20   250 peanuts.

21      Q    You were being asked about piles of tablets at

22   that time?

23      A    Right.  I think that's what they're talking

24   about, and I think that's accurate because in this

25   particular case the 250 is the number of tablets that

1   were involved, not -- I mean, obviously, there were

2   more peanuts than that involved.

3       Q   So Mr. Rich, correct me if I'm wrong, but as

4   of July 13, 2011, in your mind, you had concluded

5   that the IFC applicators at Severn had left piles in

6   excess of 250 Fumitoxin tablets?

7       A   I don't know if I would say it that way.  I

8   think what I'm trying to -- or what I meant here and

9   what I'm saying is there's more than 250 tablets used

10  in the Severn fumigation.

11      Q   In a pile?  Isn't that what you said?

12      A   Yes, that's what I said.  In the pile.  So it

13  could -- yes, it could be, but also, it's more --

14  there are more tablets used in Severn than the issue

15  that we're discussing here.  That's why I said more

16  than 250 in a pile.

17      Q   You concluded that then when Randy Turner and

18  Brian Lilley applied Fumitoxin tablets through the

19  hatch in the head house on August 4th, 2009, that

20  they left piles of clumped-together Fumitoxin tablets

21  that were in excess of 250 tablets, correct?

22      A   Yes.  And it could have been more.  Could have

23  been less.  He didn't ask me that.  But yes.

24          THE VIDEOGRAPHER:  Counsel, we need to go off

25      the record, change tapes.

1       This is the end of tape number 2.  Time now

2    is 11:46 a.m.  We're off the record.

3       (A recess was taken.)

4       THE VIDEOGRAPHER:  We're going back on the

5    record.  This is the beginning of tape number 3.

6    Time now is 11:58 a.m.

7    Q   Mr. Rich, how could you have reached the

8    conclusion that there were piles containing more than

9    250 Fumitoxin tablets on the surface of the peanut

10   pile at the Severn dome as of July 2011?

11   A   Well, based on the amount of tablets that were

12   applied and the configuration of the surface of the

13   peanut pile, that's my -- at that point, that was my

14   working hypothesis on the cause and the number.  And

15   pretty much I said more than 250 because that was the

16   issue in that case.  I don't know -- that's not

17   necessarily -- that number was related to that case

18   more so than this case, if that makes sense.

19   Q   But the simple geometry of the peanut pile

20   coupled with the 49,000 tablets by itself led you to

21   the conclusion that there would have been piles on

22   the surface of 250 tablets?

23   A   I would say the configuration of the amount,

24   the surface, the configuration of the dome would lead

25   me to believe that there would have been piles, yes.

1    Q   Okay.  Mr. Rich, identify each and every test

2   that you conducted related in any way to your

3   conclusions and opinions in this case.

4      MR. WIDIS:  Object to form.

5    Q   And by test, I mean physical tests, not

6   analytical tests.

7    A   And by physical tests, you mean like an

8   experiment or --

9    Q   Using a substance or process, using something

10   physical.

11    A   I do not have any.

12    Q   Another way of asking that, you reached your

13   opinions in this case without performing a single

14   physical test regarding the origin and cause of this

15   fire, correct?

16    A   Yes, without performing a physical test.

17   That's not to say there was no testing that took

18   place.  But yes.

19    Q   If you would -- and you may just decide to

20   quote from your deposition in the E.J. Cox case, but

21   I would like you to describe for me the precise

22   sequence of events that in your opinion led to

23   ignition in the Severn peanut dome.

24    A   The -- okay.  Ask me that one more time.

25    Q   Could you share with me in your opinion the

1    precise sequence of events that led to ignition in

2    the Severn peanut dome.

3        A    Yes.  The sequence of events would be -- see

4    if I -- I'm trying to figure out how to answer that

5    in the order of -- with the report -- in other words,

6    the sequence of the first field ignited, the ignition

7    source, and -- is that the sequence you're talking

8    about, the ignition sequence?

9        Q    The ignition sequence being the application of

10   the tablets, how they were applied, what happened

11   then, what continued to happen from a chemical

12   standpoint, from a fire science standpoint, until the

13   moment of ignition.

14       A    Okay.  That the Fumitoxin was applied through

15   a single opening on the top of the dome by the two

16   IFC employees and that they did that by shaking the

17   cans.  And that 49,000 tablets were placed through

18   that single opening onto the top of the peanut pile.

19   There's some discrepancy as to how high that was,

20   from 20 to 25 feet, based on the -- the actual level

21   where the peanuts were below the hatch that they

22   used.

23           That the -- the peanut pile itself, the

24   geometry and configuration is the peanuts -- because

25   they're loaded in the center, even though that

1    flattens out, they slope away, that they are shaking

2    and moving the tablets.  There's -- they're going to

3    spread out and cover the top of the -- of the pile.

4    And that they're going to roll or slide and collect

5    because there's also various geometries at the top of

6    the pile.  There's valleys as the peanuts slide and

7    roll, and then there's also a -- kind of a trough

8    that's created because as the peanut slope comes down

9    and the dome curves up, that creates a channel or

10   interface where the peanuts and the walls meet.

11        And that the method of application resulted in

12   the collection and the congregation, the piling, the

13   touching of the tablets, and the tablets then -- the

14   reaction began, and the piles and the touching of the

15   tablets via the phosphene -- I'm sorry -- the

16   phosphene gas production began, and that the

17   localized areas around those piles reached the lower

18   flammability level of the phosphene, and there was an

19   ignition and that that ignition ignited -- the first

20   fuel ignited, which would be the farmers stock

21   peanuts, the husk, the broken -- broken husks, pieces

22   of vine, that material that's in there.

23        And then that developed as a smoldering

24   slow -- excuse me -- slow-growth fire, and the fire

25   development continued until it was discovered.

1      Q    Okay.  I want to take this day by day.  How

2   much of that process had occurred as of midnight on

3   August 4th, 2009?

4      A    I'm sorry.  How much of what -- my process

5   or --

6      Q    Of the sequence that you just described, how

7   much of that had occurred by August 4th, 2009, in

8   your opinion?

9      A    Oh, the Fumitoxin was applied on August 4th.

10  So that would -- that part would have occurred.

11     Q    Any other part of your sequence of events that

12  occurred on August 4th, 2009 before we get to

13  August 5th, 2009?

14     A    Well, they sealed the dome back up after their

15  application on the 4th, and I believe that's all.

16     Q    Did the reaction commence on the 4th?

17     A    Yes, the reaction would have started

18  essentially when the tablets left the -- left the

19  flask.

20     Q    Would -- first of all, how many localized --

21  you said there was localized -- let's see if I can

22  quote exactly what you said.  Localized areas reached

23  lower flammable -- lower flammability limit of

24  phosphene.  How many of those localized areas do you

25  think there were?

1        A    I don't know.

2        Q    More than one?

3        A    Possibly.

4        Q    More than ten?

5        A    I don't know.  It's 49,000 tablets, and it's

6    an irregular geometry of the slope, so it could have

7    been, yes.

8        Q    Okay.  In your opinion, as of midnight on

9    August 4th, 2009, had that lower flammability been

10   reached in any of those localized areas?

11       A    I don't know.

12       Q    Do you think it's more likely it happened

13   later or more likely it happened on August 4th,

14   2009?

15       A    I would say it's more likely it happened later

16   because the reaction profile of the Fumitoxin tablets

17   are -- it's sort of a bell curve.  They start off

18   slow, they maximum the reaction, and then it begins

19   to die down.  So I would say it would be later than

20   that.

21       Q    So the concentration in those localized areas

22   would have been less, in your opinion, than the lower

23   flammability limit of 18,000 parts per million as of

24   midnight on August 4th, correct?

25       A    I don't know that because I don't know how

1    rapidly the uptake of that reaction is.  I mean, it's

2    dependent on all the variables, including the piling,

3    the moisture, the size of the tablets, if the tablets

4    are broken, if they're not broken, any of those

5    factors.  So other than to say the literature

6    suggests a three- to five-day reaction time -- the

7    applicator's manual -- that's what I have to go with.

8    I can't give you a specific hour-by-hour Fumitoxin

9    release of a pile.

10        Q    Okay.  Isn't 90 percent of the reaction

11   completed in the first 20 hours?

12        A    I don't know if that's correct or not.  I

13   think it could be, depending on the temperature and

14   humidity of the -- of the conditions.

15        Q    Well, let's talk --

16        A    I know there's -- there's different -- there's

17   a couple of papers where they reacted at different

18   times and recorded those times, and there's some

19   variables.

20        Q    What was the temperature at the time of the

21   application on August 4th, 2009?

22        A    What temperature where?

23        Q    The ambient temperature.

24        A    I believe it was recorded at about 90 degrees.

25   It's on the fumigators -- it's on the fumigation

1    report.

2       Q    Any reason to believe that the air -- ambient

3    air would not have been humid on August 4th, 2009?

4       A    Then it probably was.

5       Q    Okay.  So in terms of the reaction time, would

6    those conditions suggest a quicker reaction than the

7    three to five days or a slower reaction than three to

8    five days?

9       A    On the sliding scale, I would -- to me, it

10   would suggest a quicker reaction, more towards the

11   three than the five.

12      Q    Okay.  What happened on August 5th, 2009

13   inside the dome, in your opinion?

14      A    The reaction probably was reaching its peak

15   because it was -- I believe it was a 1 o'clock-ish in

16   the afternoon fumigation time.  So 24 hours -- 20,

17   24 hours would be the next morning, was probably when

18   the reaction was reaching it peak.  But that's an

19   estimation because we really don't know the exact

20   progress of the reaction.

21      Q    That, in your opinion, would mean that if it

22   reached its peak, that that's when the lower

23   flammable limit would have been reached in those

24   localized areas that you described earlier?

25      A    Most likely, yes.

Deposition of Lester Rich

1    Q    Does that mean ignition would have occurred at

2    the same time or not?

3    A    The -- yes, the ignition would have occurred

4    contemporaneous with the reaching of the maximum

5    evolution of phosphene gas.

6    Q    Okay.  And what temperature would have been

7    reached in those localized areas?

8    A    I can't say exactly.

9    Q    For there to be ignition, what kind of

10   temperature would you need?

11   A    Ignition of the phosphene gas?

12   Q    Ignition of the farmers stock peanuts.

13   A    Oh.  I would say, you know, excess of 400,

14   450 degrees.  There's some literature that talks

15   about commodity storage at 3- to 500 C as the

16   ignition temperature.  Again, it's a range.  3- -- 3-

17   to 500 C, 450, somewhere in there.

18   Q    Mr. Rich, what is your basis for saying that

19   those localized pockets or areas attained the lower

20   flammability limit of phosphene gas?

21   A    The basis of the opinion that the -- that the

22   piles reached the LEL?

23   Q    Yes, sir.

24   A    The basis of that opinion is the research and

25   the literature that suggests the evolution or talks

1    about the evolution of the phosphene and the rate of

2    reaction and the precautionary or the direction not

3    to allow the tablets to stack or pile or even touch

4    in certain situations because that increases the

5    reaction rate.  So we're dealing with a product that

6    once it begins to come together, the reaction rate

7    increases and spirals out of control.

8        Q    Okay.  So the applicator's manual is one of

9    the sources that you would say is a basis for your

10   opinion that the LEL will be reached from a piling of

11   the tablets; is that correct?

12       A    It's -- yeah -- one of the sources, I would

13   say, yes.

14       Q    Name every other source.

15       A    Let me look through here.

16            I would say this -- as far as sources of the

17   LEL being reached, my item 47, the evaluation and

18   priority illness investigation following a phosphene

19   fire at a Kern County commodity processing facility

20   would be a reference.  The evolution of phosphene

21   from aluminum phosphide formulations at various

22   temperatures and humidities.  I think that's the

23   document I was referring to earlier.

24       Q    That's 47, 48.

25       A    48.  52, the --

1     Q    That's Schumacher's article?

2     A    Report by Schumacher and Jason, correct.

3          53, I believe, talks about the LEL.

4     Q    And I'm specifically asking you what your

5     basis is for testifying to an opinion that the LEL of

6     phosphene gas is reached by the mere piling of

7     aluminum phosphide tablets or pellets.  That's what

8     I'm asking you about.

9     A    Okay.  Well, it's reached -- ask me that

10    again.

11    Q    I'm not asking you about LEL of phosphene gas

12    or any articles that talk about the LEL of phosphene

13    gas.  I'm asking you the basis for your opinion in

14    this case that the mere piling of dry aluminum

15    phosphide tablets or pellets by itself will result in

16    the LEL of phosphene gas being reached.

17         Does that mean still mean 47, 48, 52, and 53?

18    A    Yes, I would say so, and then I would also go

19    back to the -- hold on one second.  I think I have

20    one more.  The number 70, the Burgoyne report where

21    they discuss the piling of the Fumitoxin and

22    subsequent explosion.

23         THE VIDEOGRAPHER:  Going off the record.

24    Time now is 12:16 p.m.

25         (A recess was taken.)

1          THE VIDEOGRAPHER:  We're going back on the

2     record.  The time now is 12:41 p.m.

3     Q    Mr. Rich, I think the question that was

4     pending -- you were going through a list of the

5     materials that you had reviewed that you believe

6     support your opinion in this case that the piling of

7     the dry aluminum phosphide tablets will result in the

8     lower explosive limit of phosphene gas being reached.

9     A    Yes.

10    Q    And you had got me as far as number 70.  I

11    think your list included the applicator's manual,

12    number 47, 48, 52, 53, and 70.

13    A    All right.  And let's go back.  I think you

14    just said that the -- which is my number 3, the

15    applicator's manual.

16    Q    Yes.

17    A    The MSDS --

18    Q    Okay.

19    A    -- for that.  And then I believe you're right

20    with the others.  Let's see.  Make sure that's all of

21    them.  And I believe -- I don't know if he talks

22    about the LEL or LFL, but 73, the information

23    provided by Dr. Rauscher.

24    Q    Okay.

25    A    And I think that would be all.

1     Q    Okay.  Mr. Rich, according to NFP 9021, your

2     theory as to the cause that is the piling of dry

3     aluminum phosphide tablets resulted in the fire must

4     be tested using a scientific method before it can be

5     accepted as the likely cause of this fire, correct?

6     A    Well, it's not tested by the scientific

7     method.  The scientific method is a process by which

8     you developed the hypothesis and developed the fire

9     cause.  The scientific method is not a test.  It's a

10    process.

11    Q    Okay.  Well, if you would, explain to me how

12    and why a dry pile of aluminum phosphide tablets, A,

13    will reach lower flammable limit of phosphene gas

14    and, B, will result in a fire.

15    A    Because the product is designed and produced

16    to be reacted individually, each pellet to be reacted

17    individually, once you pile the product together,

18    then that's what changes the dynamic of the reaction,

19    the phosphene production, the configuration of the

20    pile, the LEL being reached, the ammonia carbonate

21    being driven off, the CO2 being driven -- all those

22    factors are uncontrollable and unpredictable once the

23    Fumitoxin has been put in the pile.

24    Q    But what is it about the pile that changes the

25    propensity to reach the lower flammable limit of

1    phosphene gas?

2        A    The geometry -- excuse me.  The ge- -- the

3    fact that it's in a pile.  That's what changes the

4    dynamic.

5        Q    What about it being in a pile changes the

6    dynamic?

7        A    The confinement, the reaction rate, the

8    production of heat, the -- the amount of surface area

9    available for the reaction to take place, the fact

10   that if it's in a pile, the heat that's being

11   liberated by the reaction can be driven into the pile

12   so the ammonia carbonate reaction takes place.

13       And it doesn't really release the inerting

14   agent simultaneous with the phosphene.  You can form

15   a crust.  You can heat up the area.  I mean, all of

16   the -- all of the -- once the chemical is piled up

17   instead of being dispersed evenly, that's when the

18   reaction spirals out of control, because that's when

19   all of the variables start to break down.

20       Q    Okay.  One of the things you said was the

21   surface available for the reaction to take place is

22   one of the reasons why the lower flammable limit will

23   be reached in that scenario but not if they're evenly

24   distributed.  Did I get you right on that?

25       A    I believe so, yes.

1      Q    Isn't it exactly the opposite?  There's a

2  smaller surface area exposed to the ambient

3  conditions if there's a pile because some of those

4  tablets are not exposed to ambient conditions?

5      A    I would disagree.

6      Q    Okay.  Confinement.  You say that the

7  confinement of the gas is going to be greater in a

8  pile than it would if there's not a pile?

9      A    Yes.

10     Q    What is the opposite of confinement as it

11 relates to the production of a gas?

12     A    Dispersion or --

13     Q    Dispersion.

14     A    -- unconfinement, non-confinement.

15     Q    Diffusion?

16     A    Diffusion.

17     Q    Okay.  Is it your testimony that you have

18 reviewed enough literature, done enough research,

19 analyzed enough testing results to know whether or

20 not phosphene gas can be confined in a pile of

21 Fumitoxin tablets to the point of reaching its lower

22 flammable limit?

23     A    It could be confined by the geometry of that

24 pile, or because the geometry of the pile and the

25 production of the pile, you can exceed the flammable

Deposition of Lester Rich

```
 1   limit in a localized area.  In other words, as the
 2   gas is coming off of the pile, you can exceed that
 3   flammable limit.
 4        So it could happen within the pile.  It could
 5   happen around the edges of the pile.
 6    Q    How often is that going to happen when you
 7   have a pile of aluminum phosphide tablets?
 8    A    You don't know.  That's -- that's the reason
 9   that the -- the applicator's manual cautions against
10   piling it.  It might happen every time.  It might not
11   happen every time.
12    Q    Is it going to happen at least 50 percent of
13   the time?
14    A    I don't know.
15    Q    Is it going to happen at least 25 percent of
16   the time?
17    A    I don't know.
18    Q    Is it going to happen at least 10 percent of
19   the time?
20    A    I don't know.
21    Q    Your testimony in this case is that it
22   happened on August 4th, 2009 or August 5th, 2009,
23   correct?
24    A    Right.  At some time there, because, again,
25   once it's piled, the reaction accelerates because it
```

1    feeds on itself.  So the time frame is still -- we're

2    still at odds on whether I can give you exactly an

3    hour.  I mean, it's a range of time, but in general,

4    what I think you said is correct.  Yes.

5        Q   You are now on record under oath as saying you

6    don't even know to a 10 percent certainty if a pile

7    of aluminum phosphide tablets will reach the lower

8    flammable limit of phosphene gas, correct?

9        A   You said every time.  It can reach that limit,

10   and that's what the literature says, and that's what

11   the other evidence in the case suggests.  But I can't

12   predict how often that will happen, in other words,

13   on a given pile, just like I can't predict how often

14   a cigarette laid on a bed will reach ignition or not

15   reach ignition.

16       Q   You can't even tell me that it will happen

17   10 percent of the time, can you?

18       A   I don't know that, no.

19       Q   And yet you're testifying under oath that the

20   probable cause of the fire in this case is that it

21   did happen?

22       A   That's correct.

23       Q   Refer, if you would, to section 18.6.2 of the

24   NFPA 921 2008 edition.

25       A   What did you say?  18 --

1      Q    18.6.2.

2      A    Okay.

3      Q    Correct me if I'm wrong, but the last two

4    sentences of that section say, if the level of

5    certainty of the opinion is only, quote, possible or

6    suspected, the cause should be listed as

7    undetermined.  Only when the level of certainty is

8    considered probable can a fire cause be classified as

9    accidental, incendiary, or natural.  Correct?

10     A    Yes.

11     Q    Mr. Rich, if you don't know that a reaction of

12   the sort you described is going to take place any

13   more than 10 percent of the time, you can't get from

14   possible to the level of certainty required to label

15   this fire as being caused by that reaction, can you?

16     A    I disagree.

17     Q    How can you get to a level of certainty

18   required by NFPA 921 if you can't tell me how often a

19   pile of aluminum phosphide tablets is going to result

20   in a lower flammable limit of phosphene gas being

21   reached?

22     A    It doesn't say I have to tell you what

23   percentage of time it would happen out of a given

24   number of piles, first.  Secondly, the literature

25   says it will happen.  The literature cautions against

1   the piling.  There's evidence that supports the fact

2   that when it's piled together the reaction spirals

3   out of control, it increases, the -- the controls

4   built into the Fumitoxin tablets by the manufacturer

5   are subverted because it's all clumped together, and

6   the reaction proceeds into a runaway condition.

7        So just like I said before with the -- with

8   the cigarette example, I mean, it's the same thing.

9    Q   The reaction proceeds into a runaway condition

10  in the testimony that you've already given to me

11  today potentially as little as 10 percent of the

12  time, correct?

13   A   Or more.  That's the point.  When you pile the

14  product together, you don't know.

15   Q   And yet you're testifying in this case that

16  you, Lester Rich, do know; isn't that right?

17   A   In this case, yes.

18   Q   And what is it that allows you to know what is

19  not knowable?

20       MR. WIDIS:  Object to form.

21   A   The totality of the circumstances of the case.

22   Q   Okay.  Mr. Rich, is there any peer-reviewed

23  literature -- peer-reviewed literature that you have

24  come across in any scientific journal that supports

25  the hypothesis that a dry pile of aluminum phosphide

1   is likely to cause a fire?

2       A   Can you give me the definition that you're

3   using of peer reviewed?

4       Q   Yes.  A journal that only accepts publications

5   after an editorial board reviews them, edits them,

6   and so forth.

7       A   Right.  I'm not certain, but I believe that

8   Schumacher's paper would have been peer reviewed for

9   publication at the ISFI conference.  I believe they

10  peer review those papers before they're published --

11  or the presentation.  I'm sorry.

12          The -- I don't know if it specifically fits

13  that description, but the applicator's manual is

14  certainly peer reviewed by the company or -- and I

15  believe that also has to go to the EPA, so there's a

16  regulatory component to that.

17      Q   I'm talking about a peer-reviewed scientific

18  journal.

19      A   Right.  A journal.  I'm thinking.  I can't

20  think of any right now other than possibly that one.

21      Q   And I'll ask Mr. Schumacher about whether that

22  was a peer-reviewed journal that he got published,

23  but that's the only one you can think of as you sit

24  there right now?

25      A   Yeah.  Let me glance at the list, but I think

1    so.  Because I'm trying to think if it -- to meet

2    that definition.

3         I don't know for certain, but I believe this

4    number 53 on my report, Spontaneous Ignition Limits

5    of Saline and Phosphene for the National Institute of

6    Materials and Chemical Research in Japan -- I believe

7    that was -- I would expect that to be peer reviewed.

8    I don't know that for certain.

9    Q    You think the periodical Combustion and Flame

10   is a peer-reviewed scientific journal?

11   A    I think that's a conference, not a journal.

12   Q    Okay.

13   A    The UL reports would probably be peer

14   reviewed.

15   Q    Which one?

16   A    Both of them.  I'm sorry.  My 55, 56, UL.

17   Q    Okay.  You said UL.  I'm asking you about a

18   peer-reviewed journal article.

19   A    I'm sorry.  I'm sorry.  You're right.  The

20   journal article.  The -- I don't really -- I mean,

21   there's -- you know, there's several -- there's

22   several articles here, and there's several research

23   papers.  I don't know other than possibly the

24   exception of Mr. Schumacher's because I know a little

25   bit about that conference -- if they're peer reviewed

1   or not.

2       Q    Okay.  Mr. Rich, is there any test or study

3   that has been reported by any certified laboratory

4   that supports your hypothesis that a dry pile of

5   aluminum phosphide is likely to result in the lower

6   flammable limit of phosphene gas being reached and a

7   fire occurring?

8       A    I think that depends on the amount of

9   phosphene that you're referring to.  In other words,

10  I'm not -- I'm not sure what --

11      Q    Well, let me ask it this way.  You've got on

12  your list number 54, Underwriting Laboratories,

13  April 12th, 1961, Underwriting Laboratories,

14  October 7th, 1964, Underwriting Laboratories,

15  April 1983.

16          Those three Underwriting Laboratory reports,

17  sir, do they support your hypothesis in this case or

18  do they tend to discredit your hypothesis in this

19  case?

20      A    Well, there was ignition in some of those, but

21  I wouldn't say that they tend to support it or

22  discredit it because the amount of Fumitoxin that

23  they're using is less than the amount of Fumitoxin

24  that we're dealing with in this case.

25      Q    Based upon your supposition of how many

1    tablets were piled in piles, correct?

2        A    The total amount that was applied, yes.

3        Q    Well, we're talking about piles.  We're not

4    talking about the total amount applied in this case,

5    correct?

6        A    Right.  But there's -- right.  That's correct.

7        Q    In fact, in none of those underwriting

8    laboratory reports was any ignition ever obtained in

9    the absence of the introduction of liquid water;

10   isn't that correct?

11       A    Absence of -- yes.  I believe it is -- I

12   believe they said liquid, yes.

13       Q    And your theory is that a pile of dry aluminum

14   phosphide tablets will have this reaction and did, in

15   fact, have this reaction in this case, correct?

16       A    I'm not sure I understand what you mean by

17   dry.

18       Q    Without liquid water being introduced.

19       A    Without liquid water, yes.

20       Q    Your testimony in this case is that there was

21   no liquid water that was introduced to the piles, as

22   you've called them, of aluminum phosphide tablets

23   left by the IFC applicators?

24       A    That's correct.  To my knowledge, there was no

25   liquid water introduced.

1    Q    And yet you believe you had this runaway

2    reaction that you've been talking about and that's

3    what caused the fire?

4    A    Correct.

5    Q    The Underwriting Laboratory reports do not

6    support that theory in any way, shape, or form, do

7    they?

8    A    Well, they did require liquid water to get

9    their ignition of their small quantity of tablets.

10    Q    And in the absence of that liquid water, there

11    never was ignition, correct?

12    A    That's right.

13    Q    Have you read the Siemens report?

14    A    Yes, sir.

15    Q    And the same is true in the Siemens report,

16    correct?

17    A    I believe that's correct.  Which --

18    Q    I don't see it listed.  I can hand you a copy

19    if you would like.

20    A    If you would, please.  That might be at the

21    very bottom on mine.

22    Q    Which one?

23    A    80 or 81 at the very bottom.  I believe that's

24    what you're talking about.

25    Q    Oh, yes.  Yes.

1    A   Let's look -- I don't remember that one as

2    well as the UL.  So let me look at that real quick.

3    Do you have --

4    Q   I do.

5    A   Let's take a look.  I think you're correct,

6    but if you don't mind me looking.

7    Q   We'll mark it as Exhibit 195.

8        (Exhibit No. 195 was marked for

9    identification.)

10   A   That was that very beginning.  Yeah, you're

11   correct.

12   Q   All right.  Did you recently receive from

13   Mr. Widis the report undertaken by MDE Labs in this

14   case?

15   A   Yes.

16   Q   Okay.  Did you review the various types of

17   testing that MDE Labs did in relation to this case?

18   A   Yes, briefly.

19   Q   Okay.  And like the UL reports and like the

20   Siemens report, did that testing show that in the

21   absence of the introduction of liquid water, piles of

22   aluminum phosphide tablets did not result in

23   combustion?

