IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NORTH CAROLINA

NORTHERN DIVISION


SEVERN PEANUT CO., INC.,

MEHERRIN AGRICULTURE &

CHEMICAL CO., and TRAVELERS

PROPERTY CASUALTY COMPANY OF

AMERICA as Subrogee of Severn

Peanut Co., Inc. and Meherrin

Agriculture & Chemical Co.,

    Plaintiffs,

  vs.      DOCKET NO. 2:11-cv-00014-BO

INDUSTRIAL FUMIGANT CO. and

ROLLINS, INC.,

    Defendants.




VIDEOTAPED DEPOSITION

OF

JOHN L. SCHUMACHER, P.E.


At Charlotte, North Carolina   Reported by:

September 12, 2013 - 10:16 p.m.  Susan S. Burgess, RMR

EXHIBIT K

```
1                    A P P E A R A N C E S

2      FOR THE PLAINTIFFS:

3            Jay M. Goldstein

4            Howard M. Widis

5            QUICK WIDIS & NALIBOTSKY

6            2115 Rexford Road, Suite 100

7            Charlotte, North Carolina 28211

8            (704)364-2500

9            (704)365-8734 Fax

10           jgoldstein@qwnlaw.com

11           hwidis@qwnlaw.com

12

13     FOR THE DEFENDANTS:

14           Steven B. Epstein

15           POYNER SPRUILL

16           301 Fayetteville Street, Suite 1900

17           Raleigh, North Carolina 27601

18           (919)783-6400

19           (919)783-1075 Fax

20           sepstein@poynerspruill.com

21

22     Also Present:

23           Raleigh Ellison, Videographer

24

25
```

1             T A B L E   O F   C O N T E N T S

2     EXAMINATION - ATTORNEY                                PAGE

3     Direct - Epstein                                         6

4     Cross - Goldstein                                      344

5

6     EXHIBITS                                              PAGE

7     Exhibit 246  Engineering Investigation Report          8

8     Exhibit 247  Handwritten notes                        46

9     Exhibit 248  Invoices                                 47

10    Exhibit 249  Second Supplemental Report               65

11    Exhibit 250  Handwritten notes                        68

12    Exhibit 251  Photograph                               69

13    Exhibit 252  Photograph                               70

14    Exhibit 253  Photograph                               70

15    Exhibit 254  Photograph                               70

16    Exhibit 255  Photograph                               71

17    Exhibit 256  Photograph                               71

18    Exhibit 257  Photograph                               71

19    Exhibit 258  Photograph                               71

20    Exhibit 259  Photograph                               71

21    Exhibit 260  NFPA 921 Section 20.5                   110

22    Exhibit 261  MDE Forensic Laboratories report        122

23    Exhibit 262  ISFI 2012 article                       145

24    Exhibit 263  Excerpt from the Deposition of Lester

25                 Rich                                     151

1   EXHIBITS, cont'd                                   PAGE

2   Exhibit 264  Diagram                                183

3   Exhibit 265  Excerpts from the Spoilage and Heating

4                of Stored Agricultural Products        187

5   Exhibit 266  Diagram                                218

6   Exhibit 267  11658 Temp Array Data                  226

7   Exhibit 268  Graph                                  226

8   Exhibit 269  Peanut Volumes/Sensing Volumes/Sensing

9                Volume vs. Peanut Volume               226

10  Exhibit 270  List of 1007s                          226

11  Exhibit 271  Calculations                           226

12  Exhibit 272  Calculations                           226

13  Exhibit 273  Calculations                           226

14  Exhibit 274  Excerpt from the Deposition of Stephen

15                L. Brown                              239

16  Exhibit 275  MSDS: Aluminum Phosphide               288

17  Exhibit 276  Alabama Cooperative Extension System

18                article                               292

19  Exhibit 277  Kansas State University - Stored

20                Product Protection - Chapter 14       295

21  Exhibit 278  Walker Fire Forensic Analysis report   336

22

23

24

25

1          I, Susan S. Burgess, being a Certified

2   Shorthand Reporter, Registered Merit Reporter, and Notary

3   Public, was appointed Commissioner by consent to take the

4   videotaped deposition of John Schumacher, P.E.,

5   September 12, 2013, at 10:16 a.m., in the offices of

6   Quick, Widis & Nalibotsky, located at 2115 Rexford Road

7   Suite 100, Charlotte, North Carolina.

8          _____

9          THE VIDEOGRAPHER:  We're going on the

10  record at 10:16 a.m. for the deposition of John

11  Schumacher.  This is being taken in the matter of Severn

12  Peanut Company and Others versus Industrial Fumigant

13  Company and Rollins, Inc.  This is being heard in the

14  U.S. District Court for the Eastern District of North

15  Carolina, Northern Division; Docket No. 2:11-CV-00014-BO.

16          If the taking attorney would introduce

17  themself for the audio record, please.

18          MR. EPSTEIN:  Steve Epstein,

19  representing the defendants.

20          THE VIDEOGRAPHER:  Thank you.

21          Other counsel present, please introduce

22  yourselves.

23          MR. GOLDSTEIN:  Jay Goldstein,

24  representing the plaintiffs.

25          THE VIDEOGRAPHER:  Thank you.

```
 1                    Please swear the witness.

 2     Whereupon,

 3                    JOHN SCHUMACHER, P.E.,

 4     having first been duly sworn, was examined and testified

 5     as follows:

 6     DIRECT EXAMINATION

 7     BY MR. EPSTEIN:

 8        Q:     Good morning.

 9        A:     Good morning.

10        Q:     Is it Mr. Schumacher?

11        A:     Versus John?

12        Q:     Doctor.

13        A:     No, it's Mister.

14        Q:     Okay.

15        A:     Or John.  Whatever you prefer.

16        Q:     All right.  Mr. Schumacher, my name is Steve

17     Epstein.  I am here to take -- here today to take your

18     deposition in a case that has been filed against my

19     clients, which include both Industrial Fumigant Company

20     and Rollins, Inc., in a case involving a peanut fire at

21     the Severn peanut dome.  I take it you're very familiar

22     with what we're here to talk about today.

23               Correct?

24        A:     Yes.

25        Q:     All right.  Go ahead and state your name for
```

Deposition of John Schumacher

1  the record.

2      **A:**    John Louis, L-o-u-i-s, Schumacher.

3      **Q:**    And where do you live, Mr. Schumacher?

4      **A:**    I live in Denver, Colorado.

5      **Q:**    And what is your residential address?

6      **A:**    It's 1149 South Clarkson Street.

7      **Q:**    And that's where?

8      **A:**    It's in Denver.

9      **Q:**    Okay.  Mr. Schumacher, I'm going to present

10  you a check made payable to AEI, which is your company,

11  correct?

12      **A:**    Yes.

13      **Q:**    Is that what you asked for in order for me to

14  take your deposition today?

15      **A:**    That's correct.

16      **Q:**    Is that in the amount that you asked for

17  today?

18      **A:**    I haven't done the math, but I mean, it looks

19  to be correct, so --

20      **Q:**    Okay.

21      **A:**    I'm sorry.  I'm not --

22      **Q:**    Excellent.  I'm going to go ahead and hand

23  you what we've marked as Exhibit 246.  Can you take a

24  look at that, please, and make sure you understand what

25  it is.

Deposition of John Schumacher

```
1      A:      Certainly.

2                      [EXHIBIT NO. 246 MARKED FOR

3                      IDENTIFICATION]

4                      THE WITNESS:   Okay.

5  BY MR. EPSTEIN:

6      Q:      Can you identify what Exhibit 246 is?

7      A:      Exhibit 246 is the engineering investigation

8  report that I prepared on April 30th, 2013, along with

9  the attachments.

10     Q:      Okay.  Is this your expert report in the case

11 that we're here to talk about today?

12     A:      Yes.

13     Q:      All right.  I want to ask you some questions

14 about your background, which I will note is at the end of

15 your report following your signature page.  It's about 15

16 pages in.

17     A:      Are you referring to my CV or resume?

18     Q:      Yes.

19     A:      Okay.

20     Q:      All right.  So I want to start by asking you

21 how long it took for you to get your chemical engineering

22 degree from the University of Illinois?

23     A:      Four years.

24     Q:      All right.  What was your GPA in those four

25 years?
```

Deposition of John Schumacher

1      A:      I think it was about 3.8.

2      Q:      Okay.  What was your class rank,

3  approximately?

4      A:      No idea.

5      Q:      Okay.  Did you fail any courses in college?

6      A:      I did not.

7      Q:      You then proceeded to get a master's in

8  chemical engineering from the Illinois Institute of

9  Technology; is that right?

10     A:      I did, yes.

11     Q:      Okay.  How long did that take?

12     A:      Oh, I think I was taking that at night.  So

13  from '92 to -- maybe about four years, three years, three

14  and a half years.

15     Q:      Okay.  You worked at Packer Engineering

16  during that period of time, correct?

17     A:      Did you say I worked?

18     Q:      Yes.

19     A:      Yes.

20     Q:      Okay.  And what was your job at Packer

21  Engineering?

22     A:      Well, as it's listed here, I was a staff

23  chemical engineer.

24     Q:      Okay.  For what reason did that employment

25  come to an end in 1998?

1     **A:**     The mountains were calling.

2     **Q:**     Okay.  Did you resign?  Were you fired?

3     **A:**     No, no.  I -- I resigned and got a job in

4     Denver.

5     **Q:**     Okay.  You then worked for the Western

6     Engineering and Research Corporation, correct?

7     **A:**     That's correct.

8     **Q:**     What was your job there?

9     **A:**     Project engineer.

10    **Q:**     And for what reason did your employment there

11    end in 2005?

12    **A:**     Basically the president -- well, there were

13    two owners of that company, Jay Freeman and Jim Royston,

14    and they had a philosophical disagreement.  And we

15    decided to form AEI corporation.  And Jim Royston bought

16    the name Western from Jay.  So it was -- I went with a

17    guy and left the company.

18    **Q:**     Okay.  And who did you go with?

19    **A:**     Jay Freeman.

20    **Q:**     Okay.  All right.  Mr. Schumacher, do you

21    have any education, training, or experience in the field

22    of agricultural engineering?

23    **A:**     Well, from the standpoint of commodities and

24    how they can self-heat, yes.

25    **Q:**     Okay.  I'm asking about agricultural

Deposition of John Schumacher

1    engineering.  Do you have a degree in agricultural

2    engineering?

3         A:    A degree, no.

4         Q:    Did -- during your college education, did you

5    have a minor in agricultural engineering?

6         A:    Agricultural engineering?

7         Q:    Yes.

8         A:    No.

9         Q:    Did you take courses in agricultural

10   engineering while you were in college?

11        A:    Well, I took a bunch of chemistry courses and

12   things of that nature that would be related to some of

13   what ag engineering's about.  And a lot of the courses

14   that I took overlapped with ag engineering.

15        Q:    Okay.  Are you an agricultural engineer?

16        A:    No.  I think I answered that.

17        Q:    Okay.  For your master's degree, were you

18   taking courses in agricultural engineering?

19        A:    No, I was not.

20        Q:    Do you have any education, training, or

21   experience in the field of biosystems engineering?

22        A:    I'm trying to think.  I think I took a course

23   on biochemical -- a biochemical engineering course,

24   undergraduate.

25        Q:    Apart from that, do you have education,

1  training, or experience in the field of biosystems

2  engineering?

3      **A:**     No, not specifically biosystems engineering,

4  but as it relates to how commodities self-heat, I would

5  say I have some experience with that.

6      **Q:**     Do you have any education, training, or

7  experience in the field of crop science?

8      **A:**     Crop science, to me, is like how you grow

9  plants and things like that.  So from the standpoint of

10  growing plants, no.

11      **Q:**     And I'm talking about commodities as well as

12  plants.  Do you have any experience in the field of

13  growing and storing commodities?

14      **A:**     Storing from the standpoint of how they

15  self-heat.

16      **Q:**     But not in terms of the actual practices that

17  are followed by food processors in the storing of

18  agricultural commodities?

19      **A:**     I mean, I have some -- some familiarity with

20  that, yes.

21      **Q:**     Okay.  I'm focused on education, training,

22  and experience as opposed to familiarity, okay, which

23  I'll explain to you in my mind is different.  Something

24  which you learned either on the job or through classroom

25  experience.

1          Do you have education, training, or

2   experience regarding the processes that are followed by

3   food processors in the storing of commodities?

4       A:      From the standpoint of how commodities are

5   stored and how that relates to self-heating, I have

6   experience with that.

7       Q:      All right.  Have you ever had any classroom

8   instruction devoted specifically to aluminum phosphide?

9       A:      Aluminum phosphide, not specifically, but

10  obviously that's a chemical that I have a lot of training

11  in.

12      Q:      Okay.  I'm specifically focused on classroom

13  instruction.  Have you had any classroom instruction on

14  the topic of aluminum phosphide?

15      A:      I don't think so, no.

16      Q:      Have you had any classroom instruction

17  specifically devoted to phosphine gas?

18      A:      Classroom instruction?  I don't think -- no,

19  not on phosphine gas.

20      Q:      Have you had any classroom instruction

21  specifically devoted to the spontaneous ignition of

22  phosphine gas?

23      A:      Not specifically phosphine gas, no.

24      Q:      Have you had any classroom instruction

25  specifically devoted to forensic chemistry?

1      **A:**     Well, I would say all my chemistry, my

2    chemical background, my chemistry courses are directly

3    related to that, so yes.

4      **Q:**     I'm specifically asking about a course

5    devoted to the topic of forensic chemistry.

6      **A:**     Yeah.  I've taken training at the

7    International Association of Arson Investigators where

8    I've actually spoken, not necessarily on that topic, but

9    I have taken training that relate -- regarding forensic

10   chemistry.

11     **Q:**     All right.  I want to shift focus now to the

12   fire investigations that you have participated in over

13   the course of your career, all right?

14     **A:**     Okay.

15     **Q:**     My guess is, because you testify a good bit,

16   you have had to answer the question that I'm going to ask

17   you, which is, can you approximate the number of fire

18   investigations that you have participated in to date?

19     **A:**     Can't give you a specific number, but it's

20   several hundred.

21     **Q:**     Okay.  More than 500?

22     **A:**     I would think 500 is about the highest for

23   fire investigations.

24     **Q:**     Correct.  Okay.  Well, of those approximately

25   500 -- I'm not going to hold you to the number --

1   approximately how many involved a peanut storage

2   warehouse?

3        **A:**     This would be the first.

4        **Q:**     Very first one?

5        **A:**     Yes.

6        **Q:**     Okay.  Approximately how many involved a

7   warehouse storing any type of agricultural commodity?

8        **A:**     I would say half a dozen to a dozen.

9        **Q:**     So 6 to 12?

10       **A:**     That would be an estimate, yes.

11       **Q:**     About how many of those investigations did

12   you conclude that self-heating or spontaneous combustion

13   played a role in the development of the fire?

14       **A:**     I don't remember all of the conclusions in

15   those cases, but I remember one involving hay where I

16   thought that that was the likely the cause.

17       **Q:**     So as you sit there right now, you can

18   remember, of your 500 fire investigations, one in which

19   your conclusion was that self-heating was responsible for

20   the fire?

21       **A:**     That's not what you asked me.

22       **Q:**     I'm sorry.  You're right.  I'll be more

23   specific.  As you sit there right now, you can think of

24   one fire investigation that involved a stored commodity

25   in which your conclusion was that self-heating was the

1    cause of the fire?

2         A:      That's right off the top of my head.

3         Q:      What causes spontaneous combustion or

4    self-heating in a stored agricultural commodity?

5                         MR. GOLDSTEIN:  Objection.

6                         You can answer.

7                         THE WITNESS:  You're referring to the

8    process --

9    BY MR. EPSTEIN:

10        Q:      Yes.

11        A:      -- that can lead to --

12        Q:      Yes.

13        A:      -- potential self-heating to ignition?

14                Well, it's in phases, and the first phase is

15   typically biological heating.  And that gets you to a

16   certain temperature, at which point the heating can stop.

17   If it doesn't stop, then you have oxidated heating, which

18   then can continue to the point of thermal runaway.  And

19   that thermal runaway allows you to get to the point where

20   the autoignition temperature of that particular commodity

21   is reached.

22        Q:      Would you agree with me that once thermal

23   runaway commences, unless something is done to stop it,

24   you will get to ignition?

25        A:      If you reach thermal runaway?

Deposition of John Schumacher

1    **Q:**    Yes.

2    **A:**    It's possible that you will reach ignition,

3    yes.

4    **Q:**    Well, in fact, the definition of thermal

5    runaway is, unless that process is interrupted, you will

6    get to ignition, correct?

7    **A:**    Generally, I would agree with it, yes.

8    **Q:**    So investigating a stored agricultural

9    commodity that had a fire, if you concluded, one, that

10   there was thermal runaway and, two, that there was

11   nothing done to interrupt that thermal runaway, it would

12   be your conclusion that self-heating led to the fire,

13   correct?  I'm sorry.  Bad question.

14   **A:**    Yeah.  That's --

15   **Q:**    Let me strike again.

16        If you concluded that thermal runaway had

17   occurred as the result of a self-heating biological

18   process and that nothing was done prior to the fire to

19   interrupt that thermal runaway, it would naturally then

20   be your conclusion that the self-heating process that

21   preceded the thermal runaway is what led to the fire?

22   **A:**    So in this -- in this hypothetical, you're

23   talking about a fire where I've investigated it, and I've

24   eliminated all other ignition sources, other ignition

25   scenarios, and I'm evaluating self-heating to ignition as

1   a potential cause, and if I determine that thermal

2   runaway in fact occurred, nothing stopped it, would that

3   be the cause?

4        Q:     Yes.

5        A:     I mean, if I've evaluated everything and

6   that's what I'm left with, then I would agree with you.

7        Q:     So really what you're trying to determine in

8   terms of whether or not spontaneous combustion played a

9   role in the fire is whether or not thermal runaway

10  commenced?

11       A:     Well, that's -- that's part of it, certainly.

12  There's a lot of other stuff that goes into investigating

13  a fire, not just, "Okay.  Do I have thermal runaway?"

14  You have to be able to get to the point where you can

15  establish that that is, in fact, the cause with all the

16  other information that's out there.

17       Q:     Okay.  I'm -- I'm asking about one specific

18  hypothesis, that being self-heating.  And as you're

19  evaluating that hypothesis, if you conclude that there

20  was thermal runaway that followed a self-heating process,

21  then, at the very least, you would not be able to

22  eliminate self-heating as a cause of the fire.

23             Would you agree with that?

24             MR. GOLDSTEIN:  Objection.

25             THE WITNESS:  Well, if I've concluded

1    that thermal runaway occurred, that's one step, but then

2    you have to determine is there something that's stopping

3    that thermal runaway from occurring.  And if I can get to

4    the point where I can say, "Yes.  This is not going to be

5    stopped," then I would say, "Yes, I would agree that

6    that's likely the cause."  That's the only one I'm left

7    with and I'm looking at.

8    BY MR. EPSTEIN:

9        Q:    Are there characteristics of stored

10   agricultural commodities that make them prone to

11   self-heating?

12       A:    Well, yes, they're -- they're organic.  They

13   can char.  They usually are somewhat porous.  They are --

14   they can be moist.  Usually stored in large quantities.

15       Q:    Anything else?

16       A:    I mean, off the top of my head, that's

17   generally what I -- what I see.

18       Q:    Going back to your CV, looking at the --

19       A:    My what?

20       Q:    Your CV.

21       A:    CV.  Sorry.

22       Q:    Looking at the section on your experience.

23       A:    Yes.

24       Q:    You indicate that you have investigated

25   "hundreds of fires and explosions in residences,

1    commercial and industrial buildings, and chemical

2    plants."

3              I take it you didn't list agricultural

4    warehouses there because that's been a very small

5    fraction of what you've done, correct?

6        A:    No.  I didn't list that because that would be

7    potentially a commercial or industrial type of incident

8    as I describe it.

9        Q:    Okay.

10       A:    I'm not limiting it to, you know, buildings.

11   That's -- to me, an agricultural building would be one of

12   those.

13       Q:    All right.  So as you view it, the Severn

14   peanut dome would fit within what you have in your first

15   sentence there?

16       A:    Yes.  I mean, in the general term, I think

17   "ag facility" is a more specific term, but I think, as I

18   wrote that, that's -- encompasses all those types of

19   investigations that I'm talking about.

20       Q:    All right.  Your next sentence says, "Many of

21   these losses have involved propane, natural gas, and

22   flammable liquids."

23             Would you agree we're not here to talk about

24   any of those subjects today?

25       A:    I would disagree.

1    **Q:**    We are here to talk about propane, natural

2    gas, and flammable liquids?

3    **A:**    I'm sorry.  I was -- flammable -- flammable

4    gas.  It's not listed there.  I saw flammable liquids,

5    but you're right.  In that sentence, that's correct.  But

6    specifically I'm talking about propane, natural gas

7    systems which is a -- they are flammable gases, and we're

8    talking about flammable gas here.

9    **Q:**    You have very specific experience regarding

10   the -- the gas of propane and natural gas, not regarding

11   phosphine, correct?

12   **A:**    Well, I think I have a lot of experience with

13   propane and natural gas, but I certainly have experience

14   with phosphine gas.

15   **Q:**    Not enough to list in your experience on your

16   CV, correct?

17   **A:**    Well, I didn't list all the other gases like

18   acetylene and ethylene and ethylene oxide and all the

19   other gases I've dealt with over my career.

20   **Q:**    You listed the two gases with which you have

21   the most experience, which are propane and natural gas,

22   correct?

23   **A:**    We do a lot of investigation related to those

24   two gases, but it doesn't mean I don't have experience

25   with phosphine gas.

1    **Q:**    And in contrast, you don't do a lot of

2    investigation in relation to phosphine gas, correct?

3    **A:**    I mean, define "a lot."  I've done, I think,

4    three cases on this -- on phosphine gas.

5    **Q:**    Okay.  Three out of about 500, right?

6    **A:**    Yeah.

7    **Q:**    Okay.  It says that you have "extensive

8    experience with propane and natural gas systems and their

9    components such as regulators, relief valves, control

10   valves, and appliances."

11           Would you agree we're not here today to talk

12   about any of that?

13   **A:**    That's correct.

14   **Q:**    It next says that you have "substantial

15   experience with propane odorant," in paren, "(ethyl

16   mercaptan) and its properties."

17           Would you agree that we're not here today to

18   talk about any of that?

19   **A:**    That's correct.

20   **Q:**    It then says, "Additionally, Mr. Schumacher

21   has investigated many carbon monoxide and

22   chemical-related incidents and has investigated accidents

23   in the chemical process industry."

24           Would you agree we're not here today to talk

25   about the chemical process industry?

1    **A:**    No; but we're here to talk about

2    chemical-related incidents, and we're here to talk about

3    chemistry in general.

4    **Q:**    All right.  Not here today to talk about

5    carbon monoxide incidents, correct?

6    **A:**    No; but that's a gas.

7    **Q:**    Next paragraph says that "Mr. Schumacher has

8    evaluated the flammability characteristics of liquids,

9    powders, plastic, and building materials."

10    Would you agree that we're not here today to

11    talk about any of that?

12    **A:**    Well, powders are a solid granular material,

13    and I would say peanuts and commodity -- commodities, in

14    general, would fall under the same concept.  So I would

15    say powders would be closely related to that.

16    **Q:**    Peanuts are powders; is that what you're

17    saying?

18    **A:**    I'm talking about solid granular material.

19    **Q:**    You believe peanuts fall somewhere within the

20    definition of powders, as you have listed there in the

21    first sentence of the second paragraph, in your

22    experience?

23    **A:**    I didn't say that it would fall within the

24    definition of powders, but I'm telling you that powders

25    are granular materials, and we're dealing with peanuts

1    and other commodities that are gran- -- that are solid

2    materials.

3        Q:      Is it your thought that peanuts are granular

4    materials?

5        A:      No.  They're solid material.  Granulars are

6    solid material, and it's just more finely divided

7    material, but it's a solid, like peanuts.

8        Q:      Of the 6 to 12 storage warehouses that were

9    storing commodities in which you participated in a fire

10   investigation, how many of those, if any, involve the

11   application of a pesticide to a stored agricultural

12   commodity?

13       A:      I think three involved the pesticide and one

14   or two of them involved something like a Sprout Nip for

15   potatoes.

16       Q:      Okay.  Can you tell me so we're -- that's

17   about 5 out of the 12, correct, involve some form of

18   pesticide application, correct?

19       A:      Yes.

20       Q:      Can you tell me the number of those five that

21   involve the application of a pesticide onto the surface

22   of the stored commodity?

23       A:      I think two of them did.

24       Q:      Two apart from this case?

25       A:      No; including this case.  I'm sorry.

1    Q:     Okay.  So one other time in your career have

2    you investigated a fire in which a pesticide was applied

3    to the surface of a stored agricultural commodity?

4    A:     Now, if we're talking about aluminum

5    phosphide, that would be correct.  If you're talking

6    about like the Sprout Nip material, then that would be

7    two more.

8    Q:     Okay.  So if you classify the Sprout Nip

9    material as a pesticide, it was applied to the surface of

10   the commodity at issue there?

11   A:     Yes.

12   Q:     And what was the commodity at issue in that

13   case?

14   A:     Potatoes.

15   Q:     Okay.  And the other one that you've

16   mentioned would be what?  What -- what was applied to the

17   surface of what?

18   A:     When you say the other one --

19   Q:     I thought you said that there were two others

20   besides this case, if you include the Sprout Nip applied

21   to the potatoes, in which a pesticide was applied to the

22   surface of an agricultural commodity.

23   A:     No.  I don't think we're communicating.  Two

24   were the Sprout Nip on the potatoes.

25   Q:     Okay.

Deposition of John Schumacher

1      **A:**     One other was -- besides this case, was

2    applied to the surface of a commodity.

3      **Q:**     And one of those was Sprout Nip?  And that

4    was Sprout Nip?

5      **A:**     No.

6      **Q:**     Okay.

7      **A:**     Two -- two Sprout Nip, two aluminum

8    phosphide, one of which was Severn.

9      **Q:**     Okay.  So there was one other fire

10   investigation that you performed in which aluminum

11   phosphide was applied to the surface of a stored

12   agricultural commodity?

13     **A:**     Yes.

14     **Q:**     And what was that stored agricultural

15   commodity?

16     **A:**     That was wheat.

17     **Q:**     And is that the subject of the article that

18   you co-wrote in -- was that the subject of an article

19   that you co-wrote, that other one?

20     **A:**     Yes.

21     **Q:**     Okay.  We'll get to that.

22            What year was that investigation

23   approximately, the one that involved the application of

24   aluminum phosphide to the surface of a wheat pile?

25     **A:**     I don't -- I don't recall.

Deposition of John Schumacher

1    **Q:**    Was it within the last five years?

2    **A:**    Yes.

3    **Q:**    Okay.

4    **A:**    I believe that's correct.

5    **Q:**    Who owned that facility?

6    **A:**    I don't remember.

7    **Q:**    Okay.  When you think about that

8    investigation, what name do you associate with that

9    investigation?

10    **A:**    I don't have a name.  It's -- if I could tell

11    you that, then I would.

12    **Q:**    Okay.  And your investigation in that matter

13    preceded your investigation in this matter; is that

14    correct?

15    **A:**    Yes.

16    **Q:**    All right.  So this is, the Severn Peanut

17    case, the second time in your career that you have

18    investigated a fire that followed the surface application

19    of aluminum phosphide to an agricultural commodity,

20    correct?

21    **A:**    Yes.

22    **Q:**    All right.  This is also the second time in

23    your career that you concluded the misapplication of

24    aluminum phosphide to the surface of agriculture -- to

25    the surface of an agricultural commodity was the cause of

Deposition of John Schumacher

1   the fire to that agricultural commodity, correct?

2       A:      No.

3       Q:      You didn't make that conclusion in the wheat

4   case?

5       A:      No.

6       Q:      Okay.  What was your conclusion in the wheat

7   case?

8       A:      It was surface and subsurface.  It was a

9   subsurface issue.  So really related to the cause.  That

10  was not surface.

11      Q:      It was the probing that you concluded in that

12  case that was the misapplication that caused the fire?

13      A:      Yes.

14      Q:      Okay.  So let me back up and see if I've got

15  this right.  The Severn Peanut case is the first fire

16  investigation in which you have concluded that the

17  surface application of aluminum phosphide resulted in a

18  fire?

19      A:      That's correct.

20      Q:      How many times have you been qualified as an

21  expert witness in a court of law?  Again, approximately,

22  if you don't have an exact number.

23      A:      I'm going to say a dozen, 12 times, about.

24      Q:      Has that ever occurred in a federal court?

25      A:      Yes.

1    **Q:**    Okay.  Can you tell me the federal courts in

2    which you have been qualified to testify as an expert

3    witness?

4    **A:**    Well, the one that I recall was in Denver.  I

5    can't tell you the --

6    **Q:**    Federal District Court in Denver?

7    **A:**    Yes.  I guess that's the best way to say

8    it.

9    **Q:**    Approximately when was that?

10    **A:**    Oh, ten years ago.

11    **Q:**    What were you qualified to give opinion

12    testimony regarding?

13    **A:**    The origin and cause of a fire.

14    **Q:**    Was that a civil case or a criminal case?

15    **A:**    Civil.

16    **Q:**    And what was the nature of the fire?  Where

17    did it occur?

18    **A:**    It occurred in a grocery store.

19    **Q:**    For whom were you testifying in that case?

20    **A:**    I think the grocery store, basically.

21    **Q:**    What was your opinion as to the origin and

22    cause of that fire?

23    **A:**    It was in the dropped ceiling area as a

24    result of hot work that was being performed near some

25    paper-backed insulation.

1    Q:    And in your entire career, that was the only

2    time in which you have been qualified to provide opinion

3    testimony in a federal court?

4    A:    I don't know the answer to that.  I'm not

5    sure if some of the other ones are district -- federal

6    courts or not.  I'd have to take a look to answer that

7    definitively.

8    Q:    Well, first of all, let's go to your

9    four-year testimony record, which is a few pages -- well,

10   it's directly behind the last page of your CV.  And I

11   will tell you, I've looked through that four-year record,

12   and there is no indication that you provided opinion

13   testimony in a federal court during those four years.

14   You can look through and tell me if I've misinterpreted

15   your chart.

16   A:    I don't know if United States District Court,

17   Northern District of Illinois -- if that -- I guess I

18   don't know how to interpret these.

19   Q:    That is a federal court.  Was that a

20   deposition or a trial, though?

21   A:    I think it was a depo- -- I'm sorry.  It's a

22   deposition.  You're correct.  So --

23   Q:    You understand that judges don't qualify

24   witnesses at a deposition like when we're here today?

25   A:    No.  I -- I do understand that, and I

1    apologize.  That's -- that's correct.

2         Q:    Okay.

3         A:    But I don't know about the prior --

4         Q:    Sure.

5         A:    -- testimony record.

6         Q:    All right.  So here, in this chart, you show

7    four occasions in which you testified in a court, the

8    Fifth District in Minnesota on April 23rd, 2009; the 18th

9    Judicial District in Montana in August of 2011; the Iowa

10   District Court for Black Hawk County on December 6th,

11   2011; and the Johnston County Superior Court on

12   March 14th, 2012, correct?

13        A:    Yes.

14        Q:    All right.  The testimony in North Carolina

15   was related to an explosion, correct?

16        A:    Yes.

17        Q:    The testimony in Iowa was related to an

18   explosion, correct?

19        A:    Flash fire.  I think it was more of a flash

20   fire.

21        Q:    Okay.  It's listed in your description as an

22   explosion, correct?

23        A:    What page -- where are we now?

24        Q:    Page 2 of 2 in your testimony record.

25        A:    Sure.

1       Q:      It's the fourth line, the Firgard case, which

2    is listed as an explosion in the description column,

3    correct?

4       A:      Yeah; but I think it's more accurately a

5    flash fire.

6       Q:      Okay.  The Montana testimony involved carbon

7    monoxide, correct?

8            That's also on the second page, second

9    line.

10      A:      Yes.

11      Q:      And on the first page, the case in Minnesota

12   that you testified in, in 2009, was an explosion case,

13   correct?

14      A:      Yes.

15      Q:      I take it you have never been qualified to

16   give opinion testimony regarding the origin and cause of

17   a fire that occurred to an agricultural commodity in a

18   store -- in a storage warehouse?

19      A:      That's correct.

20      Q:      This would be the first time in your career

21   you're looking to be qualified to provide opinion

22   testimony regarding the -- the origin and cause of a fire

23   in a -- in a storage warehouse of an agricultural

24   commodity?

25      A:      Can you --

1    **Q:**    Sure.

2    **A:**    -- say that again?

3    **Q:**    This would be the first time in your career

4    you're seeking to be qualified as an expert witness to

5    give opinion testimony as to the origin and cause of a

6    fire to a stored agricultural commodity in a warehouse?

7    **A:**    I think that's correct.

8    **Q:**    Okay.  And would this also be the first time

9    in your career that you're seeking to be qualified to

10    provide opinion testimony as to a pesticide causing a

11    fire?

12    **A:**    I believe that's correct.

13    **Q:**    Those are two topics that you've never

14    testified about in court before, correct?

15    **A:**    In court, correct.

16    **Q:**    Have you provided deposition testimony about

17    those topics before today?

18    **A:**    Yes.

19    **Q:**    Okay.  Tell me when.

20    **A:**    It would have been the case --

21    **Q:**    The wheat case?

22    **A:**    Yes.

23    **Q:**    Is that wheat case listed in this chart

24    anywhere?

25    **A:**    Let me take a look here.

```
 1              Yes.

 2        Q:    Which one is it?

 3        A:    It's the one nine down from the top on

 4   page 1, 10676.

 5        Q:    So that occurred in Oklahoma?

 6        A:    Yes.

 7        Q:    Who is the attorney that you worked with in

 8   that case?

 9        A:    Jim Dendinger.

10        Q:    Spell the last name.

11        A:    D-e-n-d-i-n-g-e-r.

12        Q:    Is he in Oklahoma?

13        A:    I don't believe so.

14        Q:    Where do you believe he is?

15        A:    I think he's in Texas.

16        Q:    Do you recall the name of his firm?

17        A:    I believe it's Cozen O'Connor.

18        Q:    Do you recall the name of the defense

19   attorney in that case?

20        A:    I don't.

21        Q:    That case never went to trial, as far as you

22   know?

23        A:    That's correct.

24        Q:    Do you have a copy of your deposition in that

25   case?
```

1     **A:**     I don't know.  I may have it.

2     **Q:**     Did you once review your deposition

3     testimony?

4     **A:**     Yeah; but I usually get rid of them.

5     **Q:**     So that attorneys like me don't ask you for

6     them?

7     **A:**     Well, just -- we purge the file, stuff we

8     don't need to keep.

9     **Q:**     Okay.  This deposition occurred less than

10    three years ago.  Do you think you purged it if it was

11    less than three years ago?

12    **A:**     I would have purged it, sure, but I've seen

13    it recently.

14    **Q:**     Okay.  If I ask you to try and find it,

15    provide it to Mr. Widis so that I can take a look at it,

16    would you have any objection to doing that?

17    **A:**     No; as long as he requests that of me.

18    **Q:**     Okay.  I am going to request that of you.  It

19    will be up to you as to whether you get it to him and up

20    to him as to whether he gets it to me.

21              MR. EPSTEIN:  And I'll follow that up,

22    Howard, with an e-mail.

23    **Q:**     What was the type of aluminum phosphide used

24    in that case or brand name?

25    **A:**     I don't remember if it's Weevil-Cide or

Deposition of John Schumacher

1    Fumitoxin, to be honest.

2        Q:    Was it tablets or pellets or both?

3        A:    It's tablets.

4        Q:    What was the size of the storage warehouse?

5        A:    I don't have that information off the top of

6    my head.

7        Q:    Was it an application that at least partially

8    occurred by scattering the tablets from above the surface

9    of the commodity?  Was that --

10       A:    No, no.

11       Q:    That wasn't part of it at all?

12       A:    No, not at all.

13       Q:    It was all probed?

14       A:    It was probed, but they were scattering on

15   the surface while they were inside the container.

16       Q:    Okay.  So some of the tablets wound up on the

17   surface, and some of them wound up subsurface?

18       A:    Right.  The majority were subsurface.

19       Q:    From the date of that application until the

20   fire was discovered, what was that time period,

21   approximately?

22       A:    I don't remember the number.

23       Q:    Did you prepare an expert report in that

24   case?

25       A:    I did.

1     **Q:**     Would you still maintain a copy of that

2  expert report?

3     **A:**     I'd have to check.

4     **Q:**     I'm going to ask you to do that, and I'm

5  going to ask Mr. Widis for that as well after this

6  deposition is over.

7               Your deposition was in November of 2010.

8  When do you believe you were engaged in that matter?

9  About a year before?  Two years before?

10    **A:**     What year -- say that again.  I'm sorry.  I

11  missed --

12    **Q:**     Your deposition was November 29th, 2010, in

13  the Planter's Cooperative Association versus Ken's Pest

14  Control case.  My question to you is, approximately how

15  much earlier than that do you believe you were retained

16  or engaged?

17    **A:**     I don't know, but I would -- I would estimate

18  a year.

19    **Q:**     Were you actually there when the fire was

20  occurring?

21    **A:**     I was there when they were doing salvage.

22    **Q:**     Okay.  Prior to 2009, had you ever read any

23  applicator's instructions or manuals regarding the use of

24  aluminum phosphide?

25    **A:**     No.

1      Q:      So 2009 is the very first time you read

2    materials produced by a manufacturer or distributor of

3    aluminum phosphide regarding its proper application and

4    use?

5      A:      That's correct.

6      Q:      And 2009 is the first time when you became

7    aware of potential fire hazards associated with the use

8    of aluminum phosphide; is that correct?

9      A:      That's correct.

10     Q:      All right.  So you've had that knowledge for

11   about four years, maybe three?

12     A:      Maybe five.  I don't remember the dates,

13   so --

14     Q:      Okay.

15     A:      Yeah.

16     Q:      Your expert report would indicate when you

17   were engaged in that matter, correct?

18     A:      It wouldn't indicate when I was engaged, but

19   it would indicate when I wrote the report.

20     Q:      Okay.  All right.  Mr. Schumacher, have you

21   ever been challenged as an expert witness by opposing

22   counsel?  And if you want me to go into more details of

23   what I mean by that, I will.  But let me start by asking

24   you if you've ever been challenged as an expert witness

25   by opposing counsel.

Deposition of John Schumacher

```
1        A:      I can only think of one time.

2        Q:      When was that?

3        A:      Well, I don't remember the date.

4        Q:      Approximately --

5        A:      It's been seven --

6        Q:      -- five years?

7        A:      No.  It's been like seven years ago, maybe.

8        Q:      Okay.  What were court were you in?

9        A:      Let me see if I have it on this sheet here.

10               It was in Iowa.  I can tell you that.  The

11   case was in Iowa, but I don't see it on here.

12       Q:      Was it a federal court or a state court?

13       A:      I think it was state, but I don't know.

14   Again, I don't know the cases preceding this list.

15       Q:      Sure.  What was the nature of the fire in

16   that case?

17       A:      It was a -- it was a flash fire in a

18   residence.

19       Q:      What was the nature of the challenge as to

20   your testimony?

21       A:      Well, the reason why it came about is that

22   their experts were struck because they were -- their

23   opinions weren't based on science, and so the only other

24   tactic they had was to try to file a motion against us.

25       Q:      All right.  Do you recall what was said about
```

1    your proposed testimony in an effort to get you

2    disqualified?

3        A:    That it was wrong, I guess.  I mean, I can't

4    tell you anything more than that.

5        Q:    Were you ultimately disqualified, or were

6    you -- was the challenge ultimately denied?

7        A:    Well, I don't think it went anywhere.  The

8    case settled.

9        Q:    So there was no resolution of that, of the

10   challenge to your testifying as an expert witness?

11       A:    As I understand, that's correct.

12       Q:    What attorney were you working with in that

13   case?

14       A:    Mark Ericson.

15       Q:    Spell the last name.

16       A:    I think it's E-r-i-c-s-o-n, but I'm -- I'm

17   not sure.

18       Q:    What state does he practice in?

19       A:    Missouri.

20       Q:    Do you know what city?

21       A:    I believe Kansas City.

22       Q:    Do you know what firm?

23       A:    That, I cannot tell you.

24       Q:    The defense lawyer -- well, were you

25   representing -- were you working with the plaintiff in

Deposition of John Schumacher

1    that case?

2        **A:**    No.

3        **Q:**    You were working with the defendant?

4        **A:**    That's correct.

5        **Q:**    Do you recall who the plaintiff's lawyer

6    was?

7        **A:**    Do I recall who the plaintiff's --

8        **Q:**    Who the plaintiff's lawyer was.

9        **A:**    Don Beattie.

10       **Q:**    Can you spell the last name?

11       **A:**    I believe it's B-e-a-t-t-i-e.

12       **Q:**    Do you know what city and state he practices

13   in?

14       **A:**    Des Moines, Iowa.

15       **Q:**    Do you know what firm he's with?

16       **A:**    I think it's the Beattie Law Firm.

17       **Q:**    Okay.  And it's your testimony here today

18   that Mr. Beattie's challenge of you in Iowa is the only

19   time in your career, as someone who has been involved in

20   500 or so fire investigations, in which you've been

21   challenged as an expert witness in a court of law?

22       **A:**    That's correct.

23       **Q:**    Has any judge ever not permitted you to

24   testify to an opinion you had intended to express?

25       **A:**    No.

Deposition of John Schumacher

1    **Q:**    Mr. Schumacher, are there books, treatises,

2  monographs, or articles that you consider authoritative

3  regarding the proper method to investigate the origin and

4  cause of a fire?

5    **A:**    Yes.

6    **Q:**    Can you tell me what those are?

7    **A:**    Well, the first one is NFPA 921, which I'm

8  sure you have a copy of.

9    **Q:**    Does that look familiar?

10   **A:**    Yeah, it does.  Okay.  And then there are

11  some others that are out there like Kirk's Fire

12  Investigation, Fire Scene Reconstruction.

13   **Q:**    Any others?

14   **A:**    Those are the ones that come to mind.

15   **Q:**    Is the Ignition Handbook something that you

16  consider being an authoritative source?

17   **A:**    That's -- yes.  But, I mean, specific to what

18  you asked me, it was regarding the -- more like the

19  process.

20   **Q:**    Okay.

21   **A:**    If you want to get into other books, then we

22  can talk.

23   **Q:**    I will ask you the next question, which is --

24   **A:**    Okay.

25   **Q:**    -- are there books, treatises, monographs, or

1    articles that you consider authoritative regarding fire

2    science?

3         A:     Fire sci- -- okay.  That's -- yes.

4         Q:     Okay.  Can you tell me what those are, in

5    addition to the ones that you've already mentioned?

6         A:     The Ignition Handbook, Fire Dynamics.

7    There's a book by Quinterri [PHONETIC].  I'm trying to

8    think of the name of it.  SFP -- SFPE Handbook of Fire

9    Protection Engineering.

10        Q:     Any others?

11        A:     Those are the ones that come to mind.

12        Q:     Do you know who John Walker is?

13        A:     I've met him recently.

14        Q:     Okay.  You have working side by side on a

15   case together recently?

16        A:     Yes.

17        Q:     Okay.  Is that your only experience with John

18   Walker, to this date?

19        A:     Yes.

20        Q:     What did you think of him during the time

21   that you were working side by side with him on that

22   case?

23        A:     I thought he was a pleasant guy.

24        Q:     Do you think he knows something about fire?

25        A:     This was an explosion, and I certainly know a

 1   lot more about explosions than he does.  But I don't know

 2   him regarding fires.

 3        **Q:**    Do you know his reputation?

 4        **A:**    I don't.

 5        **Q:**    You, in your report, indicate that you

 6   considered the 2011 version of NFPA 921 to be the

 7   applicable version.  I'm curious as to why you concluded

 8   that the 2011 version was applicable to a 2009 fire.

 9        **A:**    Well, I mean, when I got brought in, I think

10   it was 2012.  So from my standpoint, I was looking at the

11   fire after 2008 edition.

12        **Q:**    Are you aware that Lester Rich -- first of

13   all, are you aware that Lester Rich has also been

14   designated as an expert witness in this case?

15        **A:**    Am I aware of that?

16        **Q:**    Yes.

17        **A:**    Yes.

18        **Q:**    Are you aware that his expert -- well, let me

19   ask you:  Did you review his expert report at a point in

20   time?

21        **A:**    I did.

22        **Q:**    Are you aware that he relied on the 2008

23   version of NFPA 921?

24        **A:**    I'd have to look at it, but I think that's

25   correct.

1      Q:     Do you believe it's appropriate for multiple

2    versions of NFPA 921 to be the guiding fire investigation

3    source in this case?

4                    MR. GOLDSTEIN:  Objection.

5                    THE WITNESS:  I mean, I don't know how

6    to answer that.  You know, the premise behind NFPA 921 is

7    a scientific method, and we both followed that.

8    BY MR. EPSTEIN:

9      Q:     Sure.

10     A:     And that's the most important part of the

11   whole document, I believe.

12     Q:     Okay.  So you don't quarrel with his use of

13   NFPA 921 2008 version?

14     A:     No.  He was there, I believe, whenever the

15   fire was, '09.  And that would have been the edition he

16   would have been under at that time.

17     Q:     Are you aware of any differences between

18   NFPA 921 2008 version versus 2011 version that would

19   relate in any way to the investigation of the origin and

20   cause of the fire in this matter?

21     A:     I'm not aware of any substantive changes.  I

22   think it's generally the same.

23     Q:     You probably are going to want to have that

24   Exhibit 246 close by, but I'm going to start showing you

25   some other exhibits.

1    A:    So you don't want this one back?

2    Q:    Well, ultimately this nice lady will want

3    that one back.

4    A:    We're not -- we're not done with this yet?

5    Q:    We'll probably be referring to it a few more

6    times.

7    A:    Okay.

8    Q:    I'm going to show you what we're marking as

9    Exhibit 247.

10                    [EXHIBIT NO. 247 MARKED FOR

11                    IDENTIFICATION]

12   BY MR. EPSTEIN:

13   Q:    Can you tell me what Exhibit 247 is?

14   A:    Basically notes.

15   Q:    All right.  Are these taken in chronological

16   order?  In other words, is your -- are your earliest

17   notes the ones on the first page and your most recent

18   notes the one -- ones on the last page?

19   A:    Yes.

20   Q:    Okay.  And the last two are called "telephone

21   notes."  Is the first set of notes not from a

22   conversation you had on the telephone or is --

23   A:    It's not a conversation on the telephone, no.

24   Q:    Was it live and in person with somebody?

25   A:    Yes.

1     **Q:**     Okay.  Who was it live and in person with?

2     **A:**     This is a meeting that took place actually in

3     this office.

4     **Q:**     Okay.  And who was at that meeting?

5     **A:**     If I remember correctly, Lester Rich, John

6     Cavaroc, Steve Brown, myself, Howard Widis.  Hunter Quick

7     might have been there for some time and maybe Al --

8     somebody's going to have to help me with his last name

9     pronunciation.

10    **Q:**     Nalibotsky.

11    **A:**     There you go.  Nalibotsky.  He may have been

12    there as well.  And then there's one other person, and I

13    don't remember who that was.  I don't remember a name.

14    **Q:**     Okay.  Do you recall approximately when that

15    took place?

16    **A:**     I want to say -- well, I could look at

17    invoices if you have them that would tell me.

18    **Q:**     Okay.

19                    [EXHIBIT NO. 248 MARKED FOR

20                    IDENTIFICATION]

21    BY MR. EPSTEIN:

22    **Q:**     Showing you what's been marked as

23    Exhibit 248.

24    **A:**     It was on December 6th of 2012.

25    **Q:**     Okay.  And these were the notes that you took

1    at that meeting or after that meeting?

2        **A:**      At that meeting.

3        **Q:**      Okay.  So you had already been engaged for

4    about four months as of that time in this matter?

5        **A:**      About four months, correct.

6        **Q:**      And let's go back to that time that you got

7    engaged.  Apparently you had a telephone conference with

8    Hunter Quick?

9        **A:**      That's right.

10       **Q:**      Had you previously worked with Hunter Quick

11   on any matter?

12       **A:**      No.

13       **Q:**      Had you previously worked with anyone at this

14   law firm on any matter?

15       **A:**      No.

16       **Q:**      This is the first time in your career you've

17   worked with this law firm?

18       **A:**      That's correct.

19       **Q:**      Okay.  From the point in time you had that

20   conversation with Hunter Quick on August 3rd of 2012,

21   what did you understand to be your assignment or

22   engagement in this matter?

23       **A:**      To determine the cause of the fire.

24       **Q:**      Were you aware of the fire before you were

25   called that day?

1      **A:**      No.

2      **Q:**      Did you become aware that there was another

3   origin and cause investigator who was also retained to

4   determine the cause of the fire, namely Lester Rich --

5                       MR. GOLDSTEIN:   Objection.

6   BY MR. EPSTEIN:

7      **Q:**      -- as of August of 2012?

8      **A:**      Did I learn in August of 2012 that Lester was

9   working on this fire?

10     **Q:**      Yes.

11     **A:**      Yes; at some point, I did.

12     **Q:**      Did you come to any understanding as to why

13  you were also being asked to work on this fire in

14  addition to him?

15     **A:**      Yes.

16     **Q:**      Okay.  What was your understanding of why you

17  were going to work on this fire in addition to him?

18     **A:**      My expertise in chemistry and chemical

19  engineering and those types of processes as well as the

20  fact that I'm a CFI, certified fire investigator.

21     **Q:**      And Mr. Rich is not?

22     **A:**      Is not what?

23     **Q:**      I'm asking you, is Mr. Rich not a certified

24  fire investigator?

25     **A:**      Oh, he is.

1          Q:     Okay.  Now, you weren't at the scene of the

2    fire during the fire as you were in the wheat fire case,

3    correct?

4          A:     That's correct.

5          Q:     Do you believe you were handicapped in some

6    way or inhibited or impaired in some way in your ability

7    to reach a valid scientific conclusion as to origin and

8    cause of this fire because you weren't at the scene?

9          A:     No.

10         Q:     You've done that other times in your career,

11   correct?

12         A:     That's right.

13         Q:     And a fire investigator with the proper

14   information can come to a valid origin and cause

15   determination without having been at the scene of the

16   fire, correct?

17         A:     Right.  Proper information, well documented,

18   et cetera, yes.

19         Q:     And in fact, to this day, you have not been

20   to Severn, North Carolina, where the peanut dome was once

21   located, correct?

22         A:     That's correct.

23         Q:     And you feel perfectly comfortable expressing

24   a scientific conclusion as to origin and cause of the

25   fire, correct?

Deposition of John Schumacher

1    **A:**    Yes.

2    **Q:**    All right.  Going back to your notes, was

3  this kind of when you started getting specific

4  information that was going to feed into your analysis,

5  this meeting that occurred in December of 2012?

6    **A:**    No.

7    **Q:**    You had previously gotten information that

8  you had already begun digesting?

9    **A:**    Yes.

10    **Q:**    Okay.  What information had you received

11  prior to December of 2012?

12    **A:**    I believe deposition -- depositions from the

13  various fact witnesses, what other -- whatever file

14  material was there available to be reviewed related to

15  the case.

16    **Q:**    So some of this -- some of these notes that

17  you have on the first page of Exhibit 247, you could

18  possibly have already acquired that information from your

19  prior reading?

20    **A:**    Yes.  I'm sure I did, and I was just trying

21  to kind of put a chronological thing together.

22    **Q:**    Okay.

23    **A:**    Keep it -- keep it fresh in my mind.

24    **Q:**    All right.  Looking through your invoices,

25  Exhibit 248, I notice you have, on September 25th, 2012,

1    a telephone conference with B, which I believe is Barry,

2    Lindley.

3         A:    Yes.

4         Q:    For -- well, you had four hours on that day.

5    I assume a portion of that was that telephone conference,

6    correct?

7         A:    Right; small portion.

8         Q:    All right.  What was the nature of your

9    telephone conference with Barry Lindley?

10        A:    Well, I think he had been to the scene and

11   was consulting on the case.  And so I just wanted to call

12   him up and chat with him a little bit.

13        Q:    Okay.  Did you ever take notes regarding that

14   telephone conference with Mr. Lindley?

15        A:    I don't think so.  Again, it wasn't very

16   long.  It was pretty short.

17        Q:    Anything that you learned from him which

18   eventually helps you form your opinion in this case?

19        A:    I don't think anything specifically, no.

20        Q:    Let me ask you:  Does Exhibit 248 represent

21   all of the invoices to date which you have sent to Quick,

22   Widis & Nalibotsky?

23        A:    Yes.  Well, let me look at it, but I would

24   have provided you with all the ones that we have to date.

25              Yes.

Deposition of John Schumacher

1    Q:    Aside from coming here, to Charlotte, did you

2    make any visits anywhere else in relation to this matter

3    prior to writing your expert report?

4    A:    I don't believe so.

5    Q:    You didn't visit any other peanut processing

6    facility?

7    A:    No.

8    Q:    Did you receive any other draft report or

9    finalized report prior to the time you completed your

10   expert report?

11   A:    I guess I don't quite understand what you

12   mean.

13   Q:    Sure.  Prior to the time you signed your

14   expert report in this matter -- and that was on

15   April 30th, 2013 -- had you received the expert report of

16   any other expert in this case?

17   A:    Dr. Lee Branscome.

18   Q:    Okay.  Any others?

19   A:    No.

20   Q:    You had not received even a draft of Lester

21   Rich's expert report?

22   A:    No.

23   Q:    When is the first time you did receive Lester

24   Rich's expert report?

25   A:    It was sometime well after I issued my

1    report.

2         Q:    Okay.  When you reviewed Lester Rich's expert

3    report, was there anything in there with which you

4    disagreed?

5         A:    I mean, I don't -- nothing comes to mind.

6         Q:    Okay.  You did not coordinate with Lester

7    Rich in coming to your opinions in this case in any

8    manner; is that correct?

9         A:    When you say "coordinate," what do you mean

10   by that?

11        Q:    Well, I mean share information, sound out to

12   one another what you're thinking of saying, and making

13   sure that you're not saying things that are inconsistent

14   from one another.

15        A:    No.

16        Q:    Didn't do that at all?

17        A:    We did not do that, no.

18        Q:    Did you have telephone conversations with him

19   prior to the time each of you issued your expert reports?

20        A:    I would have to look at my invoices, but I --

21   I don't think so.

22        Q:    There was no information that he supplied to

23   you that led you to write or not write something in your

24   expert report?

25        A:    Well, I mean, you know, we had a meeting.  We

1   may have discussed things.  But nothing that he said or

2   provided me structured my opinions.

3        **Q:**     Your last entry on Exhibit 248 is July 31st,

4   2013.  Have you done work on this matter since then?

5        **A:**     Yes.

6        **Q:**     Okay.  Approximately how many hours have you

7   worked on this matter since July 31st, 2013, prior to

8   today?

9        **A:**     I think it's about 80 hours.

10        **Q:**     8-0?

11        **A:**     8-0.

12        **Q:**     And that would be charged to the Quick, Widis

13   firm at $230 an hour, correct?

14        **A:**     Yes.

15        **Q:**     Okay.  And so it's about another 24-,

16   $25,000?  I'm sorry.

17        **A:**     No.

18        **Q:**     That's my bad math.

19        **A:**     18,400, I think.

20        **Q:**     There you go.  Thank you.

21        **A:**     You're welcome.  That's the new math.

22        **Q:**     Thank you.  Good.

23               Can you break that down into categories of

24   what you've done over the course of those 80 hours?

25        **A:**     You mean generally?  Not number of hours but

1    what I've done in that 80 hours?

2        Q:    Correct; since I don't have an invoice

3    reflecting what you've done.

4        A:    Right.  I just wanted to make sure you

5    weren't --

6        Q:    Sure.

7        A:    -- trying to give me -- ask for estimates of

8    each category because I couldn't do that.

9        Q:    I would like to know topically,

10   category-wise, what you have done in those 80 hours.

11       A:    Sure.  I've reviewed other expert reports.

12   I've reviewed other depositions, expert depositions,

13   30(b)(6) depositions.  I have played with Fumitoxin

14   flasks and watched and distributed Fumitoxin.

15       Q:    I'm sorry.  I didn't hear the words you used.

16             Played with Fumitoxin flasks --

17       A:    -- flasks and distributed them and watched

18   it -- watched them be distributed.

19       Q:    That's something you did over Labor Day

20   weekend, correct?  Or the day -- the Monday after Labor

21   Day?

22       A:    Yeah.  I hope it wasn't over Labor Day

23   weekend, but --

24       Q:    Tuesday after Labor Day.

25       A:    Yeah.  There you go.

1    **Q:**    September 4th.

2    **A:**    Yes.  Well, I'm trying to think if it was --

3    if I traveled, I would have traveled on Tuesday and done

4    it the four -- whatever the day after that was.

5    **Q:**    Okay.  What else have you done during those

6    80 hours?

7    **A:**    I'm trying to -- I'm trying to think general

8    categories.  I mean, that's -- those are the main ones.

9    **Q:**    Okay.  Specifically, have you reviewed the

10   deposition testimony of Lester Rich?

11   **A:**    Yes.

12   **Q:**    Have you reviewed the deposition testimony of

13   Steve Brown?

14   **A:**    Yes.

15   **Q:**    Have you reviewed the deposition testimony of

16   John Mueller?

17   **A:**    Yes.

18   **Q:**    Have you reviewed the expert deposition

19   testimony of Dennis Ryman?

20   **A:**    Yes.

21   **Q:**    Have you reviewed the expert deposition

22   testimony of Sean O'Keefe?

23   **A:**    No.

24   **Q:**    Okay.  Have you reviewed all eight of the

25   expert reports that were produced by the defendants in

1   this case?

2       A:    I think I've skimmed some of them and

3   reviewed others in great detail.

4       Q:    Okay.  Well, I'll just go through and make

5   sure that you have actually seen each one of them.

6             Carol Jones?

7       A:    Yes.

8       Q:    Dale Mann.

9       A:    Yes.

10      Q:    Michael Montross?

11      A:    Yes.

12      Q:    Rodney Nohr?

13      A:    That's one I've seen, yes.

14      Q:    Sean O'Keefe?

15      A:    I'm not sure if I have that or reviewed that

16  or not.

17      Q:    Dennis Ryman?

18      A:    Yes.

19      Q:    David South?

20      A:    Remind me who David South is.

21      Q:    From Monolithic Domes.

22      A:    Is that the short report?

23      Q:    Very short.

24      A:    Yes, yes.

25      Q:    John Walker?

1      **A:**      Yes.

2      **Q:**      Okay.  So you're not sure if you've seen sean

3  O'Keefe, and that was the only one you're not sure of?

4      **A:**      That's right.

5      **Q:**      Okay.  All right.  If you would, walk us

6  through your investigation in this matter from

7  August 3rd, 2012, until you issued your expert report on

8  April 30th, 2013.  What did you do?  What were you

9  considering?  What hypotheses did you form?  How did you

10  investigate those hypotheses?  And so forth.

11                    MR. WIDIS:  Objection.

12                    THE WITNESS:  Well, I obviously reviewed

13  a bunch of material:  depositions, complaints, et cetera.

14  I looked at photographs and other information related to

15  the dome and looked at various -- you know, the

16  applicator manual for the Fumitoxin tablets and pellets,

17  MSDS for that.  Basically reviewed a lot of the material

18  that was available to be reviewed.

19  BY MR. EPSTEIN:

20      **Q:**      Okay.

21      **A:**      And talked to John Cavaroc and talked to

22  Lester Rich.  And, as you know, I briefly spoke with

23  Barry Lindley.  Would have had a meeting as we talked

24  about.  I considered the various ignition scenarios and

25  went through the process of evaluating those from the

1    standpoint of them being probable causes and essentially

2    eliminated all of them.  And looked at the application of

3    Fumitoxin as being the cause and went through that

4    process to show that that was the cause of the fire.

5    Would have done some analysis by looking at temperatures,

6    et cetera.  Looked at scientific literature.  I don't

7    know if I mentioned reports or -- that would have been

8    available to review.

9         Q:    When you say "reports," can you be more

10   specific?  What do you mean?

11        A:    Well, I'm trying to -- well, Dr. Branscome,

12   for instance.  That's, I think, the only one I reviewed.

13        Q:    That was about lightening strikes, right?

14        A:    Essentially, yeah.

15        Q:    What else did you do to get to a point where

16   you were ready to express the opinions that are contained

17   in Exhibit 246?

18        A:    Well, that's a lot.  I then did some analysis

19   related to self-heating.

20        Q:    Did you, at some point during that process,

21   come to understand that the defendants in this case would

22   be contending that the fire was the result of

23   self-heating?

24        A:    Well, I mean, at some point it -- that's

25   all -- it's something to be considered, and the way

1    you're asking questions, it was obvious that's what you

2    guys were thinking.

3        Q:    Okay.  So in other words, you weren't in this

4    case long before you knew the defendants would contend

5    that the fire was caused by self-heating?

6        A:    I think that's -- you know, that's

7    appropriate -- that's correct.

8        Q:    Okay.  In the wheat case, is that what the

9    contention by the defendant -- by the pesticide

10   applicator was, was that the fire was caused by

11   self-heating?

12       A:    No.

13       Q:    What was their contention in that case?

14       A:    Sabotage or something like that.

15       Q:    Okay.  Did you consider sabotage in the

16   Severn Peanut case?

17       A:    Yes.

18       Q:    How come you rejected it?

19       A:    It just -- the dome was found sealed.  No one

20   would -- in their right mind would go into a dome filled

21   with phosphine gas.

22       Q:    Right.  We're going to take a break in a

23   minute, but before we take that break, let me ask:  Based

24   upon your review of documents in this case, do you

25   believe the peanuts could have been safely removed from

1    the dome within the first two or three days following the

2    discovery of the fire?

3        A:    I have not evaluated that; so I can't answer

4    that.

5        Q:    As you were reviewing the information in this

6    case, did it not strike you as odd that the peanuts had

7    not been removed from the 11th of August of 2009, when

8    the fire was discovered, until over two weeks later?

9        A:    I don't know that it struck me as odd, but

10   there were some circumstances I understand that were

11   playing into that; for instance, the phosphine being in

12   the dome, the EPA being involved, things like that.  But

13   again, I haven't evaluated that enough to give you an

14   opinion on that.

15       Q:    Okay.  Well, let me ask you a question based

16   upon what went through your mind.  Did it go through your

17   mind, at any point, "Why weren't these peanuts taken out

18   of the dome?"

19       A:    I mean, I didn't really consider that.  That

20   wasn't what I was looking at.  Again, there's phosphine

21   restrictions.  There -- EPA is looking at it.

22       Q:    Well, as someone who has been involved in

23   fires and fire science for quite some time, you didn't

24   come to any point in time in your review of materials --

25   put the materials down and ask yourself, "I don't

1    understand.  Why didn't they get the peanuts out of the

2    dome?"

3                        MR. GOLDSTEIN:  Objection.

4    BY MR. EPSTEIN:

5        Q:    That never happened?

6        A:    No, it actually didn't.

7        Q:    Okay.  Did you ever consider whether peanuts

8    could have been removed, at least in significant

9    quantities, just simply by offloading them from the

10   spouts, the down -- the chutes that allow the peanuts to

11   come out, the eight of them?

12       A:    Did I consider if that could have happened?

13       Q:    Did you ever question whether or not a large

14   number of the peanuts could have been removed safely by

15   that method?

16       A:    I didn't question it.  Again, I didn't

17   consider it.

18       Q:    Just wasn't part of your analysis at all?

19       A:    No.

20                        MR. EPSTEIN:  Okay.  All right.  I think

21   we're at a good stopping point.

22                        THE VIDEOGRAPHER:  Off the record at

23   11:24.

24                        [RECESS TAKEN]

25                        THE VIDEOGRAPHER:  On the record at

1    11:34.

2    BY MR. EPSTEIN:

3         Q:      Mr. Schumacher, please identify each and

4    every test that you conducted prior to reaching your

5    opinions that are contained in your April 30th, 2013,

6    expert report, Exhibit 46 -- 246.

7         A:      By tests, what do you mean?

8         Q:      I mean a physical test, an experiment,

9    something that involved materials.

10        A:      Okay.  I did not do any.

11        Q:      None whatsoever, correct?

12        A:      Right.

13        Q:      You did, subsequent to issuing that report,

14   perform some testing, correct?

15        A:      More like demonstrations, yeah.

16        Q:      Okay.  Why?

17        A:      Because I wanted to actually play with the

18   Fumitoxin tablets and flasks and peanuts and see how they

19   would be distributed in a situation that Lilley and

20   Turner were under when they were trying to distribute

21   these tablets inside the dome or into the dome.

22        Q:      Is it your testimony that you believe you

23   created a comparable set of conditions in which they

24   applied Fumitoxin tablets?

25        A:      I believe I created a condition that bolsters

1    my opinion that when you distribute these things, you get

2    a very large concentration of tablets directly below

3    where they're applying them and the manner that they

4    applied them and the constraints that they were under to

5    apply them, I believe, I did enough to support that

6    opinion that there would have been concentrations

7    directly below it.

8         Q:    Would you agree with me that as of

9    April 30th, 2013, you hadn't done enough to form a

10   conclusion regarding that?

11        A:    No, I would not agree with that.

12        Q:    Why did you feel it necessary to do that on

13   September 4th or September 5th, 2013?

14        A:    Because I wanted to see it.  That's what I

15   thought would happen, and that was my opinion.  And I

16   wanted to see it and confirm that even more.

17        Q:    Show you what's been marked as Exhibit 249.

18                    [EXHIBIT NO. 249 MARKED FOR

19                    IDENTIFICATION]

20                    THE WITNESS:  Yes.

21   BY MR. EPSTEIN:

22        Q:    Can you identify what that is?

23        A:    It's a Second Supplemental Report dated

24   September 6th, 2013.

25        Q:    Why did you issue a Second Supplemental

Deposition of John Schumacher

1   Report on that day?

2       A:      Because Mr. Widis asked me to.

3       Q:      The Second Supplemental Report relates to

4   your opportunity to take part in and witness the

5   dispensing of Fumitoxin tablets from flasks onto the

6   surface of peanuts in Memphis, Tennessee, on

7   September 4th, 2013, correct?

8       A:      Yes.

9       Q:      And you did that in connection with your work

10  on this case, correct?

11      A:      Yes.

12      Q:      You expect to get paid for the work you did

13  in that testing, correct?

14      A:      Yeah, of course.

15      Q:      Okay.  You didn't just do that on a lark; you

16  did that because you were trying to bolster your opinions

17  in this case, correct?

18                  MR. GOLDSTEIN:  Objection.

19                  THE WITNESS:  I guess I'm confused with

20  your line of questioning.  Are you asking me why I wrote

21  a report, or are you asking me why I did -- you started

22  off by asking me a different line of question.

23  BY MR. EPSTEIN:

24      Q:      Sure.  I'll withdraw the question and start

25  another one.

1          You did this work in an effort to bolster

2     your opinion as you had expressed it in your April 30th,

3     2013, expert report, correct?

4          **A:**    I did this testing because I wanted to see

5     the distribution, and it also bolstered my opinion.

6          **Q:**    It wasn't just curiosity, because Mr. Widis

7     wasn't going to pay you for your curiosity, correct?

8                    MR. GOLDSTEIN:  Objection.

9                    THE WITNESS:  I haven't asked him, but I

10    would doubt he would.

11    BY MR. EPSTEIN:

12         **Q:**    Mr. Widis knew you were going to be doing

13    this testing, correct?

14         **A:**    Mr. Widis knew?

15         **Q:**    Let me back up.

16                Mr. Widis and his partners knew that you were

17    going to be performing this testing before you performed

18    it, correct?

19         **A:**    Right; these demonstrations, correct.

20         **Q:**    You needed to get authorization to do this

21    work to know that you were going to be paid for it,

22    right?

23         **A:**    Yes.

24         **Q:**    And you did get authorization to do it,

25    correct?

1       **A:**     Yes.

2       **Q:**     Okay.  Let me show you what's been marked as

3  Exhibit 250.

4                          [EXHIBIT NO. 250 MARKED FOR

5                          IDENTIFICATION]

6  BY MR. EPSTEIN:

7       **Q:**     Can you identify what Exhibit 250 is?

8       **A:**     These would be my notes from the

9  demonstrations that we're talking about right now.

10      **Q:**     All right.  We're going to come back to these

11 in a moment, but I want to hand you -- let me back up.

12                  Was it you or someone who worked with you who

13 was taking photographs of what was done that day?

14      **A:**     I think a couple of us were.

15      **Q:**     Okay.  And over a hundred photographs were

16 taken; is that your recollection?

17      **A:**     Are you asking if I took over a hundred, or

18 what's your question?

19      **Q:**     I'm asking if there were over a hundred

20 photographs that were taken that are part of your expert

21 file to this -- to today?

22                  MR. GOLDSTEIN:  Objection.

23                  THE WITNESS:  I think that's correct.  I

24 mean, I'd have to go look.

25 BY MR. EPSTEIN:

Deposition of John Schumacher

1      **Q:**      Okay.

2      **A:**      I don't know for sure.

3      **Q:**      You eventually got those photographs to this

4    law firm to produce to me, correct?

5      **A:**      Yeah.  Let me -- let me take a look here

6    to --

7      **Q:**      Sure.

8      **A:**      103, it looks like.

9      **Q:**      Okay.  What I've done, so that we can talk

10   intelligently without being overloaded with those

11   photographs is I've selected some of those photographs to

12   talk with you about today.  Because the photographs don't

13   print out with their number on it, as I hand you each one

14   of these, I'm going to tell you which numbered photograph

15   it was.  You can certainly look through your notes, and

16   if they don't seem to be right, you can let me know.  But

17   I wanted to be able to marry up your notes, which talk

18   about photographs by number, with the exhibits that I'm

19   about to hand you, all right?

20     **A:**      Okay.

21     **Q:**      I'm going to start by handing you

22   Exhibit 251.

23                         [EXHIBIT NO. 251 MARKED FOR

24                          IDENTIFICATION]

25   BY MR. EPSTEIN:

1      Q:      And I will tell you and ask you to write

2    somewhere in the white space on Exhibit 251 that that's

3    the photograph that ends in 35.

4      A:      Yeah.  That's the best way to relate them.

5      Q:      Okay.

6      A:      That's the only number you really need.

7      Q:      That's correct.

8      A:      035?

9      Q:      035.

10     A:      Okay.

11     Q:      Okay.  And we're just going to make a pile of

12   these.

13          So Exhibit 252, which I'm handing you, is

14   039.

15                      [EXHIBIT NO. 252 MARKED FOR

16                      IDENTIFICATION]

17                      THE WITNESS:  Okay.

18                      MR. EPSTEIN:  Exhibit 253 is 040.

19                      [EXHIBIT NO. 253 MARKED FOR

20                      IDENTIFICATION]

21                      THE WITNESS:  Okay.

22                      MR. EPSTEIN:  Exhibit 254 is 042.

23                      [EXHIBIT NO. 254 MARKED FOR

24                      IDENTIFICATION]

25                      THE WITNESS:  Okay.

1          MR. EPSTEIN:  Exhibit 255 is 052.

2          [EXHIBIT NO. 255 MARKED FOR

3          IDENTIFICATION]

4          THE WITNESS:  052?

5          MR. EPSTEIN:  Yes.

6          THE WITNESS:  Okay.

7          MR. EPSTEIN:  Exhibit 256 is 058.

8          [EXHIBIT NO. 256 MARKED FOR

9          IDENTIFICATION]

10         MR. EPSTEIN:  Exhibit 257 is 064.

11         [EXHIBIT NO. 257 MARKED FOR

12         IDENTIFICATION]

13         MR. EPSTEIN:  And Exhibit 258 is 091.

14         [EXHIBIT NO. 258 MARKED FOR

15         IDENTIFICATION]

16         MR. EPSTEIN:  And the last one is

17  Exhibit 259, which is 101.

18         [EXHIBIT NO. 259 MARKED FOR

19         IDENTIFICATION]

20         THE WITNESS:  259 is what?

21  BY MR. EPSTEIN:

22     Q:    101.  Okay.  You got the whole stack marked?

23     A:    I do.

24     Q:    All right.  First of all, having looked

25  through those photographs as we have been marking them,

1   would you agree with me that the peanuts that you used on

2   September 4th in Memphis, Tennessee, were not farmers

3   stock peanuts?

4       **A:**     That's correct.

5       **Q:**     They were actually processed peanuts, weren't

6   they?

7       **A:**     That's correct.

8       **Q:**     They didn't have vines and leaves and foreign

9   material in them, did they?

10      **A:**     That's correct.

11      **Q:**     They didn't have moisture that would be

12  associated with farmers stock peanuts going into storage,

13  did they?

14      **A:**     No.

15      **Q:**     These peanuts weren't part of a peanut mass

16  in a pile of peanuts in a storage warehouse, were they?

17      **A:**     No.  They were a mass on the -- on the

18  ground.

19      **Q:**     But what I'm asking is, the source of the

20  peanuts that came to you in Memphis, Tennessee, that day

21  was not a storage warehouse containing a mass of peanuts

22  in a storage environment, correct?

23      **A:**     I guess I'm confused by your question a bit.

24  Can you rephrase that?

25      **Q:**     Sure.  These processed peanuts came in bags

1    as if they were going to be sold to people to eat them,

2    correct?

3        A:      That question I understood.  That's

4    correct.

5        Q:      These peanuts had not, for eight or nine

6    months, been sitting in a storage warehouse before they

7    wound up on some plastic in a yard in Memphis, Tennessee,

8    on September 4th, 2013, correct?

9        A:      That's correct.

10       Q:      All right.  These peanuts bore no similarity

11   to the peanuts that Mr. Lilley and Mr. Turner confronted

12   on August 4th, 2009, other than the fact that they were

13   peanuts in their shells, correct?

14                    MR. WIDIS:  Objection.

15                    THE WITNESS:  I -- I disagree.

16   BY MR. EPSTEIN:

17       Q:      Well, what do you disagree with?

18       A:      They're peanuts.  They have the same

19   structure.  They would pack similarly to peanuts in a

20   dome.  So they're peanuts, and they have a great

21   similarity to these peanuts that were in the dome, other

22   than they don't have the vines and the other stuff.

23       Q:      How many millions of pounds of peanuts did

24   you use for your testing on September 4th, 2013?

25       A:      Well, I know you know we didn't use millions

1   of pounds.

2         **Q:**    You didn't?

3         **A:**    Did not.

4         **Q:**    Okay.

5         **A:**    I said, I know you know we did not use --

6         **Q:**    Okay.

7         **A:**    -- millions of pounds.

8         **Q:**    How many pounds of peanuts did you use?

9         **A:**    I'm not sure.  It was probably three or four

10  bags of peanuts.

11        **Q:**    And how many pounds per bag?

12        **A:**    I don't have the picture in front of me that

13  shows the pounds per bag.

14        **Q:**    Okay.  You know the dimensions of the dome

15  were 192 feet wide by 96 feet tall, correct?

16        **A:**    I am aware of that.

17        **Q:**    Looking at Exhibit 251, that's not the

18  dimensions of what you were looking at that day, was

19  it?

20        **A:**    That's right.

21        **Q:**    Okay.  What were the dimensions of the pile

22  that you created on September 4th, 2013?

23        **A:**    It was -- the dimension was ten foot by ten

24  foot.

25        **Q:**    What was the height?

1       A:      The height was probably three or four

2  inches.

3       Q:      What was the angle of repose?

4       A:      We weren't trying to do the angle of repose

5  in this instance.  It's flat.

6       Q:      Right.  You had a flat pile of peanuts?

7       A:      Right.

8       Q:      To compare what Mr. Lilley and Mr. Turner did

9  to peanuts that, in your report, you concluded had an

10 angle of repose of somewhere between 30 and 38 degrees,

11 correct?

12      A:      That's right because that's -- we weren't

13 looking at the angle of repose.  We were looking at the

14 flat spot and how the application of Fumitoxin tablets

15 from a very small opening would generate significant

16 piling.  It has to, and it did.

17      Q:      You said you were looking at the flat spot.

18 Can you tell me what you mean by that?

19      A:      Looking at a flat spot similar to the one

20 that's being described by Lilley and Turner.

21      Q:      Your testimony is, what is shown in

22 Exhibit 251 is similar to what was described in the

23 under-oath testimony of Brian Lilley and Randall

24 Turner?

25      A:      Yeah.  I think they said it was about ten

 1   feet.

 2       Q:      Okay.  We'll talk about that.

 3               So the -- in your mind, the comparison you

 4   were making was not to what would have happened to any

 5   other spot or point on the surface of the peanut pile on

 6   August 4th, 2009, with the very -- exception of the very

 7   top of the pile; is that correct?

 8       A:      In this particular demonstration, yes, we

 9   were looking at how the peanuts -- or, excuse me, the

10   tablets land on a flat section of peanuts --

11       Q:      Okay.

12       A:      -- directly below the point of application.

13       Q:      Okay.  And that, in your mind, is the

14   relevance of this demonstration to what happened on

15   August 4th, 2009?

16       A:      That's part of it.

17       Q:      What's the other part?

18       A:      Well, the constraints that Lilley and Turner

19   were under when they were trying to apply the tablets:

20   small opening, very constricted by the angle iron and

21   other things in that area, the -- what happens when you

22   actually turn a flask of tablets over, the restriction on

23   their arm movement when they're trying to actually spread

24   these out.  It's going to all basically create a

25   condition where you're going to have piling on the

1    surface below them and in other areas.

2        **Q:**    Okay.  You weren't looking into the issue of

3    other areas other than the surface below them on

4    September 4th, 2009, correct?

5        **A:**    In this particular test, we -- that's right.

6    We were just looking at this spot.

7        **Q:**    The ten-by-ten spot that you say existed on

8    August 4th, 2009, correct?

9        **A:**    Well, the flat spot, yes.  It's about ten

10   foot.

11       **Q:**    Okay.  Go ahead and read, so we're clear on

12   your handwriting, what you have written on the first page

13   of Exhibit 250.

14       **A:**    You want me to read everything on here?

15       **Q:**    Yes, please.

16       **A:**    Okay.  So, "Number 1:  Pile of tablets in bin

17   during application one to two flasks.

18                "Number 2:  Prepacks hung in building,

19   removed, put in bucket, flash spent material, two to

20   three days after hung.

21                "Number 3:  ALP, aluminum phosphide, applied

22   through roof of structure, fire.  No rain.  Piled.

23                "Number 4:  Bulk tablet bags in buckets.

24   Flash when you would open the buckets.  Also evidence of

25   fire in buckets that had gone out.  Don't make that

1   product anymore.

2               "Number 5:  Dry dust from aluminum phosphide

3   on plastic on floor of structure.  About two to three

4   days after application.  Gather up dust and plastic,

5   ignites.  Happens very frequently.

6               "Number 6:  Opening flasks."

7       Q:      And you have in your -- right next to

8   "Advanced Engineering Systems," you have written

9   "Examples of ignition without liquid.  John Mueller,"

10  correct?

11      A:      Yes, yes.

12      Q:      So this was your review of his deposition,

13  and that's what you got out of it?

14      A:      That's not at all what that is.

15      Q:      Okay.  Tell me -- this is an interview with

16  him where he gave you that information?

17      A:      There's no interview.  It was a discussion

18  relating to his observations of this particular material,

19  aluminum phosphide, and how it can flash without the

20  presence of liquid water, and it happens frequently.

21      Q:      Okay.  You understand he is a paid expert

22  witness in this case to work for the plaintiffs, like

23  you?

24      A:      Yes.

25      Q:      Okay.  Go to the second page.  Tell me what

Deposition of John Schumacher

1   you have drawn and what you have written there.

2       A:     Well, this is a schematic of a flask of

3   Fumitoxin tablets.

4       Q:     Okay.  And underneath your description of the

5   lot number, net weight, you have written something.  Can

6   you read what you wrote there.

7       A:     "Opened a new flask.  Heard noticeable 'hiss'

8   sound.  Draeger alarmed very quickly afterwards was about

9   three feet from flask with Draeger."

10      Q:     And what are you describing there?

11      A:     Just the sound of opening a flask and what

12  comes out.

13      Q:     And what's the significance about the DrÃfÂ¤ger

14  alarmed?

15      A:     It just -- it just means that you're putting

16  phosphine out very quickly.  And -- for instance, with

17  Turner and Lilley being inside that head house, people

18  opening that, they're going to be exposed to phosphine

19  immediately and all the time throughout that

20  application.

21      Q:     Does it have a smell?

22      A:     Yes.

23      Q:     Pretty distinct smell?

24      A:     Yes.

25      Q:     Pretty dominant smell in terms of anything

1    else that might be around them?

2        A:      Well, I don't know how to characterize that,

3    but it's -- it's a noticeable smell.

4        Q:      Well, if there were flowers ten feet away,

5    which would have been more dominant, the smell of what

6    was in that flask or the smell of flowers?

7        A:      I don't know how to answer that.  I'm

8    assuming the smell of the flask material, but I don't

9    know which flowers you're talking about and how potent

10   those are.

11       Q:      Okay.  And if you were doing 49,000 tablets,

12   do you think that would be a pretty powerful smell?

13       A:      Yeah.

14       Q:      Okay.  You think on August 4th, 2009, in the

15   head house, there was a pretty powerful smell of

16   phosphine gas?

17       A:      Yeah.

18       Q:      Okay.  Probably would have prevented them

19   from smelling things that were in the dome beneath them,

20   don't you think?

21       A:      Not -- not initially, because they stuck

22   their head in there initially.

23       Q:      I'm asking when they were applying phosphine

24   tablets.

25       A:      I don't know about application, but

1    initially, no, it wouldn't have any bearing on that.

2        Q:      All right.  Go ahead to the next page in your

3    notes.  Tell us what you've written there.

4        A:      "Set up simulated opening about 15 inches

5    wide by 40 inches long on flatbed.  Had cardboard

6    attached to planks representing 7-inch concrete dome.

7    Mueller on knees, arm through opening, holding bottom of

8    flask, side to side, based on opening restriction.  Arm

9    about three feet from peanuts.  Photos 27 through 41.

10              "Piled tablets, 160 to 170, by pouring them

11   out of flask onto peanuts.  Photos 42 through 48.

12              "Poured flask, 500 tablets into recessed area

13   in peanuts.  Dust came out with tablets.  Photos 49

14   through 59.

15              "Mueller dispensed one flask of tablets from

16   height of about 16 feet above 10-by-10 peanut pile.

17   Moved arm similarly to first test.  Photos 61 through

18   65."

19       Q:      Okay.  Before we move on to the next page --

20   so with the exception of Photograph 61 through 65, the

21   other photographs were all taken when he was three feet

22   above the surface of the peanuts; is that right?

23       A:      No, that's not true.  I mean, 61 through 65

24   are of that flask being dispensed.  The other ones --

25   some were when he was on his knees dispensing.  Others

1    were piles we had poured and -- onto the surface.

2        Q:    All right.  Let me ask it this way, then:

3    Photographs 27 through 65 were made of the result of

4    Mr. Mueller dispensing tablets from a flask when he was

5    three feet above the surface of the peanut pile,

6    correct?

7                    MR. GOLDSTEIN:  Objection.

8                    THE WITNESS:  No.

9    BY MR. EPSTEIN:

10       Q:    Then tell me what I'm missing.

11       A:    61 through 65 were of --

12       Q:    I'm sorry.  I'm sorry.  I hate to interrupt.

13   You're right.  Let me fix my question.

14               Photographs 27 through 59 are photographs

15   depicting the result or showing the process of Mr.

16   Mueller dispensing tablets from three feet above the

17   surface of the pile, correct?

18       A:    I mean, 27 through 41 was what's depicted in

19   one of those pictures, him dispensing them from the

20   flatbed.  The other ones we poured out just standing a

21   couple feet above the peanuts --

22       Q:    Right.

23       A:    -- so that it wasn't related to that flatbed

24   distribution.  But the answer -- general answer is yes.

25       Q:    There was no effort made in any of those

1    photographs to replicate the circumstances that

2    Mr. Lilley -- Mr. Lilley and Mr. Turner faced on

3    August 4th, 2009, regarding their distance from the

4    peanut pile, correct?

5        A:      Regarding their distance, correct.  But

6    again, the constraints and the -- how the peanut -- how

7    the tablets come out of the flask would definitely

8    represent what they were doing.

9        Q:      Mr. Schumacher, are you testifying that from

10   three feet above the surface of the pile, when one shakes

11   a flask of these tablets, the distribution of those

12   tablets is going to be no different than had one been 20

13   to 25 feet above the surface of the pile?  Is that your

14   testimony?

15       A:      That's not what I said.

16       Q:      Okay.  Well, explain to me how there's any

17   relevance at all to watching Mr. Mueller, from three feet

18   above the surface of a flat spot, distribute tablets when

19   you know in this case Mr. Turner and Mr. Lilley were 20

20   to 25 feet above the surface.  What's the relevance?

21       A:      Because what I'm saying is, if you look at

22   when the flask is initially turned over and the tablets

23   fall straight down right below where you are, that is

24   indicative of how they're going to come out, and that is

25   going to create a piling situation directly below them.

1    And his movement of his arm shows you how restricted the

2    person who's trying to distribute those tablets is

3    under.

4        Q:     Mr. Schumacher, is it your testimony that if

5    Mr. Turner and Mr. Lilley were 20 to 25 feet above the

6    surface of the peanuts, making the exact same arm

7    movements that Mr. Mueller made with a flask, that the

8    distribution of the tablets on a flat spot below them

9    would have resembled the distribution of the flat -- of

10   the tablets on the flat spot that Mr. Mueller obtained?

11   Is that your testimony?

12       A:     That's not what I said again.

13       Q:     Okay.  Then help me understand the relevance.

14       A:     We're missing each other.

15       Q:     Sure we are.

16       A:     It's a pretty simple concept, and it is this:

17   When you take a flask and you turn it over, initially

18   you're going to have a large amount of tablets come

19   straight out of that flask before you even start moving

20   it.  That representation of how those tablets come out of

21   the flask initially is representative of what's going to

22   happen when they're trying to do that.  That's what I'm

23   saying.  I'm not saying how the tablets land on the

24   peanuts three feet away is going to show the distribution

25   below them, but I'm telling you that it's going to show

 1    you exactly what's going to happen when you take a flask

 2    and turn it under -- upside down to distribute it.  And

 3    that doesn't take into consideration if you get bridging

 4    when you have a flask so that you have to unbridge that

 5    flask.  And when you do that, two ways you can do it.

 6    You shake it up like this, and so that unbridges and it

 7    comes out directly straight down below you; or you take

 8    it up, turn it over.  Same concept, dump it back in

 9    straight below you.

10        Q:     Okay.  Can you, for the camera --

11               MR. EPSTEIN:  And, Videographer, I'd

12    like you to capture this, please.

13        Q:     Can you demonstrate how you believe

14    Mr. Lilley and Mr. Turner applied the Fumitoxin tablets

15    on August 4th, 2009, when they were on their hands and

16    knees at the hatch?

17        A:     Well, I mean, they described it differently.

18    They said they were on their hands and knees and they

19    were squatting.  There were two different situations.

20    And so when you're squatting, you can't really get your

21    arm down there all the way to get it past the pivot

22    point.  And so you're doing this, and you're holding the

23    flask and you're going side to side.  And you're locked

24    by your elbow.  It can only go this way, but it can't go

25    back this way.  And so you're going to have a natural

1    fanning distribution in one direction, and you're going

2    to naturally come back over that same spot below you a

3    couple times for every time you go to one side.  And so

4    that's one way.

5              Now, if you're on your knees, you have a

6    better chance to get it in there, but you've got to

7    remember what their constraints are.  They have angle

8    iron that is limiting their ability to get their arms

9    into the opening.  They have electrical boxes there.  And

10   so they're basically going side to side along the 15-inch

11   opening, as they described it.

12      Q:     With a flask in the hand and the tablets

13   coming out of the flask?

14      A:     Yes.

15      Q:     That's your understanding of their

16   testimony?

17      A:     Yes.

18      Q:     Okay.  So we're clear on that.  And that's

19   what Mr. Mueller did; Mr. Mueller didn't do anything

20   different than that during September 4th, 2013?

21      A:     Than taking a flask, holding it, and then

22   distributing it like that?

23      Q:     Correct.

24      A:     That's correct.

25      Q:     Based upon your belief that that's how

Deposition of John Schumacher

1  Mr. Lilley and Mr. Turner applied the Fumitoxin tablets,

2  correct?

3     A:    Yes.

4     Q:    Okay.  You didn't know that Mr. Turner

5  applied Fumitoxin tablets with a bare hand?

6     A:    That was not described in his deposition.

7     Q:    Really?

8     A:    Well, that I remember.

9     Q:    Okay.  If you had remembered that, you might

10  have needed to alter the testing you did, wouldn't you

11  have?

12     A:    Slightly, yes.

13     Q:    You didn't do any testing where Mr. Mueller

14  took tablets with his bare hands and threw them below

15  him, did you?

16                 MR. GOLDSTEIN:  You mean Mr. Turner.

17                 MR. EPSTEIN:  No.  I mean Mr. Mueller.

18                 THE WITNESS:  That's right.

19  BY MR. EPSTEIN:

20     Q:    You did not pick up on the fact, in

21  Mr. Turner's deposition, that he testified that some of

22  the Fumitoxin tablets he applied with his open hand and

23  not with the flask itself?

24     A:    Now, you just said some of them, and so --

25     Q:    Right.

Deposition of John Schumacher

1     **A:**     I can go back and read that, but -- that's

2  fine, but there was distribution from the flask.  Maybe

3  some of them are from the hand, but that doesn't change

4  the fact that by distributing it through a flask you're

5  going to still have that situation.

6     **Q:**     Correct me if I'm wrong.  Until I just

7  pointed it out to you, you did not recall that Mr. Turner

8  had distributed Fumitoxin tablets with a hand as opposed

9  to with a flask?

10     **A:**     I did not recall that.

11     **Q:**     Okay.  Let's look through the -- well, let me

12  back up.  Go quickly to the third page and tell me what

13  you have written there.  I'm sorry; the fourth page.

14     **A:**     The fourth page?

15     **Q:**     Yes.

16     **A:**     All right.  Are you saying that you can't

17  read my handwriting?

18     **Q:**     I'm saying I want to make sure we all can

19  read your handwriting.

20     **A:**     Fair enough.

21        "Made piles of peanuts about one to one and a

22  half feet tall.  Dropped tablets onto pile from about two

23  feet above.  Some tablets stuck in pile.  Some rolled

24  down.  Some bounced off.  Same with height of about ten

25  feet.

1           "Dropped Weevil-Cide tablet into spent

2     Weevil-Cide dust.  Tablets sunk into dust and

3     disappeared."

4           And then do you want me to go through the

5     photo log?

6        Q:     Yes.

7        A:     "Photo 60.  Fumitoxin in peanuts in shade.

8           "66 through 73.  Tablet prepack.

9           "74 through 88.  ProFume closed-loop fan.

10    Eco2Fume vapor.  Phosphine fumigant.  Phosphine

11    generator.

12          "89 through 101.  Weevil-Cide flask, spent

13    Weevil-Cide" -- "spent Weevil-Cide with new tablet next

14    to it.

15          "102.  Dropped Weevil-Cide tablet into spent

16    Weevil-Cide dust from about one to two feet."

17          103 is uncovered tablet.

18       Q:     Okay.  Now, going to the top of that page, it

19    seems to me that you made small piles of peanuts in an

20    effort to determine what would happen when you dropped

21    Fumitoxin tablets onto those piles, correct?

22       A:     Right; from various heights.

23       Q:     And what happened is the tablets dispersed,

24    correct?

25       A:     Well, some stuck in there.  Some rolled a

1   little bit.  And some bounced off.  Correct.

2       Q:      You didn't get piles of Fumitoxin tablets on

3   a pile of peanuts, did you?

4       A:      I mean, that's not what we were attempting to

5   do.  We were attempting to see what happens with the

6   tablets, and they stick in there was well as roll and

7   bounce.

8       Q:      Okay.  Ask the question again.  You didn't

9   get piles of tablets when you had piles of peanuts and

10  you were applying the tablets from above the piles of

11  peanuts?

12      A:      That's right; because we weren't trying to do

13  that.  We weren't throwing 98 flasks full of 500 tablets

14  into the same area.

15      Q:      And you didn't take any photographs showing

16  the results of what happened when you applied the tablets

17  to a pile of peanuts, correct?

18      A:      Well, that's not correct.

19      Q:      Well, are there photographs listed with that

20  first paragraph that I've missed?

21      A:      Well, that's one type of pile.  A flat is

22  also a pile.  You've got to describe your pile.

23      Q:      I'm talking about the -- the piles that you

24  made on the top -- referenced on the top of the fourth

25  page of Exhibit 250 were piles that had an angle of

Deposition of John Schumacher

1    repose, correct?

2       **A:**    That's right.

3       **Q:**    And when you had an angle of repose, one, you

4    didn't take pictures of that, did you?

5       **A:**    I did not, but Lester Rich did.

6       **Q:**    Lester Rich was there on September 4th?

7       **A:**    Oh, we didn't talk about who was there?  You

8    never asked me that question.

9       **Q:**    Okay.

10      **A:**    Yes, he was there.

11      **Q:**    Okay.  Who else was there?

12      **A:**    John Mueller.

13      **Q:**    All right.  So three of the four experts for

14   the plaintiffs in this case, over four months after the

15   expert report deadline, were out doing testing on what

16   happens when you drop Fumitoxin tablets from above a pile

17   of peanuts; am I accurate?

18      **A:**    Three of the four experts were doing

19   demonstrations, yes, of this phenomenon.  Exactly.

20      **Q:**    Four-plus months after you were required to

21   issue your expert reports in this case, correct?

22      **A:**    Right.

23      **Q:**    Okay.  Any reason why that didn't happen

24   prior to the time you were required to issue your expert

25   report in this case?

1      **A:**      No reason.

2      **Q:**      Any reason that you felt it was a good idea

3    to do it after you issued your expert report in this

4    case?

5      **A:**      I just wanted to see the peanuts and how the

6    tablets landed on them, how the tablets came out of the

7    flasks, and it was consistent with what I thought was

8    going to happen.

9      **Q:**      Would you agree that to form a valid

10   scientific conclusion as to what will happen, you've got

11   to do more than think about it; you actually have to find

12   something that supports what you think?

13     **A:**      Well, you can do testing, thought

14   experiments, which is perfectly allowable in 921.  And

15   those experiments that I did showed exactly what these

16   demonstrations that I did showed.

17     **Q:**      You weren't comfortable relying on your

18   thought experiments, obviously, were you?

19                       MR. GOLDSTEIN:  Objection.

20                       THE WITNESS:  It has nothing to do with

21   being comfortable or not comfortable.  I just wanted to

22   do it.

23   BY MR. EPSTEIN:

24     **Q:**      Okay.  Who was directing what Mr. Mueller was

25   doing?  You?  Mr. Rich?

Deposition of John Schumacher

```
1        A:      I think it was consensus-based, and we
2   decided what we thought we wanted to do and we did it.
3        Q:      Did you draw up a protocol of any sort?
4        A:      No.
5        Q:      Was there any attorney there with you?
6        A:      No.
7        Q:      Did you have phone conferences with
8   Mr. Mueller and Mr. Rich in advance of going out to
9   Memphis, Tennessee, to do this testing?
10       A:      Mr. Mueller, no.  Mr. Rich, yes.
11       Q:      What did you discuss with him?
12       A:      Timing, when we'd be there.
13       Q:      Did you discuss with him the protocol that
14  you would be using?
15       A:      Well, we discussed what generally we wanted
16  to do.
17       Q:      Okay.  And what did you discuss you generally
18  wanted to do?
19       A:      Basically what you see here.
20       Q:      Decide if peanuts would -- I'm sorry.  Decide
21  if tablets would form piles on the flat surface of
22  peanuts?
23       A:      It wasn't decide.  We wanted to demonstrate,
24  like I said, the tablets coming out of the flask onto the
25  flat surface and how they would react on angled
```

1   surfaces.

2       Q:     And on angled surfaces, the tablets dispersed

3   from being applied only two feet above them, correct?

4       A:     They -- well, again, we only put a few on

5   there.  And so I can't tell you that they dispersed and

6   you wouldn't get piling, because some of them stuck and

7   some of them rolled a little bit and some of them

8   bounced.

9       Q:     You don't have any pictures to show me any

10  that stuck together, do you?

11      A:     Well, I don't have any pictures of that

12  because, as I said, Lester Rich took those photographs.

13      Q:     Okay.  Are you going to rely on those

14  photographs in testifying as an expert in this case?

15      A:     Well, I haven't really looked at them.  So I

16  don't know what they show.  I'd have to look at them.

17  But I've seen them stick with just a few app- -- tablets

18  where they stick on the actual sloped surface of the

19  peanuts.  And that's not considering any recessed areas

20  or areas where -- that would be natural collection

21  points.

22      Q:     Okay.  I'm going to walk with you through the

23  photographs and make sure I understand what we're looking

24  at.  Photograph 35, which is Exhibit 251.  Describe what

25  we're looking at there.

1    **A:**    That would be the flatbed with the peanuts

2    below them and the ladder and the tarp.

3    **Q:**    Okay.  What was the maximum height one could

4    obtain by applying peanuts from that -- I'm sorry --

5    applying tablets from that ladder?

6    **A:**    I get that mixed up, too, sometimes.  But

7    it's -- I think it's 17 feet.

8    **Q:**    Okay.  That was the highest you could get?

9    **A:**    Safely, yes.

10   **Q:**    Above the surface of the peanut pile or above

11   the ground?

12   **A:**    Surface of the peanut pile.

13   **Q:**    Okay.  And the flatbed was how high above the

14   surface of the peanuts?

15   **A:**    I think the flatbed was about four feet above

16   it.

17   **Q:**    Okay.  And if you look at the next picture,

18   Exhibit 252, Photograph 39, Mr. Mueller was actually

19   applying the Fumitoxin flasks below the surface of the

20   flatbed, correct?

21   **A:**    Yes.

22   **Q:**    So three feet, two feet above the surface?

23   **A:**    I thought it was about three feet; so I'm not

24   totally sure about the height of the -- the flatbed.

25   **Q:**    Were these dummy tablets?

Page 96
September 12, 2013

Deposition of John Schumacher

1    A:    No.

2    Q:    These were actual tablets?

3    A:    Yes.

4    Q:    There was actual phosphine being released in
5    the environment?

6    A:    Yes.

7    Q:    Okay.  Did you have a permit of any kind to
8    do this -- to do this test?

9    A:    I didn't set it up.  I don't know.

10   Q:    Okay.  Any particular reason Mr. Mueller was
11   not wearing a gas mask?

12   A:    You'd have to ask him.  I don't know.

13   Q:    Were you wearing a gas mask?

14   A:    No; but we had alarms.

15   Q:    Okay.  And the alarms went off, correct?

16   A:    At times.  Other times, they wouldn't.

17   Q:    Didn't make you uncomfortable that there was
18   phosphine being released in sufficient concentration to
19   set off those alarms, and you weren't -- you had no
20   breathing apparatus?

21   A:    No; because we got away right away when they
22   alarmed.

23   Q:    Okay.  What is depicted by the cardboard
24   cutouts in Exhibit 252?

25   A:    That was a depiction of the thickness of the

Capital Reporting, Inc.
(919) 841-4150
Case 2:11-cv-00014-BO   Document 75-12   Filed 11/07/13   Page 96 of 361

1    dome.

2        **Q:**    Okay.  And I'm specifically trying to get you

3    to tell me what is depicted by the dimension between

4    those two pieces of cardboard.

5        **A:**    15 inches.

6        **Q:**    Okay.  And that's because that was the width

7    of the hatch through which Mr. Turner and Mr. Lilley

8    applied the Fumitoxin tablets?

9        **A:**    That's correct.

10       **Q:**    So what we're looking at with Mr. Mueller on

11   his hands and knees would approximate what either

12   Mr. Turner or Mr. Lilley was doing on August 4th, 2009,

13   at either end of that rectangle; is that your

14   understanding?

15       **A:**    Well, no -- yes and no.  I mean, they're not

16   being -- he's not being constrained by the angle iron and

17   the electrical box that would be there that would

18   naturally impede their ability to really get their arm in

19   there well.

20       **Q:**    What else is different about what we see in

21   Exhibit 252 than the deposition testimony of Mr. Turner

22   and Mr. Lilley regarding how they applied the Fumitoxin

23   tablets?

24       **A:**    Well, I mean, they're -- he's applying it

25   with the flasks turned upside down like they said they

1    did.  He's not using his hands, if that's what you're

2    talking about.

3       Q:     Is that a side-to-side motion that's being

4    pictured in Exhibit 252, or is that just turning the

5    flask upside down and dumping it?

6       A:     No.  That was a picture caught in the middle

7    of moving it back and forth.  So it's a still photograph,

8    not a video.

9       Q:     Okay.  And it's your testimony he didn't just

10   dump it; he just -- you don't have a video, do you?

11      A:     Lester has a video.

12      Q:     Lester has a video?

13      A:     Yeah.

14                MR. EPSTEIN:  Let me go off the record,

15   please.

16                THE VIDEOGRAPHER:  Off the record at

17   12:11.

18                [RECESS TAKEN]

19                MR. WIDIS:  For the record, the parties

20   have agreed that the questioning regarding the trip to

21   Memphis will stop now, and with the understanding that

22   Mr. Schumacher will be subject to deposition later at a

23   later date.  We're going to reserve our positions as to

24   the time that that deposition can take.  But at this

25   point, we're going to resume the deposition and just move

1   on from the subject of the Memphis visit.

2                   MR. EPSTEIN:  And I'll just state that

3   that's consistent with my understanding with the caveat

4   that I am not precluding the possibility that my client

5   may move in the interim to strike or exclude any evidence

6   in this case of this testing.  And if, of course, that

7   were to happen, then we would not proceed ahead with the

8   subsequent deposition.  And in the interim, we're also

9   looking for the production of all materials, written,

10  photographs, videos, and so forth, associated with the

11  work that was done in Memphis on September 4th, 2013.

12                  MR. GOLDSTEIN:  And we agree that will

13  be produced within the next few days.

14                  MR. EPSTEIN:  Okay.  So I guess we're

15  ready to go back on the video record.

16                  THE VIDEOGRAPHER:  Stand by.

17                  We're on the record at 12:40.

18  BY MR. EPSTEIN:

19      Q:     Mr. Schumacher, what I'd like you to do now

20  is walk me through every step in the sequence that led in

21  your opinion -- that led to your opinion -- strike that.

22  We'll start again.

23                  I want you to walk me through every step in

24  the ignition scenario, as you have opined or intend to

25  opine at the trial of this case, from the application of

1    Fumitoxin on August 4th, 2009, to the discovery of smoke

2    coming out of the head house on August 11th, 2009.  Do

3    you think you can do that?

4        **A:**    I can try, sure.  Basically, you had Turner

5    and Lilley in the head house with 98 flasks, each

6    containing 500 tablets.  And they were applying the

7    flasks through a 15-inch by about 40-inch-wide opening.

8    And they were on the 15-inch side, both of them, and they

9    were constrained by the angle iron and other things.  And

10   in applying that -- or applying the tablets, they formed

11   one or more piles of tablets on the surface of the

12   peanuts, and the piling created a concentration of

13   phosphine gas proximate to the pile or piles that was at

14   or above the LFL and ignition occurred.

15          The fire was initially likely a smoldering

16   fire that may have transitioned into flame at some point,

17   but most of the time within the dome, it was smoldering.

18   And because the dome is very well sealed, smoke was not

19   able to get out until -- well, they initially started

20   smelling things on August 10th.  Smoke was actually

21   observed on August 11th.

22       **Q:**    Okay.  I want to focus now, specifically, on

23   the pile or piles.  And you testified in the alternative.

24   I take it you haven't formed a conclusion about that,

25   correct?

1      **A:**    About what?

2      **Q:**    If there was one pile of Fumitoxin tablets on

3   the surface of the peanuts or more than one.

4      **A:**    Well, I think there's at least one.  I would

5   not be surprised if there were several.

6      **Q:**    Okay.  What I want to do is take at least the

7   one that's part of your opinion and have you describe, in

8   the depth that you are capable of, exactly what was

9   happening in that pile from the moment it formed until

10  the moment there was combustion.

11     **A:**    Well, basically, you have the pile of tablets

12  and the reaction takes place with the moisture in the air

13  as well as the commodity.  And that instantly starts

14  to -- or rapidly starts to generate phosphine.  When I

15  say rapidly, initially starts off generating phosphine.

16  And it generates it far quicker and faster than if you

17  had a single tablet because they're in a pile situation,

18  and that pile situation now creates a concentration

19  that's at or above the LFL.  And you're going to get the

20  reaction occurring, which creates heat.  And that heat

21  drives the temperature; the temperature drives the

22  reaction; and you get this process where you can get

23  heating of the pile.  And at some point, the -- the

24  phosphine ignites, and from there, it ignites other

25  combustible material within the pile of peanuts.

1      Q:      When you say "other combustible material

2   within the pile of peanuts," what specifically do you

3   mean by that?

4      A:      Well, the -- the dust, the -- the foreign

5   material, the twigs, things like that.  The hulls of the

6   peanuts, the peanuts themselves.

7      Q:      Do you have an opinion as to what

8   specifically was ignited?

9      A:      Well, I think all of that was eventually

10  ignited.

11     Q:      Do you have an opinion as to what was first

12  ignited?

13     A:      Well, I think it was the smaller material

14  that's in there.

15     Q:      And not the peanut hulls?

16     A:      Well, and the peanut hulls, things like that.

17  Not necessarily entire peanut itself, but maybe broken

18  peanuts, hulls, foreign material, things like that.

19     Q:      How many tablets were in these piles or the

20  pile that you have opined was created?

21     A:      I don't know the exact size of the piles, but

22  the manner in which they applied the tablets, they would

23  lead to significant piling.

24     Q:      Define what you mean by "significant piling."

25     A:      Well, again, I don't know the size, but they

1    could be, you know, a hundred to 200 tablets possibly,

2    maybe more.

3        Q:    Okay.  Would you agree with me that if you

4    had a pile of a hundred to 200 tablets, that a number of

5    those tablets will not be exposed to the ambient air,

6    initially?

7        A:    Some may not, yes, initially.  Depends on the

8    pile, the distribution of them in the pile, how they are

9    contacted by the peanuts --

10        Q:    Go back --

11        A:    -- things like that.

12        Q:    Let's go back and have you look at -- not for

13    purposes of talking about your Memphis trip, which we'll

14    do another day -- have you look at Exhibit 254.

15        A:    Okay.

16        Q:    If you had to approximate, how many Fumitoxin

17    tablets do you believe are in that pile?

18        A:    160.

19        Q:    Okay.  So it's right between a hundred and

20    200, just by happenstance, right?

21        A:    I mean, again, I don't know the exact number

22    that would be in there, but I'm just giving you an

23    example of the sizes that you -- that you would expect.

24        Q:    Right.  Okay.  So you've got 160 there.  How

25    many of those tablets are exposed to the ambient air?

1     A:      Well, there -- there's some porosity in

2     there; so they're all exposed to a certain extent.

3         Q:      Okay.  Is it your testimony that the tablets

4     on the exterior do or do not insulate the tablets on the

5     interior of that pile from the ambient air?

6         A:      Well, to a certain extent, but there's

7     porosity, and you can't completely insulate them from all

8     of the air.

9         Q:      Is it your testimony that there will be a

10    reaction, a chemical reaction, releasing phosphine from

11    all 160 of those tablets as soon as they hit that -- as

12    soon as they form that pile?

13        A:      That's not what I said.

14        Q:      Okay.  I'm asking.

15        A:      Right.

16        Q:      Is it your testimony that all of them will be

17    part of that reaction initially?

18        A:      A significant number will be, not necessarily

19    all of them.

20        Q:      Okay.  How do you know a significant number

21    will be?

22        A:      Just because you're going to have air around

23    these tablets, and you're going to have a significant

24    amount of them on the outside that are exposed.  And

25    some on -- a lot of them on the inside, not necessarily

1    in the core of them, will be exposed to moisture, which

2    will then generate this reaction.

3         Q:     And then what happens to the phosphine when

4    the reaction starts?

5         A:     The phosphine, some of it basically moves,

6    and it's trapped a bit because it's now in a pile versus

7    if you had one single tablet on top of a peanut pile

8    where it can disperse wherever it wants to go without any

9    inhibition.

10        Q:     I thought you said there was porosity.  So

11   where -- where's the trap?

12        A:     Well, there is porosity, of course, but it's

13   a lot more confined than if you had a single tablet with

14   nothing on top of it.

15        Q:     Why?

16        A:     It should be obvious.

17        Q:     Tell me why.

18        A:     You have one tablet sitting on top of a

19   peanut pile, the phosphine can go straight up without

20   having anything confining it, versus if you have a pile

21   of tablets, you're going to confine whatever is in the

22   center from moving out to a certain extent.

23        Q:     Suppose what's in the center hasn't even

24   reacted yet?

25        A:     In the immediate center, right, but you're

1    going to have to some -- and that's -- that's pile
2    configuration based -- it's based on pile configuration.
3    And so some of it you have a majority of them reacting;
4    some of it you may have not as many in the middle
5    reacting.
6        Q:    Well, what's going to react mostly is what's
7    on the outside, correct?
8        A:    Right.  But you can't say that just because
9    one pile has a lot of them on the outside reacting that
10   another pile won't have the majority of them reacting.
11   There's going to be a delay in reaction, certainly, but
12   eventually all of them will be reacting.
13       Q:    Well, what happens to the tablets on the
14   outside that are reacting after they have reacted?  What
15   happens to those tablets?
16       A:    I guess I don't quite understand your
17   question.
18       Q:    Well, what -- what is the finished product of
19   the tablet after the reaction is complete?
20       A:    You have aluminum hydroxide, and you -- and
21   often you have spent -- a material that hasn't reacted,
22   necessarily.  You can have some dust that has aluminum
23   phosphide that's unreacted.
24       Q:    Okay.  And will that dust act as a door
25   allowing more ambient air to get to the interior of the

1  pile?

2      **A:**    React as a -- act as a door?

3      **Q:**    Act as a means through which more ambient air

4  can reach the interior of the pile to cause more of a

5  reaction on the interior of the pile.

6      **A:**    It may act as an inhibitor, but you

7  eventually will get air into the center of the pile.

8      **Q:**    Well, how do you get air into the center of

9  the pile at the same time you confine the gas in the

10  center of the pile?  How does that happen?

11      **A:**    You've got a couple things going on.  You've

12  got the reaction taking place where you're generating the

13  phosphine, and you also have -- you don't just have the

14  stagnant environment.  You're going to have air moving

15  in.  You're going to have phosphine moving out.  But

16  they're not going to move as fast as if they weren't in a

17  pile.  So if you had a single tablet, that's different.

18  When you have a pile, you change things dramatically.

19      **Q:**    But you still have diffusion of the phosphine

20  gas away from the pile, correct?

21      **A:**    Sure.  I didn't say you wouldn't have that,

22  but you basically now are generating at such a rate that

23  you're creating a concentration that's at the LFL that

24  you wouldn't normally have if you had a single tablet.

25      **Q:**    What testing have you done that allows you to

1    state that opinion to a degree of scientific

2    probability?

3         **A:**    Well, I've done, again, thought experiments.

4    And that's -- that's what this would tell me.  I've seen

5    a bunch of literature that suggests the same thing is

6    happening.  I've seen testing done by -- by Dale Mann

7    that shows exactly what I'm talking about.  You have high

8    concentrations in piles being generated.  In fact, a

9    couple of his tests he almost reached the LFL with a

10   hundred tablets in that particular configuration.  So I

11   have seen testing that basically demonstrates that.

12        **Q:**    Correct me if I'm wrong.  100 percent of the

13   testing that you have seen reported resulted in the LFL

14   not being reached, correct?

15        **A:**    If you're talking about the testing where

16   they use 1, 4, 5, 20 and a hundred tablets, that's

17   correct.  The hundred-tablet test almost reached the

18   LFL.

19        **Q:**    If it almost reached the LFL, that's about

20   the same as being almost pregnant, right?

21        **A:**    Right.  But it's like, why stop at a hundred

22   tablets?  Why was that the threshold for testing?  They

23   could have added 20 percent, and logically that would

24   have brought you to the LFL.  There will be a pile size

25   that will create the LFL.

1     **Q:**      How do you know that?

2     **A:**      Because I know it based on Dale Mann's

3     testing, based on the science of this, based on the fact

4     that people who are applying this stuff see this stuff

5     ignite in piles.  You've got people opening flask and it

6     flashes, and you've got people opening pails and it

7     flashes.  So you know it's going to happen.  You confine

8     it enough, you generate it fast enough, you're going to

9     hit the LFL.

10     **Q:**      Are there forensic testing laboratories in

11     the Denver, Colorado, area?

12     **A:**      I don't know what you mean by that.

13     **Q:**      Are there forensic chemists who are capable

14     of making a pile bigger than 100 tablets so that you can

15     demonstrate how the LFL is reached in a pile of Fumitoxin

16     tablets?

17     **A:**      Oh, I'm sure.  But in this particular case, I

18     don't need to do that to know that that's going to

19     happen.

20     **Q:**      So you needed to go out to Memphis,

21     Tennessee, on September 4th, 2013, to demonstrate what

22     will happen when you apply Fumitoxin tablets to a pile of

23     peanuts, but you didn't need to actually do work

24     necessary to demonstrate your primary opinion in this

25     case, which is what will happen to those piles in terms

1    of the concentration of phosphine gas?

2                    MR. GOLDSTEIN:  Objection.

3                    THE WITNESS:  I didn't have to go out

4    and do the demonstrations in Memphis, and I don't have to

5    do a test here to tell you that the LFL will be reached

6    and ignition will occur.  The science shows it.  Field

7    experience shows it.  The literature shows it.  All

8    the -- the manual shows it's going to happen.  They warn

9    against it.  So I don't have to do that to know that it's

10   going to happen.

11   BY MR. EPSTEIN:

12       Q:     Okay.  I'm showing you what we're marking as

13   Exhibit 260.

14       A:     Yes.

15                    [EXHIBIT NO. 260 MARKED FOR

16                    IDENTIFICATION]

17   BY MR. EPSTEIN:

18       Q:     And 260, I'll tell you, the out -- the first

19   page is the cover of NFPA 921 2008 edition, and I want to

20   focus you on Section 20.5, Fire Testing.  I'm sorry.  I

21   gave you -- I'm going to -- that's my cheat sheet.

22       A:     Makes it easier for me.

23       Q:     I'm sure it does.  You're going to be looking

24   at the same exact spot, but I need to know what spot to

25   look at.  Try this again.  Showing you Exhibit 260, and

1    I'm focusing you on Section 20.5, Fire Testing.

2             Would you agree that fire testing is a tool

3    that can provide data -- that can provide data that

4    competent data collected at the fire -- sorry.  We'll try

5    again.

6        A:    Let's read that again.

7        Q:    I've got to use the right word.

8             Would you agree that fire testing is a tool

9    that can provide data that complement data collected at

10   the fire scene or can be used to test hypotheses?  Would

11   you agree with that?

12       A:    Sure, you can do that.

13       Q:    And here, they're not talking about thought

14   testing in NFPA 921, are they?

15       A:    They're talking about physical testing, but

16   it's not necessary in this case.

17       Q:    Not my question.  Would you agree that such

18   fire testing can range in scope from bench-scale testing

19   to full-scale recreations of the entire event?  Would you

20   agree with that?

21       A:    That such testing could -- that -- yeah,

22   sure.  Depends on what variables you take into

23   consideration --

24       Q:    Sure.

25       A:    -- how those bench-scale testing relate to

1    the actual full-scale testing, if they can be scaled up.

2    If you've actually done enough testing to show that the

3    bench scale are supportive of a full scale, I would

4    agree.

5         Q:    Okay.  And would you agree with 20.5.1.1,

6    that "Used as part of a data collection, fire testing can

7    provide insights into the characteristics of fuels or

8    items consumed in the fire into the characteristics of

9    materials or assemblies affected by the fire or into fire

10   processes that may have played a role in the fire.  This

11   information is valuable in the analysis of data and the

12   formation of hypotheses"?

13            Do you agree with that?

14        A:    I agree that it can be valuable, and

15   sometimes it may be necessary.  But it's not always

16   necessary, and you don't always have to do it on every

17   single fire.

18        Q:    Would you agree with Section 20.5.1.2, that

19   "Used as a part of hypotheses testing, fire testing can

20   assist in evaluating whether a hypotheses is consistent

21   with the case facts and the laws of fire science"?

22            Would you agree with that?

23        A:    Sure.  It can assist, if you need it.  If you

24   don't need it, then you don't need to do it.

25        Q:    Fire testing can also assist in evaluating

1    whether a hypothesis is inconsistent with the case facts

2    and the laws of fire science, correct?

3        A:    Did you read -- is that --

4        Q:    That's the -- the converse of what is written

5    in the first sentence.

6        A:    So you haven't read that from 20.5.1.2.

7        Q:    I just changed the word "consistent" to

8    "inconsistent."

9        A:    Say that one more time.

10       Q:    Would you agree that, used as part of

11   hypothesis testing, fire testing can assist in evaluating

12   whether a hypothesis is inconsistent with the case facts

13   and the laws of fire science?  Do you agree with that?

14       A:    Sure.  If -- if you need to do that, you need

15   to test it, it can help under certain circumstances.

16       Q:    Well, I want to make sure --

17       A:    It's not necessary on every case.

18       Q:    I want to make sure we're clear on one thing.

19   You could have done testing that would establish or

20   falsify the hypothesis that you reached in this case.

21             Would you agree with that?

22       A:    Well, I could have done testing, if that's

23   what you're saying.  But again, in this case, it's not

24   necessary because everything shows it's going to happen.

25   It's going to happen, and literature shows it.  Science

1    shows it.  The distributor shows -- they warn against

2    it.

3         Q:      Okay.  That's not my question.  My question

4    very simply is, you could have conducted testing with the

5    aid of a forensic laboratory that would either establish

6    or falsify your hypothesis in this case that a pile of

7    Fumitoxin tablets created a scenario which led to

8    ignition?  Agree or disagree?

9         A:      I could have done testing to try to

10   demonstrate that, but just because you do testing and you

11   don't get an outcome doesn't mean it's not going to

12   happen.  For instance, there are things you can't

13   control.  You may not recreate exactly what happened.

14   You may not have the exact pile size, pile dimension,

15   moisture content, relative humidity.  All these things

16   come into play.  And so can you do testing?  Sure.  But

17   it's not necessary in this case because I've gone through

18   the process of evaluating the different causes, and I've

19   eliminated everything, and I've looked at the other

20   potential cause, and I've gone through that process, and

21   it's the only cause of this fire.

22        Q:      Mr. Schumacher, I understand that you want to

23   demonstrate to anybody who will listen to you that it

24   wasn't necessary in this case, and that has nothing

25   whatsoever to do with my question.

1            MR. GOLDSTEIN:  Objection to the

2    statement.

3    BY MR. EPSTEIN:

4        Q:     My question to you is, could you, with the

5    assistance of a forensic laboratory, have done testing

6    that would demonstrate that your hypothesis in this case

7    is true and not false?

8                MR. GOLDSTEIN:  Objection.

9                THE WITNESS:  Could I have done testing?

10   Possibly.

11   BY MR. EPSTEIN:

12       Q:     That would demonstrate --

13       A:     Possibly.

14       Q:     Possibly?

15       A:     It depends on the parameters that you're

16   looking at and if you recreated that -- those parameters

17   that were in the dome at the time of this fire.  So, yes,

18   I could have done that.

19       Q:     Okay.  I -- put the dome aside.  Put what you

20   want to say about this not being necessary aside.

21              My question to you is, could you have done

22   testing, with the assistance of a forensic laboratory,

23   that would demonstrate under any conditions you decided

24   for a dry pile of aluminum phosphide tablets that you can

25   place that pile in some environment, however adverse you

1    want to make it, and without the introduction of liquid

2    water, one, reach the lower flammable limit of phosphine

3    gas and, two, auto-ignite the phosphine gas?  Could you

4    have done that?

5         A:     Yes, it's possible to do that.

6         Q:     And you consciously chose in this case not to

7    do that, correct?

8         A:     Right; because I didn't see the need to it.

9    There's no value.  I know it's going to happen.

10        Q:     And because you know it's going to happen,

11   you don't need to prove it's going to happen?

12        A:     That's right.  Science -- well, no.  I have

13   proved it's going to happen through the fact that science

14   shows it's going to happen, that all the information that

15   the distributor provides shows it can happen, it will

16   happen.  You have Ryman, who is the 30(b)(6) person,

17   saying it can happen.  You have the IFC 30(b)(6) people

18   saying it can happen.  You've got a bunch of case studies

19   showing it does happen.  You have people who have field

20   experience who actually witness it happening.  So I don't

21   need to do the testing to know it's going to happen.

22        Q:     You just know?

23        A:     Yeah.

24        Q:     You just know?

25        A:     Right.  And that's -- you're taking one small

1    part of it.  It's the whole investigation that I've done,

2    and I know that that's going to happen.

3        Q:    So fire science is, when you just know, you

4    just know; that's the way it works, right?

5                    MR. GOLDSTEIN:  Objection.

6                    THE WITNESS:  Well, that's not -- that's

7    not what I'm saying.

8    BY MR. EPSTEIN:

9        Q:    That's not?

10       A:    I told you -- I've told you all the reasons

11   why I know it's going to happen and that through the

12   process of going through the causation analysis that

13   that's the only cause.

14       Q:    Okay.  So without anyone ever having

15   demonstrated in the history of the world that a dry pile

16   of aluminum phosphide tablets in a controlled environment

17   will cause phosphine gas to reach its lower flammable

18   limit and will cause autoignition of the phosphine gas,

19   it is a matter of science that that will happen?

20       A:    Yeah.  People see it in the field happening.

21   People see it when they open up flasks.  People see it

22   when they open up pails.  People see it when they

23   actually take the spent material and collect it and it

24   ignites on them.  There's no water.  It's all moisture in

25   the air.  And so it's igniting in a pile because it

1   reaches the LFL.

2        Q:      When did that happen in this case?

3        A:      When did what happen?

4        Q:      The process that you just described.

5        A:      Well, I don't know the exact timing on

6   that.

7        Q:      Approximate it for me.

8        A:      Well, I think if you look at the literature,

9   two-to-three-day periods is about as close as I can

10  get.

11       Q:      So it happened on the 6th or the 7th of

12  August?

13       A:      Something like that, around there.

14       Q:      That's when the LFL was exceeded in one of

15  these piles?

16       A:      Correct.  That's when it reached the

17  autoignition temperature.

18       Q:      Okay.  So the LFL was exceeded, and by

19  definition, you had autoignition?

20       A:      Not by definition.

21       Q:      Well, how did you wind up with autoignition

22  just because you reached 18,000 parts per million?

23       A:      Well, there's a couple ways.  A -- well, the

24  first is if you have diphosphines being generated, and

25  that can ignite an ambient temperature.  And then the

1    second way is if you actually have the temperature

2    driving that to the autoignition temperature, which I've

3    seen in a range from a hundred to 300 degrees Fahrenheit.

4    You've got the pyrophoric nature of -- of phosphine that,

5    under very low oxygen concentrations, you can get to

6    ignite.

7         Q:     Okay.  The first way was with diphosphine,

8    and second way was what?

9         A:     Well, you're -- the temperature is

10   increasing, and you're generating the temperature so that

11   you're getting to the autoignition temperature, which

12   again I've seen range from like a hundred to 300 degrees

13   Fahrenheit.

14        Q:     Haven't you seen it at a hundred degrees

15   Celsius?

16        A:     Well, I've seen it as 150 C.  That's why I'm

17   saying 300 Fahrenheit.

18        Q:     Okay.  And what evidence do you have that

19   that temperature will be attained as the result of this

20   reaction?

21        A:     Well, we've seen some testing done by Dale

22   Mann where he shows you getting high -- high temperatures

23   being generated in the pile.

24        Q:     Not a hundred C?

25        A:     Not a hundred C, but that was with his

1    particular pile size, his particular pile configuration,

2    the moisture content, the humidity, et cetera.

3        Q:    And what did Dale Mann say about when the

4    highest temperatures were reached in relation to the

5    concentration of phosphine gas?

6        A:    He said there was a delay.  There was a --

7    they didn't co-exist at the same time, but that was in

8    his testing of a hundred tablets, in his configuration.

9        Q:    Having seen that, don't you think it makes

10   sense to go out into a laboratory and say, "You know

11   what?  I can get it to do that at the same time"?  You

12   don't think that makes sense?

13       A:    No.  I don't need to do that.  Again, I know

14   science says it's going to happen.  All the other reasons

15   I've listed shows it's going to happen.

16       Q:    And the fact that there's a report that says

17   it isn't going to happen done under laboratory conditions

18   with a forensic chemist conduct -- conducting the

19   testing, that doesn't persuade you that there's just the

20   slightest little chance that you might be wrong?

21                  MR. GOLDSTEIN:  Objection.

22                  THE WITNESS:  No, no, not at all.  I

23   mean, he stopped at a hundred tablets, again, and he

24   almost reached the LFL with a hundred tablets.  And so

25   you add more tablets to that, you will reach the LFL.

1    And that's given his pile configuration.  And again, we

2    have field experience.  We have -- people applying have

3    seen it happening.  We have flashing going on in flasks

4    and in pails and in spent material.  So we know it

5    happens.

6    BY MR. EPSTEIN:

7        Q:     How many fires did you get on September 4th,

8    2013?

9        A:     I don't know what you mean.

10       Q:     How many fires did you get from the piles of

11   Fumitoxin tablets that you created that day?

12       A:     Oh, we didn't get any.  We weren't even

13   trying.  It wasn't the -- it wasn't the point of the

14   testing, the demonstrations.

15                      MR. GOLDSTEIN:  Can we go off the

16   record?

17                      MR. EPSTEIN:  Uh-huh.

18                      THE VIDEOGRAPHER:  Off the record at

19   1:05.

20                      [DISCUSSION WAS HELD OFF THE RECORD]

21                      THE VIDEOGRAPHER:  On the record at

22   1:06.

23   BY MR. EPSTEIN:

24       Q:     Showing you what we're going to mark as

25   Exhibit 261.

```
 1                    [EXHIBIT NO. 261 MARKED FOR

 2                    IDENTIFICATION]

 3   BY MR. EPSTEIN:

 4        Q:    Are you familiar with MDE Laboratories,

 5   Mr. Schumacher?

 6        A:    I am.

 7        Q:    Are they a reputable forensic laboratory?

 8        A:    I think so, yes.

 9        Q:    Have any experience with Dale Mann?

10        A:    I've met him a few times.

11        Q:    Have you come to any particular conclusion

12   about his capabilities as a forensic chemist?

13        A:    I don't know him very well.

14        Q:    Go, if you would, to page 10 of his report.

15        A:    Yes.

16        Q:    We're going to go through this, and I'll ask

17   you questions about it.  I'll read to you what I'm

18   interested in having you soak in, and then I'll ask you

19   my questions.

20              He said on the third conclusion -- or the

21   third paragraph after "Conclusions," "When Fumitoxin

22   tablets are piled, the reaction to form phosphine occurs

23   only at locations within the pile that have access to

24   moisture.  Lack of elevated temperatures and lack of

25   physical change to the morphology of the core tablets
```

1   demonstrate that little moisture diffused past the outer

2   shell of the unspent tablets, rendering the core

3   environment a somewhat dry and nonreactive zone for a

4   time."

5           Do you have any reason to doubt that that's

6   exactly what happened in his testing?

7       A:     Well, no, not in his testing.  I mean, in

8   that particular set of tests, that's maybe what -- maybe

9   what he observed.

10      Q:     If the pile were 200 tablets as opposed to

11  100 tablets, why do you believe what he concluded there

12  would be any different?

13      A:     Well, I mean, you may still have the similar

14  situation, but again, you're generating phosphine at a

15  higher concentration because you have 200 tablets versus

16  a hundred tablets.  And so you're going to reach the LFL

17  with 200 tablets if you couldn't with a hundred.  I mean,

18  it's -- it's -- the more tablets you have, the more

19  likely you're going to be to reach the LFL, because more

20  of the surface area will be reacting because you have a

21  bigger pile.

22      Q:     Wouldn't you actually have a bigger reaction

23  if you had 200 tablets not piled but sitting right next

24  to each other, all with the ambient air available to

25  react as opposed to in a pile where the core is not going

1    to react?

2         **A:**     You may have more reacting, but you're not

3    going to have a higher concentration when you spread them

4    out versus if you put them in a pile.

5         **Q:**     Can you have it both ways?  Can you have the

6    ambient air getting in sufficiently to cause the reaction

7    at the same time containing those gases and not having

8    them diffuse?

9         **A:**     I guess I don't understand your question.

10        **Q:**     I'll withdraw it.

11             He said, "The tendency to have a progressive

12   reaction zone prevented all the tablets" --

13        **A:**     Where -- where are you?

14        **Q:**     I'm just reading the next sentence.

15        **A:**     Oh, you're reading.

16        **Q:**     "The tendency to have a progressive reaction

17   zone prevented all the tablets from reacting

18   simultaneously, limiting the total concentration of

19   phosphine at any one time."

20             Isn't that exactly what's going to happen

21   irrespective of the size of the pile, Mr. Schumacher?

22        **A:**     You will have some limitation, but the larger

23   the pile, the more phosphine will be generated, and you

24   will have higher concentrations.

25        **Q:**     It says, "The number of tablets available for

1    reaction decreased with time as the surface area of the

2    reactive zone shrank."

3                Irrespective of the size of the pile, that

4    statement is going to be true, isn't it?

5        A:     You may get some shrinking, correct.

6        Q:     So where -- where, specifically -- I had you

7    tell me in your ignition scenario how you got to the LFL.

8    Where, specifically, are you getting to the LFL?

9        A:     Well, you're getting to the LFL somewhere

10   within the pile, and if you look at Dale Mann's testing,

11   he had like almost 15,000 parts per million near the

12   center of the pile.  That's where he measured it.  And on

13   the outer, it was less.  And it's -- so it's going to be

14   closer to within the pile itself.  I mean, his testing

15   demonstrates that.

16       Q:     His testing demonstrates you can get as high

17   as 15,000 parts per million.

18       A:     With a hundred tablets, correct.  You add

19   more tablets, you will reach the LFL.

20       Q:     So you're saying if you went to a laboratory

21   and said, "I'm going to do the same testing Dale Mann

22   did, the exact same ambient conditions.  We're going to

23   use a pile of 300 tablets," you're a hundred percent sure

24   that you would get 18,000 parts per million, correct?

25       A:     I'm very confident you would, yeah.

1      **Q:**    Okay.  And it wouldn't be difficult to design

2   that test?  Heck, the test is already designed, isn't

3   it?

4      **A:**    It wouldn't be difficult to design it?

5      **Q:**    You could -- you could do the exact same

6   thing that Dale Mann did and just increase the number of

7   tablets and get your LFL, correct?

8      **A:**    Sure.  I don't need to do that, though.  I

9   know it's going to happen.  That's the point.

10     **Q:**    And if Dale Mann had done this test at 200

11  tablets, you would have said, "He needed to do 300."  And

12  if he had done 300, you would be saying, "He needed to do

13  400," right?

14                    MR. GOLDSTEIN:  Objection.

15                    THE WITNESS:  I -- first off, that's

16  totally a hypothetical question, but you need to do the

17  number of tablets that are representative with when

18  you're throwing in 49,000 tablets.  So, you know, what

19  that limit is is what you need to establish.  He stopped

20  at a hundred, and I don't think that's accurate.  He only

21  did a few tests at a hundred.  I don't think that's

22  statistically significant.

23  BY MR. EPSTEIN:

24     **Q:**    And of course you know that Mr. Lilley and

25  Mr. Turner created piles that were in excess of a hundred

1    Fumitoxin tablets, correct?

2        A:      Well, I think they created piles that were

3    significant in size.  I wouldn't be surprised if they

4    were, you know, much greater than a hundred.

5        Q:      The fact is you have no earthly idea whether

6    they created piles, let alone how many tablets might have

7    been in those piles, correct?

8                    MR. GOLDSTEIN:  Objection.

9                    THE WITNESS:  Based on a reasonable

10   degree of engineering certainty, the way they applied it

11   would have created piles.

12   BY MR. EPSTEIN:

13       Q:      How many tablets were in the piles that they

14   created?

15       A:      That, I can't tell you.

16       Q:      Then how can you render an opinion in this

17   case as to that being the cause of the fire when you know

18   that a pile of a hundred tablets under adverse conditions

19   isn't going to reach the LFL?

20       A:      Well, I mean, you're -- you're looking at one

21   aspect of the investigation.  You have to look at the

22   whole process that we go through to determine what the

23   cause is.  And so you go through and you look at the

24   viable or potential ignition scenarios, and you compare

25   them to the available evidence, and you realize that

1    heating to -- self-heating to ignition is not the cause

2    of this fire.

3              And so then you look at the way that things

4    were applied, and you look at the literature and the

5    science, field experience, manufacturer's information,

6    and it says that this will happen.

7         Q:    All of the literature says this, quote, will

8    happen?

9         A:    It says it can happen.  And so then, when you

10   look at potential ignition source, is it more probable

11   than not that ignition occurred as a result of piling,

12   and the answer is yes.

13        Q:    And based upon Dale Mann's testing under

14   adverse conditions significantly more adverse than the

15   Severn peanut dome, you would have to conclude they had

16   piles in excess of 100 tablets in the Severn peanut dome,

17   correct?

18              MR. GOLDSTEIN:  Objection.

19              THE WITNESS:  Well, that's -- that's the

20   test he did with a hundred tabs.  And you can see when

21   you change from 100-tablet test to another hundred-tablet

22   test, you have significant differences.  And so you can't

23   say -- you can't back out and say, yeah, a hundred -- a

24   hundred wouldn't have done it.  In those particular

25   tests, a hundred almost reached the LFL.  Change the

1    configuration a little bit and you very potentially could

2    get there.

3    BY MR. EPSTEIN:

4        Q:      Okay.  Go ahead and in the -- read out loud,

5    for the benefit of the record, the last paragraph on page

6    10 of Mr. Mann's report.

7        A:      "During the time period of maximum production

8    of phosphine, the core temperature (not yet reacting)

9    remained at ambient temperature, well below that required

10   for spontaneous ignition.  This testing clearly

11   demonstrated the two conditions for spontaneous ignition

12   of phosphine never coexisted.  It is unreasonable to

13   expect the simultaneous conditions required for

14   spontaneous ignition to ever exist unless liquid water

15   comes in contact with Fumitoxin tablets."

16       Q:      So Mr. Mann is just wrong about that?

17       A:      I think -- yes, I think he's wrong about

18   that -- that basic general conclusion on the few tests

19   that he did.

20       Q:      So if you had run the tests that we've talked

21   about in the laboratory near Denver, Colorado, you would

22   have shown the co-existence of the autoignition

23   temperature of phosphine gas and 18,000 parts per

24   million, correct?

25       A:      Well, I -- I would have shown at some point

 1    that you were going to get to the LFL.  Now, whether or

 2    not you recreate the ignition mechanism, that's

 3    questionable because you can't control all the

 4    parameters; for instance, the diphosphines being present,

 5    the pile how it's going to react, et cetera.

 6        Q:    You've now twice mentioned diphosphines being

 7    present.  Mr. Schumacher, what evidence do you have that

 8    there were diphosphines present in any one of the 49,000

 9    Fumitoxin tablets applied on August 4th, 2009?

10        A:    Well, I don't have any -- I can't point to

11    any evidence, but that is one of the ignition mechanisms

12    by which these piles ignite.

13        Q:    Did you read Mr. Ryman's expert report?

14        A:    I did.

15        Q:    I'm not sure I have it.  Come back to that.

16            Mr. Ryman's report indicated -- and if you'll

17    recall reading it -- that he didn't think that would be

18    true at all that there were diphosphines present in any

19    of the Fumitoxin tablets that were applied that were

20    supplied by his company.

21        A:    Okay.

22        Q:    Is he wrong?

23        A:    I don't know how he'd know that.  They don't

24    do quality control on their -- on their project -- on

25    their tablets.  So there's no way he can say that.

1    Q:    How do you know they don't do quality control

2  on their tablets?

3    A:    They don't -- they don't actually test their

4  tablets for excess phos- -- phosphorous.

5    Q:    And where do you get that information from?

6    A:    His deposition.

7    Q:    Okay.  So despite the fact that the person

8  who is the lead technical person at Degesch America that

9  supplied the tablets said there is -- it is extremely

10  unlikely that there are diphosphines present in the

11  Severn peanut dome, in those 49,000 tablets, you believe

12  you can state to a reasonable degree of engineering

13  certainty there were diphosphines present?

14    A:    I'm saying he has no way of knowing if there

15  was excess phosphorous in those tablet formulations.  And

16  I can't say if they were there.  I'm telling you that's

17  one of the ignition mechanisms whereby you can get the

18  pile to ignite and not have to get significantly high

19  temperatures.

20    Q:    But it's utter speculation to conclude that

21  there were diphosphines present in the Severn peanut

22  dome, correct?

23    A:    It is not.  It's -- it's based on a

24  reasonable degree of engineering certainty.  You either

25  have the diphosphine present or you generate the high

1    temperatures or you have the pyrophoric nature going on.

2    That's your -- those are your potential ignition

3    mechanisms.

4        Q:    Sir, all you're doing is taking circumstances

5    that are known to create conditions to cause a fire, and

6    you're applying them to the Severn peanut dome; isn't

7    that right?

8        A:    I'm looking at the -- the whole process of

9    how you go about determining what the cause of the fire

10   is, and what you're asking me is to look at one small

11   part.  There's a lot of other stuff that goes behind

12   that, and when you eliminate self-heating to ignition of

13   peanuts, you're left with one cause.  And it's known when

14   you pile tablets, that under certain circumstances you

15   will get ignition.

16       Q:    You are left with one potential cause that

17   still has to uniquely fit the circumstances of the case

18   in order for you, as a fire scientist, to conclude that

19   it is the cause; isn't that right?

20       A:    That's right, and it does.

21       Q:    Do you agree that it's very difficult in the

22   absence of a sustained heat source to raise the

23   temperature of peanuts to the point where combustible

24   gases from the peanuts will be given off?

25       A:    Say that --

1    **Q:**    Sure.

2    **A:**    Ask me that one more time, please.

3    **Q:**    Do you agree that it is very difficult to

4    heat peanuts to the point that they reach their ignition

5    temperature -- strike that.  Let me try again.

6            Do you -- do you agree that it is very

7    difficult in the absence of a sustained heat source to

8    raise the temperature of peanuts to the point that it --

9    they will produce combustible gases?

10    **A:**    Absence of a heat source?

11    **Q:**    A sustained heat source.

12    **A:**    I don't know.  It -- it sounds reasonable,

13    but I'm not sure.

14    **Q:**    Don't you think it's something you should

15    know since your conclusion is that you had a fire to

16    peanuts as the result of -- your hypothesis -- the lower

17    flammable limit of phosphine gas?  Don't you need to know

18    whether that scenario is sufficient to ignite the

19    peanuts?

20    **A:**    I guess I'm confused what your question is.

21    You're asking about an external heat source creating

22    flammable gases is what I thought you asked me.

23    **Q:**    Okay.  Don't you need flammable gases in

24    order to have a fire?

25    **A:**    Combustible gases, yeah.

1   **Q:**    Sure, yeah.

2   **A:**    I thought you were talking about the

3   generation of like some sort of odd flammable gas in the

4   space.  You're talking about absent a heat source,

5   it's -- you can't drive to the point where you're going

6   to create gas that will be ignited --

7   **Q:**    From the peanuts.

8   **A:**    -- from the peanuts?  Yeah, I would agree

9   with that.

10  **Q:**    Okay.

11  **A:**    Now I understand -- I didn't understand what

12  you were asking me.

13  **Q:**    And let's take it the other way.  The peanuts

14  at some point were on fire.  We all know that, correct?

15  **A:**    Right.

16  **Q:**    And what initially got the peanuts to be on

17  fire was their temperature being raised to the point that

18  they produced combustible gases, correct?

19  **A:**    Right.

20  **Q:**    Okay.  What raised the temperature of the

21  peanuts to the point, in your scenario, that they

22  produced combustible gases?

23  **A:**    Well, you've got the ignition of the

24  phosphine gas, which will create a small fire on top of

25  the -- the tablets, and tablets are known to smolder.  So

1    that's one possibility.  The other is flashing and

2    igniting thermally thin materials, like I've talked about

3    before.

4        Q:    So you believe it's plausible that the

5    tablets themselves were on fire, and that's what raised

6    the temperature of the peanuts to the point that they

7    produced combustible gases?

8        A:    It's possible.  These tablets are prone to

9    smoldering.

10       Q:    And that smoldering was going to raise the

11   temperature of the peanuts adjacent to those tablets to

12   the point that they were capable of producing combustible

13   gases?

14       A:    Right.  That's one way.  And the other way is

15   the flash, which then ignites the thermally thin

16   materials.

17       Q:    A flash in sci- -- in fire jargon is no

18   different than the word itself.  It happens in a flash,

19   doesn't it?

20       A:    And it can ignite thermally thin materials,

21   right, that could then start to smolder, like we had in

22   this case.

23       Q:    The flash itself can't raise the temperature

24   of the peanuts to the point where combustible gases are

25   going to be produced from the peanuts, correct?

1    **A:**    It's going to raise -- it's going to ignite

2    the thermally thin materials, that will then smolder and

3    start burning and ignite the actual peanuts themselves.

4    **Q:**    So not only did you need a pile of Fumitoxin

5    tablets in some unknown number, but that pile of

6    Fumitoxin tablets had to be perfectly situated on top of

7    thermally thin materials such that the flash from the

8    ignition of the phosphine would ignite the thermally thin

9    material so that subsequently the peanuts could produce

10   combustible gases.  Did I get it right?

11   **A:**    That's -- you said a lot there.  Can you

12   repeat that again?

13   **Q:**    I'll take it one step at a time.  You had to

14   have a pile of Fumitoxin tablets sufficiently large to

15   get the reaction that you have described that would cause

16   18,000 parts per million of phosphine gas being

17   contained, correct?

18   **A:**    Well, 16,000 is a -- LEL is a range.  So it

19   can be 16,000.

20   **Q:**    So now you're down to 16,000 as causing the

21   autoignition of phosphine gas?

22   **A:**    Well, I said in my report there's a range of

23   1.6 to 1.8 percent.  And so, to be fair, you're not

24   necessarily talking 18,000; you're talking 16,000.

25   **Q:**    Okay.  All right.  But you have this pile,

1    and if this pile is sitting on peanuts that Hampton Farms

2    produced and put in bags and you put on a pile on a tarp

3    somewhere for an experiment, that flash that you're

4    describing will not result in a fire, will it?

5                      MR. GOLDSTEIN:  Objection.

6                      THE WITNESS:  I'm not sure.  You're

7    talking about different peanuts.  You're talking about

8    peanuts that are farmers stock with other material in

9    them versus peanuts that have nothing in them but the

10   actual peanuts themselves.

11   BY MR. EPSTEIN:

12        Q:     All I'm talking about is actual peanuts

13   themselves that are good enough to eat coming out of

14   Hampton Farms bag.  And if you have your pile of

15   Fumitoxin tablets sitting upon them and you create your

16   flash, you're going to have a nice little flash, and a

17   couple of those peanuts might char a little bit.  There's

18   not going to be a fire, is there?

19                      MR. GOLDSTEIN:  Objection.

20                      THE WITNESS:  Well, I mean, that's a

21   scenario I don't know all the -- the question -- I don't

22   know all the situations or parameters in that question,

23   actually.  Do you have thermally thin material in there

24   or not?  Are we talking about stuff that's just peanuts?

25   Because if you --

1    BY MR. EPSTEIN:

2        Q:      We're talking about what you would buy from a

3    grocery store.

4        A:      Right.  And so that's a different situation

5    than what we're talking about in a -- in a dome.

6        Q:      I just want to make sure we're clear.

7        A:      Yeah.

8        Q:      If you bought them from the grocery store,

9    laid them out, and put your pile of Fumitoxin tablets

10   upon them, you might get a flash, according to your

11   theory of this case, but you're not going to get a fire,

12   are you?

13       A:      Well, you're assuming that the -- the pile of

14   tablets do not start smoldering because they are prone to

15   smoldering.  So when you have a smoldering fire in this

16   situation, you can ignite those.

17       Q:      Okay.  But to hedge your bets, you're

18   suggesting that it just so happened that when Mr. Lilley

19   and Mr. Turner piled their Fumitoxin tablets on

20   August 4th, 2009, those tablets happened to land in an

21   area on the surface of the pile where there was thermally

22   thin material that also ignited, correct?

23                    MR. GOLDSTEIN:  Objection.

24                    THE WITNESS:  Like I said, that's one of

25   the ways it's going to ignite.  The other is the

1    smoldering of the tablets, which will then ignite the

2    thermally thin materials and the peanuts.  So there are

3    two different ways.

4    BY MR. EPSTEIN:

5        Q:      So for your hypothesis in this case to be

6    correct, first there had to be a pile of Fumitoxin

7    tablets created from the application that was done by

8    Brian Lilley and Randy Turner, correct?

9        A:      Yes.

10       Q:      And naturally, that would have been on the

11   surface of the peanuts since they weren't going to be

12   driven into the peanuts, correct?

13       A:      Right.

14       Q:      And one of two things then had to happen.

15   Well, first of all, the first thing that had to happen

16   was the LFL needed to be reached, correct?

17       A:      Right.

18       Q:      Of phosphine?

19       A:      Unless you're dealing with a pyrophoric where

20   you can actually get 10,000 parts per million and have

21   ignition that way.

22       Q:      That's not your theory in this case, is it?

23       A:      That's one of the ignition mechanisms.

24       Q:      The pile of phosphine gas -- I'm sorry.  The

25   pile of aluminum phosphide tablets had to confine

1    sufficient phosphine gas to eventually lead to the

2    autoignition of the phosphine gas in your scenario,

3    correct?

4         A:    Yeah.  Generate the phosphine quick enough so

5    that you get it autoignition.

6         Q:    Okay.  So that's the next step.  And then the

7    next step that had to happen for your hypothesis to be

8    correct is either there had to be smoldering of the

9    Fumitoxin tablets themselves or there had to be material

10   right where that pile was that was thermally thin and

11   capable of being ignited by a flash, correct?

12        A:    There's an and/or component.  You could have

13   both going on.  And so I would agree that if you said

14   and/or, yes.

15        Q:    Okay.  And in your opinion, that's how this

16   fire started?

17        A:    Yes.  I mean, this -- this happens.  People

18   see it happen.

19        Q:    Have you done any testing at all to establish

20   that scenario that we have just walked through?

21        A:    I think we've talked about that.  No.  And

22   again, I don't need to do that testing.

23        Q:    Now, the fire triangle requires at one of its

24   legs oxygen, correct?

25        A:    Yes.

1    **Q:**    So --

2    **A:**    An -- an oxidizer.

3    **Q:**    An oxidizer.  Well, in this case, the

4    oxidizer was oxygen, correct?

5    **A:**    Right; but I was answering your -- your

6    question.

7    **Q:**    So we know that there was sufficient oxygen

8    present, whatever the cause of the fire was, for there to

9    be combustion, correct?

10   **A:**    Right.  Initially, sure.

11   **Q:**    All right.  And so, in your scenario, right

12   where the Fumitoxin pile was, there was sufficient oxygen

13   to lead to ignition and combustion, right?

14   **A:**    Right.

15   **Q:**    Right.  Any idea why if there was sufficient

16   oxygen present to permit the ignition and combustion of

17   the combustible materials you wound up with a smoldering

18   fire instead of a flaming fire?

19   **A:**    Because you're starting off with a smoldering

20   fire with whatever ignition mechanism you're talking

21   about, and that smoldering fire can sit there and

22   smolder.  Eventually does it transition into flame at

23   some point?  Possibly.  But throughout most of the time

24   this is burning, it was a smoldering fire.  You're in a

25   very confined dome, very tight dome.

1    Q:      When you say "confined," what do you mean?

2    There were hundreds of thousands of cubic feet of head

3    space, correct?

4    A:      Right.

5    Q:      And the fire was, by your theory, on the

6    surface of the peanut pile, correct?

7    A:      Correct.

8    Q:      Why didn't something that was smoldering very

9    quickly become flaming?

10   A:      Because they don't always become flaming.

11   Your smoldering fires can smolder forever.  It depends on

12   the material.  For instance, peanuts can smolder.  And so

13   it depends on the sub- -- if you're talking about, for

14   instance, a couch, surface fire, it's going to -- it's

15   going to flame.  But when you're talking about peanuts,

16   you can have smoldering taking place for most of the

17   time.

18   Q:      Even with an abundant supply of oxygen?

19   A:      Yeah.

20   Q:      Okay.  Do you have any literature that you

21   can point to that peanuts, when they are ignited, smolder

22   as opposed to flame?

23   A:      When you say they're ignited, I mean, if

24   they're ignited by a smoldering mechanism, they can

25   smolder.  If you're -- I mean, I'm not sure what you

1    mean.  If you pour gasoline on them and light them, they

2    would probably -- probably flame.

3        Q:     Is there any literature you've come across in

4    this case which suggests that when peanuts are ignited by

5    a smoldering source of ignition, that the peanuts will

6    smolder rather than flame?

7        A:     I haven't looked at that or seen that, no.

8        Q:     So how often will a dry pile of aluminum

9    phosphide tablets that's 200 tablets or more result in

10   phosphine gas reaching its lower flammable limit?  How

11   often will that happen?

12       A:     Well, I don't know how often it will happen,

13   but there will be a pile size that you will reach the LFL

14   almost every time.

15       Q:     Almost every time?

16       A:     Yeah.  Given the same configuration, you

17   will -- and you have the same pile, the same number, same

18   relative humidity, same moisture content, almost every

19   time you're going to.  It's just a matter of science.

20       Q:     Just a matter of science.  So under proper

21   laboratory conditions, 90 percent relative humidity,

22   90 percent -- 90 degree temperature, at the right size,

23   you can reproduce over and over and over again the

24   attainment of the lower flammable limit of phosphine

25   gas?

1      A:      Right; at a certain pile size.  I didn't say

2  every time.  I said frequently, high degree, yes.  You

3  can never always recreate it exactly the same, though.

4      Q:      All right.  Is there any peer-reviewed

5  literature you have come across in any scientific journal

6  that supports what you've just said?

7      A:      That supports what?  I just --

8      Q:      That if you create a dry pile of aluminum

9  phosphide tablets at some size, you will almost every

10 time reach the lower flammable limit of phosphine gas?

11     A:      I haven't seen any peer-reviewed stuff, no.

12     Q:      Not a single one, right?

13     A:      No.  I haven't seen anybody test that.

14     Q:      How many times in your career have you stated

15 an opinion to a reasonable degree of engineering

16 certainty as to the origin and cause of a fire that is

17 not supported by physical testing or peer-reviewed

18 literature?

19     A:      Well, that's not what happened in this case,

20 but a lot of the fires I investigate, you don't do

21 testing.  It's not often that you actually do testing --

22     Q:      Okay.

23     A:      -- on a case.

24     Q:      My question, though, is, how often have you

25 expressed an opinion to a reasonable degree of

Deposition of John Schumacher

1   engineering certainty as to the origin and cause of a

2   fire that is not supported by a single piece of

3   peer-reviewed literature or a single physical test?

4       A:      I don't know the answer to that.

5                       [EXHIBIT NO. 262 MARKED FOR

6                       IDENTIFICATION]

7   BY MR. EPSTEIN:

8       Q:      Okay.  Let me show you what's been marked as

9   Exhibit 262.

10      A:      Before we get going, can I go to the

11  bathroom?

12                      MR. EPSTEIN:  Absolutely.  Let's

13  break.

14                      THE VIDEOGRAPHER:  Off the record at

15  1:33.

16                      [RECESS TAKEN]

17                      THE VIDEOGRAPHER:  On the record at

18  1:42.

19  BY MR. EPSTEIN:

20      Q:      Mr. Schumacher, I've handed you Exhibit 262.

21              Can you tell me what Exhibit 262 is?

22      A:      Yes.  It's a paper I did for the

23  International Symposium on Fire Investigation Science and

24  Technology in 2012.

25      Q:      Was this paper ever published anywhere?

1      A:      In the proceedings in the International

2    Symposium on Fire Investigation Science and Technology.

3      Q:      Okay.  That's not a peer-reviewed or refereed

4    journal, is it?

5      A:      That's correct.

6      Q:      Okay.  And, in fact, you wrote what you

7    wanted to write, along with Mr. Jason from your company,

8    and it was printed exactly as you wrote it, correct?

9      A:      Right.  And we had Barry Lindley review it,

10   peer review it.

11     Q:      Yeah.  But Barry Lindley is not a peer

12   reviewer for the International Symposium on Fire

13   Investigation Science and Technology, is he?

14     A:      No; but he's a knowledgeable chemist.

15     Q:      That's not the peer-review process as you

16   know the peer-review process, correct?

17     A:      Well, it's a peer-review process.  It's not a

18   peer-reviewed journal process.

19     Q:      Okay.

20     A:      Same concept.

21     Q:      Okay.  Barry Lindley is not an editor of a

22   journal of -- he's not an editor for the International

23   Symposium on Fire Investigation Science and Technology,

24   is he?

25     A:      No.

1    **Q:**    And he's not someone who had been chosen to

2    be a peer reviewer by the International Symposium on Fire

3    Investigation Science and Technology, is he?

4    **A:**    That's right.

5    **Q:**    He's just somebody that you sent this article

6    to and asked to look at it?

7    **A:**    He's not just somebody.  He's a knowledgeable

8    chemist who understands these principles.

9    **Q:**    You're familiar with Daubert?  You've been

10   around long enough to be familiar with what Daubert says

11   about peer-reviewed literature, correct?

12   **A:**    Yes.

13   **Q:**    Exhibit 262 is not peer-reviewed literature,

14   correct?

15   **A:**    Well, I'm not sure what peer-reviewed in

16   Daubert means.  If it means a journal article, then this

17   would -- a publication where there's an editing board

18   that reviews it, then it's not a peer-reviewed article.

19   **Q:**    And this is something you wrote as opposed to

20   something you are relying on in deciding what your

21   opinion in this case would be, correct?  This is your own

22   writing?

23   **A:**    This is what I wrote, correct.

24   **Q:**    Right.  In other words, when you are looking

25   to support your hypothesis in a given case as to the

1    origin and cause of a fire with literature, you're

2    looking for what other people have found and said as

3    opposed to trying to find your own articles, correct?

4        A:    Well, not necessarily.

5        Q:    Okay.  Well, let's -- let's look at what you

6    wrote here.  By the way, who is Mr. Jason?

7        A:    He works for us.

8        Q:    Okay.  Is he subordinate of yours?

9        A:    I don't like using those terms, but yes, he

10   works for us.  He's employed by us.

11       Q:    What is his role?

12       A:    At the firm?

13       Q:    Yes.

14       A:    He's a -- he's a project engineer.

15       Q:    Okay.  All right.  Go to page 568.

16       A:    Yes.

17       Q:    You have referenced there testing performed

18   by Underwriting Laboratories on Phostoxin tablets in

19   1961, Phostoxin pellets in 1964, and Fumitoxin tablets

20   and pellets in 1983, correct?

21       A:    Yes.

22       Q:    And as part of your preparation of this

23   paper, you reviewed all of those studies, correct?

24       A:    Yes.

25       Q:    And what you write in this paper is that in

1    the absence of the introduction of liquid water, none of

2    the testing performed by Underwriting Laboratories in any

3    of those test series showed that a pile of aluminum

4    phosphide tablets or pellets could be ignited, correct?

5         **A:**      Right.  The limited number of tablets and

6    pellets that they used in their test sequence.  That's

7    correct.

8         **Q:**      So you're critical in your paper that they

9    didn't use enough tablets?

10        **A:**      Right.

11        **Q:**      Like you're critical of Dale Mann that he

12   didn't use enough?

13        **A:**      Well, he stopped at a hundred, right.  He

14   almost got the LFL.  And so if he'd gone a little higher,

15   he would have eventually got the LFL.

16        **Q:**      So you do agree that nothing in those

17   Underwriting Laboratory reports supports the conclusion

18   that a dry pile of aluminum phosphide tablets will

19   contain sufficient phosphine gas such that it will reach

20   its lower flammable limit?

21        **A:**      Right.  In that limited testing with limited

22   tablets -- number of tablets, limited pellets, limited

23   pile size, that is -- that is correct, which is not

24   really appropriate when you're dealing with real world

25   applications.

1      Q:      Did you review the Siemens testing that was

2  in Degesch America's files that was the subject of part

3  of Mr. Ryman's testimony?

4      A:      Yes, I did.

5      Q:      Okay.  And although it's not referenced in

6  your paper here, the Siemens testing resulted in the same

7  conclusion, correct?

8      A:      Yes.  I think they used even -- even smaller

9  quantities of that, and so that's not representative of

10  real world situations.

11      Q:      But dry piles of aluminum phosphide tablets

12  tested in -- by Siemens did not result in the lower

13  flammable limit of phosphine gas being reached or

14  ignition, correct?

15      A:      I'm not sure -- I need to look at that to see

16  if they actually did dry piles or if they actually did

17  smaller quantities.

18      Q:      But there was no ignition in the absence of

19  liquid water in that testing, correct?

20      A:      Right; in the very small amount of aluminum

21  phosphide that they were testing.

22      Q:      Okay.  You have reviewed the deposition

23  testimony of Lester Rich, correct?

24      A:      Yes.

25      Q:      Let me show you what we're marking as

1    Exhibit 263.

2                    [EXHIBIT NO. 263 MARKED FOR

3                    IDENTIFICATION]

4    BY MR. EPSTEIN:

5        Q:    You can read as much as you want or as little

6    as you want, but I'm going to point you to the questions

7    and answers that I want to talk with you about.

8        A:    Okay.

9        Q:    All right.  I'm starting on page 139.  I

10   asked Mr. Rich, "In fact" -- this is line 7 -- "in none

11   of those Underwriting Laboratory reports was any ignition

12   ever obtained in the absence of the introduction of

13   liquid water; isn't that correct?"

14               He answered, "Absence of -- yes.  I believe

15   it is -- I believe they said liquid, yes."

16               Okay.  You agree with that, correct?

17       A:    Do I agree with that's what he said?

18       Q:    Do you agree that Mr. Rich is correct in his

19   analysis of the Underwriting Laboratory reports?

20       A:    Yes.  And again, with the caveat that we're

21   talking small amounts.

22       Q:    Okay.  On line 20, I asked him, "Your

23   testimony in this case is that there was no liquid water

24   that was introduced into the piles, as you've called

25   them, of aluminum phosphide tablets left by the IFC

1     applicators?"

2             Answer.  He said, "That's correct.  To my

3     knowledge, there was no liquid water introduced."

4             You agree with that, correct?

5     **A:**     Yes.

6     **Q:**     All right.  Page 140.  I asked him, "And yet

7     you believe you had this runaway reaction that you've

8     been talking about, and that's what caused the fire?"

9             He said, "Correct."

10            I asked, "The Underwriting Laboratory reports

11    do not support that theory in any way, shape, or form, do

12    they?"

13            His answer was, "Well, they did require

14    liquid water to get their ignition of their small

15    quantity of tablets."

16            And I asked, "And in the absence of that

17    liquid water, there was never" -- "there never was

18    ignition, correct?"

19            And he said, "That's right."

20            What he's testifying to is the same thing

21    you're testifying to today, correct?

22    **A:**     Right.  And with the caveat that all of those

23    tests with limited number of tablets and pellets in their

24    piles.

25    **Q:**     Okay.  But you're in agreement with

Deposition of John Schumacher

1    Mr. Rich?

2        **A:**    That that's what the testing showed?

3        **Q:**    Yes.

4        **A:**    Yes, I agree.

5        **Q:**    Okay.  Next, line 13.  I asked, "Have you

6    read the Siemens report?"

7              He said, "Yes, sir."

8              And I asked, "And the same is true in the

9    Siemens report, correct?"

10             He said, "I believe that's correct.

11   Which --"

12             I asked, "I don't see it listed.  I'll

13   hand" -- "I can hand you a copy, if you would like."

14             He said, "If you would, please.  That might

15   be at the very bottom of mine."

16             I said, "Which one?"

17             He said, "80 or 81 at the very bottom.  I

18   believe that's what you're talking about."

19             And I said, "Oh, yes.  Yes."

20             And he said, "Let's look -- I don't remember

21   that one as well as the UL.  So let me take a look at

22   that real quick.  Do you have --"

23             I said, "I do."

24             He said, "Let's take a look.  I think you are

25   correct, but if you won't mind me looking."

1          I marked it as Exhibit 195, and he -- it was

2    then marked.

3          And he said, "That" -- "That was that very

4    beginning.  Yeah, you're correct."

5          So his ultimate answer was "You're correct."

6    You have no different recollection of the Siemens report,

7    and I'll show it to you, if you want.

8    **A:**    Can you show me it?

9    **Q:**    Absolutely.  And apparently it's already been

10   marked as Exhibit 195.

11   **A:**    No.  I -- I agree that they did not get

12   ignition, but again, I point to the fact that these are

13   small quantities.

14   **Q:**    Okay.  They did pile, correct?

15   **A:**    I need to -- if you can point me to that.

16   **Q:**    It would take me too long to get to it.

17   **A:**    Okay.  Let me -- let me take a look here.

18         It looks like they're using 2 millimeters of

19   substance.

20   **Q:**    Okay.

21   **A:**    So, I mean, you're talking significantly

22   small.  A pile with a size approximately 2 centimeters in

23   height by 3 centimeters in diameter.  So again, very,

24   very small quantities of material.

25   **Q:**    Piled together?

1          **A:**     Right.  But significantly small quantities.

2          **Q:**     All right.  I want to keep going with

3     Mr. Rich's testimony.

4          **A:**     You want that back?

5          **Q:**     Sure.

6                     So after we talked about the Siemens report,

7     I then asked him, on line 12, "Did you recently receive

8     from Mr. Widis the report undertaken by MDE Labs in this

9     case?"

10                    He said, "Yes."

11                    I asked, "Did you review the various types of

12    testing that MDE Labs did in relation to this case?"

13                    He said, "Yes, briefly."

14                    I asked him, "And like the UL reports and

15    like the Siemens report, did that testing show that in

16    the absence of the introduction of liquid water, piles of

17    aluminum phosphide tablets did not result in combustion?"

18                    He said, "That's correct.  I believe their

19    tests resulted in no combustion."

20                    That true -- that is true as you have read

21    the MDE Lab's report, correct?

22         **A:**     Right.  With the amount of tablets that

23    they've tested in those configurations, that's correct.

24         **Q:**     All right.  I want to go back to your

25    article.

1      A:      Are we done with this?

2      Q:      We're going to come back to it; so have it

3   someplace where you can find it.

4      A:      What page are you on?

5      Q:      I'm going now to page 574.  And just to make

6   sure we're clear on this:  The case study that you're

7   describing in this paper is the wheat bin where there was

8   probing of aluminum phosphide tablets into the wheat,

9   correct?

10     A:      Yes.

11     Q:      And this turned into a legal case in which

12  you were retained as an expert witness, correct?

13     A:      Yes.

14     Q:      Okay.  And that's the one that never went to

15  trial, correct?

16     A:      Correct.

17     Q:      You were deposed in that case, however,

18  right?

19     A:      Yes.

20     Q:      Okay.  Bottom -- the very bottom paragraph,

21  you noted that, in the second sentence, "The fire started

22  as a smoldering fire and transitioned to a flaming fire

23  after reaching the surface," correct?

24     A:      Where are we?

25     Q:      Second sentence in the last paragraph.

1      **A:**      Second sentence, last paragraph.  Okay.

2      **Q:**      So that's -- that's how that fire started,

3    smoldering, and once it reached the surface, flaming,

4    correct?

5      **A:**      At some point, yes, it transitioned to a

6    flaming fire.

7      **Q:**      Okay.  Why would it be smoldering in the

8    interior of the pile and flaming on the surface of the

9    pile?

10     **A:**      Well, just the availability of oxygen in that

11   particular case.

12     **Q:**      And there was more oxygen in the head space

13   in the Severn peanut dome than there was in this metal

14   bin, wasn't there?

15     **A:**      Right.  But you can't compare the two.  I

16   mean, you're dealing with a fire that starts on the

17   surface as a smoldering fire, and it's going to smolder

18   for a long time.  Is it going to transition to flaming at

19   some point?  Possibly.  But the majority of the time, it

20   will be smoldering.

21     **Q:**      You said here that "The exact time the fire

22   started was unknown.  One possibility was the fire

23   started fairly early after the fumigation and went

24   undiscovered because the smoldering was deep inside the

25   pile of grain."

1          That wouldn't explain why our fire wasn't

2    discovered on August 6th or August 7th when you say "The

3    fire started," would it?

4         A:    Say that again.  I'm not sure what you mean.

5         Q:    The explanation you give here as to why this

6    fire wasn't discovered for 16 days wouldn't apply to the

7    Severn Peanut case, would it?  The first explanation --

8         A:    You mean as far as fire on the surface from

9    aluminum phosphide?

10        Q:    Correct.

11        A:    Right.  There are other reasons why.

12        Q:    Okay.  But here, your conclusion was the fire

13   wasn't discovered because it was deep within the pile.

14        A:    Right.  And there's another possibility

15   there, too.

16        Q:    Okay.  And the other possibility was that it

17   started when the fan started.  That wouldn't apply to

18   Severn Peanut Company either, would it?

19        A:    That's correct.

20        Q:    Okay.  So the two explanations you gave for a

21   delay in the discovery of the fire that you investigated

22   in the wheat bin, neither of those would explain why

23   there was a delay in discovery in the fire in the Severn

24   Peanut case, would it?

25        A:    That's right.

1      **Q:**     Okay.  Now, your conclusion in this paper is

2     actually carried over into your report in this case and

3     your conclusions in this case, correct?

4      **A:**     Yeah.  Generally, I would say they're --

5      **Q:**     You actually list the same factors on page --

6     on page 11 out of 14 of your report, you have the exact

7     words from your conclusion in your paper, Exhibit 262,

8     correct?

9      **A:**     I haven't looked at it, but they're very

10    similar, if not exact.

11     **Q:**     Okay.  You just carried that paragraph from

12    your paper over into your report in this case, pretty

13    much, correct?

14     **A:**     Right; because it's consistent with the two

15    cases.

16     **Q:**     And in both, you say, as No. 2, "Water in the

17    form of a liquid or vapor comes in contact with the

18    fumigant."  That --

19     **A:**     No.  I said, "Moisture in the form of a

20    liquid or vapor."

21     **Q:**     Okay.  So you have changed a word, correct?

22    Look in your paper.

23     **A:**     Right.  This is a general paper, right?

24     **Q:**     Uh-huh.

25     **A:**     This is talking about general ignition of

1    aluminum phosphide tablets and pellets.  This is more

2    specific in the case we're on now.

3        Q:     Well, in both your paper and your report,

4    you're talking about ignition scenarios in agricultural

5    storage structures where there's been an application of

6    aluminum phosphide, correct?

7        A:     Right.

8        Q:     And what you said in your paper was that

9    water, in the form of a liquid or vapor, comes into

10   contact with the fumigant, correct?

11       A:     Okay.

12       Q:     And you changed the word "water" to

13   "moisture" in this report and left everything else the

14   same, correct?

15       A:     Water, to me, is moisture.  Moisture is

16   water.  Water is H2O.  It comes in several different

17   forms:  liquid, gas, solid.

18       Q:     Okay.  The fact of the matter is, to the

19   extent that there is literature out there reporting fires

20   as the result of the application of metal phosphides, the

21   vast majority of that literature talks about liquid

22   water, doesn't it?

23                   MR. GOLDSTEIN:  Objection.

24                   THE WITNESS:  I don't agree.  There's a

25   bunch of literature that talks about moisture.  It talks

1    about piling.  It talks about dome pile, because you can

2    get ignition.  There are case studies that show that

3    there was no liquid water involved in the ignition of

4    aluminum phosphide tablets or pellets in piles.  There's

5    field experience showing that.

6    BY MR. EPSTEIN:

7        Q:    Tell me every case study that you're talking

8    about.  Is there any case study that's referenced in your

9    expert report in this case?

10       A:    Yeah.

11       Q:    Tell me what they are.

12       A:    It may be "case study" isn't necessarily the

13   correct -- no, it is.  Actually, it is correct.  It's

14   investigations that were done related to incidents where

15   aluminum phosphide caused a fire and explosion.

16       Q:    Okay.  No different than you writing about

17   your experience with this wheat bin.  There are other

18   such materials out there that you can find where somebody

19   like you reported on a single incident in their

20   investigation of what happened.

21       A:    Or an entity like the State of California

22   that did an independent investigation related to an

23   incident.

24       Q:    Right; a single incident.

25       A:    Right.  But there are incidents out there

1    that have been reported on --

2        Q:      Okay.

3        A:      -- and investigated.

4        Q:      Okay.  That's what you're relying on in this

5    case.  You're not relying on a case study that has done

6    some form of a global or generic investigation of

7    aluminum phosphide tablets or pellets, correct?

8        A:      I'm relying on case studies where people have

9    investigated the cause of a certain fire and explosion

10   related to this particular material and they have

11   concluded that there was no liquid water involved.

12       Q:      Okay.  And that's what you conclude in this

13   paper, Exhibit 262, correct?

14       A:      I concluded in the paper in general, or what

15   are you talking about?

16       Q:      Regarding the wheat bin fire.

17       A:      The wheat -- yes, that's correct.

18       Q:      Okay.  And that wheat bin fire resulted

19   following the application of aluminum phosphide tablets

20   into the interior of the commodity pile, correct?

21       A:      Yes.

22       Q:      Which is a different application than

23   occurred in the Severn Peanut case, correct?

24       A:      That's correct.

25       Q:      And you know there was piling in that case

1   because the tablets went in, in a pile, correct?

2        A:      Right.   The way they probed them.

3        Q:      Right.

4        A:      Right.

5        Q:      Randy Turner and Brian Lilley didn't probe

6   the tablets into the peanut mass in this case, did they?

7        A:      No.   They just dumped them in and created

8   piles on the surface.

9        Q:      That was their testimony that they dumped

10  them in -- dumped them in and created piles, right?

11       A:      Well, no.   That's -- they talked about

12  slinging it and moving them around, but that would have

13  generated piles.

14       Q:      Despite the fact that their testimony was

15  they specifically looked on the surface directly beneath

16  them and there were no piles.   They were either wrong

17  about that or they lied about it?

18       A:      Well, I think they're inaccurate, and they're

19  wrong about that.

20       Q:      So you know they created piles, even though

21  you weren't there, you didn't have a flashlight, and you

22  didn't look at the surface; is that correct?

23               MR. GOLDSTEIN:   Objection.

24               THE WITNESS:   Well, based on the

25  description of how they applied them and all the other

1    things we've talked about, they would have piled the

2    peanuts -- or piled the tablets on the peanuts, and it

3    would have been difficult for them to really know if they

4    piled when neither of them could describe what piling

5    was.  They couldn't describe a pile.  They didn't know if

6    it was bad to pile.  They didn't know if piling could

7    create a fire.  They couldn't see the entire dome when

8    they were applying it.  They have a two-dimensional view

9    when they're 20 feet above it; so they don't know if they

10   have piling below in a recessed area because they can

11   really only see length and width.  There's other material

12   in there like from a prior fumigation; so they don't know

13   if they've actually put the tablets into that dust from

14   the prior fumigation and if it's creating piles below

15   that.

16            So there are a lot of reasons why what

17   they're saying is inaccurate.  They're looking in -- they

18   didn't look in until they were done applying it.  They

19   had a flashlight to look into a dark dome, and it's

20   difficult to determine the difference between the peanuts

21   and the tablets.  Number of reasons why I think their

22   statement is inaccurate and is incorrect.

23   BY MR. EPSTEIN:

24       Q:      And specifically, you have decided, to a

25   reasonable degree of engineering certainty, that there

1    was one or more pile on the what you call ten-foot flat

2    spot on the surface of the peanut pile, correct?

3         A:    I said that's one area.  There are other

4    areas down the slope where you could also get piling.

5         Q:    Show me where any witness in this case has

6    described there being a ten-foot flat spot on the surface

7    of the peanut pile?

8         A:    I need -- do you have the depositions of --

9         Q:    Well, I'll show you your report, because your

10   report has 90 footnotes -- 93 footnotes, correct?

11        A:    Yes.  And that's why I'm saying, if you can

12   give me the deposition stuff, we can look at it.

13        Q:    Well, you're citing page 7 of 14.  You wrote,

14   on the last paragraph, "The peak of the peanut pile

15   inside the dome was described as being about 15 to 20

16   feet from the top and had a small flat spot," and you

17   have Footnote 42 and 43.

18        A:    Where are you again?  I'm sorry.  What page?

19        Q:    Page 7.

20        A:    7.

21        Q:    Last paragraph.

22        A:    Okay.

23        Q:    And then you say -- and then you go on later

24   and say, "In creating the drawings, it was assumed that

25   the flat spot of the pile had a diameter of about ten

1    feet."

2              That's an assumption that you made.  That's

3    not something that somebody testified to, is it?

4        A:    No.  I think he described -- one of them

5    described it as about a ten-foot flat spot.

6        Q:    One of whom?

7        A:    One -- Turner or Lilley, from what I

8    remember.  Or it was somebody else in July, whoever

9    applied the Protect-It, but that's what I recall.

10       Q:    Okay.  Well, you've got Turner's deposition,

11   page 144 to 145, cited, and Patrick Rowe's deposition,

12   page 75.  I will read you what those gentlemen said in

13   those locations that you have cited.

14       A:    Okay.

15       Q:    Mr. Turner, page 145, line 10:  "And tell

16   me" --

17       A:    Can -- can I see this for myself?

18       Q:    Sure.  Do you have your copies with you?

19       A:    I -- I -- no.

20              MR. GOLDSTEIN:  Why don't we go off the

21   record.

22              MR. EPSTEIN:  Sure.  Let's go off the

23   record.

24              THE VIDEOGRAPHER:  Off the record at

25   2:06.

1              [RECESS TAKEN]

2                   THE VIDEOGRAPHER:  On the record at

3    2:17.

4    BY MR. EPSTEIN:

5         Q:     Mr. Schumacher, it's my understanding that

6    you've had a chance to review what you cited in

7    Footnotes 42 and 43 regarding the depositions of Randall

8    Turner and Patrick Rowe.  Did you find anything in what

9    you cited there that would lead you to the conclusion

10   that somebody actually said they saw a ten-foot flat spot

11   on the surface of the peanut pile?

12        A:     Not in those two.  They said flat spot, but I

13   recall reading ten feet somewhere.  And I don't think

14   it's just my report, but I need to look at that a little

15   more.

16        Q:     Well, in your review of Mr. Rowe's testimony,

17   did you not read, when he was asked was it completely

18   flat, that he said, "It had flattened out on the top, but

19   it was still -- it had a curve to it.  So it wasn't

20   completely flat structure, if I remember correctly."

21             You don't recall that?

22        A:     I read that, but he's talking about it being

23   flat, and there is some curvature on the outside, is

24   what -- is how I read that.

25        Q:     And what you say in your report is you

1  assumed that there was a ten-foot flat spot.  You used

2  the word "assumed," did you not?

3      A:    Based on that drawing, yeah.

4      Q:    On what drawing?

5      A:    The drawing that was done to create the dome

6  drawings.

7      Q:    Okay.  I've lost you.  I don't know what you

8  mean.  The drawing that was done to create the dome

9  drawings?

10      A:    Right.  The dome drawings that were done by

11  John Cavaroc.

12      Q:    Oh.  He created something that looked like a

13  ten-foot flat spot?

14      A:    Right.

15      Q:    Well, do you know what he was relying on?

16      A:    I imagine the deposition testimony.

17      Q:    Would you conceive the possibility that on

18  August 4th, 2009, the top of the peanut pile did not have

19  a ten-foot flat spot?

20      A:    Well, I don't know.  I remember that

21  somewhere, and I'd have to review that a little more, but

22  there certainly was a flat spot.

23      Q:    And as of right now, you can't tell me how

24  large it was or anybody that said how large it was?

25      A:    As I sit here, I remember that, but I can't,

1    again, tell you.

2         Q:    And your report doesn't cite any such

3    testimony, does it?

4         A:    That's right.

5         Q:    Okay.  Going completely off topic for a

6    moment.  What is a clinker?

7         A:    A clinker is something that's used in the

8    industry when you're talking about self-heating to

9    ignition of a particular commodity.  Could be hay.  Could

10   be other things.

11        Q:    Okay.  Could there be such a thing as a

12   peanut clinker?

13        A:    Well, I haven't seen one, but I imagine there

14   could be.

15        Q:    And if, in fact, there was one, what would it

16   look like?

17        A:    Well, I imagine it would be black.

18        Q:    Okay.  Would it be kind of glassy looking?

19        A:    It could.  Doesn't necessarily have to be.

20        Q:    Okay.  If such a peanut clinker were found

21   in -- among the peanuts at the Severn peanut dome, would

22   that be an indication that there was potentially

23   self-heating to the point of ignition?

24        A:    No; because you get -- well, possibly.  You

25   can also get clinkers from smoldering fires that have

1   nothing to do with self-heating.

2       Q:      Isn't there something about a clinker that

3   generally makes it more likely to be the result of

4   spontaneous combustion?

5       A:      I don't know of anything that makes it more

6   likely, but you can have it both ways.

7       Q:      Okay.

8       A:      You can have clinkers made from just a

9   surface fire, too.

10      Q:      So if I were to show you a clinker that

11  resulted from the Severn Peanut fire, you wouldn't be

12  able to tell me one way or the other that -- whether that

13  makes self-heating or your theory the more likely of the

14  two?

15      A:      Well, the reason why I -- the thing to

16  consider is you can have clinkers that are related to a

17  fire that starts on the outside as a flaming flyer -- as

18  a flaming fire like in hay and it transitions in.  You

19  can create clinkers as it burns down.  And so because you

20  have a clinker doesn't mean that you have a

21  self-heating-to-ignition reaction taking place.

22      Q:      All right.  Let's take a look at your report,

23  Exhibit 246.  And I want to look first at page 2, at the

24  materials that you reviewed in this case.

25      A:      Okay.

1    Q:    Do you know if you received a transcript of

2  every witness who had, by April 30th, 2013, provided

3  sworn testimony?

4    A:    I don't -- I don't know if I had or not.

5    Q:    Did you make a request for all depositions

6  that had been taken as of that point in time?

7    A:    I probably made a request related to

8  witnesses that would have been in and around the dome,

9  talking about, you know, how they managed the -- the

10  peanuts and things like that.  Whether it be all 30(b)(6)

11  witnesses and things like that, I don't know.

12    Q:    Okay.  Did you know that, prior to your

13  report being issued, the deposition was taken of Degesch

14  America's director of quality control, Dennis Ryman?

15    A:    I'm not sure if I knew that or not.

16    Q:    You had not been supplied his deposition

17  testimony before you issued your report, had you?

18    A:    That's right.  Did we -- when was that

19  deposition taken?

20    Q:    The deposition was taken on April the 10th,

21  2013.

22    A:    Okay.  Then, no, I hadn't seen that.

23    Q:    And, in fact, you didn't list it in your

24  reviewed items because you hadn't seen it, correct?

25    A:    That's right.

1   **Q:**    And the first time you actually were looking

2   at that deposition transcript, according to your

3   invoices, the last page of Exhibit 248, was July 18th,

4   2013, correct?

5   **A:**    That appears to be correct.

6   **Q:**    I'm sorry.  Let me back up.  You started

7   reviewing that deposition of Dennis Ryman on July 15th,

8   2013, correct?

9   **A:**    Right.

10  **Q:**    Two and a half months after you issued your

11  expert report?

12  **A:**    Correct.

13  **Q:**    Having read Mr. Ryman's deposition, do you

14  believe that's something you should have had access to

15  before you rendered your opinions in this case?

16  **A:**    I mean, certainly, I would have liked to, but

17  it doesn't change my opinion.

18  **Q:**    Okay.  And the fact that he believes it's

19  very difficult to contain phosphine gas to the point that

20  you could reach the lower flammable limit, that doesn't

21  affect your view of this case, even though he works for

22  Degesch America?

23  **A:**    That's right.  I don't think he's

24  investigated -- he's not a fire investigator, and he

25  doesn't understand that process.  And, you know, it

1    happens in the field so I'm surprised he says that that

2    doesn't happen.

3        Q:      And even though he's said he's many times

4    been around phosphine gas where the concentration is well

5    in excess of 18,000 parts per million with there being no

6    autoignition, that doesn't affect your view of the

7    likelihood of autoignition in this case?

8        A:      No; because we know it happens.  And we have

9    people in the field saying they see it happen.  And we

10   have people -- we have literature showing it happens and

11   case studies showing it happens.

12       Q:      Would you agree that Mr. Ryman has more

13   technical knowledge of Fumitoxin and its properties than

14   you do?

15       A:      I would say no.

16       Q:      Okay.  You first put your hands on a

17   Fumitoxin tablet eight days ago?

18       A:      When -- you can tell me when that was when

19   the -- September 4th?

20       Q:      Yes.

21       A:      What's the date today?  Eight days ago,

22   sure.

23       Q:      And you know as much about Fumitoxin as

24   Mr. Ryman does?

25       A:      Sure.  The chemistry, absolutely.  The

1    ability for it to ignite and start fires and that whole

2    investigation process, absolutely.

3        Q:      Even though he's been working with it for 18

4    years?

5        A:      Right.

6        Q:      You have, in your reviewed items, a

7    deposition of Jack Kennedy.  Can you tell me what the

8    deposition of Jack Kennedy brought to bear on your

9    opinions in this case?

10       A:      Well, I think he was related to the EJ Cox

11   case and the testing that they had done in that EJ Cox

12   case where they actually aborted the testing because the

13   piles that they had created were generating

14   concentrations that they were not comfortable with from

15   the standpoint of ignition.

16       Q:      That was similar to your wheat case.  That

17   was probing; it wasn't piles on the surface of the

18   commodity, correct?

19       A:      Right; but there was no liquid water, which,

20   you know, is important to note.

21       Q:      Would you agree with me that the issue of

22   confinement of phosphine gas is going to be completely

23   different on the surface of a commodity pile versus in

24   the interior of a commodity pile?

25       A:      There will be some differences, yes, but

1    piles will confine it.

2       Q:     Well, would you agree with me that in a wheat

3    pile you're going to have confinement by the wheat in

4    addition to the confinement by the pile of Fumitoxin?

5       A:     I would agree with that.

6       Q:     And the same would be true in a peanut pile

7    like the testing that Mr. Kennedy performed, correct?

8       A:     Sure.

9       Q:     So you -- kind of apples and oranges.  I

10   understand what you're saying:  There's no liquid water,

11   and you're talking piles.  But you're still apples and

12   oranges if you're probing the Fumitoxin into the interior

13   of a commodity versus putting the pile on the surface of

14   the commodity?

15      A:     Right.  When you're talking about a perfectly

16   flat surface, but if you have recessed areas, then you

17   are getting closer to that confinement that you get when

18   it's actually being probed.

19      Q:     Okay.  Is it your testimony in this case that

20   the pile of Fumitoxin tablets or pile of Fumitoxin

21   tablets that you have testified existed on August 4th,

22   2009, was in a recessed area in the surface of the

23   peanuts?

24      A:     Well, it's possible it was, yes.

25      Q:     It's possible it wasn't?

1       **A:**      That's right.  But there were piles, and if

2       it's in a recessed area, then it more closely resembled

3       that of being within a pile as opposed to being on the

4       surface.

5       **Q:**      Okay.  You also --

6       **A:**      And you also have a situation when you drop

7       the tablets.  They don't just land on the surface; they

8       actually bed themselves.  And so you're still going to

9       get some of that going on as well.

10      **Q:**      You also have listed in your reviewed items

11      deposition of Barry Lindley.  What, if any, bearing did

12      the deposition of Barry Lindley that you reviewed bare on

13      your opinions in this case?

14      **A:**      Well, he was there to testify about the

15      EJ Cox case and the ignition scenarios, and his

16      testimony -- I don't know that it really affected this

17      case, but it certainly is consistent with what I think

18      happens in these cases without having liquid water.

19      **Q:**      Okay.  You're not relying on anything that

20      Barry Lindley testified to in that deposition to form any

21      basis of any opinion you've expressed in this case, are

22      you?

23      **A:**      I would say generally, yes, that's true.  I'm

24      not relying on Barry Lindley or that deposition.

25      **Q:**      Okay.  Move to page 3 of your report, please.

1          Did you create this timeline on your own?

2    Did you have somebody assist you?  How did you put this

3    timeline together?

4         **A:**     I put it together myself.

5         **Q:**     Okay.  Did you know that it contained errors?

6         **A:**     Well, if you'd point out what errors you

7    think it contains, I will then be able to answer that

8    question.

9         **Q:**     You -- you have a date of October 6th, 2008,

10   as the first load of 2008 growing season peanuts put into

11   dome, and you have Exhibit 60.  And they you're got --

12        **A:**     Where is October 6th?  Where do you see

13   October 6th?

14        **Q:**     On the left-hand side.

15        **A:**     I see October 2005.

16        **Q:**     No.

17        **A:**     Oh, you're talking down 2008?

18        **Q:**     Yes.

19        **A:**     I'm sorry.  I was looking at the top.  Okay.

20        **Q:**     Did you know that was wrong, that that was

21   not the first load for the 2008 growing season of the

22   peanuts put into the dome?

23        **A:**     Well, if I had put that there, then I

24   probably wouldn't think it was wrong.  I'd have to have

25   you show me where that is incorrect or give me the actual

1    dates.

2        Q:    Did you know that Exhibit 60 was not a

3    complete list of all the 1007s for all the peanuts that

4    were put in the dome?

5        A:    That's my understanding, that it was not a

6    complete list, right.

7        Q:    Okay.  In which case, the first date in

8    Exhibit 60 wouldn't necessarily represent the first day

9    peanuts were put in, and the last date in Exhibit 60

10   wouldn't necessarily represent the last?

11       A:    Possibly.  I don't know.  It depends on when

12   the first one went in there.  If you can just show me

13   something --

14       Q:    I will.

15       A:    -- we can cut to the chase.

16       Q:    We will.

17       A:    Okay.

18       Q:    I'm going to show you what has previously

19   been marked as Exhibit 198, which is Dr. Montross'

20   report.

21       A:    Okay.  This is 198?

22       Q:    Okay.

23       A:    Is there a --

24       Q:    There's no sticker on it.

25       A:    Oh, okay.

1    **Q:**     If you would go to page 40.

2    **A:**     Okay.

3    **Q:**     Exhibit 40 represents the start date, average

4    moisture content, and standard deviation by

5    one-million-pound lot of peanuts that entered the dome.

6              Do you see that?

7    **A:**     I do.

8    **Q:**     What was the start date for the first lot?

9    **A:**     9/26/08.

10   **Q:**     And what was the last start date for the --

11   for a lot?

12   **A:**     It looks like 12/1/08.

13   **Q:**     Okay.  So do you accept that Dr. Montross got

14   that right and perhaps you got it wrong?

15   **A:**     It's possible.

16   **Q:**     Okay.

17   **A:**     Yeah.

18   **Q:**     It wouldn't be the first time you've made a

19   mistake, right?

20              MR. GOLDSTEIN:  Objection.

21              THE WITNESS:  I don't have the answer to

22   that.  I make typographical errors occasionally.

23   BY MR. EPSTEIN:

24   **Q:**     You just had a misapprehension of what

25   Exhibit 60 was when you created your timeline, correct?

1    **A:**    I don't know if it was a miss -- I mean, I

2  knew I didn't have them all --

3    **Q:**    Okay.

4    **A:**    -- and I was basing it on that document.

5    **Q:**    Do you not recall R.P. Watson's testimony

6  that the growing season started in September in terms of

7  when they loaded the dome?

8    **A:**    I'd have to review his deposition

9  testimony.

10    **Q:**    All right.  Go to page 4.  You had made it a

11  point to indicate every time dome temperatures were

12  recorded on page 3, correct?  You've got one, two, three,

13  four, five, six, seven, eight, nine, ten entries for dome

14  temperatures recorded on page 3, right?

15    **A:**    On page 3?

16    **Q:**    Go back to page 3.

17    **A:**    Okay.

18    **Q:**    You've got ten different entries for when

19  dome temperatures are recorded, right?

20    **A:**    Yes.

21    **Q:**    And then you've got two more on -- actually,

22  three more on page 4, right?

23    **A:**    Yes.

24    **Q:**    So total of 13 different times you've entered

25  when dome temperatures were recorded, right?

1      **A:**     Yes.

2      **Q:**     Didn't you recall that there were dome

3  temperatures recorded on July 13th, 2009, some three and

4  a half weeks before the application at issue in this

5  case?

6      **A:**     No.  I absolutely knew that.  It just didn't

7  get in there.

8      **Q:**     That's a big mistake, don't you think?

9               MR. GOLDSTEIN:  Objection.

10               THE WITNESS:  No.  It's just an

11  oversight.  I mean, I clearly talk about it in my report

12  everywhere else.

13  BY MR. EPSTEIN:

14      **Q:**     Okay.  That should have been included in your

15  timeline because those were the last temperatures known

16  in the peanut pile before there was a fire, correct?

17      **A:**     Yeah, they should have been in there.  But

18  again, it's -- it's clear that I talk about the July 13th

19  temperature data that was recorded, and so that's just an

20  oversight.

21      **Q:**     Okay.  Go to page 5.  The first full

22  paragraph you indicate that the dome was instrumented

23  with 19-cable temperature -- with a 19-cable temperature

24  detection system with a computerized portable reading

25  instrument, right?

1    **A:**    Yes.

2    **Q:**    How much coverage did those 19 temperature

3    cables provide in the dome?

4    **A:**    Well, I mean, if you believe Dr. Montross,

5    around 40 -- 40 percent, 42 percent, but that's

6    misleading.

7    **Q:**    Why is that misleading?

8    **A:**    Because that's not the area.  Even he agrees

9    that nothing's going on outside in the far radii of the

10   dome.  It's really the stuff from 1 through 13 that

11   you're concerned about.  And if you look at that, you're

12   actually talking about 90 percent.

13   **Q:**    90 percent, you believe?

14   **A:**    Something around there.  Doing it the same

15   way that he -- he did his calculation.

16   **Q:**    What were you using for the radius of the

17   temperature sensors in terms of their ability to detect

18   temperatures?

19   **A:**    Well, that would be with a 15-foot detection

20   radius, which is the far end of the limit for what Scott

21   Chant said they were.

22   **Q:**    The far end meaning the greatest?

23   **A:**    Right.

24   **Q:**    Well, if you use the low end of what

25   Mr. Chant said, what would you wind up with?

1     **A:**     I think about 70 percent.

2     **Q:**     Okay.  So your testimony is that between 70

3  and 90 percent of the area in which temperature cables 1

4  through 13 were located was -- would have been detected

5  by the temperature cables?

6     **A:**     Yeah, something around there.  I mean,

7  that's -- that's doing the same method that Dr. Montross

8  used.

9                [EXHIBIT NO. 264 MARKED FOR

10                IDENTIFICATION]

11  BY MR. EPSTEIN:

12     **Q:**     Okay.  And what is Exhibit 264 that I've just

13  handed you?

14     **A:**     That's basically a demonstration or an

15  exhibit -- an example of what the cable detection would

16  look like at different radiuses of detection.

17     **Q:**     Okay.  And tell me what's what.

18     **A:**     The left side is a 12-and-a-half-foot

19  diameter.  The right side is a 15-foot diameter.

20     **Q:**     Okay.  And what's the second page?  Is that

21  the same thing --

22     **A:**     Yeah.

23     **Q:**     -- without the cables listed?

24     **A:**     I think that's correct, yes.

25     **Q:**     Okay.  Is there a reason that you have

1    different colors?

2        A:      No.  It's just to show the -- the

3    different --

4        Q:      The different band of concentric circles?

5        A:      Right.

6        Q:      Okay.  So the first band or the 1 -- cable 1

7    is red; the second band -- 2, 3, 4, and 5 is yellow and

8    on?

9        A:      Yes.

10       Q:      Okay.  So your testimony is is that between

11   70 and 90 percent of everything inside the concentric

12   circle of the green sensors, for lack of a better way of

13   describing it, would -- would have been covered?

14       A:      Right.  Approximately 70 to 90 percent.

15       Q:      Which means 10 to 30 percent of the area was

16   not covered?

17       A:      That's right.

18       Q:      And that means, necessarily, that there could

19   be temperatures higher or lower than the ones recorded by

20   the temperature cables on each of the dates for which we

21   have temperature recording, correct?

22       A:      Possible.  I think it's unlikely.

23       Q:      You think it's unlikely that there's a higher

24   temperature that would have been found in that area of

25   the dome the day IFC fumigated the dome?

1    A:    That's right.  I think the temperature

2  detection in that area was sufficient to detect what

3  would be the, more or less, highest temperatures in that

4  area.

5    Q:    Do you know how many temperature cables

6  Mr. Chant recommended be included in the dome?

7    A:    I don't.  I know more than 19.

8    Q:    Did you know he recommended more than 50?

9    A:    I don't know the number off the top of my

10  head.

11    Q:    Did you read his testimony?

12    A:    I did.

13    Q:    Don't you think, in deciding how much of the

14  dome would have been covered by the existing cables, you

15  would wanted to have known what he actually designed for

16  the dome?

17    A:    Well, in general.  But if you're looking at

18  the spot that's of interest, the reason why you have so

19  much of it not covered is in the outer part of the dome,

20  which is not really the area where you're concerned

21  about.  The area that Dr. Montross is concerned about is

22  the area on the inside.  And so I think, it that respect,

23  you would have good coverage.

24    Q:    So you think Scott Chant would have put

25  another 30-plus cables on the outer edge of the dome?

1       **A:**      I didn't say that.

2       **Q:**      Well, if he recommended more than 30 more

3   cables, don't you believe some of those cables would have

4   been in the area that Dr. Montross is talking about?

5       **A:**      Possibly.  But I'm saying it's not important

6   in this analysis.

7       **Q:**      All right.  I want to go to page 6 of your

8   report, and I want to start on the section -- and we're

9   going to spend some time on this -- "Self-Heating to

10  Ignition of Peanuts."

11      **A:**      Okay.

12      **Q:**      You have cited there one, two, three, four

13  times, and on the next page, one, two, three times, a

14  publication by J.T. Mills out of Canada, "Spoilage and

15  Heating of Stored Agricultural Products."  By virtue of

16  the number of times you cited that authority, did you

17  consider it to be an important authority that brings

18  something to bear on the issues in this case?

19      **A:**      I would say generally, yes.

20      **Q:**      Okay.  Okay.  So what Mills is saying on

21  the -- on page 11, which you're citing on page 6 of your

22  report --

23      **A:**      On page 11 of his -- okay.  Yeah.

24      **Q:**      Page 11 of his publication.

25      **A:**      Sure.

1      **Q:**      And you're citing at the bottom of page 6.

2   What he's saying is that once the biological reaction

3   turns into a chemical reaction at 167 degrees Fahrenheit,

4   self-ignition can occur, correct?

5      **A:**      No.

6      **Q:**      He says, "Chemical heating is caused by

7   oxidation, takes over above 75 degrees Celsius, 167

8   Fahrenheit, and can continue until ignition occurs,"

9   correct?

10      **A:**      Right; but you're making it sound like

11   ignition occurs at 167, which is not correct.

12      **Q:**      Well, he's not saying that once it gets that

13   hot, it's going to then run away to -- to ignition?

14      **A:**      No.  Basically you need to have the condition

15   where you reach thermal runaway, and it says it "can"

16   continue until ignition occurs.

17      **Q:**      Let me show you what we're marking as

18   Exhibit 265.

19                      [EXHIBIT NO. 265 MARKED FOR

20                      IDENTIFICATION]

21   BY MR. EPSTEIN:

22      **Q:**      And I would have created the whole thing for

23   you, but as you know, it's a very large document,

24   correct?  So I've given you --

25      **A:**      There are several pages, yes.

1      Q:      I've given you some excerpts, and if you

2   want, I will let you see the whole thing.  But you are

3   citing page 11.

4      A:      Uh-huh.

5      Q:      And what he says is, "Phase two is known as

6   chemical heating, which occurs from above 75 degrees

7   Celsius to at least 150 degrees Celsius."

8      A:      Okay.

9      Q:      Right?

10     A:      Yes.

11     Q:      And he's describing that as the second step

12  that results in self-ignition, correct?  He even shows it

13  in his diagram.

14     A:      Right.  But then he says, "When the

15  biological heating exceeds 75, a purely chemical process

16  may occur and raise the temperature of the material to

17  ignition."  It doesn't say it does occur.

18     Q:      Understood.  But if that chemical process

19  begins, it runs away to ignition, correct?

20     A:      Not necessarily.

21     Q:      Did you know that in the Mills publication,

22  there's a section on peanuts?

23     A:      I do.

24     Q:      Okay.  In fact, you cited page 80 in your

25  report on page 7.

1      **A:**      Right.

2      **Q:**      Okay.  Go to page 80.

3      **A:**      Right.

4      **Q:**      Where he talks about peanut slash ground nut.

5   And would you agree, by "ground nut," he's talking about

6   in-shell peanuts?

7      **A:**      Say that again.

8      **Q:**      Would you agree that when he uses the phrase

9   "ground nut," he's talking about in-shell peanuts, not

10  shelled peanuts?

11     **A:**      I believe that's correct, but let me see

12  here.

13     **Q:**      In fact, he -- he has -- I'll show it to you.

14     **A:**      Yeah.  He's got it in there.  So just -- if

15  you show me it, then I can --

16     **Q:**      I will show it to you.  I'm going to

17  highlight it on mine in the lighter yellow to orient you.

18     **A:**      Lighter?

19     **Q:**      Lighter yellow.

20     **A:**      In-shell -- in shelled -- well, hold on for a

21  second.  I think that that's incorrect.  In -- if you

22  read that in shelled --

23     **Q:**      Oh, I see what you're saying.

24     **A:**      Yeah.

25     **Q:**      He's referring to -- you're right.  He's

1   referring.

2       **A:**     So that's why I was confused.

3       **Q:**     Okay.

4       **A:**     I think "peanuts" refer to unshelled and

5   ground nuts --

6       **Q:**     Okay.

7       **A:**     -- as I read that.

8       **Q:**     Okay.  Okay.  So "Storage Problems" on the

9   right-hand side.  Do you see that?

10      **A:**     Yes.

11      **Q:**     "Careful harvesting and storage procedures

12  are required to reduce fungal infection by Aspergillus

13  flavus and the development of aflatoxins."

14              That's talking about peanut -- farmers stock

15  peanuts that are stored, correct?  That's what develops

16  or can develop, aspergillus flavus and aflatoxin,

17  correct?

18      **A:**     Yes.

19      **Q:**     All right.  So we know we're talking about

20  the same thing that was stored in the Severn peanut dome,

21  correct?

22      **A:**     The same possibly --

23      **Q:**     The same type of nut?

24      **A:**     Right.

25      **Q:**     Okay.  And then he goes on to say,

1    "Self-heating promoted by the presence of damaged nuts

2    and moisture sometimes occurs when peanuts are stored in

3    the large stacks."

4              Do you see that?

5      A:     Right.  And then it goes on to say, "It is

6    often detected by an unpleasant smell" --

7      Q:     Okay.

8      A:     -- "given off by decomposing stacks."

9      Q:     I want to take one -- one sentence at a time.

10   What you had in the Severn peanut dome on August 4th,

11   2009, was a 21-million-pound stack of peanuts, correct?

12     A:     Yes.

13     Q:     It would be an understatement to say that

14   that was a large stack, correct?

15     A:     Well, I mean, it's all relative, right?  It's

16   a big stack.

17     Q:     It's one of the biggest known to humankind.

18   Wouldn't you agree?

19              MR. GOLDSTEIN:  Objection.

20              THE WITNESS:  I don't know what -- I

21   don't know.  It's a big -- it's one of the biggest domes;

22   let's put it that way.

23   BY MR. EPSTEIN:

24     Q:     It's one of the largest storage facilities

25   for peanuts that's ever been built.  Would you agree with

1    that?

2                    MR. GOLDSTEIN:  Objection.

3                    THE WITNESS:  I have no reason to

4    disagree; let's put it that way.

5    BY MR. EPSTEIN:

6        Q:    All right.  And it certainly fits what Mills

7    is talking about when he says "large stack," correct?  It

8    fits what he's saying?

9        A:    Yes, yes.

10       Q:    All right.  And I understand what you want to

11   say about unpleasant smells, but that's not my point in

12   asking you questions.  You can tell me about that.  We'll

13   talk about it.  But he says, down about five sentences,

14   "stack temperatures."  Do you see that?

15       A:    Yeah.

16       Q:    "Stack temperatures should be monitored" --

17       A:    Yep.

18       Q:    -- "at regular intervals."

19                    And then he says, "Once heating has reached

20   80 degrees Celsius, the temperature will likely continue

21   to increase" until what happens, sir?

22       A:    Ignition occurs.  But he says "likely."  It

23   doesn't mean it will increase until ignition occurs.

24   That's the point I'm making.

25       Q:    You're relying in this case on what can

1    happen to testify as to what did happen, correct?

2        A:    Well, no.  I know what will -- what -- well,

3    we know that it happens.  We know that that process

4    happens.  It's not can.

5        Q:    Are you saying what -- what Mills says here

6    doesn't give you a sufficient scientific basis to say

7    that if you reach 80 degrees Celsius in a peanut pile as

8    large as what occurred in the Severn peanut dome, you'll

9    reach ignition?  You don't have a scientific basis based

10   upon what he says here?

11       A:    No.  That -- that says it can; it's a likely

12   will, but it doesn't say that it's definitely going to.

13   I mean, yes, you can look at that and say that if you get

14   to 80, that you could get ignition.  But you have to look

15   at all the other things to see if it did happen.

16       Q:    The Fumitoxin Applicator Manual says that

17   ignition could occur as the result of the piling or

18   stacking of Fumitoxin tablets, correct?

19       A:    Right.

20       Q:    That is your scientific basis for concluding

21   that ignition did occur, correct?

22       A:    Well, that was one of the references I -- I

23   had in my report.

24       Q:    This says that at 80 degrees Celsius,

25   self-ignition will likely occur.

1    **A:**    Okay.

2    **Q:**    Correct?

3    **A:**    That's what it says.

4    **Q:**    That's a stronger statement than what appears

5    in the Fumitoxin Applicator's Manual, isn't it?

6    **A:**    That is what it says, but I'm just saying it

7    didn't say it will occur.

8    **Q:**    Any more than the Fumitoxin Applicator's

9    Manual says that if you pile or stack Fumitoxin tablets,

10   ignition will occur, correct?

11   **A:**    Correct.  All I'm saying is it says it will

12   occur -- or likely occur; it doesn't say it will occur.

13   **Q:**    And as --

14   **A:**    And you basically -- this whole sentence --

15   question came about by saying it will occur, I think, in

16   your question.  I said that's not necessarily true.

17   **Q:**    But from a reasonable -- reasonable degree of

18   engineering certainty, this statement by Mr. Mills allows

19   you to conclude that, more likely than not, if you hit 80

20   degrees Fahrenheit in a large stack of farmers stock

21   peanuts -- did I say 80 degrees Fahrenheit?  Try again.

22          What Mills says in the passage we just

23   read -- and I'll read it again:  "Once heating has

24   reached 80 degrees Celsius, the temperature will likely

25   continue to increase until ignition occurs" -- gives you,

1    as an engineer and a fire scientist, a reasonable degree

2    of engineering certainty that if we had that condition

3    occur in the Severn peanut dome, then that is a likely

4    cause of ignition of the peanuts, correct?

5         A:    I mean, on face value, you could look at that

6    and say, yes, if it gets to 80, that could occur.  You

7    could use that as supporting information, I suppose.  But

8    just on face value, if you're looking at everything else,

9    that doesn't necessarily mean it's going to happen.

10        Q:    Tell me how -- how looking at this and

11   concluding that this condition will produce ignition is

12   any different than looking at the statement in the

13   applicator's manual that stacking or piling of tablets

14   could cause ignition -- how are those two different where

15   one you can say, yeah, that's going to get me there and

16   the other is not?  I'm very confused.

17                  MR. GOLDSTEIN:  Objection.

18                  THE WITNESS:  You're asking me about one

19   specific part, and all I'm saying is, yes, you could look

20   at that, and under certain circumstances, given the

21   entire investigation, you might be able to use that piece

22   of information.  On face value, I would agree with you,

23   but I want to make sure it's not in this particular

24   case.

25   BY MR. EPSTEIN:

1      **Q:**      Okay.  So in this particular case, you would

2    be looking for two things:  One, was it likely that you

3    got to 80 degrees Celsius, which is 176 degrees

4    Fahrenheit; and, two, was it self-heating that got you

5    there?  Because if you've got those two things, then the

6    inescapable conclusion is a fire was likely to result

7    from that, correct?

8                        MR. GOLDSTEIN:  Objection.

9                        THE WITNESS:  I guess ask that question

10   again, please.

11   BY MR. EPSTEIN:

12      **Q:**      Sure.  Take this statement at face value.

13      **A:**      Right.

14      **Q:**      And if you then fit around it two facts:

15   One, self-heating within the Severn peanut pile and, two,

16   that you had temperatures that would have gotten to 176

17   degrees Fahrenheit, then that would at least not allow

18   you to eliminate self-heating as the cause of the fire,

19   correct?

20      **A:**      Well, I don't necessarily agree with that,

21   no.

22      **Q:**      Why is that?

23      **A:**      Because you have to look at the totality of

24   the information; not just, oh, well, let's look at this

25   one statement, which is what you're asking me to do.  And

1   so I disagree with that.  Just because you get to 80

2   degrees doesn't mean you have ignition.

3        Q:     So if I told you that I have irrefutable

4   proof that there was self-heating in the center of the

5   Severn peanut pile and that temperatures did in fact,

6   prior to August 11th, 2009, reach 176 degrees Fahrenheit,

7   you would still conclude that you could eliminate

8   self-heating as a cause of this fire?

9        A:     If you can look at the temperatures and say

10  you don't have anything that's near ignition

11  temperatures, sure.

12       Q:     So the fact that he says, "If you get to 176,

13  you will then get to ignition temperature," doesn't

14  change your mind about that?

15       A:     Well, again, it's not you will.  You likely

16  will.  It didn't say you will.

17       Q:     Okay.  What you did -- you didn't cite that

18  statement anywhere in your report, did you?

19       A:     No.

20       Q:     Any particular reason why not?

21       A:     No.

22       Q:     So in a section deciding whether or not

23  self-heating could have led to ignition of these peanuts,

24  in which you cited J.T. Mills' publication seven times,

25  you didn't think it was worthy of mentioning that he said

1    that once heating has reached 80 degrees Celsius, the

2    temperature will likely to continue to increase until

3    ignition occurs; is that right?

4        A:    Is what right, that I didn't --

5        Q:    You didn't think it was worthy of a mention

6    in a section in which you cited J.T. Mills seven times on

7    the section in your report talking about self-heating?

8        A:    No.  I didn't think I needed to reference

9    that, no.

10       Q:    Okay.  And did you know, on the very next

11   page in his report, he gave a case study like the case

12   studies you've mentioned on Fumitoxin causing fires,

13   right?

14       A:    Right.

15       Q:    In which self-heating in the middle of a

16   stack of peanuts led to thermal runaway and ignition,

17   correct?

18       A:    Right.  Under significantly hot temperatures

19   and in the sun, under a tarp.

20       Q:    Be that as it may, he gave an example of

21   peanuts self-combusting, correct?

22       A:    Right.  And this is like the only one I've

23   actually ever heard about in the research I've done as

24   far as self-heating ignition of peanuts.

25       Q:    Did you reference that --

1      **A:**      This is a very -- I mean, this is under

2   extreme conditions in India, under a tarp.

3      **Q:**      Did you reference that case study in your

4   report anywhere?

5      **A:**      No; because it wasn't remotely similar to the

6   case we're dealing with.

7      **Q:**      At the top of page 7 of your report, you cite

8   J.T. Mills for this statement:  "Comparatively, shelled

9   peanuts have a very slight tendency to self-heat."

10            Do you see that?

11     **A:**      Yes.

12     **Q:**      You do realize that this case doesn't involve

13  shelled peanuts?

14     **A:**      That's right.  We're talking with in-shell or

15  unshelled peanuts.

16     **Q:**      But that statement was worth mentioning from

17  J.T. Mills?

18     **A:**      Right.  You're dealing with peanuts, whether

19  they're shelled or unshelled.  We're looking at the

20  ability to self-heat.  The ability of unshelled is low

21  anyway.  So it's somewhere between low and very low as

22  far as its self-heating ability.

23     **Q:**      You do understand the difference between

24  shelled peanuts and farmers stock peanuts?

25            MR. GOLDSTEIN:  Objection.

1          THE WITNESS:  I do.  And you do

2   understand that he's saying that unshelled peanuts have a

3   low tendency to self-heat.

4   BY MR. EPSTEIN:

5       Q:      Right.  And Fumitoxin tablets on the surface

6   of a peanut pile, no matter what their configuration,

7   have a low tendency to result in a fire, correct?

8       A:      Well, I don't know.  I've heard a lot --

9   about a lot of cases involving application of aluminum

10  phosphide resulting in fires.  I've heard of one case

11  with peanuts that have resulted in a fire.  And so I

12  think percentage-wise you have a better chance of having

13  a fire with aluminum phosphide -- aluminum phosphide than

14  you do with peanuts.

15      Q:      Okay.  The very thing that distinguishes

16  farmers stock peanuts from shelled peanuts is what

17  allowed you to make the statement earlier that a flash

18  would still have caused ignition of the farmers stock

19  peanuts, correct?  The small materials, the broken

20  shells, the sticks and the twigs, that's what you think

21  was ignited; not the peanuts, correct?

22      A:      Well, I think we talked about that.

23      Q:      Right.

24      A:      We talked about the smoldering of the

25  tablets, and we talked about ignition of the material in

1    there that then led to ignition of the peanuts.

2         Q:      That's why farmers stock peanuts are much

3    more likely to suffer from self-heating than shelled

4    peanuts.  Would you agree with that?

5                     MR. WIDIS:  Objection.

6                     THE WITNESS:  Well, I mean, you have --

7    you have low versus very low.  So both of them are not in

8    a situation where it happens frequently.  It's a low

9    tendency to self-heat.

10   BY MR. EPSTEIN:

11        Q:      Yeah.  And what J.T. Mills says is going to

12   increase that likelihood is the way in which the food

13   processor has stored the peanuts, correct?

14        A:      That can affect it, yes.

15        Q:      In fact, he said --

16        A:      What page are you on?

17        Q:      Back on page 80.

18                He says, "Self-heating promoted by the

19   presence of damaged nuts and moisture sometimes occurred

20   when peanuts are stored in large stacks."

21        A:      Right.  Sometimes occurs.

22        Q:      But you know that the peanuts that went into

23   the Severn peanut dome, from reading Dr. Montross'

24   report, from reading Dr. Jones' report and on and on,

25   went in with more moisture than they were allowed to

1   have, correct?

2                    MR. WIDIS:  Objection.

3                    THE WITNESS:  A few loads went in,

4   correct.

5   BY MR. EPSTEIN:

6       Q:      Hundreds of thousands of pounds.

7       A:      I'd have to look at the exact number, but

8   we're talking five loads out of I don't know how many

9   that went in.

10      Q:      Are peanuts a good insulator?

11      A:      Generally, yeah.

12      Q:      So if you put five loads of peanuts that are

13  3 percent higher in moisture than they should be right in

14  the middle of the peanut pile, does it matter that there

15  are only 5 as opposed to 50?

16      A:      I'm not sure where you get the 3 percent.  I

17  mean, they went in slightly higher than the 10 and a half

18  percent based on the allowable limit.  And so when you're

19  saying 3 percent, where is that coming in?

20      Q:      I'm using an example.  I'm not even talking

21  about the Severn peanut dome.

22      A:      Well, I didn't realize you were giving me --

23      Q:      Okay.

24      A:      3 percent?

25      Q:      Yeah.

1    A:      Likely what?

2    Q:      If you put -- if you put in peanuts that were

3  3 -- well, I will tell you that there's testimony in this

4  case that peanuts in storage should not be any higher

5  than 8 percent.

6    A:      Okay.

7    Q:      That once you get those peanuts in there,

8  you've got to get them down to 8 percent, and if you

9  don't, you're asking for trouble.  And there's all kinds

10  of testimony in this case and all kinds of information in

11  expert reports and in literature saying that.

12            Assume that's true.  We know peanuts went in,

13  hundreds of thousands of pounds, 3 percent approximately

14  higher than that.  Are you with me?

15    A:      Okay.

16    Q:      If those peanuts were concentrated in a

17  certain area in the peanut mass, is it your testimony,

18  well, as long as the average is 8 percent, who cares that

19  there's hundreds of thousands of pounds in 21 million

20  pounds; is that your testimony?

21    A:      Well, I think in this particular case, yes.

22  It -- self-heating didn't cause this fire.  We have

23  evidence to show that.  And so putting in those peanuts

24  really didn't affect things.  And you have drying taking

25  place when they're running the fans.

1       Q:      Did you do calculations to figure out how

2    much drying you're going to get from running the fans two

3    hours per day?

4       A:      I did not.

5       Q:      How much drying are you going to get from

6    running the fans two hours a day in the middle of the

7    peanut pile?

8       A:      Well, I've looked at R.P. Watson's

9    deposition, and he talks about whenever these things come

10   out -- the first time they came back out way too dry; so

11   he had to cut back on the drying.  And then in his

12   experience with that, the peanuts are dryer than they

13   were when they went in, and so you do get drying.  Now,

14   Dr. Montross has some calculations, assumptions made in

15   those calculations, but really you have to also look at

16   field experience of guys pulling the peanuts out.

17      Q:      Okay.  Did you know that same guy pulling the

18   peanuts out testified that the temperatures in the dome

19   never got above 60 degrees as far as he knew before he

20   was shown temperature readings to the contrary?

21      A:      You'd have to point that to me.

22      Q:      Just because R.P. Watson said it, you believe

23   that that's something you can take to the bank?

24      A:      Well, I believe that's a data point you need

25   to look at when you're dealing with the guy who is

1    looking at his product and whether or not he has to get

2    rid of some of the peanuts because they're molded or have

3    problems.  They're not coming out the way he wants them

4    to.  I think that's something he would definitely pay

5    attention to.

6         Q:    Okay.  I'm not sure if you've answered,

7    forgive me, if you have, whether peanuts that go in at a

8    3 percent moisture content higher than is -- should be in

9    the peanut mass, if those peanuts are wet enough to

10   create the kind of problem that Mr. Mills is talking

11   about here.

12        A:    And which problem would that be?

13        Q:    The problem of self-heating promoted by the

14   presence of damaged nuts and moisture sometimes occurs

15   when peanuts are stored in large stacks, and I'm talking

16   specifically about the moisture in peanuts that went in

17   at 11 percent.

18        A:    Could they?

19        Q:    Sure.

20        A:    Sure, they could.

21        Q:    Okay.

22        A:    The question is, how much and does it matter?

23        Q:    Okay.  And we'll talk about that.

24              You say on page 7, same paragraph we were

25   just looking at at the top, that "Autoignition of an

1    organic commodity as a result of thermal runaway

2    typically occurs at 3- to 500 degrees Celsius, 572 to 932

3    degrees Fahrenheit."

4              What was your point in making that

5    statement?

6        A:    The point is you need to have significantly

7    high temperatures to actually reach the autoignition and

8    start the smoldering process.

9        Q:    So you disagree with what Mills says about

10   once heating has reached 80 degrees Celsius, 176

11   Fahrenheit, the temperature will likely to continue to

12   increase until ignition occurs?

13       A:    Well, that's kind of a -- the point is, he's

14   not saying when ignition occurs.  He's not saying at 80

15   degrees ignition occurs.  He's saying in that example

16   that if you get to 80 degrees, ignition likely will

17   occur.  I'm saying you need to be at that temperature for

18   that ignition to occur.  And so it's a long way from 80

19   degrees C to 300 to 500 degrees C.

20       Q:    But if you have self-heating that gets to

21   176, it doesn't matter what the ignition temperature is.

22   That reaction is going to continue until you get to

23   ignition in all likelihood; not every time, but it

24   usually will, won't it?

25       A:    Possibly, yes.  If you have the 80 degrees,

1    you can potentially reach autoignition.

2         Q:    Right.  What is the container handbook on

3    which you relied for that statement about the

4    autoignition temperature of organic commodity?

5         A:    It's a reference I found regarding bulk

6    commodity storage.

7         Q:    Is it a published -- is it published?

8         A:    What do you mean "published"?

9         Q:    Is it something that you can buy on Amazon?

10        A:    I think it's online.  It's a German -- I

11   think it's a German reference.

12        Q:    Okay.  Do you know if it's a reliable

13   authority?

14        A:    You know, these ignition temperatures are

15   what I would expect.  So, I mean, in that respect, I

16   think it's fine.  It's not outside the realm.

17        Q:    Okay.  And the other thing that J.T. Mills

18   says that will get you from self-heating, potentially, to

19   autoignition of the commodity relates to how you store

20   the commodity.  And he says, about four or five -- about

21   eight lines down from "Self-heating promoted by the

22   presence of damaged nuts," he says, "The nuts should be

23   kept dry and the maximum amount of ventilation provided

24   to the storage," right?

25        A:    Yeah, that's what he says.

1      Q:      And we know that's not what happened in the

2   Severn peanut dome, correct?

3                       MR. GOLDSTEIN:  Objection.

4                       THE WITNESS:  What's not?

5   BY MR. EPSTEIN:

6      Q:      The maximum amount of ventilation provided to

7   the storage?

8      A:      Well, they ran their fans up until, I

9   believe, the end of February.  And then after that point,

10  they didn't run them, except for a couple hours after

11  the --

12     Q:      They sealed it up.

13     A:      -- Protect-It.  Yeah.

14     Q:      So they weren't ventilating that dome but two

15  hours a day until the end of February and then not at

16  all, right?

17     A:      Except for the time they added the

18  Protect-It.

19     Q:      For two hours?

20     A:      Right.

21     Q:      So did you know that Dr. Brown in this case

22  has already testified that the storage conditions, both

23  in terms of the moisture and in terms of the aeration,

24  were not appropriate for the Severn peanut dome?

25                      MR. GOLDSTEIN:  Objection.

1                    THE WITNESS:  I read his deposition.

2     And, I mean, if that's what he said, that's what he

3     said.

4     BY MR. EPSTEIN:

5          Q:     Well, those things will lead to temperature

6     increases of the commodity, correct?

7          A:     They can, sure.

8          Q:     In this case, we know they did, correct?

9          A:     We have temperatures showing certain things.

10    Whether or not those cables are accurate or not is really

11    a huge question in this case.

12         Q:     So you're going to doubt the -- what the

13    cables are showing?

14         A:     Well, I mean, I think Scott Chant said

15    that -- to use his words, worthless related to the data

16    that was recorded.  Things were going on with the cables

17    from the beginning.  So we don't know the accuracy or

18    reliability of those particular cables.

19         Q:     Mr. Schumacher, Mr. Chant used the word

20    "worthless" for the readings that were taken in prior

21    growing seasons -- isn't that correct? -- that jumped all

22    around?

23         A:     He was talking about Exhibit 69, but he said

24    the same thing would apply to Exhibit 70.

25         Q:     He did.  He said the readings taken on

1    Exhibit 70 were worthless.

2        A:      He said the same concerns he had with

3    Exhibit 69 he had with Exhibit 70.  He doesn't know what

4    to make of those particular readings.

5        Q:      All right.  If you would, go to page 8 in

6    your report.

7        A:      Okay.

8        Q:      Now, if I understand what you did in terms of

9    Figure 1, you decided that the height of the peanut pile

10   was 20 feet from the ceiling of the peanut dome, and then

11   you created two possible scenarios of an angle of repose

12   of 30 degrees and an angle of repose of 38 degrees to

13   figure out which of the sensors on which cables would

14   have been in the peanut mass.

15       A:      Right.  I didn't create the dome drawings.

16   John Cavaroc did.

17       Q:      Okay.  And he used 20 feet as opposed to the

18   25 feet that R.P. Watson, as the corporate witness for

19   Severn Peanut Company, testified to?

20       A:      Yes.

21       Q:      Okay.  And did you know that R.P. Watson,

22   answering for Severn Peanut Company, said that it was 25

23   feet, and "Here's" -- "Here's how I came up with that,"

24   and he described how he came up with the 25 feet?

25               Do you recall that?

1      A:      You'd have to point it out, but I've seen the

2   number 20 before frequently in the testimony of people

3   who saw it.

4      Q:      And the fact of the matter is we'll never

5   know precisely, correct?

6      A:      Right.  We won't know exactly.

7      Q:      And we don't know precisely what the angle of

8   repose is either, correct?

9      A:      That's right.

10     Q:      Okay.  And so you created two possibilities,

11  and if you'll look in Dr. Montross' report, he created a

12  slightly different configuration on page 42.

13     A:      Okay.

14     Q:      You charted it differently, but the concept

15  that you're both working with is the same between your

16  Figure 1 and his Table 4?

17     A:      Same concept, sure.

18     Q:      Okay.  His X's are showing sensors that are

19  in the pile of peanuts based upon what he described in

20  his report being a -- an angle of repose of 30 degrees

21  and a distance between the ceiling and the top of the

22  peanut pile of 25 feet.

23     A:      Okay.

24     Q:      Are you with me on that?

25     A:      Sure.

1      Q:     At somewhere roughly in the vicinity of what

2    you did in Figure 1, correct?

3      A:     Right, roughly.

4      Q:     Okay.  And I want you to keep that page of

5    Dr. Montross' report handy as we work through your

6    report.

7             You selected four sensors --

8      A:     Right.

9      Q:     -- to extrapolate the escalation of

10   temperatures that had been occurring prior to the

11   fumigation to August 11th, 2009, correct?

12     A:     Yes.

13     Q:     All right.  You selected, on the second

14   cable, sensors 7 and 8?

15     A:     Right.

16     Q:     On the sixth cable, sensor 7; and on the 13th

17   cable, sensor 6, correct?

18     A:     Yes.

19     Q:     Did you realize that not all of those, even

20   by your own Figure 1, were within the peanut pile?

21     A:     Yeah.  I wanted to be really conservative and

22   look at that situation where you have heating that's in

23   the dome part of the thing and look at that as well.

24     Q:     But if you're looking at self-heating and

25   whether it's occurring, it's not going to be occurring at

1    the head space, is it?

2        A:      No, self-heating will not be.  But you're

3    going to have heating from the natural heating of the

4    head space of the dome that's going to take place as

5    well.

6        Q:      You've got a pocket of biologically degrading

7    peanuts in the center of the peanut pile.  How is that

8    going to affect the temperature in the head space?

9        A:      I didn't say that was going to affect it.  I

10   said you have head space temperature variations from the

11   natural heating up of the dome from one season to the

12   next.  That's what I'm talking about.

13       Q:      Okay.  Who is it that told you that?

14       A:      Who is it that told me what?

15       Q:      That the dome is going to get hotter as the

16   seasons change?

17       A:      Well, there is going to be some heat

18   transfer.  Whether or not that's significant or not, you

19   will have some of that heating going on from the sun

20   above it.

21       Q:      Really?

22       A:      Some of it, yeah.

23       Q:      Do you know who David South is?

24       A:      Yes.

25       Q:      Did you read his report?

1      **A:**     Yes.

2      **Q:**     How many domes has he been involved in

3   constructing over the course of his career?

4      **A:**     I don't know.

5      **Q:**     Thousands?

6      **A:**     I don't know.

7      **Q:**     Does he agree with you that the weather

8   conditions outside the dome are going to affect the

9   temperature on the inside of the dome?

10     **A:**     Well, I don't know if he agrees totally, but

11  there will be some -- some change.  Whether it's large or

12  not, he may disagree with that.

13     **Q:**     Okay.  You're not an expert on dome

14  technology, are you?

15     **A:**     Not as far as building them, no.

16     **Q:**     Did you understand that there's a significant

17  insulating quality to the monolithic dome of the sort

18  that was built at Severn Peanut Company?

19     **A:**     Right, sure.

20     **Q:**     In fact, that's why Mr. Watson wanted the

21  dome in the first place, isn't it?

22     **A:**     Right.

23     **Q:**     He wanted to keep the peanuts cool, right?

24     **A:**     Right.

25     **Q:**     So you can't just make the assumption, if

1    it's getting warmer outside, the head space and the

2    peanuts inside are going to get warmer, too, can you?

3        A:    Well, I didn't say the peanuts.  I'm just

4    saying that the head space will change temperature more

5    than the peanuts based on the seasons changing.

6        Q:    Why would the head space be changing?

7        A:    Because it's in direct contact with the sun.

8    It's above it where -- and solar radiation and things

9    like that.

10       Q:    Are going to be happening through an

11   insulated concrete dome?

12       A:    There will be some of that going on.  I'm not

13   saying it's significant, but you will have some -- some

14   changes.

15       Q:    All right.  On page 9, you actually said that

16   the reason you selected those four sensors is because

17   they were, quote, buried in the peanuts and were not in

18   the head space.  You realize that's in error, right?

19       A:    No.  I mean, if you look at -- so you're

20   looking at 6-7?  If you look at 6-7 on an angle of repose

21   at 38, it's in the pile.  So I guess -- actually, let me

22   look at that.  I'm sorry.  Give me a second here.

23             That's right.  So it's not -- well, it's not

24   in the pile on either of those.  I was looking at the

25   heat -- that was from the heating or the change in

1    temperature over time.  That's why I selected it.

2        Q:     You realize that on the bottom figure, the

3    one that's based upon an angle of repose of 38 degrees,

4    three out of the four that you chose were in the head

5    space?

6        A:     Let me look at that.

7               That may be on the bottom, but that's not on

8    the top.

9        Q:     I agree.

10       A:     Right.

11       Q:     On the top, three out of four in the peanuts

12   and one out of four is in the head space.

13       A:     That's right.

14       Q:     Okay.  But your point in picking those was

15   that these four sensors were buried in the peanuts and

16   were not in the head space.  That's just not accurate --

17       A:     Well --

18       Q:     -- is it?

19       A:     Other things were basically that it was -- it

20   was -- they were heating the fastest, the greatest

21   temperature change over time.  So that's what I was

22   looking at in choosing those.

23       Q:     But the number one reason you actually gave

24   in your report was that all four sensors were buried in

25   the peanuts when in fact that's not so?

1      **A:**     That's right.  I'm assuming they're buried in

2    the head -- in the peanuts, because they are the ones

3    that are showing the greatest temperature change over

4    time.

5      **Q:**     Okay.  I'm with you now.  So you're not

6    saying they were, according to your own charts, buried in

7    the peanuts, but you're making the assumption that they

8    would have been?

9      **A:**     Right.

10      **Q:**     Okay.  I'm with you.

11      **A:**     Right.

12      **Q:**     All right.  Well, what I want to talk a bit

13    with you about is exponential and second order polynomial

14    regressions.

15      **A:**     Okay.

16      **Q:**     Those are the -- that's the expressions you

17    used below your four bullet point items, correct?

18      **A:**     Yes.

19      **Q:**     What's an exponential regression?

20      **A:**     Well, that's the regression involving E to

21    the -- E to the X, basically.

22      **Q:**     E to the X?

23      **A:**     Yeah.

24      **Q:**     Okay.  Go ahead on that legal -- piece of

25    legal pad paper, show me an exponential regression.

1    **A:**    Regression or an exponential type of growth

2  based on a regression?

3    **Q:**    I'm looking for you to show a formula or

4  calculation that is what you would describe as

5  exponential regression which was used to fit the data in

6  this case.

7    **A:**    Well, you basically have data points that you

8  then use Excel to apply the best curve fit as an

9  exponential regression to see how the trends are going.

10    **Q:**    Okay.  Can you write "exponential regression"

11  on there, and we'll mark that as Exhibit 266.

12                   [EXHIBIT NO. 266 MARKED FOR

13                   IDENTIFICATION]

14  BY MR. EPSTEIN:

15    **Q:**    And as I understand it, you're then using the

16  exponent that you created by looking at those multiple

17  data points to make them fit on the same line to then

18  build the line out further; is that right?

19    **A:**    Yes.

20    **Q:**    Okay.  I want you to do the same thing with

21  respect to what you consider second order polynomial

22  regression?

23    **A:**    Well, it's just basically -- the end result

24  is the same thing.  You're just looking at how -- it's a

25  different curve fit to those particular points.

1     **Q:**    Okay.  And what's different between second

2  order polynomial regression and exponential regression?

3     **A:**    Well, the ultimate curve.  I mean, the way it

4  looks, the exponential regression actually gives you

5  higher temp -- or excuse me.  The second order of

6  regression gives you higher predicted temperatures than

7  the exponential does.

8     **Q:**    Okay.  Why?  What is it about using second

9  order polynomial regression that results in higher

10 numbers as you go further down the line?

11    **A:**    That's just the way it ended up with this

12 particular regression using Excel.

13    **Q:**    Okay.  Is it Excel that you used, or is it

14 some other program?

15    **A:**    Excel.

16    **Q:**    Okay.  All right.  So you're not showing me

17 anything differently on a legal paper than you did on

18 Exhibit 266?

19    **A:**    That's right.

20    **Q:**    Okay.  Then you can put it aside.

21        What did you have to -- what part of Excel

22 were you using?  What were you telling Excel to do with

23 these numbers?

24    **A:**    You basically plot on a YX graph, and then

25 you say add trend line.

1    Q:    Okay.

2    A:    And you determine if you want to use an

3  exponential trend line or if you want to use a second

4  order polynomial trend line, and then it gives you that

5  fit in its equation.

6    Q:    And it's a purely mathematical equation,

7  correct?

8    A:    Right; based on what the data is telling

9  you.

10   Q:    And that data is simply numbers as it's used

11  in Excel, correct?

12   A:    Right.  They're numbers that you're using to

13  predict, based on that trend, future temperatures.

14   Q:    And that assumes that what happened before

15  will continue to happen going forward, correct?

16   A:    It's showing you what's going on at that

17  time, yeah.  It's -- it's charting what's taking place at

18  that time.

19   Q:    It's not charting any changes that would take

20  place in the future, correct?

21   A:    It's looking at what the trend is at that

22  point, yes.

23   Q:    So in other words, if you got to thermal

24  runaway by getting to 80 degrees Celsius and quickly

25  thereafter got to a temperature capable of causing

 1    ignition, the exponential regression and the second order

 2    polynomial regression isn't going to show that, is it?

 3        A:      Again, it's going to show you the trends at

 4    that time as to what's going on.

 5        Q:      It doesn't apply any concepts of agricultural

 6    or biosystems engineering to the process, does it?

 7        A:      Well, those involve exponential growth.  So

 8    in that sense, it did.  And they're very similar to what

 9    Dr. Montross got as far as ranges of temperatures in his

10    analysis.

11        Q:      You know that he took your analysis and he

12    showed that it didn't come up with the same numbers?

13        A:      But I looked at his analysis that he did.  He

14    did some regression and said, "Oh, it looks like you can

15    do that."  And I looked at his analysis, and the

16    temperatures he got weren't even -- weren't that much

17    different than mine.

18        Q:      Okay.  Let's look at Exhibit -- at Exhibit

19    No. 198.

20        A:      Okay.

21        Q:      Page 70 and 71.  And I take it you've had a

22    chance to study this now, correct?

23        A:      Yes.

24        Q:      And so what Dr. Montross did in Figure 27 is

25    he took your exact analysis --

1      **A:**      Which figure are you on again?

2      **Q:**      Figure 27.

3      **A:**      27.

4      **Q:**      He took your exact analysis and he plotted

5      the actual temperature readings from March, from June,

6      and from July -- and those are the black dots; do you see

7      that? -- which gave him the line that you drew in

8      Exhibit 266 up to the point of the July 13th readings,

9      correct?

10     **A:**      Okay.

11     **Q:**      And he gave a 95 percent prediction band

12     around those.  Do you see that?

13     **A:**      Right.

14     **Q:**      From an engineering or scientific point of

15     view, do you agree with applying a prediction band as

16     opposed to a simple linear line?

17     **A:**      Well, I mean, the numbers he actually -- that

18     were measured on August 11th are very close to the

19     predicted model, and so I guess I don't know what your

20     question is.  I mean --

21     **Q:**      You're --

22     **A:**      You're looking at, you know --

23     **Q:**      You're --

24     **A:**      -- orders of magnitude here, and still I'm

25     not -- I don't get it.

1    Q:    You came out with a temperature barely of 100

2    degrees.

3    A:    It's 105, I think, and I think the actual --

4    what is this temperature showing?

5    Q:    The black line is showing 120.  The red line

6    is showing, on top, 160.  And the red line on the bottom

7    is showing about 110.

8    A:    And I need to look at what that -- the one

9    that's about 170, that very likely could be on the

10   surface.  And that's why it's at that high temperature.

11   And I think that's -- what number is that one there?

12   Q:    I'm sorry.  What number is what one?

13   A:    The high one, the one that's higher.  I guess

14   I don't understand the question you're asking.

15   Q:    You're --

16   A:    I'm not concerned with this analysis because

17   it's close and it gives you orders of magnitude, which is

18   what I'm looking at.

19   Q:    Why did you get a different number then than

20   he did by applying the exact same analysis?

21   A:    Well, he's got -- I don't know how.  He's got

22   several different points at each date, when I only did

23   one.  I didn't do several; I did one thermocouple per

24   regression.  He's doing several together and doing a

25   regression off those several.

1    Q:    You had four different sensors.

2    A:    I did individual regressions on those -- on

3    each sensor, not coupled together.

4    Q:    Okay.  You took sixth grade math, didn't

5    you?

6    A:    I did.

7    Q:    Did your sixth grade math teacher make you

8    show your work in order to get credit?

9    A:    Sure.

10   Q:    Where is the work that you did that supports

11   the 125 degree Fahrenheit, 105 degree Fahrenheit

12   temperatures that you came up with on page 9 of your

13   report?

14   A:    It's in the material that I provided, that

15   should have been provided to you.

16   Q:    All right.

17   A:    While you're looking at that, can we --

18   Q:    Absolutely.

19   A:    -- take a quick break?

20         THE VIDEOGRAPHER:  Off the record at

21   3:19.

22         [RECESS TAKEN]

23         THE VIDEOGRAPHER:  On the record at

24   3:31.

25   BY MR. EPSTEIN:

1      Q:      All right.  Now, off the record,

2   Mr. Schumacher, I was having you try and help me

3   understand on the disk of material that you provided

4   which you were referring to as what showed your work for

5   the analyses that we have just been talking about, and

6   you have said it is a file that says "Temperature

7   Readings" -- an Excel file that says "Temperature

8   Readings, Exhibits" -- I'll open it up -- "Exhibits 69 to

9   70."  Is that the Excel file that you used to come up

10  with the numbers that are included in your report?

11     A:      Yes.

12     Q:      Okay.  And just to make sure I complete my

13  thought, there's also a -- one that says "Temperature

14  Readings 8/11/09."  Did that go into your analysis at all

15  of -- on page 9 of your report of exponential and second

16  order polynomial regressions?

17     A:      No, that one did not.

18     Q:      Okay.  So all of the data that are in your

19  report are also in the Excel file "Temperature Readings,

20  Exhibits 69 to 70," correct?

21     A:      Your question is all the data in my --

22     Q:      All of the data included in the paragraph

23  beginning "Exponential and second order polynomial

24  regressions were used to fit the data" -- all of the data

25  that we see in that paragraph, 105 degrees Fahrenheit,

1    125 degrees Fahrenheit, 89 degrees Fahrenheit, and 115

2    degrees Fahrenheit, can be -- how you got there is

3    contained in the Excel file titled "Temperature Reading,

4    Exhibits" -- "Temperature Readings, Exhibits 69-70 Excel

5    SX"?

6         A:    Yes.

7         Q:    Okay.  All right.  And while we're talking

8    about your file material, I placed before you -- or at

9    least I thought I'd placed before you.

10        A:    I haven't -- I haven't lost them.

11                   [EXHIBIT NOS. 267 THROUGH 273 MARKED FOR

12                   IDENTIFICATION]

13   BY MR. EPSTEIN:

14        Q:    I am placing before you Exhibits 267 through

15   273, and I wanted to go through those with you very

16   quickly, just having you identify what each is and why

17   you prepared it, starting with 267.

18        A:    Those are just temperature profiles similar

19   to what Dr. Montross did with his movies for various

20   temperature readings.

21        Q:    Okay.  And this is just -- this is just to

22   show the actual temperatures recorded by the Severn

23   temperature monitoring equipment as opposed to any

24   increases in temperatures, correct?

25        A:    Right.  They're showing what is being

1   recorded by Severn.

2        Q:     Okay.  The actual temperatures with colors as

3   depicted in the color temperature chart on the right-hand

4   margin?

5        A:     Right.  The temperatures that were recorded,

6   yeah.

7        Q:     Okay.  What is 268?

8        A:     That's just showing the dome, the pile of

9   peanuts as -- let me look at this first before I speak.

10            This is a dome, I think, or a pile of peanuts

11  showing dimensions in where thermocouple sensors were

12  located or cables were located.

13       Q:     Okay.  So that's not trying to show the

14  peanut pile?

15       A:     And I'm trying -- I think it is.  I think

16  we're trying to show the volume of the peanuts at, you

17  know, different configurations here.  So it's calculating

18  those peanut volumes.

19       Q:     Okay.  Go to 269.  What is that -- what is

20  that and what is it attempting to show?

21       A:     That's showing, again, that you're sensing

22  percentages at different configurations.

23       Q:     Okay.  And at 12.5 feet, you're at 68.4

24  percent of what's in the 1-through-13 space, and at 15

25  feet, you're at 92.1 percent of what's in the 1-to-13

1    space?

2        **A:**     Yes.

3        **Q:**     Okay.  270; what is that?

4        **A:**     I think these are just the various -- what

5    are those, 1007s?

6        **Q:**     1007s, uh-huh.

7        **A:**     1007s.  Probably from Exhibit 60.

8        **Q:**     Okay.

9        **A:**     I just was putting it in there and --

10       **Q:**     Did you use this information in any

11   particular way?

12       **A:**     No.

13       **Q:**     Okay.  Exhibit 271.

14       **A:**     That is just quick calculation of the height

15   of the peanuts at the chute, I think.  Done early on.

16       **Q:**     Okay.

17       **A:**     It had no bases necessarily to my

18   conclusions.

19       **Q:**     Okay.  272.

20       **A:**     This is -- I read something in Dr. Montross'

21   report where he cited something that was clearly wrong,

22   and I was showing that you're not going to get this huge

23   BTU generation from the dry metal loss model as

24   carbohydrate oxidation that he reported in his report.

25       **Q:**     Can you find specifically what in his

1    report -- you've got it in front of you -- you're talking

2    about?

3        A:      Right.  And I will do that.  Give me one

4    second.

5        Q:      Yes.  I know you've got a lot of paper in

6    front of you.

7        A:      Got to organize it here.

8                So it's equation 7.

9        Q:      You think his equation 7 is wrong?

10       A:      Let me -- let me step back.  It's -- where he

11   says every gram -- sorry.  So it would be underneath

12   equation 7, second sentence.  Every gram of dry metal

13   loss would produce 1.47 grams of $CO_2$, .6 grams of water,

14   and 677.2 -- or 670 -- let me just start again -- 6,772

15   BTUs of heat.  And in actuality, it's only 15 BTUs of

16   heat.

17       Q:      And that's what you show in Exhibit 272?

18       A:      Yeah.

19       Q:      Okay.  273; what is that?

20       A:      I got the -- okay.  That was just looking at

21   the water available on the Protect-It versus in the

22   peanuts and in the air.

23       Q:      What were you using that to determine?

24       A:      Just looking at the effect that Protect-It

25   would have potentially had.

1     **Q:**     In terms of whether it would have created

2     sufficient moisture to have a reaction with the Fumitoxin

3     tablets?

4     **A:**     Right.  Whether or not it was a big

5     contributor, and I don't think it had anything to do with

6     it.

7     **Q:**     Okay.

8     **A:**     Is that the last one?

9     **Q:**     That is.

10    **A:**     You want these back or --

11    **Q:**     The court reporter would want them.

12              So I want to go back to Dr. Montross' report

13    where we were, which is on Figure 27.  And you understand

14    that Dr. Montross believes that the hot spot was located

15    primarily in a different area than the sensors that you

16    used for your two regression analyses, correct?

17    **A:**     I think some of them, yeah, I would agree.

18    **Q:**     Okay.  I think you have one in common, which

19    was sensor -- well, let's go to Dr. Montross' report on

20    page -- we were there a minute ago.

21    **A:**     You want --

22    **Q:**     Page 42.

23    **A:**     42?  Okay.

24    **Q:**     Yeah.

25    **A:**     I've got it.

1     Q:      Okay.  On page 42, he marked in red X's the

2  sensors that he believed were in the hot spot resulting

3  from self-heating, correct?

4     A:      Yes.

5     Q:      Okay.  And that would be sensor -- or cable

6  2, sensor 7; cable 3, sensor 6 and 7; cable 4, sensor 6

7  and 7; cable 5, sensor 6 and 7; and cable 6, sensor 6,

8  correct?

9     A:      Yes.

10    Q:      And of those, the only one that you had in

11 common was cable 2, sensor 7, correct?

12    A:      Let me -- let me take a look and --

13    Q:      It's on page 8 of your report.

14    A:      Thank you.

15            That's correct.

16    Q:      Okay.  So what he did in Figure 28, if you

17 move to Figure 28, which is on page 71 --

18    A:      Figure 28?

19    Q:      Uh-huh.

20    A:      Okay.

21    Q:      -- is he went ahead and did the exact same

22 regression analysis that you did to come up with your

23 temperatures, and his analysis showed that the

24 temperatures measured, on August 11th, five out of six --

25 one, two, three, four -- one, two, three, four, five --

1    five out of six that there were temperature data

2    available for wound up right in that 95 percent

3    prediction zone, correct?

4        **A:**    Okay.

5        **Q:**    So do you understand that what Dr. Montross

6    shows through regression analysis is that you actually do

7    get to most of the temperatures that were detected on

8    August 11th when the fire was discovered just by a

9    straight linear regression analysis?

10            Do you see the red triangles within the 95

11   percent prediction zone?

12       **A:**    Sure.  I don't know how that's a linear

13   regression.

14       **Q:**    Okay.  You think he did a different

15   regression analysis than you did?

16       **A:**    You're saying he did a linear.  That looks --

17   doesn't look like a linear regression.

18       **Q:**    I'm not -- I'm talking about the same -- he

19   took the same data and he used a straight mathematical

20   equation like you did, which is equation 18.

21            Did you see his equation 18?

22       **A:**    Yeah, I did.  Sure.

23       **Q:**    Do you object to his equation 18?

24       **A:**    No, I think it's fine.

25       **Q:**    Using that equation, he wound up getting the

1    August 11th temperatures from the temperatures that were

2    recorded in March -- in March, in June, and July?

3         A:    Okay.

4         Q:    So he is saying that you actually do get to

5    the August 11 temperatures as the result of regression

6    analysis; whereas, you are saying in your report, unless

7    I'm missing something, that you don't?

8         A:    No.  I'm saying that you don't get to

9    temperatures that are remotely close to ignition

10   temperature, and so if there -- if these temperatures are

11   accurate and there is some heating, it's inconsequential

12   to me.

13        Q:    Show you what's been marked as Exhibit 196.

14        A:    Okay.

15        Q:    Mr. Schumacher, there's not a single

16   temperature in Exhibit 196 that would be, quote, an

17   ignition temperature, is there?

18        A:    That's right.  And we don't know what's going

19   on with the 230's, but that's -- you know, that's --

20   could be bad cable or anything.  But you're right.

21   That's why you've got to wonder about these

22   thermocouples.

23        Q:    These thermocouples don't go beyond 230.

24   Didn't you read Mr. Chant's testimony?

25        A:    That's right.  My point is, we don't know

1    what's going on with, for instance, thermocouple -- or

2    cable 13 or 3 or 1.  They can just be bad.  You could

3    have a fire on the surface.  You could have a fire

4    somewhere else.  We don't know.  But the point is, if you

5    look at all the other data, there's nothing that shows

6    ignition temperatures in this stuff.

7         Q:    But there are significantly elevated

8    temperatures as you would expect there to be knowing that

9    there was a fire inside of the dome, correct?

10        A:    Well, you're assuming that these temperatures

11   are accurate, one; which, again, that's very

12   questionable.  And there are temperatures -- so if you

13   assume that they're accurate, there are some temperatures

14   that are higher, yes, but they're not at ignition

15   temperature.

16        Q:    Because you don't have 100 percent coverage

17   in the dome and because the temperature cables can't

18   tolerate temperatures higher than 230 degrees.

19        A:    That's right, but they don't show anything

20   here that says that there is ignition because of

21   self-heating to ignition.

22        Q:    Okay.

23        A:    And that's what Dr. Montross showed, too.

24        Q:    Okay.  Well, if you had a self-heating

25   process and you got to temperatures of 176 degrees

1    Fahrenheit, then somewhere within that material, you're

2    going to get thermal runaway --

3        **A:**    And --

4        **Q:**    -- in all likelihood, according to J.T.

5    Mills, correct?

6        **A:**    Right.  And we don't see that in these --

7    assuming these are accurate, we don't see that.

8        **Q:**    You see temperatures in excess of 176, don't

9    you?

10       **A:**    But we don't see ignition temperatures.

11   That's my point.  There is no evidence of any ignition

12   temperatures in this data.

13       **Q:**    Well, you didn't have to do any regression

14   analysis to state that in your report, did you?

15       **A:**    Sure.  You have to look at what you think's

16   going to happen and you look at what the temperatures are

17   showing you and you look at the reliability of the data

18   and you determine, well, was this data accurate or not?

19   Is it reliable or not?  If you can't look at the

20   temperatures and believe they're correct, then you have

21   to look at other things that may or may not tell you if

22   you have heating going on.  And that's exactly what

23   Dr. Montross showed, that you're not going to get there

24   from here.  You can't get to the ignition temperature.

25   He proved that.

1      Q:      Okay.  You think Dr. Montross proved that you

2   can't get ignition of the peanuts by virtue of the

3   temperature modeling he did in his report?

4      A:      That's what his self-heating modeling is

5   showing to me.

6      Q:      Okay.  Do you agree or disagree that there is

7   nothing about the August 11th temperature readings that

8   supports the notion that the fire began on the surface of

9   the peanuts?

10     A:      Well, again, we don't know about the

11  reliability of the temperature data.  And so you can't

12  say either way what these temperatures are showing you.

13     Q:      Well, let me ask specifically again.  Would

14  you agree that there is nothing in the temperature data

15  from August 11th, 2009, the first page of Exhibit 196,

16  which would support the notion that the fire commenced on

17  the surface of the peanut pile?

18     A:      Well, I mean, again, you have those

19  thermocouples that we don't know what's going on with

20  those.  And those could actually be bad because you have

21  a fire on the surface, but we don't know.

22     Q:      So the answer is, yes, there's nothing here

23  that supports the notion that the fire occurred on the

24  surface of the peanut pile?

25     A:      And there's nothing that supports the notion

1    that it occurred in the peanut pile.

2        Q:    Okay.  I'm with you on that; however, the

3    hottest temperatures recorded on this page of

4    Exhibit 196, August 11th, 2009, were deep within the

5    peanut mass, correct?  The ones that recorded actual

6    temperatures as opposed to 230, the very hottest

7    temperatures were in the interior of the peanut pile?

8        A:    Well, just taking these on face value, that

9    is correct, assuming that there's any reliability to

10   these readings.

11       Q:    Okay.  We're back on page 9 of your report.

12   For the time being, I'm done with Dr. Montross.  We will

13   come back to it.

14       A:    Let me get this -- let me get this organized

15   here.

16       Q:    Sure.  You can hand me back that exhibit to

17   get it out of your way.

18       A:    This one?

19       Q:    Yeah.

20       A:    Okay.  What page?

21       Q:    You're on page 9 of your report.

22       A:    Okay.

23       Q:    You begin your next-to-last paragraph on the

24   self-heating section by saying that "Randall Turner and

25   Brian Lilley did not notice anything with the dome or

1    peanuts prior to fumigating on August 4th, 2009, that

2    concerned them.  An unpleasant odor associated with mold

3    growth likely would have been noticed by the IFC

4    fumigators had self-heating of any significance been

5    occurring at that time."

6         A:    Correct.

7         Q:    Mr. Schumacher, how heavily do you rely on

8    the fact that, as you say, the applicators did not smell

9    any odors associated with mold on August 4th for your

10   conclusion that self-heating can be eliminated as a cause

11   of the fire?

12        A:    Well, it's one point that I'm considering.

13   And, you know, several people said that they would have

14   smelled it if there had been any self-heating of

15   significance taking place on August 4th.  People like

16   Scott Chant.  R.P. Watson I think said it.  Even Mills

17   talks about it in the -- that publication, and that's

18   typically how these things are discovered as far as when

19   you have a mold problem is through smell.

20        Q:    Did you read Dr. Brown's testimony?

21        A:    I did.

22        Q:    Did you see that Dr. Brown had a different

23   take on that?

24        A:    Well, you can point to that section.

25        Q:    I can if I find it.

1          Let me ask you generally what I asked him.

2     Do peanuts have an insulating effect?

3          **A:**     They do, yeah, but they also have a lot of

4     porosity and a lot of ability to allow the air to move

5     through them.

6          **Q:**     Okay.  And if there is mold 60 feet down in a

7     peanut pile, do you believe that 25 feet above the peanut

8     pile it's necessarily something that somebody's going to

9     smell?

10         **A:**     Well, I think with the size of the peanuts

11    that is being modeled as far as molding and self-heating,

12    I think you would have smelled it, particularly where the

13    hot spots are, where he's modeling those.  So, yes, I

14    would think you would smell that.

15                    [EXHIBIT NO. 274 MARKED FOR

16                    IDENTIFICATION]

17    BY MR. EPSTEIN:

18         **Q:**     Show you what's being marked as Exhibit 274.

19         **A:**     Okay.

20         **Q:**     Okay.  This is from the deposition of

21    Dr. Brown.

22         **A:**     Okay.

23         **Q:**     At the very bottom of page 131, he was asked,

24    "What causes self-heating in a stored commodity?"

25                    He said, "Well, there's two different things.

1    One could be a microbial activity that is the result of

2    poor storage conditions, high moisture, high temperature

3    resulting in an explosion of microbial activity.  And

4    those microbe" --

5         A:    I'm sorry.  Where are you?

6         Q:    Bottom of page 131.

7               "What causes self-heating in a stored

8    commodity?"  Do you see that?

9         A:    Oh, then you went to the next page.

10        Q:    Yes.

11        A:    I was looking for it on that page.  Sorry.

12        Q:    And he said, "Well, there's two different

13   things.  One could be microbial activity that is the

14   result of poor storage conditions, high moisture, high

15   temperature resulting in an explosion of microbial

16   activity.  And those microbes are all generating heat so

17   that, in those particular cases, you can get very high

18   temperatures."

19               At the bottom on line 23, I asked, "Whereas

20   the microbial growth would, in fact, cause heat within

21   peanuts?"

22               He said, "Under the right conditions, it

23   could, yes."

24               I asked, "Okay.  Well, let's assume" --

25   133 -- "that happened under the right conditions, okay?

1    Can you think of any reasons why that type of process,

2    presumably occurring somewhere in the middle of a

3    21-million-pound mass of peanuts, would be detectable by

4    a smell some 20 to 25 feet above the peanut mass?"

5            Okay.  He gave a long answer.  And then I

6    asked him, on line 16, "Okay.  And so my question is, if

7    that phenomena is occurring right smack dab in the middle

8    of that massive pile, will there be an insulating effect

9    from the peanuts above that mass of biological

10   degradation which, for at least a period of time, will

11   suppress the smell from reaching the head space?"

12           Answer:  "That's reasonable to conclude.  I

13   can't say with any certainty how long it would take, but,

14   yes, there would be some insulating effect, I would

15   assume."

16       **A:**    Okay.

17       **Q:**    He knows a lot more about peanuts than you

18   do.  Would you agree with that?

19       **A:**    I would say he knows more about peanuts,

20   sure.  But as far as self-heating and things like that,

21   no.

22       **Q:**    Okay.  So what R.P. Watson says about smells

23   is more important that what Dr. Steve Brown says about

24   it?

25               MR. GOLDSTEIN:  Objection.

1          THE WITNESS:  Well, I mean, the way he

2    phrased it, deep in the pile versus near the surface

3    where the hot spot is being modeled by Dr. Montross, I

4    think in that situation you would smell it.

5    BY MR. EPSTEIN:

6          Q:      Okay.  Where in NFPA 921 does it state that

7    the cause of a fire or a potential cause of a fire can be

8    eliminated based upon what was smelled or not smelled

9    prior to the discovery of the fire?

10         A:      Well, I don't know if that language is in

11   there, but that -- you use the information that is

12   available to you in trying to determine what can be

13   eliminated and what cannot.  And so, certainly, that's a

14   part of what we look at when we're investigating these

15   fires are observations like that.

16         Q:      And your conclusion is that what Dr. Montross

17   labels is the hot spot is close enough to the surface of

18   the peanut pile that if Randy Turner and Brian Lilley

19   didn't smell a rancid odor on August 4th, 2009, then

20   there wasn't a biological heating process that could have

21   resulted in the combustion of these peanuts?

22         A:      At that point, yeah.

23         Q:      Have you done any research or testing about

24   the smells that are produced by a 21-million-pound mass

25   of peanuts?

1     **A:**    No.  Just read what's in Mills and what

2  people in and around peanuts like R.P. Watson say and

3  Scott Chant.

4     **Q:**    Okay.  And Mills didn't talk about a

5  21-million-pound of peanuts -- peanut -- 21-million-pound

6  mass of peanuts where biological heating is occurring

7  beneath the surface, did he?

8     **A:**    I don't think he was that specific, no.

9     **Q:**    And you intend to tell the jury in this case

10  that you concluded that self-heating is not a possible

11  cause of this fire based upon what Mr. Turner and

12  Mr. Lilley did not smell on August 4th, 2009?

13     **A:**    That's one of the things I'm relying on,

14  yes.

15     **Q:**    Would you agree with me that under NFP 921 --

16  NFPA 921, that if you do not have a scientifically valid

17  basis to eliminate self-heating as a cause of the Severn

18  dome fire, you cannot come to a scientifically valid

19  conclusion that something else caused the fire?

20     **A:**    Are you saying if I can't eliminate one

21  particular cause scientifically, then I can't reach a

22  conclusion as to the cause of the fire?

23     **Q:**    That you can't reach a conclusion that

24  something else caused the fire; that's my question to

25  you.

1    **A:**    Right.  You have to eliminate things before

2    you can move on to the next --

3    **Q:**    Okay.  So let me ask --

4    **A:**    -- potential cause.

5    **Q:**    Let me ask it again.  I think we're seeing

6    eye to eye on this.  You would agree with me that under

7    NFPA 921, if you do not have a scientifically valid basis

8    to eliminate self-heating as a cause of the Severn dome

9    fire, in that event you could not come to a

10   scientifically valid conclusion that something else

11   caused the fire, correct?

12   **A:**    Correct.  If I can't eliminate self-heating,

13   then I can't reach a conclusion.

14   **Q:**    I understand you did eliminate self --

15   **A:**    Hypothetically.

16   **Q:**    I understand you did eliminate self-heating,

17   but you agree with the general concept?

18   **A:**    Yes.

19   **Q:**    Okay.  And the last thing you say as to why

20   you eliminated self-heating is, "Additionally, peanut

21   temperatures as recorded by IFC on August 4th, 2009, were

22   24 C, 75 Fahrenheit.  Therefore, self-heating to ignition

23   of the peanuts can be eliminated as potential cause" --

24   "potential fire cause in the dome at Severn."

25          So you're relying on the temperature

1    measurement recorded by the IFC applicators; is that

2    correct?

3         A:    Right.  It's a piece of information I can use

4    that I'm told is accurate.

5         Q:    Who told you it was accurate?

6         A:    Well, no one told me specifically, but the

7    30(b)(6) witness said that it's reliable for IFC.

8         Q:    What 30(b)(6) witness?

9         A:    Don't know if it's Henry or -- I mean, one of

10   the 30(b)(6) witnesses that I read.

11        Q:    Show you what's been marked as Exhibit 23

12   previously.  Is that what you're referring to?

13        A:    What I'm referring to regarding the --

14        Q:    Commodity temperature.

15        A:    Yes.

16        Q:    So it's the commodity temperature 75 degrees

17   in Exhibit 23 that is one of the bases upon which you

18   conclude that self-heating can be eliminated as a

19   potential cause of the fire, correct?

20        A:    Right.  That's one piece of information that

21   I --

22        Q:    Along with the smell?

23        A:    Along with the smell and the other stuff that

24   I've done.

25        Q:    Okay.  Show you what's been previously marked

1    as Exhibit 199, which is a portion of the deposition

2    testimony of Randall Turner.

3       **A:**     Correct.

4       **Q:**     Okay.  Did you read this?

5       **A:**     His deposition?

6       **Q:**     Yes.

7       **A:**     Yes.

8       **Q:**     All right.  He was asked, line 7, "Did you

9    check the temperature inside the dome prior to doing the

10   August 4th, 2009, fumigation?"

11             Answer:  "I didn't check it myself."

12             Question:  "All right.  Where did you get the

13   number that's on your service report?"

14             Answer:  "R.P. Watson gave it to me" --

15   "provided it for me."

16             Question:  "But you didn't check any

17   temperature yourself?"

18             Answer:  "No."

19             Did you know that Mr. Turner did not check

20   any temperature that was recorded on his service report?

21      **A:**     Well, that's what he's saying.  But again,

22   I've been told that that's a reliable number by the

23   30(b)(6) witness.

24      **Q:**     You have?

25      **A:**     In the deposition, yes.

1      Q:      Okay.  So despite the fact that the person

2  who wrote that number on the service report says, "I

3  didn't measure that temperature.  I got it from R.P.

4  Watson" -- do you know what R.P. Watson said about that,

5  by the way?

6      A:      Yeah.  I think he said that he didn't give it

7  to him.

8      Q:      Okay.

9      A:      So it came from somebody.  Somebody checked

10 it.  Somebody -- he got that information somewhere.

11 Certainly he wouldn't pencil-whip that report.

12     Q:      That's not what you draw the conclusion of

13 having read the testimony of Randy Turner, who said, "I

14 got it from R.P. Watson," and R.P. Watson's saying, "I

15 didn't provide it to him"?

16     A:      They don't remember how it got there, but

17 it -- there's a temperature on there showing 75 of the

18 commodity.

19     Q:      Randy Turner didn't have any temperature

20 monitoring equipment with him.  Did you know that?

21     A:      I did know that.

22     Q:      So how could you rely on a temperature that

23 he wrote down if he didn't have any temperature

24 monitoring equipment to measure it?

25     A:      Well, the number, 75 degrees, is written on

1     the commodity temperature.  And so that's, to me, what

2     the commodity temperature was when they went to fumigate.

3          Q:     The reality, sir, is that there would have

4     been a myriad of temperatures in that peanut mass, not

5     one, correct?

6          A:     Well, possibly.

7          Q:     Possibly?  Every -- every spreadsheet that

8     you've seen from the temperature monitoring cables has a

9     myriad of temperatures, correct?

10         A:     There are differences, correct.

11         Q:     There wasn't going to be one temperature

12    coming from a 21-million-pound mass of peanuts, was

13    there?

14         A:     Probably not, but 75 is the number that I see

15    indicated was the temperature of the commodity on

16    August 4th.

17         Q:     So even if the temperature was 150, you're

18    relying on 75, right?

19         A:     Well, that's the number that they recorded,

20    and it wasn't 150.

21         Q:     The reality is we know that a few days later

22    there were temperatures over 200 degrees, don't we?

23         A:     We don't know the accuracy of those

24    temperatures.  That's the problem.  You have a fire

25    situation taking place.  These thermocouple cables are

1  not meant to be in a fire environment.

2      Q:      We know, three and a half weeks before, there

3  were temperatures that exceeded 90 degrees, correct?

4      A:      Well, I think you had one temperature of 91.

5      Q:      Okay.

6      A:      One temperature of 191 [sic] I think is what

7  you were --

8      Q:      And multiple temperatures in excess of 85,

9  correct?

10     A:      Well, I don't know how many in excess of 85,

11  but you had some, sure.  But that's --

12     Q:      So we know that there were temperatures that

13  were going to be in excess of 85 degrees on August 4th,

14  2009; true or false?

15     A:      Well, that's assuming again that those are

16  accurate reads.

17     Q:      So the temperature that you're assuming is

18  accurate is the one that was recorded without any

19  temperature monitoring equipment at all, and the

20  temperatures that you're questioning are the ones that

21  were recorded by temperature monitoring equipment,

22  right?

23     A:      I'm questioning the reliability of the

24  temperature cables because it's been said by Scott Chant

25  that they're worthless.  Some -- 75 degrees has been

1    written down as a commodity temperature.  30(b)(6)

2    witness says you can rely on that as an accurate number,

3    even though he doesn't remember -- he said, "I asked it

4    of R.P. Watson."  R.P. Watson said, "I didn't give it to

5    him."  Somehow that number was there, and it's considered

6    an accurate number.

7        Q:     Sir, if the temperature monitoring equipment

8    was working properly on July 13th, 2009, there were

9    temperatures in that peanut dome at least 10 degrees in

10   excess of 75 degrees on August 4th, 2009, correct?

11       A:     In parts of the dome, sure, if they're

12   accurate.

13       Q:     So if I understand you correctly, you're

14   eliminating self-heating as a potential cause of the fire

15   because you don't see any temperatures that are over 500

16   degrees Fahrenheit, number one; because, number two,

17   Randy Turner and Brian Lilley didn't smell a stench when

18   they were on top of the dome on August 4th, 2009; and,

19   number three, because the actual temperature recorded on

20   their fumigation report for the commodity temperature on

21   that day was 75 degrees.  Is that about it?

22       A:     No.  I've done some analysis on what I think

23   the temperatures would be, and they're not close to

24   ignition.  We're not seeing temperatures in the dome on

25   August 11th, after a fire has been discovered, that

1    indicate ignition temperatures anywhere in the dome.

2        Q:    But you had to have reached ignition

3    temperatures as of August 11th by definition, correct?

4        A:    Right.  And we're not showing that, and so

5    you've got question the reliability of the temperature

6    data itself.

7        Q:    Go back to Exhibit 196.

8        A:    I think you took it back.

9        Q:    I did; you're right.  It would be fair of me

10   to give it back to you.

11            Exhibit 196 shows temperatures that very

12   likely could have existed in the Severn peanut dome on

13   August 11th, 2009, at 9:00 p.m., if there was a fire

14   somewhere within that peanut mass.

15            Would you disagree with that?

16       A:    What is your question?

17       Q:    Let me ask it a different way.  Just because

18   you reach the ignition temperature of peanuts somewhere

19   within the 21-million-pound mass of peanuts doesn't mean

20   you're going to have ignition temperatures throughout the

21   mass of peanuts, does it?

22       A:    You should -- right; but you should see

23   evidence of ignition temperatures somewhere, which we

24   don't see.

25       Q:    Unless you have cables that were compromised

1    because you reached ignition temperatures around those

2    cables, correct?

3        A:      Or because you have ignition of a fire on the

4    surface and they've compromised those cables.  And so

5    then you have bad cable readings.  So what I'm saying is,

6    you can't look at this data and rely on it to say one way

7    or the other what's going on.

8        Q:      Why can't you look at cable 11 and see

9    temperatures of 200, 197, 201, 208, which are within the

10   capability of that cable to measure temperatures and say

11   those were the temperatures in those locations of cable

12   11?

13       A:      And then you see on cable 11 a sensor 12 of

14   157, which is not present.  You see no reading in

15   sensor 11 for cable 11.  And so you have readings in here

16   that make no sense, which makes me want to question

17   what's going on with all of these readings.  You've

18   got -- you've got several of them that don't even exist.

19   So when somebody is taking this down, where are they

20   getting those numbers?  How is that generating any

21   temperature data whatsoever?

22       Q:      Okay.  So even though the people who recorded

23   these data said they knew what they were doing and they

24   thought these were accurate data, you're saying, no, they

25   weren't?

1          MR. WIDIS:  Objection.

2          THE WITNESS:  I'm questioning them as

3   well as Scott Chant.  He's the guy who designed these

4   things.  He says all this stuff is basically worthless.

5   BY MR. EPSTEIN:

6      Q:    Scott Chant said that the August 11th, 2009,

7   temperature data was worthless?

8      A:    Exhibit 70 he was referring to, which

9   includes this.

10     Q:    Okay.  That's your perception of what Scott

11  Chant said about Exhibit 70?

12     A:    He said Exhibit 69 was worthless, and he

13  said, with Exhibit 70, he has the same concerns as he has

14  with Exhibit 69.

15     Q:    Okay.  You didn't review and credit the

16  testimony from Mr. Chant which said, "I find that the

17  temperatures in Exhibit 70 basically make sense and I

18  would rely on them" -- you don't find that to be worthy

19  of crediting?

20     A:    No.  He was all over the place, but he did

21  say that he had questions and couldn't -- didn't know

22  what to make of these temperatures in Exhibit 70.

23     Q:    Okay.  What's the point of origin of this

24  fire, Mr. Schumacher?

25     A:    The point of origin of the fire?

1    Q:    Yes.

2    A:    Well, I believe the fire started on the

3    surface.

4    Q:    That's not a point of origin, is it?

5    A:    Well, I mean, that's as best you're going to

6    get as far as area.  It's more of an area, but it's on

7    the surface of the peanut pile.

8    Q:    Do you know that there are 66,000 square feet

9    to that surface?

10   A:    Right.

11   Q:    You think it's acceptable for an origin and

12   cause determination to say, well, somewhere within those

13   66,000 feet?

14   A:    Well, I think that's an exaggeration as far

15   as 66,000.  It's somewhere within the area underneath the

16   dome where they're accumulating these piles of tablets.

17   And so 66,000 is really not an accurate representation of

18   what you're dealing with here.  You're dealing with a

19   much more limited area.  And as far as the point of

20   origin, I can't tell you exactly on that surface where it

21   occurred, but I can tell you it occurred inside the

22   dome.

23   Q:    Inside a 2-million-cubic-foot dome, somewhere

24   in there?

25   A:    Right.  It's likely directly below or

1    somewhere off to the side of that area right below the --

2    the area where they applied the tablets.

3       **Q:**    How can you determine the cause of a fire

4    within a 21-million-pound mass of peanuts if you don't

5    know where the fire began?

6       **A:**    Well, I do know where the fire began, on the

7    surface.  Can I pinpoint exactly where on the surface?

8    No, I can't.

9       **Q:**    How many times in your career have you

10   reached the origin and cause determination of a fire

11   without being able to establish the point of origin?

12      **A:**    Well, I mean, the point of origin is more

13   specific than the area of origin, but you can establish a

14   fire based on the area of origin.  So that's the surface

15   of the peanut pile.  I can't tell you exactly where on

16   the surface it occurred.

17              MR. EPSTEIN:  Could you read him back

18   the question.

19              [RECORD READ]

20              THE WITNESS:  I have concluded -- or

21   determined the cause based on an area of origin and --

22   where I have not been able to say the point.  It's

23   happened in the past.  I can't tell you how many times.

24   BY MR. EPSTEIN:

25      **Q:**    Very few.  Would you agree with that?

1       A:      Well, I mean, I can't -- I mean, I've done a

2   lot of fires, and so I can't tell you how many times

3   that's occurred.

4       Q:      It's not what you would prefer in determining

5   the cause of a fire; you would prefer to determine the

6   point of origin of the fire, correct?

7       A:      Sure, if you could do that, but it's not

8   necessary, particularly in this case.

9       Q:      You agree with me that there is no evidence

10  whatsoever that the fire began on the surface of the

11  peanut pile?

12                  MR. WIDIS:  Objection.

13                  THE WITNESS:  Well, there's evidence of

14  the manner in which Fumitoxin tablets were applied and

15  all those reasons why that would lead to piling and

16  ignition.  As far as physical evidence -- well, I don't

17  know of any physical evidence that supports one way or

18  the other in this case because no one got into the

19  dome.

20  BY MR. EPSTEIN:

21      Q:      Well, in terms of photograph, video, infrared

22  technology, in terms of any temperatures ever recorded

23  anywhere, any data of any kind, there is not a shred of

24  that kind of evidence that in any way establishes that

25  this fire commenced on the surface of the peanut pile;

1    isn't that correct?

2       A:      Well, I think there were some temperature

3    data taken after the fire had been going showing that you

4    had high temperatures in the head space.  But as far as

5    temperature data on August 11th, there's nothing that

6    establishes that there is a fire inside the peanut pile.

7    And again, there's no physical evidence that you can

8    point to to suggest that the fire started inside the

9    peanut pile.

10      Q:      I know you want to reverse the question I'm

11   asking, but I'm going to ask my question, which is, there

12   is no evidence that you can point to, whether it is

13   photographic or data, that in any way suggests that the

14   fire commenced on the surface of the peanut pile,

15   correct?

16      A:      Well, there -- I mean, there's evidence based

17   on the whole process of eliminating causes, and when you

18   eliminate self-heating, then you look towards the other

19   cause.  And in -- through that process, you evaluate that

20   cause related to the evidence that is there, and it's

21   supportive of piling the Fumitoxin tablets on the

22   surface.

23      Q:      Okay.  For an investigator who showed up on

24   August 11th, 2009, to determine the origin and cause of

25   this fire, were there any data available or images

1    available or that could have been created which would
2    have established that the fire commenced on the surface
3    of the peanut pile?
4        **A:**    Was there -- were there any pictures taken?
5    No, I don't think they -- they took one on August 27th, I
6    think, a thermal image, you know, several weeks later
7    showing the fire on the surface.
8        **Q:**    And the only other available data would have
9    been temperatures, correct?
10       **A:**    That's right.
11       **Q:**    And none of those temperatures establish in
12   any form or fashion that the fire commenced on the
13   surface of the peanut pile, correct?
14       **A:**    Well, they -- again, they're showing high
15   temperatures in the head space a couple days after, which
16   I think is the first time they took readings, like
17   significantly high temperatures.  Maybe actually it was
18   a -- of the metal surface.  So you have high temperatures
19   in the head space.
20       **Q:**    Would you agree with me that high
21   temperatures in the head space on August 13th, 2009, do
22   not establish where the point of origin of that fire
23   was?
24       **A:**    That's right.  They don't tell you if it's in
25   the peanut pile or if it's on the surface.

1      Q:     And if, just by chance, the temperatures

2   recorded throughout Exhibit 136 -- you realize that

3   they -- Lester Rich was there when they were taking these

4   temperatures a few times a day on the Severn temperature

5   monitoring system?  You know that, right?

6      A:     Okay.

7      Q:     Do you think he was doing that just for the

8   heck of it?

9                   MR. GOLDSTEIN:  Objection.

10                   THE WITNESS:  I don't know.  He probably

11   had a reason for doing it, but then you have to sit back

12   and look at it after you've taken it to determine what it

13   means.

14   BY MR. EPSTEIN:

15      Q:     Okay.

16      A:     Is it reliable?  Is it not?

17      Q:     Okay.  Well, let's assume, just for kicks and

18   giggles, that it was reliable.  Where were the hottest

19   temperatures recorded on August 11th, 2009, at 9:00 p.m.?

20      A:     Well, the ones that -- hottest ones that were

21   recorded were, it looks like, on cable 11.

22      Q:     More than halfway below the center of the

23   peanut pile, correct?

24      A:     It was down in the peanut pile, yes.

25      Q:     Okay.  And whether you use a 30 degree or

1   38 degree angle of repose, and whether you use 20 or 25

2   or 23 feet as the height of the peanut pile or the

3   distance of the peanut pile from the ceiling of the dome,

4   you don't have any temperatures approaching the

5   temperatures that you have on cable 11 at the bottom, do

6   you?  On the surface.

7        A:      Right.  Well, and again, we don't know what's

8   going on with sensor 11 or sensor 3 or sensor 13.

9        Q:      Sure.  But for the data that you do have, you

10  tend to have cooler temperatures by the surface than you

11  do down below, correct?

12       A:      That's right.

13       Q:      Okay.  If the fire was on the surface of the

14  peanuts, why didn't the dry ice blanket extinguish it?

15       A:      Because you have a smoldering fire, and the

16  smoldering fires have worked themselves into the depth of

17  the peanuts.  They're not just going to sit there and

18  burn on the surface; they're going to actually burn

19  downward.  And when you put the CO2 dry ice on top of it,

20  that will help with a surface fire but not what's burning

21  below it.  I mean, it's the same thing if you had a

22  smoldering fire on a couch.  You can extinguish, you

23  know, the fire on the surface, but you're not necessarily

24  going to get into the -- into the substrate of that

25  material.

1    Q:    Doesn't the fact that the fire persisted for

2    weeks following -- or for at least two weeks following

3    the blanket of dry ice that was put on the surface of the

4    peanut pile -- doesn't that suggest that it's more likely

5    that the fire commenced below the surface than that the

6    fire commenced on the surface?

7    A:    No.

8    Q:    Doesn't at all?

9    A:    No.

10   Q:    All right.  I want to look more -- I said

11   we'd come back to Dr. Montross' report.

12   A:    Okay.

13   Q:    I'm going to keep that promise.

14   A:    I thought you'd forget.

15   Q:    You don't know me very well.

16        I want to look at Figure 16 on page 59,

17   because to this point we've just looked at his analysis

18   of your analysis.  Now I want to look at your analysis of

19   his analysis.

20   A:    Okay.

21   Q:    Did you study his report well enough to get a

22   grasp of what he's showing on Figure 16?

23   A:    Yes.

24   Q:    Okay.  Can you explain, looking at

25   Figure 16 -- and again, I understand that you're

1    questioning the accuracy of the temperatures recorded by

2    the Safe Grain system.

3        A:    Yes.

4        Q:    For the sake of all of these questions I'm

5    going to ask you, I'm going to ask you to assume the

6    accuracy of those readings, okay?

7        A:    Okay.

8        Q:    If the jury should find that those readings

9    aren't accurate, I fully expect them to throw out

10   everything Dr. Montross says about those readings.

11       A:    Okay.

12       Q:    Makes sense.  For the time being, assume that

13   those are accurate readings.  Can you explain why the

14   average temperatures within what Dr. Montross described

15   as the hot spot read -- were some 30 degrees hotter as of

16   July 13th, 2009, than the average temperatures in the

17   outer edges of the peanut mass, which was green on his

18   Figure 16?

19       A:    Well, some of it is going to be the natural,

20   again, heating of the dome.  But assuming they're

21   accurate, then that would be from heating within the

22   pile.

23       Q:    There's no other way to explain that, is

24   there?

25       A:    Correct.  I mean, there has to be some

1    heating or -- and some contribution from the -- the

2    changes in the head space, et cetera, from the

3    temperatures.

4         Q:    But the head space isn't anywhere near where

5    the hot spot was located, correct?

6         A:    What do you mean "anywhere near"?

7         Q:    Well, the hot spot wasn't in the head space

8    and it wasn't on the surface, correct?

9         A:    Right.  But I'm saying it's driving some of

10   that.  But I would -- I would agree; the only way you get

11   those things is from heating.

12        Q:    And if what you said earlier about the sun

13   and the way it's going to affect temperatures in the

14   dome, you would expect that to be more on the outer edges

15   of the dome than you would the interior of the dome,

16   correct?

17        A:    Outer edges and also depending on the sun

18   angle -- I mean, you could have it directly above it as

19   well.

20        Q:    But you would expect the commodity that's

21   closest to the concrete wall to receive more of that

22   ambient heat coming from the sun than commodity that's

23   more in the center of the peanut pile, correct?

24        A:    Outside as well as on the surface.

25        Q:    Okay.  Well, we know from what's shown in

1    green in these temperatures that the temperatures

2    reported on the outer ring of the temperature cables were

3    actually significantly cooler than what was going on in

4    the middle, correct?

5        A:    They're cooler, yes.

6        Q:    So if ambient temperatures outside the

7    concrete walls are having an effect, that certainly

8    doesn't explain why you have the coolest temperatures on

9    the outside and the hottest temperatures in the peanut

10   mass, correct?

11       A:    Right.  But you have a contribution from

12   that.  I'm saying you get some heating, yes.

13       Q:    Okay.  So let me take you back to Mr. Rich's

14   testimony.

15       A:    Okay.

16       Q:    If you can grab that exhibit, which is

17   Exhibit 263.

18       A:    All-righty.

19       Q:    And you'll recall that I took him through

20   this same exercise, and I'm trying to truncate it with

21   you.  So I want to start on page 211.

22       A:    Okay.

23       Q:    Starting on line 16 -- this might seem

24   familiar to you -- I said, "Can you explain why the

25   average temperatures within what Dr. Montross described

1    as the hot spot were some 30 degrees hotter as of

2    July 13th, 2009, than the average temperatures in the

3    outer edges of the peanut mass, along the outer

4    concentric circle?  Why there would be a 30 degree

5    difference between those two?"

6              Answer:  "Well, without reading the whole

7    report, my -- the only explanation I would have based on

8    this is that there's some self-heating going on."

9              You agree with that, correct,

10   Mr. Schumacher?

11        A:    That's what he said or that --

12        Q:    You agree that his analysis squares with your

13   analysis of Figure 16?

14        A:    Right.

15        Q:    Okay.  Page 212, line 9:  "You can see it on

16   July 13th where the hot spot is somewhere -- looks like

17   about 85 degrees on average, and the ambient air rolling

18   average is under 80 degrees.  Does that not strike you as

19   significant in terms of analyzing the self-heating going

20   on within the dome?"

21              His answer was, "I would say it's -- yes.

22   It's -- I wouldn't say it strikes me as significant.  I

23   think it strikes me as -- that there's -- if the numbers

24   that he's taken are accurate, that that does suggest that

25   there is some self-heating going on."

1          Would you agree not only that that's what
2     Mr. Rich said but that Mr. Rich is accurate in that
3     statement, that there's some self-heating going on as
4     demonstrated by the hot spot being hotter than the
5     rolling average of the ambient air outside?
6          **A:**     I would agree.
7          **Q:**     Okay.  Page 213 -- I'm sorry -- 215, line 15:
8     "Do you agree that the progression that we see from March
9     to August in what Dr. Montross labels the hot spot -- I'm
10    sorry -- March to July, was going to continue progressing
11    after July 13th, 2009, if in fact self-heating was
12    playing a role in that progression?"
13               Answer:  "No."
14               Question:  "You think it would just stop on
15    July 13th?"
16               Answer:  "It could have stopped at some time
17    shortly after July 13th, yes."
18               Question:  "And what would have led it to
19    stop?"
20               Answer:  "The death of the biological
21    material that's creating a spontaneous" -- or sorry.
22    "The death of the mold and the microbes that are creating
23    this self-heating."
24               Question:  "Okay.  So you're in agreement
25    that there were molds and microbes creating the

1    self-heating that we see evidenced on page 59, correct?"

2            Answer:  "I'll say my understanding and

3    experience is, with the stored commodity, that it is the

4    mold and the microbes that initiate the biological

5    heating.  That's why it's biological."

6            Question:  "And that's, in your opinion, what

7    we see evidenced on page 59 of Dr. Montross' report in

8    that red circle?"

9            Answer:  "Given that this is accurate --"

10            Question:  "Yes."

11            "And like I said before" -- "like I said, I

12    haven't studied his report.  So there may be things in

13    his report I don't agree with, but based on the premise

14    of your question, I would say, yes, that's self-heating

15    from a biological -- or most likely self-heating from a

16    biological event or biological source."

17            So I went a long way, Mr. Schumacher, to get

18    to that last answer, and I want to -- I want to get you

19    to say whether you agree with Mr. Rich that what we see

20    in Figure 16 in Dr. Montross' report demonstrates

21    self-heating from a biological event or biological

22    source?

23        **A:**     It certainly could be, yes.

24        **Q:**     Okay.  Go to the next page, which is

25    page 217.

1          He said, "Well, I don't know specifically" --

2    wait a second.

3          I asked him at the bottom of 216, "You have

4    no way of knowing whether that biological source would

5    have continued to cause self-heating after July 13th,

6    2009, do you?"

7          And his answer was, "Well, I don't know

8    specifically if this hot spot would continue heating, but

9    I do know from my research and reading that the

10   biological activity ceases at a certain temperature."

11         Question:  "At which point, thermal runaway

12   can begin, correct?"

13         Answer:  "Not thermal runaway, but the

14   oxidation reaction could then take over, which then could

15   lead to thermal runaway, which then could lead to

16   spontaneous combustion."

17         I want to stop there.

18         Do you agree with what Mr. Rich said, that

19   once the biological activity ceased at a certain

20   temperature, that oxidation could occur, which could lead

21   to thermal runaway, which would lead to spontaneous

22   combustion?

23   **A:**     Yes, it could.  Sure.

24   **Q:**     So if the temperatures are accurate that

25   Dr. Montross is relying on, what is demonstrated here,

1    especially from March 11th to July 13th, is self-heating

2    from a biological source that could get to the point of a

3    thermal runaway reaction, correct?

4              All other things being equal, that is a

5    possibility of what we see being shown as a trend in

6    Figure 16?

7        A:    Right.  It's a possibility, but it didn't

8    happen, in my opinion.

9        Q:    I understand it didn't happen, in your

10   opinion.  What Mills says is that if you got this process

11   that we're looking at here that you've agreed would be,

12   if the temperatures are accurate, self-heating from

13   biological activity -- if you got that process to 176

14   degrees Fahrenheit, Mills said you're eventually going to

15   get to ignition, correct?

16             MR. GOLDSTEIN:  Objection.

17   BY MR. EPSTEIN:

18       Q:    Likely?

19       A:    He said you will likely, sure.

20       Q:    Okay.  So that's the question -- is, from

21   what Dr. Montross shows here as of July 13th, between

22   July 13th and August 11th, did you reach temperatures

23   that would have led to that runaway reaction that led to

24   ignition, if the temperatures again are accurate?  That's

25   the question.  Correct?

1      **A:**    And I say no.

2      **Q:**    I understand that's your answer to the

3   question.

4      **A:**    Right.  But, I mean, you're looking at the

5   trends here, and you're saying, "Okay.  This shows that

6   there's heating going on."  Well, that's fine, but the

7   question is, does that heating -- does it mean anything?

8   Are we concerned about it?  And my answer is, no, we're

9   not based on my analysis and based on his analysis.

10     **Q:**    Okay.  Because you can't get the temperatures

11  all the way to 176 degrees or because you can't get the

12  temperatures to over 500 degrees?

13     **A:**    I can't get the temperatures to 120.  He gets

14  them to about 117 in the hot spot.

15     **Q:**    You're saying Dr. Montross gets them to about

16  117?

17     **A:**    Yeah, absolutely.

18     **Q:**    All right.  Page 239 of Mr. Rich's testimony.

19     **A:**    Okay.

20     **Q:**    Line 14, I asked him, "Assume for a moment

21  that it is demonstrated to your satisfaction that the

22  aluminum phosphide tablets applied on August 4th, 2009,

23  had nothing whatsoever to do with the fire.  Just assume

24  for the sake of argument.  Are you with me?"

25          He said, "Okay."

1          Question:  "Assuming that were true, what

2     would be the most likely explanation for the cause of

3     this fire based upon everything you know?"

4          His answer was, "The -- one of my other --

5     well, the most likely would be one of my -- the likely

6     ones would be one of my other hypotheses that I

7     eliminated, and I would say the most likely would be that

8     the self-heating progressed to thermal runaway,

9     progressed to spontaneous combustion."

10         Do you agree or disagree that if you

11    eliminate the Fumitoxin as a potential source of this

12    fire, that what -- what Mr. Rich said is the most likely

13    explanation for the cause of the fire?

14    **A:**    Assuming the fire still actually occurs?

15    **Q:**    Yes.

16    **A:**    Okay.  With that, if you can eliminate one of

17    the two, then the most likely cause would be

18    self-heating.

19              MR. EPSTEIN:  All right.  Why don't we

20    go ahead and take a break.

21              THE VIDEOGRAPHER:  Off the record at

22    4:27.

23              [RECESS TAKEN]

24              THE VIDEOGRAPHER:  On the record at

25    4:36.

1     BY MR. EPSTEIN:

2          Q:     Mr. Schumacher, looking for a last moment at

3     Figure 16 from Dr. Montross' report.

4          A:     Yes.

5          Q:     You would agree that if the temperatures he's

6     relying on were accurate, temperatures that had been

7     rising due to self-heating caused by biological activity

8     from March to June and June to July would have continued

9     to rise between July 13, 2009, and August 11, 2009,

10    correct?

11         A:     No, not necessarily.

12         Q:     Why is that?

13         A:     Well, it depends on if that biological

14    heating continues or if it dies out eventually.

15         Q:     So you think it's just as likely that this

16    trend would have stopped in the three or so weeks after

17    July 13th before the fire was discovered?

18         A:     Well, again, I've eliminated self-heating

19    ignition as the cause.  And so whether it stopped

20    completely or -- either way, it didn't matter because you

21    didn't reach the part -- the point of ignition or the

22    temperatures where you needed to be in order to ignite

23    the material.

24         Q:     Go forward, if you would, to page 68, which

25    is Figure 25.

1      **A:**     Okay.

2      **Q:**     Did you read Dr. Montross' report for how he

3   came up with his red line in Exhibit -- I'm sorry --

4   Figure 25 --

5      **A:**     Yes.

6      **Q:**     -- which is his model hot spot?

7      **A:**     Yes.

8      **Q:**     He did that in a different way than you came

9   up with your exponential and second order polynomial

10  regressions, correct?

11     **A:**     Yes.

12     **Q:**     He used something that was based upon

13  agricultural and biosystems engineering, correct?

14     **A:**     Well, I suppose that that model is used

15  there, yes.

16     **Q:**     Okay.  And you understand that somebody like

17  Dr. Montross, who works with stored agricultural

18  commodities and their temperatures, have means and

19  methods to predict temperatures that are different than

20  straight math.  Do you understand that?

21     **A:**     Yes.

22     **Q:**     Okay.  Do you have the ability to criticize

23  the model that he used in this case?

24     **A:**     Well, I mean, it's a model based on dry

25  matter loss.

1    **Q:**    Uh-huh.

2    **A:**    And it's a model where he didn't have certain

3    things for peanuts, and so he assumed certain items.  And

4    in that model, I believe he assumed no convective

5    currents and basically just -- it was by conduction as

6    far as heat transfer.  And it was basically a --

7    oxidation of a carbohydrate was what he using to

8    determine the heat generation.

9    **Q:**    Okay.

10   **A:**    And so, I mean, there's things that -- he's

11   making a lot of assumptions in there.  He has to in order

12   to generate the model to figure out what temperatures

13   he's predicting.  And so there are assumptions that are

14   being made in that model.  I'm not certain I agree with

15   all the assumptions that are made.

16   **Q:**    Well, if you don't agree with any of them,

17   I'd like to know today.  This is my one chance to ask you

18   about that.

19   **A:**    Well, I mean, if he is in fact eliminating

20   convective currents, I mean, that's a big way you

21   actually transfer -- stuff goes through a baseline

22   convection, and assuming you have no heat loss I don't

23   think is accurate.  You're always going to have some heat

24   loss.  So that should over-predict it.  And certainly if

25   he uses the number that he references in his report about

1    the number of BTUs generated, that would overestimate it

2    as well.  So those are the things that come to mind.

3         Q:    Okay.  Is there anything else about

4    Dr. Montross' analysis of how you get the temperatures to

5    the point of what his model shows -- I understand you

6    contend his model doesn't show getting to the point of

7    combustion.  Let's put that aside.

8              Is there anything about what he shows of the

9    temperatures he does get to that you believe is not

10   supported by reliable science?

11        A:    Well, I mean, he assumes a certain volume of

12   peanuts that are at a moisture content that he -- that he

13   uses as his area for heating as well as in the hot spot.

14   And so, I mean, how he comes up with that and why he uses

15   that, I mean, that's obviously an assumption.

16        Q:    Okay.  Anything else?

17        A:    Well, that's what comes to mind, those --

18   those few.

19        Q:    Okay.  All right.  Would you agree that

20   Dr. Montross, based upon what he does for a living, knows

21   a lot more about the biological heating of stored

22   commodities than you do?

23        A:    No, I wouldn't.

24        Q:    You wouldn't?

25        A:    No.

1    Q:    You know as much as he does about the

2    biological heating of stored agricultural commodities?

3    A:    When you're talking about self-heating to

4    ignition and investigating fires involving these, I would

5    say no.  I have more experience than he does.

6    Q:    I'm talking about the processes by which

7    stored commodities biologically heat.

8    A:    I mean, I can't answer that.

9    Q:    Okay.  I want to move to the section of your

10   report that is titled "Autoignition of Phosphine Gas as a

11   Result of Piling of Fumitoxin Tablets."

12   A:    Okay.

13   Q:    Which is your theory as to what caused this

14   fire, correct?

15   A:    Yes.

16   Q:    On -- you wrote on page 11 -- you quoted from

17   the Fumitoxin Applicator Manual that "Aluminum phosphide

18   tablets and pellets outside their containers should not

19   be stacked or piled up or contacted with liquid water.

20   This may cause a temperature increase, accelerate the

21   rate of gas production, and confine the gas so that

22   ignition could occur."

23        Why did you include this quotation from the

24   applicator's manual in your report?

25   A:    Because it's -- it's provided by the

1    distributor, and they provided that information to the

2    EPA, and it's -- it's information about what can happen

3    when you pile up or stack these particular tablets or

4    pellets.  And so it's supportive of the theory that I

5    have in this case.

6         Q:    Do you have any idea what the origin of that

7    quoted language is?

8         A:    Well, I believe it came from the manufacturer

9    or distributor.

10        Q:    Do you know whether the EPA requires this

11   statement to be included for all applicator's manuals for

12   aluminum phosphide products?

13        A:    Well, I imagine they would, but I think it

14   originally comes from the manufacturers or

15   distributors.

16        Q:    Do you know if any scientific research or

17   testing was undertaken by any manufacturer, distributor,

18   laboratory, or government agency which led to the quoted

19   language being required in manuals for aluminum phosphide

20   products?

21        A:    Well, I don't know the origination of that

22   statement, no.

23        Q:    Okay.  Would you agree with me,

24   Mr. Schumacher, that the quoted language by itself does

25   not serve as a scientific basis for concluding that

1    stacking or piling dry aluminum phosphide tablets is

2    likely to result in a fire?

3        A:      Well, I mean, in and of itself, no, but

4    clearly that's what the manufacturers are saying.  And

5    that's consistent with other information that's out

6    there; that's consistent with field experience showing it

7    happens; that's consistent with case studies that show

8    that it happens.  And so, you know, that in and of

9    itself, no.  But clearly I can rely on that as supportive

10   of my opinion because it comes from the manufacturer, the

11   people who make this and distribute it.

12       Q:      In your view, that one sentence is as

13   reliable scientifically as testing in a laboratory

14   demonstrating that piling of aluminum phosphide tablets

15   will result in ignition?  The statement that's in the

16   applicator's manual is no different than a certified

17   laboratory test that shows that phenomenon to occur?

18       A:      I mean, it really depends on what that

19   certified laboratory is doing when they're testing it.

20   How many of these particular items are they testing?  And

21   how are they determining concentrations?  And how are

22   they determining temperatures?  And are they doing this

23   in a fashion where you do several tests that make it

24   statistically significant?  Are you actually changing the

25   parameters that are important as far as is -- are you

1  changing the number of tablets and pellets, how you stack

2  them, et cetera?

3          And so if you have all of that data for a

4  wide number of tablets, then that would be potentially

5  more meaningful, but -- however, that statement is what

6  it is.

7      Q:     Even though you have no idea whether there's

8  any scientific research or testing that led to that

9  statement?

10     A:     Well, I know that there are stuff that you

11 had referenced that I had referenced -- or you had

12 pointed to that I had referenced in my paper on limited

13 testing that was done with limited number of tablets and

14 pellets, but as far as other stuff, I don't know of --

15 and again, this is consistent with field experience,

16 consistent with what people see and what happens in other

17 cases.

18     Q:     Did you read Mr. Ryman's deposition testimony

19 in this case?

20     A:     Mr. Ryman with Degesch?

21     Q:     With Degesch.  His expert deposition

22 testimony.  He was -- his testimony as an expert was

23 taken a few weeks ago.

24     A:     Yes.

25     Q:     Did you read that testimony?

1       **A:**      I did.

2       **Q:**      And did you review what he said about that

3   language and what it really should say?

4       **A:**      No.  You can point it out.  Well, I did

5   review it, but specifically what section are you --

6       **Q:**      That the reality is -- is that the real

7   danger is the piling of aluminum phosphide tablets and

8   the introduction of liquid water, not or?

9                   MR. GOLDSTEIN:  Objection.

10                  THE WITNESS:  I mean, you have to point

11  me to that because what he did say is that, yes, the

12  piling of aluminum phosphide tablets without the presence

13  of water can result in a fire.

14  BY MR. EPSTEIN:

15      **Q:**      You think that's what Mr. Ryman said?

16      **A:**      Sure.  He said he agrees with that.

17      **Q:**      He said he agrees with that as a

18  precautionary statement, didn't he?

19                  MR. GOLDSTEIN:  Objection.

20                  THE WITNESS:  He agrees that -- no.  He

21  said it -- that it can happen when he was asked of it,

22  and of course there's no reason to put a precautionary

23  statement in there if it can't happen.  That just doesn't

24  make any sense.

25  BY MR. EPSTEIN:

1    Q:    That statement certainly doesn't say anything

2    about the likelihood that that phenomenon will cause a

3    temperature increase or a fire, does it?

4    A:    No.  Just like it doesn't say the likelihood

5    of a cigarette igniting a trash can, but we know that

6    that happens.

7    Q:    Okay.  So if it happens one out of a million

8    times, you think you can rely on that as your scientific

9    support for the cause of the fire in this case?

10   A:    Well, I mean, I haven't -- I don't know where

11   that statistic came from because --

12   Q:    I'm just using that as a hypothetical.

13   A:    -- certainly happens far more than that.  We

14   have cases in California.  There are, I guess, five a

15   year over ten years where they had fires with aluminum

16   phosphide.

17   Q:    Where did you get that from?

18   A:    That was in Vito Borrowski's [PHONETIC]

19   report.

20   Q:    Did you know he was wrong about that?

21   A:    I didn't check that.  I'm just quoting what

22   he said.

23   Q:    If he was wrong about that, do you want to

24   take -- would you take that back?

25   A:    I'd have to evaluate it.

1    **Q:**    Okay.

2    **A:**    But the fact is these fires do occur.

3    **Q:**    Okay.  So the first thing that came to your

4    mind is five a year in California based upon what Vito

5    said, right?

6    **A:**    Well, that and -- and other cases that I've

7    seen it occur in other case studies where they've talked

8    about it and field experience where it actually

9    happens --

10    **Q:**    So you are --

11    **A:**    -- where we've seen it occur.

12    **Q:**    -- you're willing to rely on what Vito said

13    without even looking to see whether what he said was

14    accurately referencing the material he was referencing?

15    **A:**    I hadn't looked at it; that's right.

16    **Q:**    If you'd looked at it, you might have come to

17    a different conclusion; isn't that possible?

18    **A:**    It's possible.

19    **Q:**    Yeah.  How do you get from the quoted

20    language that said it's possible for there to be a

21    reaction that would result in the generation of heat to

22    the point of ignition to the probability that ignition

23    occurred from the stacking of piling -- stacking or

24    piling of tablets in the peanut dome?

25    **A:**    Well, it's the whole process that we talked

1    about ad nauseam today.  You go through the process of

2    eliminating certain causes, and then you look at the

3    other potential cause and you look at the manner in which

4    the tablets were applied and the configuration, et

5    cetera, and the constraints under which they were

6    applying the tablets.  And you look at the scientific

7    literature.  You look at science.  You look at the

8    available information out there, field experience.  And

9    you know that this happens.  And so you're able to, based

10   on a reasonable degree of engineering certainty, say that

11   is what caused the fire.

12       Q:     Based upon anecdotal incidents that have been

13   reported one at a time?

14       A:     I wouldn't say anecdotal.  They're actually

15   investigations conducted regarding these incidents, and

16   then you have people who have actually seen it happen.  I

17   mean, I know that Degesch was getting reports of fires,

18   and they were trying to test it, and they couldn't

19   replicate it.  So they're getting field experience saying

20   that they're having fires with their materials.  That's

21   what Ryman said.

22       Q:     Fires or flashes from the opening of the

23   flasks?

24       A:     No; fires.  They had -- we talked about a

25   fire that he did some experimentation on to try to

 1   recreate.

 2       Q:      Well, phosphine is a flammable gas,

 3   correct?

 4       A:      Right.

 5       Q:      If you combine water with aluminum phosphide

 6   tablets, there it's demonstrated through scientific

 7   testing that you're likely to get a fire, correct?

 8       A:      Right.  You can get a fire, yeah.

 9       Q:      There's no scientific testing that

10   demonstrates in the absence of water you're likely to get

11   a fire, is there?

12       A:      There is testing that was done that shows you

13   will get to the LFL based on a certain pile size, and

14   that's Dale Mann's testing.  He's almost reaching the LFL

15   in that testing.  And so their -- the testing that was

16   done related to moisture, not liquid water, was on

17   limited numbers of tablets.

18       Q:      Okay.  So just to make sure we're clear, Dale

19   Mann has proved, as an expert for me, that you get to the

20   lower flammable limit by piling Fumitoxin tablets; is

21   that your testimony?

22       A:      I may have misspoke.  He didn't -- he didn't

23   get to the LFL, but he showed the trend that if you add

24   some more tablets to it, you will reach the LFL.

25       Q:      And Dr. Montross has proven as an expert for

1    me that self-heating wasn't a cause of this fire,

2    correct?

3        **A:**     I think his data shows that, right.

4        **Q:**     Okay.  And Mr. Ryman says that you're right

5    to rely on the warning in the applicator's manual about

6    stacking or piling for the conclusion that stacking or

7    piling leads to the lower flammable limit being reached

8    and combustion?  He says that?

9        **A:**     He says you -- that can happen, yeah.

10       **Q:**     So basically all the experts that are

11   testifying for me and the defendants in this case are

12   actually supporting you; is that your testimony?

13                   MR. GOLDSTEIN:  Objection.

14                   THE WITNESS:  I think these -- some of

15   the things they're saying support me and some of the work

16   they've done support what I'm talking about, yes.

17   BY MR. EPSTEIN:

18       **Q:**     You didn't pay attention to where Dr. --

19   where Mr. Ryman says in his report, you can't

20   sufficiently contain phosphine in a pile of aluminum

21   phosphide to reach the lower flammable limit?  You didn't

22   read that?

23                   MR. GOLDSTEIN:  Objection.

24                   THE WITNESS:  I read that in his report.

25   I also read in his deposition as an expert where he said

1    this can happen.  And so how you can not confine it but

2    yet have it happen, I don't -- I don't get that.  So I

3    think he's saying it can happen.  And so it's a little

4    bit different in his report and his 30(b)(6)

5    deposition.

6    BY MR. EPSTEIN:

7        Q:    Did you read in -- and I can show it to you,

8    if you want -- in Mr. Ryman's expert report, his comment

9    about the statement we just looked at in Section 4.2 of

10   the manual "being merely precautionary and does not mean

11   and was not intended to convey that the piling or

12   stacking of tablets will result in the LFL of phosphine

13   gas being reached, let alone a fire."

14            Did you appreciate that he had said that --

15       A:    That --

16       Q:    -- about the statement that you're relying

17   on?

18       A:    Right; that it's a precautionary statement.

19   But then he goes back and says, yes, it can happen.  So

20   there are two different things he's saying there.

21       Q:    Had you ever seen the Fumitoxin Applicator's

22   Manual before the -- before 2009?

23       A:    I think I answered that.  No, I had not seen

24   it.  Maybe I hadn't answered it.  I'm sorry.

25       Q:    I think you answered the question about

1    whether you had ever become aware of aluminum phosphide

2    tablets before 2009.

3        A:      Right.  And I figured it was obvious.  I

4    probably hadn't seen the manual.  Sorry.

5        Q:      Back to your report.  You compared what's in

6    the applicator's manual to, quote, similar admonitions

7    and discussions regarding piling of the tablets or

8    pellets found in numerous sources, correct?

9        A:      Yes.

10       Q:      And you cite Footnote 71, 72, 73, 74, 75,

11   correct?

12       A:      Yes.

13       Q:      Well, 71 and 72 are simply applicator's

14   manuals that are saying the same thing, correct?

15       A:      Right.

16       Q:      Because the EPA requires them to say the same

17   thing, don't they?

18       A:      Well, because it's their product and they

19   have to warn against potential issues with their product,

20   like piling and stacking and causing ignition that way.

21       Q:      You also cite the material safety data sheet,

22   right?

23       A:      Yes.

24       Q:      Have you read that?

25       A:      I've seen one, yeah.  Whatever -- yeah, of

1    course.

2        Q:    Showing you what's being marked as

3    Exhibit 275.

4                    [EXHIBIT NO. 275 MARKED FOR

5                    IDENTIFICATION]

6    BY MR. EPSTEIN:

7        Q:    Show me where in the material safety data

8    sheet it says that the piling of aluminum phosphide

9    tablets or pellets without contacting liquid water

10   presents a fire hazard.

11       A:    Well, I'm not sure if this is exact MSDS that

12   I looked at.

13       Q:    This is the material safety data sheet for

14   aluminum phosphide, correct?

15       A:    Right.  There are, I think, different MSDS's

16   for aluminum phosphide.

17       Q:    Okay.  This is --

18       A:    -- Fumitoxin.

19       Q:    -- specifically for Fumitoxin tablets and

20   pellets --

21       A:    Right.

22       Q:    -- which is what was used in our case.

23       A:    Right; but there are different -- my point is

24   there are different iterations of this thing.  And so let

25   me take a look at this one.

1     Q:     Well, the unusual fire and explosion hazards

2   are listed on the second page.

3     A:     Well, I don't see anything about tablets, but

4   I do see something about confinement of partially spent

5   residual materials as in an enclosed container or

6   collection and storage of large quantities of dust may

7   result in a fire or explosion hazard.

8     Q:     Okay.  That's after the reaction's already

9   over, correct?

10     A:     Well, no.  The reason why is you have

11   material that's not reacted, and so it's the same -- same

12   concept.  You're going to have phosphine being ignited

13   because it reaches the autoignition.

14     Q:     That's talking about how to dispose of the

15   spent material, correct?

16     A:     Right.  But it's talking about unreacted

17   material, and it's talking about large quantities of dust

18   may result in a fire explosion hazard.  It's the same

19   concept.

20     Q:     Okay.  Let's look at what they say about

21   piling of large quantities of Fumitoxin tablets or

22   pellets, okay?

23     A:     Okay.

24     Q:     Page 2, under "Unusual Fire and Explosion

25   Hazards."

1      **A:**    Yes.

2      **Q:**    About eight lines down, there's a sentence

3    that begins "Spontaneous ignition," which is what you're

4    saying happened in this case, correct?

5      **A:**    Yes.

6      **Q:**    It says, "Spontaneous ignition may occur if

7    large quantities of aluminum phosphide or magnesium

8    phosphide" -- can you please finish that for me.

9      **A:**    -- "are piled in contact with liquid water."

10     **Q:**    Not an "or" proposition in the MSDS, is it?

11   It's piled in contact with liquid water, correct?

12     **A:**    That's what it says.

13     **Q:**    The MSDS says exactly what the Underwriting

14   Laboratory tests show, correct?

15     **A:**    No.  It's -- it's talking about liquid water,

16   but also they're -- it's talking about spent material

17   that can also react.  So it's the same concept.

18     **Q:**    Where in your 14-page report do you say

19   anything about spent material or applicator instructions

20   or MSDS's about spent material?

21     **A:**    Well, I haven't said anything about it, but

22   again, it's the same -- same idea.  You're not -- you're

23   not using liquid water.  You're using the moisture in the

24   air, which is creating the ignition scenario.

25     **Q:**    What the MSDS says that's different from the

1    applicator's manual is that if you pile aluminum

2    phosphide in large quantities in contact with liquid

3    water, in that event, you are at risk of spontaneous

4    ignition, correct?

5         A:     Say that one more time.

6         Q:     What the MSDS says that's different than

7    Section 4.2 of the applicator's manual is that if you

8    pile large quantities of aluminum phosphide tablets or

9    pellets in contact with liquid water, that is when you

10   have a danger of spontaneous ignition, correct?

11                    MR. GOLDSTEIN:  Objection.

12                    THE WITNESS:  That's what this

13   particular MSDS is showing, yes.

14   BY MR. EPSTEIN:

15        Q:     Okay.  Have you ever met Dr. Brown before?

16        A:     Before this case?

17        Q:     No; before today.

18                    MR. GOLDSTEIN:  Objection.

19                    THE WITNESS:  As in Dr. Steve Brown?

20   BY MR. EPSTEIN:

21        Q:     Yes.

22        A:     Yes.

23        Q:     You met him at that December 2012 meeting

24   that you described that occurred here at Quick Widis?

25        A:     Yes.

1      **Q:**      Is that the only time you ever met him?

2      **A:**      Yes.

3      **Q:**      Have you spoken to him on the phone since

4    that time?

5      **A:**      No.

6      **Q:**      Have you reviewed his expert report in this

7    case?

8      **A:**      I believe I have, yes.  Of course --

9      **Q:**      Have you reviewed his deposition testimony in

10   this case?

11     **A:**      Yes.

12     **Q:**      Do you think this man knows what he's talking

13   about when it comes to fumigating agricultural

14   commodities with phosphine?

15     **A:**      Yeah, I would think he knows.

16                [EXHIBIT NO. 276 MARKED FOR

17                IDENTIFICATION]

18   BY MR. EPSTEIN:

19     **Q:**      Okay.  Show you what's Exhibit -- been marked

20   as Exhibit 276.

21                Have you seen this publication before from

22   the Alabama A&M and Auburn University Extension

23   Service?

24     **A:**      I have not.

25     **Q:**      Okay.  If you'll go to the last page, you'll

1    see it's an article co-written by Dr. Steve Brown.

2         A:      Can you tell me where it starts?

3         Q:      I'm sorry.  The last page.  I wanted just

4    to --

5         A:      Last page.

6         Q:      The last page, it shows who wrote this

7    article, Kathy --

8         A:      Oh, I got you.

9         Q:      Kathy Flanders, extension entomologist,

10   associate professor, entomology and plant pathology,

11   Auburn University.  And Steve Brown, extension

12   entomologist, professor, entomology, Georgia Cooperative

13   Extension Service, University of Georgia, right?

14        A:      Okay.

15        Q:      Go to page 6.  First full paragraph in the

16   middle column, they write, "Do not allow the aluminum

17   phosphide to contact liquid water, and do not leave

18   aluminum phosphide pellets or tablets in piles because

19   doing so interferes with the proper release of the

20   phosphine gas.  It also increases the risk of explosion

21   or fire" -- can you finish that for me, please.

22        A:      -- "should the pile be suddenly exposed to

23   water."

24        Q:      Right.  So what they describe as the risk of

25   a pile of aluminum phosphide tablets is there's a risk of

1    explosion or fire should the pile be suddenly exposed to

2    water, correct?

3        **A:**    That's what it says here.

4        **Q:**    So that's two sources, the MSDS, Exhibit 275,

5    and the Alabama Cooperative Extension System article,

6    "Fumigating Agricultural Commodities With Phosphine,"

7    that indicate that liquid water is required in order to

8    get a pile of aluminum phosphide tablets to spontaneously

9    combust, correct?

10                   MR. GOLDSTEIN:  Objection.

11                   THE WITNESS:  You're referring to this

12   article and the MSDS?

13   BY MR. EPSTEIN:

14       **Q:**    Yes.

15       **A:**    And again, I don't know if that's the MSDS I

16   looked at, but that one says that.  As far as this

17   article, that's what it says just reading it.  What he

18   actually meant by that, I don't know.

19       **Q:**    Okay.  But as opposed to what these two

20   exhibits say, you're hanging your hat on what the

21   applicator's manual says, correct?

22       **A:**    It's not just the applicator manual.  There

23   are other things that say the same thing.

24       **Q:**    Okay.  What else?

25       **A:**    Well, there's -- whatever I've referenced

1    down there.

2        Q:      Oh, "Stored Product Protection,"

3    Chapter 14?

4        A:      Yeah.

5                        [EXHIBIT NO. 277 MARKED FOR

6                        IDENTIFICATION]

7    BY MR. EPSTEIN:

8        Q:      Show you what's being marked as Exhibit 277.

9        A:      Okay.

10       Q:      Can you first confirm that this is the

11   publication and the chapter within the publication that

12   you were referring to in Footnote No. 74?

13       A:      Yes.

14       Q:      I think you're referring to page 163.

15       A:      Okay.

16       Q:      There's a statement that "Spontaneous

17   ignition of phosphine gas, if the gas concentration

18   exceeds 18,000 parts per million" -- how often does it

19   say that happens if you get to 18,000 parts per

20   million?

21       A:      It says "rarely happens."

22       Q:      Rarely happens.

23       A:      Okay.

24       Q:      Even at 18,000 parts per million.

25       A:      Okay.

1      Q:      Isn't that consistent with what Dennis Ryman

2  testified to and opined in his report?

3      A:      It says "rarely happens," but we see that it

4  happens.  We know it happens.

5      Q:      Okay.  And it says, "It could occur if large

6  numbers of phosphide pellets or tablets quickly generate

7  gas in a small-volume space."

8              Do you see that?

9      A:      Yes.

10      Q:      The Severn peanut dome wasn't a small-volume

11  space, was it?

12      A:      No; but you're looking at areas local --

13  localized areas to the actual pile itself, not the entire

14  dome.

15      Q:      Is that what you think that the authors here

16  are talking about when they refer to a small-volume

17  space?

18      A:      Well, that may not be what they're talking

19  about, but that's what I'm talking about.

20      Q:      Okay.

21      A:      You have to take a look at the area around

22  the actual pile, not the entire volume of what you're

23  fumigating.

24      Q:      Okay.  So you have -- MSDS says that you need

25  contact with liquid water.  You have the Alabama

1   Extension -- Alabama Cooperative Extension article that

2   says you need contact with liquid water.  The Stored

3   Product Protection chapter that you referenced saying

4   that, even if you have piling and even if you get to

5   18,000 parts per million, you're rarely going to have a

6   fire as the result of that, correct?

7       A:      That's what that's saying, sure.

8       Q:      All right.  What else did you rely on?

9       A:      Well, there's the Herbert Rauscher article.

10      Q:      That Mr. Ryman talked about in his

11  deposition, correct?

12      A:      Yes.

13      Q:      And that's it?  That's all you got?

14      A:      Well, there are others out there that I

15  haven't referenced, but -- but this -- there are

16  references that say this happens.

17      Q:      And a reference that says it happens is a

18  reliable scientific basis to form an opinion as to the

19  cause of a fire in a 2-million-cubic-foot peanut storage

20  dome; is that right?

21      A:      Well, you look at the available references

22  that talk about the likelihood of it happening and it

23  shows it can happen.  You have the applicator's manual

24  and label that says it can happen.  You have all these

25  other things; for instance, the other case studies,

1    the -- the people actually witnessing it happen.  And so

2    you have direct observation of the guys in the field

3    doing it who says it -- who say it happens.

4        Q:    Mr. Schumacher, you have direct observations

5    of the guys who apply the Fumitoxin tablets saying they

6    applied it in such a manner as to not cause piles, and

7    yet, you feel perfectly comfortable saying, "Well,

8    they're wrong about that and I'm right"?

9                    MR. GOLDSTEIN:  Objection.

10                   THE WITNESS:  That's right; based on how

11   they said they did it, based on the constraints under

12   which they were trying to apply it.  I mean, how it would

13   fall out of the flask, I agree that it's incorrect what

14   they're saying.

15   BY MR. EPSTEIN:

16       Q:    But what all these other people have said in

17   these case studies and incident reports and anecdotal

18   examples, that's your scientific basis for saying that

19   the piling of Fumitoxin tablets in this instance created

20   the lower flammable limit being reached and ignition,

21   based upon what these people that you don't even know

22   have to say about incidents that you weren't involved in

23   investigating; is that right?

24                   MR. GOLDSTEIN:  Objection.

25                   THE WITNESS:  That is information I can

1    rely upon.  These people who are doing investigations

2    into these causes, the references that say it can and

3    will happen, yes, I can rely on those.

4    BY MR. EPSTEIN:

5        Q:      Even when there are other published sources

6    that say it can't happen in the absence of liquid

7    water?

8        A:      They don't say it --

9                MR. GOLDSTEIN:  Objection.

10               THE WITNESS:  -- can't happen in the

11   absence of liquid water.  Your -- they said with water,

12   but it didn't say if you have just moisture, it can't

13   happen.  There's nothing in there that says it can't

14   happen if you just have moisture.

15   BY MR. EPSTEIN:

16       Q:      Mr. Schumacher, with all this conflicting

17   information out there, don't you think you should have

18   tested -- if it's that easy to prove that you're right,

19   don't you think you should have done it?

20               MR. GOLDSTEIN:  Objection.

21               THE WITNESS:  No, I don't need to do

22   it.

23   BY MR. EPSTEIN:

24       Q:      Okay.  Are you familiar with case law under

25   Daubert versus Merrell Dow Pharmaceuticals that has

1    required fire investigators to physically test their

2    theories at the risk of being excluded from testifying?

3                      MR. GOLDSTEIN:  Objection.

4                      THE WITNESS:  I obviously don't know

5    case law as well as you do.

6    BY MR. EPSTEIN:

7        Q:      You're not aware that there are cases out

8    there in which experts professing to an opinion as to

9    origin and cause of a fire have been excluded because

10   they have not physically tested their theory?  You're not

11   aware of that?

12                     MR. GOLDSTEIN:  Objection.

13                     THE WITNESS:  I'm not aware of that.

14   BY MR. EPSTEIN:

15       Q:      Okay.  And physically testing your theory

16   wouldn't give you a more reliable scientific basis for

17   your hypothesis in this case than the information upon

18   which you are currently relying?

19       A:      Well, again, I don't need to do the testing.

20   I can rely upon that information and that data.

21                     MR. EPSTEIN:  Can you read it back to

22   him, please.

23                     [RECORD READ]

24                     THE WITNESS:  Testing it could bolster

25   it, but I don't need to do that.

1    BY MR. EPSTEIN:

2         Q:      Go to page 12 of your report.

3         A:      Yes.

4         Q:      You said, after Footnote 78, "Piling of the

5    tablets in one area which effectively decreases the heat

6    loss causes the temperature rate of phosphine gas

7    generation and local phosphine gas to increase."

8                 Take that one sentence.  Show me your

9    scientific support for that statement.

10        A:      Basically you have -- that's what's going to

11   happen in a pile under a certain configuration.  It's

12   just the Arrhenius equation, temperature and rate of

13   reaction.

14        Q:      Show me any literature, show me any testing,

15   show me any report of some anecdotal incident that

16   establishes that piling of tablets in one area

17   effectively decreases the heat loss, causes the

18   temperature rate of phosphine gas generation and local

19   phosphine gas to increase?

20        A:      Well, the testing that Dale Mann did shows

21   that the concentration increases and that the -- it leads

22   to higher concentrations in a pile than it does if it's

23   singular.

24        Q:      And causes the temperature to increase at the

25   same time?  Dale Mann showed that?

1        **A:**    He showed that there's a slight difference in

2    when the phosphine is at its highest and when the

3    temperature is at its highest in that particular

4    configuration.

5        **Q:**    He didn't get temperatures when the phosphine

6    gas was being generated to its highest level -- he didn't

7    get temperatures above ambient temperatures, did he?

8        **A:**    Initially that's correct, in that situation.

9    But he got high concentrations of gas from piling.

10       **Q:**    And without an increase in temperatures,

11   you're not going to get autoignition of that gas, are

12   you?

13       **A:**    Under that scenario, unless you have

14   diphosphines being generated or unless you have the

15   pyrophoric nature of this material coming into play.

16   That's one method of igniting it.

17       **Q:**    In fact, not only do you not have a source to

18   cite me right now to support the statement that you wrote

19   there; there's not a footnote supporting the statement in

20   your report, is there?

21       **A:**    Footnote supporting what?

22       **Q:**    The statement that "Piling of tablets in one

23   area which effectively decreases the heat loss causes the

24   temperature rate of phosphine gas generation and local

25   phosphine gas to increase," that statement isn't

1    supported by a footnote, is it?

2         A:      Actually, if you look at the other ones, 79

3    through 84, that speaks specifically to this -- this

4    concept.

5         Q:      Well, what the Swedish Club and Australian

6    Government, and State of California -- what all of those

7    are are incident reports of individual incidents,

8    correct?

9         A:      That's right; with people investigating

10   them.

11        Q:      Like you.

12        A:      Correct.  The State of California being an

13   independent group.

14        Q:      None of that is peer-reviewed literature,

15   correct?

16        A:      That's right.

17        Q:      None of that is testing done by a certified

18   laboratory, correct?

19        A:      It's not testing, no.

20        Q:      Okay.  Did you have any concept about Daubert

21   versus Merrill Dow Pharmaceuticals requiring a scientific

22   opinion to be grounded on testing and/or peer-reviewed

23   literature?

24                    MR. GOLDSTEIN:  Objection.

25   BY MR. EPSTEIN:

1    **Q:**    Do you have an understanding that Daubert

2    generally requires that?

3                    MR. GOLDSTEIN:  Objection.

4                    THE WITNESS:  I don't under -- I don't

5    have an understanding that you're -- you're allowed to

6    base your opinion on science and base your opinion on

7    literature that's out there, field experience, your

8    education, your experience.  And so there are a lot of

9    things you can base your opinion on.

10   BY MR. EPSTEIN:

11   **Q:**    Okay.  And so in your -- in this case, you

12   based your opinion as to what caused the fire on your

13   education, your experience, what some applicator manuals

14   say about Fumitoxin or aluminum phosphide, and some

15   incident reports where people like you have investigated

16   fires; is that basically correct?

17                   MR. GOLDSTEIN:  Objection.

18                   THE WITNESS:  And based on science and

19   based on field experience of people in the field, the

20   information that we've been talking about.

21   BY MR. EPSTEIN:

22   **Q:**    Incidents that have occurred in the field;

23   what's in the applicator's manuals; and your education,

24   training, and experience as a fire investigator; that's

25   what you're bringing as science to your conclusion in

1    this case, correct?

2          A:      Well, also all the other stuff that's in my

3    report that we've talked about, all the other references

4    that I've -- I've put in there support the opinion that

5    piling of tablets will lead to ignition under a certain

6    pile size and condition.

7          Q:      What certain pile size?

8          A:      Well, I told you, I can't tell you exactly

9    that pile size, but it will happen.

10         Q:      Is there anything that you have referenced or

11   reviewed in your work on this case that talks about a

12   pile size that is necessary in order for there to be a

13   confinement of gas and ignition?

14         A:      No; because I don't know the pile size

15   because it's too dependent on the configuration and all

16   the other parameters.

17         Q:      All right.  You said you were relying on --

18   let's go back to Exhibit 277, because that's one of the

19   sources in your group of footnotes from 79 to 84.  In

20   fact, you said, "This ignition scenario has been

21   referenced in various sources."  So where in that section

22   that we were just looking at does it say anything

23   about piling causing a decrease in heat loss and an

24   increase in temperature and phosphine gas generation?

25         A:      What page is that on again?  I --

1     Q:      I think it was on --

2     A:      I seem to have lost it.

3                MR. GOLDSTEIN:  163.

4  BY MR. EPSTEIN:

5     Q:      -- 163.  Because you say you're citing that

6  source for the statement that "Piling of the tablets in

7  one area which effectively decreases the heat loss causes

8  the temperature rate" -- "the temperature, the rate of

9  phosphine gas generation, and local phosphine gas to

10  increase.  This ultimately results in the" -- "in

11  autoignition of the phosphine gas."

12               Where does it say anything like that in this

13  chapter on stored product protection?

14     A:      Well, it talks about -- here, it talks about

15  ignition of fires, depositing in piles in which the

16  pellets are touching each other or when standing water is

17  present.  I mean, that part is what I'm referencing

18  there.  And basically, as with spontaneous combustion

19  under high concentration fire hazard from piling can be

20  avoided by proper application.  So what I'm saying

21  regarding this reference is that the piling of the

22  tablets just with moisture leads to -- can lead to

23  ignition.

24     Q:      Okay.  There is no source that says piling

25  ultimately results in autoignition of phosphine gas.  No

1    source says that.

2        A:      I'm talking about the process.  Sources say,

3    basically, that piling of tablets or pellets can lead to

4    ignition even if you just have moisture.  And what I'm

5    describing here is the process of that occurring.  You

6    pile it, and eventually you lead to ignition of the

7    phosphine gas.  And so there are sources that say, yes,

8    basically you will have -- you can have ignition; so you

9    will have that from autoignition.

10       Q:      There is no source that says you will have

11   autoignition of the phosphine gas resulting from the

12   piling of tablets or pellets?

13       A:      That's right.

14       Q:      There is none?

15       A:      There is no source, and I'm not saying that

16   it happens every time.  What I'm saying is, in describing

17   the ignition scenario that occurs when you get ignition

18   from piling, that is ultimately what happens.

19       Q:      And here, you know you have ignition because

20   you had a fire, right?

21       A:      Yes.

22       Q:      Based upon your analysis and Mr. Turner's and

23   Mr. Lilley's testimony, you had piling, correct?

24       A:      Yes.

25       Q:      And because there are references that say

1    it's possible that piling can lead to ignition, you

2    concluded that's what you had here, right?

3              MR. GOLDSTEIN:  Objection.

4              THE WITNESS:  No.  I mean, again, we go

5    through the whole process of how we get to this point,

6    and there's a lot more to it than what you just

7    described.  Ultimately you eliminate self-heating to

8    ignition of the peanuts as a cause.  Then you look at the

9    manner in which the pellets -- or excuse me -- the

10   tablets were applied in this case, and you know how

11   they're going to come out of the flask and how -- the

12   constraints you're under in applying them, and you know

13   that that is an ignition source and a potential ignition

14   scenario, and you can conclude that that happened in this

15   case.

16   BY MR. EPSTEIN:

17        Q:      And you can conclude that without having

18   demonstrated that piling, in and of itself without the

19   introduction of liquid water, can contain sufficient gas

20   to lead to the autoignition of phosphine gas?  You can --

21   you can get from the piling to the fire without

22   demonstrating that piling can lead to the fire?

23        A:      That's right.  I don't need to demonstrate

24   it.  The science shows it's going to happen and all the

25   literature and field experience, et cetera.

1        Q:    Well, we've already been through literature

2    that shows you need liquid water, correct?

3                    MR. WIDIS:   Objection.

4                    THE WITNESS:   Well, the two you

5    referenced say liquid water, but it doesn't say with

6    moisture it won't happen.

7    BY MR. EPSTEIN:

8        Q:    Dale Mann's report says you need liquid

9    water, correct?

10       A:    Well, that's fine.  That's his opinion.  But

11   he did limited testing on the tablet size.

12       Q:    Underwriting Laboratories' reports all show

13   that you need liquid water, correct?

14       A:    Right; with the limited number of tablets

15   they used in their pile size.

16       Q:    And you keep on criticizing the limited

17   number of tablets that were used, and you've testified

18   that you could have shown by using more tablets that you

19   would get to a fire, but you decided against doing that,

20   right?

21       A:    I decided I didn't need to do it; that's

22   right.

23       Q:    Wasn't the concern that if you tried you

24   might not get the outcome you wanted?

25       A:    No.

1      **Q:**    That wasn't it?

2      **A:**    You would have reached the LFL for sure.

3      **Q:**    For sure?  And you could have demonstrated

4      that?

5      **A:**    Right.

6      **Q:**    You just didn't --

7      **A:**    I didn't need to do it, no.

8      **Q:**    Okay.

9                   THE WITNESS:  Is it a reasonable spot to

10     take a quick break?

11                   MR. EPSTEIN:  Sure.

12                   THE VIDEOGRAPHER:  Off the record at

13     5:23.

14                   [RECESS TAKEN]

15                   THE VIDEOGRAPHER:  On the record at

16     5:30.

17     BY MR. EPSTEIN:

18     **Q:**    All right.  We're going to page 13 of your

19     report, Mr. Schumacher.  And since it only has 14 pages,

20     we are getting close to being done.

21     **A:**    Okay.

22     **Q:**    We've been over this before, but on No. 6,

23     you're giving the reasons why you concluded that there

24     was piling.  Most probably was piling on the surface of

25     the peanut pile.  Number 6, you said the peanut pile had

1    a ten-foot flat section at the top, and the surface was

2    not smooth and likely had dips in it, creating locations

3    for piling of the tablets.

4              Again, as you sit there right now, you don't

5    know where you got the ten-foot flat section from,

6    correct?

7        A:    That's right.  I know I could point to flat

8    section, but that ten foot, I'd have to do some looking

9    into.

10       Q:    Okay.  And there's nobody who testified that

11   there were dips in the surface in that flat section,

12   correct?

13       A:    Well, I don't know that anybody was

14   specifically asked if there were dips or not.

15       Q:    But you concluded it likely had dips in it,

16   correct?

17       A:    That's right.

18       Q:    Any particular reason why?

19       A:    Well, just the way that things are going to

20   settle differently in a pile.  I've seen peanuts, the

21   irregular shape of them.  I've seen other commodities in

22   bins, and they're not flat; there are dips.

23       Q:    Showing you what's been marked as Exhibit No.

24   7.

25              Do you recall seeing this picture before,

1    Mr. Schumacher.

2        **A:**    I don't even know what that is.

3        **Q:**    You've never seen the soldier that R.P.

4    Watson testified about?

5        **A:**    I have, but I can barely --

6        **Q:**    I know.  It's not a good picture.

7        **A:**    It's a terrible picture.  I -- don't take

8    that personally.  I'm just saying I can't really tell you

9    much from this picture.

10        **Q:**    Okay.  I'll show you that picture on my

11    computer, then, so you've get a better picture of it.

12        **A:**    Okay.

13        **Q:**    Much better.  Okay.  See Exhibit 7 on my

14    computer?

15        **A:**    I do.

16        **Q:**    Okay.  Have you seen that before?

17        **A:**    I have.

18        **Q:**    Okay.  Do you recall R.P. Watson's testimony

19    about what that is?

20        **A:**    Yes.

21        **Q:**    And what is it?

22        **A:**    It's a soldier.

23        **Q:**    Okay.  And where was it located in the

24    dome?

25        **A:**    I -- I think it was near the center.

1    Q:    Right.  Well, would you agree with me that

2    that's not the type of surface you are talking about

3    being at the flat section on the top of the peanut

4    pile?

5                    MR. GOLDSTEIN:  Objection.

6                    THE WITNESS:  Well, I mean, this is not

7    even remotely representative of what's going on in the

8    dome, and this has been after you've actually drained a

9    lot of the peanuts out of the dome through the chutes in

10   order to allow you to go in and remove them from the

11   dome.  And so this is totally different than what you

12   would see if you looked inside the dome.

13   BY MR. EPSTEIN:

14   Q:    Okay.  So you don't think the surface of the

15   peanut pile that was underneath where Mr. Lilley and

16   Mr. Turner were applying Fumitoxin tablets had anything

17   to do with the soldier?

18   A:    Well, I don't think that that's what the

19   surface would look like, no, because you've had a lot of

20   peanuts removed from there.

21   Q:    Okay.  Did you review the sworn testimony of

22   Randy Turner and Brian Lilley as to how they applied the

23   tablets?

24   A:    I did.

25   Q:    And you had forgotten that Mr. Turner applied

1    the tablets using two different methods, correct?

2        A:    I had forgotten that, but it doesn't matter

3    because he occasionally used his hands to throw them.

4    The majority of the time, he was actually shaking the

5    flasks.

6        Q:    And did they testify that they applied the

7    tablets in a manner that prevented piling or that led to

8    piling?

9        A:    Well, I mean, they described how they

10   actually said they applied it.  And I -- and, you know,

11   there's no way it did not lead to piling.

12       Q:    There's no way?  Not possible?

13       A:    No, it's not.

14       Q:    You're a hundred percent certain that what

15   they did led to piling, 100 percent?

16       A:    Based on a reasonable degree of engineering

17   certainty, yes.

18       Q:    Okay.  Okay.  Are you 100 percent certain, or

19   are you not 100 percent certain?

20                    MR. GOLDSTEIN:  Objection.

21                    THE WITNESS:  I am confident based on a

22   reasonable degree of engineering certainty that there was

23   piling underneath them based on the method that they used

24   to apply the tablets to the dome.

25   BY MR. EPSTEIN:

1      Q:      So you're not absolutely certain?

2                  MR. GOLDSTEIN:  Objection.

3                  THE WITNESS:  I go -- I gave you what I

4      am.  I -- based on a reasonable degree of engineering

5      certainty, there was piling based on their application.

6      BY MR. EPSTEIN:

7      Q:      Okay.  Let me ask you this question:  Under

8      NFPA 921, are you as a fire investigator permitted to

9      discredit the sworn testimony of those who were directly

10     involved in the event that you conclude caused the fire

11     if you do not have physical evidence to the contrary?

12     A:      You're allowed to look at their testimony and

13     to evaluate that testimony based on all the conditions

14     related to that fire.  And you can test the veracity of

15     that statement, the accuracy of that statement based on

16     science, based on demonstrative testing, based on all

17     kinds of other information that allows you to say, "Well,

18     I don't think that what he's saying or she's saying is

19     accurate."  And so, yes, you can look at it and test the

20     accuracy of somebody's statement, whether or not it's

21     under oath or not, and determine if it is accurate or

22     not.

23     Q:      Are there any eyewitnesses in this case who

24     testified as to actually seeing the distribution of the

25     tablets on the surface of the peanut pile on August 4th,

1    2009?

2         A:    Are there any eyewitnesses besides Turner --

3         Q:    Any.

4         A:    -- Turner and Lilley?

5         Q:    So there are two?

6         A:    Right.

7         Q:    And you do discredit their testimony, don't

8    you?

9         A:    I don't think it's accurate.  Yes.

10        Q:    Okay.  Show you what's been marked as

11   Exhibit 201.

12        A:    Okay.

13        Q:    Go ahead and take a look at that.

14        A:    Okay.

15        Q:    Mr. Turner testified that after he was done

16   with the application, he looked into the pile with his

17   flashlight and, quote, "I could see that the tablets had

18   been scattered.  They were all across the peanuts."

19              And he was asked, "How much of the pile could

20   you see?"

21              He said, "I could see a lot of it, but I

22   couldn't see all the way to the walls."

23              Okay.  Based upon what he could see, you

24   discredit his testimony, correct?

25        A:    Right.  Based on the information that we've

 1    talked about, his inability to really define a pile, say

 2    if a pile is a problem, say if a pile would lead to

 3    ignition, all the other things we've talked about -- I

 4    don't know how he could say that there was -- there were

 5    no piles and that it was spread out if he doesn't know

 6    what a pile is.

 7        Q:    He didn't testify about piles in this section

 8    of his testimony, did he, Mr. Schumacher?

 9        A:    In this section, that's right.

10        Q:    He testified, "I could see that the tablets

11    had been scattered.  They were all across the peanuts."

12    That has nothing to do with what his definition of a pile

13    is, does it?

14        A:    But there is -- there are other questions

15    related to that, and based on the application method,

16    there had to have been piles there.

17        Q:    Okay.  So what he says on line 18 and 19 of

18    page 174 of his transcript, you as the fire investigator

19    can say, with a reasonable degree of engineering

20    certainty, is wrong?  What he saw is wrong?

21        A:    That's right.  His -- looking into a dark

22    dome, based on the way they applied the tablets, all the

23    other things that we've talked about, I disagree with his

24    observation that there was scattering and that there were

25    no piles.

1       Q:      Even though he was there, he had a

2  flashlight, he looked in, he saw what he saw, and --

3  what's the closest you've ever been to Severn, North

4  Carolina?

5                      MR. GOLDSTEIN:  Objection.

6  BY MR. EPSTEIN:

7       Q:      Here in Charlotte?

8       A:      I don't know the answer to that.

9       Q:      But you can say this man's testimony under

10  oath is incorrect?

11      A:      I can say it's inaccurate, yes.

12      Q:      Okay.

13      A:      You want that --

14      Q:      Sure.  Show you what's been marked as

15  Exhibit 202.  Take your time and look at that.  That's

16  Mr. Lilley's testimony.

17      A:      Okay.

18      Q:      Your testimony is there was one or more pile

19  on the flat section of the pile directly underneath where

20  Mr. Lilley and Mr. Turner were applying Fumitoxin

21  tablets, correct?

22      A:      Yes; as well as potentially on the slopes.

23      Q:      But you're certain that directly beneath

24  them, on the flat section as you called it, there would

25  have been one or more piles, correct?

1      **A:**     I think you would have concentration of

2   tablets in the area directly below them, yes.

3      **Q:**     Okay.  Mr. Lilley testified that they had to

4   look for a flask that fell in after their application was

5   over, correct?

6      **A:**     Correct.

7      **Q:**     And they used a flashlight to try to find it,

8   correct?

9      **A:**     Yes.

10     **Q:**     And he said, "Randy shined the flashlight

11  down, and I was looking in the hole, too," correct?

12     **A:**     Yes.

13     **Q:**     And he was asked, "But you could see again

14  the top of the pile and a little ways down?"

15             He said, "Uh-huh."

16             And Mr. Widis asked him, "And that's all you

17  could see?"

18             He said, "Yes, sir."

19             And he said, "You didn't see any piling in

20  that little area you could see; is that right?"

21             He said, "Yes, sir."

22             He was wrong when he said that; that's your

23  testimony?

24     **A:**     I think he's inaccurate, yes.  Again, we go

25  back to he doesn't know what piling is.  He can't

1   describe it.  He can't say it's bad.  He can't say if it

2   leads to ignition.  He's looking and sees a flask, which

3   is shiny, with a flashlight, which is different than if

4   you have tablets in a pile of peanuts below you 20 feet.

5   You can't -- you can only see length and width, not

6   depth.

7        **Q:**     Okay.

8        **A:**     Here you go.

9        **Q:**     How does gravity play into the analysis of

10  what you just described, sir?

11       **A:**     Well, it's going to cause the tablets to fall

12  and hit the top and hit the sides.  Some will stick.

13  Some will roll.  Some will collect in recessed areas.

14       **Q:**     Do these tablets have the ability to bounce

15  off a hard surface?

16       **A:**     They could, but peanuts absorb it.  A lot of

17  them just go right into the peanut pile.

18       **Q:**     From 20 to 25 feet, you think that's what's

19  going to happen?

20       **A:**     Yes.

21       **Q:**     Okay.  How does the angle of repose play into

22  your analysis?

23       **A:**     That plays into the analysis of when they hit

24  it, they're going to either stick, they're going to roll

25  a little bit, or they're going to bounce.

1   Q:      If they're rolling or bouncing, they're not

2   likely to wind up in a pile.  Would you agree with

3   that?

4   A:      That's not necessarily true.  Depends on

5   where they're rolling to and if others are rolling to

6   them and if they're getting caught up in a dipped area.

7   Q:      Okay.  Have you read Dr. Jones' expert report

8   in this case?

9   A:      Yes.

10  Q:      Do you have any basis to disagree with her

11  math that the peanuts piles -- peanut pile's surface area

12  was at least 66,000 square feet?

13  A:      I haven't done that calculation, but just

14  assuming that it's correct.

15  Q:      Okay.

16  A:      That's fine.

17  Q:      And do you have any reason to doubt her

18  calculation that, placed side by side, 49,000 Fumitoxin

19  tablets would comprise a total of 108 square feet?

20  A:      I haven't done that calculation, and assuming

21  that's correct.  That's fine.

22  Q:      So you've done some math in your report, and

23  you do the division.  108 divided by 66,000 and that

24  produces .16 percent.

25  A:      That's right, but that's misleading.

1      Q:      Why is that misleading?

2      A:      Because you're not looking at 66,000 square

3  feet of the peanut pile.  You're going to have

4  concentration of tablets directly below you, simply by

5  the manner in which you apply these tablets from the

6  flasks.  And so you have to look at a much smaller

7  surface area when you're looking at that.

8      Q:      You do not conclude that piles were formed at

9  the location where the downward sloping peanuts and

10 upward sloping concave side walls came together,

11 correct?

12     A:      Could you have gotten a tablet there?  Maybe.

13 But I don't think you would have piles down there.

14     Q:      And at least if the temperature data from

15 August 11th were accurate, certainly those temperature

16 data wouldn't support the notion that that's where the

17 fire was located, correct?

18     A:      Those are the -- I'd have to look at that.

19     Q:      All right.  If you can -- do you still have

20 that exhibit in front of you?

21     A:      Actually, I do.

22     Q:      Look at cables 13 through 19.  Or is it 14

23 through 19?  I think it's 14 through 19.

24     A:      Yep, it's 14 through 19.

25     Q:      Okay.  And those are the coolest temperatures

1    as of August 11th at 9:00 p.m. in the entire dome,

2    correct?

3         A:    That's right.

4         Q:    So at least if those data are accurate, the

5    notion that what caused this fire was piling of Fumitoxin

6    tablets at the intersection of the concrete dome's walls

7    and the surface of the peanut pile, that wouldn't support

8    it, correct?

9         A:    That's right.

10        Q:    And that's not your hypothesis as to how this

11   fire commenced, correct?

12        A:    Right.  That's not the area where I think the

13   piling occurred, correct.

14        Q:    Okay.  You say --

15        A:    Which -- where are you now?

16        Q:    You're back -- back in your report.  We're

17   getting so close to the end.  You have a whole paragraph

18   devoted to Protect-It, and we were -- I saw earlier that

19   you did some data and analysis on Protect-It.  And the

20   purpose of doing that, as you told us earlier, was to

21   determine if there was any production of water or

22   moisture sufficient to have caused a different reaction

23   than would have occurred without the Protect-It,

24   correct?

25        A:    To see what the Protect-It would -- if it

1  could contribute to the reaction, correct.

2      Q:    All right.  And you know that there was 1,116

3  pounds of Protect-It that was taken through the conveyor

4  and dumped into the dome that day, correct?  July 1,

5  2009.

6      A:    Yes.

7      Q:    And that's five weeks before the application

8  that we're talking about today, correct?

9      A:    Yes.

10      Q:    All right.  What was the purpose of applying

11  Protect-It on that day?

12      A:    I think it was a precautionary measure as far

13  as insect protection.

14      Q:    What does the Protect-It do?

15      A:    It's basically a diatomaceous earth with a

16  bunch of little creatures that have -- dead creatures

17  that have more or less sharp parts to them that the bugs,

18  I think, walk over.  And it -- it's effective against

19  certain particular types of insects.  It then basically

20  sucks them dry of water, I guess, or something like

21  that.

22      Q:    And as we talked about earlier, the fans were

23  running for a couple of hours to disperse and spread the

24  Protect-It dust material across the pile of peanuts,

25  correct?

1      **A:**      Yes.

2      **Q:**      And that would have led to a layer of this

3   Protect-It dust on the surface of the peanut pile,

4   correct?

5      **A:**      Yes.

6      **Q:**      Kind of like a protective glazing, something

7   like that?

8      **A:**      I don't know if that's the proper

9   terminology, but you'd have a thin layer.

10      **Q:**      Okay.  Can you explain how a flash from the

11   autoignition of phosphine gas could have ignited fine

12   material underneath that protective layer?

13      **A:**      Well, I mean, when you're applying the

14   tablets, you're actually disperse -- you're moving the

15   material that's on top of them.  So you're basically

16   coming down in a layer, and you're pushing that stuff

17   away.  So now you have more or less fresh material

18   underneath it and near it.  So you're creating a

19   situation where you don't have that stuff like it was

20   before.  It's being moved around.  It's being stirred up.

21   And so now you have material that's available to see a

22   flash.

23      **Q:**      Okay.  Would you agree with me that if the

24   Protect-It layer, as you have described it, was not

25   disturbed by the application of Fumitoxin tablets on

1   August 4th, 2009, a flash from the autoignition of

2   phosphine gas could not have ignited fine material within

3   the peanut pile?

4       A:    I mean, with your hypothetical question, if

5   you completely don't disturb it, which is -- I think

6   that's highly unlikely, then a -- it would make the

7   chances of a flash igniting it less likely.  However,

8   again, you have the smoldering of the tablets that it

9   doesn't matter if you've got this fine layer; it will --

10  it will start the fine materials underneath it and the

11  peanuts on fire eventually.

12      Q:    So you're saying the flash may not have

13  ignited the fine material if there was a buffer of

14  Protect-It between the Fumitoxin tablets and the peanut

15  pile, but eventually there would have been sufficient

16  smoldering within the Fumitoxin pile to penetrate through

17  the Protect-It?

18      A:    That's right.  And that's in your

19  hypothetical question where you don't disturb it

20  whatsoever.

21      Q:    Before I just asked you these questions, did

22  you even consider the effect that the Protect-It had on

23  the ability for there to be ignition on August 4th, 2009,

24  or thereafter?

25      A:    Sure.

1      Q:      Is there a reason you didn't mention that in

2   your report?

3      A:      Because I didn't think it was necessary.  I

4   didn't need to talk about it.

5      Q:      But your conclusion is the mere application

6   of the tablets would have moved the Protect-It out of the

7   way, so to speak?

8      A:      Right.  You would have disturbed that -- that

9   surface by dropping tablets from 20 or 25 feet.

10  Absolutely.

11     Q:      Okay.  So the -- the gravity of 20-to-25-foot

12  drop is sufficient to cause the Protect-It to get out of

13  the way but insufficient to prevent there being piling;

14  is that your testimony?

15     A:      That's right.  You're going to actually embed

16  inside the peanuts, and you're going to move them.  Did I

17  say that none of them are going to -- of the tablets are

18  going to move off the surface?  No.  But you're going to

19  have a big accumulation of tablets directly below where

20  they're applying it.

21     Q:      And the Protect-It that was underneath there

22  is going to move out of the way?

23     A:      Sure.  You're going -- it's not like going to

24  instantly move left, but you're going to displace it

25  because you're displacing the peanuts and the tablets are

1    taking its place.  And so, yes, you're going to have

2    movement of that material.

3         Q:     How much do those tablets weigh?

4         A:     Each tablets weigh three grams.

5         Q:     Three grams?

6         A:     Yes.

7         Q:     Okay.  Your last paragraph, the first

8    sentence says, "The fire that occurred in the Severn dome

9    was caused by the autoignition of phosphine gas which was

10   at or above the LEL."

11              Where specifically did that happen?

12        A:     I'm -- can you be more specific with that

13   question?  Where --

14        Q:     Where within the 2-million-cubic-foot dome

15   did the fire caused by the autoignition of phosphine gas

16   occur?

17        A:     Well, I think I've answered that.  I said I

18   can't give you the exact point of origin, but it was on

19   the surface of the peanut pile.

20        Q:     In one place?  More than one place?  Ten

21   places?

22        A:     At least one place.  It could be more.

23        Q:     Is it really your testimony that if there was

24   one smoldering pile of Fumitoxin tablets on the surface

25   of the peanut pile, that was going to be sufficient to

1    sustain a fire in a smoldering state for weeks?

2        **A:**    Yes.

3        **Q:**    And there never would have been a flaming

4    fire prior to the fire suppression efforts?

5        **A:**    I think you could have had flaming combustion

6    going on there, but you had smoldering initially.  It

7    could have been flaming some point, changed from flaming

8    to smoldering and flaming in that environment, but

9    eventually it would be a smoldering fire.

10        **Q:**    Based upon your education, training, and

11    experience, if a fire results from the self-heating of a

12    commodity, spontaneous combustion, is that a fire which

13    develops slowly or quickly?

14        **A:**    Read that question one more time, please.

15        **Q:**    Sure.  Based upon your education, training,

16    and experience, if a fire results from self-heating of a

17    commodity to spontaneous combustion, is that a -- is that

18    fire typically one which develops slowly or quickly?

19        **A:**    I mean, it depends on the pile size.  It

20    depends on a lot of things.  But generally relatively

21    slowly.

22        **Q:**    Would you not agree, Mr. Schumacher, that the

23    type of fire you describe at the bottom of page 13 in

24    your report is more consistent with a fire caused by

25    self-heating and spontaneous combustion than with the

1    autoignition of a gas that has reached its lower

2    flammable limit?

3         **A:**     No.

4         **Q:**     You don't agree with that?

5         **A:**     No.

6         **Q:**     And you've testified that this fire commenced

7    within the first two to three days after the application,

8    correct?

9         **A:**     Yes; something like that.

10        **Q:**     And if there wasn't smoke detected until the

11   seventh day, how do you explain that?

12        **A:**     Simply.  It's a very, very tight dome.  It's

13   sealed, and it's made to be insulated.  And so I'm not

14   surprised it wasn't noticed for that amount of time.

15        **Q:**     Are there any people with whom you have

16   discussed this case, other than the lawyers for the

17   plaintiffs, that we haven't already discussed or gone

18   over today?

19        **A:**     Besides Jay Freeman, who is my partner.

20        **Q:**     Okay.  What have you discussed with Jay

21   Freeman, your partner?

22        **A:**     Just the case in general, sounding-board-type

23   things.  But besides that, not much.  Zach Jason helped

24   do some of that work that you've seen.

25        **Q:**     No one else other than other engineers in

Deposition of John Schumacher

```
1    your firm, the lawyers in this case, and the experts in
2    this case?
3         A:    That's right.
4         Q:    Okay.  All right.  Have we discussed any and
5    all disagreements or criticisms you have of the opinions
6    expressed by Mr. Ryman in this case?
7         A:    Well, I mean, can you -- that's a --
8         Q:    Is there anything that stands out in your
9    mind that Mr. Ryman says with which you disagree that you
10   haven't already discussed with me today?
11        A:    And I'm going to give you what I can think
12   about --
13        Q:    Sure.
14        A:    -- but I'm not going to say it's
15   all-encompassing.
16        Q:    Understood.
17        A:    Well, the biggest thing is -- well, no,
18   actually.  He says that this can happen.  I mean --
19        Q:    I'm talking about disagreements.
20        A:    Yeah.  And I'd have to look at his report and
21   stuff that -- well, I disagree that you can't confine the
22   phosphine, that kind of thing.  So his discussions about,
23   you know, the label, that it doesn't really happen, those
24   kind of things I would disagree with.
25        Q:    Okay.  Dr. Mann -- "Dr. Mann."
```

1          Mr. Mann; are there things that you disagree

2     with from his report that you haven't already expressed

3     today that can come to your mind readily?

4          A:     Besides the fact that he doesn't think this

5     can happen.  I mean, the obvious things were he and I

6     disagree with opinions.

7          Q:     Do you agree with his protocol or methodology

8     on how he did his testing?

9          A:     Well, I mean, he did spot measurements as

10    opposed to constant sampling, and why he did -- why he

11    chose to take a measurement at one time and not sooner or

12    more periodically, that may have changed the

13    concentrations that he was getting when he was doing that

14    sampling.  I know he did a GC mass spec analysis, and so

15    he had to do spot measuring.  But why he chose the times

16    to measure, I don't know why.  Why he stopped at a

17    hundred, I don't know why.  And so things like that, you

18    know, I question.

19         Q:     Is there anything about his methodology as

20    you read it in his report -- first of all, have you

21    analyzed the file data from Mr. Mann?

22         A:     What file data?  Like --

23         Q:     The file data showing the actual

24    concentration of phosphine gas at every interval he

25    measured it, the file data showing the actual temperature

1   of the commodity and just aside the commodity at every

2   interval he measured it.  Have you seen all those data?

3       **A:**     I've seen what's in his report, yes.

4       **Q:**     Well, have you not seen the file material

5   that supports what's in his report?

6       **A:**     I'm trying to think if I have.  I don't know

7   if I've seen the specific file material.  I've seen

8   what's in his report as far as those concentrations.

9       **Q:**     Okay.  Is there anything about his

10  methodology or protocol or the way he analyzed the

11  information that made you think this is a man who is

12  trying to get to a certain result and will do what he

13  needs to do to get that result?

14      **A:**     Well, again, I think stopping at a hundred

15  tablets, I question why that was done in this case; why

16  he didn't go to 200 tablets, for instance.  So in that

17  regard, yes, I question that.

18      **Q:**     And if he went to 200 tablets, would you be

19  criticizing him for not going to 300 tablets?

20      **A:**     I have no idea.  I want to -- I want to see a

21  progression, because he's showing a progression of an

22  increase in the phosphine concentration, one that is very

23  near the lower flammable limited with a hundred

24  tablets.

25      **Q:**     Anything else that comes to mind about Doc-

1   -- about Mr. Mann's report that you would disagree

2   with?

3        A:      I mean, I can't think of specifics.  Again, I

4   would have to spend time looking at the report.  But

5   anything where he says it can't happen and -- I disagree

6   with.

7        Q:      Okay.  Let's move on to Dr. Montross.  Let me

8   ask you first:  Were you supplied all of the backup data

9   on the modeling that Dr. Montross did?

10       A:      Yes.

11       Q:      Okay.  Did you have a chance to review

12   that?

13       A:      I looked at it briefly.  Some of the files I

14   could not open.  I don't know what program he was using.

15       Q:      Right.

16       A:      And so, in that sense, I can't look at that

17   data.

18       Q:      Well, let me ask you the same question about

19   Dr. Montross that I asked you about Mr. Mann.  Is there

20   anything you saw from his backup data, from his report,

21   from his analysis, that makes you believe that

22   Dr. Montross was essentially trying to get to a certain

23   result and did what he had to, to get there?

24       A:      Well, I mean, his model.  He picks a certain

25   number of peanuts and then models it using whatever

1    model -- the dry mass -- dry matter loss model.  But, I

2    mean, I can't say he was trying to get to a certain spot,

3    if that's what you're asking.  I mean, I don't know how

4    to answer that question.

5         Q:    Did you understand the entirety of his

6    report?

7         A:    Yes.  I understood the majority of it,

8    sure.

9         Q:    And are there con- -- you've already told me

10   about a couple of significant things, the BTUs in

11   particular.  Is there a concept that he described about

12   his analysis with which you disagreed with his

13   description?  Whether it was dry matter loss, whether it

14   was spontaneous combustion, whether it was the degree to

15   which moisture plays a role in spontaneous heating.  Any

16   concept that he discussed with which you disagree?

17        A:    Well, just his ability to take the

18   temperatures of his model and say that that's going to

19   result in ignition of the peanuts from self-heating to

20   ignition I disagree with.

21        Q:    Okay.  Anything else that comes to mind?

22        A:    I mean, it's a big report.

23        Q:    Okay.  I'll get to a smaller one.  Rodney

24   Nohr; did you have a chance to review his report?

25        A:    That's the one I think I was unsure of if I

1    looked at or not.

2         **Q:**     Okay.  I thought that was Sean O'Keefe.

3         **A:**     Okay.  That's right.

4         **Q:**     Rodney Nohr, in fact, talked about

5    spontaneous combustion.

6         **A:**     Right.  I think I did look at it.  I'd have

7    to review it again because it's been a while.

8         **Q:**     Okay.  David South, the very short report; is

9    there anything that you looked at in that report with

10   which you disagreed?

11        **A:**     I think there would be some temperature

12   variations, but in general, I'm not sure I disagree with

13   the concept.

14        **Q:**     Okay.  We haven't talked at all about John

15   Walker, and I do want to give you his report, which we'll

16   mark as Exhibit 278.

17                        MR. EPSTEIN:  Do you need a copy?

18                        [EXHIBIT NO. 278 MARKED FOR

19                        IDENTIFICATION]

20   BY MR. EPSTEIN:

21        **Q:**     I take it you have had a chance to review his

22   report since he's the only origin and cause investigator

23   that we have designated, correct?

24        **A:**     Yes.

25        **Q:**     All right.  And I take it you paid particular

1    attention to this report when you went through it,

2    correct?

3         A:      Well, I read it, sure.

4         Q:      Okay.  And take whatever time you need, but

5    I'd like for you to tell me what in his report that you

6    believe is material to either his opinions or yours you

7    disagree with.

8         A:      Well, I mean, if you go to page 34 where he

9    talks about the fire results on the surface of the

10   peanuts, it should be flaming.  I mean, I think it's

11   initially going to be smoldering.  And as I've talked

12   about, it could transition to flaming, but in the end, it

13   will be smoldering once you get there -- you get to

14   August 11th.  So in that sense, I disagree with his

15   discussion about a fire on the surface.

16        Q:      Did you say that there was flaming combustion

17   on August 11th?

18        A:      No.  I said by the time you come to

19   August 11th, it would be smoldering.

20        Q:      Okay.

21        A:      Yes.  I didn't intend to say that.  I hope I

22   didn't say that.

23        Q:      Okay.  No.  I think I was zoning out.

24                Go ahead.

25        A:      That happens late in the game, doesn't it?

1            And then he's -- again, he's relying a lot --

2    a lot of this stuff is relying on the temperature cables

3    as of August 11th, which again I pointed out how they

4    appear to be unreliable, how Scott Chant's talked about

5    that.  And so a lot of these discussions he's having is

6    related to these temperature cable readings.

7        Q:    Okay.

8        A:    And so, I mean, that's something to point

9    out.  And this is a big report; so it's -- I'm just

10   trying to --

11       Q:    Sure.

12       A:    -- go through it so we're not here forever.

13           Well, he talks about -- on page 48, he says,

14   "As previously discussed, circumstance and evidence in

15   this matter were consistent with self-heating and

16   spontaneous combustion ignition inside the pile of

17   peanuts."  I disagree with that.

18       Q:    Is the SFPE handbook on fire protection

19   engineering one of the sources that you testified earlier

20   you found to be authoritative?

21       A:    Yes.

22       Q:    Okay.  And Kirk's Fire Investigation is as

23   well, correct?

24       A:    Yes.

25       Q:    Okay.

1      **A:**      Page 49, "Testing conducted by MDE Labs did

2   not support the ignition hypothesis opined by the

3   plaintiff's experts."  I don't think that's correct.  And

4   again, it's a limited number of tablets in that

5   situation.  And so just because you don't get ignition or

6   the LFL with that doesn't mean it doesn't happen.

7      **Q:**      Okay.

8      **A:**      His hypothesis of the origin was that it was

9   deep in the pile, not in the surface.  I disagree with

10  that; not that that is a hypothesis, but that that

11  occurred.

12          And then, again, I disagree that -- he's

13  determined it's spontaneous combustion versus the

14  Fumitoxin application.

15          And then his -- on page 57, he talks about my

16  report and saying that the same basis -- that there's no

17  scientific foundation, et cetera, I obviously disagree

18  with that.  And I would disagree with his conclusions.

19     **Q:**      Okay.

20     **A:**      So that's as quick as I can do it without

21  going through it.

22     **Q:**      Okay.  I appreciate you doing that.  She's

23  going to need that.

24     **A:**      Yep.

25     **Q:**      And I've just got some closing questions, and

1    then Mr. Goldstein may have some additional questions.

2              Well, let me ask first if anything -- did you

3    review Dr. Carol Jones' report?

4       A:    Yes, I did.  I mean, she talked about the

5    66,000 square feet, correct?

6       Q:    Yes.  You disagree with her analysis of that.

7       A:    Right.

8       Q:    Apart from that, I know most of what she

9    talked about were best practices in the storage of

10   agricultural commodities.  And do you have any opinions

11   regarding her statements on those issues:  best practices

12   regarding agricultural commodities?

13      A:    No.

14      Q:    Okay.  And to the extent that she testified

15   that the method of application by Brian Lilley and Randy

16   Turner was appropriate, that's really not your bailiwick

17   because you're not a certified applicator, correct?

18      A:    That's right.

19      Q:    Okay.  So you're --

20      A:    I'm not addressing those issues.

21      Q:    The only issue that you are addressing that

22   intersects with what she addressed was on the piling of

23   Fumitoxin tablets, and you've already expressed your

24   opinions about that, correct?

25      A:    Well, and then she said, I think, something

1    to the effect you can't pile, you wouldn't pile,

2    et cetera.  So I disagree with that.

3        Q:      And she did some testing, and apparently you

4    have done some testing with Lester Rich and John Mueller.

5    And there may come a day where we talk further about

6    that?

7        A:      Right.

8        Q:      Okay.  Now, closing questions --

9        A:      Now, her testing was done with the dummy

10   tablets --

11       Q:      Correct.

12       A:      -- not the real stuff, so that's -- that's

13   one difference.

14       Q:      It didn't smell as bad when she was doing it.

15       A:      Well, I mean, that's certainly one of them.

16   And they appear to -- apparently they're slicker and

17   they're lighter, et cetera.

18       Q:      All right.  My guess is Mr. Widis or

19   Mr. Goldstein will ask her questions about that.

20       A:      I'm sure.

21       Q:      All right.  Mr. Schumacher, over the course

22   of the seven or so hours that you have testified today,

23   have you expressed every opinion you intend to express at

24   the trial of this action, save for the testing that you

25   did in Memphis, Tennessee, on September 4th, 2013?

1      **A:**      I think so, yes.

2      **Q:**      Have you told me -- again, with that one

3   exception, have you told me about every basis you have

4   for your opinions?

5      **A:**      Besides what's in my report and -- yes, I

6   think that's correct.

7      **Q:**      Is there any other work you intend to perform

8   in relation to this matter between now and the time of

9   this trial?

10     **A:**      Well, I -- I'm certain I'll be reviewing

11   other depositions --

12     **Q:**      Uh-huh.

13     **A:**      -- and other testimony in this case, and what

14   that will mean, I don't know.

15     **Q:**      But for instance, you have no intention of

16   now engaging a certified laboratory to perform testing of

17   the type done by Dale Mann?

18     **A:**      That's right.

19     **Q:**      Okay.  On page 1 of your report, you stated

20   that -- well, I might have the wrong page, but I think

21   somewhere you state that, if necessary, you might do

22   additional reports.  You've already done two supplemental

23   reports.  You have no intention of doing any others, do

24   you?

25     **A:**      Well, at this time, that's right; I don't.

1    **Q:**    Okay.  And the sole purpose that you produced

2    those supplemental reports was to provide additional

3    bases for the opinions expressed in your report,

4    correct?

5    **A:**    Well, I mean, that's one of the things,

6    sure.

7    **Q:**    Have you reviewed any additional information

8    since April 30th, 2013, that you would consider

9    significant enough to change any of the conclusions you

10   expressed in your report?

11   **A:**    No.

12   **Q:**    Have you reviewed any additional information

13   since April 30th, 2013, you would consider significant

14   enough to alter -- to alter anything you expressed in

15   your report?

16   **A:**    No, I don't think so.

17   **Q:**    Might have a little -- a couple little nits

18   that I picked out where you might have missed something

19   like the July 13th temperatures and the timeline or the

20   actual dates when the loading or -- of the dome began or

21   when it was completed.  But apart from that, you're

22   comfortable with everything in your report?

23   **A:**    Yes.  And thank you for pointing those out.

24   **Q:**    You're welcome.

25   **A:**    I appreciate that.

1        Q:     During your preparation for your deposition,

2    did you see anything that you included in your report

3    that in hindsight you believe should not be in your

4    report?

5        A:     No.

6        Q:     During your preparation for your deposition,

7    did you see anything that you omitted in your report that

8    you believe should be in your report?

9        A:     No.

10                 MR. EPSTEIN:  I'm going to pass you

11    along to Mr. Goldstein.  Thank you.

12    CROSS EXAMINATION

13    BY MR. GOLDSTEIN:

14        Q:     Hi, Mr. Schumacher.  We're just going to take

15    a few minutes, and then you'll, hopefully, get out of

16    here.

17                 I just want to go back to two exhibits that

18    Mr. Epstein had used.  Exhibit 276, that's the article

19    that Mr. Brown and a colleague of his -- or Dr. Brown and

20    a colleague of his had prepared?

21        A:     Yes.

22        Q:     If you could turn to page 3.

23        A:     Okay.

24        Q:     And there's a paragraph that says, "How do I

25    apply the fumigant?"  Do you see that?

1     **A:**      Yes.

2     **Q:**      And can you read the last sentence of that

3     paragraph.

4     **A:**      It says, "Too much aluminum phosphide in any

5     one spot can lead to fires and explosion."

6     **Q:**      There's no mention of the need for contact

7     with liquid water in that sentence, is there?

8     **A:**      That's correct.

9     **Q:**      And then one last exhibit, the MSDS, 275.

10    **A:**      Yes.

11    **Q:**      And again, I think you told us you don't know

12    if this is exactly the MSDS that you saw.  The first

13    page, there's a date, date of revision.

14                Do you see that?

15    **A:**      If you could point it to me.

16    **Q:**      Yeah, it's right there.

17    **A:**      Oh, yeah.  March 2011.

18    **Q:**      Well, that's two years after this incident,

19    correct?

20    **A:**      Yes.

21    **Q:**      So we don't know whether the one that was in

22    existence at the time of the fumigation was identical to

23    this one, do we?

24    **A:**      That's right.

25    **Q:**      Okay.  But go to the last page.  And there's

1    a section -- you see that "Other Precautions"?

2        A:    Yes.

3        Q:    And then -- and read No. 2.

4        A:    "Do not pile up large quantities of Fumitoxin

5    during fumigation or disposal."

6        Q:    Okay.  And that's similar to what's in the

7    applicator's manual, correct?

8        A:    Yes.

9        Q:    And then read No. 4.

10       A:    "Open containers of Fumitoxin only in open

11   air.  Do not open in flammable atmosphere.  Phosphine,

12   hydrogen phosphide, PH3, in the head space of containers

13   may flash upon exposure to atmospheric oxygen."

14       Q:    Okay.  And is it your understanding that that

15   flash that it's warning may occur would occur without

16   exposure to liquid water?

17       A:    Yes.

18       Q:    And that warning is also within the manual,

19   correct?

20       A:    Yes.

21       Q:    And the manual's considered a matter of

22   federal law, correct?

23       A:    That's my understanding, yes.

24              MR. GOLDSTEIN:  That's all I have.

25   Thanks.

1              MR. EPSTEIN:  All right.  We're done.

2    I'm going to give this to you, because next week, when

3    you do Dale Mann, you'll remember we're on 279.

4              MR. GOLDSTEIN:  Yes.  Thank you.

5              THE VIDEOGRAPHER:  Off the record at

6    6:20.

7              _____

8              [WITNESS DISMISSED AT 6:20 P.M.]

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      I have read the foregoing pages which contain a

2  correct transcription of the answers given by me to the

3  questions herein recorded.  My signature is subject to

4  corrections on the attached errata sheet, if any.

5  Signed this _____ day of _____, _____.

6

7                    _____

8                    JOHN L. SCHUMACHER, P.E.

9

10

11  STATE OF _____

12  COUNTY OF _____

13

14  Subscribed and sworn to before me this _____ day of

15  _____, _____.

16

17

18                    _____

19                    Notary Public

20

21  My commission expires:

22

23

24  _____

25

STATE OF NORTH CAROLINA

COUNTY OF WAKE


C E R T I F I C A T E


    I, Susan S. Burgess, notary public/court reporter, do

hereby certify that the above-named was duly sworn or

affirmed prior to the taking of the foregoing deposition;

and that said deposition was taken and transcribed under

my supervision; and that the foregoing pages, inclusive,

constitute a true and accurate transcription of the

testimony of the witness.

    I do further certify that the persons were present as

stated in the caption.

    I do further certify that I am not of counsel for or

in the employment of either of the parties to this action,

nor am I interested in the results of this action.


This is the 26th day of September, 2013.


                    _____

                    Notary Public #200530000115

# MATERIAL SAFETY DATA SHEET: ALUMINUM PHOSPHIDE

| | U.S. EPA Reg. No. | Canada Reg. No. |
|---|---|---|
| FUMITOXIN® TABLETS | 72959-1 | 19227 |
| FUMITOXIN® PELLETS | 72959-2 | 19226 |

PROPER DOT SHIPPING NAME: ALUMINUM PHOSPHIDE, 4.3 (6.1) UN1397 PG I DANGEROUS WHEN WET, POISON LABELS APPLY

## SECTION I - PRODUCT INFORMATION
Manufacturer:

D & D Holdings
153 Triangle Dr.
P. O. Box 116
Weyers Cave, VA 24486 USA

Telephone: (540) 234-9281 / 1-800-330-2525
Telefax: (540) 234-8225 / 1-800-548-2778
Internet Address: www.degeschamerica.com
E-mail: degesch@degeschamerica.com

### EMERGENCY TELEPHONE NOS.:
Emergency – Call PROSAR: 1-800-308-4856 for human or animal emergencies
        Call Chemtrec: 1-800- 424-9300 for all other chemical emergencies
Emergency and Information - DEGESCH America, Inc. (540) 234-9281 / 1-800-330-2525
        Pestcon Systems, Inc. (252) 237-7923 / 1-800-548-2778

Fumitoxin tablets and pellets are available as 0.6g pellets and 3.0g tablets.

Date of Revision: March 2011

## SECTION II - HAZARDOUS INGREDIENTS INFORMATION
Identity:

Fumitoxin and Aluminum Phosphide (AlP) - react with water to produce phosphine (hydrogen phosphide, $PH_3$) as shown in Equation 1. Fumitoxin is formulated with 55% aluminum phosphide and also contains ammonium carbamate (AC) and inert ingredients. Ammonium carbamate releases ammonia and carbon dioxide as shown in Equation 2.

1)    $AlP + 3H_2O \longrightarrow Al(OH)_3 + PH_3$    2)    $NH_2COONH_4 \longrightarrow 2NH_3 + CO_2$

| | | | |
|---|---|---|---|
| AlP | CAS No. 20859-73-8 | $NH_2COONH_4$ | CAS No. 1111-78-0 |
| $PH_3$ | CAS No. 7803-51-2 | $NH_3$ | CAS No. 7664-41-1 |
| $Al(OH)_3$ | CAS No. 21645-51-2 | $CO_2$ | CAS No. 124-38-9 |

NFPA Chemical Hazard Ratings:
Flammability Hazard 4
Health Hazard 4
Reactivity Hazard 2
Special Hazard W

SARA Physical and Health Hazards:
    Fire
    Reactivity
    Immediate (Acute)

Inhalation Exposure Limits:

| Component | OSHA PEL TWA (ppm) | ACGIH TLV TWA (ppm) | ACGIH TLV STEL (ppm) | NIOSH IDLH (ppm) |
|---|---|---|---|---|
| Phosphine (Hydrogen Phosphide, $PH_3$) | 0.3 | 0.3 | 1.0 | 50 |
| Ammonia | 50 | 25 | 35 | 300 |
| Carbon Dioxide | 5,000 | 5,000 | 30,000 | 40,000 |

## SECTION III - PHYSICAL CHARACTERISTICS
Boiling Point:
  AlP    >1000°C
  $PH_3$    -87.7°C

Specific Gravity of Vapors (Air = 1):
  AlP        N/A
  $PH_3$        1.17

Vapor Pressure:
  AlP    0mm Hg
  $PH_3$    40mm Hg @ 129.4°C
  AC    100mmHg @ 26.7°C

Solubility in Water:
  AlP    Insoluble, reacts
  $PH_3$    26cc in 100 ml water at 17°C
  AC    Very soluble, reacts



EXHIBIT
2-75
Schumacher
PENJUD 800-631-6989

Appearance and Odor:
Fumitoxin and aluminum phosphide have a greenish-gray color and the phosphine (hydrogen phosphide, $PH_3$) gas produced by these chemicals has an odor described as similar to garlic, carbide or decaying fish.

Specific Gravity:
AlP     2.85.

Melting Point:
AlP     >1000°C
$PH_3$   -133.5°C

## SECTION IV - FIRE AND EXPLOSION HAZARD DATA

Flash Point:
Aluminum phosphide and Fumitoxin are not themselves flammable. However, they react readily with water to produce phosphine (hydrogen phosphide, $PH_3$) gas which may ignite spontaneously in air at concentrations above its LEL of 1.8% v/v (18,000 ppm). UEL of phosphine (hydrogen phosphide, $PH_3$) is not known.

Extinguishing Media:
Suffocate flames with sand, carbon dioxide or dry extinguishing chemicals.
Special Fire Fighting Procedures:
Do not use water on metal phosphide fires.

Respiratory Protection:
Wear NIOSH/MSHA approved SCBA or equivalent respiratory protection.

Protective Clothing:
Wear gloves when handling Fumitoxin tablets, pellets or dust.

Unusual Fire and Explosion Hazards:
Phosphine (hydrogen phosphide, $PH_3$) -air mixtures at concentrations above the lower flammable limit of 1.8% v/v (18,000 ppm). Phosphine (hydrogen phosphide, $PH_3$) may ignite spontaneously. Ignition of high concentrations of phosphine (hydrogen phosphide, $PH_3$) can produce a very energetic reaction. Explosions can occur under these conditions and may cause severe personal injury. Never allow the buildup of phosphine (hydrogen phosphide, $PH_3$) to exceed explosive concentrations. Open containers of metal phosphides in open air only and never in a flammable atmosphere. Do not confine spent or partially spent dust from metal phosphide fumigants as the slow release of phosphine (hydrogen phosphide, $PH_3$) from these materials may result in the formation of an explosive atmosphere. Spontaneous ignition may occur if large quantities of aluminum phosphide or magnesium phosphide are piled in contact with liquid water. This is particularly true if quantities of these materials are placed in in an environment (i.e., moist or spoiled grain) which can provide partial confinement of the phosphine (hydrogen phosphide, $PH_3$) gas liberated by hydrolysis.
Fires containing phosphine (hydrogen phosphide, $PH_3$) or metal phosphides will produce phosphoric acid by the following reaction:

$$2PH_3 + 4O_2 \text{ ---> } 3H_2O + P_2O_5 \text{ ---> } 2H_3PO_4$$

## SECTION V - REACTIVITY DATA

Stability:
Fumitoxin and aluminum phosphide are stable to most chemical reactions, except for hydrolysis. They will react with moist air, liquid water, acids and some other liquids to produce toxic and flammable phosphine (hydrogen phosphide, $PH_3$) gas. Phosphine (hydrogen phosphide, $PH_3$) may react vigorously with oxygen and other oxidizing agents.

Incompatibility:
Avoid contact with water and oxidizing agents.
Corrosion:
Phosphine (hydrogen phosphide, $PH_3$) gas may react with certain metals and cause corrosion, especially at higher temperatures and relative humidities. Metals such as copper, brass and other copper alloys, and precious metals such as gold and silver are susceptible to corrosion by phosphine. Small electric motors, smoke detectors, brass sprinkler heads, batteries and battery chargers, fork lifts, temperature monitoring systems, switching gears, communication devices, computers, calculators and other electrical equipment may be damaged by this gas. Phosphine (hydrogen phosphide, $PH_3$) will also react with certain metallic salts and, therefore, sensitive items such as photographic film, some inorganic pigments, etc., should not be exposed.

Hazardous Polymerization:
Will not occur.

## SECTION VI - HEALTH HAZARD INFORMATION

Routes of Entry:
The dermal toxicity of aluminum phosphide is very low. The LD50 via the dermal route is greater than 5,000 mg per kilogram for a 1-hour exposure. Primary routes of exposure are inhalation and ingestion.

Acute and Chronic Health Hazards:
Fumitoxin and aluminum phosphide are highly acute toxic substances. The LC50 for phosphine (hydrogen phosphide, $PH_3$) gas is about 180 ppm for a one-hour inhalation exposure. The acute oral toxicity of the Fumitoxin formulations was found to be 11.5 mg/kg of body weight. Aluminum phosphide and phosphine (hydrogen phosphide, $PH_3$) are not known to cause chronic poisoning.
Carcinogenicity:
Aluminum phosphide and phosphine (hydrogen phosphide, $PH_3$)are not carcinogenic and are not listed as such by NTP, IARC or OSHA.

**Signs and Symptoms of Exposure:**
Aluminum phosphide tablets, pellets, and dust react with moisture from the air, acids and many other liquids to release hydrogen phosphide (phosphine, PH3) gas. Mild exposure by inhalation causes malaise (indefinite feeling of sickness), ringing in the ears, fatigue, nausea and pressure in the chest which is relieved by removal to fresh air. Moderate poisoning causes weakness, vomiting, pain just above the stomach, chest pain, diarrhea and dyspnea (difficulty in breathing). Symptoms of severe poisoning may occur within a few hours to several days resulting in pulmonary edema (fluid in lungs) and may lead to dizziness, cyanosis (blue or purple skin color), unconsciousness, and death.

**Emergency and First Aid Procedures:**
Symptoms of overexposure are headache, dizziness, nausea, difficult breathing; vomiting, and diarrhea. In all cases of overexposure get medical attention immediately. Take victim to a doctor or emergency treatment facility.

**If the gas or dust from aluminum phosphide is inhaled:**
Get exposed person to fresh air. If person is not breathing, call 911 or an ambulance, then give artificial respiration, preferably by mouth to mouth, if possible. Contact a poison control center or doctor for treatment advice.

**If aluminum phosphide pellets, tablets or powder are swallowed:**
Call a poison control center or doctor immediately for treatment advice. Have person sip a glass of water if able to swallow. Do not give anything by mouth to an unconscious person. Do not induce vomiting unless told to by a poison control center or doctor.

**If powder or granules of aluminum phosphide get on skin or clothing:**
Take off contaminated clothing. Rinse skin immediately with plenty of water for 15-20 minutes. Call a poison control center or doctor for treatment advice.

**If dust from pellets or tablets gets in eyes:**
Hold eye open and rinse slowly and gently with water for 15-20 minutes. Remove contact lenses, if present, after the first 5 minutes, then continue rinsing eye. Call a poison control center or doctor for treatment advice.

HOTLINE NUMBER: Have the product container, label or applicator's manual with you when calling a poison control center, doctor, or when going for treatment. CONTACT 1-800-308-4856 FOR ASSISTANCE WITH HUMAN OR ANIMAL MEDICAL EMERGENCIES. You may also contact Degesch America, Inc. (540) 234-9281 / 1-800-330-2525 or Pestcon Systems, Inc. (252) 237-7923 / 1-800-548-2778 OR CHEMTREC 1-800-424-9300 for all other chemical emergencies.

## SECTION VII - PRECAUTIONS FOR SAFE HANDLING

**Spill Cleanup Procedures:**
If possible, dispose of spilled Fumitoxin by use according to label instructions. Freshly spilled material which has not been contaminated by water or foreign matter may be replaced into original containers. Punctured flasks or containers may be temporarily repaired using aluminum tape. If the age of the spill is unknown or if the product has been contaminated with soil, debris, water, etc., gather up the spillage in small open buckets having a capacity no larger than about 1 gallon. Do not add more than about 1 to 1.5kg (2 to 3 lbs.) to a bucket. If on-site wet deactivation is not feasible, transport the uncovered buckets in open vehicles to a suitable area. Wear gloves when handling Fumitoxin tablets and pellets.

Respiratory protection may be required during cleanup of spilled material. If the concentration of phosphine (hydrogen phosphide, PH₃) is unknown, NIOSH/MSHA approved SCBA or its equivalent must be worn.

Small amounts of spillage, from about 4 to 8 kg (9 to 18 lbs.) may be spread out over the ground in an open area to be deactivated by atmospheric moisture. Alternatively, spilled Fumitoxin may be deactivated by the wet method as described in the following:

**Wet Deactivation of Spilled Fumitoxin:**

1. Deactivating solution is prepared by adding the appropriate amount of low sudsing detergent to water in a drum or other suitable container. A 2% solution or 4 cups of detergent in 30 gallons is suggested. The container should be filled with deactivating solution to within a few inches of the top.
2. The material is added slowly to the deactivating solution and stirred so as to thoroughly wet all of the product. This should be carried out in open air and respiratory protection may be required. At no time should the deactivation drum be covered.
3. No more than about 45 to 50 lbs. of Fumitoxin should be added to 15 gallons of water-detergent mixture. Add weights or otherwise ensure that Fumitoxin stays submerged until deactivation is completed.
4. Allow the mixture to stand, with occasional stirring, for about 36 hours. The resultant slurry of dust or packaged product will then be safe for disposal.
5. Dispose of the slurry of deactivated material, with or without preliminary decanting, at a sanitary landfill or other suitable site approved by local authorities. Where permissible, this slurry may be poured into a storm sewer or out onto the ground.

For Assistance:
Contact -
D & D Holdings
Telephone: (540) 234-9281 / (800) 330-2525
Fax: (540) 234-8225
Internet address: www.degeschamerica.com
E-Mail: degesch@degeschamerica.com

or

Human or Animal Emergencies – PROSAR: 1-800-308-4856
All other chemical emergencies – CHEMTREC: 1-800-424-9300

Disposal of Spent Fumitoxin:
When being disposed of, spilled or partially reacted Fumitoxin is considered hazardous wastes under existing Federal Regulations. If properly exposed, the grayish-white residual dust after a fumigation will not be a hazardous waste and normally contains only a very small amount of unreacted aluminum phosphide. This waste will be safe for disposal. However, the spent residual dust from incompletely exposed Fumitoxin may require special care.
Triple rinse tablet and pellet flasks and stoppers with water. Then offer for recycling or reconditioning, or puncture and dispose of in a sanitary landfill, or by other procedures approved by state and local authorities. Rinsate may be disposed of in a storm sewer, sanitary landfill or by other approved procedures. Or, it is permissible to remove lids and expose empty flasks to atmospheric conditions until the residue in the flasks is reacted. Then puncture and dispose of in a sanitary landfill or other approved site, or by other procedures approved by state and local authorities.
   Some local and state waste disposal regulations may vary from the following recommendations. Disposal procedures should be reviewed with appropriate authorities to ensure compliance with local regulations. Contact your State Pesticide or Environmental Control Agency or Hazardous Waste Specialist at the nearest EPA Regional Office for guidance.

1.  Confinement of partially spent residual materials, as in a closed container, or collection and storage of large quantities of dust may result in a fire or explosion hazard. Small amounts of hydrogen phosphide may be given off from unreacted aluminum phosphide, and confinement of the gas may result in a flash.
2.  In open areas, small amounts of spent residual dust or spent packaged products may be disposed of on site by burial or by spreading over the land surface away from inhabited buildings.
3.  Residual dust from Fumitoxin may also be collected and disposed of at a sanitary landfill, or other approved sites or by other procedures approved by Federal, State or Local authorities.
4.  From 3 to 5 kg (7 to 10 lbs.) of spent dust from 2 to 3 flasks of Fumitoxin may be collected for disposal in a 1-gallon bucket. Larger amounts, up to about one-half case, may be collected in burlap, cotton or other types of porous cloth bags for transportation in an open vehicle to the disposal site. Do not collect dust from more than 7 flasks of tablets, 10 flasks of pellets (about 11 kg or 25 lbs.) in a single bag. Do not pile cloth bags together. Do not use this method for partially spent or "green" dust. Caution: Do not collect dust in large drums, dumpsters, plastic bags or other containers where confinement may occur.

Precautions to be Taken in Handling and Storage:
Store Fumitoxin products in a locked, dry, well-ventilated area away from heat. Post as a pesticide storage area. Do not store in buildings inhabited by humans or domestic animals.

Other Precautions:
1.  Do not allow water or other liquids to contact Fumitoxin tablets, pellets or their dust.
2.  Do not pile up large quantities of Fumitoxin during fumigation or disposal.
3.  Once exposed, do not confine Fumitoxin or allow phosphine (hydrogen phosphide, $PH_3$) concentrations to exceed the LEL.
4.  Open containers of Fumitoxin only in open air. Do not open in a flammable atmosphere. Phosphine (hydrogen phosphide, $PH_3$) in the head space of containers may flash upon exposure to atmospheric oxygen.
5.  Fumitoxin tablets and pellets are restricted use pesticides due to acute inhalation toxicity of highly toxic phosphine (hydrogen phosphide, $PH_3$) gas. For retail sale to and use only by certified applicators or persons under their direct supervision and only for those uses covered by the certified applicator's certification.
6.  See EPA approved labeling for additional precautions and directions for use.


SECTION VIII - CONTROL MEASURES

Respiratory Protection:
   NIOSH/MSHA approved full-face mask with approved canister for phosphine (hydrogen phosphide, $PH_3$) may be worn at concentrations up to 15 ppm. At levels above this or when the phosphine (hydrogen phosphide, $PH_3$) concentration is unknown, NIOSH/MSHA approved SCBA or equivalent must be worn.

Protective Clothing:
   Wear gloves when contact with aluminum phosphide tablets, pellets or dust is likely to occur.

Eye Protection:
   None required.

Ventilation:
   Local ventilation is generally adequate to reduce phosphine (hydrogen phosphide, $PH_3$) levels in fumigated areas to below the TLV/TWA. Exhaust fans may be used to speed the aeration of silos, warehouses, shipholds, containers, etc.

We believe the statements, technical information and recommendations contained herein are reliable, but they are given without warranty or guarantee of any kind, expressed or implied, and we assume no responsibility for any loss, damage, or expense, direct or consequential, arising out of their use.



ALABAMA
COOPERATIVE
**Extension**
S Y S T E M
*Your Experts for Life*

ANR-1154

# Fumigating Agricultural Commodities With Phosphine

EXHIBIT
276
Schumacher
PENGAD 800-831-6989

Various ways are used to prevent insects from attacking stored products. Once insects get into a stored product, however, few practical solutions are available for getting rid of them. Small amounts of products can be frozen, or heated, to kill the insects. Large quantities need to be fumigated. This publication presents information about using phosphine fumigants to control insect infestations in stored agricultural commodities.

Phosphine fumigants are sold in solid form, either as aluminum phosphide or magnesium phosphide. This publication focuses on aluminum phosphide that is sold under various brand names including Phostoxin, Phosfume, and Weevilcide. Aluminum phosphide can be used to eliminate insect infestations in a variety of commodities, including animal feed and feed ingredients, corn, cottonseed, grass seed, millet, oats, peanuts, pecans, popcorn, rye, sorghum, soybeans, triticale, and wheat. They can also be used for a variety of processed foods as long as the residue dust does not come in direct contact with the product. They can be used on some nonfood commodities including straw and hay, cotton, feathers, tobacco, dried plants and flowers, and seeds. The fumigant label contains a complete list of commodities that can be fumigated. Phosphine fumigants can be used in a variety of structures including grain bins and silos, rail cars, warehouses, and flat storage structures.

When the solid fumigant is exposed to water vapor in the air, a chemical reaction occurs releasing phosphine gas (hydrogen phosphide) and heat:

Aluminum phosphide + Water = Phosphine gas + Aluminum hydroxide + heat

$AlP + 3H_2O = PH_3 + Al(OH)_3 + heat$

The breakdown of the solid fumigant starts slowly, gradually accelerates, and then tapers off. When the chemical reaction has finished, all that is left is a nonhazardous gray powder consisting of aluminum hydroxide and other inert materials.

Phosphine gas is highly toxic, reactive, and potentially explosive. Because of the dangers associated with their use, phosphine fumigants are restricted-use pesticides that can be used only by trained and certified applicators in accordance with label instructions. Farmers who have a private applicator's license can apply phosphine fumigants on their farms.

An effective fumigation requires that the phosphine gas be held in the infested structure long enough to kill the target pests. After fumigation, the gas must be vented to the legal level for human exposure. These requirements are constant regardless of the structure involved; however, different types of structures may require different application procedures and safety considerations.

When you purchase a phosphine fumigant, be sure to ask for the applicator's manual, which is legally part of the fumigant label. The manual contains information needed to perform a safe, effective, and legal fumigation procedure. Read and follow all instructions on the container label and in the applicator's manual. Remember that the label, including

the applicator's manual, is the law. This publication is not a substitute for the applicator's manual. It is meant to be an overview of the process of fumigation.

## Frequently asked questions about aluminum phosphide:

### *Why should I read the applicator's manual?*

- Your safety and the safety of others depend on it. Deaths have occurred from using the product improperly.
- Fumigations too often fail because the fumigant isn't applied correctly. This is a waste of time, money, and effort.
- The label is the law, and the applicator's manual is part of the label.

### *What is a fumigation management plan?*

This is a written plan that summarizes all the steps that will be taken before, during, and after the fumigation. It makes sure that the fumigant is applied effectively and safely by forcing you to think about all the steps beforehand. The applicator's manual explains what has to be in the plan: you must document who, what, when, where, how, and why. For example, who should be told about the fumigation because they might be accidentally exposed to phosphine gas during the fumigation, or who should be notified in case of emergency. Include the phone numbers of the nearest fire department, police department,

Case 2:11-cv-00014-BO   Document 75-12   Filed 11/07/13   Page 354 of 361

hospital, and your physician. Also, who will conduct the fumigation? What commodity will be fumigated? What type of structure will be fumigated? Can it be sealed? If not, it shouldn't be fumigated. When will you begin the fumigation, and when will you end the fumigation? When will it be safe to use the commodity? Describe the characteristics of the site, including a sketch. Indicate places where people might be accidentally exposed to phosphine gas. Think about where phosphine gas can escape and where you need to seal potential leaks. How will the structure be sealed? How will accidental exposure be prevented? How will you monitor gas concentrations? How will you apply the aluminum phosphide pellets or tablets? How will you aerate the structure? Why was the fumigation necessary?

### Do I have to prepare a fumigation management plan?

Yes, unless you have some old product that came with the old (pre-2004) label. The plan needs to be kept on file for at least 2 years.

### Why should I seal the structure?

- If you don't, the gas will probably leak before it reaches a high enough concentration to kill all the insects.
- Unsealed or poorly sealed structures are safety hazards.
- Sealing the structure before fumigation is the law.

### How do I seal the structure?

Various materials are available, including plastic (4 mil or thicker is best), duct tape, expanding foam, and caulk. If you think you will need to fumigate, seal all cracks and crevices before you load the commodity into the structure. Every step you take to seal potential leaks and allow the gas to be distributed throughout the enclosure will improve effectiveness.

### Should I use tablets or pellets?

Aluminum phosphide is packaged as tablets about $\frac{5}{8}$ inch in diameter, as pellets about $\frac{3}{8}$ inch in diameter, or as granules in a sachet or small, porous bag. Tablets re-

lease about five times more phosphine gas than pellets release. At high temperatures, it may be safer to use tablets because they break down slower than pellets. If you are fumigating a raw agricultural commodity, you can use tablets or pellets, without removing the residue. For processed commodities, prepacs, ropes, or blankets, keep the residue within the packaging so it can be removed after the fumigation.

### How much aluminum phosphide do I need?

The applicators manual recommends different amounts for different structures. The maximum dose is 900 pellets or 180 tablets per thousand bushels (725 pellets or 145 tablets per 1,000 cubic feet). Since phosphine gas diffuses to an equal concentration within the structure containing it, volume (cubic footage, Figure 1) is usually a better way to calculate dosage than the number of bushels. For example, if you have 2,000 bushels of wheat in a 6,000-bushel bin, calculate the dose for 6,000 bushels because the gas will spread throughout the structure. An

(A) For a flat structure such as a boxcar or truck trailer or a rectangular pile of the commodity:



| | cubic feet | bushels |
|---|---|---|
| | length x width x height | length x width x height x 0.8 |

(C) For a conical mound of grain:



| cubic feet | bushels |
|---|---|
| height x 1.05 x r x r | height x 0.84 x r x r |

r = radius = diameter divided by 2; or
r = radius = distance around the bin divided by 6.2

(B) For a cylindrical structure such as a tarped grain mass in a bin:



| cubic feet | bushels |
|---|---|
| height x 3.14 x r x r | height x 2.51 x r x r |

r = radius = diameter divided by 2; or
r = radius = distance around the bin divided by 6.2

(D) For the total volume of a cylindrical grain bin with a cone-shaped roof:



Use height 1 to calculate the volume of the cone-shaped roof as in C, and use height 2 to calculate the volume of the cylindrical part as in B. Add the two volumes to get the total volume.

**Figure 1.** Calculating the volume of the structure to be fumigated. Make size measurement in feet.

2 Alabama Cooperative Extension System

exception would be if you placed a plastic tarp over the top of the grain to keep the gas within the commodity, then you would calculate the dose for 2,000 bushels. Dosage depends not only on the volume of space to be fumigated but on the temperature, the commodity, the moisture content of the commodity, and how well the structure is sealed.

### How long does it take to fumigate?

Do not rush the fumigation. You must give the gas time to build up to the concentration needed to kill insects (Figure 2). Respiration rates of insects are much slower than those of humans, especially in cooler temperatures. Only minutes of exposure of a given concentration of phosphine can be very dangerous to humans while the same concentration may take days to kill insects. Phosphine gas concentration also depends on temperature. It takes at least 2 days for the pellets to break down when the temperature in the structure is above 68 degrees F. It takes about a day longer if you are using tablets. The cooler it is, the longer it takes (Table 1). Then, it can take up to 2 days to aerate the product after the fumigation. Many professional fumigators like to see gas concentrations of 200 to 300 parts per million for a minimum of 3 days. Not allowing enough exposure time can be a waste of money, but, more importantly, it can be very dangerous because the solid fumigant may not have completely broken down when the commodity is moved and people are then exposed. Partially spent fumigant, called greendust, will continue to give off gas and may create a significant hazard to anyone near the commodity. Special procedures are needed to dispose of greendust. They are discussed in detail in the applicator's manual.



**Figure 2.** Fumigation failure in grain bins is often caused by poor sealing.

### How do I apply the fumigant?

The applicator's manual provides tips for how to fumigate farm bins, flat storages, rail cars and other transport vehicles, vertical storages, mills, food processing plants and warehouses, tarped commodities, barges, small sealable structures, beehives, and in-transit ship holds. This includes where and how to place the fumigant. Too much aluminum phosphide in any one spot can lead to fires and explosions.

### How long do I have to apply the fumigant in the grain bin (peanut warehouse, etc.)?

It depends on the temperature, the moisture in the air, and the volume of air in the headspace. The only way to be sure is to have an air monitoring device (see below) to make sure the gas concentrations are below safe levels. It is most dangerous to apply the fumigant on a hot, humid day. In an experiment on a hot day in South Georgia, six pellets left confined in a 30-gallon garbage can generated 50 ppm of gas in 5 minutes and 200 parts per million in 40 minutes.

**Table 1.** Temperature and Minimum Length of Exposure Time Needed to Fumigate With Aluminum Phosphide*

| Temperature | Pellets (0.6 g) | Tablets (3 g) |
|---|---|---|
| 40°F or below | Do not fumigate | Do not fumigate |
| 41 to 53°F | 8 days | 10 days |
| 54 to 59°F | 4 days | 5 days |
| 60 to 68°F | 3 days | 4 days |
| above 68°F | 2 days | 3 days |

*Allow longer exposure periods for taller storage structures. A rule of thumb is to add 24 hours for every 10 feet of vertical distance in tall structures such as grain silos. Commodities with a low moisture content, such as grain with less than 10% moisture, should be given a longer exposure period—24 hours for each 0.5% under 10% moisture. Adapted from Phostoxin Applicator's Manual, DeGesch America, Inc.

Case 2:11-cv-00014-BO   Document 75-12   Filed 11/07/13   Page 356 of 361

### *I can smell the gas, can't I, and know when to get out?*

No. Phosphine gas has no odor. The garlicky smell is the result of a different chemical reaction. Although it is an exposure indicator, you can't always depend on the smell.

## General Safety Considerations

During a fumigation procedure, observe the following safety rules in addition to the rules specifically relating to fumigation.

- Wear a safety belt or harness equipped with a properly fastened lifeline if the commodity is more than waist high in the storage structure.
- Always have someone stand outside the storage structure in case of an emergency.
- If a storage structure has a ventilating fan, turn on the fan to thoroughly ventilate the structure before anyone enters.
- Do not allow anyone inside a confined-space storage structure while the commodity is being added or removed.

## Fumigation Safety Rules

Phosphine fumigants are valuable tools as long as they are used properly. Read and follow all instructions on the label, including the applicator's manual to ensure a safe and effective fumigation.

Store all containers of fumigant under lock and key, and keep a careful inventory so each container and package is accounted for. If you discover that any fumigant has been stolen, you are required to report the theft immediately to your local law enforcement authorities. Make sure the storage area is properly placarded as a pesticide storage area. The applicator's manual specifies

what must be on the placards for an area where phosphine fumigants will be stored. Never store fumigants inside a home or in any structure where humans or animals live. Just-in-time delivery of exactly the right amount of fumigant is the safest practice.

If you have to transport fumigants, keep the container(s) locked in a metal box in your truck bed. If you transport large quantities on a regular basis, you may want to consider a security system like the one in Figure 3. The applicator's manual lists the hazards associated with transporting aluminum phosphide. Be aware of these hazards and have a list of them with you in the truck. Your truck will need to display a placard providing information about aluminum phosphide. If you are carrying less than 46 pounds of fumigant, you may be eligible for a placarding exemption, such as exemption DOT E 11329 (http://hazmat.dot.gov).

Make sure all employees know about the fumigation and are aware of potential safety hazards and emergency procedures. Make a list of the telephone numbers and addresses of the nearest fire department, rescue squad, hospital emergency room, and police department, and notify each agency of the fumigation

ahead of time. Include on the list the names and telephone numbers of all appropriate personnel in charge. Provide each agency with a copy of your fumigation management plan and any other information needed in case of an emergency. This information should include the Material Safety Data Sheet (MSDS) for the phosphine fumigant used and a copy of the label, including the applicator's manual. There may be local requirements in addition to those in the applicator's manual. As you work your way through notifying the above agencies, you may learn of additional requirements. Accidents involving aluminum phosphide are rare – but in case the worst happens, a well-informed emergency response team would have a greater chance of saving your life than one that has not been informed about the hazards of aluminum phosphide.

A certified applicator is someone who has passed a state exam. Individuals receiving specific instructions in documented training sessions are classified as trained applicators. One certified applicator and another trained person are the minimum personnel required when aluminum phosphide is applied. Two trained people can



**Figure 3.** A safe storage box for transporting flasks of aluminum phoshide.

Case 2:11-cv-00014-BO   Document 75-12   Filed 11/07/13   Page 357 of 361



**Figure 4.** Hand-held, digital, continuous exposure meter used to monitor the concentration of phosphine gas.

legally make the application, as long as they are under the direct supervision of the certified applicator. All should carry some form of communication device, such as a radio, a walkie-talkie, or a cellular phone. See the applicator's manual for requirements after the application.

You cannot follow label instructions without knowledge of the phosphine gas concentration during the fumigation process. One possible exception would be an isolated farm bin location on private property (see sections 10.3, 18.1, and 22.1 in the applicator's manual). The label requires that you keep a log showing phosphine gas concentration at key locations surrounding the structure. The type of respiratory equipment used depends on the gas concentration. Furthermore, it makes sense to monitor the gas inside the structure (using extension hose from a safe outside location) to make sure an insect-lethal concentration of gas is present. Information about air-monitoring equipment is available from fumigant manufacturers and distributors. Safety equipment catalogs also provide valuable information and help in choosing the appropriate equipment. Two methods are commonly used to monitor the concentration of phosphine gas

in the air. One method is using a hand-held continuous exposure meter with a digital display (Figure 4). This meter may be able to monitor gases other than phosphine. A monitor that can detect oxygen, lower explosive limits, phosphine gas, and carbon monoxide could be very useful on the farm. The second method consists of using tubes that change color to indicate the phosphine gas concentration (Figure 5). These tubes are used with a special pump that draws a sample of air through the tubes. The farther the color goes along the tube, the higher the gas concentrations. Different kinds of tubes are used to indicate

different gas concentrations, so each type of gas requires a different tube. Low-level detecting tubes for concentrations from 0.15 to 5 parts per million (ppm) are suitable for most uses. Extension hoses are available so inside air can be sampled from outside.

If you will be applying the fumigant from within the structure, you must have some form of respiratory protection on site to follow label instructions. Use approved respiratory protection when the gas concentration is above the permissible exposure level of 0.3 ppm (as an 8-hour time-weighted average) or 1.0 ppm (15-minute short-term exposure limit).

All respiratory protection equipment must be models approved by the National Institute for Occupational Safety and Health/Mine Safety and Health Administration. Half-mask, dual cartridge respirators used for many pesticides and organic vapors are not suitable for use with phosphine gas. A full-face canister gas mask (Figure 6) can be used at gas concentrations from 0.3 ppm to 15 ppm (for example, NIOSH/MSHA prefix TC-14G). Be sure to use canisters designed to filter out phosphine gas. These canisters are typically color-coded olive green with an



**Figure 5.** Gas-monitoring tube used to measure the concentration of phosphine gas.



**Figure 6.** A canister gas mask must be worn when the concentration of gas is higher than 0.3 ppm and less than 15 ppm.

orange stripe. If the concentration is above 15 ppm or if the phosphine gas concentration is unknown, use a self-contained breathing apparatus (SCBA).

The gas mask or self-contained breathing apparatus must fit the face properly. Any gaps that allow in unfiltered air will make the respiratory protection useless. Facial hair can interfere with the proper fit of a mask. A canister gas mask or self-contained breathing apparatus must be available on site when phosphine fumigant is applied from inside any enclosure. If air-monitoring equipment is not available on a farm, an approved canister gas mask must be worn during an application from within the structure.

Wear dry cotton gloves and body-covering clothing while applying the fumigant, and after fumigating, aerate the gloves and clothing before laundering them. Wash hands thoroughly after using phosphine fumigants.

Keep all containers tightly closed until it is time to apply the fumigant. Then it is a good idea to open the fumigant containers in the open air or near an exhaust fan. Otherwise, the accumulated gas within the canisters may provide an alarmingly high concentration of gas in the breathing zone during the fumigation. To open the container, invert it several times, point it away from the face and body, and slowly loosen the cap. Do not open the containers in a flammable atmosphere. Dispose of empty containers according to label instructions.

Do not allow the aluminum phosphide to contact liquid water, and do not leave aluminum phosphide pellets or tablets in piles because doing so interferes with the proper release of the phosphine gas. It also increases the risk of explosion or fire should the pile be suddenly exposed to water. Fire or explosion can occur if phosphine gas concentration exceeds 1.8 percent. The gas is corrosive to copper, brass, and precious metals, so electric and electronic gear should be protected from exposure or removed.

Post warning placards on all entrances to structures under fumigation. Placards must be weather proof. They can be handwritten, but they must include specific information. See the applicator's manual for details. Remove placards only when the gas concentration is 0.3 ppm phosphine gas or less. Make the structure under fumigation as secure as possible by putting locks on the entry points. If there is a fence surrounding the structure, make sure that the gate is locked. A security guard may be required under extremely sensitive conditions, such as in the middle of a town.

## Fumigating Using a Closed-Loop System

Although phosphine gas tends to penetrate deep into large volumes of stored commodities, its ability to evenly distribute itself does have limits. The following are some factors that would inhibit even distribution:

- Leaks that release the fumigant from the structure as fast as it diffuses within the structure
- Insufficient dosage for the



**Figure 7.** In a closed-loop fumigation system, a pump pushes the gas into the bottom of the grain bin.

Case 2:11-cv-00014-BO   Document 75-12   Filed 11/07/13   Page 359 of 361

volume being fumigated

- A tightly packed commodity with minimal airspace (such as a warehouse full of bagged or other packaged material or a farm bin with excessive amounts of fine particles and dust mixed with grain)
- Low temperatures resulting in the slow release of phosphine
- Large-volume structures with no means of application other than shallow probing or surface application

When any of these conditions exists, insects may be killed in one section of the enclosure and not in another. One way to deal with the problem of uneven distribution is to use a closed-loop fumigation system (Figures 7 through 9), which improves the distribution of phosphine gas within an enclosure. It involves the use of a tubing system and a blower to continuously recirculate the phosphine gas during the fumigation period. The system can be designed in a number of ways, but, for most situations, using 4- to 6-inch-diameter PVC pipe and flexible, solid drain tile is an inexpensive way to move gas from one point to another along the outside of the structure. The system should be designed to draw the gas from the headspace of the bin and reintroduce it under the false floor. Place a blower at a convenient point in the system. Usually a 0.25- to 1.0-horsepower motor is adequate. Proper sealing of the structure is even more critical with closed-loop fumigation since recirculation may speed up the escape of gas. Make sure all joints between sections of tubing and all entry and exit points are well sealed with duct tape, caulking, or other means. Place all tubing away from high-traffic areas, and protect it to prevent accidental damage. Test the system for leaks before applying aluminum phosphide.

Closed-loop fumigation systems



**Figure 8.** The gas is pumped up through the bin and then pulled down through a pipe running along the outside of the bin.

are usually not necessary in small (less than 5,000 bu) tightly sealed bins. Advantages of closed-loop systems increase with the size of the bin since even distribution of the fumigant becomes more important. Closed-loop systems eliminate the need for labor-intensive and potentially dangerous probing operations or for moving grain from a full bin to an empty bin for the sole purpose of fumigation. Closed-loop systems can be safer than probing operations because the fumigant can be applied to the top of the grain so workers are not required to be inside the structure as long. Gas recirculation can reduce exposure time to as little as half the time required for some fumigations. Although there is an initial cost for a recirculation system, increased fumigant efficiency and lower dosages will usually pay

for these costs in 1 to 4 years, depending on the size of the system and the frequency of fumigation.

## Fumigating Transportation Vehicles

Ocean-going vessels can be fumigated with phosphine fumigant in transit, as can rail



**Figure 9.** Here the gas leaves the bin at the top and is drawn back down through the pipe.

Case 2:11-cv-00014-BO   Document 75-12   Filed 11/07/13   Page 360 of 361

cars and containers, trucks, vans, and other transport vehicles shipped piggyback by rail. However, it is **not** legal to fumigate trucks, trailers, containers, vans, or other vehicles as they are being moved on public roads or highways. The fumigation must be completed and the placard removed following aeration before the vehicle can be moved.

## Ventilating the Structure after Fumigating

After the appropriate exposure period, ventilate the structure as thoroughly as possible before reentering it. If the structure is a building, open roof vents and several doors from the outside to create a stack action, releasing most of the gas to the upper atmosphere. If the structure is a grain bin or silo, open the necessary vents and run the aeration fans. If you have to enter the structure, wear respiratory protection until the air-monitoring equipment indicates that the concentration of phosphine gas is less than 0.3 ppm (8-hour TWA)

or 1.0 ppm (15-minute STEL). Finished foods and feeds that have been fumigated with phosphine must be aerated for 48 hours before being offered to the end consumer. An alternative is to analyze the commodity to prove that the phosphine residue is less than 0.1 ppm in animal feed, 0.01 ppm in processed foods, or 0.3 ppm for nonfood items.

## Important Reminders

All fumigants are dangerous, and their use requires specific training. All fumigants are restricted-use pesticides for application by trained and certified pesticide applicators only. This publication is intended to assist applicators who meet these requirements. It is always advisable, however, to consider using the services of a professional commercial fumigator to reduce both risk and liability.

Use fumigants according to the directions on the label. Follow all directions, precautions, and restrictions that are listed. Do not use fumigants on commodities or sites that are not listed on the label.

The fumigant rates listed in this publication are recommended only for those fumigants registered with the Environmental Protection Agency and the pertinent state department of agriculture. If the label is cancelled or changed, the information contained herein is no longer recommended.

## Additional Information

A video is available on the fumigation of on-farm grain bins. It is available on DVD or VHS. In Alabama, you can obtain a copy of this video from your regional agronomy agent of the Alabama Cooperative Extension System. Copies can also be obtained, at a cost of $15, from the Publications Distribution Office, Alabama Cooperative Extension System, Room 6 Duncan Hall, Auburn University, Alabama 36849. Make checks payable to the Alabama Cooperative Extension System. This video is available with a high-speed Internet connection at http://www.aces.edu/extcomm/satellite/fumig.wmv.

**Kathy Flanders**, *Extension Entomologist*, Associate Professor, Entomology and Plant Pathology, Auburn University; and **Steve Brown**, *Extension Entomologist*, Professor, Entomology, Georgia Cooperative Extension Service, University of Georgia

Figures 4, 5, and 6 are courtesy of IFC, Olathe, KS.

Use pesticides **only** according to the directions on the label. Follow all directions, precautions, and restrictions that are listed. Do not use pesticides on plants that are not listed on the label.

The pesticide rates in this publication are recommended **only** if they are registered with the Environmental Protection Agency and the Alabama Department of Agriculture and Industries. If a registration is changed or cancelled, the rate listed here is no longer recommended. Before you apply any pesticide, fungicide or herbicide, check with your county Extension agent for the latest information.

Trade names are used **only** to give specific information. The Alabama Cooperative Extension System does not endorse or guarantee any product and does not recommend one product instead of another that might be similar.

**For more information**, call your county Extension office. Look in your telephone directory under your county's name to find the number.

Issued in furtherance of Cooperative Extension work in agriculture and home economics, Acts of May 8 and June 30, 1914, and other related acts, in cooperation with the U.S. Department of Agriculture. The Alabama Cooperative Extension System (Alabama A&M University and Auburn University) offers educational programs, materials, and equal opportunity employment to all people without regard to race, color, national origin, religion, sex, age, veteran status, or disability.

Web Only, **Revised Aug 2005**, ANR-1154



ALABAMA COOPERATIVE

# Extension
S Y S T E M

*Your Experts for Life*

ANR-1154

© 2005 by the Alabama Cooperative Extension System. All rights reserved.