SEVERN PEANUT CO, INC.,
MEHERRIN AGRICULTURE &
CHEMICAL CO., and TRAVELERS
PROPERTY CASUALTY COMPANY
OF AMERICA as Subrogee of Severn
Peanut Co., Inc. and Meherrin Agriculture
& Chemical Co.,

         Plaintiffs,

vs.

INDUSTRIAL FUMIGANT CO. and
ROLLINS INC.,

        Defendants.

**DOCKET NO. 2:11-cv-00014-BO**

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants Industrial Fumigant Co. ("IFC") and Rollins, Inc. ("Rollins"), by and through

counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby submit the

following memorandum of law in support of their motion for summary judgment.

## STATEMENT OF THE CASE

For a complete Statement of the Case, Defendants refer the Court to the Statement of the

Case contained in their Memorandum in Support of Motion to Exclude Plaintiffs' Expert

Witnesses, which was filed on November 7, 2013. (DE #75).

## STATEMENT OF RELEVANT FACTS[1]

The fumigation at issue in this case was the subject of a two-page "Pesticide Application

Agreement" between Plaintiff Severn Peanut Company ("SPC") and IFC (hereinafter the

"Pesticide Application Agreement" or "Contract"). Amd. Compl. Ex. A (DE #34); *see* Watson

---

[1] For a more complete Statement of Facts, Defendants refer the Court to the Statement of Relevant Facts contained in their Memorandum in Support of Motion to Exclude Plaintiffs' Expert Witnesses. (DE #75).

Dep., Vol. II, p. 286-88 (Ex. A). The Contract was "for the treatment of commodities and/or space by IFC" under the specified terms and conditions. Amd. Compl. Ex. A, p. 1. It specified that IFC was to apply aluminum phosphide tablets to the peanut storage dome in order to treat the peanuts for two target pests – flour beetles and Indian-meal moths. *Id.* p. 1, § 4. According to SPC's chief operating officer, R.P. Watson, "[t]he subject [of the contract] was the peanuts. The building was irrelevant. I wasn't treating the building. I was treating the peanuts." Watson Dep., Vol. II, p. 290.

Under the Contract, IFC was responsible for "sealing and preparing the building/area for treatment" and for "releasing the pesticide and aeration of the treated areas." Amd. Compl. Ex. A, p. 1, § 6, p. 2, § 8(g). IFC agreed to use "reasonable and practical efforts to apply the pesticides . . . in a manner consistent with instructions, procedures, directions, and precautions set forth in the labeling of the pesticide as required by the EPA." *Id.* p. 1, § 7(a). For each treatment of the peanut dome, SPC agreed to pay IFC $8,604.00. *Id.* p. 2, § 8(h)(I).

The Contract expressly limited IFC's potential liability:

> [SPC] acknowledges that all warranties, expressed or implied, of the goods contained on the labels affixed to the goods, and all terms and conditions of such labels are a part of this Agreement. There are no terms, conditions, or warranties, expressed or implied, of merchantability, fitness for a particular purpose, or otherwise of the goods other than or different from those contained on the labels affixed to the goods. ***IFC shall in no event be liable for consequential damages*** for breach, if any, of such limited warranties, or ***resulting from the performances of its services and use of any products pursuant hereto.***

*Id.* p. 1, § 7(b) (emphasis added).

> Charges for services provided under this Agreement [$8,604.00/fumigation] are based solely upon the value of the services provided and are not related to the value of [SPC's] premises or the contents therein. ***The amounts payable by [SPC] are not sufficient to warrant IFC assuming any risk of incidental or consequential damages such as [SPC's] property, product, equipment, downtime, or loss of business.***

*Id.* p. 2, § 8(h)(II) (emphasis added).

As a result of the August 2009 fire, SPC's peanut storage dome, and the 21 million pounds of peanuts stored therein, were destroyed. Under SPC's property insurance policy, Plaintiff Travelers Property Casualty Company of America ("Travelers") paid SPC approximately $7 million for the loss of the peanuts; approximately $2.3 million for the loss of the storage dome; approximately $2.6 million for debris removal; approximately $5.1 million for fire suppression; and approximately $2.2 million for business income losses. Nata Dep. pp. 155-77 & Exs. 135-37 (Ex. B).

## ARGUMENT

Summary judgment is appropriate when there exist no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets that burden, the non-moving party must then come forward and establish the specific material facts in dispute in order to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). In ruling on the motion, the trial court should view the evidence and the inferences in the light most favorable to the non-moving party. *Scott v. Harris,* 550 U.S. 372, 378 (2007). "The mere existence of a scintilla of evidence" in support of the non-moving party's position is insufficient to defeat a motion for summary judgment. Rather, to defeat the motion, the non-moving party must demonstrate the existence of evidence from which the jury could reasonably find in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

