```
            IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF NORTH CAROLINA
                    NORTHERN DIVISION

SEVERN PEANUT CO., INC.,        )
MEHERRIN AGRICULTURE &          )
CHEMICAL CO., and TRAVELERS     )
PROPERTY CASUALTY COMPANY OF    )
AMERICA as Subrogee of Severn   )  DOCKET NO. 2:11-cv-00014-BO
Peanut Co., Inc. and Meherrin   )
Agriculture & Chemical Co.,     )
                                )
            Plaintiffs,         )
                                )
    v.                          )
                                )
INDUSTRIAL FUMIGANT CO. and     )
ROLLINS INC.,                   )
                                )
            Defendants.         )
_____)


                      8:54 A.M.
                   October 10, 2013
                 Raleigh, North Carolina



                      DEPOSITION

                          OF

                 CAROL L. JONES, Ph.D.


REPORTED by:    Laura Riley Bridges
                Court Reporter
                Notary Public
                Bridges Court Reporting, Inc.
                P.O. Box 2156
                Rutherfordton, N.C. 28139
                P.O. Box 6545
                Spartanburg, South Carolina 29306
                (828)429-7839
                Laura@LBridgesCourtReporting.com
```

1   A.   No, this -- this was in my -- my other work.
2   Q.   Okay.  You were asking for the angle of repose for
3        phosphine fumigant tablets.
4   A.   Yes.
5   Q.   All right.  Now, why are you asking that question?
6   A.   Because a question that -- that came from one of my
7        students in a class.
8   Q.   And what was the question?
9   A.   What's the angle of repose of the -- of the phosphine
10       tablets?
11  Q.   Okay.  Is that because the student believed that there
12       could be piling?
13  A.   I have no idea why he asked that.  That was just a
14       question that I got in class.
15  Q.   All right.  You didn't ask him why are you asking that?
16  A.   No, sir.  I didn't.
17  Q.   They ask a question and you're going to find the
18       answer?
19  A.   Well, that's my job.
20  Q.   You have no idea why this question is being asked as to
21       what the angle of aluminum phosphine fumigant tablets?
22  A.   I didn't ask him why he was asking, no.
23  Q.   Did you think that might be of any -- that the answer
24       to that question might be of any relevance to the
25       Severn case?

```
 1  A.  At that time, no.  Obviously, you know, here it is.
 2      We've talked about it here, so you know -- it happened
 3      that here it is in this case, but at that time, no.
 4  Q.  All right.  Angle of repose means a pile and you're
 5      determining the -- the steepness of the pile, correct?
 6  A.  The slope, yes.
 7  Q.  Slope.  And you knew you were going to opine that there
 8      basically is no slope of Fumitoxin tablets, aren't you?
 9  A.  No.
10  Q.  I mean, you're saying -- aren't you saying that they
11      don't pile -- they -- you're basically saying that they
12      slide off each other and off the pile so you were
13      taking the position that you can't pile these tablets.
14  A.  That it's hard to pile them, yes.
15  Q.  And if there is an angle of repose then that refutes
16      your position that they're -- that they can't pile,
17      isn't that right?
18  A.  That would determine how easily they're -- or how high
19      the pile would be if they did pile, yes.
20  Q.  Right and they -- if the pile is --
21  A.  Whatever a pile is.  I don't know what a pile is, but
22      --
23  Q.  To whatever extent --
24  A.  Yes.
25  Q.  -- you've got an angle of repose of a product then at
```

```
 1        least it's going clump up at that point, right?
 2   A.   Yes.
 3   Q.   Okay.  So you didn't feel that that was at all relevant
 4        to the Severn case?
 5   A.   Not at that point.  I wasn't thinking about that.  I
 6        was trying to answer his -- his question.
 7   Q.   All right.  Well, you're -- you're getting ready to
 8        write your expert report now, right?  June 26, 2013 is
 9        when your report comes out.  This is June 8th?
10   A.   Uh-huh.  True.
11   Q.   You've had discussions as to what -- and thoughts as to
12        what you're going to include in your expert report,
13        right?
