UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

SEVERN PEANUT CO, INC., et al.,            )
                                           )
            Plaintiffs,                    )
                                           )
v.                                         )            DOCKET NO. 2:11-cv-00014-BO
                                           )
INDUSTRIAL FUMIGANT CO. and                )
ROLLINS INC.,                              )
                                           )
            Defendants.                    )
_____)


## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, Industrial Fumigant Company ("IFC") and Rollins, Inc. ("Rollins"), have

moved for summary judgment, raising many of the same arguments previously rejected by this

Court in its decision to deny Defendants' Motion to Dismiss. (DE #26). For the reasons

discussed herein, Defendants' current Motion should likewise be denied.

## STATEMENT OF THE FACTS

1)        Plaintiff Severn Peanut, Co., Inc. ("Severn") entered into a "Pesticide

Application Agreement" with Industrial Fumigant Co. ("IFC"), whereby IFC agreed to apply

aluminum phosphide tablets within a peanut storage dome ("Dome") owned by Severn. (DE

#34-1), Watson Dep. pp. 286-288 (DE #85-1).

2)        Defendants' use and application of Fumitoxin tablets, an aluminum phosphide

product, was regulated by The Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA")

and the North Carolina Pesticide Law of 1971, both of which are public safety statutes.

7 U.S.C.A. § 136, *et seq.*, N.C. Gen. Stat. § 143-435, *et seq.*

1

3)      The Fumitoxin applicator's manual, which has the force of law, directs the applicator not to allow the tablets to pile and warns against possible ignition from piling. Turner Dep. at 47-49 (DE #75-7) (DE #87-13).

4)      On August 4, 2009, IFC inserted 49,000 tablets of Fumitoxin into the Dome from a single opening located on the top of the Dome and thereafter sealed the Dome.  Defs. Resp. to Pls. 1st Set of Interrogs. No. 2. (DE #75-4).

5)      On August 11, 2009, smoke was discovered coming from the Dome and Severn notified IFC.  Pls. Resp. to Defs. 1st Set of Interrogs. No. 17 (DE #75-3).

6)      IFC, a wholly owned subsidiary of Rollins Inc. ("Rollins"), notified Rollins of the fire and Rollins sent a representative to the site who advised that Rollins would take responsibility for the suppression of the fire.  Rollins thereafter retained a company to supervise and coordinate the firefighting activities at the site.  Pls. Resp. to Defs. 1st Set of Interrogs. No. 18 (DE #75-3), (DE #85-4).

7)      The fire substantially damaged and destroyed the Dome and peanuts resulting in damages to Severn in excess of $19,000,000.00.  The damages included the loss of the Dome, loss of the peanuts, debris removal, fire suppression and business income loss resulting from the destruction of the Dome and peanuts.  Nata Dep. pp. 155-77 & Exhbs. 135-137 (DE #85-2).

8)      Plaintiffs' experts testified that in their opinion, the Defendants' improper method of application of the Fumitoxin tablets resulted in piling of the tablets which caused the fire. Rich and Schumacher Expert Reports and Deps.  (DE #75-8, #75-13, #75-14 and #75-15).

**STANDARD OF REVIEW**

A motion for summary judgment cannot be granted unless there are no genuine issues of material fact for trial. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 32223, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party must demonstrate the lack of a genuine issue of fact for trial and if that burden is met, the party opposing the motion must "go beyond the pleadings" and come forward with evidence of a genuine factual dispute. *Celotex,* 477 U.S. at 324. The Court must view the facts and the inferences drawn from the facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 58788, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**LAW OF THE CASE**

As noted above, Defendants' Motion for Summary Judgment is based in large part on arguments previously made and rejected by this Court in its denial of Defendants' Motion to Dismiss. This Court held that damage to the Dome and peanuts allegedly caused by the misapplication of the Fumitoxin constituted damage to "other property" of the Plaintiffs and thus the negligence and negligence per se claims were not barred by the economic loss doctrine. It further held Plaintiffs could proceed on their breach of contract claim for any direct damages.

The law of the case doctrine provides that when a court decides a rule of law, its decision should continue to govern the same issues in subsequent stages in the same case. *Aikens v. Ingram,* 513 F. Supp. 2d 586, 594 (E.D.N.C. 2007) citing *United States v. Aramony,* 166 F.3d 655, 661 (4th Cir. 1999). The law of the case doctrine, however, is a matter of discretion and does not limit the power of the court to reopen matters already decided. *Giacomo–Tano v. Levine,* 199 F.3d 1327, (Unpublished and attached). While a district court has the power to revisit an issue where the underlying factual basis for a prior ruling has changed, in *United States*

*v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999), the court noted that "unless (1) a subsequent trial or proceeding in the district court produced substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice, we are precluded from addressing the argument a second time."  None of these exceptional circumstances are present in the case at bar and the factual basis for the prior ruling has not changed.

## ARGUMENT

I.    **PLAINTIFFS ARE ABLE TO SUBMIT SUFFICIENT PROOF THAT THE FIRE WAS CAUSED BY IFC'S IMPROPER FUMITOXIN APPLICATION.**

Defendants argue that if the Court grants its motion to exclude Plaintiffs' experts Lester Rich and John Schumacher from offering the opinion that the piling of the aluminum phosphide tablets caused the fire in the Dome, then summary judgment must follow as Plaintiffs would be without any proof whatsoever as to causation.  At this point, however, Plaintiffs have submitted their Memorandum in Opposition to the Motion and the parties are awaiting this Court's ruling. (DE #87).  As the Court has not yet excluded any or all of the testimony from Lester Rich and/or John Schumacher or provided the basis of such ruling, Defendants' argument relies on pure speculation as to what testimony or evidence would or would not be available.

Defendants' Daubert Motion questioned the scientific foundation of the experts' opinions.  It did not attack their methodology under NFPA 921 and both experts identified all of the potential ignition sources, eliminating all but the piling of aluminum phosphide tablets. (DE #75-8 and 75-13).  The elimination of other possible causes is a factor that may be relied upon in determining whether the evidence may be submitted to a jury in a products liability case. *Williams v. O'Charley's, Inc.*, 728 S.E.2d 19 (N.C. Ct. App. 2012).  If the Court were to allow

4

the experts to testify as to their investigation and the elimination of all other potential causes, there would still be evidence sufficient to support a jury's finding as to causation even if the Court granted Defendants' Daubert Motion.  See *Wheelahan v. G D Searle & Co*., 814 F.2d 655 (4th Cir. 1987) (Unpublished and attached) where the court noted that causation maybe proved through a process of *elimination,* citing *In re Beverly Hills Fire Litigation*, 695 F.2d 207, 219 (6th Cir. 1982) (causation may be proved by showing absence of other causes), cert. denied sub nom. *Bryant Electric Co. v. Kiser*, 461 U.S. 929 (1983).