24   A   That's correct.  I believe their tests

25   resulted in no combustion.

1    Q    All right.  To make sure we're clear, every

2    single certified laboratory test that you have seen

3    related to the question of whether dry aluminum

4    phosphide tablets piled together can cause combustion

5    resulted in there being no combustion, correct?

6    A    And again, when you're saying dry, you're

7    talking about liquid water, but you're not taking

8    into consideration humidity or other factors?

9    Q    Well, let's back up.  Humidity is required for

10   the reaction to commence, correct?

11   A    Correct.

12   Q    Okay.  Putting the humidity and the ambient

13   air aside, is it correct to say that every certified

14   laboratory testing result that you have seen in the

15   course of your investigation into what caused the

16   Severn peanut dome fire has reached the same

17   conclusion that aluminum phosphide tablets when

18   stacked or piled together do not combust in the

19   absence of the introduction of liquid water?

20   A    Yes.  That's what the laboratory reports have

21   suggested.

22   Q    Okay.  And in view of all of those laboratory

23   reports that we have just been through, did you

24   consider whether perhaps it might be important for

25   you to do some kind of testing to show and

1    demonstrate that the piling of aluminum phosphide

2    tablets, in fact, could result in either the lower

3    flammable limit of phosphene gas being reached for

4    combustion?

5        A    Yes, I considered that possibility.

6        Q    Okay.  Well, let me hear about your

7    consideration of that possibility and what became of

8    it.

9        A    The consideration is that while the

10   small-scale tests that you've referred to have been

11   done and can be done, they don't really translate to

12   the full-scale situation that we have here.  The

13   small bench-scale testing may or may not translate to

14   this 49,000 -- 100 tablets that MDE tested may not

15   translate to 49,000 tablets.

16           And again, when you put the -- when you put

17   the material in the pile, that's what sets off the

18   reaction, and the -- to really test that, you would

19   have to re-create the entire geometry of the dome and

20   the conditions, I believe.

21           And the -- I thought of something else, but

22   that's to the -- to the test.  Yes, I thought about

23   that.  But I think -- but I think there's an issue

24   with the transfer of the small-scale test to the

25   amount of Fumitoxin that we have here.

1    Q    But Mr. Rich, your testimony and opinion in

2    this case isn't that 49,000 tablets of Fumitoxin

3    combusted, correct?

4    A    Well, some of them would have reacted.  Some

5    of them would have combusted.  We don't know.

6    Q    Your testimony -- and I wrote it down -- in

7    terms of the sequence of events was that there were

8    localized areas reached where the LFL of phosphene

9    gas was reached, correct?

10   A    Yes.

11   Q    And those localized areas, in your mind, are

12   piles, correct?

13   A    Yes.

14   Q    Well, isn't each of those piles its own

15   self-contained environment for purposes of whether or

16   not the LFL is going to be reached?

17   A    In general, yes.  It could be reached in one

18   and maybe not reached in the other.  Is that what

19   you're -- what you're asking?  I'm not --

20   Q    One pile is not dependent upon another pile in

21   terms of whether the LFL in or around that pile is

22   going to be reached, correct?

23   A    No.  They would -- they're not dependent on

24   each other.  But if they're proximal to each other,

25   that would certainly have some effect on it.  Again,

1    it's -- once you start -- whether it's three little

2    piles all clumped together or a larger pile, that's

3    what I'm saying.  When you get it in a pile, that's

4    where the problems occur.

5        Q    Mr. Rich, in view of the fact that every

6    certified testing laboratory that has done any

7    experimentation with dry aluminum phosphide tablets

8    has failed to yield a single result of combustion

9    from the piling of those tablets in the absence of

10   introduction of liquid water, don't you think you

11   could have designed a test to demonstrate that it

12   really is possible under some scenario to get a fire

13   from the piling of aluminum phosphide tablets?

14       A    I still go back to the -- yes and no.  I mean,

15   yes, you might -- could design a test to see how many

16   you could get there.  But no, because you don't know

17   the geometry within the dome and the way that these

18   tablets fell and were piled together.

19       Q    Is there no test that you can think of that

20   would rig the test in the most favorable way to the

21   LFL being reached into combustion to see whether or

22   not you would actually get the LFL being reached and

23   combustion?

24       A    I don't know the answer to that.  I don't know

25   if you could -- I don't know what you mean by rig the

1     test.  I mean, I don't know if you could do that or

2     not.

3          Q    Well, based upon what you know about how this

4     ignition sequence occurred, what would you want to

5     include in your test to make it as likely as possible

6     that you're going to get combustion absent the

7     introduction of liquid water?

8          A    Right.  Well, if you're just dealing with --

9     again, it's the -- what's unknown and what makes that

10    question difficult is you don't know the

11    configuration of the tablets as they were piled in

12    the dome or as the piles occurred in the dome.  So to

13    try to re-create that, I think, is -- I don't think

14    you can accurately do that.

15         Q    I think we're missing each other, Mr. Rich.

16    Forget you ever heard anything about the Severn

17    peanut dome fire.  Okay?

18         A    Okay.

19         Q    I'm asking you as someone who has experience

20    and training in forensic chemistry -- because you've

21    told me you have, correct?

22         A    Yes.

23         Q    -- to design for me a test to prove that you

24    can get combustion from the piling of aluminum

25    phosphide tablets without the introduction of liquid

1    water.  Based upon all the literature you've read and

2    you've told me about --

3        A    Right.

4        Q    -- it's your opinion you can, correct?

5        A    Yes.

6        Q    Design for me the test that's going to

7    demonstrate that.

8        A    Well, absent some other parameters, which I

9    don't know that I can consider off the top of my

10   head, I mean, really you would -- to do what -- to

11   answer the question correctly like you're asking me

12   to, you would have to sit down and design an

13   experiment.  And there may be other factors that I'm

14   forgetting or not -- don't think to include here.

15   But essentially I would say the gist of the test

16   would be to accumulate different-size piles of

17   phosphene under different conditions, because

18   although you've been talking a lot about liquid

19   water, the humidity also affects that.

20           And so if I put them in 100 percent humidity

21   environment versus a 40 percent and I have two of the

22   same size piles, I expect they're going to be

23   different reaction rates going on.

24           So in broad terms, I would say that would be

25   the experiment to perhaps try -- set up various tests

1    with various size piles under various atmospheric

2    conditions.  But again, it comes back to what I was

3    saying earlier.  Just because you do that test

4    100 times doesn't mean 99 times there's going to be a

5    fire.  Just like -- just like I said earlier with a

6    cigarette fire, if you put a cigarette on a bed --

7    and I've done it -- you may or may not get a fire.

8    But you can get a fire when you put the cigarette on

9    the bed.  And it takes a lot of repetition to do

10   that.

11        There's -- there's lots of examples of -- or I

12   mean -- not lots.  There are examples where

13   laboratories have undertaken tests to prove something

14   happened with not being able to get it to go but it's

15   well known that that's the fire cause.  It's

16   documented that's the fire cause.

17        One example is Fire Phonics.  They threw

18   cigarettes in trash cans to try to get it to go.  And

19   it took, you know, many, many, many times before a

20   fire actually happened.

21        So that's what I'm saying.  In your general

22   broad theory of designing an experiment, it would be

23   different-size piles under different configurations

24   and different geometries with different humidity and

25   temperatures, both ambient and the temperature of

1    the -- of the Fumitoxin, in other words, the initial

2    temperature of the Fumitoxin.  All of those -- all of

3    those factors are going to play into whether you get

4    an ignition or not.  And there -- all those factors

5    are also sort of independent of each other, so just

6    barely changing one variable or the other might

7    result in an ignition in this pile and not in this

8    pile.  Otherwise the piles are identical.

9         Q    All things being equal, the higher the

10   humidity, the higher the temperature, the greater the

11   likelihood the reaction is going to reach the point

12   that you think is going to result in the LFL being

13   attained, correct?

14        A    In conjunction with it being in a pile?

15        Q    Correct.

16        A    Yes.

17        Q    So you really don't need to test the

18   40 percent humidity and the 35 degrees to try and

19   demonstrate you're going to get this reaction.  You

20   need to demonstrate something more like 95 percent

21   humidity and 95 degrees to see whether those extreme

22   heat and humidity conditions will liberate enough

23   phosphene gas and contain that gas to the point of

24   the LFL being reached, right?

25        A    Well, certainly what you asked previously,

1   yes, the more adverse the conditions are that you

2   subject the pile of tablets to, I would suggest the

3   more likely you're going to get the ignition, if

4   that's -- if that was your question.  I'm sorry.

5       Q   And Mr. Rich, if you did that test under the

6   most adverse conditions with a large pile of

7   Fumitoxin tablets 100 times and didn't a single time

8   get the LFL being reached or a fire, would it still

9   be your testimony that, well, yeah, that's still

10  capable of causing a fire even though under testing

11  conditions it never does?  Would that still be your

12  testimony?

13      A   It would be, but not like you said that.

14      Q   Okay.  Go ahead and say it the way you would

15  say it.

16      A   I would say there is -- I would say that just

17  because it didn't happen in your laboratory test

18  doesn't mean it can't happen in a given warehouse on

19  a given day under a given set of circumstances with a

20  given set of parameters.

21      Q   Would you agree that for your hypothesis or

22  theory in this case to be scientifically valid, it

23  must be uniquely consistent with the facts and with

24  the principles of science?

25      A   I think that's out of 921.  I would certainly

1  agree that it's consistent with and I'm not sure

2  about the uniquely, but I believe you're correct on

3  that.

4      Q   Would you agree --

5      A   Is that from a particular place in 921?

6      Q   I don't have the reference, but it is.

7          Would you agree with me that for your

8  hypothesis or theory to be scientifically valid, it

9  must also stand the test of careful and serious

10  challenge?

11     A   That, I would agree on.  And I'll say it again

12  that I don't necessarily agree with uniquely but

13  possibly.

14     Q   How did you test your hypothesis or theory

15  that the Severn peanut fire was caused by the piling

16  of the Fumitoxin tablets during the August 2009

17  application?

18     A   By comparing the information that I had, the

19  facts associated with the case, the totality of the

20  circumstances, the -- by taking those, dealing with

21  just -- in one particular instance, just Fumitoxin,

22  applying that, working it through the scientific

23  method, which has a working hypothesis of maybe this

24  is Fumitoxin, working hypothesis, maybe this is

25  spontaneous combustion, working hypothesis, maybe

1    this is lightening strike, maybe this is incendiary

2    fire, and test the facts as we have them against

3    those hypotheses.  And as those other hypotheses fall

4    away, you're left with the most probable cause of the

5    fire.

6        Q    Is it your opinion that when the NFPA talks

7    about testing one's hypothesis as to the cause of a

8    fire that the methodology for doing so is to analyze

9    competing causes and then eliminate those?  Is that

10   your understanding of what NFPA 921 means?

11       A    That's part of it.  It doesn't mean that you

12   have to create a physical test of your theory before

13   you can say that that's your final tested hypothesis.

14       Q    But you have to do some kind of testing of

15   your theory as opposed to other hypotheses, don't

16   you?

17       A    Yes.  You have to do some kind of testing, but

18   that doesn't necessarily mean it's a physical,

19   laboratory, or experimental test.

20       Q    What I asked you is what testing you did not

21   of other theories in this case but of your theory

22   that the Fumitoxin being in piles caused this fire.

23       A    Correct.

24       Q    Tell me what testing you did of your theory.

25       A    That is the testing.  I have taken the

1    scientific method and the cognitive test and the

2    facts that are presented in this case and applied

3    them and tested this hypothesis against all of the

4    information, the literature, the facts, the witness

5    statements, the -- all the information that's

6    involved with the case.

7        Q    Okay.  That's different than the answer you

8    gave a minute ago --

9        A    I'm sorry.

10       Q    -- when you were talking about other theories

11   that you eliminated.

12       A    Well, and part of that testing or part of that

13   scientific method, part of that hypothesis

14   development and testing would include the elimination

15   of other -- other potential causes.

16       Q    But you tested analytically your theory

17   against all of the evidence in this case and

18   concluded that your theory is consistent with the

19   facts and evidence in this case?

20       A    Yes.

21       Q    Okay.  Tell me every fact that you considered

22   from the evidence to be consistent with your

23   hypothesis or theories as to what caused this fire.

24       A    Okay.  Let me look back at my report, if

25   that's all right.  Okay.  Now you're going -- the

Deposition of Lester Rich

1    facts that's -- I think support my theory --

2        Q    Yes.

3        A    -- of the ignition of Fumitoxin?  Not other

4    hypotheses?

5        Q    Correct.

6        A    Okay.  The first fact would be there was a

7    fumigation.  The amount of Fumitoxin that was applied

8    would be considered.  The way it was applied, the

9    method of distribution would be considered.  The

10   geometry of the pile or the area where the Fumitoxin

11   was being placed.  In this case, I did consider some

12   of the preexisting thermocouple data.  There was --

13   IFC attempted to take some measurements of

14   temperatures on the top of the dome on the 14th.

15   The thermal imaging camera image is certainly data.

16   A sample was collected from the top of the peanut

17   pile.

18       Q    Not to short-circuit you, but you're referring

19   to the considerations specifically set forth in your

20   report?

21       A    That's correct.

22       Q    Okay.

23       A    Is that not what you wanted or --

24       Q    So there's nothing outside of your report that

25   you considered to be a fact consistent with your

1    hypothesis or theory in the case?

2        A   I don't -- now -- well, I considered like the

3    reference material and the applicator's manual to be

4    facts.  I don't know if that's -- I don't know if

5    that's -- I don't want to say no, but that's -- that

6    part is included with this, I think.

7        Q   I'm talking about evidence associated with

8    Severn Peanut Company and the peanut dome.

9        A   Right.  Right.  Okay.  That's what I thought

10   you were talking about.

11       Q   Did you list in your report every fact that

12   you considered to be consistent -- every fact related

13   to the Severn Peanut Company and the peanut dome that

14   you believe is consistent with your theory as to what

15   caused the fire.

16       A   Well, I'm trying to figure out how to answer

17   that because I didn't list -- there are facts

18   reported in the applicator's manual and the other

19   research papers.  I didn't list those out here, but I

20   would consider that they are part of this hypothesis

21   and opinion.

22       Q   Yeah.

23       A   And I'm not trying to -- I want to make sure

24   that I don't just go yes and then you say, oh, well,

25   you can't refer to the applicator's manual.  But

1    there's stuff in there that supports this.

2        Q    We're missing each other.

3        A    I'm sorry.

4        Q    Because I was, again, focused on facts related

5    to the Severn Peanut Company and the Severn peanut

6    dome.  Those are the only facts that I'm talking

7    about that support your opinion in this case or are

8    consistent with your opinion in this case.  And I

9    think you have tried to tell me that if there are

10   such facts related to the peanut company or the

11   peanut dome, you've listed them in your report.

12       A    Right.  And maybe that's where -- maybe I'm

13   trying to take your question too far.  But there are

14   additional facts and information that also support

15   this, not just what's listed.  But I see what --

16   you're trying to separate the stuff at the dome --

17       Q    Correct.

18       A    -- from the other facts that might be

19   available through deposition or research papers or

20   whatever?

21       Q    Correct.

22       A    Okay.  Yes.  Then in that case, I will say

23   yes, you're -- those -- those -- sorry.  Those

24   dome-related facts are listed out in our report

25   here -- in my report.

1     Q    Let me ask you the opposite question.  Are

2    there any facts whatsoever that you believe, being as

3    candid as you can, are inconsistent with your

4    hypothesis or theory as to what caused this fire?

5     A    Ask me that one more time.

6     Q    Sure.  Are there any facts whatsoever, again

7    focused on Severn Peanut Company and Severn peanut

8    dome, that you believe are inconsistent with your

9    hypothesis or theory as to what caused this fire?

10     A    No.  And that's -- and that's part of the

11    reason that I was able to reach this conclusion is

12    because I don't think there are any outlying facts

13    that do not fit within this hypothesis.

14     Q    Mr. Rich, did you make any assumptions about

15    any facts in this case where you did not have hard

16    data to determine whether something was true or not?

17    Did you make any assumptions at all?

18     A    I don't believe so, because the facts of the

19    dome and stuff are reported.  You know, either

20    witness statements or deposition or observations or

21    photographs, that type of thing.

22     Q    Okay.  Well, what I want to do now -- and

23    we'll spend at least a couple of hours doing -- is

24    working my way through your report, so --

25     A    Okay.

1      Q    -- you probably don't need anything in front

2   of you at this point other than Exhibit 192, and I'm

3   literally starting at the very beginning, and I'm

4   going to take you to page 5.

5      A    Okay.

6      Q    Toward the bottom of page 5, in your second

7   sentence, you state, additional moisture reduction in

8   the stock -- and there you're talking about the

9   peanut stock -- resulted from the operation of the

10  fans during the cooling periods from approximately

11  December to February of each year.

12          That's what you wrote, correct?

13     A    Yes, sir.

14     Q    What's your basis for stating that the running

15  of cool air through the peanut mass will reduce the

16  peanuts' moisture content?

17     A    The -- I think he -- well, when I interviewed

18  RP Watson, he told me that, and I believe he also

19  said that in his deposition.  I think we had that

20  conversation earlier about interviews versus

21  deposition.  But that's one item.

22          And then I believe there is -- I believe

23  there's a research -- or there's a paper that also

24  talks about air movement through stored commodity

25  reducing the moisture content.

1    Q   Is it your understanding that running cold

2    winter air through a stored commodity will reduce its

3    moisture content?

4    A   In general, I would say yes, and specifically

5    that's what RP Watson told me as related to this

6    incident.

7    Q   But whatever RP Watson tells you, whatever the

8    science is is going to be what controls what actually

9    happened, correct?  It's a scientific proposition,

10   isn't it?

11   A   Correct.

12   Q   RP Watson is not a scientist, is he?

13   A   No, but I believe he had first-hand

14   experience --

15   Q   Okay.

16   A   -- about this situation, this particular

17   sentence.

18   Q   How long were those fans run from December

19   until February, as you understand the evidence?

20   A   My understanding is it was intermittent, and

21   it was run either in the evenings or the mornings

22   when it was cool.  And there are no -- I have not

23   seen any records indicating a time frame or

24   parameter.

25   Q   Did you know that Mr. Watson's testimony

1    speaking on behalf of his company was that the fans

2    were never run more than two hours per day?

3        A    I did read that, and I believe that's correct,

4    and I think specifically he's talking about the --

5    this particular stock of peanuts.

6        Q    Correct.

7        A    Because that was part of the issue is

8    previously I think they had had problems running the

9    fan.

10       Q    All right.  How much of the 21-million-pound

11   mass of peanuts would have been affected by running

12   the fans two hours per day?

13       A    How many days?

14       Q    Do you believe that you're going to get

15   cooling air through the entirety of the

16   21-million-pound mass of peanuts in two hours?

17       A    I don't believe so.

18       Q    Well, if you run the fans the next day for two

19   hours, do you think you're going to start at the

20   bottom that day?

21       A    No.  I think it would probably be a gradual

22   process through the pile.

23       Q    And so you think you're going to get all the

24   way to the bottom if you run it for enough days in a

25   row at only two hours a day?

Deposition of Lester Rich

1    A    I don't know.  I would be guessing.

2    Q    Is there a calculation that can actually

3  figure that out?

4    A    There may be.

5    Q    You haven't undertaken that calculation?

6    A    I have not.

7    Q    You don't know what it is?

8    A    I would suspect it's some sort of airflow

9  calculation, but no, I have not -- I have not done

10  that calculation.

11    Q    Go to page 6, please.  On page 6, in the

12  second paragraph, you say, the expected geometric

13  configuration of the peanuts inside the dome created

14  a series of plateaus, flattened areas, valleys,

15  ridges, and slopes across the surface of the stored

16  commodity.  Correct?

17    A    Yes.

18    Q    What is the source of that information that's

19  concluded in that paragraph?

20    A    That's my personal observations of peanuts

21  being loaded into different kinds of warehouses,

22  particularly the top -- peanuts being loaded into

23  storage from a single point, point-source conveyor.

24  When they come off the pile, it creates just what

25  I've described, valleys, ridges, dips, just because

1    of the way the peanuts fall.

2        Q    And you think whatever you've seen in those

3    situations would be the same in a 21-million-pound

4    dome structure like Severn Peanut Company had?

5        A    Probably not at the bottom, but as you fill

6    that, the peanuts are going to behave similarly as

7    they -- because it's still a single source or single

8    spout fill and it's still peanuts.

9        Q    Did some of the witnesses in this case testify

10   that they had seen that pile of peanuts through the

11   head house when there was no fire?

12       A    Yes.

13       Q    Did a single witness in this case talk about

14   there being a series of plateaus, flattened areas,

15   valleys, ridges, and slopes?

16       A    I believe they did talk about a flattened

17   area.

18       Q    Okay.  Did anybody talk about valleys,

19   ridges -- valleys or ridges or plateaus being in the

20   peanut pile?

21       A    I don't know if it was -- I don't know if they

22   specifically said it that way.

23       Q    Your testimony just a moment ago was that that

24   sentence is in your report based upon your personal

25   observations of other peanut warehouses?

Deposition of Lester Rich

1    A    Correct.

2    Q    And you've applied that to this peanut

3  warehouse, the likes of which you had never seen

4  before in your life, correct?

5    A    I have applied it, yes.  But like I said, it's

6  not so much the size because the pile's confined.

7  It's the way that they're filled and the way that

8  they come from a single point.  And I believe the

9  testimony is that there was a flattened area on top

10  of the pile.  I don't know -- I don't think there's

11  testimony about valleys and ridges.

12        But yes, based on my personal experience, the

13  way that peanuts come out of the single point fill,

14  there are valleys and ridges and other anomalies.

15  It's not a -- it's not a smooth cone.

16    Q    Mr. Rich, if you are incorrect about what you

17  say on page 6 about the expected geographic -- I'm

18  sorry -- geometric configuration of the peanuts

19  inside the dome, if you're wrong about that, then

20  your ultimate opinion in this case is wrong, too,

21  isn't it?

22    A    No.

23    Q    That's how you decided there was piling, based

24  upon the expected geometric configuration of the

25  peanuts, correct?

Deposition of Lester Rich

1      A    Right.  There's a flattened area, there's

2  slopes, and there's also the interface of the slope

3  with the wall.

4      Q    Okay.  Is it your testimony that you believe

5  that the fire began at the interface of the wall and

6  the peanuts?

7      A    No.  You were asking me about places where

8  there's -- well, those are places where piling could

9  potentially occur.  In addition to the ridges and

10 slopes and other surface irregularities of the pile.

11     Q    Let me ask you specifically.  Do you believe

12 that this fire had its origin against the wall where

13 Fumitoxin tablets collected at the juncture between

14 the peanuts and the wall?

15     A    I don't know.  It's possible.

16     Q    What do you think is more likely, that fire

17 began there or the fire begun somewhere else on the

18 surface of the peanuts?

19     A    Really because of the geometry of the pile and

20 the method of application, the only thing you can say

21 is that the fire began on the surface of the pile of

22 peanuts.

23     Q    Page 7 -- if you would go there, please.  You

24 quote the applicator's manual in the second

25 paragraph, stating, since phosphene may ignite

1    spontaneously at levels above its lower flammable

2    limit of 1.8 percent v/v, it is important not to

3    exceed this concentration.

4         Did I read that correctly?

5    A    Yes.

6    Q    What is v/v?

7    A    Volume, percent of volume.

8    Q    That's what v/v means?

9    A    Yes, 1 percent volume.

10   Q    I thought v/v meant volume of the gas to the

11   volume of air.

12   A    You're right.  Yes.  I'm sorry.  You're right.

13   Q    Is phosphene the only gas produced by the

14   reaction that occurs when Fumitoxin tablets react

15   with humidity?

16   A    What was the -- phosphene --

17   Q    Is phosphene the only gas produced by the

18   reaction that occurs when Fumitoxin tablets react

19   with humidity?

20   A    No.

21   Q    What other gases are created?

22   A    Ammonia and carbon dioxide, based on the

23   formulation of the Fumitoxin we're talking about in

24   this particular case.

25   Q    What is the ratio of phosphene to carbon

1    dioxide to ammonia that is liberated by Fumitoxin

2    during the reaction?

3       A    I'll have to look in a reference material to

4    give you that.

5       Q    Okay.

6       A    I think it's in the -- I think it's in the

7    applicator manual.

8             THE VIDEOGRAPHER:  It's the end of tape

9       number 3.  Time now is 1:33 p.m.  We're off the

10      record.

11            (A recess was taken.)

12            THE VIDEOGRAPHER:  We're going back on the

13      record.  Beginning of tape number 4.  Time now is

14      1:50 p.m.

15      Q    Mr. Rich, when we went off the record, you

16   were looking to find the ratio of the ammonia and

17   carbon dioxide and phosphene liberated by Fumitoxin

18   tablets.  Did you find that?

19      A    I only found the amount of Fumitox -- or I'm

20   sorry -- the amount of phosphene released from a

21   single tablet and the reaction --

22      Q    Which is what?

23      A    -- which is 1 gram.

24      Q    You couldn't find the --

25      A    I don't have right in front of me -- I can't

1  put my hands on the percentage of ammonia and CO2

2  that are released.

3      Q   How does the fact that ammonia and CO2 are

4  also produced from Fumitoxin relate to the ability of

5  liberated phosphene to reach 1.8 percent v/v?  Do

6  those inerting --

7      A   Ask me that again.  I'm sorry.

8      Q   Yes.  Do the carbon dioxide and ammonia being

9  released at the same time as phosphene gas retard the

10  production of phosphene gas to the point that it's

11  difficult for the phosphene gas to reach 1.8 percent

12  v/v?

13      A   Yes, as long as the individual tablets are

14  reacting.  In other words, that's the formulation and

15  the design and the manufacture of the tablet is that

16  the phosphene and the ammonia and the carbon dioxide

17  are released simultaneously from a single tablet

18  that's not in a pile with other tablets.

19      Q   So I think your testimony is to the extent

20  that they're individual tablets, the ammonia and

21  carbon dioxide will prevent the phosphene gas from

22  reaching its lower flammable limit but not true in a

23  pile?

24      A   You said single tablets to start with?

25      Q   Yes.

1      A    Correct.

2      Q    Okay.  You quote the statement that I've heard

3   from you earlier that -- from the applicator's

4   manual -- that aluminum phosphide tablets or pellets

5   outside their container should not be stacked or

6   piled up or contacted with liquid water.  This may

7   cause a temperature increase, accelerate the rate of

8   gas production, and confine the gas so that ignition

9   could occur.

10          Do you see that?

11     A    You're on page 7; is that correct?

12     Q    Yes.

13     A    Yes, sir, that's correct.

14     Q    And you rely on that statement in the

15  applicator's manual to support your opinion in this

16  case that piled aluminum phosphide tablets without

17  the introduction of liquid water can cause the lower

18  flammable limit of phosphene gas to be reached and

19  ignition, correct?

20     A    Yes.

21     Q    You rely heavily on that portion of the

22  applicator's manual for your opinion in this case;

23  would you agree with that?