# I. PLAINTIFFS CANNOT MEET THEIR BURDEN OF PROOF THAT THE FIRE WAS CAUSED BY IFC'S FUMITOXIN APPLICATION.

Defendants have moved to exclude Plaintiffs' fire causation experts Lester Rich and John Schumacher. (*See* DE #74-75). Messrs. Rich and Schumacher are the only witnesses Plaintiffs have tendered to establish the cause of the fire. Once they are excluded from testifying, Plaintiffs will be unable to satisfy their burden of proof that the fire was causally related either to a breach of contract or negligence by IFC. Consequently, this Court's conclusion that, under *Daubert*, Messrs. Rich and Schumacher lack the necessary scientific foundation to testify as to the cause of the fire leads inexorably to the conclusion that summary judgment in Defendants' favor must be granted. *See, e.g., Bryte v. American Household, Inc.*, 429 F.3d 469, 480 (4th Cir. 2005) (once fire causation experts' testimony was excluded under *Daubert*, the plaintiffs were without any proof as to what caused the fire, rendering summary judgment appropriate); *Davis v. City of Mebane*, 132 N.C. App. 500, 504-05, 512 S.E.2d 450, 453 (1999) (where subject matter is far removed from ordinary experience and knowledge, only expert can provide competent evidence as to causation; in the absence of expert causation testimony, summary judgment is appropriate).

Should the Court deny Defendants' motion to exclude Messrs. Rich and Schumacher, summary judgment in their favor is nevertheless appropriate, for the reasons which follow.

# II. THE ECONOMIC LOSS DOCTRINE PRECLUDES PLAINTIFFS' CLAIMS FOR NEGLIGENCE AND NEGLIGENCE PER SE.

Plaintiffs allege that "[b]y undertaking to use highly toxic and potentially explosive pesticides at [SPC's] storage dome, IFC/Rollins assumed a duty to [SPC] and Meherrin to perform its services in a good, safe and workmanlike manner." Amd. Compl. ¶ 29 (DE #34). They further allege that IFC "assumed a statutory duty to [SPC] and Meherrin to perform its services in compliance with" the Federal Insecticide, Fungicide and Rodenticide Act and the

North Carolina Pesticide Law of 1971. *Id.* ¶ 35. They allege that IFC breached these duties in numerous respects. *Id.* ¶¶ 30, 39. Under long-standing North Carolina law, however, the rights and remedies available to Plaintiffs are governed not by the law of negligence, but rather by the law of contracts.

### A.     <u>The Economic Loss Doctrine Precludes a Claim for Negligence Where the Defendant's Obligations are Governed by Contract.</u>

Thirty-five years ago, the North Carolina Supreme Court adopted the economic loss doctrine in the case of *N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co.*, 294 N.C. 73, 240 S.E.2d 345 (1978). The court announced the general rule that "[o]rdinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor." *Id.* at 81, 240 S.E.2d at 350. As the Fourth Circuit has observed, this doctrine makes sense because "'parties to a contract do not thereby become each others' fiduciaries; [therefore], they generally owe no special duty to one another beyond the terms of the contract.'" *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 347 (4th Cir. 1998) (quoting *Branch Banking & Trust Co. v. Thompson*, 107 N.C. App. 53, 61, 418 S.E.2d 694, 699 (1992)).

> "[A] tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract, even if that failure to [properly] perform was due to the negligent or intentional conduct of that party, when the injury resulting from the breach is damage to the subject matter of the contract. It is the law of contract and not the law of negligence which defines the obligations and remedies of the parties in such a situation."

*Lord v. Customized Consulting Specialty, Inc.*, 182 N.C. App. 635, 639, 643 S.E.2d 28, 30-31 (2007) (quoting *Spillman v. American Homes of Mocksville, Inc.*, 108 N.C. App. 63, 65, 422 S.E.2d 740, 741-42 (1992) (citations omitted)); *see also Bob Timberlake Collection, Inc. v. Edwards*, 176 N.C. App. 33, 42, 626 S.E.2d 315, 323 (2006) (it is "'unlikely that an independent tort could arise in the course of contractual performance, since those sorts of claims are most appropriately addressed by asking simply whether a party adequately fulfilled its contractual

obligations'") (quoting *Southeastern Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 330, 572 S.E.2d 200, 206 (2002)).

Since the Court last addressed this issue in November 2011, The Honorable James C. Dever III has applied the doctrine to bar claims asserted by a farm owner for damage to its cotton and soybeans caused by pesticides. *See Crop Prod. Servs., Inc. v. Ormond*, 2012 U.S. Dist. LEXIS 5499 (E.D.N.C. Jan. 18, 2012) (unpublished and attached). The defendant farm owner entered into a credit agreement with a CPS, a chemical and fertilizer supplier, to receive materials and agronomic services. *Id.* at *3. As part of its contractual obligations, CPS employees monitored the defendant's fields to identify weed and pest problems and to recommend appropriate crop protection chemicals. *Id.* CPS made certain recommendations regarding chemicals the defendant should use to protect its cotton and soybean crops from pests and other problems. The defendant followed those recommendations by purchasing those chemicals from CPS and applying them to the cotton and soybeans. *Id.* at *4-5. The chemicals, however, caused a significantly depressed harvest of both crops, physically causing the soybean plants to diminish to half their original size. *Id.*

When the defendant refused to pay for CPS's products and services, CPS sued. One of the defendant's counterclaims was for negligence in CPS's recommendations regarding the chemicals to apply to its cotton and soybeans and the damage caused by those chemicals. CPS moved to dismiss that counterclaim, contending that it was barred by the economic loss doctrine. *Id.* at *18. Citing *Ports Authority*, *Spillman*, and several other cases, Judge Dever observed that "North Carolina courts have applied the economic loss rule to prohibit recovery for purely economic loss in tort when a contract or warranty has already allocated the risk." *Id.* He noted that "[t]he rationale for the rule is that it confines parties to the contract's terms when seeking

6

redress concerning the subject matter of the contract" and "prevents a party from seeking an extra-contractual tort remedy in an attempt to avoid a contract's allocation of risk." *Id.* at *19-20. Thus, "[w]hen injury occurs to the subject matter of a contract, '[i]t is the law of contract and not the law of negligence which defines the obligations and remedies of the parties.'" *Id.* at *20 (quoting *Spillman*, 108 N.C. App. at 65, 422 S.E.2d at 742). Because the defendant contracted with CPS to recommend and provide appropriate crop protection products, the injury to the defendant's cotton and soybean crops was an injury to the subject matter of the contract, thereby barring any claims for negligence. *Id.* at *21.