14   A.   Uh-huh.  Yes.
15
16
17   Q.   But the question of whether there was an angle of
18        repose for Fumitoxin just --
19   A.   No.
20   Q.   -- you didn't see any relevance whatsoever to the
21        Severn --
22   A.   I -- I asked the question as a response to a question
23        that was asked of me in class.
24   Q.   All right.  Now, Jim Smiley writes to Dennis Ryman,
25        "Any thoughts on this.  I can't imagine why this would
```

1  Q.  All right.  So this didn't -- all right.  So now, we've
2      got that same morning, Mr. Ryman's responding back,
3      "I'll be happy to give your grad students something to
4      do.  We will send a flask of each to your attention and
5      I appreciate your offer to help."
6  A.  Uh-huh.
7  Q.  Would you have liked more than one flask?
8  A.  Sure.  I'll take what I can get.
9  Q.  Okay.  You didn't ask him that.
10 A.  No, I didn't ask for more.
11 Q.  Okay.  You said, "Dennis, This is awesome! Thanks! I'll
12     look for them.  When we get the testing done, I'll
13     contact you and we can discuss the results."  Why do
14     you think he'd be interested in the results?
15 A.  It's his product.  I would assume he'd want to know
16     what the results are.  And I certainly would want to
17     discuss it with him before I offered any information to
18     outside sources because it's his product.
19 Q.  So now, this is just a separate project, non-related to
20     the Severn that you think, "Hey, let's do this" and
21     this came from a student asking what you felt is an
22     innocuous question --
23 A.  Yeah, one of my fumigation students.
24 Q.  Were you all discussing piling of tablets at the time
25     you asked the question?

```
 1        would do that.
 2   Q.   All right.  So you weren't talking about in your report
 3        that you were going to write for Severn then?
 4   A.   No, this is my research.  This is not Severn work here.
 5   Q.   All right.  Do you think you made the distinction
 6        between the real and dummy tablets clear enough in your
 7        report?
 8   A.   Yes, sir.
 9   Q.   The Severn report?
10   A.   Yes, sir.
11   Q.   "All reports will go back to you.  If they look like
12        something that the industry can use, you'll have the
13        option to approve release of the information, of
14        course."  You were hoping at this point to be able to
15        produce something that's publishable?
16   A.   Yes.
17   Q.   And I guess as a professor, it's publish or perish?
18   A.   Not necessarily, but it is nice to publish.
19   Q.   You said, "I'm working on a certain expert witness
20        report right now."  Is that the Severn report you're
21        talking about?
22   A.   No, sir.
23   Q.   Which report is that?
24   A.   That was the report for my Texas case that was two
25        weeks ago.
```

1  A.   That's correct.
2  Q.   Okay.  And you're going to do it now after July 3rd.
3  A.   Correct.
4  Q.   After the July 4th weekend, basically.
5  A.   Correct.
6  Q.   Or holiday.  And then Dennis writes you on Monday, July
7       8th.  "Good morning Carol, Thanks for the update and I
8       hope you had a nice holiday. I also hope your harvest
9       went well and I look forward to hearing back from you
10      in a couple of weeks."
11           Now, July 12th, you're writing to him and you
12      called it "tablet question."
13 A.   That -- yes, okay.
14 Q.   Okay.  "We have preliminary data for the phosphine
15      material you shipped to us."  And the phosphine
16      material is -- what material is that?
17 A.   That was my reference to the dummy tablets.  It's not
18      phosphine.  That's an incorrect word there.
19 Q.   Okay.  So basically should mean --
20 A.   The dummy tablets.
21 Q.   Dummy tablets.  "There are also 2 videos.  The files
22      are too large for our email carrier so you will be
23      receiving a Dropbox invitation soon and that will allow
24      you to view the video files."
25           Were this -- was this test done for the Severn

```
 1         case or was it done --
 2   A.    No, sir.
 3   Q.    What was it done for?
 4   A.    For my research.
 5   Q.    And do you feel that determining the angle of repose of
 6         demonstration tablets of aluminum phosphide product had
 7         any impact or bearing whatsoever on your opinion as to
 8         whether these tablets will stack?