Furthermore, Plaintiffs' experts John Mueller and Dr. Steve Brown both testified in their depositions that IFC's method of application would have resulted in piling of tablets.  Mueller Dep. at 107, 109 (DE #87-5), Brown Dep. at 57, 60 (DE #87-7).  Mr. Mueller testified that he had observed ignition caused by piling of tablets and there is ample evidence of the ignition scenario resulting from piling of tablets as detailed in Plaintiffs' Memorandum in Opposition to Exclude.  Mueller Dep. at 47-51 (DE #87-5).  If the Court were to allow the introduction of evidence supporting the ignition scenario caused by piling of tablets, there would be sufficient evidence for a jury to determine the cause of the fire.

Until this Court rules on the motion to exclude, Plaintiffs do not know the nature or extent of the evidence they will be able to present to the jury.  A legitimate question of fact exists as to what evidence the Plaintiffs will be able to present and whether such evidence will be sufficient to support a jury's verdict as to causation.  In the event this Court grants Defendants' Motion to exclude the testimony of Lester Rich and/or John Schumacher, in whole or in part, Plaintiffs respectfully request they then be given the opportunity to respond to Defendants' argument and detail what would then be the available evidence that could support a finding by the jury as to causation.

## NEGLIGENCE AND NEGLIGENCE *PER SE* CAUSES OF ACTION

## II.     THE ECONOMIC LOSS DOCTRINE DOES NOT BAR PLAINTIFFS' CLAIMS FOR NEGLIGENCE AND NEGLIGENCE *PER SE*.

The Defendants argue that the economic loss doctrine precludes Plaintiffs' claims for negligence and negligence *per se*. However, this argument is based on a misapplication of the doctrine, which has not been expanded in North Carolina to pure service agreements. As previously held by this Court, even if deemed applicable, this case involves damage to "other property" and thus is not subject to operation of North Carolina's economic loss doctrine. Furthermore, the doctrine does not preclude a negligence or negligence *per se* claim arising from a common law or statutory duty existing independent of the contract.

### A.     The Economic Loss Doctrine has not expanded in North Carolina to pure service agreements and is not applicable to this Pesticide Application Agreement.

North Carolina has adopted the economic loss rule which prohibits a purchaser of a defective product from bringing a negligence action against the manufacturer or seller of that product to recover purely economic losses sustained as a result of that product's failure to perform as expected. Instead, such claims are governed by contract law. *Wilson v. Dryvit Sys., Inc.,* 206 F. Supp. 2d 749, 753 (E.D.N.C. 2002). The rationale for the economic loss rule is that the sale of goods is accomplished by contract and the parties are free to include or exclude provisions as to the parties' respective rights and remedies, should the product be defective. *Moore v. Coachmen Indus., Inc.,* 129 N.C. App. 389, 401-402, 499 S.E.2d 772, 780 (1998). When a product fails to perform as intended, economic loss results. *AT&T Corp. v. Med. Review of N.C., Inc.*, 876 F. Supp. 91, 94 (E.D.N.C. 1995). Economic loss is essentially the loss of the benefit of the user's bargain. *Id.* The courts have construed the term "economic losses" to

6

include damages to the product itself. *Moore v. Coachmen Indus., Inc.,* 129 N.C. App. 389, 401, 499 S.E.2d 772, 780 (1998).

The economic loss doctrine arises in the context of product liability cases. The court in *Ellis-Don Const., Inc. v. HKS, Inc.*, 353 F. Supp. 2d 603, 606 (M.D.N.C. 2004) noted that the North Carolina courts had not expanded the rule beyond its traditional role in product liability cases. While Defendants may argue the doctrine has been extended to pure service contracts, a review of the cases confirm work, in each instance, being performed on a tangible item. For example, in *North Carolina State Ports Auth. v. Lloyd A. Fry Roofing Co.,* 294 N.C. 73, 240 S.E.2d 345 (1978), described by the Court in its Order denying Defendants' Motion to Dismiss as a service agreement, the roofing contractor was constructing a roof on a transit shed and warehouse with the end result being a tangible item, i.e., a roof. In the case at bar, the Plaintiffs' agreement with Defendants was for the *application* of pesticide, a pure service agreement that did not involve the sale of goods or a defective product or result in a tangible item. It involved the application by certified personnel of a restricted use pesticide. As the economic loss doctrine is not applicable to a pure service agreement, it has no relevance with regard to Plaintiffs' negligence and negligence *per se* claims[1]

> **B.** **Even if the economic loss doctrine were applicable, the loss would clearly fall within the acknowledged exception pertaining to "damage to other property."**

The North Carolina Supreme Court in *North Carolina State Ports Auth. v. Lloyd A. Fry Roofing Co.,* 294 N.C. 73, 240 S.E.2d 345 (1978) acknowledged that there were "many decisions of this and other courts holding a promisor liable in a tort action for a personal injury or damage

---

[1] In this Court's Order Denying Defendants' Motion to Dismiss, it left open the question of whether the economic loss doctrine applies to service contracts. Plaintiffs acknowledge that this question need not be addressed given the Court's holding that the case involved damages that are not subject to operation of North Carolina's economic loss doctrine.

to property proximately caused by his negligent, or willful act or omission in the course of his performance of his contract." *Id.* at 81, 240 S.E.2d at 350. After recognizing that the categories of cases they exempted were not exclusive, the *Ports Authority* court listed four (4) exceptions.

> (1) The injury, proximately caused by the promisor's negligent act or omission in the performance of his contract, was an injury to the person or property of someone other than the promisee.

> (2) The injury, proximately caused by the promisor's negligent, or willful, act or omission in the performance of his contract, was to property of the promisee other than the property which was the subject of the contract, or was a personal injury to the promisee. See *Insurance Co. v. Sprinkler Co.* (promisee's merchandise damaged by water as a result of negligence in the installation of a sprinkler system; *Jewell v. Price* (promisee's house burned as a result of negligence in the installation of a furnace).

> (3) The injury, proximately caused by the promisor's negligent, or willful, act or omission in the performance of his contract, was **loss** of or damage to the promisee's property, which was the subject of the contract, the promisor being charged by law, as a matter of public policy, with the duty to use care in the safeguarding of the property from harm, as in the case of a common carrier, an innkeeper or other bailee.

> (4) The injury so caused was a willful injury to or a conversion of the property of the promisee, which was the subject of the contract, by the promisor.

*Id.* at 82, 240 S.E.2d at 350-351.