24     A    I wouldn't say that I rely heavily on it.  I

25  would say I rely on it as well as other sections of

1    the applicator's manual as well as other sections of

2    the -- other published documents and references that

3    talk about the ignition.

4        Q    Well, this is the only section of the

5    applicator's manual that talks about the piling up of

6    aluminum phosphide tablets causing a temperature

7    increase, accelerating the rates of gas production,

8    and confining the gas so that ignition could occur.

9    Would you agree with that?

10       A    Accelerate -- right.  I believe that's the

11   only -- yes.  That's the only -- this is the only

12   section in the applicator's manual that says that,

13   yes.

14       Q    All right.  Mr. Rich, do you know if any

15   scientific research or testing was undertaken by any

16   manufacturer, laboratory, or government agency which

17   led to the quoted language being included in the

18   manual that you're looking at -- in the manual that

19   you quoted that information from?

20       A    I don't know of a test that results in that

21   verbiage.

22       Q    Okay.  Would you agree with me, Mr. Rich, that

23   the quoted language by itself does not serve as a

24   scientific basis for the conclusion that the stacking

25   up of dry aluminum phosphide tablets is likely to

1    result in a fire?

2        A    Well, I don't know if I can agree other than

3    just what the -- what the sentence says on its face.

4    I mean, it says -- I think you had a likely or

5    something in there.  I mean, it says the -- this may

6    cause temperature increase, accelerate the rate of

7    gas production, and confine the gas so that ignition

8    could occur.  I don't think you read it exactly like

9    that, but --

10       Q    Does the quoted language say how likely it is

11   that the stacking or piling of dry aluminum phosphide

12   tablets will cause a temperature increase?

13       A    Does it say how likely?

14       Q    Yes.

15       A    No.

16       Q    What does it say about it causing a

17   temperature increase?

18       A    It says it may cause a temperature increase.

19       Q    In other words, that a temperature increase is

20   a possible result of that condition, correct?

21       A    Yes, that's what this particular verbiage

22   says.  That's a possible result.  But we also know

23   that if you increase the temperature or increase the

24   rate of reaction, then that drives -- temperature

25   increase drives the rate of reaction.  So there's --

1    I mean, there's other -- there are other -- there are

2    other sources other than this sentence that talk

3    about this phenomenon, I guess is what I'm trying to

4    say.

5        Q    But what this sentence is saying is that a

6    temperature increase may occur from the piling of

7    aluminum phosphide tablets, correct?

8        A    Yes.  It may increase the temperature,

9    accelerate the rate of gas production, and confine

10   the gas so that ignition could occur.

11       Q    Nothing about that sentence says how likely

12   any of those phenomena are to happen from the piling

13   of aluminum phosphide tablets, correct?

14       A    I would agree, yes.

15       Q    Does the quoted language say how likely it is

16   that the stacking or piling of dry aluminum phosphide

17   tablets will cause ignition?

18       A    Is that -- ask me -- would you -- did I just

19   say that or --

20       Q    No.  We're talking about ignition now.

21       A    Okay.  I'm sorry.  I'm sorry.

22       Q    Does the quoted language say how likely it is

23   that stacking or piling of dry aluminum phosphide

24   tablets will cause ignition?

25       A    No, it does not.

1    Q    It just says that ignition could occur,

2    correct?

3    A    Yes, sir.

4    Q    In other words, ignition is a possible result

5    of piling or stacking of aluminum phosphide pellets

6    or tablets, correct?

7    A    Ignition is -- right.  Yes.

8    Q    Right.  You have relied on the language we

9    have just been looking at to support your conclusion

10   in this case that the piling or stacking of aluminum

11   phosphide tablets in the Severn dome did, in fact,

12   cause ignition, correct?

13   A    A portion of it, but not solely relied on

14   this.  I mean, this is certainly a factor in my

15   opinion, but I would not say that this sentence is

16   the sole reason I've reached my conclusion.

17   Q    Understood.  But you're relying on the fact

18   that this sentence in the applicator's manual said

19   this is a possible result of piling to lead you to

20   the conclusion that that is probably what happened in

21   this case, correct?

22   A    One of the things.

23   Q    The last sentence on page 7 states that,

24   quote, technical grade aluminum phosphide may contain

25   impurities which may produce diphosphene gas.

Deposition of Lester Rich

```
 1          Right?
 2      A   Yes, sir.
 3      Q   You then note that diphosphene gas may
 4   spontaneously ignite in ambient temperatures,
 5   correct?
 6      A   Yes.
 7      Q   What was your purpose of including that
 8   information -- for including that information in your
 9   report?
10      A   Because that's another factor involved in
11   this -- in this case.  It's additional information
12   about this particular incident.
13      Q   How do you know that diphosphene had anything
14   whatsoever to do with this case?
15      A   Well, I know that when the aluminum -- I'm
16   sorry -- the Fumitoxin begins to react, there are
17   impurities that occasionally produce diphosphene, and
18   if those diphosphenes are present, they reduce the
19   autoignition temperature of the phosphene.
20          And the example of that is given in the manual
21   where they caution against opening the flask when it
22   would flash upon opening.  Just a flask at ambient
23   temperature would flash upon opening.  So obviously
24   that flash is -- I mean that flask -- sorry.
25          MR. WIDIS:  I got it.
```

1      A    That flask is not at 100 degrees, the

2   autoignition temperature of the phosphene.

3          So the diphosphenes effectively lower that

4   ignition temperature.

5      Q    If they're present in the particular aluminum

6   phosphide tablets at issue?

7      A   Yes, sir.

8      Q    And Mr. Rich, it would be pure speculation to

9   conclude that such impurities were present in the

10  Fumitoxin tablets applied in the Severn dome,

11  wouldn't it?

12     A    I don't think it's pure speculation, no.

13     Q    How could you know whether there were

14  impurities in the aluminum phosphide tablets that

15  were applied in the Severn dome?

16     A    Well, you can't know that, but there are --

17  there's anecdotal evidence -- there's information to

18  support that this particular diphosphene reaction or

19  the inclusion of the diphosphenes in the reaction

20  will take place.

21     Q    But only if those impurities are present in

22  the aluminum phosphide tablets at issue, correct?

23     A    Yes.

24     Q    Which isn't going to be true for all aluminum

25  phosphide tablets, is it?

1      A    I don't know.

2      Q    Let's move to page 8.  You say in the very

3  last sentence on that page, the higher the

4  temperature, the more rapidly the chemical change

5  occurs.

6      Correct?

7      A    Yes, sir.

8      Q    And I think we've covered this.  On

9  August 4th, 2009, the temperature at the time of

10  application was approximately 90 degrees, correct?

11      A    I don't think we covered that.  I think we

12  need -- we have to -- I would say we need to refer to

13  the fumigation report to get that temperature.

14      Q    I'm talking about ambient air.

15      A    I think it's recorded on there, but -- and I

16  believe that's correct, but I don't know that for

17  sure.

18      Q    All right.  Assuming that's true for the

19  purpose of saving a little bit of time, assuming that

20  the ambient temperatures were recorded at 90 degrees

21  at the time of the application, you would have

22  expected the liberation of the phosphene gas from the

23  Fumitoxin tablets to have occurred pretty quickly,

24  correct?

25      A    Well, if they were dumped on the ground

1    outside -- in other words, if they're occurring in a

2    90-degree environment.

3        Q    Okay.  So it's more a question of what the

4    head space or surface of the peanut pile's

5    temperature was as opposed to the ambient air?

6        A    Yes.  Right.  I would say so.  And it also

7    possibly had some effect as to the temperature of the

8    Fumitoxin.

9        Q    Okay.  You would expect the temperature of the

10   Fumitoxin fairly quickly to approximate the

11   temperature of the ambient air, wouldn't you?

12       A    In this set of circumstances, I would.

13       Q    Okay.  So assuming the ambient air was

14   90 degrees, the Fumitoxin probably went into the pile

15   of peanuts at about 90 degrees, correct?

16       A    That -- approximately, yeah.  I mean,

17   approximately.  I would say that's accurate.

18       Q    And therefore, somewhere in 24 to 36 hours you

19   would have expected the vast majority of the

20   phosphene gas to have been liberated, correct?

21       A    Like I said before, if the tablets are

22   separate and the reactions occurring, you know, as

23   designed -- I guess would be the way to that -- one

24   tablet reacting, one tablet reacting -- although

25   they're reacting simultaneously.  I'm not saying in

1    series.  But if you take the warm Fumitoxin and you
2    pile it, then I don't think you can -- you can say
3    that that's going to change that reaction rate.
4        Q    Tell me how it's going to change that reaction
5    rate.
6        A    It will accelerate the reaction rate.
7        Q    Okay.  So what might have been 24 to 36 hours,
8    because you were dealing with 90-degree ambient to
9    begin with, is actually going to be even less than 24
10   to 36 hours if you pile the Fumitoxin tablets?  Is
11   that what you're saying?
12       A    I'm saying that because it's piled, you can't
13   really give -- I mean, you still are stuck with that
14   range.  And I -- and you don't know because it's
15   piled.  That's the problem.  If it was spread out
16   even, I think your assessment is correct.  But
17   because it's piled, I don't know.
18       Q    I thought you said just a second ago that
19   piling is going to accelerate the reaction rate.
20       A    That's what I would expect, yes.
21       Q    Wouldn't that stand to reason that if it
22   accelerates the reaction rate that that will shorten
23   the total length of time necessary for the reaction?
24       A    In general, yes.  And I would agree with that
25   in general.  There may be -- because of this crust

1    that might develop over the exterior of the pile and

2    the differentiation, just because the air and the

3    moisture can't get to different parts of the pile, it

4    also could extend it because the Fumitoxin down on

5    the bottom may not be able to react as quickly as the

6    Fumitoxin up on the surface.

7        Q    Haven't you just said two very inconsistent

8    things, Mr. Rich?

9        A    Okay.  Maybe, but point it out and let me try

10   to fix it.

11       Q    On the one hand, you said if you pile, you're

12   going to have an acceleration of the reaction rate,

13   correct?

14       A    Yes, sir.

15       Q    And then you said because of crusting over

16   that you can also get the situation where some of the

17   Fumitoxin tablets on the interior of the pile don't

18   have a chance to react, correct?

19       A    Yes.

20       Q    Which is it?

21       A    It is both.  And that's the problem with the

22   piling because it alters the way that IFC and the

23   manufacturers determined -- it alters the way the

24   chemical reaction occurs.

25       Q    As you sit here right now, you don't know

1  which of those two scenarios is more likely to

2  happen, the acceleration of the reaction or the

3  retarding of the reaction because of crusting over,

4  correct?

5      A    In my opinion, the acceleration is probably

6  more likely to happen, but you can't discount the

7  tablets embedded in the pile that would also stretch

8  that reaction out.

9      Q    Is it possible that some of those tablets in

10  the middle of the pile will actually never even

11  react?

12     A    I would say yes, that's possible.

13     Q    Wouldn't you want to kind of study those

14  issues before you state an opinion in a $20 million

15  case as to what the most likely scenario actually is?

16     A    I did study those.

17     Q    Wouldn't you want to study those in a setting

18  where you can actually see what happens in a pile of

19  Fumitoxin tablets with your own two eyes and with

20  thermocouples and with gas detection equipment?

21     A    I mean, you could do that, yes, but it's not

22  completely necessary to develop an opinion in this

23  case.

24     Q    Well, you just said that there are two

25  distinct possibilities as to what will happen in a

1    pile of Fumitoxin tablets.  On the one hand, you

2    might have the acceleration of the reaction, in which

3    case you'd have a more energetic reaction, correct --

4        A    Yes.

5        Q    -- than you otherwise would.

6             On the other hand, you said you might have a

7    crusting over of the exterior of the pile such that

8    the interior of the pile doesn't even react, correct?

9        A    Right.  But I think we're maybe -- by

10   listening to you explain it, I'm not saying that --

11   those aren't two separate things.  I mean, it's --

12   the reaction is taking place on the outside.  You've

13   got the humidity and the air is available, the

14   Fumitoxin available for reaction.  That reaction is

15   occurring.  There's heat being generated.  The

16   reaction is speeding up because you're increasing the

17   temperature, and it's working its way into the pile

18   of Fumitoxin.

19            And there's tablets down on the bottom of the

20   pile that it may take longer for that reaction to get

21   to.

22       Q    So which is it?  Is it an acceleration of the

23   reaction rate overall or is it deceleration of the

24   reaction rate overall?

25       A    It's an acceleration of the reaction rate

1    overall from the exterior of the pile.

2        Q    Okay.  Where was the origin of this fire?

3        A    The surface of the dome -- I mean the surface

4    of the peanuts inside the dome.

5        Q    Where was the point of origin of the fire?

6        A    I don't know.  The area of origin is all that

7    I was able to determine.

8        Q    On the surface of the peanut pile?

9        A    Yes.

10       Q    And laterally across the peanut pile, you

11   can't state with any likelihood one place or another?

12       A    Not particularly.

13       Q    Did you make any effort to determine the point

14   of origin of the Severn dome fire?

15       A    Yes.

16       Q    And what effort did you make?

17       A    I attempted to put the camera in early on.  I

18   attempted to look with the thermal imager.  And then

19   I also drew a sample out from under the hatch to see

20   if, in fact, there was Fumitoxin residue there, which

21   there was.  So those three -- three things.

22       Q    Which there was or wasn't?  I didn't hear.

23       A    There was.  There was no phosphene in the

24   sample, but there was -- it was reacted Fumitoxin, I

25   believe, was what the actual lab report said.

1        But yes, so I did make efforts to see if there

2   was a way -- and I looked at the -- the in-house

3   thermocouple data to see if there was a way to

4   identify a point of origin, but I don't feel that you

5   can.

6       Q   You listed six hypotheses at the bottom of

7   page 9 of your report, correct?

8       A   Six.  Yes, sir.

9       Q   Now, Mr. Rich, I don't see listed the

10  possibility that liquid water made contact with the

11  Fumitoxin tablets.  Did you not consider that

12  possibility?

13      A   Yes.  I considered that within number 6.  I

14  didn't put that out as a separate -- it's not a

15  separate hypothesis.  It's included as number 6.

16      Q   Well, you actually don't talk about liquid

17  water in your report at all, do you?

18      A   I don't think I do.

19      Q   You actually didn't analyze a scenario by

20  which liquid water could have gotten into contact

21  with the Fumitoxin tablets, did you?

22      A    No, that's not true.  I did consider liquid

23  water being present, and I believe the information

24  that I have is that there was not -- there were no

25  leaks or other water intrusion into the dome.

Deposition of Lester Rich

1      Q    Okay.  Go forward to page 11, please.  And at

2    the top of page 11, you're talking about

3    self-heating, correct?

4      A    Yes.

5      Q    One of the reasons you eliminated self-heating

6    of the peanuts as a possible cause of this fire is

7    because you concluded that the fire began at the

8    surface of the peanut pile, correct?

9      A    That -- well, I think self-heating and thermal

10    runaway and spontaneous combustion eliminate

11    themselves, but that is an issue, yes.

12      Q    You concluded that the fire began on the

13    surface of the peanut pile because of your conclusion

14    that the Fumitoxin on the top of the pile was the

15    cause of the fire, correct?

16      A    Yes.

17      Q    There's no evidence whatsoever that the fire

18    began on the surface of the peanut pile, is there?

19      A    I think there is.

20      Q    Tell me every piece of evidence you have that

21    supports your conclusion that the fire began on the

22    surface of the peanut pile.

23      A    Well, I would go back to the same items that

24    we listed on page 8, and then also there's some

25    evidence to suggest that previously functioning

 1    thermocouples inside the building that have been

 2    giving readings were not giving accurate or maxed out

 3    or were giving 230-degrees readings at the time of

 4    the discovery of the fire.

 5          So that would suggest that there's a fire on

 6    the surface working its way into the pile.

 7              (Exhibit No. 196 was marked for

 8      identification.)

 9    Q   I'm showing you what's being marked as

10    Exhibit 196, and I'll also show you what we're going

11    to mark as Exhibit 197.

12              (Exhibit No. 197 was marked for

13      identification.)

14    Q   Mr. Rich, can you point me to the

15    thermocouples that you're referring to that establish

16    that you had a surface fire on August 11, 2009?

17    A   Well, I didn't say that.  That's another

18    factor to consider.  I didn't say that just the

19    thermocouples would establish that it was a surface

20    fire.  I think, again, you go back to the totality of

21    the circumstances or -- this -- okay.  I'm sorry.  I

22    was looking at the wrong -- the -- what I just

23    referred to was the August -- let's go back here

24    to -- these are going -- okay.  Here it is.

25    Q    In fact, go ahead on Exhibit 196 and circle

1  for me every data cell that you believe supports your

2  conclusion that there was a fire on the surface of

3  the peanut pile.

4      A    Okay.  The reason that I said that is I'm

5  looking at the July 13th data, which is --

6  thermocouple arrays 3 and 13 are giving numbers.

7  They're giving temperatures.

8            And then on August the 11th at 9:00 p.m.,

9  after discovery of the fire, number 3, number 13, and

10  a portion -- a portion of number 1 are no longer

11  giving -- giving data.  So that suggests that the

12  fire is burning into or attacking those trees so that

13  what was previously giving data has now been

14  compromised by the fire.

15      Q    That means the fire is hitting some portion of

16  those three cables, correct?

17      A    Yes.

18      Q    Those cables run from the top of the dome to

19  11 feet off the surface of the floor of the dome,

20  correct?

21      A    Yes.

22      Q    What does a cable going bad because it's being

23  attacked by a fire have to do with demonstrating that

24  the fire is located on the surface of the pile?

25      A    Well, because where the fire attacks the cable

1    and burns with the insulation, that short or that

2    point where the thermocouple's wires touch now

3    becomes the data point.  In other words, if you have

4    a cable laid out and you have a connection down here,

5    that's where it's taking its temperature where the

6    two dissimilar metals meet.  If somewhere up the

7    cable you short that, you touch those wires together,

8    that then becomes the point that the temperature is

9    being taken, not what you originally had down here.

10          So if the fire is on the surface burning into

11   these trees or attacking these trees, and even if

12   it's attacking the trees at the top of the dome where

13   they leave the dome, that's what -- that's why I'm

14   saying -- I'm not saying that the fire was at 1, 3,

15   or 13.  I'm saying that previously functioning

16   thermocouples now, after this August 11th time

17   frame, are not giving that data.  So they've been

18   compromised or attacked in some fashion in between

19   this time.

20   Q    And that has nothing whatsoever to do with

21   whether the fire emanated on the surface of the

22   peanut pile, does it, Mr. Rich?

23   A    In my mind, it does.

24   Q    I don't understand.  Explain to me how that

25   has anything to do with where the fire began.  The

1    same result could be equally true if the fire began

2    in the middle of the peanut pile or toward the bottom

3    of the peanut pile; is that not correct?

4        A    Not -- I don't think so.  But it has to do

5    with the fact that these three trees are being

6    attacked and they're not -- they're no longer giving

7    recordable data, but they previously were giving

8    recordable data.

9        Q    Is it your testimony that they're being

10   attacked at the surface of the peanut pile?

11       A    They could be, yes, or they could be being

12   attacked a little bit above the surface of the pile.

13       Q    Or they could be being attacked from within

14   the peanut pile?

15       A    They could be, yes.

16       Q    And you could still wind up losing all the

17   data from the cable?

18       A    Well, if it was being attacked from within the

19   pile, you would expect that at least somewhere that

20   was below in the pile you would still be getting

21   data.  If you're attacking it down here deep in the

22   pile, then the other sensors up above might still be

23   giving you -- I mean, you would expect that they

24   would still be giving you data.  It's only that --

25   the reason I think this is because as we attack it at

1  the surface, that takes out the entire array below

2  that.

3      Q    Okay.  Is it your testimony that the entire

4  array in a cable of the sort Safe-Grain installed

5  could only become dysfunctional from top to bottom if

6  it was attacked at the top of the cable?

7      A    Only dysfunctional if it was attacked at the

8  top of the cable.  Not the entire -- in other words,

9  if you attack at the top, I think they got the entire

10  cable.  If you attack it midline or near the bottom,

11  then you're going to -- I think you'll have different

12  readings -- you could still be getting readings from

13  above where the fire is attacking the cable -- or

14  vertically, I mean above.

15      Q    Have you talked with Scott Chant of Safe-Grain

16  about whether that is, in fact, true?

17      A    I have not talked with Scott Chant.

18      Q    Have you talked with anybody who manufactures,

19  sells, installs, or repairs temperature cables in

20  agricultural warehouses to determine whether what you

21  just said about where you're going to get readings

22  and where you're not is true?

23      A    I have not talked to anybody in the

24  agricultural business, no.

25      Q    Would it surprise you to learn that you can

1    have a compromise of one of these temperature cables

2    anywhere along the cable and result in the entire

3    cable being dysfunctional?

4        A    Well, not necessarily, because, I mean, that's

5    the nature of the thermocouple cable.  I mean, if you

6    attack it or you breach it or you short it, then that

7    takes out what's below it.

8        Q    My question to you is, would it surprise you

9    to learn that it is possible for an entire

10   temperature cable to become dysfunctional without

11   producing any data by attacking it at a place in its

12   middle or bottom?  Would it surprise you to learn

13   that?

14       A    I would say at the bottom, yes.

15       Q    That would surprise you?

16       A    Yes.

17       Q    You don't think that can happen?

18       A    I don't think if you attack it at the bottom

19   it's going to affect the arrays above it.

20       Q    And what if you attack it in the middle?

21       A    Then I think that you would attack -- if you

22   attack it in the middle, it will affect what's below

23   it, or depending on how it's attacked, I guess you

24   could take out the whole cable.

25       Q    Okay.  And if I hear you correctly, you have

1    concluded that because previously functioning cables

2    3 and 13 were not functioning as of August 11th,

3    2009, that those cables were attacked by fire at the

4    top of the cable toward the surface of the peanut

5    pile, correct?

6        A    Yes, that they were attacked by fire.    I

7    believe, yes, it's towards the surface, and I think

8    your example of number 1, which I included, suggests

9    just that, that the bottom of the thermocouple tree

10   in number 1 is giving readings, but the top is now

11   not giving readings.

12       Q    Okay.  Sir, do you know where the -- one, two,

13   three, four, five, six -- the seventh sensor on cable

14   1 was located?

15       A    Let's see.  They're numbered from the bottom.

16   That -- since that's number 7, that would be about

17   halfway up the pile.  I mean, I don't --

18       Q    Well, the first one is 12 and a half feet,

19   right?

20       A    Right.

21       Q    Then it's 19 and a half feet, right?

22       A    Yes.

23       Q    26 and a half feet, 33 and a half feet, 40 and

24   a half feet, and 47 and a half feet.  So the next one

25   that's missing there is 54 and a half feet, correct?

1      A    And you're at?

2      Q    I'm at the seventh position.

3      A    Right.  Right.  54.  Okay.

4      Q    That's over 50 feet below the ceiling of the

5   dome, isn't it, sir?  Right?

6      A    You're saying that number 7 is 54 feet --

7      Q    Above the ground.

8      A    -- above the ground.

9      Q    Uh-huh.  Do you disagree with that?

10     A    No.  I agree with that.  I'm just trying --

11  I'm trying to get it right in my head the order that

12  they were to remember what I had, but that's --

13  you're correct.

14     Q    The ceiling is 96 feet off the ground,

15  correct, at the center?

16     A    Yes.

17     Q    Cable 1 is at the center, right?

18     A    Cable 1 is at the center, yes.

19     Q    You've got 51 and a half feet between the

20  ceiling and where that sensor was located, correct?

21     A    Yes.

22     Q    Even assuming you've got head space of

23  25 feet, you're still nearly 30 feet into the peanut

24  pile where that sensor became inoperable as of

25  August 11, 2009, correct?

1     A    Yes, if -- yes.

2     Q    That does not establish anything supporting

3  the existence of a fire on the surface of the peanut

4  pile, does it, sir?

5     A    No, that does not.

6     Q    In fact, by your analysis, that establishes

7  that the fire began on cable 1 somewhere 51 and a

8  half feet below the surface of the ceiling of the

9  dome, correct?

10    A    No, because that doesn't take into

11 consideration 3 and 13, which also were giving

12 readings.

13    Q    I'm looking at number 1.

14    A    Right.  But that's not -- I'm not saying that

15 that's where the fire started.  I said these are

16 indications that the fire was attacking these cables.

17    Q    And the fire was attacking the cable number 1

18 specifically some 30 to 35 feet below the surface of

19 the peanut pile; isn't that correct?

20    A    It's possible that's correct.  We don't know

21 that for certain based on these two pieces of data.

22 But it's possible.

23    Q    Well, a moment ago you were saying don't

24 ignore number 1 because number 1 is also telling us

25 that we have a surface fire.  Isn't that what you

Deposition of Lester Rich

1   were telling me just a moment --

2       A   Yes, that is what I said.  That's what I said.

3   I believe I was incorrect.

4       Q   The fact of the matter is that the hottest

5   temperatures recorded on Exhibit 196 are well within

6   the peanut pile; isn't that correct?

7       A   I don't know if that's correct or not.  The --

8   because you don't really know what 13 and 3 are.

9       Q   Putting aside 13 and 3, the hottest

10  temperatures that includes reliable data --

11  208 degrees on cable 11, 205 degrees on cable 12,

12  201 degrees on cable 12, 201 degrees on cable 11,

13  200 degrees on cable 11 -- all those readings are

14  within the mass of peanuts, correct?

15          MR. WIDIS:  I'm going to object to the form

16    of the question.

17      A   Well, I will agree with you that they're

18  within the mass of the peanut.  I will not

19  necessarily agree with you on the reliability of them

20  based on what Mr. Chant has said in his depositions.

21  But I -- yes, I would agree that these numbers

22  recorded as written show higher temperature inside --

23  in the pile.

24      Q   And if the fire began on the surface, as of

25  August 11th, 2009 at 9:00 p.m., can you explain why

1    some 85 feet below the ceiling of the dome you're

2    getting temperature readings of 200 degrees?

3        A    Again, if those are accurate, the method of

4    the -- well, yeah, because you're raising the

5    temperature inside the dome because of the combustion

6    that's taking place.  You have smoldering combustion

7    taking place.  You're raising the temperature, as we

8    talked about earlier, throughout the dome.

9            Now, it's going to take longer to raise the

10   peanuts.  It's going to take a little bit longer

11   probably to raise the concrete temperature.  But

12   because the fire is burning in a sealed environment,

13   the only place for the heat from combustion to go is

14   back into the product and into the head space.

15       Q    Mr. Rich, other than Exhibit 196, do you have

16   any basis to support your conclusion that the fire in

17   the Severn peanut dome began on the surface of the

18   peanut pile?

19           MR. WIDIS:  Object to form.

20       A    I would say not other than what we talked

21   about on page 8, and that's the -- again, the -- all

22   of the facts that I have before me.

23       Q    The facts before you on page 8 just relate to

24   all of the different applications of Fumitoxin by

25   IFC?

1    A    I'm sorry.  I'm sorry.  I was talking about on

2    page 15.  We've been through 15, where we talked

3    about the items that I suggest support the Fumitoxin

4    fire.