B. **Because IFC's Obligations Were Governed by the Contract, Plaintiffs are Precluded From Suing IFC for Negligence.**

Plaintiffs' breach of contract claim here is grounded on IFC's contractual obligations under the Pesticide Application Agreement:

> 42.     The April 20, 2009 contract . . . provides in pertinent part that "IFC agrees to exercise all reasonable and practical efforts to apply the pesticides…. in a manner consistent with instructions, procedures[,] directions, and precautions set forth in the labeling of the pesticide as required by the EPA."

> 43.     Defendants breached the contract with Severn in various ways including but not limited to failing to exercise ["]all reasonable and practical efforts to apply the pesticides…. in a manner consistent with instructions, procedures[,] directions, and precautions set forth in the labeling of the pesticide as required by the EPA."

Amd. Compl. ¶¶ 42-43 (DE #34). Consequently, this case falls squarely within *Ports Authority* and its progeny. It is therefore the law of contracts – not the law of negligence – that provides Plaintiffs with whatever remedies to which they may be entitled. *Lord*, 182 N.C. App. at 639, 643 S.E.2d at 30-31.

Indeed, the rationale for applying the economic loss doctrine against Plaintiffs is particularly strong here because of the Contract's exclusion of consequential damages. Amd. Compl. Ex. A, p. 1, §§ 7(b), 8(h)(II). That exclusion makes clear that in forming their

contractual bargain, these sophisticated commercial parties consciously allocated risks. As Judge Dever made clear in *Crop Prod. Servs.*, the economic loss doctrine "prevents a party from seeking an extra-contractual tort remedy in an attempt to avoid a contract's allocation of risk." 2012 U.S. Dist. LEXIS 5499 at *20.

As the Pesticide Application Agreement SPC executed expressly provided, the mere $8,604.00 IFC earned for fumigating SPC's peanuts was "not sufficient to warrant IFC assuming any risk of incidental or consequential damages such as [SPC's] property, product, equipment, downtime, or loss of business." Amd. Compl. Ex. A, p. 2, § 8(h)(II). By executing that agreement, SPC knowingly accepted the risk that those very losses would be allocated to SPC, rather than to IFC. The fundamental purpose of the economic loss doctrine is to prevent contracting parties like SPC from making an end-run around such a contractual bargain and risk allocation. *Crop Prod. Servs.*, 2012 U.S. Dist. LEXIS 5499, at *19-20. Yet by claiming damages for the destruction of the peanut storage dome and stored peanuts, and related business losses, that is precisely what Plaintiffs attempt here. That attempt is squarely foreclosed by the economic loss doctrine.

C. **Because the Dome and Peanuts Constituted Property Which was the Subject of the Contract, Their Destruction Constitutes Economic Loss, Rather than Compensable Property Damage.**

In *Ports Authority*, the North Carolina Supreme Court recognized four exceptions to the application of the economic loss doctrine:

(1)    injury or damage to "the person or property of someone other than the promisee";

(2)    injury or damage to the "property of the promisee other than the property which was the subject of the contract";

(3)    injury or damage to the property of the promisee which was the subject of the contract, "the promisor being charged by law, as a matter of public policy, with the duty

8

to use care in the safeguarding of the property from harm, as in the case of a common carrier, an innkeeper or other bailee"; or

(4)     where there "was a wilful [sic] injury to or a conversion of the property of the promisee[.]"

294 N.C. at 82, 240 S.E.2d at 350-51.

Plaintiffs have argued that damages to the peanut dome and the stored peanuts should be considered "other property damage" under the second *Ports Authority* exception, rather than uncompensable "economic loss." Yet the second *Ports Authority* exception permits a contracting party to recover in negligence for its own property damage only for property which was ***not*** "the subject of the contract." *Ports Authority*, 294 N.C. at 82, 240 S.E.2d at 350-51; *see also Lord*, 182 N.C. App. at 639, 643 S.E.2d at 30-31. In this case, as numerous provisions of the Pesticide Application Agreement make clear, both the dome structure and the stored peanuts ***were*** the "subject of the contract":

- The preamble of the Pesticide Application Agreement reveals that its purpose was "for the treatment of commodities [peanuts] and/or space [storage dome] by IFC," Amd. Compl. Ex. A, p. 1;

- Section 1 reveals that pesticides were to be applied in the "Peanut Dome," *id.* § 1;

- Section 2 reveals that the "AREA[] TO BE TREATED" was the "Peanut Storage Warehouse," *id.* § 2;

- Section 3 reveals that "commodities," *i.e.*, peanuts, were to be treated, *id.* § 3;

- Section 6 reveals that IFC's obligations included "sealing and preparing the building/area," *id.* § 6; and

- Section 7(c) refers to the treatment of "the commodities and/or space," *id.* § 7(c).