 9   A.    No, sir.
10   Q.    "The angle of repose for the tablets is about 12
11         degrees while the tablets is 20 degrees for the
12         pellets."
13   A.    Yeah, that -- okay.
14   Q.    I mean, I understand --
15   A.    No, but that's --
16   Q.    -- "while the tablets" shouldn't be there.
17   A.    Right.
18   Q.    I write emails too.  So --
19   A.    Right.
20   Q.    All right.  What you're saying is the, "The angle of
21         repose for the tablets is about 12 degrees...and 20
22         degrees for the pellets."
23   A.    Pellets.
24   Q.    Knowing that, would you agree that these demonstration
25         tablets do pile?
```

```
 1   A.   The demonstration tablets pile.
 2   Q.   Okay.  "The tablets do not fit through the standard
 3        funnel so we tested them with a PVC pipe drop."  And
 4        I've seen the video.  The pellets you did through a --
 5        a type of -- what would you call that?
 6   A.   It's a funnel.
 7   Q.   The metal funnel.
 8   A.   Yes.
 9   Q.   And drop them from what, two or three inches?
10   A.   I don't remember the height.  It's a standard height
11        through the ASAB standard so probably about a foot.
12   Q.   And then it drops onto a flat, hard surface?
13   A.   Yes, sir.
14   Q.   Is there paper or plastic covering it?
15   A.   There's paper.
16   Q.   Paper, white paper?
17   A.   White paper.
18   Q.   And so the demonstration pellets fell a foot and landed
19        on a hard surface with paper --
20   A.   Yes, sir.
21   Q.   -- covered by paper.  And for the tablets, you put them
22        in a PVC pipe and then lifted the PVC pipe and saw how
23        they --
24   A.   That's correct.
25   Q.   -- what the configuration of the pile was afterward.
```

1  A.  Correct.
2  Q.  All right.  And did you measure the configuration of
3      the -- of the tablet pile after you removed the PVC
4      pipe?
5  A.  That's where this angle came -- comes from here for the
6      tablets --
7  Q.  So the test --
8  A.  -- or -- yeah.  The tablets is 12, pellets is 20.
9  Q.  The testing that you did on -- on the -- is that now on
10     YouTube?
11 A.  I believe so, yes.
12 Q.  Is -- you measured it was 12 degrees for the tablets?
13 A.  Yes.
14 Q.  Okay.  "I will ask Kevin to do the same for the pellets
15     so we can get that comparison also."  Did Kevin later
16     do another --
17 A.  Not yet.
18 Q.  "I don't expect the result to be different but let's
19     test to see."  And you're saying it's the same for the
20     pellets.  That would mean put them in a PVC pipe?
21 A.  Yes.
22 Q.  Now, did you advise your student of the angle of repose
23     of phosphine -- of the tablets?
24 A.  Did I advise him --
25 Q.  The student who started this whole thing.  Did you

```
 1          advise him of what the angle of repose was for the
 2          Fumitoxin?
 3     A.   I'm sorry, I don't understand your question.
 4     Q.   Sure.  Your first page back here, a student had asked
 5          you "what's the angle of repose"?
 6     A.   Oh, okay.  I thought you meant my grad student.  Okay.
 7          Yes.  Actually, I did tell him that.
 8     Q.   Do you know what he was doing with that?
 9     A.   I have no idea.  May have been just for his own
10          interest.  I don't know.
11     Q.   Okay.  And then what did you do with this information?
12     A.   Nothing so far.
13     Q.   You've asked Dennis, "Any additional testing Degesch
14          would like us to do?  Would you mind if we took this a
15          little further for a publishable journal article as
16          long as we give Degesch credit?"  So that's -- you're
17          hoping you can make some publishable article out of
18          this.
19     A.   I would like that, yes.
20     Q.   And but -- as of right now, you haven't?
21     A.   We have not.
22     Q.   Then Dennis writes on July 15th, "This is good
23          information and I appreciate your work."  Did Dennis --
24          were you speaking on the phone to Dennis during any of
25          this time or is this all --
```