Exception No. 2 pertains to damage caused to property "other than the property which was the subject of the contract." This exception has routinely been expressed by courts with conventional product liability language: "Where a defective product causes damage to property other than the product itself, losses attributable to the defective product are recoverable in tort rather than contract." *Moore v. Coachmen Indus., Inc.,* 129 N.C. App. 389, 402, 499 S.E.2d 772, 780 (1998)**;** *see also Reece v. Homette Corp.,* 110 N.C. App. 462, 467, 429 S.E.2d 768, 770 (1993)**.**

Defendants have again resurrected the same argument already rejected by this Court that the real and personal property that they damaged as a result of their negligent application of the

8

fumigant, i.e., the Dome and the stored peanuts, were actually "the subject of the contract" and not "other property" of the Plaintiffs. They seek to ignore that they were retained and paid as licensed and certified *applicators* of pesticide. This argument, however, is patently disingenuous. The very title of the agreement, i.e., Pesticide *Application* Agreement (emphasis added) confirms the Defendants agreed to provide a service to the Plaintiffs.

Paragraph 8 (h)(ii) of the agreement exposes the fallacy in their "subject matter" argument. That provision states:

> Charges for services provided under this Agreement are based solely upon the value of the services provided and are not related to the value of Client's premises or the contents therein.

This statement is a clear expression that the subject matter of the agreement is a service, that is the application of the pesticide. The storage facility and/or its contents (i.e., property other than the subject matter) are not the focal point of the contract nor in any way determinative in calculating the charges for the services provided. To maintain that the Dome and peanuts are the subject matter of the agreement is to ignore the clear and expressed purpose in the contract for which Defendants were hired as well as the basis on which they were paid.

As noted by this Court, in explaining Exception No. 2 dealing with "damage to property other than the subject matter," *Ports Authority* selected as an example and cited *Firemen's Mut. Ins. Co. v. High Point Sprinkler Co.,* 266 N.C. 134, 146 S.E.2d 53 (1966). The damage to the Dome and peanuts fit neatly within the parameters of *Firemen's*. The defendant in *Firemen's* contracted to convert a wet sprinkler system to a dry sprinkler system in a warehouse owned by the plaintiffs' insured. Due to the defendant's alleged negligence, water in the sprinkler system piping froze, caused the pipes to split, and damaged the insured's property. The plaintiff brought a negligence claim against the defendant sprinkler company, and the trial court nonsuited the

9

action after plaintiff had presented its evidence. In reversing the trial court and allowing the

negligence action to proceed, the North Carolina Supreme Court stated: "The law imposes upon

every person who enters upon an active course of conduct the positive duty to exercise ordinary

care to protect others from harm and calls a violation of that duty negligence." *Id.* at 140, 146

S.E.2d at 60-61. (*citing Council v. Dickerson's, Inc.*, 233 N.C. 472, 474, 64 S.E.2d 551, 553

(1951)).

> The duty to use due care, the breach of which gives rise to a tort action for
> negligence in favor of one injured thereby in his person or property may arise out
> of a contract. A breach of contract nothing else appearing does not give rise to an
> action in tort. 38 *Am. Jur. Negligence* § 20 (1966). However, the making of the
> contract may give rise to a relationship between the parties to use due care so as
> not to injure the person or property of the other. In that event, the failure to use
> such care resulting injury to the person or property of the other party gives him a
> right of action in tort for such negligent injury."

*Id*. at 141, 146 S.E.2d at 60.

The defendant in *Firemen's* was contracted to perform work in the warehouse. The

sprinkler system that the defendant contracted to install was to protect the building and contents

in the event of a fire. If one were to apply the argument advanced by Defendants in the present

case, the warehouse and its contents would be considered the subject matter of the contract and

thus outside Exception No. 2 ("other property"). However, in direct contradiction to Defendants'

specious argument, *Ports Authority* deemed the damage to the contents of the warehouse in

*Firemen's* to be damage to *other property of the promisee*. For this same reason, in the case at

bar, damage to the Dome and peanuts due to the negligent application of fumigant was *damage

to other property of the promisee* and thus within Exception No. 2.

Defendants cite the unreported decision of *Crop Prod. Servs., v. Ormand*, 4:11-CV-41 D

(E.D.N.C. Jan. 18, 2012) as support for the application of the economic loss doctrine. Contrary

to Defendants' assertions, the subject matter of the contract between CPS, the chemical and

fertilizer supplier, and Ormand was not simply the application of pesticides. Rather, the contract was for agronomic services which included soil sampling, monitoring and specific recommendations regarding chemicals to be applied to the crops. CPS recommended various mixtures of chemicals which CPS manufactured and distributed and later recommended additional products to counteract the effects of a previously applied product. Ormand followed the recommendations which resulted in severely depressed crop production. When Ormand refused to pay for CPS' products and services, CPS sued. Ormand then counterclaimed and alleged numerous causes of action described by the court as "far reaching" including tortious interference with contract, unfair and deceptive trade practices, treble damages, negligence and negligent misrepresentation.

In addressing the economic loss doctrine, the court noted that the rationale for the rule is that it confines a party to the contract terms when seeking redress concerning the subject matter of the contract. The court observed that Ormand was alleging CPS was negligent in describing and recommending products resulting in damages. It then pointed out that the parties had specifically contracted for CPS to recommend appropriate products. *Id.* at *21. As such, the subject matter of the contract included the recommendations by CPS for which Ormand sought redress.[2] By contrast, in the case at bar, the subject matter of the contract was the application of the pesticide.

Put simply, in *Crop Prod. Services*, Ormand sought redress because of the economic loss which occurred when CPS' recommendations failed to yield the crop production that Ormand expected. In the present case, however, Plaintiffs do not seek redress because Defendants'

---

[2] *Accord Maynard Co-op. Co. v. Zeneca, Inc.,* 143 F.3d 1099, 1100–03 (8th Cir.1998) (economic loss rule barred farmer's tort claims against defendant who recommended crop chemical that did not perform as described); *Bailey Farms, Inc. v. NOR–AM Chem. Co.,* 27 F.3d 188, 190–92 (6th Cir.1994) (economic loss rule barred farmer's tort claims against defendant who recommended fumigant that damaged crops).

11

pesticide application failed to control pests; instead, Plaintiffs bring this claim because Defendants' negligent application of the pesticide, in violation of warnings that have the force of law, caused a catastrophic fire and explosion that destroyed the Dome and peanuts.