5    Q    You're talking about the -- whether or not

6    piles were created?

7    A    Yes, that phosphene was applied, whether piles

8    were created, the surface configuration, the

9    temperature, the arrays.  All of that, yes.

10   Q    I'm asking if there is any physical evidence,

11   demonstrative evidence, evidence that we can look at,

12   on a piece of paper, in a photograph, that supports

13   your conclusion that the fire began on the surface of

14   the peanut pile other than Exhibit 196 which we've

15   just spent some time working on.

16        MR. WIDIS:  Object to form.

17   A    Not that I'm aware of.

18   Q    Mr. Rich, if, in fact, as you say, the fire

19   had begun on the surface of the pile, would you have

20   expected heat from that fire to have made the head

21   space hotter than places within the pile?

22   A    Well, the heat produced by the combustion --

23   the smoldering combustion is going to -- actually,

24   it's going to go in both directions because we're

25   talking about a smoldering fire, so that's a -- it's

1    a -- it's a -- it's a moving flame zone.  It's from

2    particle to particle.  Just like a cigarette, from

3    tobacco particle to tobacco particle.  It's a moving

4    front.

5          So it's going to move into the pile and up the

6    pile in this glowing combus- -- sorry -- glowing

7    combustion.  That's going to drive heat energy into

8    the pile as well as liberate it off the top.

9      Q    In a structure fire, what's the hottest

10   portion of the structure once the fire gets going?

11     A    In flaming combustion or smoldering

12   combustion?

13     Q    Let's take both.

14     A    Smoldering combustion, the flame front zone is

15   the hottest portion.

16     Q    Right where the --

17     A    Where the shouldering -- where the combustion

18   zone is taking place.  That's the hottest portion.

19          In flaming combustion or free-burning fire,

20   the primary transfer is convection.  So the hot air

21   rises.  So it's going to be hotter initially -- well,

22   it's going to be -- the layer collection is going to

23   the hotter at the ceiling.  The reaction zone where

24   the flames are actually burning, where there's

25   pulling of air and oxidation is occurring will be

1    hotter than the ceiling, obviously.

2        Q    Flaming fire, heat transfer is primarily

3    upward?

4        A    That's correct.

5        Q    You're saying smoldering fire, it's going to

6    be driven in both directions?

7        A    Yes, sir.

8        Q    All right.  Well, be it -- considering that to

9    be true, don't you find it odd, looking at

10   Exhibit 196, that the temperatures being recorded in

11   the head space are in the range of 115, 135, 150,

12   when you have temperatures significantly higher than

13   that at the bottom of the peanut pile?

14       A    Well, one, that's a big head space to change

15   temperature in.  Two, the readings you're looking at

16   are point measurements, particularly even so in the

17   head space, because it's a very small point that's

18   measuring the temperature.  And -- and it's a

19   seal- -- that's the differ- -- it's a sealed

20   container.  It's a sealed environment.  So the amount

21   of heat that's being liberated through combustion can

22   only go -- it has to stay in that system.  It's not

23   an open system, like a room fire or a house fire.

24           I think that's the difference here.

25       Q    Look at Exhibit 197, if you would.  We talked

1  about these temperature readings earlier, and I

2  believe it was your testimony that you did not

3  receive these temperatures prior to departing the

4  scene of the fire.  Correct?

5      A   Yes, sir.  I believe I got these shortly after

6  that.

7      Q   Where in your report on the section on

8  self-heating did you review and analyze these

9  pre-August 2009 temperatures?

10     A   I'm not -- I'm not sure I understand the

11 question.  I mean, I analyzed them and I looked at

12 them in conjunction with discussing or what I was

13 considering the spontaneous combustion.

14     Q   Show me.  Show me where.

15     A   I don't -- what do you mean show you where.

16     Q   Show you [sic] where you considered those

17 temperatures in your report, specifically on the

18 section on self-heating.

19     A   Oh.  Well, I didn't -- I didn't specifically

20 list them out, but they're -- they're included kind

21 of in this discussion about the pre-August 4th

22 temperature reading, the discussion about the

23 thermocouple array 16 being -- you know, giving the

24 same reading over an extended period of time.

25     Q   Can you show me what you're pointing to.

1      A    Oh, I'm sorry.  Page 12, they're included, I

2   would say -- most of that's included in the paragraph

3   that starts with the Safe-Grain, where I reference

4   these tables talking about the thermocouple array

5   number 16.  It's about three or four sentences down.

6      Q    So your analysis is the highest

7   pre-August 4th, 2009 non-default reading recorded

8   on July 13, 2009 was 91 degrees.  The arrays do not

9   show any sporadic increase or spiking of temperatures

10  on the order of several hundred degrees Celsius, as

11  expected, if self-heating proceeds to thermal

12  runaway.

13          Correct?

14     A    Yes, sir.

15     Q    That was essentially your analysis of

16  Exhibit 197?

17     A    Essentially, yes.

18     Q    Okay.  Was Exhibit 197 not telling the story

19  of what was happening inside of that dome prior to

20  the time of the fire?

21     A    I don't -- I don't follow what you're asking.

22     Q    What information do we have as to where there

23  was a heating process going on inside of that dome

24  prior to the time of the fire?

25     A    Oh, the -- the temperatures recorded by the

1      Severn employees, if you agree to their accuracy.

2          Q   And that's Exhibit 197, correct?

3          A   And that's 190- -- yeah.  I'm sorry.  Yes, the

4      answer would be Exhibit 197, because I think this

5      covers from -- let me look.  This covers from

6      December, January, February, March.  Because this one

7      stops in July, correct?  Yes.  Okay.

8          Q   And Mr. Rich, did you analyze whether there

9      was self-heating going on as demonstrated by

10     Exhibit 197?

11             MR. WIDIS:  Object to form.

12         A   Yes, I considered that.

13         Q   Was there self-heating going on?

14         A   There is -- if these temperatures are

15     accurate, there is some indication that there was

16     self-heating.

17         Q   Did you review Mr. Montross's report -- I'm

18     sorry -- Dr. Montross's report, Mr. Rich?

19         A   I reviewed it very briefly.

20         Q   Let me show you what we're marking as

21     Exhibit 198.

22             (Exhibit No. 198 was marked for

23          identification.)

24         Q   198 is Dr. Montross's report.  Does that

25     appear to be correct?

1      A    Yes, I believe so.  I mean, that's what it

2    says on it.

3      Q    Okay.  Did you come to understand that

4    Dr. Montross detected the existence of hot spots

5    within the peanut dome prior to August of 2009?

6      A    I'm not sure I understand what you mean by he

7    detected them.  I mean --

8      Q    Noted them.

9      A    That's what he says in his report, that there

10   were hot spots in existence.

11     Q    Did you understand that, that that's what he

12   says in his report?

13     A    Yes.

14     Q    Go to page 42, if you would.  And I will tell

15   you that in Exhibit 42 he's referencing Exhibit 197,

16   which we've just been looking at.  Do you have 197

17   still handy?

18     A    Yes, sir.

19     Q    190- -- there you go.  And he has marked with

20   a red X each one of those sensor readings -- of

21   course.  Each one of those sensors that he labeled to

22   be the hot spot.  Do you see that?

23     A    Is that what the red X is?

24     Q    Yes.

25     A    Okay.

Deposition of Lester Rich

1    Q    So for instance, cable number 2, the seventh

2    sensor.  Cable number 3, the sixth and the seventh

3    sensor.

4    A    Wait.  Hold on a second.  Cable number 1 --

5    I'm sorry.  Cable number 2.

6    Q    The seventh sensor.

7    A    The seventh sensor.  Let me number these so I

8    can do this here.  Okay.  So number 2 is number 7.

9    Okay.

10    Q    Cable number 3, cable number 4, and cable

11    number 5, the sixth and the seventh sensors and cable

12    number 6, the sixth sensor.

13    A    That's the 85?

14    Q    If you're looking at July 13th.

15    A    Yes.

16    Q    Yes.

17    A    Is that what I'm supposed to be looking at

18    or --

19    Q    Yes.  That's correct.  And what he said in his

20    report was that those sensors were consistently

21    hotter than the other sensors in the dome in 2009.

22    A    Okay.

23    Q    If you look forward on page 57 --

24    A    Now, I mean, are we going to go back and look

25    at those, or is that -- is that what -- is that what

1    he said?

2        Q    Accept that to be true for this point in time.

3        A    Okay.

4        Q    So just accept it to be true.

5            Page 57 shows you the actual physical location

6    of those sensors relative to all the other sensors in

7    the dome.  Do you see that?

8        A    I do.

9        Q    Did you take any particular note of these two

10   charts that we've been looking at or the graph and

11   the chart that we've just been looking at on pages 42

12   and 57 when you had an opportunity to look at

13   Dr. Montross's report?

14       A    I did see these.  I don't fully grasp this

15   three-dimensional cone diagram or -- I'm sorry --

16   dome diagram.  I read what he says, but I don't quite

17   understand how it's laid out up here --

18       Q    Okay.

19       A    -- in the schematic.

20           But yes, I did see these when I perused the

21   report.

22       Q    Did you understand what Dr. Montross is saying

23   is that the temperatures on the sensors that we just

24   looked at on pages 42 and 57 progressed at an

25   entirely different rate than the rest of the sensors

1    in the dome?  Did you understand him to be saying

2    that?

3        A    No, I did not -- I didn't take that from what

4    I've read.

5        Q    Well --

6        A    I got that they're warmer, but I'm not sure I

7    follow you on the -- what did you say?  Steady

8    progression?

9        Q    Progressed at an entirely different rate.

10       A    I'm sorry.  Right.  No.  I --

11       Q    Okay.  Well, go ahead and look at page 59,

12   which is simply plotting out of those temperatures

13   versus the other temperatures in the dome.

14       A    You said 59?

15       Q    Uh-huh, which is figure 16.

16       A    For the hot spot.

17       Q    The hot spot is red.

18       A    And that's -- this is referenced back to the

19   figure 14?

20       Q    Correct.

21       A    Wait.  That's this one.

22       Q    It's both of them.

23       A    Okay.  All right.  So we got that.  On 113.

24       Q    In fact, the colors match, so if you're

25   looking at page 57 -- yeah, if you're looking at

1    page 57, you can look at page 59 and see the average

2    temperatures by color.  So the green on page 57 is

3    the green on page 59.

4       A    Okay.  That's what I was getting ready to ask

5    you.  That's what you meant.

6       Q    The blue on page 57 is the blue on page 59,

7    and the red on page 57 is the red on page 59.

8            And on March 11th -- and these are just

9    taking the actual numbers from Exhibit 197 --

10      A    Okay.

11      Q    -- and transposing them onto charts and

12   graphs.

13           On 3/11, you can see that the blue core

14   temperatures as he labeled them were almost identical

15   to the red hot-spot temperatures as he labeled it and

16   that both of those were a little bit elevated from

17   what he labeled to be the outer temperatures.

18           Do you see that?

19      A    You're in between --

20      Q    March 11th.

21      A    March 11th.  Right.

22      Q    Right.  Do you see that?

23      A    Wait.  I don't know about the above -- his --

24   does he show me the ambient temperature, or is it the

25   line?

1    Q   The line --

2    A   Is --

3    Q   -- if you look on the legend, is the 21-day

4  average ambient.

5    A   Okay.

6    Q   So you have a confluence on March 11th of the

7  21-day average ambient temperature, the hot spot, and

8  the core temperatures, all of which are almost

9  identical.  Do you see that?

10   A   Yes.

11   Q   And then in June, on June 9th, the hot spot

12 temperature is above 60, the core temperature looks

13 like it's just above 50, and the outer temperature is

14 just below 50.  Do you see that?

15   A   You're on June 9?

16   Q   June 9th.

17   A   Well, I see the -- oh, I'm sorry.  The outer

18 temperature -- is that outer rings in the dome -- or

19 that's -- that's not the ambient temperature.  That's

20 the outer rings of the dome.

21   Q   Correct.  I'm sorry.

22   A   Okay.

23   Q   The line --

24   A   Yeah, because I was going to say, to me the

25 ambient temperature is above --

1    Q    Correct.

2    A    -- all of those temperatures.

3    Q    That's correct.  The ambient temperature --

4    A    Okay.

5    Q    -- on June 9th --

6    A    Okay.

7    Q    -- is above the hot spot, which is just above

8    60, which is above the core temperature, which is

9    just above 50, which is above the outer temperatures,

10   which is just below 50.

11        Do you see that?

12   A    Yes.  And that's his range delineated by the

13   lines on either side of the point; is that correct?

14   Q    No.  No.  The -- I don't know the answer to

15   that question, but I know the square, the diamond,

16   and the circle are the average of the temperatures in

17   the zones.

18   A    Oh, okay.  So not a -- not -- okay.  Wait a

19   minute.  I'm confused.  The square, the diamond, and

20   the circle are averages?

21   Q    Correct.

22   A    Of what?  This or --

23   Q    Of the cables that we looked at just a moment

24   ago.

25   A    Okay.  Okay.  Oh, the averages of --

1       Q    The blue, the green, and the red.

2       A    The ones I circled?

3       Q    Yes.  So --

4       A    Wait a minute.  I got it.  I think I got it.

5   So --

6       Q    If you put 57 side by side with 59 --

7       A    I told you, I haven't looked at this, so I'm

8   sorry, but be patient with me.  I just want to make

9   sure I'm looking at the right -- I want to make sure

10  I'm understanding.

11      Q    Put these two side by side.

12      A    Right.

13      Q    They match.  The green --

14      A    Okay.

15      Q    -- squares are the average of the green

16  circles on page 57.

17      A    No.  My question is the red circle, the blue

18  rectangle -- I mean blue diamond and the green square

19  are the averages that correspond to these temperature

20  readings and it's the average all of those sensors?

21      Q    No.  It's the average of the sensors that

22  you're looking at that match the color on page 57.

23  57, everything you see in green is averaged together.

24      A    Okay.  And that gives me this dot over here?

25      Q    Gives you a square.

Deposition of Lester Rich

1    A    Okay.  But what -- what are these?  Those

2   colors -- those numbers, those temperatures, what is

3   that?  What is he averaging?

4    Q    Page 59 is a graph that shows the average

5   temperatures within the dome at each date measured in

6   three different areas of the dome.

7    A    Okay.  And those are the red, the blue, and

8   the green?

9    Q    As denominated on page 57.

10    A    Okay.

11    Q    Do you see that?

12    A    I see that.  I'm still slightly confused about

13   what sensors -- no, I think I got it.  So these --

14   these sensors -- these sensors -- these green, this

15   green, and this green are all averaged together to

16   give me this.

17    Q    To every green square --

18    A    Right.

19    Q    -- that you see on page 59.

20    A    Okay.  And there's a -- there's a temperature

21   reading off of here that he's matched up with this?

22    Q    Exactly.

23    A    I'm with you.  Go ahead.  Sorry.

24    Q    And so basically he's looking at three

25   different areas of the dome --

Deposition of Lester Rich

1    A    Okay.

2    Q    -- what he denominates the hot spot, the core,

3    and the outer areas, and the outer areas comprise the

4    cables that are on the outside ring of the concentric

5    circles in the Safe-Grain diagram.

6         Does that make sense to you?

7    A    Okay.

8    Q    And the core temperatures are the temperatures

9    other than the hot spots everywhere interior of the

10   outer ring.

11        Do you want to look at Mr. Chant's diagram?

12   A    I was going to say, so that -- in Chant's

13   diagram, that's the two center concentric circles.

14   Q    Actually, there's the one in the middle.

15   A    Well, the one in the middle.  Okay.  All

16   right.

17   Q    Okay.

18   A    And that's the core.

19   Q    That's the core with the exception of the red

20   dots that he has denominated to be the hot spot.

21   A    And actually, can we -- can we look at

22   Mr. Chant's diagram, just so I don't get confused?

23   Q    We can.

24   A    Since I had so much trouble with the green

25   squares, let's just look at the diagram.

1      Q    I've got it right here.  It's Exhibit 105.

2      A    All right.  So our outer ring is green.  The

3   inner three rings are blue.  Correct?

4      Q    Unless he has denominated --

5      A    Unless he has --

6      Q    -- a sensor or a hot spot.

7      A    -- designated as a hot spot.

8      Q    We've already written down which particular

9   sensors those were.

10     A    These are blue, and then hot spots are red.

11  Okay.  Got that for reference.  Now let's go ahead.

12     Q    Now, looking back at page 59, do you have a

13  better understanding of what is being graphed out on

14  page 59?

15     A    I do.

16     Q    Okay.  Good.  Can you explain why the average

17  temperatures within what Dr. Montross described as

18  the hot spot were some 30 degrees hotter as of

19  July 13, 2009 than the average temperatures in the

20  outer edges of the peanut mass, along the outer

21  concentric circle, why there would be a 30-degree

22  difference between those two?

23     A    Well, without reading the whole report, my --

24  the only explanation I would have based on this is

25  that there's some self-heating going on.

1      Q    Okay.  And for this self-heating to get to a

2   point where the hot spots, as Dr. Montross labeled

3   them, are at about 85 degrees and the 21-day average

4   ambient temperature is somewhere between 70 and

5   80 degrees, would you not consider that to be pretty

6   significant self-heating?

7      A    What was the -- what was the difference in the

8   temperature?

9      Q    You can see it on July 13th where the hot

10  spot is somewhere -- looks like about 85 degrees on

11  average, and the ambient air rolling average is under

12  80 degrees.  Does that not strike you as significant

13  in terms of analyzing the self-heating going on

14  within the dome?

15     A    I would say it's -- yes.  It's -- I wouldn't

16  say it strikes me as significant.  I think it strikes

17  me as -- that there's -- if the numbers that he's

18  taken are accurate, that that does suggest that there

19  is some self-heating going on.

20     Q    I mean, there -- assuming the numbers are

21  accurate, as you've said, and assuming you properly

22  understand how the data is compiled on page 59,

23  there's no other explanation for what's going on in

24  that dome other than self-heating, is there?

25     A    Well, there is -- it could be a combination.

1   Self-heating I think would be a part of that, but we

2   do have increase in the ambient temperature, also.

3   So it may be a combination of the two facts.

4       Q    Can you explain why the increase in the

5   ambient temperature would apply in a way that in the

6   hot spot the average temperature is 30 degrees hotter

7   than all of the sensors around that hot spot?

8           MR. WIDIS:   Object to form.

9       A    No, I'm not saying that that's -- that it's

10  30 degrees hotter than them because of the ambient

11  temperature.  I'm saying that the two factors, the

12  self-heating and the ambient temperature, are working

13  in concert -- both -- both items are a factor in my

14  opinion.

15      Q    Okay.

16      A    Not just one completely independent of the

17  other.

18      Q    Looking at page 59, you see that the hot spot,

19  as Dr. Montross labeled it, has gone from an average

20  of 45 degrees, thereabout, in March, to an average of

21  65 degrees, thereabout, in June, to an average of

22  about 85 degrees in August.

23          Do you see that?

24      A    Yes.  You're just -- you're tracking it right

25  up.

1    Q    Yes.

2    A    You're reading it right off of page 59?

3    Q    Correct.

4    A    Okay.

5    Q    And I will tell you that Dr. Montross

6    concludes in his report that peanuts that were cooled

7    to 40 degrees Fahrenheit on March 11th in a sealed,

8    insulated concrete dome cannot increase in

9    temperature above the 21-day average ambient

10   temperature unless biological heating was occurring.

11       Do you agree with that as well?

12   A    I wouldn't disagree with that, I don't think.

13   Q    And Dr. Montross also states that there is no

14   other plausible explanation regarding how the hot

15   spot could be significantly warmer than other regions

16   within the dome and the outdoor temperature.

17       Do you agree with that?

18   A    Say that one more time.

19   Q    He says, other than self-heating, there is no

20   other plausible explanation regarding how the hot

21   spot could be significantly warmer than other regions

22   within the dome and the outdoor temperature.

23       Do you agree with that?

24   A    Yes, because he -- read that one more time.

25   He included ambient and the outer regions of the dome

Deposition of Lester Rich

1    at the end of that question, didn't he?

2        Q    Correct.

3        A    Just read it to me one more time.

4        Q    He said apart from self-heating --

5        A    Right.

6        Q    -- there is no other plausible explanation

7    regarding how the hot spot could be significantly

8    warmer than other regions within the dome and the

9    outdoor temperature.

10            Do you agree?

11       A    Yes, with the -- with the caveat of I think

12   those two things work together.  The ambient

13   temperature and the self-heating would work together,

14   interrelated.

15       Q    Okay.  Do you agree that the progression that

16   we see from March to August in what Dr. Montross

17   labels the hot spot -- I'm sorry -- March to July was

18   going to continue progressing after July 13th, 2009

19   if, in fact, self-heating was playing a role in that

20   progression?

21       A    No.

22       Q    You think it would just stop on July 13th?

23       A    It could have stopped at some time shortly

24   after July 13th, yes.

25       Q    And what would have led it to stop?

1    A   The death of the biological material that's

2  creating the spontaneous -- or sorry.  The death of

3  the mold and the microbes that are creating this

4  self-heating.

5    Q   Okay.  So you're in agreement that there were

6  molds and microbes creating the self-heating that we

7  see evidenced on page 59, correct?

8    A   I'll say my understanding and experience is

9  with the stored commodity that it is the mold and the

10  microbes that initiate the biological heating.

11  That's why it's biological.

12    Q   And that's, in your opinion, what we see

13  evidenced on page 59 of Dr. Montross's report in the

14  red circle?

15    A   Given that this is accurate --

16    Q   Yes.

17    A   And like I said, I haven't studied his report.

18  So there may be things in his report I don't agree

19  with.  But based on the premise of your question, I

20  would say yes, that's self-heating from a

21  biological -- or most likely self-heating from a

22  biological event or biological source.

23    Q   You have no way of knowing whether that

24  biological source would have continued to cause

25  self-heating after July 13th, 2009, do you?

1    A    Well, I don't know specifically if this hot

2  spot would continue heating, but I do know from my

3  research and reading that the biological activity

4  ceases at a certain temperature.

5    Q    At which point thermal runaway can begin,

6  correct?

7    A    Not thermal runaway, but the oxidation

8  reaction could then take over, which then could lead

9  to thermal runaway, which then could lead to

10  spontaneous combustion.

11    Q    What evidence do you have that would allow you

12  to state to a reasonable degree of scientific

13  certainty that that's not exactly what happened to

14  what Dr. Montross labeled a hot spot subsequent to

15  July 13th, 2009?

16    A    There's no evidence to suggest that that's

17  what happened.

18    Q    What evidence do you have that it did not

19  happen?

20    A    Well, I would point to the -- the statements

21  of the Severn employees who didn't -- with this

22  biological heating, there is normally an odor

23  associated with it.  There's a mold or rancid odor

24  associated with that process.  And there's the Severn

25  employees that don't report any smells when they were

1　　up there applying the protectant.  There were the IFC

2　　employees who were asked that don't report any

3　　mold -- I mean don't report seeing any -- seeing any

4　　mold or smelling any smoke or other rancid odors.

5　　And there's nothing -- I think they -- I think what

6　　they actually said was there's nothing that they

7　　observed or saw that would contraindicate the

8　　fumigation.

9　　　　　　And the other issue is that IFC reported the

10　　temperature of the commodity at 77 degrees on the day

11　　they fumigated it, not 91.

12　　　　　　And there's also the -- if you look at this

13　　data, which may or may not be accurate, there's

14　　nothing in these temperatures to suggest that the

15　　self-heating is progressing to a thermal runaway.

16　　　Q　　Okay.  Well, let's take those one by one.  You

17　　said the Severn employees didn't smell anything

18　　consistent with self-heating or biological process.

19　　Did I get that right?

20　　　A　　Yes.

21　　　Q　　You've already told me that as of July 13th,

22　　you would agree there was a biological process

23　　causing self-heating, correct?  You're on record as

24　　having said that.

25　　　A　　I would agree that that's what this shows.

1    Q   Okay.  And guess what, Mr. Rich.  They were

2  standing atop that dome on July the 1st.

3    A   Okay.

4    Q   That heating was already taking place as of

5  then, correct?

6    A   According to this, yes.

7    Q   The fact that they didn't smell it means that

8  they didn't smell a biological process that was

9  already taking place, correct?

10    A   That they report not having a smell at the top

11  of the dome.  That's -- I can tell you that.

12    Q   But page 59 tells us -- assuming it's

13  accurate -- that it was taking place despite the fact

14  they didn't smell it?

15    A   Yes.  If that's accurate.

16    Q   And the same thing could well be true on

17  August the 4th when the IFC applicators were at the

18  top of the dome, as was true on July the 1st.  They

19  didn't smell what was happening right beneath them.

20    A   I don't know if I agree with that or not

21  because I think they said that they actually put

22  their head inside the dome through the hole.  So

23  that's different -- I don't know -- I don't recall if

24  the Severn employees put their head through the -- in

25  other words, when they were applying the protector,

1    were they standing up?  Are they up, you know,

2    vertically above the hole or like the IFC employees,

3    who said they put their head through the hole?

4            That, to me, would make a difference on

5    whether you could smell it or not.

6      Q    You're not basing your opinion that biological

7    heating or self-heating can be eliminated as a cause

8    of the fire based upon what humans were able to smell

9    on top of that head house, are you?

10     A    I'm not saying that self-heating is eliminated

11   as the cause of the fire.  I'm saying that

12   self-heating leading to thermal runaway leading to

13   spontaneous combustion was eliminated as a cause of

14   the fire, and one of the factors involved in that was

15   the reported -- the testimony of the people who were

16   on top of the head house.

17           THE VIDEOGRAPHER:  Counsel, we need to go off

18      the record, change tapes.

19           This is the end of tape number 4.  Time now

20      is 3:02 p.m.  We're off the record.

21           (A recess was taken.)

22           THE VIDEOGRAPHER:  We're going back on the

23      record, beginning of tape number 5.  The time now

24      is 3:15 p.m.

25     Q    Mr. Rich, we were going through the reasons

Deposition of Lester Rich

1    why you believe the self-heating process documented

2    by Dr. Montross, with which you agree up to

3    July 13th, 2009, did not get to oxidation and

4    thermal runaway, and we had talked about what the IFC

5    employees smelled on August the 4th or didn't smell

6    on August the 4th.  We talked about what the Severn

7    employees smelled or didn't smell on July the 1st.

8         You also mentioned the temperature that was

9    obtained for the commodity itself on August 4th when

10   the IFC applicators were there.  Did you mention

11   that?

12       A   Yes.

13        And I also have one -- I have a question on

14   Montross's report.

15       Q   Okay.

16       A   When we were looking at 59 and were talking

17   about what he's identified as the hot spot, those are

18   based -- his -- his temperatures -- what are they

19   based on?  Where -- where does the green square, the

20   blue diamond, and the red dot -- where does that

21   number that he's plotted come from?

22       Q   Exhibit 197.

23       A   But what -- is it an average of all the --

24       Q   Average of each of the sensors on the -- that

25   are green, blue, or red.  So each of the sensors that

1    are green, blue, or red are averaged from Exhibit 197

2    and put onto the graph that you see on page 59.