9

SPC's chief operating officer, R.P. Watson, testified that the peanuts were the subject of the contract. Watson Dep., Vol. II, p. 290.

Moreover, possible damage to the dome and the stored peanuts was specifically contemplated at the time of contracting:

> Charges for services provided under this Agreement are based solely upon the value of the services provided and are not related to the value of [SPC's] ***premises*** or the ***contents therein***. The amounts payable by [SPC] are not sufficient to warrant IFC assuming any risk of incidental or consequential damages such as [SPC's] ***property, product***, equipment, downtime, or loss of business.

Amd. Compl. Ex. A § 8(h)(II) (emphasis added). Thus, the damages about which Plaintiffs complain were to the subject matter of the Contract, namely, the peanut dome and stored peanuts, and were specifically contemplated by the Contract. Consequently, "[t]he law of contract, not the law of negligence, defines the obligations and remedies of the parties." *Land v. Tall House Bldg. Co.*, 165 N.C. App. 880, 883, 602 S.E.2d 1, 3 (2004); *see also Lord*, 182 N.C. App. at 639, 643 S.E.2d at 30-31.

In its order denying Defendants' motion to dismiss, the Court relied on *Fireman's Mut. Ins. Co. v. High Point Sprinkler Co.*, 266 N.C. 134, 146 S.E.2d 53 (1966) to conclude that SPC's peanuts and dome constituted "other property" for which recovery could be pursued notwithstanding the economic loss doctrine. (DE #26, p. 4). The defendant's contractual obligations in that case involved installation of a new sprinkler system in the plaintiff's insured's warehouse. Though that warehouse contained merchandise, that merchandise had nothing whatsoever to do with the defendant's contractual obligations. The merchandise therefore constituted property "other than the property which was the subject of the contract[.]" *Ports Authority*, 294 N.C. at 82, 240 S.E.2d at 350.

Similarly, had the fire within SPC's peanut dome spread to Plaintiffs' vehicles or other structures, damage to such other property would be recoverable in negligence under the second

*Ports Authority* exception as damage to property other than the property which was the subject of the contract. However, because IFC's specific contractual obligation was to apply Fumitoxin tablets directly to SPC's peanuts and dome structure – to eradicate flour beetles and Indian meal moths within the peanuts and dome – the peanuts and dome were "property which was the subject of the contract[.]" *Id.* Indeed, IFC's contractual obligations could not have been performed without purposeful contact with both the peanuts and the dome: the 49,000 Fumitoxin tablets were applied directly onto the surface of the peanuts and every nook, cranny, and crack of the dome was sealed to ensure the phosphine gas remained within the dome. Defs.' Resp. to Pls.' 1st Set of Interrogs. p. 3 (Ex. C). Consequently, because the peanuts and the dome were inextricably linked to IFC's contractual performance, the second *Ports Authority* exception does not apply.

Analyzed from a slightly different angle, the question is whether the damage to SPC's peanuts and dome was "'damage to the subject matter of the contract.'" *Lord*, 182 N.C. App. at 639, 643 S.E.2d at 30-31 (quoting *Spillman*, 108 N.C. App. at 65, 422 S.E.2d at 741-42). For the second *Ports Authority* exception to apply, the answer to this question must be "no." Thus, for the second *Ports Authority* exception to apply, it must be true that the subject matter of a contract "for the treatment of ***commodities*** and/or ***space*** by IFC," Amd. Compl. Ex. A, p. 1 (emphasis added), did not include those very commodities or that very space. Because that sentence is completely illogical, the opposite is most obviously true: the subject matter of a contract "for the treatment of commodities and/or space by IFC" does in fact include those very commodities and that very space, *i.e.*, the peanuts and the dome. The Contract's express terms make that abundantly clear. *See also id.* Ex. A, p. 1 ("2. AREAS TO BE TREATED: Peanut Storage Warehouse").

Finally, although Judge Dever did not squarely address the second *Ports Authority* exception in *Crop Prod. Servs.*, the similarities to this case cannot be ignored. Judge Dever expressly found that the damages sustained to the defendant farmer's cotton and soybeans from CPS's pesticides could not be pursued in tort because CPS's contractual obligations were related to the recommendation of pesticides to apply to those crops. 2012 U.S. Dist. LEXIS 5499, at *18-21. Similarly here, the damages sustained to SPC's peanuts and dome from the purported application of Fumitoxin cannot be pursued in tort because IFC's contractual obligations were related to the application of Fumitoxin to the peanuts and dome. There is no basis for any distinction between the two cases and the result here should be the same as the result in *Crop Prod. Servs.* Plaintiffs' negligence claims are barred by the economic loss doctrine.

### D. The Economic Loss Doctrine Precludes Plaintiffs From Seeking to Recover for Their Purely Business Losses in Negligence.

In its order denying Defendants' motion to dismiss, the Court found the second *Ports Authority* exception applicable only to SPC's peanuts and storage dome. The Court did not find any *Ports Authority* exception applicable to Plaintiffs' purely business losses, and none are. Consequently, should this case proceed to trial on Plaintiffs' negligence claims notwithstanding the foregoing arguments, the Court should expressly hold that Plaintiffs may not recover their purely business losses in negligence.