Defendants further argue that their contractual obligations to apply the fumigant could not have been performed without purposeful contact with both the peanuts and the dome. They seek to expand the subject matter of the contract to cover all contact with any property necessary to apply the fumigant. However, simply performing work that creates contact with existing property does not convert the existing property into the subject of the contract.[3]

As certified applicators, Defendants applied the aluminum phosphide tablets into a domed structure holding approximately 20 million pounds of peanuts for the sole purpose of killing insects. From a product liability standpoint, if one were to somehow consider the fumigation itself as a "product," Defendants would be adding the fumigant to a pre-existing structure storing farmer stock peanuts. When faced with the introduction of a new product into a pre-existing product, the court in *Indem. Ins. Co. of N. Am. v. Am. Eurocopter LLC,* 1:03CV949, (M.D.N.C. July 8, 2005) (Unpublished and attached) held the economic loss doctrine did not bar the negligence claim for damage to the pre-existing product:

> In the context of replacement parts that are integrated into a product already owned by the user, this Court finds that the approach most consistent with North Carolina law would recognize that where a user purchases a product (such as a light bulb) and then installs the product into other property already owned by the user (such as a light fixture in the user's pre-existing home), the product that is sold by the light bulb manufacturer into the stream of commerce to the user pursuant to its own terms of sale would constitute the "product itself." Thus, if the light bulb were negligently manufactured and as a result exploded, causing a fire that destroyed the user's home in which it was installed, the economic loss rule would not preclude the homeowner from pursuing a negligence claim against the light bulb manufacturer for the damage to his home. *Id.* at *14.

---

[3] The *Firemen's* court noted "[a] carpenter who contracts to repair a house is liable in damages if he performs the repair so unskillfully as to damage other portions of the structure." *Id.* at 141, 146 S.E.2d at 60. As such, it is obvious that doing repair work in or around a house does not make the entire house the subject of the contract.

Defendants argue that the Pesticide Application Agreement also lists the location of the fumigation and the commodity. However, the Fumitoxin Applicator's Manual lists over 130 raw agricultural commodities, processed foods, and nonfood commodities that may be fumigated with Fumitoxin, as well as a myriad of possible fumigation sites. Memorializing the location of the site or identifying the commodity doesn't alter the fact that IFC was paid solely for their professional services as certified applicators in applying a restricted use fumigant. The purpose of the contract was to allow a trained and certified individual to apply a restricted use fumigant in order to kill the insects and it was anticipated that the commodity and storage site would vary.

In their effort to again argue that the subject matter of the pesticide application agreement was actually the Dome and peanuts rather than the fumigation services, Defendants attempt to skew the meaning of certain deposition testimony by R.P. Watson. After asking Mr. Watson about the contract and whether it was the building or peanuts that were being treated, Defendants' counsel slipped in a question in which he dropped the term "treating."

> Q: So, in other words, your understanding is its not the specific commodity or quantity of that commodity that's being treated; it is the space in the interior of the structure.
> A. The area.
>
> Q: Would you agree with me that the subject matter of this contract was the dome and the interior space of the dome?
> A. I mean, the idea of this contract was to treat the peanuts, but in order to treat the peanuts, you have to treat the area.
> Watson Dep. pp. 289-290 (Exhibit A).

A review of the deposition transcript shows (1) despite Defendants counsel's attempt to "lead" Mr. Watson down a path where he would ultimately agree that the subject matter of the contract was the Dome and peanuts, Mr. Watson consistently testified that the purpose of the contract was the "treatment" (i.e., the fumigation), and (2) Mr. Watson later clarified his testimony by stating:

The Witness: The question to me as pertaining to the subject of the fumigation of the – the – I'm not sure I was clear on that. But the subject was the actual service that they were providing in fumigation.

Watson Dep. p. 329 (Exhibit A).

The pesticide application agreement states on its face that it is for the *treatment* of commodities and/or space and that the charges are based solely on the services provided. Taken in the light most favorable to the Plaintiffs, the testimony of Mr. Watson simply confirms that IFC was hired to perform a service. The most that can be said for Defendants' argument is that it raises its own question of fact.

The Defendants did not manufacture, construct, design, install or sell the Dome to the Plaintiffs. Defendants did not produce or sell the peanuts. They simply contracted with Plaintiffs for the application of pesticide in an attempt to eradicate flour beetles and Indian meal moths. Their negligent application of the pesticide resulted in damage to other property and the resulting claim for damage to the other property (Dome and peanuts) falls clearly within the *Ports Authority* Exception No. 2.

For the above reasons, and as previously held by this Court, the economic loss doctrine does not preclude Plaintiffs' claims for negligence and negligence *per se*.[4]

C.    **Defendants are liable for all damages naturally flowing from their negligence.**

Defendants argue that the *Ports Authority* Exception No. 2 allowing the Plaintiffs to proceed in tort would apply only to the peanuts and Dome and not to other losses resulting from the destruction of this "other property." They cite no North Carolina case law that would so restrict the recoverable damages in this tort action. Defendants, having negligently destroyed this "other property," are liable for all damages naturally flowing from their negligent act

---

[4] Defendants cite this Court's recent decision in *Cooke v. Stanley Steemer Southern Virginia, LLC* No. 2:13-cv-32-BO, slip op. at 3-4 (Sept. 20, 2013) as a basis for dismissing the negligence *per se* claim. However, that opinion clearly states the negligence *per se* claim was dismissed because plaintiff failed to properly allege all of the necessary elements in her complaint. There was no reference to the economic loss doctrine.

including debris removal, fire suppression and loss of business income. *Binder v. Gen. Motors Acceptance Corp.*, 222 N.C. 512, 514, 23 S.E.2d 894, 895 (1943).[5]

### III. DEFENDANTS BREACHED COMMON LAW AND STATUTORY DUTIES THAT WERE SEPARATE AND INDEPENDENT OF THE "PESTICIDE APPLICATION AGREEMENT" AND FOR WHICH THE COURT ALLOWS CLAIMS IN TORT.

Defendants argue that Plaintiffs are precluded from suing in negligence because the Pesticide Application Agreement contains certain obligations of the parties. In effect they argue that since the agreement restates certain statutory and common law obligations of the parties, the only redress available to Plaintiffs for Defendants' breaches of the obligations would be in contract. However, applicable North Carolina law allows for the same act to give rise to both a tort and contract claim and the circumstances of this case support both tort and contractual remedies.

To pursue both tort and contract claims arising out of the same conduct, "a plaintiff must allege a duty owed him by the defendant separate and distinct from any duty owed under a contract. *Kelly v. Georgia-Pacific LLC*, 671 F. Supp. 2d 785, 791 (E.D.N.C. 2009), *quoting Vanwyk Textile Sys. B.V v. Zimmer Mach. America, Inc.*, 994 F. Supp. 350, 362 (W.D.N.C. 1997).

> The duty owed by a defendant to a plaintiff may have sprung from a contractual promise made to another; however, the duty sued on in a negligence action is not the contractual promise but the duty to use reasonable care in affirmatively performing that promise. The duty exists independent of the contract.

*Oates v. Jag, Inc.*, 314 N.C. 276, 279-280 333 S.E.2d 222, 225 (1985), *quoting Navajo Circle, Inc. v. Dev. Concepts Corp.*, 373 So.2d 689, 691 (Fla. Dist. Ct. App. 1979).