3        A    And that's for each month?

4        Q    Correct.  Exactly right.  Are we on the same

5    page?

6        A    Well, we are.  I just -- I'm -- I'm just --

7    I'm a little -- I don't know that the average

8    temperature is going to be -- I mean, I know that's

9    what he's reporting, and I know that's what we're

10   talking about showing.  But I don't know how accurate

11   or applicable an average is out of these numbers of

12   sensors, and I haven't gone through his report to

13   see --

14       Q    Okay.

15       A    -- how he did that.

16       Q    Okay.

17       A    Did he make some other assumptions or did

18   he -- and as I was reading it while we were on the

19   break, there's a -- he uses a model here of some sort

20   to project additional temperatures.

21       Q    Okay.  And I will tell you that that model

22   projecting additional temperatures is not until you

23   get to page 68.

24       A    Okay.

25       Q    So that has nothing to do with page 59, which

1    is taken exclusively --

2        A    Okay.

3        Q    -- from existing temperatures that are in

4    Exhibit 197.

5        A    All right.  So just -- I want to just try to

6    be clear, make sure I understand that these are --

7    he's using averages of these sensors, and he's

8    predicting or showing this hot spot based on these

9    averages of the sensors?

10       Q    Not predicting but showing.

11       A    Or showing.  Okay.

12       Q    And I'll show you --

13       A    But the --

14       Q    I will show you Exhibit 68, just so

15   you understand the diff- -- page 68, just so you

16   understand the difference.  If you look at page 68,

17   there is a red line that is added in which is his

18   model hot spot.  So I think when you were reading,

19   you were reading something about his model hot

20   spot --

21       A    Right.

22       Q    -- which graphs out through that line what his

23   model projected the hot spot temperature to be from

24   December 1st all the way through August 11th of

25   2009.

1      A    Okay.  Well, yeah.  And I guess what I'm

2   trying to say is if -- if these are the averages,

3   then I agree that if you average them together, this

4   is what he would get.  I'm not agreeing with his

5   report or --

6      Q    Correct.

7      A    -- his conclusions or pretty much anything

8   else other than if he averaged these, that's what

9   this is going to show if he documented this -- you

10   know, grammatical errors or mathematical errors.

11      Q    Correct.  And so that -- my questions were all

12   based upon the hard data, not predictions, not

13   projections, not models.

14      A    Okay.

15      Q    Okay?

16      A    If that's accurate, then that's what we've

17   got.

18      Q    Okay.  So you had said why -- despite what we

19   see Dr. Montross saying on page 68 would have

20   continued to happen following July the 13th, which

21   he concludes would have gotten you to the

22   temperatures recorded by the Safe-Grain system on

23   August 11th, 2009, and that's shown on page 68,

24   your conclusion is the opposite, correct, Mr. Rich,

25   that you would not have gotten to temperatures

Deposition of Lester Rich

1    capable of producing ignition, correct?

2        A    Where -- I believe the answer is yes, but

3    where on page 68 are you seeing -- where is that

4    projected temperature of ignition?

5        Q    I didn't say -- if I said that, I misspoke.

6    He projects temperatures continuing to escalate after

7    July the 13th in the line that heads in the

8    direction of July 13th to August 11th in the red.

9    That's his projection through his model as to what's

10   going to continue to happen with the temperatures

11   after July the 13th.

12            You told me that for ignition to occur, you'd

13   have to get oxidation, oxidation to have to lead to

14   thermal runaway, and you told me a variety of reasons

15   why you know that didn't happen.  Correct?

16       A    Yes.

17       Q    We've been through a couple of those.  I

18   wanted to get to the reason you mentioned related to

19   what temperature was recorded in the peanut mass the

20   day of the August 4th fumigation.

21       A    Okay.  Well, then I think the other -- I can't

22   agree or disagree based on what his model is.  I'm

23   not -- I don't know if --

24       Q    I agree.

25       A    Was that a question or not?

1      Q    It's not.

2      A    Okay.  All right.  Because I mean --

3      Q    I expect you disagree.

4      A    There's a line.  I don't know anything more

5  than that right now.

6      Q    I expect -- in fact, you have disagreed that

7  the temperatures were going to continue escalating

8  until combustion?

9      A    Okay.

10     Q    You disagree with that, correct?

11     A    Yes.

12     Q    And despite the fact that the temperatures had

13  escalated from March to June and June to July in that

14  hot spot, your testimony is they would not have

15  escalated to the point of combustion and did not

16  cause this fire, contract?

17     A    Yes.

18     Q    And one of the reasons you told me just before

19  we took our break that you believe that's so is

20  because the fumigators from IFC detected

21  temperatures, you said, of 77 degrees in the

22  commodity on August 4th, 2009.  Correct?

23     A    I believe that's correct, but we have the --

24  I'm sure we can look at it here.

25     Q    We're going to.  Exhibit 4 -- I'm sorry -- 23.

1    Is this what you were referring to when you said that

2    the IFC applicators measured the temperature and they

3    got a temperature -- I think you said 77.  It shows

4    here 75 degrees.

5        A    Is this for -- yeah, August 4th.  Yes, this

6    is what I was referring to.

7        Q    Okay.  You believe that the IFC fumigators

8    actually used a thermometer of some sort to measure

9    that temperature.  Is that your understanding?

10       A    That -- I don't know.  My understanding is

11   from the deposition that that is the temperature that

12   they recorded, both an interior -- I mean, it's twice

13   on here.  It's a commodity temperature, an interior

14   temperature, an exterior temperature, an exterior

15   humidity, and then the two dash lines.  I mean, it's

16   my understanding that this is accurate -- this is an

17   accurate document.

18       Q    You reviewed Mr. Turner's deposition, did you

19   not?

20       A    Yes.

21            (Exhibit No. 199 was marked for

22      identification.)

23       Q    Go ahead and take a look at Exhibit 199, which

24   is page 228 from Mr. Turner's deposition.  He was

25   asked on line 7, did you check the temperature inside

1    the dome prior to the August 4th, 2009 fumigation?

2          Answer:  I didn't check it myself.

3          Question:  All right.  Where did you get the

4    number that's on your service report?

5          Answer:  RP Watson provided it for me.

6          Question:  But you didn't check any

7    temperature yourself?

8          Answer:  No.

9          Were you not aware of that testimony,

10   Mr. Rich?

11     A    I was not aware of that testimony.

12     Q    I'll show you what we're marking as

13   Exhibit 200.

14          (Exhibit No. 200 was marked for

15     identification.)

16          MR. GOLDSTEIN:  Excuse me.  What was 199?

17          THE WITNESS:  That page.

18          MR. GOLDSTEIN:  I'm sorry.  Okay.

19     Q    Did you review Mr. Watson's Volume 1

20   transcript, Mr. Rich?

21     A    Yes.

22     Q    Okay.  Look at page 252.  Mr. Watson was

23   asked, do you ever remember having a conversation

24   with Randy Turner prior to the time he or a crew from

25   IFC came to do a fumigation where he would ask you,

1    RP, what's the temperature of the peanuts?

2          Answer:  I never recall having that being

3    asked.

4          Question:  Are you certain that conversation

5    never occurred in relation to any fumigations IFC

6    performed in the peanut dome?

7          Answer:  I'm certain.

8          Having reviewed Mr. Turner's testimony and

9    Mr. Watson's testimony, do you still feel comfortable

10   relying on the commodity temperature in Exhibit 23 to

11   support your conclusion that the commodity did not

12   have a temperature that was escalating as of that

13   date?

14      A    I don't -- I can't -- I mean, they're saying

15   two different things.  So you have the document, and

16   it was prepared by Randy Turner.  He wrote down these

17   temperatures.  One person is saying one thing and one

18   person is saying the other.  They're both under oath.

19   I can't make a determination of that other than

20   what's here.

21      Q    So even though he said he didn't measure the

22   temperature and he got the temperature from a person

23   who says didn't give it to him, you're going to rely

24   on the 75 degrees to support your conclusion that the

25   self-heating process that you described a moment ago

1    had come to conclusion?

2         MR. WIDIS:  Object to form.

3    A    It's one piece of the information.

4    Q    So you're willing to rely on that 75 degrees

5    in Exhibit 23 to support your conclusion eliminating

6    self-heating as a possible cause of the fire?

7    A    I'm willing to consider this as one point of

8    the data.  Yes.

9    Q    Okay.  Well, what else do you have at this

10   point to convince a jury that the self-heating

11   process that you testified to a moment ago occurring

12   from biological activity within the peanut dome had

13   stopped in time so that the fire that occurred in

14   August of 2009 was not related to that self-heating

15   process?

16        MR. WIDIS:  Object to form.

17   A    Well, the -- well, the information that I

18   would rely on goes back to what I say in my report.

19   There's -- there's basically -- there's basically

20   four data points that can be used in addition --

21   working with the spontaneous combustion hypothesis.

22   The witness statements, the recorded IFC temperature,

23   the temperatures recorded by the in-house

24   thermocouple system, if it's reliable, and the -- and

25   I would say the fire dynamics of the smoldering fire.

1          So of those things, we've talked about the

2     witnesses not reporting any odors, we've talked about

3     this temperature, we've got temperatures that are

4     being recorded that show or suggest some self-heating

5     could be taking place in conjunction with the ambient

6     temperature.

7          And again, if Montross is using an average

8     ambient temperature, there could be an issue.  If

9     it's a really hot day and then it's a cool day, that

10    could change, too.  So we don't know -- I mean, we

11    know the ambient temperature for a day, so you could

12    put that instead of an average.  We could look at

13    that.

14         But those -- those things would be what I --

15    or those are the items that I relied upon or looked

16    at to test this hypothesis of self-heating leading to

17    thermal runaway leading to spontaneous combustion.

18    Q    You also relied on the NFPA Handbook,

19    17th Edition, when listing materials subject to

20    spontaneous heating, listing shelled peanuts as very

21    slight or negligible.  You relied on that, too,

22    didn't you?

23    A    Both shelled and unshelled.  I included that

24    just because they're both peanuts.  And we do have

25    broken peanuts in there, so there are some -- even

1    though it's farmers stock, we know that they break.

2    They come apart.  There's also foreign material.

3         Q    Do you remember looking at the peanuts that we

4    looked at a while ago on your timeline?

5         A    Right.

6         Q    How many of those were shelled peanuts, sir?

7         A    They weren't shelled, but there are kernels

8    outside of the shell just because the nature of the

9    loading and unloading and it being farmers stock.

10        Q    The reference in the NFPA handbook and in the

11   JT Mill Spoilage and Heating of Stored Agricultural

12   Commodities to the risk of fire associated with

13   peanuts, sir, is to shelled peanuts, correct?

14        A    I believe you're correct.  I don't think

15   Mills -- I don't think Mills -- I think there's two

16   separations in Mills.  There's shelled, and then

17   there's peanuts.  There's also a red skin.

18        Q    Without marking this as an exhibit, since it's

19   so long -- it's in color -- just go ahead and look at

20   Mills publication, page 11.

21        When he's talking about the tendency to

22   self-heat, is he talking about shelled or unshelled?

23        A    This is -- this isn't the chart I was thinking

24   about when you said that.  Here Mills is talking

25   about peanuts shelled, yes.  He has them listed as

1    very slight.

2        Q    And you've already agreed that if the

3    temperatures recorded in Exhibit 197 are accurate, we

4    know there was self-heating going on in the peanut

5    dome, correct?

6        A    I'm agreeing that's what Montross's chart

7    shows.

8        Q    Okay.  And that -- despite what you say about

9    moisture content at the bottom of page 11, it would

10   have to be the moisture content of those peanuts that

11   led to that self-heating, correct?

12       A    I'm sorry?

13       Q    Despite what you say about the moisture

14   content at the bottom of page 11 of the peanuts that

15   went into the dome, the only way you could have had

16   that self-heating going on inside the dome was

17   because of excess moisture, correct?

18           MR. WIDIS:  Object to form.

19       A    Well, I don't know that I can agree with you

20   that it was excess moisture.  I would agree -- or to

21   me it would be that yes, there were -- it's the --

22   you're right -- half the question.  I agree that the

23   moisture is what drives the mold and the biological

24   heat.

25       Q    Right.  And it was the moisture that drove

1    mold and biological heating in this dome if the

2    temperatures in Exhibit 197 are accurate and

3    Dr. Montross accurately captured that on his chart,

4    correct?

5        A    In conjunction with any effect the ambient

6    temperature would have had.

7        Q    Okay.  I didn't see any reference in your

8    report, Mr. Rich, to the soldiers that RP Watson

9    talked about.  Is there a reason you decided not to

10   reference those soldiers in your report?

11       A    I'm familiar with what you're talking about,

12   but no, not particularly.

13       Q    Did you find the soldiers that he was talking

14   about germane to the topic of whether self-heating

15   played a role in this fire?

16       A    Some of the literature does discuss that, and

17   it may have been in one of the reports that you

18   provided that I perused that discusses that.  I

19   remember RP talking about that and relating it --

20   it's a combination of the method of loading, what

21   they call the fines, the dirt, and that sort of thing

22   that stays in the peanut pile -- I'm sorry -- in the

23   peanut pile as a result of top loading.

24       Q    Did you analyze in any form or fashion whether

25   those soldiers had anything to do with excess

1    moisture?

2        A    I don't know that for certain, but there is --

3    and again, it could be from one of your experts'

4    reports, and I'm not -- I don't know if I agree with

5    it or if it's accurate.  But I have read that there

6    can be moisture associated with the soldier, but I

7    think it was from one of --

8        Q    Does that concept make sense to you?

9        A    In general, yes, but I also say that would

10   be -- it's got to be more than the moisture.  I think

11   it would deal with the dirt, the dust, the leaves,

12   the twigs.  I don't think it's just -- I don't think

13   it would be just moisture.  I think it's a

14   combination.

15       Q    And all those things that you just mentioned

16   in combination, does that sound like a recipe for

17   self-heating?

18            MR. WIDIS:  Object to form.

19       A    I don't agree that it's a recipe for

20   self-heating, but it's -- self-heating could occur

21   under those conditions.  I don't think it's

22   guaranteed.

23       Q    Page 12, at the top -- and we're back to your

24   report.  I'm sorry it's taking us a while to get back

25   there.

1        You state that because none of the peanuts

2    removed in previous years exhibited any signs of

3    self-heating, it is unlikely that self-heating, if

4    any, as a result of organic decomposition in the

5    stored peanuts was sufficient to cause the fire.

6        Right?

7    A    I was on the wrong page.  I'm sorry.  I'm with

8    you now.

9    Q    It's at the end of the first paragraph.

10   A    After the portion about JLA?

11   Q    Uh-huh.  And it's after you talked about the

12   prior years that they had not lost any product to

13   mold contamination or aflatoxin nor any of the

14   peanuts removed during the prior years exhibited

15   signs of self-heating, and so you say, therefore, I'm

16   discounting the possibility that organic

17   decomposition in stored peanuts would have been

18   sufficient to sustain to lead to thermal runaway.

19       Right?

20   A    I didn't say discounting.  I said it's

21   unlikely that self-heating would have occurred.

22   Q    None of the fumigations in any of the prior

23   years had caused a fire, either, correct?

24   A    Yes.  That's absolutely right, that we know

25   of.

1    Q   And yet you concluded that a fire was caused

2   by the fumigation on August 4th, 2009, correct?

3    A   Yes, sir.

4    Q   Just because something didn't happen in prior

5   years doesn't mean it didn't happen in the year

6   you're looking at, correct?

7    A   Well, yes.  And that's the -- I mean, that

8   kind of gets back to what you were asking earlier

9   about the Fumitoxin.  If you did an experiment and it

10   didn't happen there, it doesn't mean it won't happen

11   in the real world.

12    Q   But you're actually pointing to the lack of

13   self-heating in prior years as a basis to conclude,

14   well, that's not an explanation for the fire in 2009?

15    A   No, I'm not using that as a basis to conclude

16   it.  I'm pointing to that as an example to say that

17   the -- there hasn't been -- in the peanuts they've

18   pulled out, they haven't had these issues previously.

19   And in my mind, if I had had those issues previously,

20   that would be something I'd want to know about and

21   consider, because if I've had moldy peanuts come out

22   before or I've had a pocket of peanuts that I

23   couldn't use because they were all brown and

24   self-heated from some prior loading of the dome, that

25   would be important to me as a fire investigator to

1    know.

2        Q    There was a mass of 21 million pounds of

3    peanuts stored in the dome, correct?

4        A    Yes, sir, I think that's the approximate

5    weight.

6        Q    And there were 19 temperature cables that ran

7    through those peanuts, right?

8        A    Yes.

9        Q    Would you agree with me that those temperature

10   sensors on those cables covered only a small fraction

11   of the 21 million pounds of peanuts?

12       A    I would say, to answer that, I would have to

13   go back and let's refer to Chant's deposition because

14   I believe that he discusses and talks about what his

15   thoughts are on how much of that area was covered.

16   And I remember about -- there's a vertical cone

17   associated with the dimensions of each one.

18            So I couldn't agree with you that it's a very

19   small percentage, but I would certainly agree that

20   it's not the entire dome.

21       Q    There are certainly peanuts in the peanut mass

22   that the temperature cables were not detecting the

23   temperature of, correct?

24       A    I would expect so, yes.

25       Q    All right.  And would you therefore agree with

1    me that the temperatures recorded on July 13, 2009

2    prior to the fumigation in question probably did not

3    record the hottest temperatures inside of the peanut

4    mass?

5         A   I don't know that.  They could have.

6         Q   Okay.  And it's also possible that they

7    didn't, correct?

8         A   It is possible they didn't.  Yes.

9         Q   It's possible there were temperatures in that

10   peanut mass that exceeded 100 degrees as of

11   July 13th, 2009, correct?

12        A   I don't know.  I can only say what's here.

13   And it's possible.

14        Q   Assume for a moment that it is demonstrated to

15   your satisfaction that the aluminum phosphide tablets

16   applied on August 4th, 2009 had nothing whatsoever

17   to do with the fire.  Just assume that for the sake

18   of argument.  Are you with me?

19        A   Okay.

20        Q   Assuming that were true, what would be the

21   most likely explanation for the cause of this fire

22   based upon everything that you know?

23        A   The -- one of my other -- well, the most

24   likely would be one of my -- the likely ones would be

25   one of my other hypotheses that I eliminated, and I

 1    would say the most likely would be that the

 2    self-heating progressed to thermal runaway,

 3    progressed to spontaneous combustion.

 4          Just not to be taken out of context, that

 5    answer is based on your assumption and not the facts

 6    as we've been discussing them today.

 7      Q   All right.  Back to your report, you say --

 8    I'm looking for exactly where you say it.  You say

 9    all of the available temperature -- all the available

10    data pertaining to temperature measurements prior to

11    discovery of the fire are well below the expected

12    ignition temperatures for ordinary combustibles,

13    including farmers stock peanuts.  I'm trying to find

14    exactly where you said that.  Oh, it's at the top of

15    page 13.  Second sentence, top of page 13.

16      A   Okay.

17      Q   First of all, we know that the ignition

18    temperature of farmers stock peanuts had been

19    obtained as of August -- well, let me ask you, are

20    you talking about temperature measurements before

21    August 11th when you say prior to discovery of the

22    fire?

23          Maybe I'm just misunderstanding you.  Is that

24    the temperature up to July 13th, 2009 that you're

25    referring to there?

1      A    That would be -- yeah, that -- I didn't --

2    apparently I didn't write that very clear, but yes,

3    that's what I'm suggest- -- all of the available data

4    would be this data, which is Exhibit 197 --

5      Q    Okay.

6      A    -- up to --

7      Q    July 13th?

8      A    Yes.  Yes.

9      Q    Okay.

10     A    Or I guess up to August the 11th, but

11   July 13th is part of 197.

12     Q    Okay.

13     A    I think that's correct.

14     Q    It's also true that the temperatures recorded

15   on August 11th are not temperatures sufficient to

16   ignite peanuts.  Would you agree with that?

17     A    I don't know that because the sensors that we

18   previously discussed, 1, 3, and 13, are not --

19   they're maxed out, and the temperatures could be

20   higher or they could be damaged.  So -- and there's

21   not even values for number 3.  So I don't know if

22   that's 230 or less.

23     Q    What I'm saying is the temperatures that we

24   see on the August 11th, 2009 chart in

25   Exhibit 190 --

1     A    You're on 196?

2     Q    196.  None of those temperatures, throwing out

3   the 230s as being invalid, are capable of causing

4   ignition of the farmers stock peanuts, correct?

5     A    That's correct.  None of them are capable of

6   causing ignition.  But I don't think you can

7   arbitrarily throw out the 1, 3, 13, 230s that were

8   previously giving us temperatures that now are not.

9   I don't agree that you could just -- that you can

10  dismiss those, because we don't know what those

11  temperatures are.

12    Q    You used Safe-Grain monitoring temperatures at

13  the top of page 13 to say, well, because we don't

14  have any temperatures reaching the level of the

15  ignition temperature of farmers stock peanuts as of

16  July 13th, 2009, well, we therefore didn't reach

17  the ignition temperature of farmers stock peanuts

18  prior to the fumigation?

19    A    Right.  There's no evidence to support that we

20  reached the ignition temperature of the peanuts prior

21  to the fumigation.

22    Q    Because the Safe-Grain temperature monitoring

23  system isn't capable of producing evidence showing

24  the ignition temperature of farmers stock peanuts

25  being reached.  It's just not possible, is it?

1      A    Well, there's -- in that particular instance,

2    yes, you're right.  It maxes out at 230 is my

3    understanding.  So that's correct.  But there's

4    also -- but the temperature of the Safe-Grain data,

5    one, is questionable and, two, is a component of what

6    I'm talking about in my testing elimination of the

7    hypothesis of self-heating or spontaneous combustion.

8    Sorry.  I didn't want to give the impression that

9    this is the --

10     Q    Understood.

11     A    -- that's the only thing.

12     Q    In the second paragraph on page 13, you state

13   that the August 11th, 2009 temperature readings

14   still record temperatures inside the stored commodity

15   in the range of 56 to 208 degrees, well below the

16   expected ignition temperature of peanuts, correct?

17     A    Yes, sir.

18     Q    I'm missing you there.  What point are you

19   trying to make?

20     A    The point I'm trying to make is that if -- I

21   guess similar to what Dr. Montross did.  If you look

22   at the peanuts -- the temperatures off of this data

23   below the pile, in the pile, we haven't reached --

24   there's no temperatures here that suggest we've

25   reached the ignition temperature inside the pile.

1    This is an average of -- the 56 to 208 is a range, I

2    guess is what I'm saying.

3        Q    But you just said a moment ago because there

4    are sensors that are knocked out, and because we know

5    that there's ignition, we know that we have

6    temperatures that exceed the ignition temperatures of

7    farmers stock peanuts as of August 11, 2009, correct?

8        A    Yes, but we don't know where in the dome

9    that's occurring.  I mean, I don't -- I'm sorry.

10   Say --

11       Q    Right.  We don't know where on August 11th,

12   2009, the ignition temperature of the farmers stock

13   peanuts had been reached, do we?

14       A    We don't, but we can look at the data that's

15   subsurface here and see we haven't reached it there

16   because they're still giving accurate readings.  And

17   we have two points that were giving readings that are

18   not giving readings.

19       Q    And we could, in fact, have had temperatures

20   in excess of the ignition temperature of the peanuts

21   anywhere along those temperature cables, whether it

22   was at the top, the middle, or the bottom of the

23   dome, correct?

24       A    Yes.

25       Q    All right.  Page 14, you state that there

1    was -- first -- second paragraph, first sentence,

2    that there was no indication of self-sustained

3    smoldering.  No indication of self-sustained

4    smoldering was reached in the commodity.

5         That's what it says, correct?

6    A    No -- yes, sir.

7    Q    What is your basis for that statement?

8    A    My basis for that statement is pretty much

9    everything we've been talking about.  I mean, it's

10   the -- it's the -- all of this information about

11   spontaneous heating, the temperatures, the witnesses,

12   the recorded temperatures, and that there's -- and I

13   didn't say there's no -- well, yeah, that's -- I

14   guess that's the answer to your question.

15   Q    Are you putting a time frame on that

16   statement?  Maybe that's what I'm missing.  There's

17   no indication of self-sustained smoldering.  Are you

18   limiting that to a period of time?

19        Let me ask it a different way.

20   A    I might be, but ask it a different way.  I'm

21   not sure.

22   Q    When you arrived at the Severn Peanut Company

23   on August 13th, 2009 --

24   A    Right.

25   Q    -- and you first were introduced to the dome,

1    the fire that was going on inside of that dome at

2    that time was a self-sustained smoldering fire, was

3    it not?

4        A    Yes.

5        Q    Okay.  That's why I'm not understanding --

6        A    Right.  Now --

7        Q    -- when you say there's no indication --

8        A    Okay.

9        Q    -- of a self-sustained smoldering fire.

10       A    I understand your confusion.  Give me one

11   second.  Let me read where we are.

12            I will concede that that paragraph would read

13   better if that sentence were moved to the bottom

14   because it is -- what -- when I read all that

15   together, I'm -- you're right.  There is

16   self-sustained smoldering combustion taking place on

17   August the 11th.

18       Q    Uh-huh.

19       A    So that is -- is probably sort of misplaced

20   there.

21       Q    Okay.

22       A    I can see how that would be confusing.

23       Q    So you were trying to say prior to the

24   fumigation, there was no evidence of a self-sustained

25   smoldering fire?

1      A    Correct.

2      Q    But a self-sustained smoldering fire could

3   have been the result of the self-heating process that

4   preceded the fumigation and eventually turned into

5   that fire subsequent to the fumigation; isn't that

6   possible?

7      A    Okay.  I was with you up to subsequent.

8      Q    Sure.

9      A    If you ask that one more --

10     Q    I'll break it apart.  I'll break it apart.  As

11  of August 4th, 2009, the IFC fumigators did not

12  observe any smoldering fire taking place when they

13  were in the head house at the dome, correct?

14     A    Yes, sir.

15     Q    And yet it is possible that a self-sustained

16  smoldering fire could have developed between

17  August 4th and August 11th that was the result of

18  the self-heating that preceded August the 4th, true?

19     A    I don't think I can agree with that because

20  there's a time lapse necessary from that transition

21  from self-heating to the oxidation to the thermal

22  runaway to the ignition --

23     Q    Uh-huh.

24     A    -- that's a -- that occurs over an extended

25  period of time or over a given period of time, and I

1    don't -- I can't agree with that because I don't know

2    if that's a sufficient amount of time for those

3    processes to take place.

4        Q    Well, couldn't the oxidation have occurred

5    somewhere between July 13th and August the 4th?

6        A    It's possible it could have.  If it went that

7    far.  If -- in other words, when the biological

8    heating reached a temperature -- which I believe is

9    around 120 degrees -- where the biological mold dies

10   off, it will just stop and nothing else will happen.

11   So that's why I can't answer that, because it's

12   possible -- it's just as possible that it stopped as

13   that it kept going.