### E. Plaintiffs' Negligence Per Se Claim is Also Precluded by the Economic Loss Doctrine.

The economic loss doctrine applies irrespective of whether the plaintiff alleges that the defendant breached a common-law duty of care or one imposed by statute. In their response to Defendants' motion to dismiss, Plaintiffs did not identify a single case from any jurisdiction in which a court found that the economic loss doctrine does not apply to claims based on negligence per se. In *Nudelman v. J.A. Booe Bldg. Contractor, Inc.*, 2003 N.C. App. LEXIS 509

(N.C. Ct. App. Mar. 4, 2003) (unpublished and attached), the plaintiff-homeowners alleged that their custom homebuilder's work resulted in violations of the North Carolina State Building Code, N.C. Gen. Stat. § 143-138 (2001). *Id.* at *6. Because these were violations of a duty imposed as a matter of public policy, the homeowners contended they were "sufficient to impose tort liability."[2] *Id.* at *13-14. The Court of Appeals rejected this argument, concluding that the homeowners' sole remedy was for breach of contract. *Id.* at *14.

Federal courts in other states have also concluded that the economic loss doctrine precludes the recovery of economic losses in tort even if the plaintiff asserts a claim for negligence per se. *See, e.g., Binder v. Bank of America Corp.*, 2010 U.S. Dist. LEXIS 124208, *9 (N.D. Tex. Nov. 22, 2010) ("economic loss rule bars negligence per se claims"); *Cemex, Inc. v. LMS Contr., Inc.*, 2009 U.S. Dist. LEXIS 89052, *12 (W.D. Ky. Sept. 28, 2009) (under economic loss doctrine, "negligence per se claims meet the same fate as . . . basic negligence claims"); *Spencer v. DHI Mortg. Co.*, 642 F. Supp. 2d 1153, 1161-62 (E.D. Cal. 2009) (economic loss doctrine warrants dismissal of both negligence and negligence per se claims); *In re Air Bag Products Liability Litigation*, 7 F. Supp. 2d 792, 802 (E.D. La. 1998) ("economic loss doctrine forecloses plaintiffs from asserting negligence per se and strict liability as theories of recovery in tort.").[3]

## III.    THE DAMAGES PLAINTIFFS SEEK ARE EXCLUDED BY THE PESTICIDE APPLICATION AGREEMENT'S EXPRESS TERMS.

The Pesticide Application Agreement excludes all damages Plaintiffs seek from Defendants:

---

[2] Violation of the Building Code constitutes negligence per se. *Oates v. Jag, Inc.*, 314 N.C. 276, 280, 333 S.E.2d 222, 225 (1985).

[3] Plaintiffs' negligence per se claim should also be dismissed for the reasons this Court recently articulated in *Cooke v. Stanley Steemer Southern Virginia, LLC*, No. 2:13-cv-32-BO, *slip op.* at 3-4 (Sept. 20, 2013), where the Court held the plaintiff did not make out a claim for negligence per se for an alleged violation of the North Carolina Pesticide Act of 1971.

- "IFC shall in no event be liable for consequential damages for breach . . . resulting from the performances of its services and use of any products pursuant hereto." Amd. Compl. Ex. A, p. 1, § 7(b).

- "The amounts payable by [SPC] are not sufficient to warrant IFC assuming any risk of incidental or consequential damages such as [SPC's] property, product, equipment, downtime, or loss of business." *Id.* p. 2, § 8(h)(II).

These contractual provisions arose from an arms-length contract between sophisticated commercial parties. Consequently, they are fully enforceable and preclude the very liability Plaintiffs assert.

A.  **All Provisions of the Contract Must Be Given Effect.**

Contract interpretation "requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." *State v. Philip Morris USA, Inc.*, 359 N.C. 763, 773, 618 S.E.2d 219, 225 (2005). "Intent is derived not from a particular contractual term but from the contract as a whole." *Id.* "'The various terms of the [contract] are to be harmoniously construed, and if possible, every word and every provision is to be given effect[.]'" *Gaston County Dyeing Machine Co. v. Northfield Ins. Co.*, 351 N.C. 293, 299-300, 524 S.E.2d 558, 563 (2000) (quoting *Woods v. Nationwide Mut. Ins. Co.*, 295 N.C. 500, 505-06, 246 S.E.2d 773, 777 (1978)). It is the "universal rule of contract law that, in construing language in a contract, 'an interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless.'" *Island Creek Coal Co. v. Lake Shore, Inc.,* 832 F.2d 274, 277 (4th Cir. 1987) (quoting *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1555 (Fed. Cir. 1983)).

14

Applying these principles to the Pesticide Application Agreement, this Court must give meaning to section 7(b)'s exclusion of consequential damages as well as section 8(h)(II)'s listing of examples of such excluded damages, including SPC's "property, product, equipment, downtime, or loss of business." Amd. Compl. Ex. A, p. 2, § 8(h)(II). Construing those provisions "harmoniously," and giving effect to each and every word, the Contract precludes IFC from being held liable for any damages to SPC's "property, product, equipment, downtime, or loss of business." *Id.* That list includes the very damages Plaintiffs seek in this action.