---

[5] "It is well established that, in a "pure tort," the case presented here, the wrongdoer is responsible for all damages directly caused by his misconduct, and for all indirect or consequential damages which are the natural and probable effect of the wrong, under the facts as they exist at the time the same is committed and which can be ascertained with a reasonable degree of certainty." *Binder v. Gen. Motors Acceptance Corp.*, 222 N.C. 512, 514, 23 S.E.2d 894, 895 (1943).

The application of the fumigant by Defendants in this case involved a highly toxic and potentially explosive pesticide and Defendants' work was regulated by FIFRA and the North Carolina Pesticide Law of 1971. This fumigant could only be applied by trained and certified applicators in accordance with the label instructions. (DE #87-12, 13). The duties and responsibilities of Defendants contained in and established by federal and state statute and are separate, distinct and independent of the duties and obligations contained in the agreement.

FIFRA and the North Carolina Pesticide Law are safety statutes. "A public safety statute is one 'impos[ing] upon [the defendant] a specific duty for the protection of others.'" *Stein v. Asheville City Bd. Of Educ.,* 360 N.C. 321, 326, 626 S.E.2d. 263, 266 (2006), *quoting Lutz Indus., Inc. v. Dixie Home Stores*, 242 N.C. 332, 341, 88 S.E.2d 333, 339 (1955). When a statute imposes a duty on a person for the protection of others, we have held that it is a public safety statute and a violation of such a statute is negligence *per se* unless the statute says otherwise. "A member of a class protected by a public safety statute has a claim against anyone who violates such a statute when the violation is the proximate cause of injury to the claimant." *Hart v. Ivey,* 332 N.C. 299, 303, 420 S.E.2d 174, 177 (1992), *citing Aldridge v. Hasty,* 240 N.C. 353, 359, 82 S.E.2d 331, 337-338 (1954).

In *Oates v. Jag*, the North Carolina Supreme Court considered claims by a subsequent purchaser against the original contractor of a house and acknowledged negligence *per se* claims based upon violations of statute. 314 N.C. 276, 281, 333 S.E.2d. 222, 226 (1985). The court held in that case:

> Therefore, regardless of the validity of any claim based on a breach of warranty, plaintiffs' complaint sufficiently states a claim for negligence. In fact, plaintiffs' complaint alleges five specific violations of the North Carolina Uniform Residential Building Code. The North Carolina Uniform Residential Building Code has been held to have the force of law and a violation thereof is negligence *per se.*

16

*Id.* at 280, 333 S.E.2d at 225, citing *Drum v. Bisaner,* 252 N.C. 305, 309, 113 S.E.2d 560, 563-564 (1960).

Defendants assumed a statutory duty to Plaintiffs to perform their services in compliance with these public safety statutes, which were enacted to protect a class of persons that included Plaintiffs. This is a duty imposed upon Defendants by statute and that duty is independent of Defendants' obligations under the contract. N.C. Gen. Stat. § 143-443(b)(3) of the North Carolina Pesticide Law of 1971 specifically provides that it shall be unlawful for any person to use any pesticide in a manner inconsistent with its labeling. Taken in the light most favorable to Plaintiffs, the piling of the tablets by Defendants would constitute a violation of this statutory duty, a duty independent of the contract. "It is well settled law in this jurisdiction, that when a statute imposes upon a person a specific duty for the protection of others, that a violation of such statute is negligence *per se*." *Drum v. Bisaner,* 252 N.C. 305, 309, 113 S.E.2d 560, 564 (1960).

Furthermore, in addition to Plaintiffs' negligence *per se* claim, in North Carolina the law imposes upon every person who enters upon an active course of conduct the positive duty to exercise ordinary care to protect others from harm and calls a violation of that duty negligence.

> The duty to protect others from harm arises whenever one person is by circumstances placed in such a position toward another that anyone of ordinary sense who thinks will at once recognize that if he does not use ordinary care and skill in his own conduct with regard to those circumstances, he will cause danger of injury to person or property of the other. The duty to use due care may arise out of contractual relations.

*Davidson & Jones, v. New Hanover County*, 41 N.C. App. 661, 666, 255 S.E.2d 580, 584 (1979).

In the present case the statutory requirement of licensing and certification of the Defendants as applicators of the fumigant supported the expectation and reliance by Plaintiffs that Defendants would perform their duties in a manner so as to protect them from harm to person and property. Their failure to exercise due care and to protect the Plaintiffs from harm

17

while applying the extremely dangerous and potentially explosive pesticide supports an independent claim of negligence.

Plaintiffs are not pursuing a remedy for the failure of the pesticide to control the pest infestation. They are pursuing claims in tort for damages to their property arising from Defendants' breach of both common law and statutory obligations. Having undertaken to apply the dangerous pesticides, the Defendants have breached their positive duty to exercise ordinary care to protect others from harm. They have breached the obligation to protect the public from harm inherent in the safety statutes. In addition, Defendants have breached their statutory obligation to follow the instructions of the pesticide label as specifically stated in the safety statute. The duties breached by Defendants were not those exclusively defined by and assumed in the contract. The law allows for the same act to give rise to both a tort and contract claim. *See Kelly v. Georgia-Pacific LLC,* 671 F. Supp. 2d 785, 791 (E.D.N.C. 2009).

Defendants argue that if the duties were stated in the agreement, then Plaintiffs are precluded from suing in negligence. However, the fact that the Pesticide Application Agreement restates an obligation does not nullify or subsume the duties that existed independently of the contract. The requirement to follow the instructions of the labeling was an independent duty that Defendants were obligated by statute to accept and the insertion and repetition of this specific requirement in the body of the agreement does not in any way diminish or alter Defendants' statutorily mandated responsibilities or eliminate the remedies available to Plaintiffs in the event the duties are breached.

The same argument was made in a case heard before the Supreme Court of Virginia where homeowners brought claims including negligence and negligence *per se* against a

fumigation company for damaging their home.  In allowing the homeowners to go forward with

their negligence counts, the court stated:

> Just because the application of pesticides is included in AAPC's contractual duty
> to control pests, it does not follow that the Kaltmans have contracted away their
> common law and statutory rights.  Because the Kaltmans have alleged that
> AAPC and Harrison breached common law and statutory duties independent of
> the company's contractual duty to control pests, we hold the trial court erred
> when it sustained the demurrers to the Kaltmans' negligence counts.

*Kaltman v. American Pest Control, Inc*., 281 Va. 483, 493, 706 S.E.2d 864, 870 (2011).

Defendants have cited *Nudelman v. J. A. Booe Bldg. Contractor, Inc.*, 2003 N.C. App.