14       Q    Understood.  But the fact that there was no

15   self-sustained smoldering fire on August the 4th

16   doesn't preclude the possibility that one developed

17   subsequent to August the 4th having nothing to do

18   with the fumigation.  That is a possibility, is it

19   not?

20       A    It's a possibility, but I don't agree with

21   that.

22       Q    Okay.  Understood.  And if, in fact, there was

23   a fire in the peanut dome that resulted from the

24   self-heating that we've talked about, that would be

25   the signature of that fire, a self-sustained

1    smoldering fire, correct?

2        A    I don't know if signature is the right word,

3    but I would say that a fire that results in a

4    commodity or biological mass from self-heating,

5    thermal runaway, that is a smoldering fire.

6        Q    Okay.  And the fire that you encountered on

7    August the 13th and the fire that continued at

8    least through August 27th was and continued to be a

9    smoldering fire, correct?

10       A    I would agree with that in that the -- the

11   information, the witnesses, and the data do not

12   suggest that the fire inside the dome was a

13   free-burning fire, and nor -- as we talked about

14   earlier, the geometry of the dome, the

15   configuration -- the fact the dome was sealed, the

16   fact that we did have the inerting agents being

17   released, we have a very -- we have an oxygen

18   suppressed or oxygen-decreased atmosphere, and that

19   situation is going to lend itself to a smoldering

20   fire because there's not sufficient oxygen there for

21   the flaming combustion to take place.

22       Q    Okay.  A smoldering fire does not rule out

23   self-heating being its cause, correct?

24       A    Well --

25       Q    I'm just talking in the abstract.

1      A    I was going to say, in the abstract, a -- a

2   fire from the result of -- well, I will agree

3   depending on where the smoldering is taking place.

4   Okay.  So for example, linseed oil in a trash can.

5   That's going to be initially a smoldering fire.

6   That's what the -- the oxidation reaction of linseed

7   oil.

8          But since it's here in the air, it will

9   quickly transition to a flaming combustion if there's

10  flammable air.  So -- and like in a sawdust pile or

11  something, you still have the same thing.  It's out

12  in the air, and so you get that transition from the

13  original smoldering fire, which I think is what

14  you're talking about.  As the fire works its way

15  through the pile, it breaks out or whatever happens,

16  and you get the flaming combustion.

17         In this -- with this particular set of facts,

18  I wouldn't agree that you're going to get the flaming

19  combustion.  I think you're going to be stuck with

20  the smoldering fire simply because of the --

21     Q    Lack of oxygen?

22     A    -- the lack of oxygen and the dynamics of the

23  building and the dome.

24     Q    You would not have expected the IFC employees

25  on August 4th to detect odors associated with

1    combustion if the fire first developed subsequent to

2    August 4th?  Would you agree with that?

3         A    I would not -- if -- okay.  I would not expect

4    them to smell smoke if the fire happened after they

5    were there.  I would expect if they put their heads

6    inside the dome and there was biological -- the -- if

7    there was self-heating going on as a result of

8    biological activity and the mold, I would expect that

9    they would have smelled something to that effect.

10        Q    If the mold and biological activity within the

11   dome causing self-heating was 50 or so feet below the

12   surface of the peanut pile, would you expect those

13   odors to penetrate all the way up into the head

14   house?

15        A    I would.  The literature suggests that yes,

16   those odors do migrate, and if you consider the

17   configuration of the peanut -- I mean, as we've

18   talked about, there is some air space associated with

19   that.  They're kind of fluffy, I guess, for lack of a

20   better word, because the way that they land.  And so

21   there is -- and it's the whole point of the fans.

22   You can draw air through the peanuts.  So there is

23   some migration -- I guess would be the right word --

24   or diffusion of the air up through the pile.

25        Q    Okay.  On page 15 of your report, you conclude

1   that the only remaining valid hypothesis as to the

2   cause of the Severn dome fire is the autoignition of

3   phosphene gas, correct?

4       A   Yes.  And I go ahead and add, likely in

5   combination with the diphosphenes.

6       Q   And because you say, likely in combination

7   with diphosphene, if the jury should in this case

8   find that there was no combination with diphosphene,

9   you would not be able to say that the fire in the

10  Severn dome was caused by the aluminum phosphide

11  tablets, would you?

12      A   I disagree with that.

13      Q   You said, likely in combination with

14  diphosphene.  That's your conclusion, is that there

15  is a more than 50 percent chance that diphosphene was

16  part of the reaction that led to fire, correct?

17      A   I would say it's likely.  I don't know if

18  likely is more than 50 percent, but it's likely

19  and -- it is likely, although it is not necessary.

20      Q   So absent diphosphene, your conclusion would

21  be exactly the same?

22      A   Yes.  What the -- what the diphosphene does is

23  mix with the phosphene to lower its autoignition

24  temperature.

25      Q   Can you point to any study, analysis, or

Deposition of Lester Rich

1   testing that supports the notion that the aluminum

2   phosphide tablets applied by IFC on August 4th

3   produced diphosphene?

4       A    I point to their applicator manual which says

5   and cautions against opening the flask and the flask

6   will flash upon opening.  That is because there are

7   some diphosphenes present in that material because

8   it's above -- it's -- the flask at ambient

9   temperature is below the autoignition temperature of

10  the phosphene.

11      Q    Going forward to the third paragraph, you talk

12  about -- and we've already discussed this -- the

13  irregular surface of the commodity with varying

14  slopes.  We talked about your basis for that

15  statement.

16           Is there any deponent in this case who has

17  provided testimony who testified about visualizing

18  the entire surface of the peanut pile that existed in

19  the dome as of August 4th, 2009?

20      A    Is there anyone who's testified about

21  seeing --

22      Q    The entire surface.

23      A    -- the whole surface?

24      Q    Yes.

25      A    Not to my knowledge.

1    Q   In fact, it wasn't possible for anyone to

2   visualize the entire surface of the peanut pile from

3   the head house, was it?

4    A   I would say no.  I think the USDA inspector --

5   he hasn't been deposed, but I talked to him.  I think

6   he had -- I mean, he had a -- he probably had a

7   better chance, I guess would be the way to say that,

8   to view more of the pile than the IFC employees, but

9   I don't know that he's been -- to my knowledge, he

10  hasn't been deposed.

11       So the answer to your question would be no, I

12  believe, that -- I don't know of a despondent --

13  sorry.

14    Q   Deponent?

15    A   -- a deponent who has seen the entire surface

16  of the pile.  That's correct.

17    Q   Have you ever seen any pictures of the peanut

18  pile?

19    A   Yes.

20    Q   I'll show you what's been marked --

21    A   I think they were pictures of the peanut pile.

22    Q   -- as Exhibit 7.

23    A   Yes.

24    Q   Have you seen Exhibit 7 before?

25    A   Yes, sir.

1      Q   Do you see in Exhibit 7 a -- an irregular and

2  varied slope?

3      A   I do.

4      Q   Where?

5      A   Well, the side of the soldier coming towards

6  you, across the top, down the right side.

7      Q   All right.  And on the sides of the soldier,

8  would you view that as an irregular and varied slope

9  or a fairly smooth slope?

10     A   I can't say from this photo.  I would say -- I

11  mean, it looks to me like there are shadows here and

12  here, which might indicate like a crease or a groove

13  or a cleavage of some sort.  It looks like there

14  might be some here plus this layering of the peanuts.

15  They're banding, I guess.  Here kind of to me looks

16  irregular, also.  But certainly up here I would say

17  this is an irregular slope with valleys and --

18     Q   And is what you see in Exhibit 7 something

19  which would likely increase the risk of piling and

20  collecting Fumitoxin tablets?

21     A   Not the way it sits here.  I think the tablets

22  would fall off the side.

23     Q   So what you see here is not going to collect

24  piles of Fumitoxin tablets?

25     A   Not the way it sits here.  But I would go back

1    to what I said earlier.  This photograph of the top

2    with the irregular surface and the -- I mean, there

3    are pockets and whatever in here.  Now, if you're

4    dropping -- I mean, I don't know I can answer that

5    from what you're saying.  If you put a ring around

6    here or you slope peanuts off the side of this

7    soldier, then yeah, I think the top would encourage

8    piling and collection.  If you cover it all the way

9    up, maybe not.  If you dump them on it the way it is,

10   they're going to fall off the side all the way to the

11   floor.

12        So I don't know if I can give you that answer

13   more than that from this picture.

14   Q    Did you review the testimony of Randy Turner

15   and Brian Lilley as to how they applied the tablets?

16   A    Yes, sir.

17   Q    How did they testify that they applied the

18   tablets?

19   A    I would want to go back, and let's look at

20   what they testified to.

21   Q    Okay.

22        (Exhibit No. 201 and Exhibit No. 202 were

23   marked for identification.)

24   Q    Have you had a chance to look at page 174 of

25   Mr. Turner's deposition testimony and pages 88 and 89

1    of Mr. Lilley's deposition testimony?

2        A    Yes.

3        Q    Would you agree with me that both of them

4    testified to looking at the pile after their

5    application was complete and seeing that the tablets

6    were distributed across the peanut pile without

7    piles?

8        A    In the areas they could see, yes.

9        Q    Okay.  Do you credit their testimony or do you

10   discredit their testimony, Mr. Rich?

11       A    I don't know how to answer that.  I mean,

12   that's their testimony.

13       Q    Well, is your opinion in this case consistent

14   or inconsistent with their testimony?

15       A    Well, in that they can't see the whole pile,

16   it would be consistent with it.

17       Q    So you would accept their testimony that, as

18   far as they were able to see, there, in fact, were no

19   piles of Fumitoxin tablets within the dome after

20   their application was complete?

21       A    As -- as we discussed earlier, I mean, this is

22   their sworn statement, so I can't -- I wouldn't

23   disagree with that as to what they could see.  No,

24   sir.

25       Q    So based upon their testimony and you not

1    disagreeing with it, the point of origin of this

2    fire, in your opinion, had to be in a location that

3    they could not see on August 4th, 2009; is that

4    correct?

5        A    If this is accurate, yes.

6        Q    And I hear you saying you're crediting their

7    testimony and accepting it as accurate for purposes

8    of this case.  Correct?

9        A    I -- I can't disagree with what they're

10   saying.  I mean, I don't have a -- yes, I guess I am.

11   I can't -- I can't disagree with it.

12       Q    Okay.  So if there was a flat spot at the

13   center of the pile that you've testified about

14   earlier, you would now agree that the fire did not

15   begin there because obviously Mr. Turner and

16   Mr. Lilley were able to view that being directly

17   above it, correct?

18       A    If this is -- again, if this is accurate and

19   what they're seeing -- he says that he -- let me look

20   at what he says.  He says he felt like it was not

21   piling up, and then he goes on -- I'm sorry.  This

22   is -- I'm sorry.  This is Lilley first.  Let's see

23   what he says on this page.

24            All right.  He says that he could hear them

25   rolling down the peanuts a little ways.  He felt it

1    was not piling up.  And then he says, in line 7 and

2    8, we didn't see anything piled up, but I know there

3    were some areas where I couldn't see -- or I'm

4    sorry -- where we couldn't see.

5           And then he talks about the flask.

6    Somewhere -- oh, he says that -- and then you're

7    correct.  On line 23, 25 -- I don't know if that line

8    of questioning continued, but it says you didn't see

9    any piling in that little area that you could see?

10          And he said, that's -- he said, yes, sir.

11          And so then -- this is Turner.

12   Q    Turner, on lines 18, 19, said --

13   A    18 and 19.  Right.  Yes, sir.

14   Q    I could see that the tablets had been

15   scattered.  They were all across the peanuts.

16          Right?

17   A    Right.

18          And then they say, how much could you see?

19          And he said he could see a lot of it but he

20   couldn't see all the way to the walls.

21          So it sounds like that he could see maybe a

22   little more than Lilley, but that's kind of

23   subjective because --

24   Q    But you'd agree with me, if you accept their

25   testimony, any flat spot at the center of the peanut

1    pile could be eliminated as the point of origin of

2    the fire?

3        A    I would agree with you that these -- that

4    their depositions suggest that there wasn't -- that

5    there were no -- that there was not a pile on the

6    flat spot that they could see directly below them.

7        Q    Okay.  These were the last two individuals to

8    look inside the dome before the fire was discovered,

9    correct?

10       A    That is my understanding.

11       Q    Are there any eyewitnesses in this case who

12   came forward to testify as to actually seeing the

13   distribution of the tablets on the surface of the

14   peanut pile other than Brian Lilley and Randy Turner?

15       A    I believe there was one other person up there

16   with them during the application, but -- where's that

17   fumigation report?  I don't know if they've been

18   deposed, but the exhibit we previously mentioned.

19   Exhibit Number 23 lists Randy, Brian, Lucas, and

20   James --

21       Q    Right.

22       A    -- as individuals involved in the fumigation.

23       Q    And I'll tell you they have not been deposed.

24       A    Okay.  And so I don't know if there's other

25   people who may have seen the pile after them.

1     Q    You are unaware of any person who professes to

2    have seen on top of that pile on August 4th, 2009

3    anything different than what is described in the

4    depositions of Randy Turner and Brian Lilley,

5    correct?

6     A    Yes, sir.

7     Q    All right.  And you concluded that despite

8    what Randy Turner and Brian Lilley say, there were,

9    in fact, piles of Fumitoxin somewhere on the surface

10   of that peanut pile after they were done with their

11   application, correct?

12    A    Yes.

13    Q    They dropped those tablets from 20 to 25 feet

14   above the -- a sloped surface, correct?

15    A    Yes, sir.  That's the -- well, flat and then

16   sloping off.

17    Q    We've eliminated the flat spot based upon

18   their testimony, correct, if you accept --

19    A    But they dropped them from -- I mean, you said

20   to a sloped surface, but there is a flat surface

21   involved.

22    Q    Putting aside that flat surface, on the sides

23   of that flat surface, you have slopes, correct?

24    A    Yes.

25    Q    And they were dropping the tablets from 20 to

1    25 feet above, correct?

2        A    I believe that was their testimony.  Yes, sir.

3        Q    Doesn't gravity play a role in the

4    distribution of those tablets from that point?

5        A    I would expect that it would.

6        Q    Doesn't the angle of repose play a role in the

7    distribution of those tablets from that point?

8        A    The angle of repose?

9        Q    Yes.

10       A    Of the peanuts?

11       Q    The peanuts.

12       A    Well, yes.  That's particularly in relation to

13   any valleys or how the peanuts had sorted themselves

14   out inside the dome.

15       Q    And you've done no testing and no research

16   that supports your conclusion that the method of

17   their application would have resulted in piles of the

18   tablets somewhere along the slope -- somewhere along

19   the surface of the peanut pile?

20       A    Well, there's one other thing that would limit

21   or affect -- before I -- well, I'll answer your

22   question.  I'm sorry.  I should do that before I go

23   on.  But no, I have not done any physical testing --

24       Q    Okay.

25       A    -- to that effect.

1        But there's another item that I think also
2   would play in addition to what you listed, gravity
3   and the slope.  The other issue is physically Turner
4   and Lilley throwing the flask.  And the reason I
5   think that's important is because the distribution --
6   in other words, it was my understanding they held the
7   flask and shook the tablets out of it.  That's going
8   to limit the distribution of those tablets to what
9   they can do with their arms.
10       Q    Uh-huh.
11       A    So if they're on opposite sides and they're
12  both shaking them like this, we can have overlap.  If
13  they're shaking them in opposite directions -- but
14  that's another factor that I think is important, that
15  the actual breadth and scope and swath of the
16  distribution is, in fact, partially limited by their
17  physical ability and the tablets coming out of the
18  actual flask.
19       Q    But assisted by the drop --
20       A    Yes.
21       Q    -- gravity, and the slope?
22       A    Right.  But we left out the human component,
23  which I don't think you can do.  I would lump that in
24  with the other two that you mentioned -- or three.
25       Q    Don't you think it's just a little bit

1    speculative, in view of their testimony, in view of

2    the vertical drop, in view of the slope, in view of

3    gravity, to make a conclusion that they must have had

4    piles of these tablets resulting from their

5    application?

6        A    No.

7        Q    You don't think that's speculative at all?

8        A    No.

9        Q    So if that's true and this was the third time

10   the peanut dome had been fumigated in this way, then

11   I guess it would be your testimony that on those

12   other occasions, there were piles of Fumitoxin

13   tablets as well, correct?

14       A    It's possible, yes.

15       Q    Well, based upon your testimony, it's not

16   possible, it's certain, because you're certain that

17   they piled tablets on August 4th, 2009, aren't you?

18       A    Yeah.  There could have been files in the

19   other applications.

20       Q    No, sir.  Your testimony is you're certain of

21   that based upon the geometry of the peanut pile.

22       A    But you also had different application rates.

23       Q    So if we went from 49,000 to 35,000, your

24   testimony in this case would be different?

25       A    No.  I'm just saying there's different factors

1     that affect whether the tablets would pile.

2         Q    What factors are those?

3         A    The same thing.  The geometry of the pile, the

4     amount of tablets you put in there.

5         Q    Is there something about the geometry of the

6     pile on August 4th, 2009 or about the amount of

7     tablets on August 4th, 2009 that leads you to the

8     conclusion piling occurred then yet would not have

9     occurred on previous applications?

10        A    I can't say whether it would have occurred on

11    previous applications or not.  It could very well

12    have.

13        Q    You don't know anything about the geometry of

14    the peanut pile on August 4th that was different

15    from any other time, do you?

16        A    Well, actually, there -- there is a difference

17    in the -- in between then because the protectant had

18    been applied by the Severn employees.  That was in

19    between the fumigations.  Time had passed.

20        Q    I'm confused.  What does the protectant have

21    to do with the geometry of the peanut pile?

22        A    I don't know if it has to do -- you're asking

23    what would be different.  So there's different

24    situations -- I mean, there's -- it's a different

25    day, it's a different application, it's a different

1    amount from the previous application.

2         So I'm saying that there are variables that

3    could affect the difference.  I'm not saying there

4    was no piling on the previous -- previous

5    fumigations, but there may be variables in between

6    the fumigations that affected what happened on

7    August 4th.

8         Q    And that's not what I'm focused on.

9         A    I'm sorry.

10        Q    I'm focused on whether there was piling on the

11   other occasion in which the fumigations occurred from

12   the head house with Fumitoxin tablets, and if you're

13   saying there had to be piling on August 4th, 2009,

14   then isn't it true that you also must be saying on

15   each and every other occasion that there was an

16   application from the head house with Fumitoxin

17   tablets there was piling then, too?

18        A    I don't think that's -- no.  I don't think I

19   would say that.

20        Q    So maybe there wasn't piling on other

21   occasions?

22        A    I don't know.

23        Q    What basis do you have to know that there was

24   on August 4th, 2009?

25        A    The things we just discussed.  That they --

1    what they can see, how they applied it, the geometry,

2    the slope, the conditions.  All those things we just

3    talked about.

4       Q   What was the total surface area of the

5    peanuts, Mr. Rich -- the 21 million pounds of

6    peanuts?

7       A   I believe that was covered in the EPA report,

8    and I can look that up for you.

9       Q   It's also covered in Dr. Jones' report, but

10   take a look at the EPA report if you want.

11      A   Okay.  Let's see.  They talk about the

12   1,345,000 cubic feet and the total volume of the dome

13   and then the approximate volume of the head space in

14   cubic feet.  But they don't give it in square feet.

15   If you have it in a --

16      Q   Sure.  I will tell you that on page 18 of

17   Dr. Jones' report, she calculated 66,000 square feet.

18   Does that sound like a reasonable estimate to you,

19   based upon the configuration of the dome as you

20   recall it?

21      A   I don't know if that's correct or not, but it

22   seems like it would be in the ballpark.

23      Q   It was a massive --

24      A   Right.

25      Q   -- dome, correct?

1      A    Right.  Yes.

2      Q    And you're talking about the surface area of

3    21 million pounds of peanuts, right?

4      A    Yes.

5      Q    Do you know what the total surface area of the

6    49,000 Fumitoxin tablets applied on that day was?

7      A    I believe that's in Jones' report, also.

8      Q    It is.  And that comes out to 108 square feet.

9      A    Correct.

10      Q    Does that sound reasonable to you based

11    upon --

12      A    It sounds reasonable to me if you line them

13    all up on this table touching each other.

14      Q    Sure.  Well, if you stack them on top of each

15    other, it's going to cover less than 108 square feet,

16    correct?

17      A    Yes.

18      Q    Okay.  So you're in a maximum of 108 square

19    feet when you apply those tablets, correct?

20      A    I don't know if that's accurate or not.

21    Again, it depends on how -- the human factor.  It

22    depends on how far Lilley and Turner can throw a

23    tablet from a flask.

24      Q    We're missing each other.  I'm not talking

25    about the distribution.  I'm talking about the actual

1    surface area of each tablet times 49,000.  That's

2    what I'm talking about.

3        A    Okay.  But --

4        Q    Because that's the largest area that those

5    tablets could take up if they, in fact, were touching

6    one another, correct, would be 49,000 times the

7    surface area of each individual tablet?

8        A    Of each individual tablet, if they were laid

9    out in a sheet --

10       Q    Right.

11       A    -- so to speak.  Okay.  All right.  Yes.

12       Q    Well, if 108 square feet of tablets is applied

13   on 66,000 square feet of a surface area, do you know

14   what the total percentage of the tablets is to that

15   66,000 square feet?

16       A    No.

17       Q    I'll give you a calculator if you want, but

18   the math turns out to be .16 percent.

19       A    Okay.

20       Q    So why is it that the tablets that would take

21   up .16 percent of the surface area of the peanut

22   surface would necessarily clump together in piles

23   when they were applied?  Why is that?

24       A    Because of the application method.  All those

25   things we just talked about.

1      Q    And your conclusion, as you testified about in

2   July of 2011, was that they didn't just clump

3   together in piles.  They clumped together in piles of

4   at least 250 tablets, correct?

5      A    That -- I would not accept the

6   characterization that that was my conclusion.  That's

7   what I testified to, but I would say that that's not

8   my conclusion in this case.

9      Q    What is your conclusion in this case?  What

10   were the size of the piles?

11      A    I don't know.

12      Q    What size of a pile was necessary in order to

13   cause a reaction that would lead to combustion?

14      A    You can't say that because you don't know how

15   they're landing and how they're joining together.

16      Q    Dr. Jones' report states, it is very difficult

17   to accidentally pile these tablets due to their slick

18   surface and their geometry.  It is even difficult to

19   intentionally do so.

20           Do you have any basis to disagree with what

21   she says?

22      A    Well, how is she doing that?  I mean, is

23   she -- I don't -- I need -- I would have to say I

24   need more information to answer that question.

25      Q    Have you ever done any work with Fumitoxin

1  tablets?

2      A   No, sir.

3      Q   Not before the Severn fire and not after the

4  Severn fire?

5      A   No.

6      Q   You've never even opened a flask for yourself?

7      A   I have not.

8      Q   You've never even looked with your own naked

9  eye at Fumitoxin tablets?

10     A   I'm trying to think -- I think I did -- no.  I

11 think I have seen tablets, yes, but I haven't used

12 them or applied them.

13     Q   Or played with them to figure out what's going

14 to happen when you drop 49,000 from 20 to 25 feet

15 above a commodity?

16     A   I have not.

17     Q   You know who Mr. Ryman is?

18     A   I remember the name from the deposition, yes.

19     Q   You, in fact, didn't review his deposition at

20 the point in time you prepared your report, did you?

21     A   I don't -- I don't believe I had that at the

22 point -- at that time, no, sir.

23     Q   Mr. Ryman is the lead technical person at

24 DeGesch America, who is the sole distributor of

25 Fumitoxin.  Did you know that?

1      A    Yes.

2      Q    Do you think it's odd that you didn't have his

3  deposition testimony at the time you prepared your

4  report?

5      A    I don't know if it's odd.  I didn't have it.

6  I don't know.

7      Q    Do you think you should have it in view of the

8  fact that you are testifying about what his product

9  does and doesn't do?

10     A    Possibly.

11     Q    Would you agree that Mr. Ryman knows more

12  about Fumitoxin than you do?

13     A    Probably.

14     Q    Mr. Ryman's report states, both the 20 to

15  25 foot drop from the head house to the top of the

16  peanut pile and the angle of repose of the pile would

17  have led to the tablets scattering and distributing

18  once they struck the surface of the pile.

19          Do you have any reason to disagree with that

20  statement?

21     A    Yeah, I don't think that's right.

22     Q    Did you know that Mr. Ryman for years has

23  taught the proper application of Fumitoxin tablets to

24  certified applicators?

25     A    I'm not -- no, sir, I'm not familiar with him.

1    I mean --

2       Q   And you would agree with me that if the

3    application of Fumitoxin tablets by Mr. Turner and

4    Mr. Lilley on August 4th, 2009 did not result in

5    the piling of Fumitoxin tablets -- because that is a

6    foundation of your opinion in this case -- that your

7    opinion would therefore be incorrect, accepting my

8    assumption?

9       A   Give that to me one more time.

10      Q   Would you agree with me that if, in fact,

11   Mr. Lilley and Mr. Turner, when they applied the

12   Fumitoxin tablets on August 4th, 2009, did not

13   apply them in such a way that piles of those tablets

14   were formed on the surface of the peanuts, if that's

15   the case, then your opinion in this case would be

16   incorrect?

17      A   I would say if that's the case, there would

18   not have been a fire.

19      Q   Well, your opinion is there was a fire only

20   because they did that?

21      A   Correct.

22      Q   And if they didn't do that --

23      A   There wouldn't have been a fire.

24      Q   Or you're incorrect as to what caused the

25   fire?

1      A    I don't think I'm incorrect as to what caused

2  the fire.  So I would say that if they weren't piled,

3  there wouldn't have been a fire.

4      Q    If the jury should conclude there were no

5  piles, then they have to find some other cause of the

6  fire, don't they?

7      A    I'm not sure I can -- I don't know.  I'm not

8  the jury.  I don't know what -- I'm not sure -- that

9  sounds like a legal question.

10     Q    We know there was a fire, right?

11     A    That's correct.

12     Q    And if there were no piles of tablets, by

13  definition, something else caused the fire, right?

14         MR. WIDIS:  Object to form.

15     A    I would say if there was no Fumitoxin, then

16  something else could have caused the fire.

17     Q    Are you now saying if it was piling of

18  Fumitoxin, it was Fumitoxin in some other way that

19  caused the fire?

20     A    No.

21         THE VIDEOGRAPHER:  Counsel, we've got to go

22    off the record.

23         MR. EPSTEIN:  Perfect timing.

24         THE VIDEOGRAPHER:  Okay.  This is going to be

25    the end of tape number 5.  Time now is 4:27 p.m.

1        We're off the record.

2               (A recess was taken.)

3               THE VIDEOGRAPHER:  We're going back on the

4        record.  This is the beginning of tape number 6.

5        Time now is 4:45 p.m.

6        Q    Mr. Rich, on page 16 of your report, you

7        indicate that on August 28, 2009, a dredge was used

8        to collect a sample from the top of the peanuts under

9        the conveyor chute opening.