**B.     The Contract's Consequential Damages Exclusion is Valid and Enforceable.**

Though Plaintiffs may argue that precluding them from any recovery for their fire-related losses is unduly harsh or unfair, the North Carolina Supreme Court has made clear that North Carolina courts will not interfere with the contractual allocation of risk made by commercial parties, even though that allocation may prove in retrospect to be a bad bargain:

> People should be entitled to contract on their own terms without the indulgence of paternalism by courts in the alleviation of one side or another from the effects of a bad bargain. Also, they should be permitted to enter into contracts that actually may be unreasonable or which may lead to hardship on one side.

*Gas House, Inc. v. Southern Bell Tel. & Tel. Co.*, 289 N.C. 175, 182, 221 S.E.2d 499, 504 (1976), *overruled on other grounds by State ex rel. Utils. Comm'n v. Southern Bell Tel & Tel. Co.*, 307 N.C. 541, 299 S.E.2d 763 (1983).

For instance, in *Blaylock Grading Co., LLP v. Smith*, 189 N.C. App. 508, 658 S.E.2d 680 (2008), the plaintiff grading company entered into a contract with the defendant-engineers for the latter to perform land surveying. Their contract contained a risk-allocation provision which expressly limited the engineers' liability to $50,000 in damages. *Id.* at 509, 658 S.E.2d at 681. The grading company subsequently sued the engineers for mistakenly setting certain benchmarks, thereby requiring the raising of the elevation of the site at issue. *Id.* at 510, 658

S.E.2d at 681. The engineers moved for partial summary judgment on the basis of the $50,000 contract limitation. The trial court denied the motion and ultimately held that the $50,000 limitation was void as against public policy; based upon the jury's verdict, it entered judgment against the engineers in the amount of $574,714. *Id.* at 510, 658 S.E.2d at 682.

On appeal, the engineers argued that the trial court should have limited the plaintiff's damages to $50,000 pursuant to the contract limitation. *Id.* Applying the above-quoted language from *Gas House*, the Court of Appeals agreed:

> Plaintiff and defendants are sophisticated, professional parties who conducted business at arms' length, and the "result" of the contract does not elicit a "profound sense of injustice." In addition, defendants are not common carriers or providers of a public utility. . . . Therefore, the Risk Allocation provision was not void as against public policy.

*Id.* at 512, 658 S.E.2d at 683 (citations omitted); *see also North Carolina Baptist Hosp. v. Novant Health, Inc.*, 195 N.C. App. 721, 725, 673 S.E.2d 794, 797 (2009) ("[o]ur courts are loath to intervene in contractual relationships based upon public policy considerations when the parties 'are sophisticated, professional parties who conducted business at arms' length, and the 'result' of the contract does not elicit a 'profound sense of injustice'") (quoting *Blaylock*, 189 N.C. App. at 512, 658 S.E.2d at 683); *Rolls v. Rolls*, 2010 N.C. App. LEXIS 2388, *8-9 (N.C. Ct. App. Dec. 21, 2010) (unpublished and attached) ("[d]efendant is not permitted to now argue that the provisions in the agreement should be disregarded because he believes he received a bad bargain") (citing *Blaylock*, 189 N.C. App. at 511, 658 S.E.2d at 682). In its order denying Defendants' motion to dismiss, the Court confirmed that, under *Blaylock*, Plaintiffs cannot escape their contractual bargain on public policy grounds. (DE #26, p. 5).

### C. **The Damages Sought by Plaintiffs are Excluded By the Pesticide Application Agreement.**

In its order denying Defendants' motion to dismiss, the Court noted that "the damages claimed by Plaintiffs for loss of their peanuts and Dome are, at least arguably, direct damages in this case. Although Plaintiffs are contractually barred from proceeding on claims for consequential damages *on their breach of contract claim*, at this stage they are not barred from pursuing their claims for direct damages." *Id.* (emphasis in original.) Thus, the Court did recognize that Plaintiffs' claim for purely business losses are in fact barred by the Contract's consequential damages exclusion.[4] As is demonstrated below, so are the losses to Plaintiffs' peanuts and dome.

The North Carolina Court of Appeals has held that where parties specify in their contract the types of consequential damages that are excluded from recovery, "those consequential damages are excluded." *Stan D. Bowles Distr. Co. v. Pabst Brewing Co.*, 69 N.C. App. 341, 351, 317 S.E.2d 684, 690 (1984). In *Bowles*, the parties' contract provided that "[u]nder no circumstances shall Pabst be liable for any loss of profits by distributor or for any part of distributor's sales promotion, organization, business investment, operating or other expenses . . . ." *Id.* at 350, 317 S.E.2d at 690. In enforcing this provision, the Court of Appeals held that "[t]he paragraph clearly does exclude loss of profits, and the [trial] court thus was correct in not awarding the $100,000 it found plaintiff had suffered in lost profits." *Id.* at 351, 317 S.E.2d at 690.