LEXIS 509 (N.C. Ct. App. March 4, 2003) in support of their argument that the economic loss

doctrine precludes claims for breach of statutory duties.  In *Nudelman,* a products liability case, a

homeowner alleged that the builders of his defective home violated the North Carolina State

Building Code.  Though not clearly stated in the opinion, the homeowner apparently argued that

the violations of the building code were violations of a duty imposed as a matter of "public

policy" thereby bringing their claim under the Exception No. 3 in *Ports Authority* which would

allow them to proceed in tort.  After referencing *Ports Authority* and specifically citing

Exception No. 3 and its "public policy" reference, the Court of Appeals stated:  "However, we

do not believe this argument is persuasive."  The Court gave no further explanation.

Exception No. 3 addresses a party's obligations involving damage to **property that is the**

**subject of the contract** and where the:  "[p]romisor being charged by law, **as a matter of public**

**policy**, **with the duty to use care in the safe guarding of the property from harm**, as in the

case of a common carrier, an innkeeper or other bailee".  *North Carolina State Ports Auth. v.*

*Lloyd A. Frye Roofing Co.,* 294 N.C. 73, 82, 240 S.E.2d 345, 350-351 (1978) (emphasis added).

The argument advanced in *Nudelman* is easily distinguishable and not the basis of the

allegations in the case at bar.  In the first instance, we are not dealing with a products liability

19

claim where the damaged product was the subject of the contract. Secondly, Plaintiffs are not

claiming that defendants breached a duty imposed by public policy to protect the "product" from

harm as stated in *Ports Authority* exception No. 3. Plaintiffs, in the case at bar, have alleged a

violation of a safety statute designed to protect the *public* from harm, a duty independent from

the agreement, supporting a negligence *per se* claim.

**BREACH OF CONTRACT CAUSE OF ACTION**

IV.    **THE DAMAGES ARE NOT EXCLUDED BY CONTRACT, AS THE LIMITATION PROVISIONS ARE VOID AS AGAINST PUBLIC POLICY AS WELL AS AMBIGUOUS AND CONTRADICTORY.**

Defendants also maintain that all of the damages under Plaintiffs' breach of contract

claims are excluded by the service agreement's express terms. However, these limitation

provisions are void as against public policy as they involve an industry heavily regulated by state

and federal authorities and are for the protection of the health and safety of the public.

Furthermore, these provisions are ambiguous and contradictory and would ultimately be for a

jury to interpret.

A.    **The limitation of liability provisions in the Pesticide Appliation Agreement are void as against public policy.**

"Freedom of contract is a fundamental basic right. However, the public interest is

paramount." *Gibbs v. Carolina Power & Light,* 265 N.C. 459, 467, 144 S.E.2d 393, 400 (1965).

The case law in North Carolina has made it quite clear that limitations of liability and

exculpatory clauses involving the public health or safety, such as the limitations contained in the

Pesticide Application Agreement, are against public policy and as such, are unenforceable.

The general rule in North Carolina is that contracting parties may, with a few exceptions,

agree to limitations on liability for ordinary negligence with the agreements being strictly

construed against the party relying on the agreement. *Hall v. Sinclair Refining Co.,* 242 N.C.

707, 710, 89 S.E.2d 396, 398 (1955). All such otherwise valid limiting agreements are void as contrary to public policy, however, when they relate to transactions affected with substantial public interest or colored by inequality of bargaining power. *Tatham v. Hoke,* 469 F. Supp. 914, 917-918 (W.D.N.C. 1979).

"While recognizing the right to contract against liability, our courts have stated 'that a party cannot protect himself by contract[ing] against liability for negligence in the performance of a duty of public service, or where a public duty is owed, or public interest is involved.'" *Fortson v. McClellan,* 131 N.C. App. 635, 637, 508 S.E.2d 549, 551 (1998), *quoting Alston v. Monk*, 92 N.C. App. 59, 64, 373 S.E.2d 463, 366 (1988), *disc. review denied*, 324 N.C. 246, 378 S.E.2d 420 (1989) (*quoting Hall v. Sinclair Refining Co.,* 242 N.C. 707, 710, 89 S.E.2d 396, 398 (1955)).

"An activity falls within the public policy exception when the activity is extensively regulated to protect the public from danger, and it would violate public policy to allow those engaged in such an activity to 'absolve themselves from the duty to use reasonable care.'" *Id. See also Tatham v. Hoke,* 469 F. Supp. 914, 918 (W.D.N.C. 1979), *aff'd,* 622 F.2d 587 (1980) (holding that exculpatory contracts between physician and patient are unenforceable because medicine is "heavily regulated by state authorities who have demonstrated the public interest in the activity"); *Alston v. Monk,* 92 N.C. App 59, 64, 373 S.E.2d 463, 466-467 (1988) (holding that exculpatory agreement with a cosmetology school unenforceable because cosmetology is a licensed activity "extensively regulated" by the State).

The public interest exception is applicable to the case at bar as the pesticide industry is a heavily regulated industry with extensive federal and state statutory regulations. More importantly, the primary interest protected is the **health and safety of the public**.

21

The North Carolina Pesticide Law of 1971 states in pertinent part in N.C. Gen. Stat. § 143-435(b):

The purpose of this Article is to **regulate in the public interest** the use, **application**, sale, disposal and registration of insecticides, fungicides, herbicides… and any other pesticides designated by the North Carolina Pesticide Board….

… it is hereby **declared to be the policy of the State of North Carolina** that for the protection of the **health, safety, and welfare** of the people of this State, and for the promotion of a more secure, healthy and safe environment for all the people of the State, the future sale, use and **application** of pesticides shall be regulated, supervised and controlled by the State in the manner herein provided. (emphasis added).

Defendants rely on *Blaylock Grading Co., LLP v. Smith*, 189 N.C. App. 508, 658 S.E.2d 680 (2008) in support of their position. In *Blaylock*, the North Carolina Court of Appeals considered a provision limiting damages that a grading company would owe to a surveying company "for all injuries, claims, losses, expenses, damages or claim expenses arising out of the agreement" to $50,000. *Id.* at 509, 658 S.E.2d at 681. The trial was bifurcated with the first phase considering the claims for breach of contract and negligence and the second phase considering the validity of the limitation. The jury found that the defendants had breached the contract and were negligent and determined the risk allocation provision was void as against public policy. The court of appeals considered the matter and held the limitation on liability was valid. However, in supporting its holding and finding that this limitation did not violate public policy, the *Blaylock* court explained that the breach only involved economic losses and did not involve the health and safety of the public. *Id.* at 512, 658 S.E.2d at 683.

The court stated:

Further, when a breach of contract between two parties involves only economic loss, as in the present case, the health and safety of the public are not implicated. **… Thus, the limitation on liability in the contract at issue does not implicate the public health or safety.** (emphasis added)

22

As such, the court implies that the holding would be different if, in fact, the health and safety of the public were implicated, as in the case at bar.