10       A    I'm sorry.  Page 16.  Oh, yes.  16.  Okay.

11       Q    Can you explain what was done.

12       A    Yes.  I took a -- it was a small stainless

13       steel dredge, which is like a clamshell, and

14       basically lowered it through the hatch, and when

15       it -- it's got a cable that you lower it with, and

16       then there's a release.  So when it hits, it kind

17       of -- just gravity just kind of lets it close.

18               And so then I pulled that up to see if we

19       could take a sample of the top of the -- any material

20       that was on the top of the pile.

21       Q    Okay.  You believe that the peanuts at the top

22       of the pile had been on fire for over three weeks as

23       of August 28th, 2009, correct?

24       A    Yes, but I don't know exactly where, I mean,

25       directly under the chute.

1    Q    What did you expect to learn by taking a

2    sample of peanuts that had been on fire for over

3    three weeks?

4    A    I was actually trying to sample the peanuts

5    but also see if there was any residue of Fumitoxin or

6    aluminum hydroxide that was still -- you know, that

7    was on the top of the pile.

8    Q    Aluminum hydroxide or aluminum phosphide?

9    A    No, not aluminum phos- -- well, if it was

10   unreacted, it would be aluminum phosphide.  If the

11   reaction had already expended itself, then I would

12   expect it to be the aluminum hydroxide.

13        (Exhibit No. 203 was marked for

14     identification.)

15   Q    I've placed before you Exhibit 203.  Can you

16   identify what that is.

17   A    These look like photocopies of the sample or a

18   sample.

19   Q    And what specifically is showing in that test

20   tube that is being held on the second, third, and

21   fourth page of Exhibit 203?

22   A    It's a combination of the burned peanut --

23   burnt peanut material, burnt [unintelligible]

24   material.  And there's -- it doesn't -- it's kind of

25   impregnated into the peanut, but there's some

1    pasty -- there's some pasty-like material associated

2    with that.  It's kind of -- it's kind of a -- mixture

3    is not the right word, but it's just kind of mashed

4    together.

5        Q    You indicate in your report that you turned a

6    sample over to Mr. Hargis representing IFC, who later

7    informed you that the sample provided to him tested

8    positive for aluminum phosphide residue.  That's what

9    you write in your report, correct?

10       A    Yes.

11       Q    Are you sure of that, Mr. Rich, that that's

12   what Mr. Hargis told you?

13       A    I'm not sure of that, because since this

14   report, you provided us with the lab results.  But

15   that was my recollection --

16       Q    Okay.

17       A    -- at the time, but that -- based on the lab

18   results that you provided, that's incorrect.

19       Q    Okay.  Did you rely on that at all in your

20   analysis of what caused the fire in this case, that

21   Mr. Hargis had reported to you that the dredged

22   material that he had tested showed the presence of

23   aluminum phosphide residue?

24       A    No, sir, I wouldn't say so.

25       Q    Okay.  I'll show you what's being marked as

1    Exhibit 104.  I'm sorry.  204.

2         (Exhibit No. 204 was marked for

3    identification.)

4    Q    Can you identify what Exhibit 204 is.

5    A    Yes, I believe this is your -- this is the lab

6    report from Travelers.

7    Q    Okay.  And what, if anything, does this lab

8    report indicate that bears in any way on the cause of

9    the fire at the Severn peanut dome?

10   A    Let me make sure what they said here.  It

11   doesn't -- ask your question again.  I think --

12   right.

13   Q    What, if anything, on page 2 of this

14   Exhibit 204 bears in any way on the cause of the fire

15   at the Severn peanut dome?

16   A    It doesn't in itself bear on the cause, but it

17   does -- they find aluminum residue, and it's -- it's

18   another -- it's another data point, basically, but I

19   would say it doesn't -- it doesn't directly go to the

20   cause of the fire because it's negative, so to speak.

21   Q    It's negative in what way?

22   A    It does not -- they do not report finding any

23   aluminum phosphide or -- well, they didn't report

24   finding aluminum.

25   Q    But there's supposed to be a residue left

1   behind?

2       A    Right, I was going to say, but that would --

3   but basically what this suggests to me is that

4   there's residue on the top of the pile.

5       Q    Which is exactly what you would expect from an

6   application of aluminum phosphide tablets done

7   properly or improperly, correct?

8       A    Yes.

9       Q    Okay.

10      A    There would be residue.

11      Q    That's a natural byproduct of the reaction

12  that causes the liberation of phosphene gas?

13      A    Yes.

14      Q    Let me show you what's been marked as

15  Exhibit 205.

16          (Exhibit No. 205 was marked for

17    identification.)

18      A    Okay.

19      Q    What does Exhibit 205 appear to you to be?

20      A    It appears to be -- it appears to me -- sorry.

21  Appears to be the document that I got from Mr. Widis,

22  purportedly from you, that is the actual analysis of

23  the sample that Mr. Hargis took.

24      Q    And in fact, it says, samples from under chute

25  by dredge 8/28/09, correct?

1    A    Yes, sir.

2    Q    What results there -- well, let me ask this.

3   Do the results there have any different texture to

4   them, so to speak, than the results obtained in the

5   Travelers laboratory?

6    A    No.  I mean, it's essentially the same -- they

7   have none detected for phosphene.  They do list out

8   the aluminum hydroxide and then a phosphorous

9   content.  And then obviously, like I said, there was

10  some burnt kernels and husk or whatever.  So they got

11  the oil out of that.

12   Q    And again, I'll ask you the same question

13  about 205 I did 204.  Is there anything in

14  Exhibit 205 that bears on the cause of the fire in

15  the Severn peanut dome?

16   A    Other than that it shows there was Fumitoxin

17  placed inside the dome, and there's residue from that

18  Fumitoxin here, that's all it shows.

19   Q    You didn't need to send a sample out for

20  testing to determine those two things.  You knew them

21  before you sent them out, correct?

22   A    Well, the way these things go, it's always

23  good to have a laboratory say that, yes, there's

24  Fumitoxin residue in the --

25   Q    Okay.

1     A    -- in the substrate or in the debris.

2     Q    So the first paragraph on page 16 of your

3   report doesn't relate to how you concluded what the

4   cause of the Severn peanut dome fire was, correct?

5   It doesn't say this is -- the first paragraph is not

6   a basis upon which you concluded what the cause of

7   the fire was?

8     A    That's correct.  It's an action that was taken

9   and data that was collected.

10    Q    Just process --

11    A    Yeah, data collection.  Right.

12    Q    Okay.  All right.  I want to focus now on the

13  third paragraph on page 16, which states that the

14  phosphene gas exceeded the LFL within localized

15  pockets during the reaction to aluminum phosphide

16  tablets.

17         We've talked about that already today at

18  length, we've gone through the materials that you say

19  support that conclusion, and you listed there for me

20  earlier from your materials by number, correct?

21    A    Yes, sir.

22    Q    All right.  And when you made that statement

23  in your April 30th, 2013 report, you did not have

24  in your hands the deposition transcript of Dennis

25  Ryman, correct?

1     A    Yes.

2     Q    Have you since been supplied with his

3  deposition transcript?

4     A    I believe so, but I'm not 100 percent certain.

5     Q    You know he's issued an expert report because

6  he's now also an expert for the defendants in this

7  case?

8     A    I think he -- they may have sent me his expert

9  report.  I don't know if I have his deposition.

10    Q    Okay.

11    A    Or it could be one way or the other, but I

12  think it's the report that I just got.

13    Q    So you don't believe you've seen the questions

14  and answers that were asked of him by Mr. Goldstein

15  as well as myself back in April -- early April of

16  2013?

17    A    I don't remember it.

18    Q    Okay.  I'm going to show you what we're going

19  to mark as Exhibit 206 --

20         (Exhibit No. 206 was marked for

21     identification.)

22    Q    -- which is page 171 from Mr. Ryman's

23  deposition taken on April 10th, 2013.  Go ahead and

24  review that, if you would.

25    A    Okay.

1      Q    Had you seen that before today?

2      A    I don't believe so.

3           (Exhibit No. 207 was marked for

4      identification.)

5      Q    I'm showing you what we're marking as

6    Exhibit 207.

7           Have you seen Exhibit 207 before today?

8      A    No, sir, I'm pretty sure I've not.

9      Q    So you don't believe you've seen either

10   Mr. Ryman's expert report or his deposition in this

11   case prior to today?

12     A    I think I've seen something from Ryman.  It --

13   I'm pretty sure it's not this.  So it could have been

14   the deposition.  I could have seen the deposition.

15     Q    Let's start with the deposition.  Based upon

16   what you've read on page 171, if the lead technical

17   person at the company that distributes Fumitoxin

18   testified under oath that it is very unlikely that

19   the piling of Fumitoxin tablets will result in the

20   lower flammable limit of phosphene gas being

21   achieved, what basis do you have to say that it is

22   actually more likely than not that the lower

23   flammable limit was achieved in relation to the

24   Severn peanut dome fumigation?

25     A    The other research material besides his

1    testimony, the other documents and other research and

2    other materials that are available --

3        Q    Go --

4        A    -- that suggest it can happen.

5        Q    Go to page 3 of his report, please.  In the

6    middle of the bottom paragraph, toward the right-hand

7    side, there's a sentence that begins the reality is.

8             Do you see that?

9        A    Hold on a second.

10       Q    Along the right-hand margin.

11       A    Okay.

12       Q    He says, the reality is, as I testified in my

13   deposition, that it is very difficult to confine

14   phosphene gas because it disperses readily and

15   quickly under virtually any circumstance, and that it

16   would be very difficult to contain sufficient

17   phosphene gas within the pile or stack to result in a

18   localized concentration exceeding its LFL of

19   18,000 parts mer million.

20            Do you see that?

21       A    Yes.

22       Q    Your conclusion on page 16 is that the source

23   of heat, of ignition, in this instance resulted from

24   the spontaneous ignition of the phosphene gas which

25   exceeded the LFL within localized pockets during the

1   reaction of the aluminum phosphide tablets, right?

2      A   Yes.  I'm sorry.  What page are we on?

3      Q   Page 16.

4      A   Right.  Okay.

5      Q   He's saying that's very difficult to achieve

6   because of the inability to confine the phosphene gas

7   sufficiently to get it to reach its lower flammable

8   limit, even in a stack or pile of tablets.

9          Do you see that?

10     A   That's what he says, yes.

11     Q   Do you have any scientific basis to disagree

12  with him in terms of the ability to sufficiently

13  confine the phosphene gas in a stack or pile of

14  aluminum phosphide tablets to reach the lower

15  flammable limit?

16     A   Well, I have the -- the reference material

17  that says it can happen.  The manual that his company

18  produced says it can happen.  And then there are also

19  the case -- you know, there's various cases where

20  this has been involved with fires before.

21         So he's not saying it can't happen.  He's just

22  saying it's unlikely, if I'm reading this correctly.

23     Q   Would you concede that Mr. Ryman has more

24  expertise regarding the ability of phosphene gas to

25  disperse from a pile or stack of aluminum phosphide

1   tablets than you do?

2       A    I might concede that he has more expertise

3   than me but not more expertise than all of the

4   documents that are available and the information

5   that's been published on the subject.

6       Q    Are you an expert on the autoignition

7   propensity of phosphene gas?

8       A    I would say as it relates to the case that

9   we're talking about, yes, but not in a situation like

10  Mr. -- I would say that Mr. Ryman has more expertise

11  on the matter than I do.

12      Q    Okay.  He says at the bottom of page 3 of his

13  report, I've been involved in testing and analysis in

14  which the concentration of phosphene gas far exceeded

15  18,000 parts per million without any result in

16  ignition or combustion.  The fact of the matter is it

17  is very difficult to autoignite phosphene gas.

18          Do you have any reason to disagree with that

19  last statement, that it is very difficult to

20  autoignite phosphene gas?

21      A    I disagree with the statement because there's

22  sufficient anecdotal evidence to fires occurring with

23  phosphene gas, the flashing of the container, the

24  warnings, the research, the other fires that have

25  been documented.  So I wouldn't -- I don't -- I

1    disagree with it in the fact that he doesn't say

2    it's -- he doesn't say it's impossible.  He says it's

3    very difficult.

4        Q    You pointed to the application manual put out

5    by DeGesch America, for whom Mr. Ryman works, as

6    saying, well, even his own company's application

7    manual talks about the propensity of ignition from

8    piling or stacking of aluminum phosphide tablets,

9    right?  You pointed to that section we looked at

10   earlier?

11       A    Correct.

12            MR. WIDIS:  Object to form.

13       Q    Right.  Take a look at what Mr. Ryman says

14   about that on page 3 of his report, and I will point

15   you to -- specifically to where he references that

16   statement in the second paragraph under the piling or

17   stacking of Fumitoxin tablets and risk of fire

18   section.  The second paragraph there, he quotes that

19   section from the application manual, section 4.2.

20            He says, as I testified in my deposition in

21   this case, this statement is merely precautionary.

22   It does not mean and was not intended to convey that

23   the piling or stacking of tablets will result in the

24   LFL of phosphene gas being reached, let alone a fire.

25   The reality is, as I testified in my deposition, that

Deposition of Lester Rich

1   it is very difficult to confine phosphene gas because

2   it disperses readily and quickly.

3        And we've looked at that already.

4        On the basis of what he says about that

5   statement being merely precautionary, you're still

6   willing to conclude that that statement gives you a

7   basis for your opinion in this case?

8   A   Yes.

9   Q   Had you ever seen the Fumitoxin application

10  manual before July of 2009?

11  A   July of 2009.  I'm not sure.  I think so, but

12  I don't know for certain when I first saw a copy of

13  the Fumitoxin manual.

14  Q   Had you ever heard of the product Fumitoxin

15  before July of 2009?

16  A   Yeah, I think I had heard of it.  I don't know

17  that I had read -- read about -- I mean, as we talked

18  about, some of the hazardous materials training.  We

19  discussed that.

20  Q   Your professional life interacted with

21  Fumitoxin for the first time in July of 2009,

22  correct?

23  A   In -- by July of 2009, are you referring to

24  the E.J. Cox case?

25  Q   Yes.

1     A   Because we talked about earlier previous --

2   yeah, I believe that would be the first -- the answer

3   that question would be yes.

4     Q   And you're testifying under oath today in a

5   manner that contradicts somebody who has worked with

6   this product for his entire professional life?

7     A   I'm only pointing out -- I'm not saying I

8   contradict what he's saying.  I'm pointing out that

9   he -- I don't agree with everything he's saying.  I'm

10  not necessarily contradicting the man.  I'm saying I

11  don't agree with what he's saying.  And he also goes

12  on to say it's not impossible.

13    Q   So you're willing to state an opinion to a

14  reasonable degree of scientific certainty based on

15  something that's not impossible; is that right?

16    A   No.  That's what I said in regard to

17  Mr. Ryman's report.  The opinion is based on the

18  totality of the circumstances that we've discussed

19  today.

20    Q   And to a reasonable degree of scientific

21  certainty, correct?

22    A   Yes.

23    Q   On page 17 of your report, you conclude that

24  the fire had been burning for several days prior to

25  its discovery, correct?

Deposition of Lester Rich

1    A    Yes.

2    Q    I think earlier you -- when we were going

3    through the timeline, you were to the point of saying

4    probably on August the 5th, the day after the

5    application?

6    A    Well, you said that, and I said that it's a --

7    it was -- it's a reaction curve, and the speed and

8    the robustness with which reaction takes place is

9    unpredictable when the Fumitoxin is piled up.

10    Q    Okay.  For the fire to have been caused by

11    localized pockets of phosphene gas that exceeded the

12    lower flammable limit of phosphene, would you agree

13    that the fire had to have been commenced at least by

14    August the 7th?

15    A    Let's look at -- do we have a calendar?  Let

16    me write that out so I can see what we're talking

17    about.  So the fumigation was August the 4th.  Okay.

18    So then we have the 5th, the 6th, the 7th.  And we

19    previously talked about that fumigation was midday,

20    approximately, which would take 24 hours to take

21    midday to the next day, midday the 6th, midday the

22    7th.

23         And now I've got the dates.  What was your

24    question?

25    Q    Would you agree that for your theory of the

1  cause of this fire to be correct, the fire had to

2  have been commenced by August the 7th, 2009?

3      A   Yes, I would say that's within the window of

4  reactivity that we were discussing earlier.

5      Q   So once we conclude that the fire did not

6  begin by August the 7th, if we reach that conclusion,

7  we would need to look for other possible causes of

8  the fire rather than the Fumitoxin tablets releasing

9  phosphene that reached its lower flammable limit,

10 correct?

11     A   Give me that one more time.

12     Q   If, in fact, we were to conclude, no, the fire

13 actually began on August 8th or thereafter, we

14 would have to find another cause to attribute the

15 fire to than the cause you attribute the fire to?

16     A   Well, are you -- and I think that's correct,

17 but are you saying when the fire began or when the

18 fire was discovered because --

19     Q   No.  When the fire commenced.

20     A   There's different -- there's a lapse there or

21 a delay, so to speak.

22     Q   Yes.  We're getting to that.  But I'm talking

23 about the physical inside-the-dome ignition

24 occurring.  I think you've said that had to be by the

25 7th of August?

1    A    I believe that's accurate.  That's within the

2    window of the reactivity that we're talking about.

3    Q    So if I had a magic camera in that dome that

4    nobody knows about that showed that there was no fire

5    in there until August the 8th, at that point you

6    would concede that your theory of the cause of this

7    fire is not the one that accurately describes what

8    caused the fire?

9    A    All depends on what that camera showed.  If

10   there's -- if there's smoldering taking place after

11   this up until you see it, then no.  If the dome is

12   pristine, crystal clear, then yes.

13   Q    And I believe you've already testified to

14   this, but I would like to hear it again.  If we could

15   establish to your satisfaction that the fire in any

16   way, shape, or form on the surface of the peanuts was

17   not existent as of August the 8th, 2009, what would

18   be the leading candidate for the actual cause of the

19   fire that was discovered on August 11th, 2009?

20        Other words, we proved to your satisfaction no

21   fire on the surface of that peanut pile on August the

22   8th, 2009.  What --

23   A    Correct.

24   Q    -- would be the leading candidate to be

25   labeled the cause of the fire that was discovered on

1   August 11th, 2009?

2       A    It would be one of the other alternate

3   hypotheses.

4       Q    The most likely being?

5       A    Well, without eliminating the others, it would

6   be the self-heating led to thermal runaway which led

7   to spontaneous combustion.

8       Q    Okay.  Your conclusion that Fumitoxin tablets

9   in piles caused this fire required you to conclude

10  that the discovery of the fire had been delayed for

11  several days; isn't that correct?

12      A    No.  That's just the way it was.  I don't

13  think it -- the conclusion didn't require me to -- I

14  don't understand the question.

15      Q    You have no idea when the fire actually

16  started because there's no evidence of when the fire

17  started, is there?

18      A    Well, there's evidence that once the fire

19  is -- the fire is discovered.  But prior to that,

20  correct, there's not -- we don't have a time frame

21  for when the fire initiated in between this date

22  range that we're talking about.

23      Q    The only basis you have to say that discovery

24  of the fire was delayed for several days relates to

25  your conclusion that it was caused by the phosphene

1    gas liberated from piles of Fumitoxin tablets,

2    correct?

3        A    No.  The delayed discovery has to do with the

4    geometry and the configuration of the building.  The

5    building's airtight.  The building is gastight.  So

6    that's going to delay discovery of the fire.

7        Q    You told me earlier that the building was not

8    gastight because the wisps of smoke that were

9    detected on August 11th were escaping through the

10   hatch through which Mr. Turner and Mr. Lilley applied

11   the Fumitoxin on August 4th, 2009.  Correct?

12       A    Right.  That's -- that is my understanding,

13   that that hatch was not taped or otherwise sealed,

14   but it was replaced.  So it's -- the rest of the

15   building, the vents, the fans, and all that

16   material -- not material -- all those openings have

17   been sealed, gastight, to hold in the phosphene.

18       Q    There was nothing preventing smoke from a fire

19   on the surface of the peanuts on August 6th or

20   August 7th from escaping through the same place at

21   which it escaped on August 11th; isn't that right?

22       A    Unless the smoke wasn't there yet.  I mean,

23   the gap -- the crack that the smoke escaped from

24   certainly -- I'm not suggesting that it opened up at

25   some point in between.  But you also have to

1    understand that with the fire burning, you've got to

2    fill that space, pressurize it, and then force the

3    smoke out through that miniscule opening or that

4    small crack or whatever is up there with the -- with

5    the piece.

6        Q    For all you know, that could have happened in

7    a day?

8        A    No.  Not for all I know, no.

9        Q    You have no more basis to say that it took

10   five days for that to happen than to say it took one

11   day for that happen, do you?

12       A    Yes.

13       Q    And what's your basis to say that it took some

14   five days for all those things to happen so the smoke

15   could escape from the head house?

16       A    The basis is the type of fire.  It's a

17   smoldering fire in an oxygen-deficient atmosphere or

18   oxygen-reduced atmosphere in a tightly-sealed

19   structure.

20       Q    In your experience as a fire investigator,

21   does a slowly-developing fire typically result from

22   the lower flammable limit of a flammable gas being

23   achieved?

24       A    It depends on what the -- what is ignited

25   by -- I'm -- you'll have to clarify that question for

1    me a little bit or give me some more details what you

2    mean by flammable gas.

3        Q    When you think of a flammable gas, propane,

4    reaching its auto- -- becoming autoignited, what type

5    of an event do you think of?

6        A    Normally with a rogue gas, it's a flash fire.

7        Q    Yet the type of fire you believe occurred in

8    the Severn peanut dome from the lower flammable limit

9    of phosphene gas being achieved was a smoldering

10   fire; is that right?

11       A    Yes.  And it could -- and that fire in the

12   dome -- just because you didn't -- I mean, we didn't

13   talk about if the propane just flashed and that's it.

14   Then that's going to be a flash.  If the flashing

15   propane ignites some other Silastic material, then a

16   smoldering fire can occur.  And often you'll find in

17   investigating gas fires that there's a brief flash,

18   then there's localized burning of different materials

19   that were ignited by that flash.

20            So in the dome, because of the reaction of

21   the -- the ceiling of the dome by IFC, because of the

22   ammonia and the CO2 that's being produced as part of

23   the reaction, like I said earlier, it's a reduced

24   oxygen environment.  So even if you have a flash or

25   you even have flaming combustion, initially in a

1    small location on the surface of the pile, that

2    combustion is going to transition or cycle, and it

3    may even cycle back and forth between smoldering and

4    flaming and smoldering and flaming depending on the

5    available air right there for combustion.

6        Q    And what actually happened is something that

7    you don't know and can't possibly know, correct?

8        A    I know that's the way the fire would behave

9    under oxygen-reduced or oxygen-deficient atmosphere.

10       Q    But you don't know what was going on inside of

11   the dome between August the 4th and August the 11th

12   because we have no evidence of it, correct?

13       A    I can't see in there, right, to tell you

14   that's what's happening.  But based on my knowledge

15   of how a fire in a reduced-oxygen environment would

16   burn and behave, I can tell you that's what's going

17   on.

18       Q    Who is Barry Lindley?

19       A    He is a chemist that works for DuPont out of

20   the Belle, West Virginia facility up there.  It's

21   a -- he does -- he's a chemist who works for them.

22   But he primarily does training and emergency response

23   for DuPont.

24       Q    What role has Barry Lindley played in this

25   case?

1   A    To my knowledge, he came to the scene after

2   the explosion for -- I don't -- he may not even have

3   been there for a day.  And then I haven't -- that's

4   it.  I don't know that he's involved in the case

5   anymore.

6   Q    Did you have any discussions with him as you

7   were trying to form your opinion in this case?

8   A    Yes, I'm sure I talked to him while he was,

9   you know, on site at the dome.

10  Q    Is that when you formed your opinion in this

11  case?

12  A    No.  That was when I was collecting data and

13  information, as we've talked about earlier.  To my

14  knowledge -- I'm sorry.  Go ahead.

15  Q    When is the last time you had a discussion

16  with him about Severn?

17  A    I believe it was that -- the day he was at the

18  scene.  I'm pretty certain I haven't talked to him

19  about Severn since.

20  Q    Did he provide you any information or analysis

21  that assisted you in forming your opinion in this

22  case?

23  A    I would say I don't think so, but I don't

24  completely recall because we did talk the day that he

25  was there at the scene.  So he may have given me some

1    information about aluminum phosphide or related some

2    technical aspect of it.  But I have not -- I haven't

3    had a conference call with Howard and he or something

4    like that and discussed this particular case.

5        Q   Okay.  I'm going to need to go off the record

6    to gather my last few materials, but after I do that,

7    I think we've got about 20 minutes or so, and we'll

8    be done.

9            THE VIDEOGRAPHER:  Okay.  We're going off the

10    record.  Time now is 5:18 p.m.

11           (A recess was taken.)

12           THE VIDEOGRAPHER:  We're going back on the

13    record.  The time now is 5:26 p.m.

14       Q   Mr. Rich, I'm going to show you what I've

15    marked as Exhibit 208.

16           (Exhibit No. 208 was marked for

17    identification.)

18       Q   I'm sorry.  Wrong one.  That one.

19       A   Okay.

20       Q   Can you identify what Exhibit 208 is?

21       A   It's an email from Barry Lindley.

22       Q   To you?

23       A   Yes.

24       Q   And in fact, that was the day before you

25    provided your sworn testimony in the E.J. Cox case,

1   correct?

2       A    Yeah.  I think that deposition was on the

3   13th.

4       Q    Okay.  What was he tell- -- what did you make

5   of all this information that he shared with you then?

6       A    I don't -- I don't know what you mean.  I

7   mean --

8       Q    What -- what information was he providing you

9   about the reaction of aluminum phosphide pellets or

10  tablets that you did not know at the point he

11  provided you this information?

12      A    I think my question to him had been about the

13  heat of formation or the theoretical heat of

14  formation as to a way to calculate that to estimate

15  what the heat of formation would have been.  And he

16  had access to some resources I didn't, which I

17  believe is the -- I think he referenced it here.  The

18  chemical -- chemical handbook or the C -- excuse me.

19  CBE or CEB.  And so he had -- he had provided that

20  reference material to me.

21      Q    Your opinion in this case, the Severn peanut

22  case, has nothing to do with the heat of formation of

23  phosphene, correct?

24      A    That's correct.

25      Q    It has to do with the lower flammable limit of

1    phosphene gas being obtained?

2        A    Yes.

3        Q    Do you know whether Mr. Lindley, when he was

4    on site at Severn Peanut Company, formed any

5    opinions, hypotheses, or impressions regarding the

6    cause of the Severn peanut fire?

7        A    I don't know.

8        Q    I'll show you what we've marked as

9    Exhibit 209.

10           (Exhibit No. 209 was marked for

11       identification.)

12       Q    I believe both pages are identical, but for

13   some reason they were two separate pages in the

14   materials that we were provided.  Do you know what

15   Exhibit 209 is?

16       A    It's my recollection -- and like I said, I

17   have not talked to him about this since he was there,

18   but this was -- it's kind of a hieroglyphic graphical

19   representation of -- I don't even know if it's an

20   opinion.  It's a hypothesis that Barry had about the

21   explosion, not the cause of the fire.