Similarly, in *Moore v. Coachmen Indus., Inc.*, 129 N.C. App. 389, 499 S.E.2d 772 (1998), a recreational vehicle's warranty provided that "[w]e shall not be liable for incidental or

---

[4] Defendants request that the Court's order on the instant motion expressly preclude Plaintiffs from proceeding on such damages if summary judgment is not granted in full.

consequential damages, **such as** your expenses for transportation, lodging, **loss or damage to your personal property**, loss of use of your product, inconvenience, or loss of income." 129 N.C. App. at 398, 499 S.E.2d at 778 (emphasis added). The fire that destroyed the plaintiffs' RV also destroyed their satellite dish, receiver box, and various other personal property. *Id.* at 392, 499 S.E.2d at 774. Just as in *Bowles*, the Court of Appeals relied on the listing of specified types of excluded damages to determine whether the plaintiffs' personal property losses were recoverable: "the Limited Warranty prevents plaintiffs from recovering any incidental or consequential damages, 'including loss or damage to their personal property.'" *Id.* at 402, 499 S.E.2d at 780. Thus, it held that the plaintiffs could not recover for those losses. *Id.*

As in *Bowles* and *Moore*, courts throughout the country recognize that contracting parties may define for themselves the specific types of consequential damages to be excluded from recovery and routinely enforce provisions similar to section 8(h)(II) of the Pesticide Application Agreement. For instance, in *Citizens Ins. Co. of America v. Proctor & Schwartz, Inc.*, 802 F. Supp. 133 (W.D. Mich. 1992), *overruled on other grounds by Detroit Edison Co. v. NABCO, Inc.,* 35 F.3d 236, 242 (6th Cir. 1994), a subrogation case like this one, the plaintiff's insured entered into a sales agreement to purchase a peanut roaster and conveyor cleaner manufactured by the defendant. Thereafter, the roaster caught fire and caused substantial damage to itself, the cleaner, as well as other property owned by the plaintiff's insured. *Id.* at 136.

The sales agreement for the roaster and cleaner contained a provision stating that the defendant "shall not be liable for proximate incidental, consequential or other damages, including but not limited to erecting expenses and damages for loss of profits or production or injury to . . . property." *Id.* at 142. The district court had little difficulty concluding, based on this language, that "all of the claimed losses arising out of damage to property other than the

peanut roaster and conveyor cleaner [which were barred by the economic loss doctrine] was effectively excluded by this provision." *Id.* at 143. Though the plaintiff argued that application of this exclusion was unconscionable, the district court disagreed, noting that the clause was "a conspicuous and unambiguous part of a sales transaction between two commercial entities." *Id.* at 145.

In *McNally Wellman Co. v. New York State Elec. & Gas Corp.*, 63 F.3d 1188 (2d Cir. 1995), the Second Circuit noted that "[w]hile ordinarily the precise demarcation between direct damages and incidental or consequential damages is an issue of fact," that is not so where "the parties themselves defined the scope of excluded damages in the contract." *Id.* at 1195. Based on language in the contract providing that the "'special, incidental, indirect, or consequential damages'" excluded by the contract "'shall be effective without regard to [McNally's] performance or failure or *delay* of performance,'" the court concluded that delay damages were excluded. *Id.* at 1193 (emphasis in original); *see, e.g., Roneker v. Kenworth Truck Co.*, 977 F. Supp. 237 (W.D.N.Y. 1997) (where parties themselves define the scope of excluded consequential damages, the court may find as a matter of law that the damages sought by the plaintiff constitute excluded consequential damages); *Combustion Sys. Servs., Inc. v. Schuylkill Energy Res., Inc.*, 1993 U.S. Dist. LEXIS 16374, *8 (E.D. Pa. Nov. 19, 1993) (unpublished and attached) ("where parties define for themselves what constitutes consequential damages courts generally will not interfere").

The listing of excluded damages contained in Section 8(h)(II) of the Pesticide Application Agreement is no different from the listings of excluded damages on which the Court of Appeals relied in *Bowles* and *Moore* and on which the federal courts relied in *Proctor & Schwartz* and *McNally Wellman*. Because SPC agreed in section 8(h)(II) that IFC would not be

liable for damages to its property, product, equipment, downtime, or loss of business, the Court need not consider whether such damages would ordinarily be considered "direct" or "consequential." For purposes of this particular contract, the parties have agreed that they are excluded consequential damages. Therefore, a jury may not find them to be compensable "direct damages." Defendants are entitled to judgment as a matter of law that those damages are excluded by the contract. Allowing Plaintiffs to pursue such damages would rewrite the Contract and render section 8(h)(II) meaningless, in contravention of universally recognized principles of contract interpretation.

## IV. THE CONTRACT'S CONSEQUENTIAL DAMAGES EXCLUSION ALSO BARS PLAINTIFFS FROM RECOVERING ON THEIR NEGLIGENCE CLAIMS.

Even if the Court disagrees that application of the economic loss doctrine precludes Plaintiffs from recovering in negligence for damages to their real and personal property and business-related losses, *see supra* Section II, the Pesticide Application Agreement's consequential damages exclusion precludes them from recovering those damages even in negligence. That conclusion is compelled by the Court of Appeals' analysis in *Moore*, which involved the destruction of the plaintiffs' recreational vehicle. The court in *Moore* began its analysis by concluding that the plaintiffs' claim for breach of warranty was time-barred. 129 N.C. App. at 401, 499 S.E.2d at 780. It then turned its attention to the plaintiffs' negligence claims and concluded that the economic loss doctrine precluded them from recovering in negligence for the destruction of the recreational vehicle itself. *Id.* at 402, 499 S.E.2d at 780.