In its Order denying the Defendants' Motion to Dismiss, this Court cited *Blaylock* for the proposition that that even companies in "extensively regulated" industries are permitted to limit their liability by contract. However, unlike the land surveying industry in *Blaylock,* the fumigation industry, dealing with application of highly toxic and flammable chemicals in public settings, is not simply an "extensively regulated" industry. An industry may be steeped in government regulations even though its activities do not immediately or directly impact the health and safety of the public. As stated by the court in *Blaylock*:

> While it is true that surveying is regulated by statute in North Carolina and that engineers and land surveyors in our State must be licensed, *see* N.C.G.S. § 89C-23 (2007), these facts alone do not automatically convert a profession into a public service. *Blaylock* at 683 (2008).

When, however, in accordance with the holding in *Blaylock*, the safety of the public is directly at issue, as in the case at bar, then public policy must be considered.[6] As articulated in the controlling statute, the pesticide industry is regulated to protect the public from danger and thus defendants' activities fall squarely within the public policy exception.

B. <u>**The limitation provisions contained in the Pesticide Application Agreement are ambiguous and contradictory and would be for a jury to interpret.**</u>

The Pesticide Application Agreement is a contract provided by Defendants to Severn and its provisions, including its attempt to limit or exculpate themselves from liability, are riddled with contradictions and ambiguities. Ward Dep. p. 24, 29 (Exhibit B) (DE #34-1). "If there is any uncertainty as to what the agreement is between the parties, a contract is ambiguous." *Crider v. Jones Island Club, Inc.*, 147 N.C. App 262, 267, 554 S.E.2d 863, 867 (2001). "An

---

[6] Furthermore, in the present case, the second element necessary for invoking the public policy exception in *Blaylock* is met as we are not concerned with only *economic losses* since the fire catastrophically destroyed "other property" including the Dome and 20 million pounds of peanuts.

ambiguity in a written contract is to be construed against the party who prepared the instrument."

*Root v. Allstate Ins. Co.,* 272 N.C. 580, 585, 158 S.E.2d 829, 834 (1968). "A contract is ambiguous when the writing leaves it uncertain as to what the agreement was." *Majestic Cinema Holdings, LLC v. High Point Cinema,* 191 N.C. App. 163, 165, 662 S.E.2d 20, 22 (2008), *quoting Salvaggio v. New Breed Transfer Corp.,* 150 N.C. App. 688, 690, 564 S.E.2d 641, 643 (2002) (citations and internal quotations omitted.) "A contract that is plain and unambiguous on its face will be interpreted by the court as a matter of law. When an agreement is ambiguous and the intention of the parties is unclear, however, interpretation of the contract is for the jury." *Majestic Cinema Holdings, LLC. v. High Point Cinema*, 191 N.C. App. 163, 165, 662 S.E.2d 20, 22 (2008), *quoting Schenkel & Schultz, Inc. v. Hermon F. Fox & Assocs., P.C.,* 362 N.C. 269, 273, 658 S.E.2d 918, 921 (2008) (internal citations omitted).

The agreement, drafted by the Defendants, contains terms addressing liability and insurance coverage by Defendants that are confusing, contradictory and ambiguous.

- Paragraph 7(b) states in pertinent part:
  IFC shall in no event be liable for consequential damages for breach, if any of such limited warranties, or resulting from the performance of its services and use of any products pursuant hereto.

- Paragraph 7(e) states in pertinent part:
  IFC maintains public liability and property damage insurance….

- Paragraph 8(h) states in pertinent part:
  Since it is impractical and extremely difficult to fix actual damages which may arise due to the actions or inactions of IFC or its employees, if, notwithstanding the above provisions, there should arise any liability on the part of IFC, such liability shall be limited to IFC's applicable insurance coverage and/or limits.

Defendants first attempt to escape from liability through a provision stating they are not liable for damages resulting from the performance of their services. The agreement then follows with a declaration that IFC does, in fact, maintain "property damage insurance." IFC's

customers would be expected to rely on this statement and understand that IFC carries such insurance to cover property that is damaged by IFC. The agreement then states that any liability would be limited to its applicable insurance coverage and/or limits. Although IFC acknowledges it maintains the insurance coverage, it fails to disclose its applicable limits, rendering these provisions even more vague and uncertain.

In summary, the agreement contains clauses that (1) deny all liability for property damage, (2) declare and assure the customer that IFC has property damage coverage, and (3) limit liability for damages to an un-quantified amount of insurance coverage. These provisions are contradictory and ambiguous and their meaning uncertain.

In addition, Paragraph 7(b) is ambiguous on its face as it is unclear whether Defendants are attempting to limit their liability arising from the performance of their services to "consequential damages" or attempting to totally exculpate themselves from *all* liability from such performance. In any event, Paragraph 7(c) states that Defendants do not guarantee 100% control of the pests or re-infestation. As Defendants are attempting to distance themselves from consequential damages as well as accountability for the result and quality of their work as pesticide applicators, one must question exactly what liability, if any, Defendants are assuming in the agreement.

The contractual provisions are open to various interpretations and are far from clear and explicit. As stated in this Court's Order Denying Defendants' Motion to Dismiss, the question as to what may be direct or consequential damages in their breach of contract claim is subject to debate. Direct and consequential damages arising from the eradication of the insects were addressed in the contract as they involve the expectations of the parties. However, damages flowing from the unanticipated catastrophic loss of the Dome and peanuts are outside the scope

25

of the contract along with its contractual limitations as the intended bargain never included the sudden and utter destruction of Severn's property.

Under the appropriate Rule 56 analysis, the interpretation of Defendants' limitation and/or exculpatory provisions must be construed in the light most favorable to the Plaintiffs. At the very least, the meaning of such ambiguous provisions would ultimately be for a jury to determine at trial.

C.     **The limitations contained in the Pesticide Application Agreement do not bar recovery on the negligence claims.**

Defendants argue that the contract's limitation of consequential damages precludes Plaintiffs from recovering even in negligence. At the outset, their argument fails as this limitation is void as against public policy. As discussed, the application of the pesticide is extensively regulated and the health and safety of the public is directly implicated.

In addition, there is no clear language addressing exemption from negligence in the contract. "Contracts for exemption from liability for negligence are not favored by law, and are strictly construed against the party asserting it." *Winkler v. Appalachian Amusement Co*., 238 N.C. 589, 596, 79 S.E.2d 185, 190 (1953). A contract will never be interpreted as exempting a party from liability for negligence in the absence of clear and explicit words showing such intent of the parties. *Id.* Inferences in a contract as to the intent of the parties are insufficient to waive liability for negligence. See *William F. Freeman, Inc. v. Alderman Photo Co.,* 89 N.C. App. 73, 76, 365 S.E.2d 183, 185 (1988). The "Pesticide Application Agreement" contains no clear or explicit language referencing "negligence" or waiving liability for "negligence" by the applicator.