22       Q    Okay.  So to the extent we see the pictures

23   there, those are supposed to be the dome?

24       A    Yes.

25       Q    And the red dots are the peanuts?

 1      A    Yes.

 2      Q    And the line above the red dots is the area

 3  above the peanuts that's the head space?

 4      A    Yeah.  Yes.  Yes.  The two little -- in

 5  between the blue line and the two hashes, I guess,

 6  are the two little parallel lines at the top that

 7  would be the head space.

 8      Q    Mr. Rich, would you agree that one does not

 9  need to understand the dynamics of the explosion on

10  August 29th, 2009 to be able to come to a

11  determination as to what did or did not cause the

12  fire to begin some weeks before then?

13      A    Yes, I would agree to that.

14      Q    So you didn't rely on anything regarding the

15  explosion to inform your opinion as to what caused

16  the actual fire?

17      A    No.

18      Q    And it was -- the explosion was likely

19  influenced by the fire suppression efforts that took

20  place from the 15th of August until the day of the

21  explosion?

22      A    Possibly, yeah.  Particularly if you follow

23  this hypothesis, it would be, yes.

24      Q    Okay.  Who is Mark Beavers?

25      A    Mark Beavis -- I'm sorry.  Mark Beavers is

1    the -- well, I don't know if he's still -- at the

2    time, he worked for Rimkus, and he was the other fire

3    investigator retained, and I believe he was retained

4    directly by Mr. Byers.

5        Q    From Travelers?

6        A    From Travelers.  Right.

7        Q    Was he at the scene before you, or were you at

8    the scene before he was?

9        A    I believe -- well, he may have been there

10   slightly before me.  I mean, I think he got there the

11   same day that the meeting occurred and the sign-in

12   sheet was taking place, but I don't know what time he

13   arrived.

14       Q    Did you have discussions with him subsequent

15   to September of 2009 about what may have caused this

16   fire?

17       A    Subsequent to when?

18       Q    September of 2009, after everybody

19   disassembled from the scene.

20       A    I don't believe I had any conversations with

21   him regarding the cause of the fire, but I believe he

22   may have been at a meeting where we discussed the

23   timeline or the manufacture -- not the man- -- but

24   the rough draft of the timeline.  That was done in

25   Charlotte, and I kind of think he might have been

1  there, but I'm not 100 percent positive.  There

2  wasn't -- there's not a sign-in sheet or anything.

3     Q    Did Mr. Beavers, to your knowledge, form any

4  opinions, hypotheses, or impressions regarding the

5  cause of the Severn peanut fire?

6     A    I don't know.

7     Q    Do you know if there was any consideration

8  given to him becoming a testifying expert witness in

9  this case?

10    A    No.

11    Q    On page 21 of your report, you refer to a

12 consultation with John Schumacher, item number 36.

13 Can you tell me about that consultation.

14    A    Yes.  That's just a -- either -- it might be

15 more than one phone call with Schumacher just

16 discussing the case in general.

17    Q    Were you trying to learn something from him?

18 Was he trying to learn something from you?

19    A    I don't know -- I don't know if you could

20 characterize it like that.  It was just -- it was a

21 general discussion of the case and the materials.

22    Q    Did anything that Mr. Schumacher shared with

23 you during any phone consultation assist you in

24 forming your opinions in this case?

25    A    I don't believe -- I would say -- I would say

1    no, I don't believe that it -- that anything that he

2    and I talked about, you know, changed or affected my

3    opinion.

4        Q    Okay.  You also have listed consultation with

5    Dr. John Cavarack, correct?

6        A    That's correct.

7        Q    Well, let me back up.  You have a consultation

8    with Barry Lindley listed.  Have you already told me

9    everything there is to know about that?

10       A    Right.  That's from the scene that we're

11   talking about.

12       Q    What about Mr. Cavarack?  What did you consult

13   with him about?

14       A    I consulted with him about the electrical

15   issues surrounding the gantry system, the

16   unloading -- or I'm sorry -- the conveyor system, the

17   motors, a little bit about the thermocouple system.

18   I remember he and I inspected that in the -- excuse

19   me -- in the house down below where the recording

20   data was, looking for signs of lightening strike or

21   overcurrent or damage to the low voltage wiring,

22   which is often easily discovered.

23          He was -- I believe he did come to a meeting

24   in Charlotte maybe back in December, just a general

25   meeting that we had at Quick Widis about the case.

1      But primarily my discussions with him dealt

2    simply with the electrical system and the -- and a

3    little bit of the lightening issues.

4      Q   And to the extent you relied on him, you

5    relied on him to assist you in excluding those two

6    possibilities as potential causes of the fire?

7      A   Yes.

8      Q   Okay.  Have you had any interaction in this

9    case about the Severn peanut fire with Steve Brown?

10     A   I know he's involved in this case.  Yes, he

11   was -- he was at the same meeting in December time

12   frame, I believe.

13     Q   Did you review his report in any form prior to

14   the time you issued yours?

15     A   No, I have not seen his report.

16     Q   Have you seen his report today?

17     A   I have his report.  I haven't read it, but I

18   have it.

19     Q   Is there anything that Steve Brown assisted

20   you in learning that aided you in forming your

21   opinion in this case?

22     A   In general, I would say as far as -- I don't

23   know that necessarily specifically to my opinion, but

24   what I did learn from him was some of the issues

25   associated with storage of the peanuts, the

1   differentiation, the different types of peanuts, some

2   of the agricultural background. I would say my

3   interaction with him was more of a -- more

4   commodity-based background information, I guess would

5   be the way to characterize that.

6       Q   Is there any information that he provided to

7   you that assisted you in forming your opinion as to

8   what the cause of the fire at the Severn peanut dome

9   was?

10      A   I don't believe so, but he had provided

11  information that, you know, assisted me in the

12  E.J. Cox, and so in my mind, I want to make sure that

13  I'm differentiating those. But we haven't had a

14  specific conversation about this case, but we did

15  have about that case. So once it's in my head, it's

16  hard to say.

17      Q   Have you had any interaction with John

18  Mueller, who has also been identified as a testifying

19  expert witness in this case?

20      A   I have not.

21      Q   Have you reviewed his report?

22      A   I think I got his the same time I got Steve

23  Brown's.

24      Q   Have you reviewed it?

25      A   Mueller?

1     Q    M-U-E-L-L-E-R.

2     A    Oh, Mueller.  I did read it, yeah.  Sorry.

3  And now that you say that, I remember that he said he

4  pronounced it Miller.

5     Q    Did you see any version or iteration of that

6  report prior to the time you issued yours?

7     A    No.

8     Q    Is there anything in his report that aids or

9  assists you in the opinion that you're expressing in

10  this case?

11     A    I have just gotten his report, and I don't

12  know the answer to that question.

13     Q    Have you had any interaction with anyone else

14  that we haven't discussed today regarding the

15  development of your opinions in this case aside from

16  Mr. Widis or anybody at his law firm?

17     A    Excluding all the people we've -- I mean,

18  including all the people we've talked about today?

19     Q    I'm looking for anybody else.

20     A    Anybody else, no.

21     Q    Do you have any knowledge regarding the fire

22  that occurred in Toledo, Ohio at an ADM grain bin

23  that had been fumigated by IFC applicators?

24     A    Yes.

25     Q    What is your understanding of the sequence of

1    events that led to that fire?

2        A    What I have is a -- I think it's like a part

3    of a presentation that I got from Mr. Widis that has

4    some photographs and some bullet points about that

5    loss, and the -- my understanding of that is -- and

6    it's limited solely to what I can read and see on the

7    pictures -- is that Fumitoxin was applied through the

8    top hatch or opening of this concrete grain silo and

9    that -- and I'm not -- I don't -- I can't remember if

10   it gives a time frame.  Subsequent, the fire is

11   discovered, but the photographs that -- the post-fire

12   photographs clearly show a large pile of residue that

13   would be commonly associated with expended Fumitoxin.

14        There's no scale laid in the photo, so it's

15   difficult to see, but I would estimate it, you know,

16   at maybe a 2-foot diameter.  And I believe there's --

17   but I don't have the photos in front of me, but I

18   believe there's a -- I believe it was a multiple -- I

19   believe there's another one, like, further back where

20   the Fumitoxin was applied, and then there's some more

21   photos of the -- of like a breaching operation on the

22   side of the silo to allow the grain to flow out.

23        Q    Do you have any appreciation of the timeline

24   of application to fire in that instance?

25        A    If you have the presentation or -- I don't

1    know if it's available.  We could look at it.  But I

2    don't recall it discussing a -- like I said, it

3    was -- it was a -- it looked to me like it was a

4    photocopy of a presentation that you would give at a

5    seminar or something, and I don't think all of the

6    material was there.

7        Q    Have you formed any opinions, hypotheses, or

8    impressions regarding the cause of the ADM grain silo

9    fire?

10       A    No.

11       Q    And nothing about the ADM grain silo fire

12   informs your opinion in this case involving the

13   Severn peanut dome; is that correct?

14       A    It doesn't inform my opinion, but the

15   photograph of the expended residue I would say is

16   consistent with what I've been talking about today

17   and the piling of the tablets and suggests that that

18   can and does happen and there is residue left over

19   and it's very localized.

20       Q    Did you know that the area of localized

21   Fumitoxin residue that you're looking at in those

22   photos is from a grain bin that did not have a fire?

23       A    No.  I said it's the -- and then -- okay.  No.

24       Q    What would that tell you about the propensity

25   of piling or stacking of Fumitoxin tablets to cause a

1    fire?

2        A    It would tell me exactly what we've been

3    talking about all day.  It's dependent on the

4    conditions and the exact environment that the

5    situation occurs.  It's the totality of the

6    circumstances, all of the factors coming together.

7        Q    Presume for a moment that the dome fire --

8    just assume this -- began deep in the pile of the

9    peanuts as a result of self-heating.  All right.  So

10   we know that the fire that was discovered, under my

11   scenario, on August 11th, 2011 -- 2009, was the

12   result of a fire that began with self-heating in the

13   middle of the peanut pile.

14            Can you explain a path or progression of that

15   self-heating in the middle of the pile that would

16   lead to the fire that was discovered on August the

17   11th?

18       A    I'm not -- okay.  So I don't understand what

19   you mean by give you a path to --

20       Q    What would the likely progression have been

21   from the self-heating in the middle of the pile to

22   the eventual discovery of smoke coming out of the

23   head house, if that is the manner in which this fire

24   occurred?

25       A    If that's the manner in which the fire

1    occurred -- which I don't believe it is -- I would

2    expect that you would have the fire developing in the

3    pile and then smoke coming up through the pile,

4    collecting in the head space, venting out.  But you

5    would also have probably -- I would expect that that

6    fire would -- since it starts in the pile, it's going

7    to migrate within the pile, based on the geometry and

8    the void spaces and the air -- the spaces between the

9    peanuts.

10         So I think you would have a -- it would be

11   like a fire in -- say it was insulation or a sawdust

12   pile or something like that, where the fire is going

13   to tunnel -- I guess is the word I was looking for --

14   is going to tunnel through in different places of the

15   of the mass.

16       Q   And eventually work its way up to the surface?

17       A   It would eventually work its way up to the

18   surface.

19       Q   And at some point, there would be smoke at the

20   surface which would eventually work its way out?

21       A   At some -- yeah.  Probably there would be

22   smoke at the surface before the fire got to the

23   surface.  I mean, I would think the smoke would come

24   out first.

25       Q   Okay.  If the Severn peanut dome fire, as you

1   opined, was a surface fire, why didn't the dry ice

2   completely extinguish it?

3       A    Because it's a class A material and the dry

4   ice, although it sublimates and does absorb some

5   heat, it's absorbing a lot of that heat from the

6   environment, not from the actual fuel.  And we talked

7   about earlier, the smoldering combustion is a

8   particle-to-particle progression of the flaming zone

9   or flame front.

10          So if you dump dry ice in -- let's go back to

11  the fire triangle.  Three things to have a fire, air,

12  heat, fuel.  We've got fuel.  We have heat.  So we

13  dump dry ice in or -- sorry.  They dump dry ice in to

14  try to remove the air from the fire triangle and

15  extinguish the fire, and that -- while that

16  diminishes the fire and knocks the fire down, it

17  doesn't address the heat that remains in the system,

18  because we talked about earlier it's a dome.  It's a

19  sealed system.

20          It's very similar to -- if your couch is on

21  fire and you use a dry chemical fire extinguisher on

22  it, it will knock the flames down, but as soon as

23  that extinguishing agent dissipates a little bit,

24  it's likely that the fire will reignite because the

25  heat is still contained in the class A materials.

1      Q   If self-heating does occur inside of a large

2   pile of a stored agricultural commodity, is there an

3   area within that pile that is more likely to exhibit

4   that self-heating than any other area?

5      A   I'm not trying to be sarcastic, but I would

6   think the area that's self-heating would be more

7   likely to exhibit that.

8      Q   I guess I didn't express the question well

9   enough.  Is that more -- is self-heating more prone

10  to occur in the middle of a large grain mass or

11  peanut mass or commodity mass?  On the top?  At the

12  bottom?  Or it doesn't really matter?

13     A   I would say the self-heating is more likely to

14  occur within the commodity because that's one of the

15  issues or one of the -- not issues, but one of the

16  factors that would drive self-heating to thermal

17  runaway to ignition, is the insulative capability of

18  that mass.  So normally you -- and it may -- it may

19  not manifest itself from the center of the pile, but

20  like a sawdust pile or hot bags of grass, that's

21  going to heat up from the inside or within, I guess

22  would be the answer to your question.

23     Q   And would you agree that peanuts are a

24  particularly good insulator in that vein that you

25  described of a commodity being a good insulator?

1      A    I would agree that they -- the data that I've

2    seen suggests that they are a good insulator.  To --

3    but continuing that train of thought, in this

4    particular case, the fact they're a good insulator is

5    important, but also the fact that there's a lot of

6    air space around them and that they're an odd-shaped

7    commodity.  So you would have -- that's going to

8    affect the convective heat currents.  It's going

9    to -- it's going to change the dynamic a little bit

10   of what you're talking about.  It's not just the

11   insulative quality, I guess is what I'm trying to

12   say.  It's also the geometry.

13     Q    Mr. Rich, have you read or reviewed any of the

14   expert reports that Mr. Widis has provided to you

15   from the defendants' experts in any detail at this

16   point?

17     A    In no detail, no, sir.  I've reviewed briefly.

18   I've seen them, but I have not had a chance to sit

19   down and study them.

20     Q    So at this point, you would be unable to tell

21   me what specific opinions of each of the experts you

22   take issue with?

23     A    Yes, sir.  I don't think I can tell you that

24   right now.

25     Q    All right.

1     A    I'm sure I do, but I don't -- I can't tell you

2    which ones those are.

3     Q    Mr. Rich, over the course of the seven or so

4    hours that you have testified today, have you

5    expressed every opinion you intend to express at the

6    trial of this action?

7     A    Yes.

8     Q    Have you told me about every basis you have

9    for your opinions?

10     A    Yes.

11     Q    Is there any other work you intend to perform

12    in relation to this matter between now and the time

13    of trial?

14     A    I don't know.  If I'm asked to I would, but

15    there's nothing planned.  Nothing I'm aware of.

16     Q    And on page 1 of your report, you state, as

17    most experts do, that, if necessary, additional

18    reports may be submitted to reflect any changes to my

19    conclusions that may arise from the analysis of any

20    additional information.

21          Let me ask you first, have you reviewed any

22    additional information since the issuance of your

23    report that you would consider significant enough to

24    change any of the conclusions you express in your

25    report?

1    A    No.

2    Q    Have you reviewed any additional information

3  since April 30th, 2013 when you issued your report

4  that you would consider significant enough to alter

5  anything you expressed in your report?

6    A    Have I reviewed anything else that would cause

7  me or suggest that I want to alter the report?

8    Q    Anything in the report.

9    A    Anything in the report.

10    Q    Not just your opinions.

11    A    Well, I haven't read it, but what we talked

12  about today, I would change that sentence to make it

13  read more correctly that we talked about in the page.

14        But other -- no, I don't think --

15  substantively to the report, I don't think there

16  would be any changes.

17    Q    And the sentence that you're talking about is

18  the first sentence in the second paragraph of

19  page 14?

20    A    Yes.  13.

21    Q    The first sentence in the second paragraph?

22    A    Right.  As we talked about previously and now

23  that we sit here and I read it in this light, I

24  probably would move that further down and make it a

25  little clearer that that's a -- what we discussed.

1      Q    And I'm going to ask you a similar question.

2   During your preparation for your deposition, did you

3   see anything that you included in your report that in

4   hindsight you believe should not be in your report?

5      A    Did I see anything I included in my report

6   that I now believe should not be in my report?

7      Q    That's my question.

8      A    No.

9      Q    And --

10     A    No.  I would say no.  No.  I'm sorry.

11     Q    And during your preparation for your

12  deposition, did you see anything that you omitted in

13  your report that you believe should be in your

14  report?

15     A    No.

16          MR. EPSTEIN:  Then at this point, I have no

17     further questions.  Thank you very much for your

18     time.

19          MR. WIDIS:  I've got a few.

20          MR. EPSTEIN:  Okay.

21  CROSS EXAMINATION

22  BY MR. WIDIS:

23     Q    Mr. Rich, I want to draw your attention to the

24  opinion you expressed regarding the Severn case that

25  you expressed in the deposition you gave in the

1   E.J. Cox deposition in July 2011.

2        Was that opinion as to the cause of the Severn

3   fire a working hypothesis?

4      A    That -- yes, that would be a fair

5   characterization of that.

6      Q    All right.  Once discovery in the Severn case

7   commenced, were you provided discovery in that case?

8      A    In this case?

9      Q    In the Severn case.

10     A    Yes.

11     Q    All right.  Which pieces of discovery were you

12  provided?

13        Let me ask you another --

14     A    I was going to say, absent just a few things,

15  it would be what's listed in appendix A except for

16  things that I have, like my notes or the photographs.

17     Q    Did you review and analyze each piece of that

18  discovery that was provided?

19     A    I did.

20     Q    Did you review and analyze it with an open

21  mind?

22     A    Yes.

23     Q    Would you have revised or changed your opinion

24  if you saw facts or information that was inconsistent

25  with the preliminary opinion you reached?

```
 1              MR. EPSTEIN:  Objection to form.
 2        A    Oh, the -- from when I discussed it in the
 3    E.J. --
 4        Q    Right.
 5        A    Yes, if something was different.  Certainly.
 6        Q    And as a result of your review of the
 7    discovery, did you learn of any facts inconsistent
 8    with your working hypothesis?
 9        A    No.
10        Q    Were there any outliers that you learned about
11    during your review of the discovery that were
12    inconsistent with the working hypothesis of the cause
13    of the Severn fire?
14              MR. EPSTEIN:  Objection to form.
15        A    When you're talking about the outliers with
16    the working hypothesis --
17        Q    Let me ask you this --
18        A    I would say the outliers relate to this.  I
19    don't find there are any outliers in this final draft
20    of my report, the final hypothesis.  But there is
21    some difference between this and what I said in
22    E.J. Cox was the working hypothesis.  I don't want to
23    be -- I don't want to get confused.
24        Q    All right.
25        A    I want to be clear.  Sorry.
```

1      Q    And did some of the discovery cause you to

2  amend that working opinion?

3      A    I would say refine it, not necessarily amend

4  it, but narrow it down and focus the opinion.

5      Q    All right.  Is it accurate that you did not

6  reach your final opinion until after you had reviewed

7  all the data collected and your review of all the

8  material identified in your report?

9           MR. EPSTEIN:  Objection to form.

10     A    Yes, I would say -- I mean, we talked about

11  the working hypothesis, but that's -- but yes, the

12  final opinion includes all of this material and the

13  discovery.

14     Q    Okay.  And you didn't reach your opinion -- is

15  it accurate that you did not reach your final opinion

16  until after you had reviewed all of that material?

17          MR. EPSTEIN:  Objection to form.

18     A    Yes, sir.

19     Q    All right.  I want to also go back to the

20  question that Mr. Epstein asked you regarding the

21  testimony of Randy Turner and Brian Lilley, and for

22  clarification sake, do you accept the testimony of

23  Randy Turner and Brian Lilley that they did not see

24  tablets piled in the area that they could see as

25  reliable evidence that there was no piling in that

1   area?

2       A    Well, I think that's what I said to -- to

3   Mr. Epstein, that they said they didn't see it, but

4   that doesn't mean that it's not there.  And if -- I

5   think Mr. Epstein showed us a little section of

6   this -- of their depositions.  But at the break, I

7   was looking at all of the deposition, and there's --

8   they're kind of -- they're kind of all over the place

9   or there's -- it seems like there's some -- it seems

10  like he doesn't remember a lot.

11          But like I said, just -- my thought on that is

12  that if he didn't see it, that doesn't necessarily

13  mean it didn't exist.

14          MR. WIDIS:  All right.  That's all I have.

15          MR. EPSTEIN:  I have nothing further.

16          THE VIDEOGRAPHER:  Okay.  This concludes the

17     videotaped deposition of Lester Rich.  The time now

18     is 5:55 p.m.  We're off the record.

19          (The deposition concluded at 5:55 p.m.)

20

21

22

23

24

25

1      I have read the foregoing pages which contain a

2  correct transcription of the answers given by me to the

3  questions herein recorded.  My signature is subject to

4  corrections on the attached errata sheet, if any.

5

6  Signed this _____ day of _____, _____.

7

8

9                     _____

10                          LESTER V. RICH

11

12  STATE OF _____

13  COUNTY OF _____

14

15  Subscribed and sworn to before me this _____ day of

16  _____, _____.

17

18

19                     _____

20                         Notary Public

21

22  My commission expires:

23

24  _____

25

CERTIFICATE OF REPORTER
STATE OF SOUTH CAROLINA
COUNTY OF CHARLESTON

       I, Cherie J. Anderson, Registered
Professional Reporter and Notary Public for the State
of South Carolina at Large, do hereby certify that the
witness in the foregoing deposition was by me duly
sworn to testify to the truth, the whole truth, and
nothing but the truth in the within-entitled cause;
that said deposition was taken at the time and
location therein stated; that the testimony of the
witness and all objections made at the time of the
examination were recorded stenographically by me and
were thereafter transcribed by computer-aided
transcription; that the foregoing is a full, complete,
and true record of the testimony of the witness and of
all objections made at the time of the examination;
and that the witness was given an opportunity to read
and correct said deposition and to subscribe the same.
      Should the signature of the witness not be
affixed to the deposition, the witness shall not have
availed himself of the opportunity to sign or the
signature has been waived.
      I further certify that I am neither related
to nor counsel for any party to the cause pending or
interested in the events thereof.
      Witness my hand, I have hereunto affixed my
official seal on July 30, 2013, at Charleston,
Charleston County, South Carolina.


_____
Cherie J. Anderson
REGISTERED PROFESSIONAL REPORTER
CERTIFIED REALTIME REPORTER
My Commission expires
April 30th, 2023

STATE OF NORTH CAROLINA    THE GENERAL COURT OF JUSTICE
                                SUPERIOR COURT DIVISION
COUNTY OF BLADEN           CASE NO:  10 CVS 971


E.J. COX COMPANY, INC., and )
AMERICAN FIRE AND CASUALTY )
COMPANY, as subrogee of )
E.J. COX, COMPANY, INC., )
                        )
        Plaintiffs,     )
                        )
    -vs-              ) DEPOSITION OF:
                        )
PESTCON SYSTEMS, INC.,     ) LESTER V. RICH
                        )
        Defendant.      )
------------------------------------ )

COPY


      The deposition of LESTER V. RICH, taken before

Julie L. Bonomo, Professional Court Reporter and Notary

Public, at Bluestein Law Firm, 1040 eWall Street, Mount

Pleasant, South Carolina, on Wednesday, July 13, 2011,

commencing at 9:03 a.m.

EXHIBIT
194

1    the vast majority of applications, caused the fire?

2              MR. NALIBOTSKY:  Object to the form of the

3    question.

4    A.   I can't speak to the vast majority of

5    applications.  I'm not sure what you mean, but I

6    believe, yes, that the Fumitoxin applied in this case

7    resulted in a chemical reaction that started the fire.

8    Q.   Is it your understanding that the majority of

9    time when Fumitoxin is applied it does not create a

10   fire?

11   A.   Yes, applied correctly.

12   Q.   Is it your understanding that every time

13   Fumitoxin -- are you testifying every time it's applied

14   contrary to the label it will cause a fire?

15   A.   No.  I don't know that every time it's applied

16   contrary to the label it will cause a fire.

17   Q.   Have you ever investigated a fire where Fumitoxin

18   was applied contrary to the label that caused a fire --

19   A.   Yes.

20   Q.   Did not cause a fire?

21   A.   Yes.  That did cause a fire.

22   Q.   When was that?

23   A.   That was at Severn.

24   Q.   How was that applied contrary to the label?

25   A.   The application was allowed to pile.  The tablets

1    were allowed to come in close proximity to each other.

2    In that case, a very large pile of tablets reacted and

3    the heat from the reaction was forced into the peanuts

4    and raised into their ignition temperature.

5    Q.  In that case, was all of the Fumitoxin applied

6    through an access port in the silo?

7    A.  Yes.

8    Q.  So it was all dumped in one area on the peanuts?

9    A.  Yes.

10   Q.  That didn't happen in this case?

11   A.  Well, not like that, but we do have a

12   concentration of the tablets in this case.

13   Q.  What is the concentration level of the tablets at

14   any given point in the small or large pile?

15   A.  The number of tablets?

16   Q.  Yes.

17   A.  Based on Percy Pate's deposition and what he told

18   ATF, he put a half of a flask in the small pile, which

19   would be about 250 tablets.  So if you take 250 tablets

20   into the small pile -- hang on a second.  Let me find my

21   notes.  Let's look at what Percy said.  I believe that's

22   what he says.

23        Okay.  So we have two different indications that

24   Percy Pate put a half a flask in the small pile.  First

25   he tells ATF that when they interviewed him

1    you throw all of those 250 in one spot, is that going to

2    cause a fire?

3        A.   Yes.

4        Q.   So it's the method of application that's as

5    important as the amount of product you're treating.   Is

6    that fair to say?

7        A.   Well, the method of application being like we

8    just said, whether the tablets can dissipate their heat

9    of reaction.   If you look in your manual, it talks about

10   when you place tables on a piece of paper in a commodity

11   warehouse.   Don't clump those tablets together.   Don't

12   put more than 50 tablets in any one piece of paper, one

13   pile, one hole, one probe insertion because of what

14   we're talking about.

15       Q.   Have you seen any documents discussing the --

16   establishing that there has been a fire as a result of

17   putting too many tablets in one spot?

18       A.   Have I seen any documents to that effect?

19       Q.   Anything discussing that that is a possibility of

20   a theoretical or a study in case where that had

21   occurred?

22       A.   My Severn case is more than 250 peanuts in the

23   pile.

24       Q.   I understand that.   Let's not talk about Severn.

25   Let's talk about something that you have not generated.