That still left open the question of whether the plaintiffs could recover in negligence for the destruction of their personal property – their satellite dish, receiver, and other personal property. *Id.* at 392, 499 S.E.2d at 774. On that question, the court applied the limited warranty's consequential damages exclusion:

Further, the Limited Warranty prevents plaintiffs from recovering any incidental or consequential damages, "including loss or damage to their personal property." ***Hence, plaintiffs cannot recover for any damages on their negligence claim*** against defendants (claims one and two).

*Id.* at 402, 499 S.E.2d at 780 (emphasis added). Thus, a consequential damages exclusion such as the one contained in sections 7(b) and 8(h)(II) of the Pesticide Application Agreement applies with equal force to both contract and negligence claims. *Accord Island Creek Coal*, 832 F.2d at 278 (applying Michigan law and rejecting argument that consequential damages exclusion cannot apply to negligence claims); *Proctor & Schwartz*, 802 F. Supp. at 143, 146 ("[t]ort claims premised upon losses caused by fire damage to property other than the product itself are precluded by defendant's contractual exclusion of liability for consequential damages."). Therefore, sections 7(b) and 8(h)(II) preclude Plaintiffs from recovering for damage to their real and personal property, and for their business-related losses, not only on their breach of contract claim, but on their claims for negligence and negligence per se as well.

## V. PLAINTIFFS HAVE NOT ADDUCED ANY EVIDENCE CAPABLE OF PIERCING THE CORPORATE VEIL BETWEEN ROLLINS AND IFC.

Plaintiffs' Amended Complaint alleges that IFC is "a mere instrumentality and alter ego of Rollins, mak[ing] Rollins responsible for the negligent acts of IFC as herein alleged." Amd. Compl. ¶ 23. North Carolina courts apply the "instrumentality rule" to analyze a contention that a corporate veil between two affiliated entities should be pierced:

"[A] corporation which exercises actual control over another, operating the latter as a mere instrumentality or tool, is liable for the torts of the corporation thus controlled. In such instances, the separate identities of parent and subsidiary or affiliated corporations may be disregarded."

*Glenn v. Wagner*, 313 N.C. 450, 454, 329 S.E.2d 326, 330 (1985) (quoting *B-W Acceptance Corp. v. Spencer*, 268 N.C. 1, 8, 149 S.E.2d 570, 575 (1966)). An attempt to pierce the corporate veil requires the plaintiff to establish three things:

(1)     Complete domination over the other company, not only in terms of finances, but in terms of policies and business practices related to the transaction at issue such that the dominated entity, with respect to that transaction, had at the time no separate mind, will, or existence of its own;

(2)     Such control must have been used by the company dominating the other to commit a wrong or violation of a legal duty; and

(3)     Such control and breach of duty must have proximately caused the complained-of injury.

*Fischer Inv. Capital v. Catawba Dev't Corp.*, 200 N.C. App. 644, 649, 689 S.E.2d 143, 147 (2009). Whether or not such control exists over a dominated corporate entity is based on an analysis of whether there was: (1) inadequate capitalization; (2) non-compliance with corporate formalities; (3) complete domination and control; and (4) excessive fragmentation. *Id.* at 649, 689 S.E.2d at 147-48.

Attached to this memorandum is an Affidavit of Dan Ponton, the Executive Vice President and General Manager of IFC. (Ex. D). Mr. Ponton avers that Rollins acquired IFC as a wholly owned subsidiary in 2005. Ponton Aff. ¶ 3. IFC's sole business is the supply of pest management products and services to commercial and industrial customers. *Id.* ¶ 5. Rollins has no involvement in the provision of the products and services IFC supplies to its customers or to the management and supervision of IFC's employees. *Id.* The day-to-day operations of IFC are separate from the day-to-day operations of Rollins. *Id.* Indeed, the internal operating procedures and policies of IFC and policies of IFC related to pest management products and services are set by IFC management, not Rollins management; the training of IFC's employees in pest management products and services is provided by IFC's management, not Rollins' management.

*Id.* ¶¶ 6-7. Rollins provides to IFC basic administrative services, including accounting/payroll, human resources, fleet administration, Web hosting, risk management, and legal. "Beyond those discrete administrative services, Rollins is not involved in the day-to-day operations of IFC." *Id.* ¶ 8.

In view of the above information, Plaintiffs cannot possibly meet its burden to prove that Rollins operated IFC as its own instrumentality or tool. Consequently, no genuine issue of material fact exists regarding whether Rollins' corporate veil may be pierced and Rollins is entitled to judgment as a matter of law.

## CONCLUSION

For all of the foregoing reasons, summary judgment should be granted in Defendants' favor on all claims asserted in the Amended Complaint and this case should be dismissed with prejudice.

This the 26th day of November, 2013.

POYNER SPRUILL LLP

By: s/ Steven B. Epstein
   Steven B. Epstein
   N.C. State Bar No. 17396
   Email: sepstein@poynerspruill.com
   301 Fayetteville Street, Suite 1900
   Raleigh, NC 27601
   Telephone: 919.783.2846
   Facsimile: 919.783.1075
   *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel and parties of record as follows:

Howard M. Widis, Esq.
Quick, Widis & Nalibotsky, PLLC
2115 Rexford Rd., Suite 100
Charlotte, NC 28211
Email: hwidis@qwnlaw.com

This the 26th day of November, 2013.

s/ Steven B. Epstein
Steven B. Epstein