Defendants cite *Moore v. Coachmen Indus., Inc.,* 129 N.C. App. 389, 499 S.E.2d 772 (1998) in support of their argument. Initially, it should be noted that *Moore* is a products

26

liability case governed by the UCC involving a recreational vehicle. As the claim involved damage to the recreational vehicle, which was the subject of the contract, the court held the economic loss doctrine applied.

After stating the economic loss doctrine prevented the plaintiff from recovering on their negligence claim for the recreational vehicle, it stated that furthermore, the limited warranty prevented the plaintiffs from recovering on their incidental or consequential damages which included personal property. No further explanation or analysis of the holding was provided by the court. Although Defendants maintain this case negates the entire *Ports Authority* Exception No. 2 and that a negligence claim for "other property" is now controlled by a contract, even the language of *Moore* does not support such an interpretation.

The *Moore* court cited the controlling case law and reiterated:

> Where a defective product causes damage to property other than the product itself, losses attributable to the defective product are recoverable in tort rather than contract, *citing Reece* 110 N.C. App. 462, 467, 429 S.E.2d 768, 770.

Furthermore, no subsequent North Carolina court has even suggested such a fundamental change in North Carolina law. In *Lord v. Customized Consulting Specialty, Inc.*, 182 N.C. App. 635, 639, 643 S.E.2d 28, 30 (2007), the North Carolina Court of Appeals reviewed the economic loss doctrine, referenced the earlier *Moore* case and, contrary to Defendants' argument, again stated the controlling law with regard to the *Ports Authority* exception No. 2 quoting:

> A claimant may, however, recover in tort rather than contract for damages to property other than the product itself, if the losses are attributable to the defective product. *Id.* at 639.

North Carolina case law provides that a party may bring a claim in negligence for damage to "other property" and contractual language pertaining to consequential damages does not control or override the tort claim.

# V. SUFFICIENT EVIDENCE EXISTS TO PIERCE THE CORPORATE VEIL.

North Carolina courts use the "instrumentality rule" to determine whether to disregard the corporate entity and hold parent or affiliated corporations or shareholders liable for the acts of a corporation. *E. Mkt. St. Square, Inc. v. Tycorp Pizza IV, Inc.,* 175 N.C. App. 628, 632-33, 625 S.E.2d 191, 196 (2006). The first element necessary to pierce the corporate veil under the instrumentality rule involves control, which is described as "not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own." *Id.*

Defendants argue that there is insufficient evidence for Plaintiffs to prove Rollins operated IFC as its own instrumentality. The courts have noted certain factors that may be considered in order to determine if control exists including: (1) inadequate capitalization; (2) non-compliance with corporate formalities; (3) complete domination and control; and (4) excessive fragmentation. *Fischer Inv. Capital, Inc. v. Catawba Dev. Corp.,* 200 N.C. App. 644, 651, 689 S.E.2d 143, 148 (2009). However, in reviewing factors, the *Fischer* court stated:

> "[T]he presence or absence of any particular factor ... is [not] determinative." *Tycorp Pizza IV, Inc.,* 175 N.C.App. at 636, 625 S.E.2d at 198. "Rather, it is a combination of factors which ... suggest that the corporate entity attacked had 'no separate mind, will or existence of its own' and was therefore the 'mere instrumentality or tool' of the dominant corporation." *Id.,* 175 N.C.App. at 636, 625 S.E.2d at 198 (quoting *Wagner,* 313 N.C. at 458, 329 S.E.2d at 332).

While Defendants argue that there is no evidence to support piercing the corporate veil, the testimony of the Rollins 30(b)(6) representative Joseph Ward, confirms the control and domination Rollins exercised over IFC. In particular, Mr. Ward confirmed that Rollins provided legal, human resource, payroll, fleet department and risk management services to IFC. He confirmed that IFC's back office functions were assumed by Rollins. Furthermore, Mr. Ward

28

testified that Rollins (1) trained employees of IFC with advanced tools, techniques and facilities, (2) conducted background checks for new IFC employees, and (3) conducted quality inspection controls to ensure IFC's employees complied with state and federal laws governing pesticides. Ward Dep. at pps. 44, 48, 62 and 70-74. (Exhibit B). This training or lack thereof, including the alleged non-compliance with the statutory requirements for the application of pesticides, goes to the very heart of this case. It was Rollins that sent an agent to the site of the fire after its discovery and who advised all parties that Rollins would take responsibility for suppressing the fire. It was Rollins who, on its own behalf, contracted with the fire suppression company.

A review of the Rollins annual report shows the finances of IFC are combined with all of the other subsidiaries. Ward Dep. p. 41 Exh. 160. (Exhibit C). Furthermore, as also noted in the annual report, Rollins holds itself out as the largest commercial pest control provider in North America and does so through its subsidiaries. Ward Dep. p. 45. (Exhibit B). Thus Rollins presents to the world that they are one unified and indistinguishable organization.

The control exercised by Rollins over the alleged lack of training of the IFC fumigators, is directly related to the breach of the defendants' duty to comply with the legal requirements imposed by the pesticide label. This breach proximately caused the loss that is the subject of this action. *Fisher*, 689 S.E.2d at 147.

In viewing the facts and the inferences drawn from the facts in the light most favorable to the Plaintiffs, there is evidence of a genuine factual dispute whether Rollins exercised the requisite control over IFC to hold Rollins liable for the acts or omissions of IFC.

29

## CONCLUSION

For all of the above stated reasons, plaintiffs respectfully request that defendants' Motion

for Summary Judgment be denied in its entirety.

This the 2nd day of January, 2014.

Respectfully submitted,

QUICK, WIDIS & NALIBOTSKY, PLLC

s/ Howard M. Widis
Howard M. Widis, Esq., NC Bar # 8094
Jay M. Goldstein, Esq., NC Bar # 22721
Quick, Widis & Nalibotsky, PLLC
2115 Rexford Road, Suite 100
Charlotte, NC 28211
Telephone: (704) 364-2500
Fax: (704) 365-8734
Email: hwidis@qwnlaw.com
       jgoldstein@qwnlaw.com
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of PLAINTIFFS'

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR

SUMMARY JUDGMENT was caused to be served electronically upon the counsel of record

stated below through the CM/ECF system, on this the 2nd day of January, 2014:

Steven B. Epstein, Esquire
Poyner Spruill LLP
301 Fayetteville St., Suite 1900
Raleigh, NC   27601
sepstein@poynerspruill.com

s/ Howard M. Widis
Howard M. Widis